UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------x

CAPITOL RECORDS, INC., et al.,              :

                          Plaintiffs,       :

                                                      **MEMORANDUM**
           -against-                        :         **DECISION AND ORDER**

MP3TUNES, LLC,                              :         07 Civ. 9931 (WHP) (FM)

                          Defendant.        :

--------------------------------------------------x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: 8/13/2009            │
└─────────────────────────────────┘
```

**FRANK MAAS,** United States Magistrate Judge.

I.      Introduction

        The plaintiffs in this action ("Plaintiffs") include five entities (the "EMI

Labels") engaged, inter alia, in the business of producing and distributing sound

recordings in the United States.  In their complaint, the Plaintiffs contend that defendant

MP3tunes, LLC ("MP3tunes") has infringed their music copyrights through the operation

of two web sites, www.sideload.com and www.mp3tunes.com.  According to the

complaint, www.sideload.com provides users with access to third-party web sites from

which they can stream and listen to music.  Users also can "sideload" music to a

permanent "locker" assigned to them at the www.MP3tunes.com website.

II.    Background

    A.    Relevant Procedural History

        In the course of discovery in this action, MP3tunes has alleged that at least some of the third-party sites from which its users stream or download music are supplying authorized versions of the EMI Labels' copyrighted music, thereby undercutting the Plaintiffs' infringement claims.  The Plaintiffs counter that even if a locker contains music that a user is entitled to have, MP3tunes has violated their copyrights by maintaining only one copy of each song on its server regardless of the number of users who download the song.  In their view, the process by which MP3tunes "de-duplicates" identical copies of music is unlawful because it enables user "A" to access music stored by user "B."

        At an earlier stage of the proceedings, MP3tunes asserted as a counterclaim that the Plaintiffs had violated the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c)(3), by sending a "takedown notice" that improperly sought to have MP3tunes remove from its site links to copyrighted works that the Plaintiffs themselves had made available for free downloading or which were otherwise lawfully available over the internet.  (Docket Nos. 51, 52).

        The counterclaim followed on the heels of a declaratory judgment action that MP3tunes previously had brought against the Plaintiffs in California.  (See Docket No. 63 Ex. 1 (Order Granting Defendants' Motion to Dismiss, No. 07CV1844 (WQH)

(S.D. Ca. Apr. 18, 2008)).  In that action, MP3tunes cited two specific works that allegedly were non-infringing as the basis for its claim that the Plaintiffs' takedown notice violated the DMCA.  That notice listed 350 "representative" songs, but demanded that MP3tunes take down links to all of the Plaintiffs' copyrighted works.  (Id. at 12). The California action was dismissed on several grounds, including (i) MP3tunes' failure to identify "a single track . . . [as] definitely lawful, non-infringing, and wrongly included in the cease-and-desist letter," (id. at 12), and (ii) the lack of materiality of any lawful works mistakenly included in the Plaintiffs' takedown notice in light of the breadth of the infringement that the Plaintiffs alleged, (id. at 13).

On March 3, 2009, Judge Pauley, to whom this case is assigned, dismissed MP3tunes' DMCA counterclaim because MP3tunes' allegation that there were five additional allegedly lawful songs on the list annexed to the Plaintiffs' takedown notice did not "transform the counterclaim in any meaningful way from the DMCA claim dismissed in the California action" and, therefore, was foreclosed under the doctrine of issue preclusion.  (Docket No. 73 at 5).  Judge Pauley also declined to allow MP3tunes to amend its counterclaim to include additional allegations regarding the Plaintiffs' alleged distribution of their music for free over the internet, reasoning that this amounted to no more than an allegation that "some of the songs on the representative list might be non-

3

infringing," a claim he deemed "too speculative to meet the <u>Twombly</u> standard."[1]  (<u>Id.</u> at 6).

