**DUANE MORRIS** LLP
Gregory P. Gulia
John Dellaportas
Vanessa Hew
R. Terry Parker
1540 Broadway
New York, NY 10036
(212) 692-1000

Edward M. Cramp *(pro hac vice)*
Michelle Hon *(pro hac vice)*

*Counsel for Defendants*


# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, INC., CAROLINE RECORDS, INC.,EMI CHRISTIAN MUSIC GROUP INC., PRIORITY RECORDS LLC, VIRGIN RECORDS AMERICA, INC., BEECHWOOD MUSIC CORP., COLGEMS-EMI MUSIC INC., EMI APRIL MUSIC INC., EMI BLACKWOOD MUSIC, EMI FULL KEEL MUSIC, EMI GOLDEN TORCH MUSIC CORP., EMI LONGITUDE MUSIC, EMI VIRGIN MUSIC, INC., EMI VIRGIN SONGS, INC., EMI AL GALLICO MUSIC CORP., EMI ALGEE MUSIC CORP., EMI FEIST CATALOG, INC., EMI GOLD HORIZON CORP., EMI GROVE PARK MUSIC, INC., EMI HASTINGS CATALOG, INC., EMI MILLS MUSIC, INC., EMI MILLER CATALOG, INC., EMI ROBBINS CATALOG, INC., EMI U CATALOG, INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN GEMS-EMI MUSIC, INC., STONE AGATE MUSIC, and STONE DIAMOND MUSIC, <br><br> Plaintiffs, <br><br> v. <br><br> MP3TUNES, LLC, and MICHAEL ROBERTSON, <br><br> Defendants. | CIVIL ACTION NO. 07-Civ. 9931 (WHP) <br> ECF Case <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ...........................................................................1

MATERIAL UNDISPUTED FACTS .................................................................3

I.    MP3tunes Provides User-Directed Internet Services at MP3tunes.com and
      Sideload.com...........................................................................................................3

II.   MP3tunes Derives No Direct Financial Benefit From Any Alleged Infringement ............6

III.  MP3tunes Maintains a Comprehensive Policy and Practice of Prohibiting
      Infringing Activity ..................................................................................................7

IV.   In 2007, Two EMI Entities Sent Take-Down Notices to MP3tunes, Which
      Promptly Complied With Them................................................................................8

V.    Plaintiffs Virally Market Free MP3 Downloads ................................................9

VI.   Deduplication Does Not Constitute Music File Sharing....................................12

ARGUMENT ....................................................................................................13

I.    The DMCA Immunizes MP3tunes From All of Plaintiffs' Claims...................13

      A.    MP3tunes' Meets the Threshold Qualifications for the DMCA's Safe
            Harbors Set by 512(k) and (i) .............................................................. 13

            1.    MP3tunes is a "Service Provider"............................................. 14

            2.    MP3tunes Has a Reasonable Repeat-Infringer Policy ............. 14

            3.    MP3tunes Accommodates Standard Technical Measures ....... 15

      B.    MP3tunes Meets the Conditions of Section 512(c) ............................ 15

            1.    MP3tunes Did Not Have Actual or Constructive Knowledge of the
                  Specific Infringements Alleged in This Suit.............................. 16

                  a.    Plaintiffs Did Not Send DMCA Take-Down Notices to
                        Provide MP3tunes with Knowledge of the Specific
                        Infringement at Issue in this Litigation.........................17

                  b.    Knowledge of the Specific Infringements Cannot Be
                        Construed from Inadequate Notices................................17

             i.      Insufficient Notices Sent by EMI Music Group North America and EMI Entertainment World Are Inadequate to Impute Knowledge under the DMCA .........17

             ii.     Plaintiffs' Viral Marketing Practices Make It Impossible for MP3tunes to Have Apparent Knowledge of Specific Infringing Activity ......................20

         c.    Plaintiffs' Viral Marketing Practices Make It Impossible for MP3tunes to Have Constructive Knowledge Specific Allegedly Infringing Activity ................................................................. 20

     2.     MP3tunes Expeditiously Removed the Specific Infringements for Which it Was Properly Notified ............................................................. 22

     3.     MP3tunes Meets Section 512(c)(1)(B)'s Requirement for DMCA Safe Harbor ........................................................................................... 22

         a.    MP3tunes Cannot Control the Allegedly Infringing Activity........23

         b.    MP3tunes Does Not Benefit From the Allegedly Infringing Activity .................................................................................25

  C.     MP3tunes Meets the Requirements of § 512(d) ................................... 25

  D.     The DMCA Safe Harbors Apply to Claims of Infringements of Sound Recordings Authored Prior to 1972 ...................................................... 26

II.    MP3tunes Is Not Liable for Direct Infringement...............................................28

  A.     Direct Infringement Requires Volitional Conduct................................. 28

  B.     MP3tunes Has Not Engaged in the Relevant Volitional Conduct ....................... 29

III.   MP3tunes Is Not Liable for Contributory Infringement .....................................29

IV.   MP3tunes Is Not Liable for Vicarious Infringement .........................................31

V.    Plaintiffs' Unfair Competition Claim Fails........................................................32

VI.   Plaintiffs Cannot Establish Full Copyright Ownership ..................................... 33

CONCLUSION...................................................................................................................34

# TABLE OF AUTHORITIES

**Cases**

*In re Aimster,*
  334 F.3d 643 (7th Cir. 2003) ................................................................................30

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)..............................................................................................13

*Arista Records,. Inc. v. MP3Board, Inc.,*
  2002 U.S. Dist. LEXIS 16165 (S.D.N.Y. Aug. 28, 2002)..............................19-20

*Arista Records LLC v. Lime Group LLC,*
  2010 U.S. Dist. LEXIS 46638 (S.D.N.Y. May 11, 2010) ....................................28

*Aymes v. Bonelli,*
  980 F.2d 857 (2d Cir. 1992)..................................................................................34

*Ballas v. Tedesco,*
  41 F. Supp. 2d 531 (D.N.J. 1999) .........................................................................33

*Banff, Ltd. v. Limited, Inc.,*
  869 F. Supp. 1103 (S.D.N.Y. 1994).......................................................................31

*Capitol Records, Inc. v. MP3tunes, LLC,*
  2009 U.S. Dist. LEXIS 96521 (S.D.N.Y. Oct. 16, 2009) .....................................16

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  372 F.3d 471 (2d Cir. 2004)..................................................................................32

*Capitol Records, Inc. v. Naxos of Am., Inc.,*
  4 N.Y.3d 540 (2005) ..............................................................................................32

*Cartoon Network LP, LLP v. CSC Holdings, Inc.,*
  536 F.3d 121 (2d Cir. 2008)..................................................................................29

*Computer Assocs. Int'l, Inc. v. Computer Automation, Inc.,*
  678 F. Supp. 424 (S.D.N.Y. 1987).........................................................................32

*Comty. for Creative Non-Violence v. Reid,*
  490 U.S. 730 (1989)...............................................................................................33

*Corbis Corp. v. Amazon.com,*
  351 F. Supp. 2d 1090 (W.D. Wash. 2004)....................................................*Passim*

*Costar Group, Inc. v. Loopnet, Inc.,*
  164 F. Supp. 2d 688 (D. Md. 2001) ............................................................23, 25, 28

*Ellison v. Robertson,*
    357 F.3d 1072 (9th Cir. 2004) ...........................................................................13

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.,*
    499 U.S. 340 (1991)............................................................................................33

*Field v. Google, Inc.,*
    412 F. Supp. 2d 1106 (D. Nev. 2006)...........................................................14, 28

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,*
    443 F.2d 1159 (2d Cir. 1971)..............................................................................29

*Hendrickson v. eBay Inc.,*
    165 F. Supp. 2d 1082 (C.D. Cal. 2001) .........................................................16, 18

*Io Group, Inc. v. Veoh Networks, Inc.,*
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) .....................................................*Passim*

*Lulirama Ltd. v. Axcess Broadcast Servs.,*
    128 F.3d 872 (5th Cir. Tex. 1997) ......................................................................33

*Newborn v. Yahoo!, Inc.,*
    391 F. Supp. 2d 181 (D.D.C. 2005) ....................................................................28

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    487 F.3d 701 (9th Cir. 2007) .........................................................................13, 20

*Perfect 10, Inc. v. Amazon.com, Inc.,*
    508 F.3d 1146 (9th Cir. Cal. 2007).................................................................26, 31

*Perfect 10, Inc., v. Amazon.com, Inc.,* et al.,
    2009 U.S. Dist. LEXIS 42341 (C.D. Cal. May 12, 2009) ...................................20

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) .......................................................................18, 20

*Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.,*
    907 F. Supp. 1361 (N.D. Cal. 1995) ......................................................... 28-29, 31

*Sony Corp. of America, Inc. v. Universal City Studios, Inc.,*
    464 U.S. 417 (1984)........................................................................................3, 30

*Staggers v. Real Authentic Sound,*
    77 F. Supp. 2d 57 (D.D.C. 1999) ........................................................................34

*Sygma Photo News, Inc. v. High Society Magazine, Inc.,*
    778 F.2d 89 (2d Cir. 1985)..................................................................................31

iv

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
 665 F. Supp. 2d 1099 (C.D. Cal. 2009) .....................................................................14, 16, 19

*Viacom Int'l v. Youtube*,
 2010 U.S. Dist. LEXIS 62829 (S.D.N.Y. June 23, 2010) ..............................................*Passim*

## Statutes and Rules

17 U.S.C. 512(c) ...........................................................................................................*Passim*

17 U.S.C. § 101.............................................................................................................. 33-34

17 U.S.C. § 201 (a) .............................................................................................................33

17 U.S.C. § 1201...............................................................................................................27

Fed. R. Civ. P. 56(c) ...........................................................................................................13

Rule 56(b) of the Federal Rules of Civil Procedure ...................................................................1

Pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, defendants MP3tunes, Inc. ("MP3tunes") and Michael Robertson (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment in their favor on all the remaining claims in Plaintiffs[1] Second Amended Complaint (the "Complaint").

