UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| CAPITOL RECORDS, LLC, *et al*, )<br>)<br>*Plaintiffs*, )<br>)<br>v. )<br>)<br>MP3TUNES, LLC, and MICHAEL ROBERTSON, )<br>)<br>*Defendants*. )<br>_____)<br>)<br>MP3TUNES, LLC, and MICHAEL ROBERTSON, )<br>)<br>*Counter-Claimant*, )<br>)<br>v. )<br>)<br>CAPITOL RECORDS, LLC, *et al*, )<br>)<br>*Counter-Defendants*. )<br>_____) | No. 07 Civ. 9931 (WHP)(FM)<br><br>**DECLARATION OF ANDREW H. BART REGARDING ERRATA IN CONNECTION WITH PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

Andrew H. Bart declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a partner in the law firm of Jenner & Block LLP, counsel for the EMI Records Plaintiffs.[1] I submit this declaration to place before the Court documents and testimony which were inadvertently omitted from my declaration filed on October 29, 2010 in support of Plaintiffs' motion for partial summary judgment (the "October 29, 2010 Declaration"). I also submit this declaration to correct a few erroneous citations in the Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment (the "Memorandum of Law") and

---

[1] The EMI Records Plaintiffs are Capitol Records, Inc.; Caroline Records, Inc.; EMI Christian Music Group Inc.; Priority Records LLC; and Virgin Records America, Inc.

Plaintiffs' Local Rule 56.1 Statement of Uncontroverted Facts (the "Statement of Uncontroverted Facts").

  2. Annexed hereto as Exhibit 4 are true and correct copies of pages 166 to 169 and pages 198 to 201 from the deposition of Michael Robertson on January 28, 2010. These pages were inadvertently omitted from Exhibit 4 to the October 29, 2010 Declaration.

  3. Annexed hereto as Exhibit 5 are true and correct copies of pages 74 to 77 of the deposition of Douglas Reese on January 25, 2010. These pages were inadvertently omitted from Exhibit 5 to the October 29, 2010 Declaration.

  4. Annexed hereto as Exhibit 6 is a true and correct copy of page 53 of the deposition of Cody Brocious on December 9, 2009. This page was inadvertently omitted from Exhibit 6 to the October 29, 2010 Declaration.

  5. Annexed hereto as Exhibit 7 are true and correct copies of pages 27 to 29 of the deposition of Kevin Carmony on April 9, 2008. These pages were inadvertently omitted from Exhibit 7 to the October 29, 2010 Declaration.

  6. Annexed hereto as Exhibit 10 are true and correct copies of pages 37 to 40 of the deposition of Julian Krause on March 13, 2010. These pages were inadvertently omitted from Exhibit 10 to the October 29, 2010 Declaration.

  7. Plaintiffs' Memorandum of Law contains the following mistaken citations:

   a. On page 5, the Ruth deposition transcript is identified as Exhibit 14 to the Bart Declaration. It is Exhibit 13.

   b. On page 11, there is a citation to Exhibits "183-84." This should state "83-84."

   c. On Page 23, there is a citation to "Exhibit 7 (Carmony) at 25:13-17:14." This should instead state "Exhibit 7 (Carmony) at 25:13-27:14."

    d. In footnote 9 on page 23, Doug Reese's "initial deposition" is identified as Exhibit 5. It should be cited as Exhibit 15.

8. Plaintiffs' Statement of Uncontroverted Facts contains the following mistaken citations:

    a. In paragraph 31 there is a citation to "Ex 5 (Robertson) at 335:8-19." The Robertson deposition is Exhibit 4.

    b. In paragraph 57 there is a citation to "Exhibit 33." The citation should be to Exhibit 28.

    c. In paragraph 71(e) there is a citation to "Ex 5 (Robertson) at 432:7-17." The Robertson deposition is Exhibit 4.

    d. In paragraph 86, there is a citation to "Ex. 4 (Robertson) at 286:24-8" which should say "Ex 4 (Robertson) at 286:24-287:8."

