# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CAPITOL RECORDS, LLC, *et al*,  )
)
               *Plaintiffs*,  )  No. 07 Civ. 9931 (WHP)(FM)
)
        v.  )
)
MP3TUNES, LLC, and MICHAEL ROBERTSON, )
)
           *Defendants*.  )
)
MP3TUNES, LLC, and MICHAEL ROBERTSON, )
)
          *Counter-Claimants*,  )
)
        v.  )
)
CAPITOL RECORDS, LLC, *et al*,  )
)
         *Counter-Defendants*.  )

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ..................................................................................1

STATEMENT OF FACTS .......................................................................................5

I.  THE CREATION OF THE LOCKER AND SIDELOAD WEBSITES ...............................5

II.  THE SIDELOAD WEBSITE DISTRIBUTES MUSIC FROM PATENTLY
   INFRINGING SOURCES....................................................................................8

   A.  The Sideload Website Aggregates and Magnifies Infringement from Small,
      Personal Websites ........................................................................................8

   B.  Other "Locker" Sites, Which Were Clearly Not Legitimate Sources of Music
      Sideloads, Were Nonetheless Major Sources of Sideloads .........................10

   C.  The Sideload Services Enable Users to Circumvent Access Requirements
      Imposed by Copyright Owners....................................................................11

III.  MP3tunes Knew Its Services Were Being Used to Commit Systematic
   Infringement ...................................................................................................12

ARGUMENT ......................................................................................................15

I.  STANDARD OF REVIEW ................................................................................15

II.  MP3TUNES IS LIABLE FOR THE INFRINGING SIDELOADS OF ITS USERS..........15

   A.  MP3tunes' Users Directly Infringed Plaintiffs' Copyrights Through the
      Sideload Services.........................................................................................15

   B.  MP3tunes Is Liable for Contributory Copyright Infringement....................16

      1.  MP3tunes Knew the Sideload Services Were Used to Infringe.........16

      2.  MP3tunes Materially Contributed to its Users' Infringement...........20

   C.  MP3tunes is Vicariously Liable for Its Users' Infringement.......................20

      1.  MP3tunes Had the Right and Ability to Supervise the Infringing
         Activity............................................................................................20

      2.  MP3tunes Reaped a Direct Financial Benefit From Infringement. .................21

   D.  MP3tunes is Liable for the Copyright Infringement of its Executives .......................22

III.  MP3TUNES HAS DIRECTLY INFRINGED PLAINTIFFS' EXCLUSIVE RIGHT OF PUBLIC PERFORMANCE ....................................................................22

    A.   The Decision to Use a "Single Master" Storage System. ...........................22

    B.   MP3tunes' Infringement of Plaintiffs' Public Performance Right. ............24

IV.  MP3TUNES IS LIABLE FOR INFRINGEMENT OF PLAINTIFFS' COPYRIGHTED COVER ART. ..........................................................................26

V.   MP3TUNES IS NOT ENTITLED TO A DMCA SAFE HARBOR. ..................27

    A.   MP3tunes Failed to "Reasonably Implement" a "Repeat Infringer" Policy................28

    B.   MP3tunes Did Not Remove Infringing Content in Response to Plaintiffs' DMCA Notices. .........................................................................................32

    C.   MP3tunes Both Knew of and Disregarded Blatant "Red Flags" of Widespread Copyright Infringement ............................................................................33

CONCLUSION....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
239 F.3d 1004 (9th Cir. 2001) ................................................................. passim

*ALS Scan v. Remarq*,
239 F.3d 619 (4th Cir. 2001) ..................................................... 18, 28, 29, 33

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ..................................................................................... 15

*Arista Records, Inc. v. Flea World, Inc.*,
No. 03-2670 (JBS), 2006 WL 842883 (D.N.J. Mar. 31, 2006) ............... 17, 21, 22

*Arista Records LLC v. Lime Group LLC*,
No. 06-CV 5936, 2010 WL 2291485, (S.D.N.Y. May 25, 2010) ................ 16

*Arista Records LLC v. Usenet.com, Inc.*,
633 F.Supp.2d 124 (S.D.N.Y. 2009) ......................................................... passim

*BMG Music v. Gonzalez*,
430 F.3d 888 (7th Cir. 2005) ............................................................... 16, 30

*Cartoon Network L.P. v. CSC Holdings, Inc.*,
536 F.3d 121 (2d Cir. 2008) ................................................................. 25, 26

*Celotex Corp.* v. *Catrett*,
477 U.S. 317 (1986) ..................................................................................... 15

*Columbia Pictures Industries, Inc. v. Fung*,
2009 WL 6355911 (C.D. Cal. 2009) ........................................................ 29

*Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*,
749 F.2d 154 (3d Cir. 1984) .................................................................... 25

*Corbis v. Amazon*,
351 F. Supp. 2d 1090 (W.D.Wash. 2004) ................................................ 32

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) ........................................................... 21, 32, 33

*Ez-Tixz, Inc. v. Hit-Tix, Inc.*,
919 F.Supp. 728 (SDNY 1996) ................................................................ 17

*Fame Publishing Co. v. Alabama Custom Tape, Inc.*,
507 F.2d 667 (5th Cir. 1975) .................................................................. 28

*Faulkner v. National Geographic Society,*
    211 F. Supp. 2d 450 (S.D.N.Y. 2002)................................................................17

*Faulkner v. National Geographic Society,*
    409 F.3d 26 (2d Cir. 2005)................................................................17

*Fonovisa v. Cherry Auction, Inc.*
    76 F.3d 259 (9th Cir. 1996) ................................................................22

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.,*
    443 F.2d 1159 (2d Cir. 1971)................................................16, 20, 21, 22

*In re Aimster Copyright Litig.,*
    252 F.Supp.2d 634 (N.D. Ill. 2002) ................................20, 27, 32

*In re Aimster Copyright Litigation,*
    334 F.3d 643 (7th Cir. 2003)................................29, 32, 34

*IO Group v. Veoh,*
    586 F. Supp. 2d 1132 (N.D. Cal. 2008) ................................................32

*Island Software & Computer Serv., Inc. v. Microsoft Corp.,*
    413 F.3d 257 (2d Cir. 2005)................................................................16

*Matthew Bender & Co. Inc. v. West Publ'g Co.,*
    158 F.3d 693 (2d Cir. 1998)................................................................16

*MGM Studios, Inc. v. Grokster, Ltd.,*
    545 U.S. 913 (2005) ................................................................20, 27

*National Football League v. PrimeTime 24 Joint Venture,*
    211 F.3d 10 (2d Cir. 2000)................................................................24

*Perfect 10 v. CCBill,*
    488 F.3d 1102 (9th Cir. 2007) ................................................30, 32

*Perfect 10 v. Cybernet Ventures,*
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ................................29, 33, 34

*Scotto v. Almenas,*
    143 F.3d 105 (2d Cir. 1998)................................................................15

*Screen Gems-Columbia Music, Inc. v. Mark-Fi Records, Inc.,*
    256 F.Supp 399 (SDNY 1966) ................................................17

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
    316 F.2d 304 (2d Cir. 1963)................................................................22

*UMG Recordings, Inc. v. MP3.com, Inc.,*
    92 F. Supp. 2d 349 (S.D.N.Y. 2000)................................................2

*UMG Recordings v. Veoh*,
    665 F. Supp. 2d 1099 (C.D. Cal. 2009) ................................................................32

*United States v. ASCAP*,
    -- F.3d ----, 2010 WL 3749292 (2d Cir., Sept. 28, 2010) ......................................24

*United States v. Texas*,
    507 U.S. 529 (1993)...............................................................................................28

*Viacom v. YouTube*,
    2010 WL 2532404 (S.D.N.Y. June 23, 2010) .......................................................32

## STATUTES

Fed. R. Civ. P. 56(c) ......................................................................................................15

17 U.S.C. §106..............................................................................................................23

17 U.S.C. § 512 .......................................................................................................passim

## OTHER AUTHORITIES

Nimmer on Copyright § 8.14 .........................................................................................35

## LEGISLATIVE HISTORY

H.R. Rep. No. 105-551 ..................................................................................................35

S. Rep. No. 105-190.................................................................................28, 30, 31, 34, 35

## CITATION FORMAT

Plaintiffs use the following citation forms in their Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment and in this Statement of Uncontroverted Facts:

a. Exhibits to the Declaration of Andrew H. Bart, dated October 29, 2010, are referred to as "Ex." followed by the exhibit number and, if appropriate, the specific page reference within the exhibit. For example, "Ex. 25 at 3" refers to page 3 of the document attached as Exhibit 25 to the Bart Declaration. When reference is being made to the transcript of deposition testimony, the citation includes the last name of the deponent and the specific page and line numbers. For example, "Ex. 1 (Robertson) at 46:7-12" refers to Lines 7-12 on Page 46 of the transcript of the deposition of defendant Michael Robertson, excerpts of which are collected and attached as Exhibit 1 to the Bart Declaration.

b. Citations to the Declaration of Professor Ellis Horowitz, dated October 29, 2010, are referred to as "Horowitz ¶ __" followed by the cited paragraph number, such that "Horowitz ¶ 14" refers to Paragraph 14 of the Horowitz Declaration. Exhibits to the Horowitz Declaration are referred to as "Horowitz Ex. __", such that "Horowitz Ex. T" refers to Exhibit T attached to the Horowitz Declaration. Professor Horowitz is submitting a series of video demonstrations on a DVD disk. Those are referred to as "Horowitz DVD Ex." followed by the DVD exhibit number, such that "Horowitz DVD Ex. 1" would refer to Exhibit 1 of the DVD video demonstrations submitted with the Horowitz Declaration.

c. Citations to the Declarations of Audrey Ashby, Michael Abitbol, Anne Tarpey and Alasdair McMullen, each submitted herewith in support of Plaintiffs' Motion for Summary Judgment, adhere to the same form as citations to the Horowitz Declaration.