       B.      <u>Evolution of Present Discovery Disputes</u>

       While the Plaintiffs' motion to dismiss the counterclaims was pending, Judge Pauley referred this case to me to resolve all of the parties' discovery disputes. (<u>See</u> Docket No. 67).[2]  Thereafter, I held a conference on February 18, 2009, to address several issues concerning electronically-stored information ("ESI").  Prior to that conference, the Plaintiffs had requested MP3tunes to produce, <u>inter alia</u>, (i) "all [d]ocuments concerning the functionality, development, and operation of MP3tunes' storage of [u]ser [f]iles; sideload feature; and streaming, play, download, and locker-sync features," and (ii) all communications involving MP3tunes' principal, Michael Robertson ("Robertson"), and three other persons concerning the "functionality, structure, operations, or source code of MP3tunes."  (Counsels' Jnt. Letter to the Court, dated Jan. 27, 2009, at 5, 7 (quoting Pls.' Doc. Request Nos. 14, 15)).  MP3tunes objected to these requests as overbroad and unduly burdensome because they would require the company "to turn over each and every document and every byte of electronic data in MP3tunes' possession."  (<u>Id.</u> at 6).

---

[1]     <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007).

[2]     Judge Pauley previously had referred the case to me to resolve other discovery disputes.  (<u>See</u> Docket Nos. 35, 45).

During the conference, I concurred that the Plaintiffs' reference to the "operation" of the MP3tunes' website made the request overbroad.  (See 2/18/09 Tr. 15). I therefore urged the parties to develop agreed search terms which would focus on the macro level of MP3tunes' software by requiring MP3tunes to produce documents relating to the design of its site.  (See, e.g., id. at 15 ("Well, all documents concerning the design presumably would get you any that say we need to design this to do X because of Y."). The EMI Labels' counsel responded, "[P]articularly given the fact that we have a transcript of this hearing, . . . I'm comfortable with that."  (Id. at 15-16).  Significantly, counsel for MP3tunes also expressed agreement with this proposed course of action.  (See id. at 20 ("We are fine with developing search terms for e-mails if we strike the word operation, just about the design and development of the . . . software.") (emphasis added), 21 ("Our position is we object to the reference to operation and . . . to streaming.  And beyond that, we're willing to work with the other side."); see also id. at 22 (remarks of the Court:  "[If] we come up with a universe of names, and search terms that relate to the design of these aspects of the MP3tunes website, maybe we can move the ball forward.")).

Subsequently, rather than sitting down with the Plaintiffs' counsel to agree on search parameters and terms, MP3tunes' counsel directed his client to conduct a search of MP3tunes' emails in April 2009 using the word "design" as the only search term.  (See letter from Andrew H. Bart, Esq., to the Court, dated June 12, 2009 ("Bart Letter"), at 2;

6/15/09 Tr. 13).  Remarkably, when I questioned the wisdom of that decision during a

subsequent telephone conference on June 15, 2009, MP3tunes' attorney suggested that he

actually considered this one-word search to be "overly broad."  (6/15/09 Tr. 13-15).  After

I observed that MP3tunes' unilateral decision regarding its search reflected a failure to

heed Magistrate Judge Andrew Peck's recent "wake-up call" regarding the need for

cooperation concerning e-discovery, see William A. Gross Constr. Assocs., Inc. v.

American Mfrs. Mut. Ins. Co., 256 F.R.D. 134 (S.D.N.Y. 2009); see also Sedona

Conference Cooperation Proclamation 2 (2008),

http://www.thesedonaconference.org/content/tsc_cooperation_proclamation/proclamation

.pdf (last visited August 11, 2009), MP3tunes' counsel apologized for not having also

used the word "development" as a search term.  (6/15/09 Tr. 16).  The references to

"design and development" during the earlier conference, however, clearly constituted an

attempt to describe the subjects that MP3tunes' search of its email files should cover, and

was not intended to be an all-inclusive list of search terms.  (See 2/18/09 Tr. 20).

        Following the disclosure of MP3tunes' single-word search, I directed

counsel to confer further in an attempt to agree on search terms which would elicit emails

concerning the design and development of MP3tunes' software, failing which the parties

were to send me a list of their agreed and disputed search terms.  (Docket No. 82 ¶ 1).