## PRELIMINARY STATEMENT

By this case, twenty-nine affiliated record companies attempt to set new precedent for copyright law.  Specifically, Plaintiffs are suing to prevent an Internet storage locker and search engine from directing users to music that has been made available for free download on the Internet—in many cases by Plaintiffs themselves—and allowing them to store their music in the cloud.  Presciently, Congress understood the practical realities of technology and therefore enacted the Digital Millennium Copyright Right Act ("DMCA"), 17 U.S.C. § 512, to safeguard the development of the Internet and the technological advancement of this country.  As Judge Stanton instructed in *Viacom Int'l v. Youtube*, 2010 U.S. Dist. LEXIS 62829 (S.D.N.Y. June 23, 2010), Congress enacted the DMCA with exactly this circumstance in mind: "[S]ervice providers must make innumerable electronic copies by simply transmitting information over the Internet . . . . [B]y limiting the liability of service providers, the DMCA ensures that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  *Id.* at *17 (citing S. Rep. No. 105-190).

With this goal in mind, the DMCA provides Internet service providers ("ISPs") like

---

[1] The term "Plaintiffs" refers to Capitol Records, Inc., Caroline Records, Inc, EMI Christian Music Group Inc., Priority Records LLC, Virgin Records America, Inc. (these five plaintiffs collectively are referred to herein as the "Labels"), Beechwood Music Corporation, Colgems-EMI Music Inc., EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI April Music Inc., EMI Blackwood Music, EMI Full Keel Music, EMI Feist Catalog, Inc., EMI Gold Horizon Corp., EMI Golden Torch Music Corp., EMI Grove Park Music, Inc., EMI Hastings Catalog, Inc., EMI Longitude Music, EMI Miller Catalog, Inc., EMI Mills Music, Inc., EMI Robbins Catalog, Inc., EMI Virgin Music, Inc., EMI Virgin Songs, Inc., EMI U Catalog, Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc., Screen Gems-EMI Music, Inc., Stone Agate Music, and Stone Diamond Music (these twenty-four plaintiffs collectively are referred to herein as the "Publishers").

MP3tunes who follow a specified notice and take-down procedure with a copyright liability safe harbor.  As Judge Stanton found, this procedure places the burden of identifying potentially infringing material squarely on copyright owners.  If the copyright owner specifically notifies an ISP of the existence and location of an allegedly infringing work on its website, and the ISP expeditiously removes it, the ISP will be immune under the DMCA.

There is no issue of material fact regarding MP3tunes' entitlement to the DMCA safe harbor, which immunizes it against all of Plaintiffs' direct, secondary and common law copyright infringement claims.  MP3tunes is an ISP which: (a) offers user-directed search and storage services; (b) does not control nor directly benefit from any infringement; and (c) lacks any actual or constructive knowledge of the specific alleged infringements.  Nor did Plaintiffs comply with DMCA procedure.  Two "EMI" entities who are not parties to this suit did send letters to MP3tunes identifying links to certain allegedly infringing material available at Sideload.com, but MP3tunes promptly removed all of those links.  Yet Plaintiffs responded by filing this lawsuit, without naming any specific infringements.  It was only a year and a half later, under Court order to identify the works at issue or see their claims waived, that Plaintiffs finally named 32,726 songs.  Almost none of these songs, however, were identified in the earlier take-down notices.  Plaintiffs, incapable or unwilling to comply with the DMCA's take-down procedure, instead opted out of the statute altogether.  Summary judgment is thus warranted.

There can be no material dispute as to the applicability of the DMCA to the facts now before this Court.  As Justice Stanton explained in *Viacom Int'l v. Youtube*, 2010 U.S. Dist. LEXIS 62829, *17, the "[DMCA] safe harbor is clear and practical: if a service provider knows (from notice from the owner or a 'red flag') of specific instances of infringement, the provider must promptly remove the infringing material. If not, the burden is on the owner to identify the infringement. General knowledge that infringement is 'ubiquitous' does not impose a duty on the

2

service provider to monitor or search its service for infringements."

In the face of this precedent, Plaintiffs now ask this Court to rewrite copyright law in a way that would grant them far more control over the Internet than Congress ever contemplated or the Courts have ever held.  This Court should deny this attempt to extend copyright law to new limits.  If Plaintiffs are not happy with the DMCA, the proper course is to continue their current lobbying effort to convince Congress to gut the statute. [2]  They may not, however, simply ignore the law and clog up the Courts with novel and dangerous theories.

Defendants merit summary judgment on non-DMCA grounds as well.  Among other things: (1) Plaintiffs' claims of allegedly direct infringements fail because there is no volitional act attributable to MP3tunes; (2) Plaintiffs' secondary liability claims fail because Plaintiffs cannot establish direct infringements and because MP3tunes is protected by the *Sony* doctrine; (3) Plaintiffs cannot establish all of the elements of their claims; and (4) MP3tunes' conduct constitutes fair use and other permitted uses.  Thus, even had the DMCA never been passed, this lawsuit would have no place in Court.  Quite simply, MP3tunes has committed no infringement, and provides a valuable service that should be free from Plaintiffs' harassment.

**MATERIAL UNDISPUTED FACTS**[3]

## I.   MP3tunes Provides User-Directed Internet Services At MP3tunes.com and Sideload.com

MP3tunes operates two separate websites:  MP3tunes.com and Sideload.com.  SUF ¶ 1. MP3tunes.com allows users to store their music collections "in the cloud"—which means that,

---

[2]   *See* "RIAA: U.S. copyright law 'isn't working'," *CNET News*, August 23, 2010, wherein Recording Industry Association of America President contends that "[t]he DMCA isn't working for content people at all" and calls for new legislation to "facilitate" cooperation between rights holders and ISPs. *See* Gulia Decl. Exh. DD.

[3]   The facts herein are set forth more fully in the accompanying Defendants' Statement of Undisputed Facts in Support of Its Motion for Summary Judgment ("SUF"), which is based on the Declarations of Michael Robertson, Douglas Reese, Gregory P. Gulia, Sarah Peyronnel; and Derek Mekkawy, all executed on October 29, 2010, along with the testimony and documents attached thereto.

rather than storing content on their local hard drive, users "upload" content to MP3tunes' storage servers on the Internet, which they can then access from any computer or mobile device with an Internet connection, in much the same way email users can access messages on Gmail or Yahoo! from any computer.  SUF ¶ 3.  This service is not unique to MP3tunes— Apple MobileMe iDisk, Microsoft SkyDrive and Google Docs all offer cloud-based storage services.  SUF ¶ 4.

The storage services offered at MP3tunes.com are user-directed.  In order to store content at MP3tunes.com, a user must first create an account by providing a valid email address and password, after which he or she may store music at MP3tunes.com in three different ways.  SUF ¶ 5.  First, the user may browse and choose files from his or her own computer to upload to his or her storage locker.  SUF ¶ 6.  Second, the user may upload his or her entire music library, for example, an iTunes library, to his or her storage locker via a synchronization function offered by MP3tunes.  SUF ¶ 7.  Third, the user may store music by loading music from other websites, like Spin.com or MTV.com, to his or her locker.  SUF ¶ 8.  The act of moving a file from a website to an MP3tunes locker is referred to as "sideloading."[4]  SUF ¶ 9.

All the content stored at MP3tunes.com is done so at the direction of its users.  MP3tunes does not control which songs users choose to store.  SUF ¶ 10.  Nor do its employees monitor the content that users upload to their lockers—indeed, it would not be possible to do so given that there are roughly 700,000 different users and millions of files.  SUF ¶ 11.  The series of events that is triggered by a user's decision to store a music file to MP3tunes.com, and ends with the storage of that file, is fully automated and does not involve the intervention or active involvement of MP3tunes personnel. SUF ¶ 12.