Dated: New York, New York
       November 3, 2010

                                                          ANDREW H. BART

# Exhibit 4

# THIS EXHIBIT HAS BEEN FILED UNDER SEAL

# Exhibit 5

## Page 74

Confidential - D.Reese 1

1 all-employee meeting, essentially?
2 A. Yes.
3 Q. Did you attend that meeting?
4 A. Yes.
5 Q. Okay. Did you first learn about the decision
6 at that meeting or sometime prior to the meeting?
7 A. I don't recall.
8 Q. Okay. It is possible that you first learned
9 about it at the meeting?
10 A. It's possible. But not likely. But I don't
11 recall.
12 Q. Okay. Did you present at the meeting, telling
13 employees about the change in strategy?
14 A. No.
15 Q. Who did?
16 A. I imagine it was Michael.
17 Q. Mr. Robertson?
18 A. Mr. Robertson.
19 Q. What did he say?
20 A. I don't recall.
21 Q. Do you recall anything he said?
22 A. 60-day development period. That was what was
23 significant to me at the time.
24 Q. Why was that significant to you at the time?

TSG Reporting - Worldwide   877-702-9580

## Page 75

Confidential - D.Reese 1

1 A. Because it was a pretty tight schedule.
2 Q. Did you think it was possible at the time?
3 A. Yeah, I did.
4 Q. Okay. Did it require, essentially,
5 around-the-clock work to get it done?
6 A. Near the end. Not around-the-clock, but it
7 required some long hours.
8 Q. Sorry. Yeah, I wasn't being literal, but I
9 appreciate the clarification.
10   Did Mr. Robertson ever tell you why he wanted
11 it done in -- with a 60-day development window?
12 A. No.
13 Q. Did you ever ask him?
14 A. I don't recall. I mean I -- I must have
15 questioned it at the time just because it was so tight.
16 But I -- I don't recall the specifics of -- of that
17 discussion anymore.
18   I imagine I begged for more time.
19 Q. A request that was denied?
20 A. No. Actually, that's probably not -- not true.
21 I'm trying to make light of a situation and I shouldn't
22 in a deposition. I apologize for that because, really,
23 what it was is, "That's -- that's a tight deadline. I
24 still think we can do it. You know, I'll let you know

TSG Reporting - Worldwide   877-702-9580

## Page 76

Confidential - D.Reese 1

1 if I think there's going to be a problem."
2 Q. And did MP3tune have to -- have to hire, either
3 as employees or contractors, more engineers to get the
4 job done?
5 A. No, we didn't.
6 Q. At that point in time, how many times engineers
7 did you have? MP3tunes, I mean?
8 A. Maybe half a dozen.
9 Q. And prior to that meeting where the change in
10 business strategy was announced, were they deployed on
11 other projects?
12 A. Yes.
13 Q. And after that meeting, were they all
14 redeployed to the development effort for the locker
15 service?
16 A. Yes.
17 Q. So, at the time, it was a fairly significant
18 shift in the resources of people working for you?
19 A. Oh, yes.
20 Q. Okay. Does that conversation -- does that --
21 does this back-and-forth refresh your recollection at
22 all as to how you first learned that the -- that
23 MP3tunes was going to shift focus from the indie music
24 store to the locker service?

TSG Reporting - Worldwide   877-702-9580

## Page 77

Confidential - D.Reese 1

1 A. No. No.
2 Q. Did you ever have discussions with
3 Mr. Robertson about the decision to shift focus to the
4 locker service?
5 A. I may have.
6 Q. Can you recall any of those discussions?
7 A. No, I can't.
8 Q. Did you ever have any discussions with
9 Emily Richards regarding the decision to shift focus
10 from the indie music store to the locker service?
11 A. I probably did.
12 Q. Can you remember any of those discussions?
13 A. No, I can't.
14 Q. Can you remember, generally, what Ms. Richards'
15 reaction was?
16 A. She was -- I don't think she was as comfortable
17 with the decision, necessarily, as -- as she could have
18 been. Mainly because she knew the music business,
19 selling music, things like that.
20   Some of this is speculation on my part because
21 I -- I don't remember talking to her about these
22 specifically. This is my general impression.
23   And moving to a locker service was a highly --
24 change technically and not being a technical person, I