## PRELIMINARY STATEMENT

For the past five years, defendant MP3tunes, LLC ("MP3tunes") has operated its business through two websites that, together, have been responsible for the infringement of thousands of copyrighted sound recordings, musical compositions, and images belonging to plaintiffs. That these websites have been the engines of massive infringement is no accident – infringement is the backbone of MP3tunes' business plan. The record clearly demonstrates that defendant made the intentional decision to use the draw of free access to infringing songs as a means of differentiating its services from those of its competitors, thus misappropriating plaintiffs' assets in an attempt to build its own business.

The first of MP3tunes' websites, located at www.mp3tunes.com (the "Locker Website"), is designed to allow users to store digital music files on MP3tunes' computer servers in so-called "lockers," and to listen to those files from a wide variety of internet-enabled devices. The second, located at www.sideload.com (the "Sideload Website"), is designed to drive paying traffic to the Locker Website by assisting users in locating music files on the internet and copying those files to MP3tunes' "lockers" for playback or use through the Locker Website.

The Locker Website and the Sideload Website operate as parts of an integrated business model. MP3tunes makes money by selling monthly or yearly subscriptions to the Locker Website. MP3tunes uses the Sideload Website to drive traffic to the Locker Website. MP3tunes does not have a license from plaintiffs or other record labels or music publishers. Rather, it simply converts the value of these assets for its own use and benefit.

Defendant cannot credibly deny that its conduct amounts to wholesale copyright infringement. Instead, MP3tunes and its CEO, defendant Michael Robertson ("Robertson"), try to cast this case as a referendum on "cloud" computing in general. They also tout the benefits to users of being able to store music they have lawfully acquired in a "locker" on the internet in

order to access the music from anywhere.  But this case is not about cloud computing or what users may do with their lawfully-acquired sound recordings.  This case is about defendants' unlawful exploitation of copyrights they do not own to advance their own business interests.  It is about defendants' persistent refusal to abide by fundamental principles of copyright law.  Defendants' plan was simple:  steal assets, build up a user base and sell the company before copyright owners could obtain a judgment and shut the service down.  Ex. 75.

Robertson is not a novice at this game.  Some years ago, he started a company called MP3.com, which was the subject of a seminal copyright decision in this District.  *UMG Recordings, Inc. v. MP3.com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000).  When it launched, MP3.com was devoted to distributing the music of independent, less-well-known artists.  When Robertson concluded that MP3.com could not be sufficiently profitable without access to major record company music, he converted MP3.com into what he called a "locker" service.  However, then, like now, Robertson designed the system in a way that flagrantly disregarded copyright laws.  MP3.com unlawfully copied countless music CDs to its servers and gave users access to music upon demonstrating that they possessed the same CD.  The Court had no difficulty finding that MP3.com was guilty of *willful* copyright infringement for copying thousands of music CDs to its computer servers.  *UMG Recordings, Inc. v. MP3.com*, 56 U.S.P.Q.2d 1376 (2000).  Notably, it was not the generalized notion of a "locker" that resulted in MP3.com's liability, but rather Robertson's implementation of that concept.[1]

Robertson made no secret of the fact that he viewed his current company, MP3tunes, as a vehicle to continue what he started with MP3.com.  Ex. 6 (Brocious) at 39:15-41:2.  The parallels are striking.  MP3tunes also started as a website devoted to selling the music of

---

[1] MP3.com was forced to pay tens of millions of dollars in judgments and settlements.  It was eventually sold and its locker service abandoned.  Robertson, however, who was not an individual defendant in that case, reportedly earned over $100 million from the sale of his interest notwithstanding the findings of copyright liability against MP3.com.

independent, lesser known artists. Ex. 2 (Robertson) at 39:3-13; Ex. 3 (Robertson) at 6:8-15; Ex.

4 (Robertson) at 57:15-18; Ex. 12 (Richards) at 24:13-17; Ex. 13 (Ruth) at 10:20-11:1.  When

Robertson again concluded that he could not make enough money selling independent music, he

converted MP3tunes into a "locker" service. Ex. 12 (Richards) at 27:22-28:7, 31:3-6.  Yet, once

again, Robertson designed the MP3tunes system in a manner that runs roughshod over copyright

law.  In particular, three of defendants' business decisions are at issue in this suit.

 *First*, MP3tunes chose to offer more than just an online storage locker service.  To attract

a larger number of subscribers, MP3tunes created a service to help users steal music.  MP3tunes

combined its Locker Website with the Sideload Website and other tools to enable users to find

and copy "free" music on the internet.  Using MP3tunes' services, users can obtain permanent

copies of almost any song they want *for free*.  MP3tunes knew full well that the "free" music it

was using to enhance the popularity of its locker service was also overwhelmingly infringing.

 *Second*, to save the cost of separately storing multiple copies of identical songs uploaded

by different users, MP3tunes designed its system to store only a single "master" copy of all

identical song files, making the master copy available to all users who requested the song.  In

this regard, MP3tunes stored music similarly to Robertson's first company, MP3.com.  Although

MP3tunes requires each user to physically upload every song file, it does not maintain song files

that are identical to files previously stored on its servers.  The legal significance of the single

master design is that when multiple MP3tunes subscribers access the same content file to listen

to a song, under copyright law, MP3tunes is engaged in an infringing public performance of that

song.  From his experience at MP3.com, Robertson knew that the use of the single master design

in an unlicensed locker service was unlawful.  However, he hoped that requiring users to engage

in the time-consuming facade of uploading every song file (even those that would be discarded)

3

would conceal the use of the single master design.  Ex. 6 (Brocious) at 47:12-52:15; Ex. 7 (Carmony) at 25:18-26:7; Ex. 78.

*Third*, MP3tunes wanted to enhance its subscribers' experience by displaying images of album cover art ("Cover Art") when subscribers listened to songs from the Locker Website. MP3tunes, however, did not want to pay for Cover Art.  So, rather than obtaining a license, MP3tunes figured out a way to copy the Cover Art from Amazon.com, in plain violation of Amazon's terms of service.  In doing so, MP3tunes willfully infringed plaintiffs' copyrights.

MP3tunes attempts to avoid responsibility for its flagrant copyright infringement by seeking refuge behind the limited safe harbors contained in the Digital Millennium Copyright Act (the "DMCA"), codified at 17 U.S.C. § 512, which limits liability for certain defined categories of infringement by *qualifying service providers*.  However, MP3tunes fails, at the most basic levels, to meet the DMCA's eligibility requirements.  Most simply, despite receiving numerous takedown notices, MP3tunes failed – as required by the DMCA – to disable access to the identified infringing material by the thousands of users who had access to that music through their MP3tunes "lockers."  Additionally, despite receiving notices from copyright owners which provided information sufficient to identify hundreds of users who had repeatedly infringed plaintiffs' copyrights through the MP3tunes' websites, MP3tunes failed – as required by the DMCA – to take any action to terminate "repeat infringers" or otherwise prevent them from continuing to infringe.  Finally, MP3tunes had knowledge of the massive copyright infringement occurring through its websites – knowledge that disqualifies MP3tunes from claiming a safe harbor.  Defendant's disqualifying knowledge came from many sources, but none more devastating than its own actions:  as discovery revealed, every member of the MP3tunes' executive team repeatedly used the company's services to infringe plaintiffs' copyrights.

4

In the end, MP3tunes is liable for the thousands of plaintiffs' copyrighted works that it and its users have infringed. It is liable as a contributory copyright infringer because it both knew of and contributed to the infringement. It is equally liable as a vicarious copyright infringer because it profited from its users' infringement while refusing to exercise its right and ability to mitigate that infringement. MP3tunes is further liable as a direct copyright infringer (i) for infringing plaintiffs' exclusive right of public performance by streaming "master" copies of plaintiffs' songs to multiple users; (ii) for infringing plaintiffs' exclusive rights in Cover Art by unlawfully reproducing those images onto its servers; and (iii) for the almost two hundred infringing copies of plaintiffs' works made by its own senior executive team.

## STATEMENT OF FACTS

## I.     THE CREATION OF THE LOCKER AND SIDELOAD WEBSITES

In February 2005, Robertson founded MP3tunes as an online music store to sell downloads of music from independent music artists. Ex. 2 (Robertson) at 39:3-13; Ex. 3 (Robertson) at 6:8-15; Ex. 4 (Robertson) at 57:15-18, 165:17-22; Ex. 5 (Reese) at 71:18-73:8; Ex. 12 (Richards) at 24:13-17; Ex. 13 (Ruth) at 10:20-11:1. By the fall of 2005, Robertson had concluded that selling music by independent artists was not a sufficiently lucrative enterprise. Ex. 12 (Richards) at 27:22-28:7, 31:3-6, 32:8-19. Robertson called a general meeting and announced a new direction for the company: an online "locker" service. Ex. 5 (Reese) at 73:24-74:5; Ex. 6 (Brocious) at 38:3-41:8; Ex. 12 (Richards) at 27:22-28:7; Ex. 14 (Ruth) at 11:16-22, 13:6-12. A "locker" storage service allows users to upload their personal digital files to a third-party internet server and then access those files from a wide array of internet-enabled devices. SUF ¶ 5.

MP3tunes was not the first company to offer online storage, but it was among the first to focus exclusively on digital music files. Ex. 4 (Robertson) at 166:4-167:6. The shift from an

independent music store to an online storage service was a radical change in the business of MP3tunes. Ex. 6 (Brocious) at 24:13-22. MP3tunes' President strongly opposed the change. Ex. 6 (Brocious) at 42:17-25; Ex. 12 (Richards) at 31:7-8. Robertson, the company's CEO, insisted on the new plan and transferred all engineering personnel to the project. Ex. 6 (Brocious) at 24:13-22; 35:3-22.