After conferring, the parties were able to agree on nine search terms, but an additional

thirty terms remained in dispute.  (See letter from Steven B. Fabrizio, Esq., to the Court,

dated June 18, 2009 ("Fabrizio 6/18 Letter"), at 3-6). The Plaintiffs complained that the agreed terms related solely to their "allegation that MP3tunes makes a single file available to multiple users" and did not address other aspects of their infringement claims, such as "sideloading," which they described as the "process of transferring a file from somewhere on the [i]nternet to an MP3tunes locker." (Id. at 6). The Plaintiffs also provided a chart identifying each search term they proposed and, if it was disputed, the basis for their request that it be employed. (Id. at 3-6).

MP3tunes argued that many of the additional search terms sought by the Plaintiffs – such as "stream*" or "download*" – were so integral to their business that they would generate "thousands upon thousands" of responsive emails. (Letter from John Dellaportas, Esq., to the Court, dated June 18, 2009, at 2). MP3tunes further objected that searching for terms such as "copyright" would yield "hundreds if not thousands" of privileged emails. (Id.). Finally, MP3tunes objected on relevance and burden grounds that the Plaintiffs were improperly seeking to increase the number of email custodians whose files had to be searched from seven to thirteen, "adding six low-level employees who had no control over software design or development." (Id. at 1).[3]

---

[3]     MP3tunes' counsel also complained that the EMI Labels' counsel was refusing to confer in good faith about any issues other than its own proposed email searches. (See id.). In a subsequent letter, the EMI Labels' counsel disputed this claim. (See Fabrizio 6/18 Letter). As I indicated during a conference with counsel on June 19, 2009, if such disputes persist, I will "require that all meet and confers be in person and that they be videotaped." (See 6/19/09 Tr. 2). While this undoubtedly would be an expensive process, it will enable me to determine definitively who said what during future conferences among counsel.

Accompanying the MP3tunes letter was a declaration by MP3tunes' principal, Robertson, that addressed the allegedly "crushing" burdensomeness of the Plaintiffs' proposed additional keyword searches.[4] (See Robertson Decl., dated June 18, 2009, ¶ 4). Robertson noted that MP3tunes relies on Google to host and manage its email accounts and that its current staff of only five employees would have to conduct manual searches for each proposed search term because "Google offers no ability to search all accounts for a given search term." (Id. ¶ 5). Robertson claimed that this process would consume one to two hours for each email user whose records were sought and require 507 separate searches, or a total of as much as three months of seven-day work-weeks by an MP3tunes employee working twelve-hour days. (Id. ¶¶ 5, 6). Despite this alleged burden, Robertson indicated that a search restricted to the nine agreed search terms and the seven users originally proposed, while still posing a "tremendous burden," would be manageable. (Id. ¶ 9). Finally, Robertson argued that the narrower search that MP3tunes proposed would be sufficient because the remaining thirty terms had nothing to do with the de-duplication issue that he understood formed the "basis for [P]laintiffs' case." (Id. ¶ 10).

---

[4]     Robertson originally was named in the complaint as a codefendant. On September 29, 2008, Judge Pauley dismissed the claims against Robertson on the ground that this Court lacked personal jurisdiction over him. (Docket No. 48). More recently, the Plaintiffs have sought to amend their complaint to bring Robertson back into the case as a defendant. (See Docket Nos. 91-94).

The day after MP3tunes sent its letter and the accompanying Robertson Declaration, I held a telephone conference during which it became clear that MP3tunes' burdensomeness objections were overblown.  In particular, Robertson's claim that it would take a minimum of three months for an MP3tunes employee to comply with the Plaintiffs' email-related document requests proceeded on the (unstated) assumption that MP3tunes would, in effect, have to produce a separate transaction register for each term searched and could not join terms together to limit the number of searches.  Once the Plaintiffs and the Court confirmed that search terms could be strung together so long as each keyword was searched, MP3tunes' burdensomeness argument essentially evaporated, leaving MP3tunes with only its relevance and privilege objections.