---

[4]   Sideloading is not a process unique to MP3tunes.  *See* http://en.wikipedia.org/wiki/Sideloading ("The term 'sideload' was coined in the late 1990's by online storage service xdrive.com as an alternative means of transferring and storing computer files. Rather than initiating a traditional file 'download' from a web/ftp site to their computer, a user could perform a 'sideload' and have the file transferred directly into their personal storage area on the service. . . . ")

A user may listen to music he or she has stored with MP3tunes.com.  To do so, however, the user must first log-in to MP3tunes.com with secured credentials.  SUF ¶ 13.  The user must then by select the desired song and click on the streaming icon.  SUF ¶ 14.  In response to the user's request, the MP3tunes system automatically streams a copy of the requested file from its servers over the Internet to the user's computer or other device.  SUF ¶ 15.

MP3tunes was conceived with the express intent to provide lawful services to music fans. SUF ¶ 16.  MP3tunes' cloud-based storage service, unlike websites like Limewire.com, is not a peer-to-peer file-sharing service.  SUF ¶ 17.  File-sharing of music files is not permitted.  It is not possible to transfer music files between lockers.  Nor can a locker be accessed by anyone other than the user because lockers are password-protected.  SUF ¶¶ 18, 62.  The accounts of offending users are terminated, and all access to offending web sites is blocked.  SUF ¶¶ 61, 67.

Sideload.com allows users to search for free music downloads that are available on the Internet.  SUF ¶ 20.  Free music downloads are made available on the Internet by small independent labels seeking inexpensive ways of promoting their music, as well as by all of the major music companies, including Plaintiffs.  SUF ¶ 22.  Plaintiffs, either directly themselves, through their artists or their managers, or through third parties, make their music available for free download all over the Internet:  at retail websites like iTunes, Amazon.com, Walmart.com, and Borders.com, at music websites like Spin.com, MTV.com, SXSW.com, and at music blogs like Stereogum.com, Pitchfork.com, and Filtermagazine.com, social networking websites like MySpace.com and Facebook.com, at artist websites, and at the websites owned and controlled by the record labels themselves, like EMI's theinsoundfromwayout.com, as well as countless other websites.  SUF ¶¶ 85-89.  No music files are stored at Sideload.com; it merely links to these third-party websites.  Thus, when a promotional MP3 download is removed from a source website like Amazon.com or MTV.com, the link on Sideload.com becomes inoperable and is

automatically removed.  SUF ¶ 25.  The links to music sites generated by searching

Sideload.com are largely the same as those found by running tailored searches on search engines

such as Google or Microsoft Bing.  SUF ¶ 22.

A user may also install the "Sideload Plug-in," a browser plug-in that enables users to

identify downloadable music files as they surf the Web.  SUF ¶ 31.  The Sideload Plug-in does

not convert a streaming file into a downloadable file, nor does it enable users to bypass controls

that copyright owners have placed on the streaming files, nor does any other function offered by

MP3tunes.  SUF ¶ 34.  The Plug-in does not circumvent digital rights management (DRM)

protections, nor does any other MP3tunes function.  SUF ¶ 35.  Rather, Sideload Plug-in merely

enables the user to more easily store already-downloadable files the user finds on third party

websites by clicking the Sideload icon next to the search results. SUF ¶ 32.

## II.   MP3tunes Derives No Direct Financial Benefit
##        From Any Alleged Infringement

MP3tunes' revenue comes only from the fees that it charges consumers for providing

storage services "in the cloud" (*i.e.*, on MP3tunes' servers).  SUF ¶ 107.  MP3tunes.com offers a

basic storage plan with two gigabytes of storage free of charge.  SUF ¶ 108.  This two-gigabyte

storage limit for free accounts applies only to files that are uploaded from users' local hard drives

but not to files that are sideloaded from the Internet.  SUF ¶¶ 109-10.  Users who seek to upload

more than two gigabytes may upgrade to premium accounts, which cost up to $12.95 per month

and offer users more storage space, as well as file back-up services. SUF ¶ 111.

Sideload.com search services are free of charge.  SUF ¶ 112.  Since the launch of the two

websites, there have never been any advertisements on either MP3tunes.com or Sideload.com.

Sideload.com benefits MP3tunes by allowing users to discover new music through free tracks

that are being promoted on the Internet and then go out into the marketplace and purchase the

music which, in turn, is stored in users' lockers at MP3tunes.com.  SUF ¶ 113.

6

### III.   MP3tunes Maintains A Comprehensive Policy And Practice Of Prohibiting Infringing Activity

MP3tunes has implemented and employs a policy that prohibits infringing activity at its websites MP3tunes.com and Sideload.com.  SUF ¶ 50.  While a small Internet start-up company like MP3tunes cannot control what each of its 700,000 users place in their storage lockers, nor review each of the millions of files placed on its system, MP3tunes takes copyright and other intellectual property laws very seriously and expects its users to do the same.  SUF ¶¶ 48, 11. This fact is made clear to the users of MP3tunes' services. SUF ¶ 48.

To combat the potential for infringement at its websites, MP3tunes requires its users to agree to its copyright policy before they may open an account with MP3tunes.  SUF ¶ 49.  Users cannot open an account without agreeing to MP3tunes' policy, which expressly prohibits users from storing content that infringes the copyright of any third party.  SUF ¶¶ 49, 50.  That policy states:  "You agree that you will not upload music and content, and will not request that any music or content be uploaded to your account maintained on the Site, that infringes the copyright or other intellectual property rights of any third party."  SUF ¶ 50.

In addition to requiring its users to be contractually bound not to use MP3tunes' services for infringement, MP3tunes constantly reminds its users of its policy by placing a Terms and Conditions link on each and every page of its websites MP3tunes.com Sideload.com.  SUF ¶ 59. Moreover, MP3tunes' employees who respond to user queries remind users that MP3tunes does not tolerate infringement.  SUF ¶ 51.  Unlike websites like Usenet, LimeWire and Grokster, MP3tunes has never allowed its users to engage in infringing activity and actively prevents users from engaging in copyright infringement on its websites.  SUF ¶ 60.

To further combat infringement, pursuant to the DMCA MP3tunes has registered an agent with the Copyright Office to receive notices of alleged infringement from copyright owners.  SUF ¶ 54.  On each and every page of its two websites, MP3tunes includes a link to its

7

Terms and Conditions wherein MP3tunes encourages copyright owners to notify its designated DMCA agent of any suspected infringing files.  SUF ¶ 59.  MP3tunes' DMCA agent's contact information can also be found on MP3tunes' "Frequently Asked Questions" page.  SUF ¶ 55. When a copyright owner sends a take-down notice to MP3tunes or its DMCA agent which identifies infringing material and information reasonably sufficient to enable MP3tunes to locate the material on its website, MP3tunes expeditiously removes or disables such material.  SUF ¶ 56.  Further, MP3tunes facilitates and never interferes with standard technical measures by copyright owners to identify or protect copyrighted works.  SUF ¶¶ 33-35.

In addition, MP3tunes has implemented and informed its users of its Repeat-Infringer Policy, which is part of its Terms and Conditions.  SUF ¶ 57.  Under its Repeat-Infringer Policy, when MP3tunes identifies a user as a repeat infringer, MP3tunes disables that user's account and all other accounts associated with that email address.  SUF ¶ 58.  MP3tunes has terminated the accounts of users whom it suspected of using MP3tunes' services for the purposes of infringing activity.  For example, if MP3tunes discovers more than one user accessing a single locker, it disables access to that locker and deletes its contents.  SUF ¶ 61.

**IV.    MP3tunes Promptly Complied With Take-Down
         Notices Sent By Two EMI Entities**

On or around September 4, 2007, MP3tunes received a cease and desist letter from "EMI Music Group North America" with an enclosed spreadsheet listing approximately 350 song titles with artist names and URLs for websites that EMI claimed infringed its copyrights.  SUF ¶ 68. Although many of the URLs listed in the letter were clearly not infringing as they were links to well known and reputable music magazines (such as *Filter*, *Spin*, and *Paste Store*), nevertheless, relying upon EMI Music Group North America's letter, MP3tunes promptly removed from its website all of the links to the URLs listed in the September 4, 2007 letter.   SUF ¶ 69.

In addition to the approximately 350 song titles referenced in its letter, EMI Music Group

8

North America represented that MP3tunes was "obligated to remove all of EMI's copyrighted works, even those not specifically identified on the attached" and provided an Internet link listing certain EMI artists.  SUF ¶ 70.  However, EMI Music Group North America provided no means of determining which specific songs of these artists were in question and where links to these songs were located.  SUF ¶ 71.  By letter dated September 13, 2007, MP3tunes offered to remove any other infringing links if EMI would merely identify them.  SUF ¶ 72.  In a follow-up letter dated September 18, 2007, EMI Music Group North America refused to do so, claiming its merely representative list had shifted the burden to MP3tunes to determine, among the millions of works that could be linked to from Sideload.com, which works belonged to EMI Music Group North America and should be disabled.  SUF ¶ 73. While it was plainly impossible to comply with this request, MP3tunes continued to seek a resolution.  SUF ¶ 74.