TSG Reporting - Worldwide   877-702-9580

# Exhibit 6

1                    C. Brocious
2     didn't feel right.
3           And I'm no lawyer. I didn't know
4     exactly why.
5           But, you know, it -- if not a
6     copyright issue, then something in terms of -- I
7     don't really know what I'm trying to say here.
8           But just in general it just -- it
9     didn't seem right.
10        Q.   And did you personally convey your
11    concerns to Mr. Robertson?
12        A.   Yes.
13        Q.   And what did he say back to you?
14        A.   He said --
15             MR. GULIA: Objection as to form.
16        A.   He said, you know, this is -- this is
17    how it's going to be done. I'm on the business
18    side. You're on the technical side. You just
19    implement this, and I'll deal with that, you
20    know. I'll deal with any legal issues or
21    business issues it presents.
22             That was how it always went.
23        Q.   That was my question.
24             In your experience in dealing with
25    Mr. Robertson was that commonly how he dealt with

# Exhibit 7

Page 27

1  masked the reality. But I think it was more, I have to do
2  two things. I have to upload the music and I have to
3  store it.
4      I can't change the way I upload it, even though
5  I'm sure that would have saved him lots of money, if he
6  could. That's what mp3.com did. So he said I can't
7  change that part, but I can change the storage part, and
8  that's specifically how he kind of started that
9  conversation with me, was I figured out how to solve the
10 storage problem and the costs associated with that.
11     And he was quite beaming and exuberant and
12 animated, I would even say, in this idea, which you could
13 tell he thought was a brilliant idea to be able do it that
14 way.
15     Q.  And you affirmatively raised with Mr. Robertson
16 the question of whether his idea was legal under the
17 copyright laws?
18     A.  Yes. I didn't like scold him or say "Michael,
19 shame on you. You shouldn't do that." I brought up that
20 if they find out that you did it this way, you, I think,
21 will be in trouble.
22     Q.  And what was his reaction to that?
23     A.  Again, how are they going to find out? They
24 won't know. They don't have access -- when I say "they,"
25 the people who would care that this copyright violation

1  had taken place, would never know. How would they have
2  access to the data center? How would they know how we did
3  this?
4        So he expressed -- I think he certainly
5  recognized that was a risky idea to do it that way, but he
6  expressed confidence in taking that risk that he wouldn't
7  be discovered.
8     Q.   And you testified that you had a discussion on
9  the issue of what actions he might take if he was
10 investigated or people did have suspicions about what he
11 had done; correct?
12    A.   Correct.
13    Q.   Okay. Can you describe that in more detail?
14    A.   Well, again, the thinking was that they won't
15 know what I did in my data center. They will know what
16 the consumer is doing. That will be publicly visible for
17 all to see. But once that consumer uploads that music,
18 nobody will know what we do from that point on.
19       If I think that it could be discovered, if I
20 think somebody may investigate this, and I might get hit
21 with a subpoena to look at my servers, I can quickly, very
22 easily write a script that would go through all of the
23 database and do it the right way.
24       Now, he would have to go buy a bunch of hard
25 drives to do it, but it would be a relatively time-wise

1   simple thing to hurry and hide the fact that they had done
2   it the other way.
3          Now, I want to add that I have no idea what they
4   did. I have no idea. I can only testify to what he
5   represented to me. Did they do it that way? He never
6   told me. He never discussed with me, Hey, we took my idea
7   and implemented it. Honestly, there were a few more
8   discussions about this and then from then on every time we
9   talked about MP3tunes, it was about other things.
10  Q.    Okay. This discussion you had with Mr. Robertson
11  about the locker and the storage space issue and his idea
12  to overcome it, to your knowledge, are there other people
13  who observed Mr. Robertson say the same or similar things
14  that he said to you?
15  A.    The two examples I can think of that are
16  Emily Richards and Chad Olson. Emily Richards had a
17  discussion with me where she was clearly concerned about
18  what Michael was planning on doing.
19         You have to realize she was an independent artist
20  that thought she was going to take this position at
21  MP3tunes to sell independent music to people. That was
22  the appeal for her. That's why she went and took that
23  job.
24         After she takes the job, she now is informed, Oh,
25  we are going to get into this locker business. So she

Exhibit 10

[10]