At the same time that defendants were shifting their business model away from selling music and into charging people to store it, they were also looking for a way to differentiate their "locker" service from potential competitors and to provide a "viral" marketing component to encourage users to purchase paying "locker" accounts. Ex. 4 (Robertson) at 208:21-210:4, 380:7-17. They decided that rather than just allowing users to upload their own music from their personal computers, MP3tunes would help users find music on the internet and "sideload" permanent copies directly into their MP3tunes lockers. Ex. 93. They referred to the act of transferring copies of music files from third-party websites to MP3tunes lockers as "sideloading," and they viewed sideloading as their competitive edge. *Id.*. To further this strategy, MP3tunes created the Sideload Website to attract users, who MP3tunes could then convert into paying subscribers to the Locker Website. SUF ¶ 77.

There are three related aspects to MP3tunes' sideloading services: (i) a software application developed and distributed by MP3tunes known as the "Sideload Plug-in"; (ii) a Locker Website feature known as the "Webload Feature"; and (iii) the Sideload Website. (Together, the Sideload Website, the Sideload Plug-in and the Webload Feature are referred to as the "Sideload Services.")

The Sideload Plug-In is an application installed as part of the user's regular internet browser. Whenever a user visits a webpage that contains a link to a music file, the Sideload Plug-In places an icon (a button) next to the link to that music file. The user merely needs to

6

click the Sideload icon to transfer (or sideload) a permanent digital copy of the song to the

MP3tunes server and into the user's MP3tunes locker.  SUF ¶ 9.

The Webload Feature was a box on the Locker Website where a user could manually

input the internet address of an unprotected music file.  Then, just like the Sideload Plug-In, the

Webload Feature would cause a permanent digital copy of the song to be transferred (or

sideloaded) to the MP3tunes server and into the user's MP3tunes locker.  SUF ¶ 10.

Both the Sideload Plug-In and the Webload Feature worked in conjunction with the

Sideload Website.  When anyone sideloaded a song into their MP3tunes "locker" – whether

using the Sideload Plug-In or the Webload Feature – MP3tunes did more than simply copy the

song to the MP3tunes server.  It also added a "link" to that song on the Sideload Website.

Thereafter, visitors to the Sideload Website did not have to visit, or even know about, the

original website that contained the music file.  Users could simply click an icon on the Sideload

Website to add a copy of that song to their MP3tunes locker.  SUF ¶¶ 12-15.

The only way a link could be added to the Sideload Website was through the Sideload

Plug-In or the Webload Feature.  Thus, every link to a song file on the Sideload Website

represented a song that had been "sideloaded" to the MP3tunes servers by an MP3tunes "locker"

user.  SUF ¶13.  In this manner, links to hundreds of thousands of song files came to be included

on the Sideload Website, and defendants offered every one of them to users for free.  SUF ¶¶ 13-

14.

MP3tunes took pains to make sure users could readily find this "free" music.  The

Sideload Website provided a search function, so users could search for any recording by artist or

title.  SUF ¶ 16.  It also provided lists of "Most Popular" songs, "Featured" songs, and "New"

songs to help users find available recordings.  SUF ¶ 17.  For each file added to the Sideload

Website, MP3tunes generated a "Track Details" page that provided additional details about the

digital music file, and even presented a list of other recordings from that same artist available on the Sideload Website. SUF ¶ 18. From an individual "Track Details" page, the user has the additional options of playing the music file through a music player offered by MP3tunes on that page, downloading the music file to a computer hard drive, emailing a link to the recording to a friend, or copying the recording to a mobile phone. Horowitz ¶ 24. (More information about the Sideload Services is contained in the accompanying Declaration of Ellis Horowitz.)

## II.   THE SIDELOAD WEBSITE ACCESSES MUSIC FROM PATENTLY INFRINGING SOURCES

The Sideload Services enable users to locate and obtain permanent copies of digital music files scattered across the internet. MP3tunes knows the overwhelming portion of these files are infringing. It also knows that it has no right to further exploit these infringing files by using them to build a digital music service. MP3tunes ignored these facts because it wanted a "destination site" to attract users to pay for locker subscriptions. SUF ¶ 77.

### A.   The Sideload Website Aggregates and Magnifies Infringement from Small, Personal Websites

The internet is full of websites hosting a few unauthorized copies of copyrighted songs, often to accompany personal events, not to distribute to others. A few simple examples include:

- The website of the Roseville Sugarbears, a local swim team training at Roseville High School in California, which posted a slideshow with pictures of the year's highlights. The slideshow was accompanied by a sound recording of the song "Every Breath You Take" by The Police. SUF ¶ 41(b); Horowitz DVD Ex. 4.

- The personal website of a person named Neil Doshi who posted photos about his trip to Thailand and other activities. The website was hosting a sound recording of Bob Marley singing the song "Buffalo Soldier." Horowitz DVD Ex. 3.

- The wedding website of "DeShonne and Michael," designed to provide family members with wedding information, plays a copy of Frank Sinatra singing the song "Love and Marriage" in the background. Horowitz ¶ 40 & DVD Ex. 2.

The Sideload Website is full of recordings from such personal websites, including the three described above. SUF ¶¶ 47-51, Horowitz ¶ 84. MP3tunes' CTO, Reese, admitted that many of the "top" source sites for the Sideload website were "personal sites," *i.e.*, "non-commercial sites," including "some college address book site." SUF ¶ 49.

The infringement occurring via each of these websites, standing alone, is relatively minimal and innocuous. It is unlikely that a large number of users would find, let alone access, Neil Doshi's personal website to obtain the song "Buffalo Soldier." The Sideload Website, however, transforms these sites from vehicles for personal memories to potentially massive distributors of online music. Once a single MP3tunes user has used the Sideload Plug-in or the Webload Feature to copy a recording from an obscure personal website to the MP3tunes system, MP3tunes posts a link to that song file publicly on the Sideload Website. SUF ¶ 12-13. From then on, users of the Sideload Website can simply search for "Bob Marley" or "Buffalo Soldier" on the Sideload Website. SUF ¶ 16; Horowitz DVD Ex. 4. Then, without ever leaving the Sideload Website and without ever viewing the original personal source website, the user can listen to the song, copy it to a computer, or transfer it to an MP3tunes' locker account. SUF ¶ 14-15.

MP3tunes was also aware that many users posted their personal music collections on personal websites or webservers, and then "sideloaded" that music to their music "locker." SUF ¶¶ 47-58. This practice developed because MP3tunes originally did not allow users of free lockers to upload music from their personal computers but permitted those users to "sideload" from websites (seemingly because "sideloaded" music benefitted MP3tunes by populating the Sideload Website). Ex. 4 (Robertson) at 197:22-200:11. MP3tunes was aware that this practice resulted in personal files being made publicly available on the Sideload Website. SUF ¶¶ 47-50, 52-57. Yet, even when MP3tunes was notified by users that they had sideloaded files from

personal websites or webservers (thereby adding them to the Sideload Website), MP3tunes took

no steps to remove those infringing links from the Sideload Website. Ex. 11 (Lindahl) at 131:5-

133:25.

>    **B.    Other "Locker" Sites, Which Were Clearly Not Legitimate Sources of Music**
>    **Sideloads, Were Nonetheless Major Sources of Sideloads**

There are numerous websites that call themselves "locker" services and allow users to

upload and store digital files, including music files. Exs. 79, 45, 51; Horowitz ¶ 69. Illustrative

of these websites are www.ezarchive.com, www.fileden.com, www.rapidshare.com, and

www.filefactory.com. Exs. 44-45, 53, and 79-81; Horowitz ¶ 69. The ostensible purpose of

these websites is to store ***personal*** files – ***not*** to distribute files publicly. Nevertheless, because

of intentionally lax restrictions on sharing files, many of these file storage sites have reputations

as havens for piracy.[2]  Indeed, Robertson was aware that such websites permitted public access

to personal files uploaded by other users, which he admitted was wrong. Ex. 4 (Robertson) at

425:13-431:14.

These other "locker" sites could ***never*** be a legitimate source of music sideloads. Even if

a recording was lawfully stored on the locker site, ***distributing*** that recording – by sideloading to

an MP3tunes locker and publicly posting a link to it on the Sideload Website – would constitute

blatant copyright infringement. Nevertheless, MP3tunes took no action to block song files from

these locker sites from being sideloaded to MP3tunes lockers and thereby added to the Sideload

Website for further unlawful, public distribution. In fact, ***every single member of MP3tunes'***

***executive team personally sideloaded multiple files from such file storage websites***. SUF ¶¶ 41,

53; Horowitz ¶ 84. Indeed, Robertson sideloaded five sound recordings by the EMI band Air

from a "locker" website called www.fileden.com. Horowitz ¶ 84(a).

---

[2]  Some of these sites in fact actively encourage infringement by, among other things, paying
users when content they upload is widely distributed.

These other "locker" sites became major sources of sideloading. The "locker" site www.fileden.com became the 6th most popular source of music on the Sideload Website. SUF ¶ 54. MP3tunes knew about these unlawful sideloading sources, including from periodically reviewing lists of "top" source sites that plainly revealed the prominence of such sites. SUF ¶ 61. MP3tunes even received a takedown notice from another major record company identifying dozens of recordings sideloaded from the "locker" site www.rapidshare.com. The MP3tunes employee responsible for responding to takedown notices testified that he was not instructed to take any action to block the site from the Sideload Website. SUF ¶¶ 57-58.

### C.   The Sideload Services Enable Users to Circumvent Access Requirements Imposed by Copyright Owners

On the rare occasion that major record labels and publishers authorize music to appear for "free" on the internet, they almost invariably do so only with certain conditions or restrictions. Ex. 82. For example, when downloads are authorized without the requirement of a monetary payment from the consumer, plaintiffs generally require the exchange of valuable marketing information, such as a name, an email address, and a mailing address. *Id.* Similarly, bonus content is sometimes made available online only to users who can prove they have already purchased an album (*e.g.*, by entering a "code" that was provided only with purchase). Exs. 183-84. In either case, these "free" downloads are not truly "free"; they are given in exchange for valuable consideration or otherwise subject to access restrictions.