For its part, MP3tunes complains about the EMI Labels' alleged lack of diligence regarding their own email production.  When I inquired during a conference on February 25, 2009, about the difficulty of searching for certain emails requested by MP3tunes, the EMI Labels' counsel explained that this issue had arisen in prior litigations in which they had to "image the hard drives of relevant custodians and do searches off of those hard drives" because there was no "centralized server or . . . set of servers that would enable [them] to short-circuit the effort."  (2/25/09 Tr. 8).  While this representation concerning the process that the EMI Labels previously employed appears to be accurate, it told only half the story.  Subsequently, when a corporate representative of the EMI Labels was deposed pursuant to Rule 30(b)(6) of the Federal Rules of Civil

9

Procedure, he explained that the EMI Labels maintained fifteen servers providing email service using Exchange 2003 software to more than 4,000 users.  (Dep. of Michael Ogryzlo, taken on June 2, 2009 ("Ogryzlo Dep."), at 54-55, 58).  Those email servers are backed up each week-night, as well as weekly, monthly, and quarterly.  (Id. at 63, 66-67). The monthly and quarterly backups are stored, either on- or off-site for at least seven years.  (Id. at 67).  In addition, EMI stores the then-active emails of all of its departing employees on CDs kept in its human resources files.  (Id. at 80, 81, 105).

The Rule 30(b)(6) witness testified that it would be extremely time-consuming to search the backups, but noted that the active emails of groups of ten users at a time could be searched simultaneously using Microsoft Outlook's advanced search functions.  (Id. at 103-04).  He claimed, however, that this process would take a day or two to complete for each keyword (and even longer if the search involved a keyword string).  (Id.).  The witness nevertheless conceded that the EMI Labels could combine the active email files of as many as 100 users in a single file not exceeding twenty gigabytes and conduct group searches, provided they had "a fair bit of time."  (Id. at 109-10).  After he made this statement, the witness was not asked, nor did he volunteer, how much time this process would entail.

Following the June 15 telephone conference, the EMI Labels made further submissions in which they allege that their situation differs from that of MP3tunes because they already have conducted a search for the ESI sought by MP3tunes – albeit, a

10

manual one.  (See letter from Mr. Fabrizio to the Court, dated June 25, 2009 ("Fabrizio

6/25 Letter"), at 2) ("[T]he EMI Labels already have conducted manual searches,

including emails for the relevant custodians, and produced documents responsive to those

requests.").  The EMI Labels further contend that they should not be required to search

their ESI for emails relating to "all senior marketing and management personnel"

because, in their view, a search of the files of the ten "most senior marketing persons"

would suffice.  (Id.).  With respect to MP3tunes' request for searches related to the EMI

Labels' contracts and communications with content delivery networks concerning free

music downloads, the EMI Labels propose in their letters to search manually for contracts

first, reasoning that if, "as suspected, there are no such contracts," email searches for

communications related to those contracts would be unnecessary.  (Id. at 3).

     Interestingly, although the EMI Labels claimed that they were unable to

conduct centralized searches of their servers, they also sought to add Boolean connectors

to MP3tunes' proposed search terms to narrow the scope of the required searches.  (Id.).

The EMI Labels also argued that certain search terms proposed by MP3tunes would yield

irrelevant documents because MP3tunes' DMCA counterclaim had been dismissed and

because the DMCA allegedly requires only that a takedown notice certify a requestor's

good faith, rendering actual good faith irrelevant.  (Id. at 4-5).

     Finally, on June 25, 2009, MP3tunes indicated that it had "withdrawn for

now its request that the EMI Labels search backup tapes for any archived emails" because

their Rule 30(b)(6) witness "testified that to do so would impose an undue burden."

(Letter from Mr. Dellaportas to the Court, dated June 25, 2009 ("Dellaportas 6/25

Letter"), at 2).

III.     Discussion

        A.     MP3tunes

                Had the parties focused their attention on discussing their differences, rather

than drafting dueling epistles for submission to the Court, MP3tunes undoubtedly would

have realized that the EMI Labels were not asking to be provided with a transaction

history for each search term, so long as they received assurances that the search

methodology that MP3tunes employed would lead to the production of all responsive

emails.[5]  As noted above, now that this has been clarified, MP3tunes no longer argues that

the mere task of conducting the searches sought by the EMI Labels is unduly

burdensome.  Nevertheless, MP3tunes apparently adheres to its claims that the thirty

disputed search terms will not lead to the discovery of admissible evidence, and that they

should not be required to search the files of six low-level employees who were not

architects of the MP3tunes software development program.  MP3tunes also continues to

raise concerns about the burden imposed by requests for potentially-privileged

documents.