On or around October 25, 2007, MP3tunes received two further cease and desist letters, one from "EMI Music Group North America" and the other from "EMI Entertainment World." In these letters, the "EMI" entities again maintained that MP3tunes was obligated to remove not only the specific songs identified in their take-down notices but also all other "EMI" songs, which could only be identified by conducting an investigation of EMI's websites.  SUF ¶ 75. MP3tunes once again disabled access to all of the links identified in both letters, and further offered to remove any other "EMI" songs if "EMI" would only provide information reasonably sufficient to permit MP3tunes to locate the material.  SUF ¶ 765.  Plaintiffs instead filed this suit, based on the fabricated theory that they put nothing on the Internet for free.

## V.   Plaintiffs Virally Market Free MP3 Downloads

Plaintiffs began this litigation by falsely claiming they did not place free downloads on the Internet and, as a result, Defendants should know that any of Plaintiffs' music on the Internet was infringing.  *Id.*  As then-counsel for both the Labels and Publishers put it:

*The notion that we at EMI put up material for free is pure fantasy. … there is no evidence in the complaint or anywhere else that reflects that EMI has ever put any of its music out for free.  There's no allegation that they know of a single one that's been put out for free.*

SUF ¶ 84 (emphasis added).  This is untrue.  Discovery has shown than Plaintiffs partner with

scores of companies to give away free MP3 downloads (SUF ¶¶ 88-89), including:

| Retailers | Music Sites (cont.) | Artist Sites |
|---|---|---|
| Walmart | MTV2 | Cold Play |
| Amazon.com | VH1 | Alice in Chains |
| Borders | SXSW | Beastie Boys |
| Best Buy | LastFm | Radio Head |
| iTunes | Stereogum | Lily Allen |
| Toyota | Pitchfork | Joss Stone |
| Pepsi | Buzzgrinder.com | Decemberists |
| Citibank | Fluxblog | Korn |
| Microsoft | Prefixmag | Angel Taylor |
| Coke | Filter | Joanna Cotton |
| Starbuck's | Cocaineblunts.com | Jamey Johnson |
| Push Entertainment | ilike.com | Saving Abel |
|  | Absolutepunk.com | Varsity Fan Club |
| **Social Networking** | 944 Magazine | Natasha Marsh |
| MySpace | Fader | The Last Goodnight |
| Facebook | Delicious Vinyl | Tristan Prettyman |
| Buzznet | Myplaydigital.com | New Adelitas Way |
| Bebo | Hipdigital.com | Jet |
|  | Tool Shed | The Last Goodnight |
| **Media Sites** | BetterPropaganda.com | Melanie C |
| Google | Freeallmusic.com | Yellow Card |
| AOL | Spinner | Ak'Sent |
| CNN | Rolling Stone | Air |
| Seventeen | EW's | Kristina Train |
| People | Popwatch | A Fine Frenzy |
| KCRW | Top Spin | Nine Inch Nails |
| Clear Channel | Pure Volume |  |
| New York Post |  |  |
| Village Voice | **Record Company Sites** |  |
| Minnesota Public Radio | Parlophone |  |
|  | Astralwerks |  |
| **Music Sites** | Columbia Records |  |
|  | Definitive Jux Records |  |
| Spin | Golden Horse |  |
| MTV | Angel Records |  |
|  | Virgin Records |  |
|  | EMI (US and UK) |  |

Indeed, Plaintiffs testified that not only did they authorize all of these free downloads, but that such downloads are so prevalent on the Internet that it is impossible for them to distinguish which downloads are authorized.  SUF ¶¶ 92, 99, 101, 105.  As Sanford Schwartz, the Senior Vice President of Digital Marketing for EMI Recorded Music North America, admitted: "I am not aware of such a way that you would know."  SUF ¶ 100.  That is because, as Schwartz explained, EMI deliberately places songs on the Internet so that those songs can become "viral": "By viral I mean giving fans the ability to disseminate to other fans, to spread like a virus."  SUF ¶ 92. Indeed, while Plaintiffs have the technology to control the spread of the free downloads through Digital Rights Management software ("DRM"), they concede that they purposely do not employ this technology for sound recordings.  SUF ¶ 90.  The Labels concede that the practice of viral marketing is so extensive that even Plaintiffs' own expert witness, Barry Massarsky, who has spent his lifetime in the music industry, admitted in his deposition that:  "It is difficult to tell what is authorized and what is unauthorized."  SUF ¶ 105

Plaintiffs' artists also make their works available for free download without seeking EMI authorization.  SUF ¶ 97.  Plaintiffs do not have a policy that requires their artists to coordinate or seek approval from higher-ups before making songs available for free download.  SUF ¶ 95. As the Executive President of Digital Strategy for EMI Recorded Music North America, Cory Ondrejka, explained: "artists are individuals, and when working with and managing individuals, it is ineffective to try to impose global policies upon them."  SUF ¶ 98.

In recent years, there have been widespread media reports of record companies serving cease and desist letters on music blogs for posting free music which the record companies' own marketing people sent to them.  For example, in *Guardian* it was reported: "After the success of blog-buzzy acts such as Arcade Fire, Lily Allen and Vampire Weekend, entire PR firms are

11

dedicated to courting armchair DJs and amateur critics." *See* Gulia Decl. Exh. CC.  The article goes on to report that the labels are so eager to have blogs offer free downloads of their music that often their lawyers are unaware that the marketing people have authorized free downloads. One blogger, Bill Lipold, cited four cases in the past year when he had received copyright violation notices for songs he was legally entitled to post, including a song by XX Teens called "Darlin."   The company that authorized the free download was Mute Records, a label that is fully-owned by EMI.  SUF ¶ 106.

As Plaintiffs themselves cannot figure out which free downloads they and their artists have authorized for free download, it would be impossible for MP3tunes, which is on the outside looking in, to know any more.  Thus, the only possible way to curb copyright infringement is for Plaintiffs to follow the procedure enacted by Congress in the DMCA; *i.e.*, to send proper take-down notices identifying infringements by specific work and URL.  MP3tunes has scrupulously complied with such notices, and will continue to do so in the future.

## VI.    Deduplication Does Not Constitute Copyright Infringement

Plaintiffs attempt to portray MP3tunes' manner of storing and retrieving files from its system as "file sharing" (*See* Compl. ¶ 51).  However, it is undisputed, even by Plaintiffs' own expert, that MP3tunes is not a file-sharing website.  SUF ¶ 17.  MP3tunes offers secure music storage for its users and ensures through technical restrictions that music stored in user lockers cannot be shared or accessed by anyone other than the user.  SUF ¶¶ 18, 19.

In the MP3tunes system, the storage and retrieval of the music is entirely user initiated. SUF ¶¶ 5-15.  In other words, a music file will be stored and accessible to the user if, and only if, that user performed the necessary volitional acts, *i.e.,* he has installed the appropriate software, has pressed the appropriate buttons to initiate the synching processes, and pressed the appropriate buttons to retrieve the file from the system.  SUF ¶47.  What is retrieved from the system is the

user's own unique copy—that is a copy of the music file that was created as a result of that user's direction to store the original file on the MP3tunes system.  SUF ¶ 47.  To our knowledge, no Court has ever ruled that such rudimentary software storage functionality constitutes copyright infringement, and this Court should not be the first.  For all of the reasons set forth below, summary judgment should be granted to Defendants in all remaining counts.

## ARGUMENT

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

## I.     The DMCA Immunizes MP3tunes From All of Plaintiffs' Claims

### A.     MP3tunes' Meets the Threshold Qualifications For the DMCA's Safe Harbors Set by 512(k) and (i).

Title 17, Section 512 of the United States Code, aka the DMCA, establishes four safe harbors to "protect qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement," H. Rep. No. 105-796, at 73 (1998); *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 487 F.3d 701, 732 (9th Cir. 2007) (holding that "the limitations on liability contained in 17 U.S.C. § 512 protect secondary infringers as well as direct infringers."). This broad statutory relief "provide[s] greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (citation omitted).

The threshold qualifications for safe harbor protection are plainly listed in Section 512(k) and (i) which provide that the defendant must: (1) be a service provider, (2) have adopted, reasonably implemented, and informed subscribers and account holders of its repeat infringer policy, and (3) accommodate standard technical measures.  17 U.S.C. § 512(k), (i).