**[Page 37]**

1  that had sideloaded that file?
2      MS. DONOVAN: Objection. Vague.
3      THE WITNESS: No.
4  BY MR. McFADDEN:
5      Q And did you remove access to the files for
6  users who had sideloaded the file?
7      A No.
8      Q Did you -- is it true that many files would
9  have artwork associated with them?
10     A That comes from a different system, but that
11 is unrelated to the specific issue at hand. The
12 sideload did not involve the album art process.
13     Q If a user -- okay.
14     If a user had sideloaded a file, would they
15 end up with album artwork --
16     A No.
17     MS. DONOVAN: Objection. Incomplete
18 hypothetical.
19 BY MR. McFADDEN:
20     Q Did anyone, in response to a takedown notice,
21 ever instruct you to attempt to remove album artwork
22 associated with files in the takedown notices?
23     A No.
24     MS. DONOVAN: Objection. Assumes facts not in
25 evidence.

**[Page 38]**

1  BY MR. McFADDEN:
2      Q In response to a takedown notice, did anyone
3  ever instruct you to identify the user associated
4  with -- who had originally sideloaded that file?
5      A No.
6      Q In response to a takedown notice, did anyone
7  ever instruct you to attempt to identify -- let's back
8  up.
9      A Sideload URL is a link to a specific file,
10 correct?
11     A Not exactly.
12     Q Okay.
13     A By a Sideload URL, if you mean the
14 www.sideload.com/cb/track/?id, that is explicitly a
15 reference to a row in this table in the database which
16 would reference a URL on another system.
17     Q I see.
18     And that URL on the other system is a link to
19 a specific file?
20     A Correct.
21     Q Okay. Thanks.
22     And a specific file generally represents a
23 song, right?
24     A In most cases, yes.
25     Q And there may be more than one URL -- more

**[Page 39]**

1  than one distinct URL -- and now we're discussing the
2  user_locker_data.sideload_files table?
3      A Correct.
4      Q There may be one more than one URL in that
5  table that reflects the same song?
6      A Correct.
7      MS. DONOVAN: Objection. Incomplete
8  hypothetical. Vague.
9  BY MR. McFADDEN:
10     Q Was there anything unclear about the question,
11 you thought?
12     A No.
13     Q And did anyone ever instruct you, in response
14 to a takedown notice, to attempt to find any song on
15 Sideload and remove access to it?
16     MS. DONOVAN: Objection. Assumes facts not in
17 evidence.
18     There aren't songs on Sideload.
19     THE WITNESS: There was nothing like that, no.
20 BY MR. McFADDEN:
21     Q Well, yeah, Ms. Donovan's objection goes to
22 sort of the technical nature.
23     There are no songs actually available on --
24     A On the Sideload.
25     Q The Sideload site is links to songs, correct?

**[Page 40]**

1      A Correct.
2      Q And when you're on the Sideload site, how do
3  you find a song you want? Do you know?
4      A There was a search field that you would use.
5      Q And you enter -- you can enter a song into the
6  search field?
7      A You would enter the name of an artist or track
8  or something. You entered it in, and that would pop up
9  information that -- it would pop up references to this
10 table using other tables, which are not in evidence at
11 the moment, that would be able to find these URLs.
12     Q And, basically, the result of that would be a
13 list, in a sense, of -- or at least a way of accessing
14 the URLs from this table associated with the song or the
15 artist, I suppose, that the person had searched for?
16     A Correct.
17     Q Okay. And just to be clear, then, when you
18 received a takedown notice, did anyone ever instruct you
19 to attempt to find -- let me step back.
20     A URL on a takedown notice would be associated
21 with a particular song, correct?
22     MS. DONOVAN: Objection. Calls for
23 speculation.
24     THE WITNESS: It would be associated with a
25 particular row in this table in Exhibit 2.

## Certificate of Service

I, Joseph J. McFadden, do hereby certify that on this 3rd day of November 2010 I caused true and correct copies of the within Declaration of Andrew H. Bart Regarding Errata In Connection With Plaintiffs' Motion For Summary Judgment to be served via elecontronic transmission and First Class Mail upon John Dellaportas, Duane Morris, 1540 Broadway, Suite 1400, New York, NY 10036-4086.

_____
Joseph J. McFadden