Through the Sideload Services, MP3tunes circumvents these conditions and restrictions. If *any* user is able to gain access to the protected file's source location, the Sideload Plug-in or the Webload Feature will copy it to MP3tunes' servers and MP3tunes will post a link directly to the source location on the Sideload Website, thus making the recording available to *all* users *without requiring any subsequent "sideloaders" to provide marketing data to the plaintiffs or to comply with plaintiffs' restrictions.* Horowitz ¶¶ 33-35 & Ex. K. & DVD Ex. 1; Exs. 82-84

and 86. Some of the songs obtained this way have gone on to become MP3tunes "Featured Tracks" on the Sideload Website. Horowitz ¶ 33-35.

In addition, certain tracks have been offered for *listening only*. Horowitz ¶¶ 36-39 & Ex. L. In such cases, the website did not offer the music for free download, but rather for listening through a music player on the website. *Id.* One such example is the EMI Label artist Katy Perry, whose website featured a music player that normally would have prevented a user from being able to copy the files being played. *Id.* Nevertheless, either a user or employee of MP3tunes traced the source of the music that was streaming on the site and sideloaded it to an MP3tunes locker, with MP3tunes thereby posting a link on the Sideload Website directly to the source location of the song. *Id.* Thereafter, all users of the Sideload Website were able to obtain unauthorized, permanent copies of the recordings by visiting only the Sideload Website. *Id.*

Finally, the Sideload Services also permit the continued exploitation, through the Sideload Website, of files that are no longer available at the web page where the link to the music file was initially offered, provided the file is still available at a "Source URL" (which normally would not be public). In this way, files that users can no longer even find on the internet continue to be publicly accessible from the Sideload Website. Horowitz ¶¶ 33-35, 40 & DVD Ex. 2; Ex. 5 (Reese) at 195:6-11, 197:3-22; Ex. 19. For example, Frank Sinatra's recording of "Love and Marriage" was posted to the Sideload Website and sourced from the personal wedding page of "DeShonne and Michael." Although that webpage no longer exists, the file is still distributed through the Sideload Website. Horowitz ¶ 40 & DVD Ex. 2.

## III.   MP3TUNES KNEW ITS SERVICES WERE BEING USED TO COMMIT SYSTEMATIC INFRINGEMENT

MP3tunes had knowledge of the rampant infringing activity occurring on the Sideload Website from numerous sources. Plaintiffs and other copyright owners sent MP3tunes written notices advising of widespread copyright infringement. SUF ¶¶38-40. Plaintiffs' notices

identified hundreds of infringing recordings available on the Sideload Website and copied to MP3tunes' locker accounts. SUF ¶¶ 38-39.

MP3tunes' sole response to takedown notices was to remove the specific links listed in the takedown notices from public access on the Sideload Website. Horowitz ¶ 61(a). Significantly, MP3tunes' did not remove the music files identified in takedown notices from any user locker accounts into which they had already been sideloaded, even though MP3tunes could easily have done so. SUF ¶ 83. As a result, the music files identified in takedown notices remained on MP3tunes servers and were available for all purposes to the thousands of MP3tunes locker users who had already sideloaded them. SUF ¶ 84-96.[3]

MP3tunes also had actual knowledge of infringement because each member of MP3tunes' executive team acting within the scope of their employment, repeatedly used MP3tunes' Sideload Services to engage in it. Specifically:

- Michael Robertson personally copied thousands of files using the Sideload Services. Horowitz Ex. W(i) & W(vi). In addition to the files that Robertson copied from obvious locker storage sites (discussed above), Robertson sideloaded a Michael Jackson song from a French website that urged people to download its music before it was shut down "under censorship pressure of a few billionaires." SUF ¶ 41(c). He downloaded a Madonna song from a pirate site offering "10 million mp3z." SUF ¶ 41(d). He even copied a song file from the Roseville Sugarbears website mentioned in section IV(A), supra. SUF ¶ 41(b); Horowitz DVD Ex. 4.

- Emily Richards, MP3tunes' President, also sideloaded a number of infringing files. Among the numerous obviously infringing files she obtained were songs from the EMI artist Coldplay from the locker site www.ezarchive.com, the Beatles recording of "In My Life" from a student's personal webpage at Oregon State University, and nearly an entire John Lennon album from the locker site www.onlinestoragesolutions.com. SUF ¶ 41(e).

---

[3]   Moreover, numerous links on the Sideload Website often referred to the exact same recording (same artist and title). MP3tunes readily could have removed all such links from the Sideload Website, but did not. Horowitz ¶¶ 73-77. Thus, even after Plaintiffs' notices, MP3tunes users could sideload the same songs into MP3tunes lockers by simply clicking other links on the Sideload Website. Finally, MP3tunes did nothing to prevent its users from using its Sideload Plug-In or Webload Feature to sideload the same files – even from the same online location identified in plaintiffs' notices – into an MP3tunes locker. SUF ¶ 87.

- Doug Reese, MP3tunes' Chief Technology Officer, sideloaded a song by the Beatles, "A Day in the Life," from the locker website www.filefactory.com. SUF ¶ 41(g). Mr. Reese also sideloaded nine songs by the band Coldplay from the personal website of a French citizen who primarily posted photos of her various vacation travels. *Id.*

- Mark Wooton, another member of MP3tunes' executive team, sideloaded 16 songs by EMI artist the Beastie Boys from the locker website, www.idisk.mac.com. SUF ¶ 41(f). He sideloaded a song by the Beatles from the fileserver of Wheaton College in Massachusetts. *Id.* He even sideloaded a song by EMI artist David Bowie from the website of a store based in New Jersey that sells electronic components. *Id.*

Additional examples of infringement committed by the MP3tunes executive team are contained in paragraph 84 and Exhibits W(i)-(xi) & X of the Horowitz Declaration.[4]

These executives added infringing files to the Sideload Website in the scope of their employment, in order to populate the Sideload Website with content that would be attractive to users (in the hope of attracting users MP3tunes could convert into paying locker subscribers). In fact, in August 2006, Robertson and Reese openly discussed having MP3tunes employees "seed[]" the Sideload Website with "higher quality tracks" by "sideloading desirable tracks ourselves, which would put them in the index and get them out there." SUF ¶ 46.[5]

---

[4] This infringement by MP3tunes personnel is undoubtedly just the tip of the iceberg. Defendants refused to disclose to plaintiffs in discovery the identity of additional user accounts that accessed defendants' system from the IP address that the MP3tunes executives used to access the system. Horowitz ¶ 86. This address appears to have been associated with the defendants' workplace. *Id.* Those other user accounts (likely MP3tunes employees) sideloaded over 19,000 files, many of them obviously infringing. Horowitz Ex. Z.

[5] The evidence shows that MP3tunes employees, at Robertson's direction, specifically sought out websites offering music which they could sideload as a means of populating the Sideload Website. SUF ¶ 45. In furtherance of this project, an MP3tunes employee was tasked with updating and circulating lists of sites "featuring free mp3s." Ex. 55. In compiling this list, the MP3tunes employee noted to Robertson that at least one of these sites, www.commontunes.org, appeared to offer mainly "pirated" music. Nonetheless, that site was included in the revised list that Robertson forwarded on to other employees. Ex. 57, *see also* 55.

MP3tunes also obtained knowledge of infringement in various other ways. For example, numerous users and artists pointed out infringing files on the Sideload Website. SUF ¶ 48. Yet MP3tunes refused to even investigate any claims of infringement, let alone remove any links from the Sideload Website, without a formal takedown notice that complied with every portion of MP3tunes' takedown policy. Ex. 29, 31, 77; Ex. 11 (Lindahl) at 51:10-52:7, 63:4-63:20.

## ARGUMENT

### I.    STANDARD OF REVIEW

Summary judgment is proper if this Court determines that "there is no genuine issue of fact as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In opposing a motion for summary judgment, "[t]he nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto* v. *Almenas*, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the opposing party "must produce specific facts indicating that a genuine factual issue exists." *Id.* at 114 (internal quotation marks omitted). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986) (internal citations omitted).

### II.   MP3TUNES IS LIABLE FOR THE INFRINGING SIDELOADS OF ITS USERS

MP3tunes is secondarily liable for the infringing sideloads of its users under established principles of contributory and vicarious copyright infringement. It is also directly liable for the infringing sideloads of its senior executives, who were acting for the benefit and at the behest of MP3tunes when engaged in their infringement.

#### A.    MP3tunes' Users Directly Infringed Plaintiffs' Copyrights Through the Sideload Services

Secondary liability for copyright infringement is premised upon a showing of direct infringement by a third party for which the secondary infringer is liable. *See Arista Records LLC*

*v. Lime Group LLC*, No. 06-CV 5936, 2010 WL 2291485, *13, (S.D.N.Y. May 25, 2010)("*Lime Group*"). To establish direct infringement, a plaintiff need only prove that the plaintiff owns the copyrights at issue, and that the third party infringed the copyrights by unauthorized copying. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 260 (2d Cir. 2005).

Plaintiffs own the copyrights in each of the compositions and sound recordings indentified in the exhibits to the accompanying declarations of Alasdair McMullan and Audrey Ashby. SUF ¶¶ 1, 2. Of these, 3,476 copyrighted works were sideloaded (reproduced) by MP3tunes users using the Sideload Services without authorization of plaintiffs. SUF ¶¶ 79-80. Indeed, many of plaintiffs' works were sideloaded by multiple MP3tunes users – often hundreds or thousands of MP3tunes users. *Id.* It is well established that each of those unauthorized reproductions constitutes *direct* copyright infringement. *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1014 (9th Cir. 2001)("*Napster*"); *BMG Music v. Gonzalez*, 430 F.3d 888, 891 (7th Cir. 2005); *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 149 (S.D.N.Y. 2009)("*Usenet*"); *Lime Group*, 2010 WL 229148 at *14.