_____

        [5]     Specifically, Plaintiffs' counsel expressed concern that Robertson, "an interested
party in this litigation, [had] conducted the search himself and determined what emails were
responsive and would be produced."  (Bart Letter at 3).

Turning first to the relevance argument, MP3tunes proceeds on the assumption that this case concerns only (or at least principally) alleged copyright infringement arising out of the de-duplication of identical files stored in music lockers by more than one user. The Plaintiffs' complaint goes well beyond that, however, alleging that the streaming and sideloading of the Plaintiffs' copyrighted works itself constitutes copyright infringement. (See, e.g., Compl. ¶ 27). Each of the thirty disputed terms is relevant to one or more of these additional claims. Accordingly, MP3tunes will be required to run all of the searches requested by the Plaintiffs. If a search using a particular search term proves unwieldy, MP3tunes of course remains free to raise its concerns with the Plaintiffs and, if a suitable compromise cannot be reached, to approach the Court for further rulings.

With respect to the issue of custodians, it may well be, as MP3tunes argues, that only the more senior present or former MP3tunes employees sent or received emails that are relevant to the issues in this case. (See letter from Mr. Dellaportas to the Court, dated June 26, 2009 ("Dellaportas 6/26 Letter"), at 7). By the same token, however, it also may be true that employees at that level took care not to say anything incriminating and that lower-level employees were less guarded in their email communications. Although the EMI Labels may have increased the size of the group that they are asking to have searched, MP3tunes has not shown that the production of all of the requested employees' email communications would be unduly burdensome or that a search of their

13

files would not potentially yield relevant information.  MP3tunes is therefore directed to search the email files of each of the custodians identified by the Plaintiffs.

Finally, turning to the privilege argument, it obviously is correct that at some point in most civil suits the focus of the principals' discussions shifts from the acts or omissions giving rise to the claims to the prosecution or defense of the lawsuit.  Here, that transition certainly would have taken place by the time this action was filed, but arguably may have occurred earlier since the parties had a prior skirmish in California.  Therefore, to minimize the burden on MP3tunes, the Court will not require it to record on its privilege log any attorney-client communications or work product documents created after the date the California declaratory judgment action was filed.  This same privilege log cutoff date also will apply to the EMI Labels' email production.[6]

---

[6]    During the June 19 telephone conference, MP3tunes urged the Court to adopt a cutoff date as much as one month earlier to account for its discussions with counsel leading up to the California suit.  Inasmuch as Robertson is alleged to have been the principal MP3tunes contact with counsel, using the date that the California action was filed does not appear to be unduly burdensome.  Furthermore, if MP3tunes wishes to ensure that it is able to make a timely production despite the need to review its emails for privilege issues, it remains free to confer with the Plaintiffs with respect to a clawback agreement to be "so ordered" by the Court.  See Fed. R. Evid. 502(d) ("A Federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court – in which event the disclosure is also not a waiver in any other Federal or State proceeding."); id. advisory committee's note (parties may enter into clawback agreements allowing them to "forego privilege review altogether in favor of an agreement to return inadvertently produced privilege documents") (citing Zubulake v. UBS Warburg LLC, 216 F.R.D. 280, 290 (S.D.N.Y. 2003).

B.    EMI Labels

Unlike MP3tunes, the EMI Labels continue to suggest that the discovery sought by their adversary is unduly burdensome.  Rule 26(b)(2)(B) of the Federal Rules of Civil Procedure states that a "party need not provide discovery of [ESI] from sources that the party identifies as not reasonably accessible because of undue burden or cost." Fed. R. Civ. P. 26(b)(2)(B).  Pursuant to the Rule, when an adverse party seeks to compel the production of such material, the party resisting discovery must show that the material sought is "not reasonably accessible because of undue burden or cost."  Id.  If that showing is made, the burden shifts to the requesting party to show good cause for the production of the not-reasonably-accessible ESI.  Id.  In deciding whether the requisite showing has been made, the Rule requires the Court to consider – as it must in any discovery dispute – whether (i) "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;" (ii) "the party seeking discovery has had ample opportunity to obtain the information by discovery in the action;" or (iii) "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."  Id. 2(B), (C).