13

1.      **MP3tunes Is A "Service Provider"**

The DMCA provides a broad definition of "service provider" as "a provider of online services or network services, or the operator of facilities thereof."  17 U.S.C. § 512(k)(1).  Courts have interpreted this term very broadly to encompass online services, including search engines and storage websites.  *See Viacom Int'l v. Youtube*, 2010 U.S. Dist. LEXIS 62829 (S.D.N.Y. June 23, 2010) (applying term to storage services); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (search engine service meets definition of online service provider).  In light of the broad definition for service provider, MP3tunes' two websites, Sideload.com and MP3tunes.com, which offer search engine and storage services respectively, clearly meet the definition of "service provider" as defined by the DMCA.  SUF ¶¶ 1, 3, 20.

2.      **MP3tunes Has A Comprehensive Repeat-Infringer Policy**

To qualify for a safe harbor, the DMCA requires a service provider to "adopt[] and reasonably implement[] . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers . . . ." 17 U.S.C. § 512(i)(1)(A).  While the statute does not define the term "reasonably implemented," the Courts have held that:

> a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications. . . . [A]n implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright.

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1099 (C.D. Cal. 2009).  Congress intended this provision to ensure that "those who repeatedly or flagrantly abuse their access to the Internet through disrespect for the intellectual property rights of others should know that there is a realistic threat of losing that access."  *Viacom*, 2010 U.S. Dist. LEXIS 62829 at

14

*42-*43 (citation omitted); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1143 (N.D. Cal. 2008) (citations omitted).

There is no dispute that MP3tunes has met the DMCA's requirements for reasonably implementing a termination policy for repeat infringers where appropriate. MP3tunes' policy is clearly stated in its Terms and Conditions to which users must agree before using MP3tunes' services. The relevant portions of this policy state: "Under the appropriate circumstances, it is MP3tunes' policy to remove and/or disable access from MP3tunes to web pages of repeat infringers, to terminate subscribers and account holders who are repeat infringers . . . ." SUF ¶ 58. MP3tunes has a working notification system whereby MP3tunes has a registered DMCA agent to receive notices of allegedly infringing material. SUF ¶ 54. When MP3tunes receives notices of alleged infringements, it expeditiously removes those materials from its website. SUF ¶¶ 56. Furthermore, on occasions where users have been discovered to be abusing MP3tunes' services to infringe copyrights, MP3tunes has terminated those accounts. In its short life span, MP3tunes has terminated 153 accounts in accordance with its policy. SUF ¶ 61.

### 3.      MP3tunes Accommodates Standard Technical Measures

The term "standard technical measures" refers to technical means by which copyright owners may identify or protect copyrighted works. *Corbis Corp. v. Amazon.com*, 351 F. Supp. 2d 1090, 1099 n.4 (W.D. Wash. 2004). MP3tunes accommodates and does not interfere with copyright owners' attempts to identify or protect copyrighted works. SUF ¶¶ 33-35. For example, where copyright owners include digital rights management software with their music files, MP3tunes' websites accommodate these measures. SUF ¶ 35.

### B.      MP3tunes Meets The Conditions Of Section 512(c).

The safe harbor provided under section 512(c) protects service providers from liability for "the storage at the direction of a user of material that resides on a system or network

controlled or operated by or for the service provider." 17 U.S.C. § 512(c).  Once the threshold

qualifications for safe harbor protection are satisfied, "a service provider is eligible for safe

harbor under section 512(c) if it: (1) does not know of the infringement; or (2) acts expeditiously

to remove or disable access to the material when it (a) has actual knowledge, (b) is aware of facts

or circumstances from which infringing activity is apparent, or (c) has received DMCA-

compliant notice; and (3) either does not have the right and ability to control the infringing

activity, or – if it does – that it does not receive a financial benefit directly attributable to the

infringing activity."  *Capitol Records, Inc. v. MP3tunes, LLC*, 2009 U.S. Dist. LEXIS 96521, *8-

*9 (S.D.N.Y. Oct. 16, 2009) (*citing Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132,

1146  (N.D. Cal. 2008)).  MP3tunes meets these requirements.

### 1. MP3tunes Did Not Have Actual Or Constructive Knowledge Of The Specific Infringements Alleged In This Suit

Section 512(c) requires plaintiffs in a copyright infringement suit to demonstrate

evidence that the service provider had actual or constructive knowledge of infringements of

specific works belonging to those plaintiffs.  *Viacom*, 2010 U.S. Dist. LEXIS 62829, at *29.

"Mere knowledge of prevalence of such activity in general is not enough."  *Id.*

Notice of infringement constitutes evidence of the service provider's knowledge.  *See*

*Corbis Corp.*, 551 F. Supp. 2d at 1108.  Under § 512(c), "the service provider's duty to act is

triggered only upon receipt of proper notice."  *Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082,

1089 (C.D. Cal. 2001) (summary judgment granted where ISP lacked "actual or constructive

knowledge that particular listings were being used by particular sellers to sell pirated copies");

*see also, e.g., UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F.Supp.2d 1099, 1110 (C.D.

Cal. 2009) (summary judgment granted where no "evidence establishing that Veoh failed to act

expeditiously whenever it had actual notice of infringement").

16

### a. Plaintiffs Did Not Send DMCA Take-Down Notices To Provide MP3tunes With Knowledge Of The Specific Alleged Infringements

"In all of the published cases addressing the knowledge component of § 512(c), the copyright holder has provided evidence that it notified the service provider of the infringing material." *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107 (W.D. Wash. 2004) (summary judgment awarded under the DMCA where plaintiffs failed to provide take-down notice of the specific infringements prior to filing suit)

In the instant litigation, Plaintiffs failed to provide notices of infringement for a shocking 32,326 of the alleged infringing works at issue.  Because notice of infringement constitutes evidence of the service provider's knowledge, Plaintiffs cannot establish that MP3tunes had actual or constructive knowledge of any of the 32,326 alleged infringements for which no notices were provided.  *See Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008) ("Plaintiff provided no notice to Veoh of any claimed copyright infringement. Thus, there is no question on the record presented that Veoh lacked actual knowledge of the alleged infringing activity at issue.); *Corbis Corp.*, 351 F. Supp. 2d at 1107 ("[Plaintiff's] decision to forego the DMCA notice provisions . . . stripped it of the most powerful evidence of a service provider's knowledge -- actual notice of infringement from the copyright holder.").  Indeed, MP3tunes did not know which alleged infringements were at issue in this litigation until nearly a year and a half after Plaintiffs filed their complaint.

### b. Knowledge Of Specific Alleged Infringements Cannot Be Construed From Inadequate Notices

### i. EMI's Notices Are Inadequate To Impute Knowledge

The DMCA requires that a proper notice "provide identification of the reference or link, to material or activity claimed to be infringing . . . and information sufficient to permit the service provider to locate that reference or link." *Viacom*, 2010 U.S. Dist. LEXIS 62829, at

**23-24.  Section 512(c)(3) sets forth the required elements for proper notification by copyright

holders.  The notification must: (i) be a written communication provided to the designated agent

of the ISP; (ii) provide information reasonably sufficient to permit the service provider to locate

the material; (iii) provide a statement that the complaining party has a good faith belief that use

of the material in the manner complained of is not authorized by the copyright owner, its agent,

or the law; and (iv) provide " statement that the information in the notification is accurate, and

under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of

an exclusive right that is allegedly infringed. *Viacom*, 2010 U.S. Dist. LEXIS 62829, at **12-13

(citing 17 U.S.C. § 512(c)(3)(A)).

"The DMCA expressly provides that if the copyright holder's attempted notification fails

to 'comply substantially' with the elements of notification described in subsection (c)(3), that

notification shall not be considered when evaluating whether the service provider had actual or

constructive knowledge of the infringing activity under the first prong set forth in Section

512(c)(1)." *Hendrickson v. eBay Inc.*, 165 F. Supp. 2d 1082, 1089 (C.D. Cal. 2001).  "Notices of

infringement must substantially comply with the DMCA's notice requirements to be considered

evidence of a service provider's knowledge." *Corbis*, 351 F. Supp. 2d at 1109.  *See also Perfect

10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1112 (9th Cir. 2007) (knowledge of infringement cannot

be imputed where plaintiffs failed to meet every element of 512(c)(3)(A)).

Plaintiffs did not specifically identify the songs that have been purportedly infringed or

are infringing, or the location of the purportedly infringing material.  Instead, the notices merely

provided a "representative" list of songs and claimed that MP3tunes was "obliged to remove all

of EMI's copyrighted works, even those not specifically identified on the attached."  Moreover,

the letters also demanded that MP3tunes remove all other "EMI" songs, which they insisted that

MP3tunes identify by conducting an investigation of EMI's websites.  SUF ¶ 70.