## B.   MP3tunes Is Liable for Contributory Copyright Infringement

A defendant is contributorily liable for copyright infringement when it (i) has knowledge of another's infringement and (ii) materially contributes to the infringement. *Gershwin Publ'g Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *Matthew Bender & Co. Inc. v. West Publ'g Co.*, 158 F.3d 693, 706 (2d Cir. 1998); *Usenet*, 633 F.Supp.2d at154. MP3tunes had the requisite knowledge and materially contributed to its users' infringement.

### 1.   MP3tunes Knew the Sideload Services Were Used to Infringe

Knowledge supporting a finding of contributory infringement can be actual or

constructive. *See Ez-Tixz, Inc. v. Hit-Tix, Inc.,* 919 F.Supp. 728, 732 (S.D.N.Y. 1996);

*Gershwin*, 443 F.2d at 1162; *Faulkner v. Nat'l Geographic Soc'y*, 211 F. Supp. 2d 450, 474

(S.D.N.Y. 2002), *aff'd, Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26 (2d Cir. 2005);

*see also Napster*, 239 F.3d at 1020.  Knowledge of specific acts of infringement is not required.

*Usenet,* 633 F.Supp.2d at 154;  *Arista Records, Inc. v. Flea World, Inc.*, No. 03-2670 (JBS),

2006 WL 842883, at *14 (D.N.J. Mar. 31, 2006)("*Flea World*").

Here, MP3tunes' actual knowledge is undeniable.  Plaintiffs and other copyright owners

explicitly notified defendants – repeatedly and in writing – that their service was being used for

massive infringement.  SUF ¶¶ 38-40, 48, 63-64.  In addition to putting MP3tunes on notice of

widespread infringement generally, notices identified hundreds of specific copyrighted works

being infringed, including specific links on the Sideload Website pointing to those works.  SUF

¶¶ 38-39.  Those specifically identified works had been sideloaded into MP3tunes "lockers" by

thousands of MP3tunes users.  SUF ¶ 84.  Yet, despite these notices, MP3tunes did not remove

those infringing recordings from its computer servers.  Nor did MP3tunes block any of its users

from having unfettered access to the infringing copies of plaintiffs' recordings that they had

copied to their MP3tunes lockers.  SUF ¶¶ 82-83.  Those MP3tunes users remained free to listen

to, download, and further distribute those infringing copies from MP3tunes' servers.  SUF ¶ 86;

*see also* SUF ¶ 87.  Thus, MP3tunes had actual knowledge of the copyright infringement

identified in these notices and knew or should have known that its users were engaged in

rampant copyright infringement using the Locker Website and the Sideload Services.  As a

matter of law, that more than satisfies the knowledge prong.  *ALS Scan, Inc. v. Remarq*, 239 F.3d

619, 625 (4th Cir. 2001).

Additionally, the other evidence that MP3tunes knew or had reason to know of the

widespread infringement by its users is overwhelming:

a.      Most starkly, MP3tunes executives were copyright infringers.  SUF ¶¶ 41-44, 53,

98.  As MP3tunes acknowledged internally, it wanted to populate the Sideload Website with high

quality tracks.  SUF ¶ 46.  To do this, MP3tunes executives undertook to sideloaded thousands of

recordings.  SUF ¶ 45; Horowitz ¶ 83.  MP3tunes executives used the Sideload Services to copy

music files from major artists such as the Beatles, the Beastie Boys, Sting, Radiohead, Coldplay,

Billy Joel, Madonna, Michael Jackson, and Led Zeppelin, to name just a few.  SUF ¶ 42.  Many

of these recordings came from websites, such as pirate locker sites and student webpages, that no

reasonable person could believe were authorized to distribute the recordings.  SUF ¶ 41; *see*

*supra* pp. 8-16; *Usenet*, 633 F. Supp. 2d at 155 (citing employees' own use as factor

demonstrating knowledge); *Napster*, 239 F.3d at 1020, n.5 (same).

b.      The Sideload Website openly promoted itself as the source for "FREE MUSIC

ON THE INTERNET."  Indeed, the opening page of the website included lists of the "Most

Popular Tracks" being sideloaded.  SUF ¶¶ 59-60.  This set of tracks routinely listed copyrighted

works by some of the world's most popular recording artists and composers, many coming from

websites that plainly signaled they were infringing.  SUF ¶ 60.  Even a casual viewing would

have put any reasonable person on notice of likely copyright infringement.

c.      MP3tunes also had access to the domains (website names) from which recordings

were being sideloaded, and periodically reviewed lists of the top sideloading domains.  SUF ¶

61.  On numerous occasions, MP3tunes employees acknowledged that certain domains from

which files were being sideloaded appeared to offer infringing music, were "personal" or

otherwise were not "legit" sideload sources.  SUF ¶ 62.  In fact, some of the top sources of music

on the Sideload Website were pirate locker sites, like www.rapidshare.com.  SUF ¶¶ 54-56.

MP3tunes executives and employees knew that some of their top sideloading domains were not

legitimate – nevertheless, even though MP3tunes easily could have blocked those domains, it did

nothing to prevent recordings from those domains from being sideloaded into MP3tunes lockers or links to those recordings from being added to the Sideload Website.  SUF ¶ 57-58; Horowitz ¶¶ 67-69.

     d.    MP3tunes also received numerous emails and messages from users warning MP3tunes that the source sites listed on the Sideload Website "were sites that had no legal right to provide access to the MP3 files" or that music to which users "obviously don't own the rights" were being sideloaded from personal websites.  SUF ¶ 47-48.[6]  It also received requests from artists or artist representatives that links to certain recordings be taken down from the Sideload Website because such recordings were not authorized for free download.  SUF ¶ 64.

     e.    Finally, MP3tunes was aware, and in fact lamented, that until mid-2007 (two years *after* the founding of MP3tunes), none of the major record labels, including plaintiffs, made sound recordings available in the popular, but unprotected, "MP3" format.  Ex. 95.  Thus, MP3tunes knew that nearly *every* file in the MP3 format from a major label that appeared on the Sideload Website prior to mid-2007 was almost certainly unauthorized.

     On this record, it is clear that MP3tunes had actual knowledge, or at a minimum constructive knowledge, that its users were using defendants' Sideload Services to engage in widespread copyright infringement.  *See, e.g., Usenet*, 633 F.Supp.2d at 155 (finding actual knowledge where the widespread availability of infringing material on defendants' system was "obvious").

---

[6] For example, one user contacted MP3tunes, writing: "Please stop directly linking to Johnny Cash and Biff-Five Feet High and Rising on www.warble.org.  I obviously don't own the rights…".  SUF ¶ 48(a).  The response from MP3tunes was a boilerplate recitation of MP3tunes "policy" with respect to removing works and an instruction for the user to send a DMCA compliant takedown notice pursuant to 17 U.S.C. § 512(c) if he wanted the files removed.  *Id.*  MP3tunes wholly ignored the fact that sending such a notice was impossible given that a DMCA takedown notice must come from the copyright owner, and the user had already acknowledged that he did not own the works.

### 2.      MP3tunes Materially Contributed to its Users' Infringement

Likewise, there can be no credible dispute that MP3tunes materially contributed to its users' infringement.  MP3tunes provides the computer servers that made the infringing copies and on which the infringing recordings are stored; the Sideload Website that hosts, indexes and organizes the links to the infringing recordings; the Sideload Plug-In and Webload Feature that facilitates users' sideloading of infringing recordings, and the "lockers" from which users access, play and further download the infringing recordings.  SUF ¶¶ 65-68.  By any standard, defendants provide the "site and facilities" through which that infringement has occurred.  *See Usenet,* 633 F.Supp.2d at 155; *Napster,* 239 F.3d at 1022; *see also, In re Aimster Copyright Litig.,* 252 F.Supp.2d 634, 652 (N.D. Ill. 2002)(providing "software" and "support services" to users was sufficient to establish material contribution).

### C.      MP3tunes is Vicariously Liable for Its Users' Infringement

MP3tunes is also vicariously liable for its users' infringement because it (i) had the right and ability to supervise its users' infringing activity, and (ii) received a financial benefit directly attributable to the infringement.  *See Gershwin,* 443 F.2d at 1162; *see also MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005)("*Grokster*").  Knowledge of the infringement is not a prerequisite for vicarious liability.  *E.g., Usenet,* 633 F.Supp. 2d at 156.

### 1.      MP3tunes Had the Right and Ability to Supervise the Infringing Activity

MP3tunes had the right and ability to supervise its users' infringing activity.  MP3tunes controls the entire physical environs where the infringement took place.  It owns and controls the Sideload and Locker Websites, which physically reside on MP3tunes' computer servers.  SUF ¶¶ 4, 69.  Likewise, MP3tunes has complete dominion and control over the infringing song files on the Locker Website and links to infringing recordings on the Sideload Website.  MP3tunes controls the servers that host those files and links and the searchable databases that organize

them. Ex. 5 (Reese) at 40:17-44:6. It is undisputed that MP3tunes could easily locate and delete files and links that were infringing. SUF ¶¶ 70-71. That is sufficient control for vicarious liability. *E.g.*, *Usenet*, 633 F. Supp. 2d at 157 (physical control over the servers and environs is sufficient for vicarious liability).

Additionally, MP3tunes controls access to its service by its users  Each MP3tunes locker user must register with MP3tunes. SUF ¶ 72. MP3tunes gives each user a unique identification number and records in a database every time a user sideloads, uploads or even listens to a recording. SUF ¶ 72-73. MP3tunes could, if it chose, block users' access to its premises. SUF ¶ 74. Indeed, it expressly reserved the right to do so in its User Agreement. SUF ¶ 75. "The ability to block infringers' access to a particular environment for any reason whatsoever is evidence of the right and ability to supervise." *Napster*, 239 F.3d at 1023; *Usenet*, 633 F.Supp.2d at 157; *see also Gershwin*, 443 F.2d at 1163; *Flea World*, 2006 WL 842883, at *9-10.