In <u>W.E. Aubuchon Co., Inc. v. BeneFirst, LLC</u>, 245 F.R.D. 38, 43 (D. Mass. 2007), the court noted its dismay that the party opposing discovery of its ESI had organized its files in a manner which seemed to serve no purpose other than "to discourage audits and the types of inquiries" that the requesting party had made, but nonetheless found that retrieval of the data "would involve undue burden or cost," and that the ESI (consisting of insurance claim forms) was "not reasonably accessible within the meaning of [Fed. R. Civ. P.] 26(b)(2)(B)." <u>Id.</u>  Similarly, in this case, the EMI Labels, which employ approximately 120 people in the global infrastructure services field and "probably have [two] terabytes" of data on their servers, (<u>see</u> Ogryzlo Dep. at 58, 120), host no ediscovery software on their servers and apparently are unable to conduct centralized email searches of groups of users without downloading them to a separate file and relying on the services of an outside vendor.  (<u>Id.</u> at 68, 84, 93).

The day undoubtedly will come when burden arguments based on a large organization's lack of internal ediscovery software will be received about as well as the contention that a party should be spared from retrieving paper documents because it had filed them sequentially, but in no apparent groupings, in an effort to avoid the added expense of file folders or indices.  Nonetheless, at this stage in the development of ediscovery case law, the Court cannot say that the EMI Labels' failure to acquire such software and to configure its systems to permit centralized email searches means that its burdensomeness arguments should be disregarded.  I therefore conclude that the EMI

16

Labels' email files that MP3tunes seeks to search are not reasonably accessible within the meaning of Rule 26(b)(2)(B).

The burden thus shifts to MP3tunes to establish good cause for the additional email discovery it seeks. Even if that showing is made, the Court has the discretion to impose conditions on any discovery it orders. Fed. R. Civ. P. 26(b)(2)(B). As set forth below, the parties' discussions in recent weeks evidently have narrowed their differences with respect to the EMI Labels' ESI, but several of MP3tunes' discovery requests remain in dispute. The parties also disagree as to the number of custodians whose active email files should be searched. I therefore turn to the issues that still require resolution.

1.    Document Request No. 3

Document Request No. 3 seeks documents concerning the EMI Labels' contracts and communications with content delivery networks ("CDNs") in an effort to bolster MP3tunes' defense that it cannot be held liable under the DMCA because much of the content on its site was properly obtained from CDNs. (Dellaportas 6/25 Letter at 4-5). "During subsequent negotiations, MP3tunes limited this request to 'contracts and communications between [any EMI Party and] any [CDN] related to free downloads of music.'" (Id. at 4 n.2). Pursuant to this narrowed request, MP3tunes now seeks to have the EMI Labels conduct searches using six search terms related to CDNs.

17

In response, the EMI Labels first contend that they should be permitted to search manually for contracts with CDNs related to free downloads of music, and that if no such contracts exist, "email searches for communications related to those contracts would be unnecessary." (Fabrizio 6/25 Letter at 3). The EMI Labels argue that this approach is appropriate because they believe there are no such contracts. (Id.). MP3tunes has not shown any basis to conclude otherwise or that an electronic search would be superior to a manual search. The EMI Labels therefore will not be required to search electronically for contracts with CDNs concerning free downloads, provided that they undertake a thorough manual search.[7]

Turning to the EMI Labels' communications with CDNs, the six search terms that MP3tunes proposes to have the EMI Labels use include, inter alia, "content*delivery*network." Since the document request has been limited to free downloads, the EMI Labels seek to have the responsive documents limited to those that also contain the terms "promotional*download" or "free*download." MP3tunes argues that this would undercut its ability to show, as part of its DMCA defense, that it has "no way of knowing which songs on the internet are unauthorized without express guidance from the EMI Labels [that] they have refused to provide." (Dellaportas 6/25 Letter at 5).