18

In *Viacom*, Viacom unsuccessfully argued that the DMCA required the defendants in that case to remove not just the specific copies of the infringing works identified by Plaintiff, but all copies of the infringed works on Defendants' website on the grounds that the DMCA purportedly permitted copyright owners to provide a mere "representative list" of infringements. The Court rejected this interpretation of the DMCA notice requirements, holding that:

> This 'representative list' reference would eviscerate the required specificity of notice . . . if it were construed to mean a merely generic description ("all works by Gershwin") without also giving the works' locations at the site, and would put the provider to the factual search forbidden by § 512(m).

*Viacom*, 2010 U.S. Dist. LEXIS 62829, at *44.

EMI's notices are clearly insufficient and fail to "substantially" comply with the DMCA notice elements in Section 512(c)(3). *See, e.g., Arista  Records,. Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. LEXIS 16165 (S.D.N.Y. Aug. 28, 2002) (by merely listing artists in take-down letter, RIAA fell short of "substantially complying with notification requirement"); *UMG Recordings*, 556 F. Supp. 2d at 1109-10 (finding notice inadequate where plaintiffs failed to identify specific works allegedly infringed and information necessary for their location).

Furthermore, Plaintiffs in this action cannot rely upon the letters that EMI Music Group North America and EMI Entertainment World sent to MP3tunes as evidence of adequate knowledge of the specific infringements at issue in this case. First, neither of those entities are plaintiffs in this action. Take-down notices from third-parties  do not demonstrate sufficient knowledge under DMCA case law. *See Corbis*, 351 F. Supp. 2d at 1108. Second, they only name 752 of the 33,756 works claimed to be infringed by Defendants in this litigation, all of which Defendants took down before this suit began. SUP ¶ 83. The remaining 33,004 songs alleged by Plaintiffs have never appeared in any take-down notice. *Id.* Third, even if it were proper for Plaintiffs to merely direct Defendants to websites listing artist names, which the case

19

law makes clear it is not (*see MP3Board, supra*), here the EMI websites at issue do not identify over 80% of the artists on Plaintiffs' song lists.  SUP ¶ 79.

### ii.     Plaintiffs' Song Lists Produced During Discovery Are Inadequate To Impute Knowledge Under The DMCA

Post-litigation notices of claimed infringement do not constitute notifications within the meaning of Section 512(c)(3).  *Corbis*, 351 F. Supp. 2d at 1090 (Corbis' failure to comply with DMCA notice by filing suit "stripped it of the most powerful evidence of a service provider's knowledge -- actual notice of infringement from the copyright holder"); *See, e.g.*, *Perfect 10, Inc., v. Amazon.com, Inc.*, et al., 2009 U.S. Dist. LEXIS 42341, *14 (C.D. Cal. May 12, 2009).

Here, there is no dispute that Plaintiffs have failed to provide a DMCA-compliant notice.  Their post-litigation production of spreadsheets listing the songs allegedly at issue does not satisfy the notice requirements set forth in Section 512(c)(3)(A).  Not only were Plaintiffs' post-litigation notices untimely, but Plaintiffs failed to comply with the notice provision, namely, by failing to provide: (1) a signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed; (2) a statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner, its agent, or the law; (3) a statement that the information is accurate, and (4) under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

### c.     Plaintiffs' Viral Marketing Practices Make It Impossible for MP3tunes To Have Constructive Knowledge of Specific Allegedly Infringing Activity

Where plaintiffs fail to show actual knowledge as a result of a DMCA-compliant take-down notice, they must show constructive knowledge: "a service provider may lose immunity if it fails to take action with regard to infringing material when it is aware of facts or circumstances from which infringing activity is apparent."  *CCBill*, 488 F.3d at 1114 (citing 17 U.S.C.

§ 512(c)(1)(A)(ii).  This constructive knowledge prong requires "knowledge of specific and identifiable infringements of particular individual items.  Mere knowledge of prevalence of such activity in general is not enough."  *Viacom Int'l v. Youtube*, 2010 U.S. Dist. LEXIS 62829, at *29 (S.D.N.Y. June 23, 2010).  As Judge Stanton clarified:

> [t]o let knowledge of a generalized practice of infringement in the industry, or of a proclivity of users to post infringing materials, impose responsibility on service providers to discover which of their users' postings infringe a copyright would contravene the structure and operation of the DMCA. . . .
>
> The DMCA is explicit: it shall not be construed to condition 'safe harbor' protection on a 'service provider monitoring its service or affirmatively seeking facts indicating infringing activity. . .

*Id.* at *30 (citations omitted).

Plaintiffs have failed to establish, and indeed cannot establish, that MP3tunes had constructive knowledge of the specific infringements at issue in this litigation.  Letters from EMI Music Group North America and EMI Entertainment World do not demonstrate knowledge of the alleged infringements at issue in this litigation because MP3tunes removed each of the specific links referenced in those letters.  The bottom line is that MP3tunes was never aware of any facts or circumstances from which specific infringing activity was apparent; nor have Plaintiffs asserted evidence of such.  Plaintiffs only allege that Defendants had such constructive knowledge but have not offered, and cannot offer, any evidence in support of such knowledge.  It is impossible for MP3tunes to tell from the third-party link listed on Sideload.com whether such links are infringing.  To make such a determination, MP3tunes would have to investigate the owners of the copyrights of each composition and sound recordings of each and every third-party link and determine whether or not those works are licensed, either explicitly or implicitly, for the song to be distributed on the Internet and for what consideration.  This goes far beyond the scope of what is required by an Internet service provider under the DMCA.

Knowing when a work on Sideload.com is infringing is made all the more impossible because of the Plaintiffs' practice of causing their music to be spread throughout the Internet in viral marketing campaigns.  There is no dispute that Plaintiffs, their artists, and people acting on their behalf make free downloads available on the Internet knowing that the music is then distributed further on the Internet and indeed with the express intention that it spread like a virus. SUP ¶ 92.  As Plaintiffs have testified, even they cannot tell an authorized from an unauthorized download.  SUP ¶¶ 99-101.  Thus, it is simply not possible for MP3tunes to determine which links on its websites are infringing without an extensive investigation, which the DMCA does not obligate MP3tunes to undertake, or without a DMCA-compliant notice.

**2**.     **MP3tunes Expeditiously Removed The Alleged User Infringements**

Section 512(c)(1)(C) provides that the DMCA safe harbor applies if the ISP "upon notification of claimed infringement . . . responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity."  17 U.S.C. § 512(c)(1)(C).  Assuming, *arguendo*, Plaintiffs are allowed to rely upon the letters provided by EMI Music Group North America and EMI Entertainment World as notices of infringement, the DMCA still provides MP3tunes with safe harbor because MP3tunes promptly disabled access to all the links referenced in those take-down notices.  There is no dispute of the fact that MP3tunes removed the identified links referred to in each of the take-down notices.

**3**.     **MP3tunes Meets Section 512(c)(1)(B)'s Requirement for DMCA Safe Harbor**

"The safe harbor requires that the service provider not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity . . . ."  *Viacom*, 2010 U.S. Dist. LEXIS 62829,  at **40-41 (internal quotation marks omitted).  "Courts have routinely held that 'the right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability

of a service provider to remove or block access to materials posted on its website or stored in its system." *Corbis*, 351 F. Supp. 2d at 1110; *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1151 (N.D. Cal. 2008) ("[T]he plain language of Section 512(c) indicates that the pertinent inquiry is not whether Veoh has the right and ability to control its system, but rather, whether it has the right and ability to control the infringing activity."); *Viacom*, 2010 U.S. Dist. LEXIS 62829,  at *41 ("'Right and ability to control' the activity requires knowledge of it, which must be item-specific."); *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 704 n.9 (D. Md. 2001) (finding that if the "standard could be met merely by the ability to remove or block access to materials [it] would render the DMCA internally inconsistent.").

Moreover, an ISP is entitled to DMCA immunity if it can demonstrate any one of these elements.  *See Corbis*, 351 F. Supp. 2d at 1110. (stating that courts need not consider direct financial benefit if the ISP did not have the right and ability to control infringing conduct).  Here, MP3tunes clearly satisfies both elements.

### a.   MP3tunes Does Not Exercise Control Over The Allegedly Infringing Activity

The fact that MP3tunes stores content at the direction of its users does not disqualify it from Section 512(c)'s safe harbor.  *See Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1147 (N.D. Cal. 2008) (defendant not disqualified from Section 512(c)'s safe harbor protections because of automated functions that automatically created Flash and still-image files from user-submitted content which were used access to content on defendant's website).

MP3tunes does not, and cannot, control the allegedly infringing activity on its websites.  As an initial matter, MP3tunes does not select the material that is stored on its system.  The fact that the songs at issue in this litigation were stored by or searched for by the users of MP3tunes services, not MP3tunes itself, is undisputed, as is the fact that these activities were the result of automated processes.  The series of events that is triggered by a user's decision to store a music

23

file and ends with the storage of that file is fully automated and does not involve the intervention or active involvement of MP3tunes or any of its personnel.  Tellingly, nowhere in their Second Amended Complaint do Plaintiffs allege that MP3tunes actually stores or searches for the allegedly infringing material.  Nor can they point to any evidence that MP3tunes engages in the volitional act of storing or searching for material on the Internet.