### 2.   MP3tunes Reaped a Direct Financial Benefit From Infringement

To satisfy the "financial benefit" element of plaintiffs' vicarious liability claim, there need only be "a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004); *see also Napster*, 239 F.3d at 1023. That relationship is established when the availability of infringing music acts as a draw for users. Importantly, "the law is clear that to constitute a direct financial benefit, the 'draw' of infringement need not be a significant draw – rather, it need only be 'a' draw." *See Usenet*, 633 F.Supp.2d at 156-57; *Fonovisa v. Cherry Auction, Inc.* 76 F.3d 259, 263-64 (9th Cir. 1996); *Flea World,* 2006 WL 842883 at *12.

Robertson, Richards, and other employees admitted that the Sideload Website was developed to make money for MP3tunes. SUF ¶ 76. The point of the Sideload Website was to attract users who MP3tunes could convert into paying subscribers of the locker service. SUF ¶¶

46, 77-78.  It is indisputable that the lure of free access to popular (and largely infringing) music is at least "a draw" for users.  MP3tunes received more user traffic to its lockers from the Sideload Website than from any other source.  SUF ¶ 78.  This is all that is required.

### D.     MP3tunes is Liable for the Copyright Infringement of its Executives

As set forth in detail above, every member of MP3tunes' executive team used the Sideload Services to copy numerous works; 171 of those works belong to plaintiffs and are at issue on this motion.  SUF ¶ 43.  Many of these files came from blatantly infringing websites.  SUF ¶¶ 41; *see also supra* pp. 12-14.  Each of these 171 instances of copying constitutes an act of direct copyright infringement of plaintiffs' exclusive right of reproduction.  SUF ¶ 44; *see supra* II(A).  Under well established principles of respondeat superior, MP3tunes is liable for the infringing acts of its executives because those acts were committed within the scope of their employment.  SUF ¶¶ 45-46; *Gershwin*, 443 F.2d at 1161-62.[7]  Indeed, that infringing sideloading was done for the benefit and at the behest of MP3tunes.  *See supra* p. 14 n. 6.

## III.   MP3TUNES HAS DIRECTLY INFRINGED PLAINTIFFS' EXCLUSIVE RIGHT OF PUBLIC PERFORMANCE

The Copyright Act grants copyright owners the exclusive right to publicly perform their works.  17 U.S.C. §§ 106(4) & (6).  By using a "single master" to play songs to multiple users, MP3tunes has engaged in the unlawful public performance of hundreds of plaintiffs' works.

### A.     The Decision to Use a "Single Master" Storage System

Early on, MP3tunes recognized that storage space was likely to be one of the company's most significant costs, especially when hundreds or even thousands of users might upload or sideload identical copies of popular recordings.  Ex. 6 (Brocious) at 47:12-48:22; Ex. 7 (Carmony) at 23:21-26:12.  There were two basic ways for MP3tunes to handle the storage of

---

[7] MP3tunes is also vicariously liable for these infringement because it clearly had the ability to control the conduct of its executives and received a financial benefit from those infringements. *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 308-09 (2d Cir. 1963).

identical song files uploaded/sideloaded by multiple users.  MP3tunes could have stored each

user's copy separately on its servers and then accessed the user's own copy when playing the

recording back to the user.  Horowitz ¶ 50.  Alternatively, MP3tunes could have recognized

when two recordings were digitally identical and only stored a single copy, or a "single master,"

of that recording on its servers.  The two approaches have different storage costs and different

consequences under copyright law.

Eager to save on storage costs, Robertson made the decision to implement the single

master design.  Ex. 7 (Carmony) at 26:13-17:14; Ex. 6 (Brocious) at 48:5-11.  As a result, if

1,000 MP3tunes users uploaded a digitally identical copy of the Beatles' song "Here Comes the

Sun," MP3tunes would permanently store on its servers just the first uploaded copy.  It would

thereafter discard identical copies uploaded by subsequent users and use the first uploaded copy

as a "master" to service all 1,000 users.  SUF ¶ 19-24.

Plainly, Robertson and MP3tunes understood the legal peril created by their decision.[8]

MP3tunes went to great lengths to try to conceal its use of single master storage.  MP3tunes went

so far as to require users to engage in the time-consuming (and technologically irrational)

process of physically copying every single recording to MP3tunes servers – even those that

would be discarded because an identical copy already existed on MP3tunes' servers.  Horowitz

¶¶ 51-53.  Robertson confided in colleagues that MP3tunes was doing that so copyright owners

would not be able to figure out that MP3tunes was using a single master design.  Ex. 7

(Carmony) at 25:18-26:7, 27:15-29, 19; Ex. 6. (Brocious) at 47:12-52:15, 67:3-68:3.[9]

---

[8] So did MP3tunes employees and Robertson's colleagues, who raised concerns that the decision
to use single master storage would raise legal problems akin to those faced by Robertson's
previous company, MP3.com.  Ex. 6 (Brocious) at 51:18-53:22; Ex. 14 (Wood) at 10:24-15:21;
Ex. 7 (Carmony) at 23:21-28:23.

[9] Continuing the charade, MP3tunes' Chief Technology Officer claimed in his initial deposition
that he either did not know or could not recall whether MP3tunes used a single master storage

### B.   MP3tunes' Infringement of Plaintiffs' Public Performance Right

An audio work is "performed" when it is transmitted in such a way as to be "contemporaneously perceptible" to the listener. *United States v. ASCAP*, -- F.3d ----, 2010 WL 3749292 at *4 (2d Cir., Sept. 28, 2010). The transmission of a digital song file over the internet for the purpose of listening, commonly referred to as "streaming" music, is a performance because "there is a playing of the recording that is perceived simultaneously with the transmission." *Id.* at *5.

Under the Copyright Act, to perform a work "publicly" means:

> to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, *whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.*

17. U.S.C. §101 (emphasis added). The word "public" has never been interpreted to mean the public at large; rather the "public" includes individual subscribers to a particular service. *National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000).

The Second Circuit is clear that "in determining whether a transmission is 'to the public,' it is of no moment that the potential recipients of the transmission are in different places or that they may receive the transmission at different times." *Cartoon Network L.P. v. CSC Holdings, Inc.*, 536 F.3d 121, 134 (2d Cir. 2008) (citation omitted) (hereinafter "*Cablevision*"). For example, in *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984), customers of a video store chose a videotape and entered a booth. Thereafter, a store employee would load a copy of the requested tape into a VCR and press play, transmitting the content of the tape to the television in the booth. Despite the fact that only a single customer was

---

system. Ex. 5 (Reese) at 50:5-52:8, 53:2-54:9, 57:2-19, 58:19-62:20; 63:13-18. Had the Magistrate Judge not ordered MP3tunes to produce its source code (over MP3tunes' vigorous objection) MP3tunes might have been able to keep its secret.

viewing a videotape at any given time, the performance was public because a single copy of the videotape was used to serially transmit to multiple customers. *Columbia Pictures*, 749 F.Supp. at 159; *see also* 2 M. Nimmer, § 8.14 [C][3], at 8-192.2 ("*if the same copy* (or phonorecord) of a given work is repeatedly played (*i.e.*, 'performed') by different members of the public, albeit at different times, this constitutes a 'public' performance"); *Cablevision*, 536 F.3d at 138 (agreeing with Nimmer and *Redd Horne*).

Thus, the fact that MP3tunes used a "single master" copy of a recording to play that recording back to multiple users constitutes copyright infringement of plaintiffs' public performance right. *Cablevision* is dispositive on this point. Cablevision offered its cable subscribers a service whereby the subscriber could record any show for later viewing. The service was similar to a typical DVR (digital video recorder), except the recorded copy of the show would not be stored on a DVR in the subscriber's home, but rather on a Cablevision server. *Cablevision*, 536 F.3d at 124. However, to avoid violating the public performance right of the copyright owners of those shows, Cablevision did *not* use a "single master" storage system. Cablevision maintained a separate copy of each show for each and every subscriber who had recorded the show. *Id.* at 138. Thus, when a subscriber later viewed a previously recorded show, Cablevision would access the separate copy of the show stored on its servers for that particular subscriber. *Id.*

The Second Circuit held that Cablevision did not violate the copyright owners' exclusive right of public performance, because each subscriber would be viewing only content separately stored for that subscriber and thus the performance by Cablevision to the subscriber was private. *Id.* at 139. A private performance does not encroach on the copyright owner's exclusive right. *Id.* Unlike MP3tunes, Cablevision sacrificed storage efficiency to abide by copyright laws. Under *Cablevision*, MP3tunes' use of a "single master" copy of a song for playback to multiple

users constitutes a public performance and violates plaintiffs' exclusive public performance right. *Id.*

Based on MP3tunes' records, Exhibits O and P to the Declaration of Professor Horowitz identify 2,598 files embodying 1,182 sound recordings and compositions owned by plaintiffs for which MP3tunes used a "single master" copy to play the recording to multiple MP3tunes users. SUF ¶ 25. All were used for playback to multiple users; some to hundreds of different MP3tunes users. *Id.* As a matter of law, MP3tunes is liable for infringing plaintiffs' public performance right as to each of those works.

## IV. MP3TUNES IS LIABLE FOR INFRINGEMENT OF PLAINTIFFS' COPYRIGHTED COVER ART

MP3tunes recognized that providing users with Cover Art associated with their digital music files would enhance the user experience. Ex. 85. MP3tunes initially began offering Cover Art only to paying subscribers, as an enticement to encourage users to upgrade to paying locker accounts. Ex. 5 (Reese) at 296:7-20. Ultimately, MP3tunes offered Cover Art to all locker users – displaying Cover Art to users when they listened to music from the Locker Website and when they were uploading music to their MP3tunes locker. SUF ¶¶ 26.