---

[7]    In his letter dated June 26, 2009, MP3tunes' counsel suggests that the EMI Labels' claim that no such contracts exist must be incorrect because Robertson has located links for seven allegedly free downloads of the Plaintiffs' songs that are available from a CDN known as "Akamai." (Dellaportas 6/26 Letter at 5). Assuming that this downloadable internet content exists, it still does not establish that contracts relating to free downloads exist.

18

Whatever the merits of that argument may be, MP3tunes previously had agreed to limit Document Request No. 3 to free music downloads. Consequently, the EMI Labels may restrict their production of emails responsive to the six search terms that MP3tunes suggests to those that also contain the terms "free" <u>or</u> "promotional" <u>or</u> "download."

    2.    <u>Document Request Nos. 7 and 9</u>

Document Request Nos. 7 and 9 seek, respectively, "[a]ll documents concerning any 'take down' notices sent under the [DMCA] by any person to MP3tunes," and "[a]ll Documents concerning any good faith investigation conducted by the EMI Parties prior to sending any 'take down' notices to MP3tunes." (Fabrizio 6/25 Letter at 4). MP3tunes seeks the emails responsive to these requests on the theory that they may be relevant to its affirmative defense alleging that the EMI Labels' takedown notices were not sent in good faith. (Dellaportas 6/25 Letter at 6). The EMI Labels respond that Section 512(c) of the DMCA requires only that a takedown notice contain a "<u>statement</u> that the complaining party has a good faith belief that the use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law." 17 U.S.C. § 512(c)(3)(A)(v) (emphasis added). Accordingly, in the EMI Labels' view, once the statement is made, whether the complaining party in fact has a good faith basis for its request is, as a matter of law, not relevant. (<u>See</u> Fabrizio 6/25 Letter at 5-8).

Neither side has cited any authority specifically addressing this issue. In any event, there is no need to determine at this preliminary stage whether a party

receiving a takedown notice can contest the complaining party's good faith because MP3tunes also seeks the discovery in an effort to show that the EMI Labels could have sent a takedown notice that listed all of the allegedly infringing works.  (See Dellaportas 6/26 Letter at 6).  Additionally, as MP3tunes notes, if the EMI Labels were unable to determine the universe of songs that infringed the EMI Labels copyrights, this would certainly "undercut [their] assertions that [MP3tunes] should be required to more proactively monitor its site for infringing content."  (See id. at 2 (citing Viacom Int'l, Inc. v. YouTube, Inc., No. C-08-80211 Misc. JF (PVT) 2009 WL 102808, at *4 (N.D. Cal. Jan. 14, 2009)).

That said, the search terms that MP3tunes proposes clearly are overbroad and would likely require the itemization of a raft of privileged documents.  The search terms that MP3tunes proposes are "mp3tunes," "Robertson," "take*down," "Digital Millenium (sic) Copyright Act," and "DMCA."  (See Dellaportas 6/25 Letter at 5).  Document Request Nos. 7 and 9, however, both relate to MP3tunes.  Takedown notices sent to other web sites consequently are irrelevant.  The EMI Labels therefore will be required to produce only those emails containing the terms "take*down," "Digital Millenium (sic) Copyright Act," or "DMCA" and  "mp3tunes," or "Robertson."

### 3.    Document Request No. 12

Document Request No. 12, as modified, calls for the production of all emails containing the search terms "locker," "lala," "media*master," "skydrive,"

"Xdrive," "repeat*downloads," "omnifone," "spotify," and "7digital." (<u>Id.</u> at 6).  During

the February 25 conference, I directed the EMI Labels to conduct a search for any

documents reflecting business arrangements with any of the content delivery networks

specified in this request and to produce responsive emails, provided they did not relate to

litigation.  (2/25/09 Tr. 48-49).  The EMI Labels subsequently conducted a search and

confirmed that they had one such arrangement.  The EMI Labels are further directed, if

they have not already done so, to produce any emails concerning that arrangement which

do not refer to litigation.  Beyond that, I am not prepared to revisit my prior rulings with

respect to this document request, nor will I require the EMI Labels to produce (or list on a

privilege log) every email containing the word "locker."  The issue in this case is the

lawfulness of MP3tunes locker service, not the manner in which other locker services

conduct their business.