Furthermore, there are over 700,000 users and millions of files that are stored and retrieved from the MP3tunes system.  Just as the Executive Vice President of Digital for EMI Recorded Music conceded that the Labels cannot prevent their artists from posting their songs for downloads on the Internet, MP3tunes cannot be expected to monitor and police its 700,000 users from posting songs from third-party websites.  SUF ¶ 11.

It simply is not possible to determine which of the millions of user files are allegedly infringing and which are not.  In order to control the alleged infringement on its sites, MP3tunes would have to develop software that would enable it to determine which of the downloads its users find on the Internet and sideload to their lockers are infringing and which are not.  Even before such software could be developed, however, Plaintiffs would first have to include in the data that comprises each and every one of their songs digital markers or "watermarks" that could not be removed and that: (1) identify the owner of the song and (2) the fact that it is not authorized for free download on the Internet.  Once Plaintiffs included this data in their songs, MP3tunes would have to design a program to screen its users' sideloads for unauthorized songs.

Indeed, as Plaintiffs' expert witness has testified, the current technology does not contain sufficient information for MP3tunes to check the access rights of the media content that its users find on the Internet.  As Plaintiffs themselves have conceded, there is no way to distinguish an authorized from an unauthorized download.  Yet, Plaintiffs outrageously expect MP3tunes to determine which songs are unauthorized and bar access to them.  Furthermore, in a telling

24

display of Plaintiffs' hypocrisy in pursuing this meritless suit, they have long had the technology to encode music with data that would prevent free downloading, but Plaintiffs choose not to employ it because of their viral marketing campaigns on the Internet.

### b.      MP3tunes Does Not Benefit from the Allegedly Infringing Activity

"To stay in the safe harbor, the service provider has to show that it does not receive a financial benefit directly attributable to the infringing activity." *See Costar*, 164 F. Supp. 2d at 704-05 (internal quotation marks and citation omitted).  Indeed, the legislative history of the DMCA discloses that it would not be considered a direct financial benefit of infringing activity "where the infringer makes the same kind of payment as non-infringing users of the provider's service." H.R. Rep. No. 105-551, Part 2, at 54.

MP3tunes benefits from the lawful purchase of music that is then stored to its servers. It does not benefit from the sideloading of allegedly infringing content as there is no charge for Sideload.com search services, nor for the sideloading of files to users' lockers.  MP3tunes' sole source of income comes from storage of users who upgrade from a basic storage plan that is free of charge to a premium plan which provides more than the two-gigabyte storage limit.  SUP ¶¶ 107-11.  This limit however only applies to files that are uploaded from users' local hard drives—not to files that are sideloaded from the Internet.  SUP ¶¶ 109-10.  Sideload.com search services are free of charge, with no income from advertisements.  Thus, there is no benefit to MP3tunes from the sideloading of free downloads that are found on the Internet.  MP3tunes does benefit when a user discovers from these free downloads a new artist and then purchases a CD to load to his or her locker.

### C.      MP3tunes Meets the Requirements of § 512(d)

As with Section 512(c), "Section 512(d) limits the liability of a service provider 'for infringement of copyright by reason of the provider referring or linking users to an online

location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link' if the service provider meets certain criteria." *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1175 (9th Cir. Cal. 2007). Congress defines "information location tools" broadly and applies it to a "directory" or "index," for example "a search engine that identifies pages by specific criteria; a reference to other on-line material, such as a list of recommended sites; a pointer that stands for an Internet location or address; and a hypertext link which allows users to access material without entering its address." S. Rep. No. 105-190, at 47.

Section 512(d) differs from 512(c) in that (1) it applies to a different type of service—a search service as opposed to a storage service—(2) it does not require the search to be at the direction of the user, and (3) does not require the designation of an agent to receive notices of infringements.  Compare 17 U.S.C. 512(c) and 17 U.S.C. 512(d).  Otherwise, the requirements of the two safe harbors are the same.  *See, e.g., Viacom Int'l v. Youtube*, 2010 U.S. Dist. LEXIS 62829, *27 (S.D.N.Y. June 23, 2010) (equating knowledge requirements of subsections (c) and (d)).  Because, as demonstrated above, MP3tunes meets the knowledge and control requirements of Section 512(c), it also satisfies those same requirements in Section 512(d).

**D.     The DMCA Safe Harbors Apply To Claims of Infringements**
**Of Sound Recordings Authored Prior to 1972**

The plain language and operation of the statute as well as its legislative history dictate that the DMCA's safe harbors apply to all claims of alleged copyright infringement, including those brought under common law, which protects pre-1972 sound recordings, and under federal law, which protects post-1972 recordings.  Congress purposefully employed broad, plain language when drafting the safe harbor provisions of 512(c) and (d) that in no way limits their protection to infringements of works published after 1972.  Section 512(c) and (d) provides:

26

> A service provider shall not be liable . . . for <u>infringement of copyright</u> by reason of the storage at the direction of a user . . . .

17 U.S.C. § 512(c) (emphasis added).

> A service provider shall not be liable . . .  for infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material . . . .

17 U.S.C. § 512(d) (emphasis added).

Had Congress intended to distinguish between infringement under common law and federal law, Congress would have used language to so designate that limited scope.  For example, Section 1201 of the DMCA employs language that clearly limits that section to infringement under federal law, stating that section 1201 applies to "a work protected under [Title 17 of the United States Code]."  17 U.S.C. § 1201.

To now assume that Section 512 would have the same limited scope as Section 1201 would contravene Congress's clear intent.  Congress intended for the DMCA to "limit[] the liability of service providers" and "ensure[] that the efficiency of the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  Senate Report 105-190 at 8.  Limiting the safe harbor to only certain copyright infringements would contravene this purpose.  Moreover, the legislative history makes clear that Congress intended the DMCA to apply to all copyright infringement claims, as opposed to only federal copyright infringement.  Accordingly, the DMCA safe harbors would shield Defendants from all of Plaintiffs' copyright infringement claims for pre-1972 sound recordings.

Plaintiffs' proposed revision to Section 512 would not only limit the DMCA where Congress plainly and purposefully chose not to but would also lead to absurd results.  In effect, a service provider that met all of Section 512's prerequisites would be immune for some songs on its system and liable for others, effectively rendering the statute pointless.

27

**II.      MP3tunes Is Not Liable for Direct Infringement**

   **A.      Direct Infringement Requires Volitional Conduct**

Failure to qualify for safe-harbor protection "shall not bear adversely upon the consideration of a defense by the service provider that the service provider's conduct is not infringing under this title or any other defense."  17 U.S.C. § 512(l).  "[W]hen an Internet provider serves, without human intervention, as a passive conduit for copyrighted material, it is not liable as a direct infringer." *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 695 (D. Md. 2001), *aff'd by* 373 F.3d 544 (4th Cir. 2004).  As the Fourth Circuit held in *CoStar*, a person has to engage in volitional conduct – *i.e.,* the act constituting infringement – to become a direct infringer. Id. at 55 ("As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another."); *accord Religious Tech. Ctr. v. Netcom On-Line Communication Servs., Inc.,* 907 F. Supp. 1361, 1373 (N.D. Cal. 1995) (requiring volitional conduct for direct infringement); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (same); *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (same); *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008) (summary judgment granted for defendants where they were found not to have exercised control over the infringement even though their system created automatic flash files of user uploaded content and automatically indexed videos into series of lists, such as "Most Recent," "Top Rated," "Most Popular," "Most Discussed" and "Top Favorite").  Similarly, under common law the plaintiff must demonstrate that the defendant reproduced the work protected by copyright without authorization from the owner.  *See Arista Records LLC v. Lime Group LLC*, 2010 U.S. Dist. LEXIS 46638, *88 (S.D.N.Y. May 11, 2010).

The law in the Second Circuit is clear: "the person who actually presses the button to make the recording supplies the necessary element of volition, not the person who manufactures,

maintains, or, if distinct from the operator, owns the machine." *Cartoon Network LP, LLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008).

> **B.**    **MP3tunes Has Not Engaged in the Relevant Volitional Conduct**

After nearly three years of discovery, Plaintiffs cannot assert a single fact showing a single volitional act by MP3tunes that violates Plaintiffs' alleged copyrights.  Plaintiffs allege that "MP3tunes directly infringes Plaintiffs' exclusive rights under copyright to publicly perform, reproduce and distribute their works." (Compl. ¶ 5.)  They also allege that "Defendants searched the Internet for digital copies of Cover Art. . . ."  (Compl. ¶ 53.)   However, there is no evidence to contradict the fact that MP3tunes merely provides a service, a tool, that allows users to search for and store material.  MP3tunes' services are operated through automated processes which automatically search for, store and update user files at the users' initiation and without involvement of MP3tunes or its employees.  The time for entertaining Plaintiffs' conclusory allegations has passed; at summary judgment Plaintiffs must show evidence of volitional acts of MP3tunes that directly infringe their copyrights and they have not and cannot.