MP3tunes, however, did not obtain a license to use plaintiffs' copyrighted Cover Art. Instead, MP3tunes figured out how to obtain Cover Art from the website of Amazon.com and copy it onto the MP3tunes server. SUF ¶¶ 27-28. MP3tunes programmed its "Lockersync" software so that each time a user used the software to upload recordings to an MP3tunes locker, the "Lockersync" software would automatically search the Amazon.com website for related Cover Art and copy that Cover Art to MP3tunes' servers. SUF ¶ 29-31.

MP3tunes' misappropriation of Cover Art from the Amazon.com website directly contravened contractual agreements with Amazon.com and was unauthorized. SUF ¶ 33. Notably, the Amazon.com terms of use expressly prohibited MP3tunes from copying the Cover

Art onto its servers.  SUF ¶¶ 32-35.  Amazon.com only permits websites to link to the Cover Art

stored on Amazon.com's servers, but even that permission is strictly limited to websites whose

"principal purpose" is driving sales of Amazon.com products, which MP3tunes of course is not.

SUF ¶¶ 33-34.  MP3tunes' use of Cover Art from Amazon.com was, therefore, unauthorized and

a willful violation of plaintiffs' copyrights.  *Usenet*, 633 F.Supp.2d at 149.[10]

The Declaration of Alasdair McMullan identifies 328 copyrighted Cover Art images

owned by plaintiffs.  McMullan ¶ 5 & Ex. B.  Without authorization, MP3tunes reproduced each

of those copyrighted images to its server; many of them were copied hundreds of times.  SUF ¶¶

36-37.  MP3tunes is directly liable for each of those infringements.

## V.    MP3TUNES IS NOT ENTITLED TO A DMCA SAFE HARBOR.

Defendants cannot fairly dispute their liability for copyright infringement.  Rather,

defendants rest much of their defense on the argument that they are immune from copyright

liability under the DMCA's "safe harbor" provisions.  That reliance is sorely misplaced.[11]

The DMCA is not a license to build a business on the back of someone else's copyrighted

content.  Congress enacted the DMCA to balance the interests of copyright owners and online

service providers – to promote cooperation between copyright owners and service providers, to

minimize copyright infringement on a service provider's system, and to provide more certainty

to service providers who otherwise might face liability for copyright infringement they did not

---

[10] Whether MP3tunes is deemed a direct or secondary infringer of Plaintiffs' Cover Art is largely academic as MP3tunes clearly would be equally liable as a contributory infringer.  MP3tunes programmed its "Lockersync" software to copy Cover Art from the Amazon.com website with full knowledge that every single reproduction of a cover art image was unauthorized and a violation of copyright.  MP3tunes thus knew of and materially contributed to the infringement of Cover Art.  *In re Aimster Copyright Litig.*, 252 F.Supp.2d at 652.  MP3tunes also actively induced the infringement of Cover Art.  *Grokster*, 545 U.S. at 935.

[11] As an initial matter, DMCA safe harbor only applies to works protected by federal copyright law.  All of the EMI Labels sound recordings created prior to 1972 are protected by state copyright law and are not affected by the DMCA.

27

know about and could not reasonably have prevented.  S. Rep. No. 105-190, at 8, 20, 48.  The

DMCA, accordingly, provides certain safe harbors (*i.e.*, limitations on remedies for copyright

infringement), but only to *qualifying* service providers.  As courts have emphasized, "[t]his

immunity ... is not presumptive, but granted only to 'innocent' service providers...".  *ALS Scan*,

239 F.3d at 625.  Moreover, the DMCA's safe harbors, as with all immunities from liability, are

to be narrowly construed.  *U.S. v. Texas*, 507 U.S. 529, 534 (1993); *see also Fame Publishing

Co. v. Alabama Custom Tape, Inc.*, 507 F.2d 667, 670 (5th Cir. 1975) (statutes that provide

exceptions to liability under the Copyright Act should be strictly and narrowly construed).

    The requirements for safe harbor vary to some degree depending upon the particular safe

harbor at issue.  Here, MP3tunes relies on the "Section 512(c)" or "hosting" safe harbor, which

addresses content stored on the service provider's system at the direction of a user.  17 U.S.C. §

512(c).  In order to qualify for that safe harbor, MP3tunes must establish each of the following

(among other requirements that plaintiffs do not contest for purposes of this motion):

- That MP3tunes has "reasonably implemented" a policy for the termination of its subscribers who are "repeat infringers," 17 U.S.C. § 512(i);

- That MP3tunes disabled access to material identified as infringing in the DMCA notices plaintiffs sent to defendants, 17 U.S.C. § 512(c)(1)(C); and

- That MP3tunes did not have disqualifying knowledge of infringing activity on its system, 17 U.S.C. § 512(c)(1)(A)(i) & (ii).[12]

Because the DMCA is an affirmative defense to copyright infringement, MP3tunes has

the burden of proving that they satisfy each threshold requirement.  *ALS Scan*, 239 F.3d at 623.

### A.     MP3tunes Failed to "Reasonably Implement" a "Repeat Infringer" Policy

A service provider is not eligible for safe harbor unless it:

---

[12] For the reasons set forth in Section II(C) above, defendant also is independently disqualified from safe harbor because it "receives a financial benefit directly attributable to the infringing activity, in a case in which [it also has] the right and ability to control such activity."  17 U.S.C. § 512(c)(1)(B).

> has adopted and reasonably implemented … a policy that provides
> for the termination in appropriate circumstances of subscribers and
> account holders of the service provider's system or network who
> are repeat infringers.

17 U.S.C. § 512(i)(1)(A).  This requirement is a threshold prerequisite for every DMCA safe

harbor and is a fundamental DMCA safeguard for copyright owners.  As described by Judge

Posner, "[t]he common element of [the DMCA's] safe harbors is that the service provider must

do what it can reasonably be asked to do to prevent use of its service by 'repeat infringers.'" *In*

*re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir. 2003); *see also Columbia Pictures*

*Industries, Inc. v. Fung*, No. 06 Civ. 5578, 2009 WL 6355911 at * 18 (C.D. Cal. Dec. 21, 2009).

Other courts have described enforcement of this provision as essential to "maintain the 'strong

incentives' for service providers to prevent their services from becoming safe havens or conduits

for known repeat copyright infringers." *Perfect 10 v. Cybernet Ventures*, 213 F. Supp. 2d 1146,

1178 (C.D. Cal. 2002)("*Cybernet*").

　　　While the DMCA does not define what "reasonably implemented" means, courts agree

that, "an implementation is reasonable if, under 'appropriate circumstances,' the service provider

terminates users who repeatedly or blatantly infringe copyright." *E.g., Perfect 10 v. CCBill*, 488

F.3d 1102, 1109 (9th Cir. 2007))("*CCBill*"); *see also* S. Rep. No. 105-190 at 52 ("those who

repeatedly and flagrantly … disrespect … the intellectual property rights of others should know

that there is a realistic threat of losing that access").

　　　Here MP3tunes has failed to "reasonably implement" any repeat infringer policy.  Indeed,

MP3tunes has purposefully blinded itself to the identities of their repeat infringing users, thus

guaranteeing that it will not terminate users no matter how persistent or flagrant their

infringement.  That uncontroverted fact disqualifies MP3tunes from DMCA safe harbor.  *CCBill*,

488 F.3d at 1110 (failure to keep records of identified infringers, without more, calls into

question a service provider's implementation of a repeat infringer policy).

By way of background, plaintiffs sent MP3tunes three separate DMCA notices over the course of a few months. SUF ¶¶ 38-40. Each identified, by specific link, over one hundred of plaintiffs' copyrighted songs that had been and were being infringed by MP3tunes' users through defendant's Sideload Services. *Id.* Each of those songs was sideloaded to an MP3tunes locker by at least one MP3tunes user. SUF ¶ 84. Based on data produced in discovery, most were sideloaded by multiple MP3tunes users; some by hundreds of MP3tunes users. *Id.* Each of those MP3tunes users is an infringer of plaintiffs' copyrights. SUF ¶ 81. *Napster.*, 239 F.3d at 1014; *BMG Music,* 430 F.3d at 891; *Usenet*, 633 F.Supp.2d at 149.

Upon receipt of a takedown notice, MP3tunes had the information necessary to identify infringing users. That information is available, in fact, only to MP3tunes. MP3tunes assigns a unique user ID to each user with an MP3tunes locker and, in the normal course of operations, defendants keep track of every single song file each user sideloads into their MP3tunes locker. SUF ¶¶ 88-89. Yet, when presented with proper DMCA notices identifying specific copyrighted works that have been infringed by being sideloaded into MP3tunes lockers, defendants refused to look at their existing records to learn which users were infringers of those works. SUF ¶ 90. Because defendants refused to take note of which of their users were infringers, *a fortiori* defendants avoid identifying – and taking action against – flagrant repeat infringers.[13]

Not surprisingly, MP3tunes has not been able to identify a single user who they terminated for being a repeat infringer. SUF ¶¶ 91-92. That is a direct result of defendant's refusal to implement a repeat infringer policy. The data produced in discovery – data that was always available to defendant and that defendant uses to run its business – readily reveals *hundreds* of defendants' users who were repeat infringers of the works identified to defendant in

---

[13] Because defendants avoid learning the identities of infringing users, they of course cannot let infringing users "know that there is a realistic threat of losing th[eir] access," S. Rep. No. 105-190 at 52, thereby subverting the overriding objective of the repeat infringer provision.

DMCA notices. SUF ¶ 93-94. Looking just at the infringement expressly identified in DMCA notices, a total of 688 of defendants' users infringed recordings identified on at least 2 notices; 139 users infringed recordings identified on at least 3 notices. SUF ¶¶ 95. Defendants did not terminate, suspend, warn, or take any action whatsoever against those blatant repeat infringers. SUF ¶ 96. Defendants do not even advise those users that their conduct has been called into question. SUF ¶ 97.