        4.    <u>Custodians</u>

       The parties' final discovery dispute concerning the EMI Labels relates to

the custodians whose active email accounts are to be searched.  MP3tunes asks that the

EMI Labels be required to search the files of their "current and former senior

management and marketing personnel," noting that the EMI Labels have yet to produce

previously-requested information concerning their organizational structure and staffing

that might allow MP3tunes to narrow its request.  (Dellaportas 6/25 Letter at 3).  The EMI

Labels counter that a search of ten custodians' files should be "more than sufficient to

cover the key personnel," especially in light of the manual searches previously conducted. (Fabrizio 6/25 Letter at 2). They note that all but one of the EMI Labels is operated centrally by shared personnel, and that any operations related to online or digital music for those companies would be handled by the Digital Marketing or Digital Business Development departments, which collectively "probably have a half dozen senior-level personnel." (Id. at 2-3). They further state that the remaining EMI Labels plaintiff "would only have a couple of senior level personnel involved with [i]nternet music issues." (Id. at 3 n.2). MP3tunes' reluctance to accept the EMI Labels' representations is understandable in light of their apparently conceded failure to respond fully to requests seeking more detailed information about their personnel.[8]

At an earlier stage of the parties' discussions, however, MP3tunes evidently proposed that the search be restricted to the "top [twenty] marketing persons during the relevant period." (Fabrizio 6/25 Letter at 2). In the spirit of compromise, the Court will direct that the emails of the fifteen marketing persons with the most senior titles be searched. Additionally, because it may not be self-evident who these persons are, the EMI Labels are directed to produce documents sufficient to enable MP3tunes to identify the twenty most senior marketing employees. Thereafter, the parties are directed to

---

[8]     As previously noted, according to MP3tunes, the EMI Labels "have neither produced an organization chart nor yet provided responsive information to Interrogatory No. 3, . . . which . . . calls for the identification of all senior marketing and management employees who have any information related to the distribution of free downloads." (Dellaportas 6/25 Letter at 3).

confer and agree as to whose files will be searched.  If counsel are unable to agree, they shall submit a joint letter as soon as possible explaining the areas of agreement and dispute.

IV.    <u>Conclusion</u>

For the foregoing reasons, it is hereby ordered that:

A.    MP3tunes

1.    shall conduct the thirty additional searches requested by the Plaintiffs; and

2.    shall search the email files of each of the custodians identified by the Plaintiffs.

B.    The EMI Labels

1.    as to Document Request No. 3, may restrict their production of emails responsive to the six search terms that MP3tunes suggests to those that also contain the terms "free" or "promotional" or "download";

2.    as to Document Request No. 7 and 9, need only produce emails containing the terms "take*down," "Digital Millenium (sic) Copyright Act," or "DMCA" and  "mp3tunes," or "Robertson";

3.    as to Document Request No. 12, need only produce any nonprivileged emails concerning the one CDN business arrangement that they previously identified;

4.    shall produce documents sufficient to enable MP3tunes to identify the Plaintiffs' twenty most senior relevant marking employees, and confer with MP3tunes to select fifteen employees whose emails will be searched.  In the event of a dispute, counsel shall submit a joint letter as soon as possible.

C. Each party is exempted from recording on its privilege log any attorney-client communications or work product documents created after the date the California declaratory judgment action was filed.

SO ORDERED.

Dated:   New York, New York
         August 13, 2009

                                    FRANK MAAS
                                    United States Magistrate Judge

Copies to:

Hon. William B. Pauley, III
United States District Judge

Andrew H. Bart, Esq.
Steven B. Fabrizio, Esq.
Jenner & Block LLP
Fax: (212) 891-1699

Frank P. Scibilia, Esq.
Pryor Cashman LLP
Fax: (212) 798-6375

John Dellaportas, Esq.
Duane Morris LLP
Fax: (212) 692-1020

24