**III.    MP3tunes Is Not Liable for Contributory Infringement**

Even absent DMCA immunity, there would be no material issues of fact supporting a claim of contributory infringement against MP3tunes.  Under common law, contributory liability requires that a defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (emphasis added).  Plaintiff bears the burden of establishing such knowledge.  *See Netcom*, 907 F. Supp. at 1374 (where ISP cannot reasonably verify infringement due to "copyright holder's failure to provide the necessary documentation to show that there is a likely infringement, the operator's lack of knowledge will be found reasonable and there will be no liability for contributory infringement

for allowing the continued distribution of the works on its system").

Here, Defendants had no knowledge of the underlying alleged infringements. Rather, whenever MP3tunes has learned of specific allegedly infringing material on its system, it has promptly disabled all of the links thereto. Thus, Plaintiffs cannot meet the first prong of proving contributory infringement.

Moreover, "[t]he Supreme Court has made clear in [*Sony Corp. of America, Inc. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984),] that the producer of a product that has substantial non-infringing uses is not a contributory infringer merely because some of the uses actually made of the product (in that case a machine, the predecessor of today's videocassette recorders, for recording television programs on tape) are infringing." *In re Aimster*, 334 F.3d 643, 647 (7th Cir. 2003) (explaining *Sony*). As the Supreme Court in *Sony* held, "the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes. Indeed, it need merely be capable of substantial noninfringing uses." 464 U.S. at 442.

Plaintiffs in this case are attempting to take this Court where the Supreme Court has refused to go: a place where copyright holders can have a new technology removed from the marketplace because a few have allegedly used it unlawfully, thus denying the lawful public the benefit of the technology. Sideload.com and MP3tunes.com, like Sony's Betamax recorder, are capable of substantial non-infringing uses. With MP3tunes.com, users can lawfully store their music "in the cloud." SUP ¶ 3. With Sideload.com, users can search for free downloads of music that is lawfully available on the Internet and then store that content on their local hard drive or in the cloud, just as they can with Google or any other search engine—the key difference being Sideload.com returns only downloads as its search results. SUP ¶ 20. The legitimacy of this purpose is made all the more evident by the fact that Plaintiffs themselves post free MP3

downloads on the Internet with the hope that users will discover and promote their music.  SUP ¶¶ 85-89, 92.  MP3tunes communicates this lawful purpose and intent to its users, making it clear that it takes copyright and other intellectual property laws seriously and expects its users to do the same.  SUP ¶¶ 48-49.  If users are unwilling to agree to this, they are blocked from using the services on either MP3tunes.com or Sideload.com.  SUP ¶ 61.

## IV.    MP3tunes Is Not Liable For Vicarious Infringement

Even absent DMCA immunity, there would be no material issues of fact supporting a claim of vicarious infringement against MP3tunes.  A defendant can only be vicariously liable for the infringement of another "where the defendant (1) has the right and ability to control the infringer's acts and (2) receives a direct financial benefit from the infringement."  *Netcom, supra*, 907 F. Supp at 1375 (2d Cir. 1963).

The Second Circuit sets a high standard when determining whether a defendant has "a right and ability to supervise" the infringement, limiting it to "persons and corporations who participate in, exercise control over . . . the infringement."  *Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985).  A mere legal right to supervise is insufficient.  *See, e.g., Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1173 (9th Cir. 2007) (right and ability required evidence that defendant failed to exercise "practical ability" to "stop or limit the directly infringing conduct.");  *Io*, 586 F. Supp. 2d at 1151 ("the right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to block or remove access to materials  posted on its website or stored on its system.");  *Banff, Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1106-1111 (S.D.N.Y. 1994) (holding that "exercising" control for the purpose of finding vicarious liability means "culpable persons actually exercise control").

As in *Banff*, MP3tunes' legal right to supervise its own websites does not equate to

"control" sufficient to impose vicarious liability.  The alleged infringing users at MP3tunes.com

and Sideload.com do not depend upon MP3tunes' direction to infringe.  MP3tunes is not in a

position to police infringements.  It is simply not possible, much less practical, for MP3tunes to

determine which of the downloads its users find on the Internet and sideload to their lockers are

infringing without Plaintiffs providing the requisite notice.  As Plaintiffs themselves have

testified, there is no easy way to tell an authorized Internet download from an unauthorized

Internet download.  SUP ¶¶ 92, 99-101.  They can little expect MP3tunes to do so.

## V.     Plaintiffs' Unfair Competition Claim Fails

Common law unfair competition, in addition to unauthorized copying and distribution,

"requires competition in the marketplace or similar actions designed for commercial benefit, or

deception of the public."  *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563-564

(2005).  In *Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 482 (2d Cir. 2004), the

Second Circuit held that Capitol Records could not prevail on its unfair competition claim where

it had no evidence of defendant's bad faith.  *Id.* at 482; *accord, e.g., Computer Assocs. Int'l, Inc.

v. Computer Automation, Inc.*, 678 F. Supp. 424, 429 (S.D.N.Y. 1987) ("The essence of [unfair

competition] is the bad faith misappropriation of the labors and expenditures of another, likely to

cause confusion or to deceive purchasers as to the origin of goods.").

Plaintiffs' unfair competition claim fails because, first and foremost, MP3tunes has not

made any unauthorized reproduction of copyrighted works.  In addition, as in *Naxos*, Plaintiffs

failed to provide, after years of discovery, any evidence of competition in the marketplace or

deception of the public—because there is none.  MP3tunes does not compete in the marketplace

with any of the Plaintiffs in this case.  Plaintiffs derive their income from distributing, selling,

and licensing music.  MP3tunes derives its income from selling "cloud based" storage for music

that is distributed, sold, and licensed by Plaintiffs and others in the music industry.  MP3tunes

does not deceive the public.  It has never falsely advertised its services as being sponsored by or affiliated with Plaintiffs.  Nor is there any evidence that MP3tunes' services caused any injury to Plaintiffs.  In fact, MP3tunes' business prospers when Plaintiffs' business prospers—as the more that Plaintiffs' music is sold, the more MP3tunes' music storage services are needed.

## VI.    Plaintiffs Cannot Establish Full Copyright Ownership

To establish a claim of copyright infringement, a plaintiff must show, *inter alia*, "ownership of a valid copyright." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201 (a).  Generally, "the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright protection."  *Comty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 737 (1989).  In the instant action, the Plaintiffs have failed to demonstrate ownership for 13,584 works.  SUF ¶ 83.  Claims for the infringement of these works should be summarily dismissed.

Included in this count are 10,179 of Plaintiffs' works that are listed as a "work made for hire."  A sound recording and a musical composition can only be a work made for hire if the author of the work was an employee, but here there is no evidence that the recording artists and composers at issue were employees of Plaintiffs.  Section 101 of the Copyright Act explicitly defines a "work made for hire" as a work "prepared by an employee within the scope of his or her employment" or a work "specifically ordered or commissioned" if it falls under one of the following nine categories.  *See Lulirama Ltd. v. Axcess Broadcast Servs.*, 128 F.3d 872, 875 (5th Cir. Tex. 1997).  However, sound recordings do not fall within the nine types of works listed in the "specially commissioned" prong of the statute.  *Id*. at *878 (holding that sound recordings are not listed in section 101); *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999) (holding that sound recordings cannot be works made for hire because sound recordings "do not fit within any

33

of the nine enumerated categories"); *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57, 64 (D.D.C. 1999) (same).  While we have not found any case law expressly addressing this issue for a musical composition, it does not fit these nine enumerated categories either.

Thus, a sound recording and a musical composition can be deemed a work made for hire only if an employee creates the work within the scope of his or her employment. *See* 17 U.S.C. § 101.  While the 1976 Act does not define the terms "employee" or "employment," the Second Circuit requires evidence of: "(1) the hiring party's right to control the manner and means of creating; (2) the skill required; (3) the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party."  *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992).  Here, Plaintiffs cannot point to any evidence of the above factors.  Accordingly, their claims for infringement of works that are claimed as works made for hire should be summarily dismissed.

## CONCLUSION

For all the foregoing reasons, summary judgment should be granted to Defendants.

Dated: New York, NY
        October 29, 2010

DUANE MORRIS LLP

By: /s/_____
Gregory P. Gulia
John Dellaportas
Vanessa Hew
R. Terry Parker
1540 Broadway
New York, NY 10036
(212) 692-1000

*Edward M. Cramp (pro hac vice)*
*Michelle Hon (pro hac vice)*

*Counsel for Defendants*