Perhaps most telling of MP3tunes' disregard for its obligation to take action against "repeat infringers," is the fact that *each of its senior executives* – CEO Robertson, President Richardson, CTO Reese, and VP Wooton – *were themselves flagrant repeat infringers*. SUF ¶ 98.

MP3tunes' conduct stands in stark contrast to any defendant that has been found by any court to have reasonably implemented a DMCA repeat infringer policy. For example:

- In *IO Group v. Veoh Networks*, upon receiving a notice from a copyright holder, Veoh identified and explicitly warned the infringing user. Veoh then terminated the user's account if it identified that user as having uploaded infringing content contained in any subsequent notice after the first warning. Veoh had terminated well over a thousand users for repeat copyright violations. 586 F. Supp. 2d 1132, 1143 (N.D. Cal. 2008); *see also UMG Recordings v. Veoh Networks*, 665 F. Supp. 2d 1099, 1116 (C.D. Cal. 2009) (same).

- In *Corbis Corp v. Amazon.com*, promptly upon receiving a notice from a copyright holder, Amazon too sent a notice to its infringing subscriber warning that repeated violations might result in "permanent suspension" from Amazon sites. Amazon further had terminated access to "hundreds" of subscribers for egregious or repeated violations. 351 F. Supp. 2d 1090, 1103 (W.D. Wash. 2004); *see also CCBill*, 488 F.3d at 1111 (defendant kept detailed logs of subscribers identified as infringers in copyright owner DMCA notices).

- In *Viacom v. YouTube*, YouTube identified and sent warnings to users who uploaded works identified in DMCA notices as infringing; YouTube terminated users who had uploaded works identified in multiple notices based on a "three strikes" policy. YouTube counted as a "strike" even informal notices from copyright holders. 07 Civ. 2103 (LLS), 2010 WL 2532404 at *13-14 (S.D.N.Y. June 23, 2010).

31

In *Aimster*, defendants "adopted" a detailed repeat infringer policy, but then encrypted user communications so it was impossible for Aimster to identify infringers. In finding that Aimster had not complied with the DMCA's repeat infringer provision, the court ruled that "[a]dopting a repeat infringer policy and then purposefully eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i)." *Aimster*, 252 F. Supp. 2d 634, 659 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003). Systematically blinding oneself to the identities of repeat infringing users, as MP3tunes did here, is no different. *Cf. Ellison*, 357 F.3d at 1080 (9th Cir. 2004).

The "repeat infringer" provision is a crucial protection for copyright owners; a critical part of the "balance" struck by the DMCA. Yet, MP3tunes ignored it, acting as if it could pass DMCA muster by removing individual infringing links from the Sideload Website, without ever addressing the sources of repeated infringement. That work-by-work notice mentality has long been rejected:

> Making the entrance into the safe harbor too wide would allow service providers acting in complicity with infringers to approach copyright infringement on [a song] by [song] basis without ever targeting the source of these [songs].

*Cybernet*, 213 F. Supp.2d at 1177. In the end, MP3tunes has acted in a manner antithetical to its obligations under the DMCA; it has "taken great pains to avoid shouldering the burdens of the copyright regime, all the while profiting from pirates." *Id.* at 1178. MP3tunes is not eligible for DMCA safe harbor as a result.

### B.     MP3tunes Did Not Disable Access to Infringing Content in Response to Plaintiffs' DMCA Notices

The DMCA also requires service providers to act "expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity" whenever it receives a notice of claimed infringement from a copyright owner. 17 U.S.C. §

512(c)(1)(C). This "takedown" requirement is not discretionary if a service provider wishes to avail itself of the safe harbor provisions of the DMCA. The failure to comply with takedown notices is an absolute bar to claiming safe harbor under the DMCA. *ALS Scan*, 239 F.3d at 625-26; *Ellison*, 357 F.3d at 1080.

The undisputed facts show that Defendants failed to comply with the takedown notices sent by plaintiffs. Plaintiffs' notices explicitly identified 416 infringing files available through the Sideload Website. SUF ¶ 39. Thousands of MP3tunes users had sideloaded these 416 infringing files into their MP3tunes locker. SUF ¶ 84. Thus, in addition to being available through links posted on the Sideload Website, the Locker Website allowed each of these thousands of users to listen to or download the song files directly from MP3tunes' servers through their "lockers." SUF ¶¶ 5, 11, 13. Plaintiffs' notices contained an explicit request to remove access to the files from both the Sideload Website *and* the Locker Website. SUF ¶ 82.

While MP3tunes removed links identified in takedown notices from the Sideload Website, it did nothing to remove or block access to the same files that were stored on MP3tunes' servers and accessible to thousands of users from the Locker Website. SUF ¶ 83. Defendants have no explanation for that failure. MP3tunes' decision not to disable access to these files by thousands of their MP3tunes "locker" users was a *complete* failure to comply with the takedown requirement. As a result, MP3tunes cannot claim safe harbor under the DMCA.

### C.   MP3tunes Both Knew of and Disregarded Blatant "Red Flags" of Widespread Copyright Infringement

MP3tunes fails to satisfy the threshold requirements of the DMCA for yet another independent reason: DMCA safe harbor is unavailable to service providers who have "actual knowledge" of infringement or who are "aware of facts or circumstances from which infringing activity is apparent." 17 U.S.C. § 512(c)(1)(A)(i) & (ii). Congress was clear that "if the service provider becomes aware of a 'red flag' from which infringing activity is apparent, it will lose the

limitation of liability if it takes no action. ... in deciding whether those facts or circumstances constitute a 'red flag' – in other words, whether infringing activity would have been apparent to a reasonable person operating under the same or similar circumstances – an objective standard should be used." S. Rep. No. 105-190 at 44.

The "red flags" that Congress was concerned about do not require knowledge of specific instances of infringement, nor do they require owners to send takedown notices. S. Rep. 105-190, at 45 ("red flag" test applies "even if the copyright owner or its agent does not notify [service provider] of a claimed infringement"). Rather "[w]illful blindness is knowledge, in copyright law...as it is in the law generally." *In re Aimster Copyright Litig.*, 334 F.3d at 650; *see also Cybernet*, 213 F.Supp.2d at 1177 (the DMCA does not "endorse business practices that would encourage content providers to turn a blind eye to the source of massive copyright infringement while continuing to knowingly profit"). Furthermore, when "the infringing nature" of a website is "apparent from even a brief and casual viewing, safe harbor status...would not be appropriate." H.R. Rep. No. 105-551 (Part II), at 58. As set forth in Section II(B)(1), *supra*, not only did MP3tunes have red flag knowledge of rampant infringement, it had actual knowledge. That knowledge included everything from senior executives personally copying hundreds of unauthorized files to regular user complaints of rampant infringement on the sites.

**D.     MP3tunes Cannot Claim DMCA Safe Harbor for its Infringement of Plaintiffs' Cover Art.**

Finally, MP3tunes cannot claim any DMCA safe harbor for its infringement of plaintiffs' Cover Art. First, MP3tunes had actual knowledge that every cover art image misappropriated from the Amazon.com website was an act of copyright infringement, thus disqualifying MP3tunes under 17 U.S.C. § 512(c)(1)(A)(i). SUF ¶¶ 28-36. Second, the DMCA only provides limited safe harbor for infringing works copied to MP3tunes' server "at the direction of" MP3tunes' users. 17 U.S.C. § 512(c). As made clear by the legislative history, "[i]nformation

that resides on the system or network operated by or for the service provider *through its own acts* and not at the direction of a user does not fall within the liability limitation of subsection (c)." S. Rep. No. 105-190 at 43 (emphasis added). Here, MP3tunes made the decision to copy Cover Art from Amazon.com and programmed its "Lockersync" software to do so automatically without any action or input from users. SUF ¶ 29-30. The infringing reproduction of Cover Art to MP3tunes servers occurred as a result of MP3tunes' acts and direction, not at the direction of its users.

<u>**CONCLUSION**</u>

For the foregoing reasons, plaintiffs respectfully request that their motion for summary judgment be granted.

DATED:  October 29, 2010

Respectfully submitted,

By: _Andrew H Bart_

Andrew H. Bart
Carletta F. Higginson
Joseph J. McFadden
JENNER & BLOCK LLP
919 Third Avenue
37th Floor
New York, NY 10022
tel. (212) 891-1690
fax (212) 891-1699

*-and-*

Steven B. Fabrizio
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
tel. (202) 639-6000
fax (202) 639-6066

*Attorneys for Plaintiffs Capitol Records, LLC,*
*Caroline Records, Inc, EMI Christian Music*
*Group Inc., Priority Records LLC, Virgin*

35

Records America, Inc.

By: _____

Donald S. Zakarin
Frank P. Scibilia
Mark A. Tamoshunas
M. Mona Simonian
PRYOR CASHMAN LLP
7 Times Square
New York, New York  10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806

*Attorneys for the Beechwood Music Corp.,
Colgems-EMI Music Inc., EMI April Music
Inc., EMI Blackwood Music, EMI Full Feel
Music, EMI Golden Torch Music Corp., EMI
Longitude Music, EMI Virgin Music, Inc.,
EMI Virgin Songs, Inc., EMI Al Gallico Music
Corp., EMI Algee Music Corp., EMI Feist
Catalog, Inc., EMI Gold Horizon Corp., EMI
Grove Park Music, Inc. EMI Hastings
Catalog, Inc., EMI Mills Music, Inc., EMI
Miller Catalog, Inc., EMI Robbins Catalog,
Inc., EMI U Catalog, Inc., EMI Unart
Catalog, inc., Jobete Music Co., Inc., Screen
Gems-EMI Music, inc., Stone Agate Music,
and Stone Diamond Music*

36