# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

—————————————————————————— )
CAPITOL RECORDS, LLC, *et al.,*                )
                                                )
                                    *Plaintiffs,*   )        No. 07 Civ. 9931 (WHP)(FM)
                                                )
                v.                              )
                                                )
MP3TUNES, LLC, and MICHAEL ROBERTSON,)
                                                )
                                    *Defendants.*   )
——————————————————————————)
                                                )
MP3TUNES, LLC, and MICHAEL ROBERTSON,)
                                                )
                                    *Counter-Claimants,*   )
                                                )
                v.                              )
                                                )
CAPITOL RECORDS, LLC, *et al.,*                )
                                                )
                                    *Counter-Defendants.*   )
——————————————————————————)

# MEMORANDUM OF LAW IN OPPOSITION
# TO THE MOTION OF MP3TUNES, LLC FOR SUMMARY JUDGMENT

## CITATION FORMAT

Plaintiffs use the following citation forms in this Memorandum of Law in Opposition to

MP3tunes' Motion for Summary Judgment and in Plaintiffs' Rule 56.1 Counterstatement of

Undisputed Facts:

| Document | Date Filed | Citation |
|---|---|---|
| Declaration of **Michael Abitbol** in Support of Plaintiffs' Motion for Summary Judgment | October 29, 2010 (Docket #187) | Abitbol |
| Supplemental Declaration of **Michael Abitbol** | November 24, 2010 | Supp. Abitbol |
| Declaration of **Audrey Ashby** in Support of Plaintiffs' Motion for Summary Judgment | October 29, 2010 (Docket #188) | Ashby |
| Plaintiffs' Memorandum of Law in Support of Their Motion for Summary Judgment | October 29, 2010 (Docket #207) | Pls. Mem. |
| MP3tunes' Memorandum of Law in Support of Its Motion for Summary Judgment | October 29, 2010 (Docket #196) | Defs. Mem. |
| Declaration of **Robert Heinemann** | November 24, 2010 | Heinemann |
| Declaration of **Ellis Horowitz** in Support of Plaintiffs' Motion for Summary Judgment | October 29, 2010 (under seal) | Horowitz |
| Supplemental Declaration of **Ellis Horowitz** | November 24, 2010 | Supp. Horowitz |
| Declaration of **Alasdair McMullan** in Support of Plaintiffs' Motion for Summary Judgment | October 29, 2010 (Docket #191) | McMullan |
| Supplemental Declaration of **Alasdair McMullan** | November 24, 2010 | Supp. McMullan |
| Plaintiffs' Statement of Undisputed Facts | October 29, 2010 (under seal) | SUF |
| MP3tunes' Statement of Undisputed Facts | October 29, 2010 (Docket #195) | MP3tunes SUF |
| Declaration of Greg Gulia in Support of MP3tunes' Motion for Summary Judgment | October 29, 2010 (Docket #189) | Gulia |
| Plaintiffs' Rule 56.1 Counterstatement of Undisputed Facts in Response to MP3tunes Statement of Undisputed Facts | November 24, 2010 | Counter-SUF |

a.  As in Plaintiffs' Memorandum of Law in Support of their Motion for Summary

Judgment, references to the exhibits attached to the **Declaration of Andrew H. Bart**

(Docket # 190) and the **Errata** annexed thereto(Docket # 198) are referred to simply as

"Ex. __."  Similarly, references to the exhibits attached to the **Supplemental Declaration**

**of Andrew H. Bart**, filed herewith, are also referred to simply as "Ex. __."  The exhibits

are sequentially numbered.  As a result, citations to Exs. 1 – 98 refer to Exhibits 1

through 98 of the Declaration of Andrew H. Bart and accompanying Errata (Docket

#190, #198).  Citations to Exs. 99 – 116 refer to Exhibits 99 through 116 of the

Supplemental Declaration of Andrew H. Bart.

b.  When reference is being made to the transcript of deposition testimony, the citation

includes the last name of the deponent and the specific page and line numbers.  For

example, "Ex. 1 (Robertson) at 46:7-12" refers to Lines 7-12 on Page 46 of the transcript

of the deposition of defendant Michael Robertson, excerpts of which are collected and

attached as Exhibit 1 to the Declaration of Andrew H. Bart.

c.  When reference is made to a specific paragraph of a declaration, the symbol "¶" is used.

For example, "Horowitz ¶ 10" refers to paragraph ten of the Declaration of Ellis

Horowitz in Support of Plaintiffs' Motion for Summary Judgment.

## TABLE OF CONTENTS

**Page(s)**

INTRODUCTION ....................................................................................................1

BACKGROUND ....................................................................................................3

I.   SUMMARY OF RELEVANT FACTS....................................................................3

II.   MP3TUNES' CLAIM THAT PLAINTIFFS AUTHORIZE UNRESTRICTED
      DOWNLOADS IS LEGALLY AND FACTUALLY UNSUPPORTABLE .......................3

      A.   Plaintiffs Do Not "Abandon" Their Copyright in a Song by Authorizing a
           Promotional Download ................................................................................4

      B.   MP3tunes Makes No Attempt to Defend the Vast Majority of Activity
           Occurring on the Sideload Website .............................................................6

      C.   The "Promotional Download" Evidence Cited by MP3tunes is Intentionally
           Exaggerated and Unreliable ........................................................................7

      D.   MP3tunes' Deposition Citations Are Taken Out of Context .......................8

ARGUMENT ..........................................................................................................8

I.   MP3TUNES IS NOT ELIGIBLE FOR DMCA SAFE HARBOR .......................8

      A.   MP3tunes' Failure To Disable Access To Works Specifically Identified On
           Multiple DMCA Notices Disqualifies MP3tunes From DMCA Safe Harbor ............10

           1.   Plaintiffs' Notices Complied With All DMCA Requirements ........................11

           2.   MP3tunes Did Not Disable Access By MP3tunes "Locker" Subscribers.........12

      B.   MP3tunes' Failure To "Reasonably Implement" A "Repeat Infringer" Policy
           Independently Disqualifies MP3tunes From DMCA Safe Harbor .............................13

      C.   MP3tunes' Actual And "Red Flag" Knowledge Of Infringement
           Independently Disqualifies MP3tunes From DMCA Safe Harbor .............................15

           1.   "Red Flag" Knowledge of "Specific" Infringements Is Not Required ............16

           2.   In Any Event, MP3tunes Had Both Actual Knowledge And "Specific
                and Identifiable Knowledge Of Particular [Infringing] Items".......................18

      D.   MP3tunes Is Disqualified from Safe Harbor Because It Failed To Comply
           With The "Representative List" Provided In Plaintiffs' Notices................................19

iii

E. MP3tunes Is Further Disqualified From DMCA Safe Harbor Because It Received A "Financial Benefit" From And Had The "Right And Ability To Control" The Infringing Activity ................................................................................23

F. The DMCA Does Not – And By The Express Terms Of The Copyright Act Cannot – Apply To Plaintiffs' "Pre-72" Sound Recordings ........................................25

II. MP3TUNES IS LIABLE FOR THE INFRINGEMENT OF ITS USERS .........................26

 A. MP3tunes Is Liable as a Contributory Infringer ...........................................26

  1. MP3tunes Knew of the Infringement on Its Websites ......................................26

  2. MP3tunes' "*Sony*" Defense is Legally Baseless .................................26

 B. Defendant Is Liable for Vicarious Infringement .................................................28

III. MP3TUNES IS A DIRECT COPYRIGHT INFRINGER ....................................................29

 A. MP3tunes' Executives Directly Infringed Plaintiffs' Copyrights ...............................29

 B. MP3tunes Directly Infringed Plaintiffs' Copyrighted Cover Art ...............................30

 C. MP3tunes Directly Infringed Plaintiffs' Right of Public Performance ......................31

IV. PLAINTIFFS HAVE PROVEN THEIR UNJUST ENRICHMENT CLAIM ....................32

V. PLAINTIFFS ESTABLISHED OWNERSHIP OF THE WORKS AT ISSUE ..................33

CONCLUSION .........................................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ...................................................................................12, 24

*A&M Records, Inc. v. Napster, Inc.*,
  No. 99 Civ. 5183, 2000 WL 573136 (N.D. Cal. May 12, 2000) ...........................................11

*ALS Scan v. Remarq*,
  239 F.3d 619 (4th Cir. 2001) ...............................................................................9, 11, 21

*American Tobacco Co. v. Patterson*,
  456 U.S. 63 (1982).....................................................................................................16

*Arista Records, Inc. v. Flea World*,
  No. 03-2670, 2006 WL 842883 (D.N.J. Mar. 31, 2006) ......................................................27

*Arista Records, Inc. v. MP3Board, Inc.*,
  No. 00 Civ. 4660, 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ...........................................12

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F.Supp.2d 124 (S.D.N.Y. 2009)...................................................................28, 29, 31, 32

*Arthur A. Kaplan Co., Inc. v. Panaria Int'l, Inc.*,
  No. 96 Civ. 7973 (HB), 1998 WL 603225 (S.D.N.Y. Sept. 10, 1998)...................................34

*Auburn Hous. Auth. v. Martinez*,
  277 F.3d 138 (2d Cir. 2002).........................................................................................26

*Barfield v. New York City Health and Hospitals Corp.*,
  537 F.3d 132 (2d Cir. 2008).........................................................................................23

*Boisson v. Banian, Inc.*,
  273 F.3d 262 (2d Cir. 2001).........................................................................................34

*Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*,
  331 U.S. 519 (1947)...................................................................................................22

*Capitol Records, Inc. v. Naxos of Am.*,
  4 N.Y.3d 540 (2005)("*Naxos II*") ............................................................................25, 32, 33

*Capitol Records, Inc. v. Naxos of America, Inc.*,
  372 F.3d 471 (2d Cir. 2004)("*Naxos I*") ..........................................................................6, 25

*Cartoon Network L.P. v. CSC Holdings, Inc.*,
    536 F.3d 121 (2d Cir. 2008)........................................................................28

*Columbia Pictures Industries, Inc. v. Fung*,
    No. CV 06-5578, 2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ..................9, 18, 24

*Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*,
    447 U.S. 102 (1980)..................................................................................16

*Corbis Corp. v. Amazon.com, Inc.*,
    351 F.Supp.2d 1090 (W.D.Wash. 2004)........................................................12, 18

*CoStar Group, Inc. v. LoopNet, Inc.*,
    164 F.Supp.2d 688 (D. Md. 2001) ................................................................24

*Eckes v. Card Prices Update*,
    736 F.2d 859 (2d Cir. 1984)........................................................................35

*Eden Toys, Inc. v. Florelee Undergarments Co., Inc.*,
    697 F.2d 27 (2d Cir. 1982)..........................................................................34

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) .....................................................................13

*Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*,
    443 F.2d 1159 (2d Cir. 1971).......................................................................23, 28

*Goldstein v. California*,
    412 U.S. 546 (1973)....................................................................................25

*Hayes v. New York City Dep't. of Corr.*,
    84 F.3d 614 (2d Cir. 1996)...........................................................................14

*Hibbs v. Winn*,
    542 U.S. 88 (2004).....................................................................................23

*In re Aimster Copyright Litig.*,
    334 F.3d 643 (7th Cir. 2003) .......................................................................19

*Intern. Gateway Exchange, LLC v. Western Union Fin. Services, Inc.*,
    333 F. Supp. 2d 131 (S.D.N.Y. 2004)............................................................15

*Io Group, Inc. v. Veoh Networks, Inc.*,
    586 F.Supp.2d 1132 (N.D. Cal. 2008) ...........................................................24, 25

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
    543 U.S. 111 (2004)....................................................................................23

*MGM Studios, Inc. v. Grokster, Ltd.*,
    545 U.S. 513 (2005)....................................................................................24, 26, 27

*Mutual Broadcasting System, Inc. v. Muzak Corp.*,
    30 N.Y.S.2d 419 (Sup. Ct. N.Y. County 1941) ...................................................32

*Neder v. United States*,
    527 U.S. 1 (1999)...................................................................................................23

*Newport Electronics, Inc. v. Newport Corp.*,
    157 F.Supp.2d 202 (D. Conn. 2001)......................................................................14

*Pem-American, Inc. v. Sunham Home Fashions, LLC*,
    83 Fed. Appx. 369 (2d Cir. 2003) .........................................................................34

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2006) ...............................................................................32

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) .........................................................................23, 24

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
    213 F.Supp.2d 1146 (C.D. Cal. 2002) ........................................................18, 24, 25

*Perfect 10, Inc. v. Rapidshare*,
    No. 09 Civ. 2596, slip op. (S.D. Cal. May 18, 2010) ...........................................13

*Raskin v. Wyatt Co.*,
    125 F.3d 55 (2d Cir. 1997).....................................................................................14

*Ronson Art Metal Works, Inc. v. Gibson Lighter Manufacturing Co.*,
    159 N.Y.S.2d 606 (1957) .......................................................................................33

*Roy Export Co. v. Columbia Broadcasting System, Inc.*,
    672 F.2d 1095 (2d Cir. 1982).............................................................................32, 33

*Shapiro, Bernstein & Co. v. H. L. Green Co.*,
    316 F.2d 304 (2d Cir. 1963)...............................................................................28, 29

*SHL Imaging, Inc. v. Artisan House, Inc.*,
    117 F.Supp.2d 301 (S.D.N.Y. 2000).......................................................................6

*SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.*,
    211 F.3d 21 (2d Cir. 2000)......................................................................................6

*Sony Corp. of America, Inc. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)...................................................................................26, 27, 28

*TeeVee Toons, Inc. v. MP3.com, Inc.*,
    134 F.Supp.2d 546 (S.D.N.Y. 2001).......................................................................35

*Tur v. YouTube, Inc.*,
   No. 06 Civ. 4436 (FMC), 2007 WL 1893635 (C.D. Cal. June 20, 2007) .............................25

*Ulloa v. Universal Music and Distribution Corp.*,
   303 F.Supp.2d 409 (S.D.N.Y. 2004)...........................................................................................6

*UMG Recordings, Inc. v. Veoh Networks, Inc.*,
   665 F. Supp. 2d 1099 (C.D. Cal. 2009) ...................................................................................12

*Viacom Int'l Inc. v. YouTube, Inc.*,
   No. 07 Civ. 2103 (LLS), 2010 WL 2532404 (S.D.N.Y. June 23, 2010) ..............15, 16, 17, 22

*Viacom Intern. Inc. v. Fanzine Intern. Inc.*,
   No. 98 Civ. 3448, 2000 WL 1854903 (S.D.N.Y. July 12, 2000) ...............................................5

*Whimsicality, Inc. v. Rubie's Costume Co.*,
   891 F.2d 452 (2d Cir. 1989).....................................................................................................35

### STATUTES

17 U.S.C. § 106...............................................................................................................................5

17 U.S.C. § 301(c)........................................................................................................................26

17 U.S.C. § 410(c)........................................................................................................................34

17 U.S.C. § 411(b)........................................................................................................................35

17 U.S.C. § 512(i)......................................................................................................................9, 13

17 U.S.C. § 512(a)........................................................................................................................24

17 U.S.C. § 512(b)........................................................................................................................24

17 U.S.C. § 512(c).................................................................................................................. passim

17 U.S.C. § 512(d)...........................................................................................................10, 11, 24

17 U.S.C. § 512(m)..................................................................................................................22, 23

17 U.S.C. § 512(n)........................................................................................................................11

Pub. L. No. 110-403.....................................................................................................................35

### OTHER AUTHORITIES

3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 12B.09[B], at 12B-99 (2009)...................22

H.R. Rep. No. 105-551, pt. 2 ........................................................................................................9

H.R. Rep. No. 94-1476 ...........................................................................................26

*Oxford English Dictionary* (2010 Online ed.) ..........................................................22

S. Rep. No. 105-190.................................................................................... passim

**<u>INTRODUCTION</u>**

Throughout this litigation, MP3tunes has attempted to defend itself from liability for the massive infringement that it commits by describing its business as two separate, unconnected websites; characterizing one (the "Locker Website," at www.mp3tunes.com) as a "storage locker" and the other (the "Sideload Website," at www.sideload.com) as a "search engine." While factually untrue, that characterization also misses the point. The dispositive fact is that MP3tunes consciously decided to use the Sideload Website – a website promising unlimited "free" (and infringing) music to all comers – to try to differentiate its "locker service" from its competitors. Indeed, MP3tunes provided the Sideload Plug-In and the Webload Feature precisely to encourage users to "sideload" infringing content to their MP3tunes "lockers" so that MP3tunes could add those songs to the Sideload Website. There was only one possible reason for doing that – to induce those who wanted "free" music to come to the Sideload Website, where MP3tunes could try to sell them "Premium" locker accounts. MP3tunes' business plan was to build a paying customer base by using infringing copies of Plaintiffs' works as bait. This damning fact is revealed not only by the architecture of and advertising on the sites but by the conscious actions of Defendant Robertson and the other executives of MP3tunes who each invested substantial time sideloading significant numbers of infringing files. This conduct was neither innocent nor personal. The intent was to increase the value of the MP3tunes operation by increasing the number and quality of songs available on the Sideload Website.

These facts disqualify MP3tunes from relying on the safe harbors provided by the Digital Millennium Copyright Act ("DMCA"). MP3tunes' description of the purpose of the DMCA is a remarkable bit of self-serving revisionist history. The DMCA reflected a careful balance between the interests of copyright owners and the interests of internet service providers that are innocent bystanders to infringement occurring on their systems. In stark contrast, MP3tunes

1

created a business that was (and is) premised on copyright infringement; MP3tunes had actual knowledge of the infringement (indeed, it directly engaged in the infringement) and it profited from the infringement.  There is no support in the DMCA for the proposition that Congress intended to immunize such affirmative misconduct.  MP3tunes' position would replace the DMCA's carefully delineated balance with a blanket immunity for willful infringers.

After this lawsuit was filed, in an attempt to deflect the focus of the Court (and the press) from its wrongful actions, MP3tunes began loudly proclaiming that its infringement is justified because Plaintiffs "littered the internet" with "free" downloads of their works.  Now, the Court will finally be able to separate rhetoric from reality.  First, virtually none of the songs actually sideloaded by MP3tunes users (and executives) come from the allegedly legitimate sources MP3tunes touts in its brief.  Rather, over 97% of sideloaded files come from manifestly infringing sites that even MP3tunes makes no attempt to defend.  That speaks volumes about MP3tunes' business plan and its made-for-litigation rhetoric.  Second, after years of litigation and extensive discovery, the number of downloads that MP3tunes can even allege were authorized in any manner is truly de minimis.

Moreover, MP3tunes' argument turns copyright law on its head.  Plaintiffs do not abandon their copyright in a song when they authorize a *particular* website to allow *visitors to that site* to download a copy.  On the rare occasions when Plaintiffs authorize "promotional" downloads of their intellectual property, they do so only in exchange for some important consideration (usually valuable demographic or marketing information about the consumer), or to draw users to a website to drive interest in an artist or event promoted on that site, or to expose the website visitor to a marketing or charitable message.  Any limited authority granted extends *only to users who visit that particular website*.  MP3tunes' "theory" that it can usurp the entire commercial value of that download for itself – which it does when it causes its users to sideload

the song from Sideload.com without ever visiting the source site – is completely unfounded. Appropriating a copyrighted work in excess of any grant of authority is copyright infringement. In other words, even as to those tiny number of songs that were available to users on a promotional basis, MP3tunes turned its users into infringers, and MP3tunes is liable for each of the resulting infringements.

In the end, this case has nothing to do with protecting the innovations of the internet by limiting the liability of "innocent" service providers.  MP3tunes operates a pirate music service. The Sideload Website was created to infringe by an individual who amassed a fortune creating websites that exploit infringing works.  There is no immunity from liability for such behavior.

## BACKGROUND

## I.      SUMMARY OF RELEVANT FACTS

Plaintiffs' own motion for summary judgment presents facts conclusively establishing MP3tunes' liability for direct and secondary copyright infringement, and its ineligibility for any DMCA safe harbor.  To avoid unnecessary repetition, Plaintiffs respectfully refer the Court to that discussion of these facts.  Pls. Mem. at 5-15.  Herein, Plaintiffs provide background on MP3tunes' false assertions about "free" downloads.

## II.     MP3TUNES' CLAIM THAT PLAINTIFFS AUTHORIZE UNRESTRICTED DOWNLOADS IS LEGALLY AND FACTUALLY UNSUPPORTABLE

In its motion, MP3tunes alleges that Plaintiffs "make free downloads available on the Internet …with the express intention that it spread like a virus."  *See, e.g*., Defs. Mem. at 22. However, Defendant's argument ignores basic tenets of copyright law, is factually unsupported, and is shown to be simply wrong by the indisputable evidence.

**A.      Plaintiffs Do Not "Abandon" Their Copyright in a Song by Authorizing a Promotional Download**

As shown below, virtually none of the actual sideloads into MP3tunes "lockers" are from sites legitimately authorized to offer a promotional download.  However, even as to the very few that are, MP3tunes' entire argument is based on the theory that a copyright owner abandons its copyright in a song when it authorizes even a single website to offer a promotional download of the song.  A century of copyright law says otherwise.

Plaintiffs are in the business of commercializing sound recordings and musical compositions.  On rare occasion, for marketing purposes, Plaintiffs offer visitors to their own websites (or other authorized websites) the ability to download a song without payment. Heinemann ¶ 6; Supp. Abitbol ¶¶ 15-20.  However, these downloads are not "free"; Plaintiffs receive important consideration in return.  A "free" song acts as a "draw," attracting users to the website.  Heinemann ¶ 5.  Once there, in many cases, Plaintiffs only allow the download in exchange for valuable personal information from the user that will facilitate more effective marketing to the user in the future.  *Id.* ¶¶ 5, 9; Supp. Abitbol ¶¶ 15-20.  In other cases, the consideration for Plaintiffs is the user's visit to the website itself.  Heinemann ¶ 6.  The website might be promoting an EMI artist, an upcoming album, or a concert or event; the website might simply be presenting a promotional, marketing, or charitable message.  *Id.* ¶¶ 5-6; Supp. Abitbol ¶¶ 22-25.  The important point is that Plaintiffs realize the consideration only from users who visit the website offering the promotion.

Plaintiffs take care in selecting the few websites authorized to offer a promotional download to ensure that a download on those sites will provide significant value in return.  For example, a Plaintiff once allowed Clear Channel, a large entertainment company that owns numerous radio stations, to host a promotional download.  In exchange, Clear Channel provided Plaintiff's artist with prominent placement on the Clear Channel homepage and further directed

traffic back to the artist's website.  Ex. 106 (cited at MP3tunes' SUF ¶ 87).  Similarly, the South by Southwest music festival is one of the largest annual music festivals.  Heinemann ¶ 6.  South by Southwest maintains festival webpages devoted to and promoting individual artists who are performing.  Some Plaintiffs occasionally have permitted a promotional download from artists' pages on the South by Southwest website to help promote the artist.  *Id*.  Again, Plaintiffs realize this consideration when the user visits the site.

MP3tunes, in contrast, designed the Sideload Website so that users can download songs without leaving the Sideload Website and *without ever visiting the promotional website or viewing the marketing and promotional messages.*  Supp. Horowitz ¶ 25.[1]  Likewise, downloads through links from the Sideload.com website bypass the exchange of valuable marketing information that was the *sine qua non* of the promotional offering in the first place.  Supp. Horowitz ¶ 27; Horowitz ¶¶ 33-40.[2]

The most fundamental principle of copyright law is that the copyright owner has the right to exclude or authorize use of its work; and, when authorizing use, to control the scope of that authorization.  17 U.S.C. § 106; *see also Viacom Intern. Inc. v. Fanzine Intern. Inc.*, No. 98 Civ. 3448, 2000 WL 1854903, at *3 (S.D.N.Y. July 12, 2000).  In those narrow circumstances when Plaintiffs allow a promotional download, the authorization is limited to those users who actually visit the website and participate in the promotion.  Indeed, no one would dare suggest that a user receiving a promotional download could turn around and start a website selling copies of that downloaded song.  Yet, MP3tunes' suggestion that its users are authorized to take permanent copies of Plaintiffs' songs without ever visiting the promotional website or participating in the

---

[1] MP3tunes' circumvention of these promotional activities not only harms the Plaintiffs but any charitable partners, too.  *See* Supp. Abitbol ¶ 20; Heinemann Ex. A; Gulia Ex. K (Abitbol) at Ex. 40.

[2] Contrary to MP3tunes' representation, true search engines, such as Google and Bing, never provide users with a direct download of the song file but rather bring users to the webpage offering the promotion, where the user participates in the promotion as intended.  Supp. Horowitz ¶¶ 18, 20.

promotion is equally absurd.  MP3tunes is implicitly arguing for a ruling that, by offering a

promotional download from a single website, Plaintiffs have either abandoned their copyright

altogether or have impliedly authorized downloads completely outside the promotional context.

Either way, MP3tunes would have the burden of proving the existence of such a broad implied

license, *Ulloa v. Universal Music and Distribution Corp.*, 303 F.Supp.2d 409, 416 (S.D.N.Y.

2004), and simply cannot meet that burden.  *Capitol Records, Inc. v. Naxos of America, Inc.*, 372

F.3d 471, 483-4 (2d Cir. 2004) (defense of abandonment requires an infringer prove an intent to

surrender all rights in a work and an overt act demonstrating that intent); *SmithKline Beecham

Consumer Healthcare, L.P. v. Watson Pharmaceuticals, Inc.*, 211 F.3d 21, 25 (2d Cir. 2000)

(implied licenses limited to "narrow circumstances"); *SHL Imaging, Inc. v. Artisan House, Inc.*,

117 F.Supp.2d 301, 317 (S.D.N.Y. 2000) ("no court has found an implied license where the

nature of the use is contested").  All reproductions enabled through the Sideload Website are

unauthorized and are copyright infringement.

### B.    MP3tunes Makes No Attempt to Defend the Vast Majority of Activity Occurring on the Sideload Website

On page 10 of its brief, MP3tunes lists 89 companies and artists that Plaintiffs allegedly

"authorized" to offer free downloads.  MP3tunes uses this as "evidence" that MP3tunes could

have reasonably believed that the activity occurring via the Sideload Website did not constitute

copyright infringement.  But collectively the sites listed on page 10 are the source of less than

2.3% of all sideloads from the Sideload.com website.  Supp. Horowitz ¶ 29.  This percentage is

not limited to just Plaintiffs' works; it includes all sideloads.  More than 97% of actual

sideloading was from sites that MP3tunes cannot even begin to defend (and has not even tried).

The activity from all of these allegedly "authorized" sites **combined** is surpassed by the activity

from any one of a number of pirate source sites alone.  Supp. Horowitz ¶ 28, Ex. A.

6

C.     The "Promotional Download" Evidence Cited by MP3tunes is Intentionally
        Exaggerated and Unreliable

In addition, the so-called "free download" evidence submitted by MP3tunes is wholly

unreliable.  First, vast numbers of the documents cited by MP3tunes relate to video, streaming

(not downloadable) music, and other wholly irrelevant activities.  Heinemann ¶ 12, Ex. A; Supp.

Abitbol ¶ 28, Ex. A.  Second, the majority of the "evidence" is temporally irrelevant.

Heinemann ¶ 19, Ex. A; Supp. Abitbol ¶¶ 11-12.[3]  The evidence cited by MP3tunes reflects that

Plaintiffs offered few downloads *of any kind* in or before 2006 when MP3tunes introduced the

Sideload Website.  Third, the evidence shows that an authorized download was, in many cases,

contingent on the user providing a promotional code, data capture, or proof of purchase prior to

obtaining the download – consideration that a user does not provide when a user obtains files

from the Sideload Website.  Of the so-called "free" downloads that MP3tunes cites in its brief:

- At least 113 of the documents to which MP3tunes refers reflect downloads with
  an access restriction, such as requiring a CD, a promotional code, or the exchange
  of demographic information.  Heinemann Ex. A, Abitbol Ex. A.
- At least 84 of the documents that MP3tunes alleges show authorized "free"
  downloads were not downloads at all.  The "supporting" documents reflect a file
  sent for streaming/listening only or reference a video file.  Other documents do
  not reflect that Plaintiffs offered any files for download or streaming.  *Id.*
- At least 145 of the documents reflect downloads that were offered in 2009 or later
  – a time period irrelevant to this action.  *Id.*

At bottom, the documents proffered by MP3tunes reflect fewer than 50 promotional downloads

during the relevant period offered without requiring the user to provide some kind of information

---

[3] During discovery, through an agreement of the parties and an order of Magistrate Judge Maas, the
infringement at issue in this case was limited to that occurring on or before December 9, 2008, the date
on which MP3tunes produced the server data upon which all the claims of infringement are based.
Plaintiffs have no information regarding infringement occurring after December 9, 2008.  Accordingly,
as further ruled by the Magistrate Judge, the only promotional download practices that are even
potentially relevant are those that existed prior to December 2008.  Ex. 116 at 31:21-32:22.

in exchange for the download.[4]   These numbers are truly *de minimis* in relation to the hundreds

of thousands of files, from over 30,000 source sites, available through the Sideload Website,

Supp. Horowitz ¶ 28, and negate any reasonable belief that any copyright owner authorized a

meaningful portion of the hundreds of thousands of files available on the Sideload Website.

### D.      MP3tunes' Deposition Citations Are Taken Out of Context

Without any real evidence, MP3tunes resorts to mischaracterizing deposition testimony.

*See* Counter-SUF at ¶¶ 85, 90-105.  MP3tunes' misstatements are not simply a litigant's spin on

ambiguous testimony.  The actual testimony of Plaintiffs' executives stands in stark contrast to

the misleading portrayal by MP3tunes.  *Id.*; *see also* Counter-SUF at ¶¶ 85, 90-105.[5]  Contrary to

MP3tunes' portrayal, each of Plaintiffs' representatives was clear that Plaintiffs strive to

maximize the promotional benefit of every authorized download.  Gulia Ex. J at 58:2-59:6; 99:7-

15; Gulia Ex. K at 62:2-11; Ex. 104 (Ondrejka) at 44:17, 68:1-6, 70:15-72:18; Ex. 105 (Schmitt)

at 51:17-52:8; *see also* Heinemann ¶¶ 4-7 & Ex. A; Supp. Abitbol ¶¶ 14-25 & Ex. A.

### ARGUMENT

## I.      MP3TUNES IS NOT ELIGIBLE FOR DMCA SAFE HARBOR

Contrary to MP3tunes' suggestion (Defs. Mem. at 13), the DMCA does not exist to

blindly protect service providers.  In enacting the DMCA, Congress equally sought to protect

copyright owners, and did so by affording safe harbor only to "innocent" service providers who

---

[4] MP3tunes' interrogatory evidence is no different.  That discovery showed that Plaintiffs only authorized 77 of the downloads addressed by those interrogatories and did so based solely on the website that the user was required to visit to get the download.  Indeed, 74 of the 77 came from the South by Southwest website discussed above.  *See also* Heinemann ¶¶ 6, 20.  Moreover, as stated, the consideration to Plaintiffs for all these downloads was the user's visit to the selected website and the promotional material contained thereon.  Not one of these downloads was authorized to appear on the Sideload Website where users could obtain the files without visiting the required website.

[5] As but one example, in paragraph 99 of its Statement of Undisputed Facts, making heavy use of brackets to insert words into a deposition answer, MP3tunes presents claimed testimony that bears no relationship to the witness' actual testimony.  *See* Counter-SUF at ¶ 99.

did their part to prevent and mitigate infringement on their systems. *E.g., ALS Scan v. Remarq,* 239 F.3d 619, 625 (4th Cir. 2001); H.R. Rep. No. 105-551, Part 2 at p. 21.

Because the DMCA provides extraordinary protection against copyright liability, a qualifying service provider seeking DMCA safe harbor must *independently* satisfy *each* of the DMCA's eligibility requirements. *ALS Scan*, 239 F.3d at 623; *Columbia Pictures Industries, Inc. v. Fung*, No. CV 06-5578, 2009 WL 6355911, at *16 (C.D. Cal. Dec. 21, 2009); *see also* Pls. Mem. at 27-28 (safe harbors to be narrowly construed). Congress designed these requirements, individually and collectively, to ensure that the service provider is truly innocent of responsibility for the infringement happening through its system. Thus:

- When a copyright owner sends a notice of infringement, a service provider must expeditiously disable *all* access to the specific works identified as infringing, as well as other works that are fairly identifiable based on the "representative list" in the notice. 17 U.S.C. §§ 512(c)(1)(C) & (c)(3)(A)(ii). MP3tunes did not do this. It failed to disable access to *any* of the identified songs on its servers, which remained freely available to its subscribers through their MP3tunes "lockers." MP3tunes likewise did nothing to deal with other infringing works plainly identifiable from Plaintiffs' notices.

- Even without a notice, a service provider must expeditiously disable access to any infringing content it learns about, whether it obtains actual knowledge or simply becomes aware of facts or circumstances from which infringing activity is apparent. 17 U.S.C. §§ 512(c)(1)(A)(i) & (ii). Here, MP3tunes repeatedly turned a blind eye to blatant "red flags" from which widespread infringement would have been apparent to any reasonable person. Indeed, rather than taking action as required, MP3tunes' CEO Robertson directed his staff that: "We do not remove songs unless we are presented with a DMCA compliant request to do so." Ex. 16.

- Additionally, a service provider that wants DMCA protection cannot sit by idly, profiting from copyright infringement that it has a right and ability to control. 17 U.S.C. § 512(c)(1)(B). MP3tunes did worse. MP3tunes used the lure of free access to infringing music to attract customers to its sideload.com website, where it converted them into paying locker subscribers. MP3tunes did not mitigate infringement, which it readily could have done, because infringement was part of its business plan.

- And, critically, a service provider cannot claim compliance with the DMCA just because it removes infringing content one work at a time as identified by copyright owners. Service providers that want DMCA safe harbor must deal with infringement at its *source* – by taking action against subscribers who engaged in repeated acts of copyright infringement, including by terminating "repeat infringers" as appropriate. 17 U.S.C. § 512(i)(1)(A). MP3tunes failed to comply. When it received DMCA notices, MP3tunes

did not even look at its own records to learn the identities of the MP3tunes subscribers who infringed the noticed songs. *A fortiori*, MP3tunes made sure it would never be in a position to take action against repeat infringers; and, in fact, never did.

MP3tunes' noncompliance goes to the core of the DMCA and is a fundamental consequence of MP3tunes' business operation. MP3tunes is not content agnostic or a passive provider of internet services. MP3tunes operates a *music service* – except it does not own or have rights to the music (or Cover Art) on which it has built its business. As set forth in detail in Plaintiffs' motion for summary judgment (Pls. Mem. at 27-35), the facts that demonstrate that MP3tunes is <u>not</u> entitled to DMCA safe harbor are not in dispute. MP3tunes' motion papers simply pretend those facts do not exist, and instead go on at length about its written "policies" against infringement. But words belied by conduct do not satisfy the DMCA. To the contrary, the most notorious adjudicated copyright infringers of the internet era – from Napster to Grokster to Isohunt to Limewire to Usenet.com – all had, on paper, DMCA "policies" and/or Terms of Use that "prohibited" infringement comparable to MP3tunes. Exs. 107-111. None of them escaped liability because, like MP3tunes, their conduct contradicted their words.

### A.   MP3tunes' Failure To Disable Access To Works Specifically Identified On Multiple DMCA Notices Disqualifies MP3tunes From DMCA Safe Harbor

Section 512(c) governs material stored on the service provider's servers at the direction of a user. 17 U.S.C. § 512(c). This is the only safe harbor that, if MP3tunes qualified, could apply to MP3tunes' "locker" service. Section 512(d) governs information location tools, *e.g.*, search engines. 17 U.S.C. § 512(d). This is the only safe harbor that, if MP3tunes qualified, could apply to the Sideload Website. MP3tunes is correct that, in relevant part, the eligibility requirements for Section 512(c) and Section 512(d) are the same.

However, the DMCA requires that MP3tunes meet the eligibility requirements *separately* for *each* function it performs, *i.e.*, for both the sideload.com website and for its locker service. The DMCA provides that "[w]hether a service provider qualifies for the limitation on liability in

any one of those subsections shall be based solely on the criteria in that subsection, and shall not affect a determination of whether that service provider qualifies for the limitations on liability under any other subsection."  17 U.S.C. § 512(n); *see also A&M Records, Inc. v. Napster, Inc.*, No. 99 Civ. 5183, 2000 WL 573136, at *6 (N.D. Cal. May 12, 2000); S. Rep. No. 105-190 at pp. 53-54.

This principle is dispositive of MP3tunes' DMCA defense.  Regardless of whether MP3tunes complied with Plaintiffs' notices under Section 512(d) as to the sideload.com website, MP3tunes admittedly did not remove the actual infringing song files from its servers; nor did it disable access to those song files by any MP3tunes subscribers who, at the time of Plaintiffs' notice, already had sideloaded the song file into their MP3tunes "lockers."  Thus, MP3tunes completely failed to comply under 512(c) as to its locker service.  *E.g.*, *ALS Scan*, 239 F.3d at 625 (defendants' failure to act on valid DMCA notice deprived it of safe harbor).

### 1. Plaintiffs' Notices Complied With All DMCA Requirements

While MP3tunes asserts that Plaintiffs' notices were deficient (Defs. Mem. at 16-20), it does not actually argue that the notices are deficient as to the song files specifically identified by "URL link" in Plaintiffs' notices (the "Referenced Song Files").  Rather, MP3tunes argues that it was not required to treat the Referenced Song Files as a "representative list," thereby obligating MP3tunes to disable *other* of Plaintiffs' works *beyond* the Referenced Song Files.  (That argument is addressed *infra* at pp. 19-23).  It is indisputable, however, that Plaintiffs' notices collectively identified hundreds of specific song files and complied with all requirements of the DMCA, 17 U.S.C. § 512(c)(3).  MP3tunes' suggestion that the notices "did not specifically identify … the location of the purportedly infringing material" (Defs. Mem. at 18) also appears to be limited to its "representative list" argument since Plaintiffs identified the Referenced Song

Files using the unique MP3tunes "URL link" for each song file.  SUF ¶¶ 38-39; Exs. 24-26; *see also* Defs. Mem. at 17 (acknowledging URL links are sufficient); Horowitz ¶ 61.

MP3tunes' argument that "Plaintiffs in this action cannot rely upon the letters that EMI Music Group North America and EMI Entertainment World sent … [because] neither of those entities are plaintiffs in this action" (Defs. Mem. at 19) is frivolous.  As provided expressly in the DMCA, the person who sends a DMCA notice – the "complaining party" in DMCA nomenclature – need not be the copyright owner of the noticed works, as long as the complaining party states under penalty of perjury that it "is authorized to act on behalf of the" copyright owner.  17 U.S.C. § 512(c)(3)(A)(vi); *see also, e.g.,* 17 U.S.C. § 512(c)(3)(A)(i).  Indeed, DMCA notices are routinely sent by copyright owner representatives.  *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 n. 6 (9th Cir. 2001) (crediting notices sent by copyright owners' trade association); *Arista Records, Inc. v. MP3Board, Inc.*, No. 00 Civ. 4660, 2002 WL 1997918, at *9 (S.D.N.Y. Aug. 29, 2002) (same); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1104 (C.D. Cal. 2009) (same).  There is no authority for MP3tunes' argument.[6]

### 2.   MP3tunes Did Not Disable Access By MP3tunes "Locker" Subscribers

MP3tunes has admitted that, as to each of the specific Referenced Song Files in Plaintiffs' notices, it did not delete the song file from its servers and it did not take any steps to disable access to the song file by any of its subscribers who already had sideloaded the song into their MP3tunes lockers.  Ex. 4 (Robertson) at 234:20-25; Ex. 12 (Richards (6/30/09)) at 87:13-88:3; Ex. 102 (Krause) at 36:24-37:7; Ex. 100 (Reese) at 207:25-209:6.  Thousands of MP3tunes' subscribers sideloaded the Referenced Song Files into their lockers.  Horowitz ¶ 66 & Ex. Q.  Every one of those users continued to have unrestricted access to those infringing song

---

[6] *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1107-09 (W.D.Wash. 2004), cited by MP3tunes (Defs. Mem. at 19), is completely inapposite.  The notices in *Corbis* were unrelated to the plaintiff's copyrighted works.  Nor did those third-parties in *Corbis* even purport to act on behalf of the plaintiff.

files.  When pressed at his deposition as to why MP3tunes did not disable access by MP3tunes'

locker subscribers, CEO Robertson could not give a reason, stating only: "Because we don't …

We don't do it."  Ex. 4 (Robertson) at 286:24-287:17.[7]

### B.   MP3tunes' Failure To "Reasonably Implement" A "Repeat Infringer" Policy Independently Disqualifies MP3tunes From DMCA Safe Harbor

As demonstrated in Plaintiffs' motion for summary judgment, MP3tunes failed to

"reasonably implement" a repeat infringer policy pursuant to DMCA Section 512(i) and is thus

ineligible for any DMCA safe harbor.  *See* Pls. Mem. at 28-32.  In its motion, not surprisingly,

MP3tunes focuses on its "policies" and not on the DMCA requirement that a service provider

must "reasonably implement" a repeat infringer policy, not just have one on paper.  17 U.S.C. §

512(i)(1)(A).[8]  In terms of implementation, it is undisputed that, when MP3tunes received

DMCA notices identifying infringed song files, it did not look at its own records to learn the

identities of its subscribers who had infringed those songs.  Pls. Mem. at 30-31.  To avoid

repeating arguments already presented, Plaintiffs respectfully refer the Court to their motion for

summary judgment, at pages 28-32, and incorporate that argument herein.

Only one issue requires a response here:  MP3tunes' claim that it has terminated any

---

[7] MP3tunes' disqualification from safe harbor for its storage of infringing sideloaded songs is not limited to just the Referenced Song Files as MP3tunes seems to imply.  As with every other basis of DMCA safe harbor disqualification, MP3tunes is not eligible for safe harbor for *any* infringement during the *entire period* of time it remains out of DMCA compliance.  *Ellison v. Robertson*, 357 F.3d 1072, 1080 (9th Cir. 2004)(no DMCA safe harbor while out of compliance with § 512(i)'s repeat infringer policy); *See Perfect 10, Inc. v. Rapidshare*, No. 09 Civ. 2596, slip op. at 12 (S.D. Cal. May 18, 2010) (no DMCA safe harbor while out of compliance with § 512(c)(2)'s designated agent requirement).  The force of this principle is particularly strong here since, at *all times* relevant to this litigation, and for *all copyright owners*, MP3tunes had an unbroken policy and practice *not* to disable access to infringing songs available to users through their MP3tunes lockers.  Ex. 77; Ex. 12 (Richards) at 87:24-88:3, Ex. 4 (Robertson) at 234:20-25, 286:24-287:11; Ex. 102 (Krause) at 36:24-37:7;  Horowitz ¶¶ 63-66 & Ex. Q.

[8] MP3tunes' reliance on the documentation of its so-called "policies" is more than a little ironic.  The MP3tunes employee directly responsible for taking action on DMCA notices testified that, at the explicit direction of CEO Robertson, MP3tunes' implementation instructions were given only orally "so that it wouldn't be discovered [in legal proceedings] exactly what the instructions had been."  Ex. 10 (Krause) at 14:7-15:2.

subscriber for repeated (or any) copyright infringement. Defs. Mem. at 8, 15. The only

purported evidence MP3tunes offers to support its contention is two conclusory sentences from

Robertson's declaration. *See* Robertson ¶ 11. At his deposition, however, Robertson testified

that he could identify only two types of conduct that resulted in termination of user accounts.

One was when subscribers shared their account passwords such that multiple users had access to

one locker. Ex. 99 (Robertson) at 193:16-194:25.[9] The other was "an incident" regarding a

"hate group" using a locker to try to disseminate hateful messages. Ex. 4 (Robertson) at 195:2-

11. Notwithstanding that he was MP3tunes' Rule 30(b)(6) corporate representative designated

on this topic, Robertson professed that he could not identify *any* other subscriber behaviors that

led to termination of a subscriber account. Ex. 4 (Robertson) at 195:18-25. He also testified that

he did not know whether MP3tunes ever kept a record of subscribers who infringed the songs

identified on DMCA notices. Ex. 99 (Robertson) at 284:13-23.[10]

It is well-established that a witness who disclaimed knowledge or recollection of facts at

his deposition cannot create an issue of fact on summary judgment by submitting a declaration

purporting to testify as to those facts. *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997);

*Hayes v. New York City Dep't. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). This principle applies

with even more force where, as here, the witness was a party's corporate designee on the topic.

*Newport Electronics, Inc. v. Newport Corp.*, 157 F.Supp.2d 202, 220 (D. Conn. 2001) (Rule

30(b)(6) witness "was not at liberty … [to] submit[] information in his affidavit which

---

[9] Stopping this type of conduct, which obviated the need for users to pay for lockers, was of course in MP3tunes' economic self-interest.

[10] This makes Robertson's self-serving summary judgment testimony particularly curious. Robertson asserts as evidence of its repeat infringer policy that "[b]y requiring its users to submit a valid, working email, MP3tunes ensures that there is sufficient means for *warning users* of improper use of its services." Robertson Decl. ¶ 11 (emphasis added). Yet, it is undisputed that despite clearly having "sufficient means" to do so, MP3tunes never warned any subscribers that they had engaged in infringing conduct by sideloading song files explicitly identified in DMCA notices. Pls. Mem. at 30-31.

14

contradicts statements in his deposition regarding his lack of knowledge on various topics");

*Intern. Gateway Exchange, LLC v. Western Union Fin. Services, Inc.*, 333 F. Supp. 2d 131, 144-

145 (S.D.N.Y. 2004).  MP3tunes, as a result, cannot rely on Robertson's declaration.

Robertson's newly manufactured testimony is also inconsistent with the representations

of MP3tunes' own counsel and the testimony of every other MP3tunes employee who was

questioned about the termination of accounts.[11]  There is no triable issue of fact that MP3tunes

did nothing to "reasonably implement" a repeat infringer policy as required by the DMCA.

### C.   MP3tunes' Actual And "Red Flag" Knowledge Of Infringement Independently Disqualifies MP3tunes From DMCA Safe Harbor

The evidence of MP3tunes' "actual knowledge" of infringing activity, 17 U.S.C.

§ 512(c)(1)(A)(i), and its "aware[ness] of facts and circumstances from which infringing activity

is apparent" (*i.e.* "red flag" knowledge), 17 U.S.C. § 512(c)(1)(A)(ii), is overwhelming.   For this

independent reason, MP3tunes is not eligible for DMCA safe harbor.  Again, to avoid repetition,

Plaintiffs incorporate and refer the Court to pages 12-15, 16-19, and 33-34 of their motion, which

detail MP3tunes' actual and red flag knowledge.

MP3tunes cannot deny those facts, and does not make any effort to refute them.  Instead,

MP3tunes argues from *Viacom Int'l Inc. v. YouTube, Inc.*, No. 07 Civ. 2103 (LLS), 2010 WL

2532404, at *14 (S.D.N.Y. June 23, 2010), that the "red flag" legal standard only disqualifies

MP3tunes if it had knowledge of "infringements of *specific works* belonging to plaintiffs."  Defs.

Mem. at 16 (emphasis added).  However, this Court is not bound to follow the *Viacom* decision

---

[11] MP3tunes' counsel represented (after purporting to have undertaken substantial investigation of the issue) that "there is no way to tell why any given [user] record was set to a 'disabled' status."  Exs. 114, 115.   Julian Krause, the MP3tunes employee who was actually responsible for handling DMCA notices, testified unequivocally that no one ever asked him to identify any subscriber who had sideloaded infringing songs listed in DMCA notices – and he did not do so.  Ex. 102 (Krause) at 38:2-5, 45:11-16; *see also* Ex. 101 (Ford) at 99:23-100:19 (never instructed to and never did remove any files because of copyright infringement); Ex. 103 (Lindahl) at 125:9-23 (same); Ex. 100 (Reese) at 485:2-486:18 (MP3tunes' Chief Technology Officer could not identify any source sites blocked for reasons related to copyright infringement).

and in this important respect, respectfully, should not do so.  The statutory text, the relevant

legislative history, and the overall purpose of the statute all dictate that MP3tunes need not know

about "specific works" in order to have disqualifying "red flag" knowledge.  Moreover, the

record in this case reveals that MP3tunes had both actual knowledge and "red flag" knowledge

of specific infringements.

### 1.     "Red Flag" Knowledge of "Specific" Infringements Is Not Required

After quoting pages of DMCA legislative history, Judge Stanton concluded that "[t]he

tenor" of the collective legislative history is that "red flag" knowledge must be "knowledge of

specific and identifiable infringement of particular individual items."  *Viacom*, 2010 WL

2532404 at *8.  That approach, however, violates the cardinal rule of statutory construction that a

court should not use legislative history to contravene statutory text that is clear on its face.

*American Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982); *Consumer Product Safety Comm'n

v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980).  The text of the "red flag" provision is clear; a

service provider is disqualified if it is "*aware* of facts and circumstances from which *infringing

activity* is apparent."  17 U.S.C. § 512(c)(1)(A)(ii) (emphasis added).  "[A]ware[ness]" of

"apparent" "infringing activity" and "specific and identifiable knowledge of particular individual

[infringed] items" are simply not textually compatible.

Other statutory text further supports the plain meaning of the red flag provision.  For

example, the DMCA expressly provides that substantially compliant notices can give a service

provider not only "actual knowledge" (of the "particular individual items" specifically identified

in the notice), but also an "aware[ness] of facts or circumstances from which infringing activity

is apparent."  17 U.S.C. § 512(c)(3)(B).  Other explicit statutory text provides that a copyright

owner's notice need only identify a "representative list" of works when multiple works are being

infringed through one site.  17 U.S.C. § 512(c)(3)(A)(ii).  Thus, the statute itself precludes any

inference that Congress intended to limit safe harbor disqualification only to situations in which the service provider had the sort of specific knowledge required by *Viacom*.

In support of its "specific" knowledge standard, the *Viacom* court expressed concern that an alternative standard would disqualify a service provider based merely on knowledge of "a generalized practice of infringement in the industry, or of a proclivity of users to post infringing materials." *Viacom*, 2010 WL 2532404, at *8. However, left unconsidered by the court are the different levels of knowledge between those two extremes. Congress evidenced a clear intent that the standard for "red flag" knowledge should fall between the two. Indeed, the statutory text itself – which requires actual subjective knowledge of "facts or circumstances" – ensures that the sort of generalized constructive knowledge of a capacity or proclivity to infringe could not subject service providers to disqualification.[12]

Indeed, legislative history about the "red flag" language encourages a "common-sense" approach and explicitly discusses how knowledge at the website level – not at the "particular item" level – could be sufficient:

> For instance, the copyright owner could show that the provider was aware of facts from which infringing activity was apparent if the copyright owner could prove that *the location* was clearly, at the time the [service] provider viewed it, a "pirate" site of the type described below, where sound recordings, software, movies or books were available for unauthorized downloading, public performance or public display.
>
> *       *       *
>
> The important intended objective of this [red flag] standard is to *exclude sophisticated "pirate" directories* – which refer Internet users to other selected Internet sites where pirate software, books, movies, and music can be downloaded or transmitted – from safe harbor.
>
> *       *       *

---

[12] Congress was explicit that "red flag" knowledge has both "a subjective and an objective element." A service provider must have "subjective awareness of … the facts or circumstances in question"; only thereafter, an objective "reasonable person" standard is used to determine "whether infringing activity would have been apparent" from the known facts and circumstances. S. Rep. No. 105-190 at 44.

> If … an Internet site is obviously pirate, then seeing it [*i.e.*, the site, not any
> 'particular item'] may be all that is needed for the service provider to encounter a
> "red flag."

S. Rep. No. 105-190 at 48-49 (emphasis added).  Defendant's sideload.com website is precisely

the sort of site Congress contemplated when it drafted the "red flag" provision.

The *Viacom* decision is simply incorrect on this point.  Other courts considering "red

flag" knowledge instead have applied the "common-sense," reasonable person standard to known

facts and circumstances, without imposing artificial restrictions on what those facts and

circumstances must be.  *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090, 1108 (W.D.

Wash. 2004) (no safe harbor for service provider that "turned a blind eye" to "blatant factors"

that would have led a reasonable observer to suspect infringement was taking place ); *Columbia

Pictures Industries, Inc. v. Fung*, No. CV 06-5578, 2009 WL 6355911, at *16-*18 (C.D. Cal.

Dec. 21, 2009); *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1177 (C.D. Cal.

2002) (the DMCA does not "endorse business practices that would encourage content providers

to turn a blind eye to the source of massive copyright infringement while continuing to

knowingly profit").

Respectfully, there is no basis in the DMCA for the *Viacom* court's "specific and

identifiable knowledge of particular individual items" standard.  The subjective/objective "facts

or circumstances" standard is compelled by the statutory text and is the balance Congress

intended.  As set forth in Plaintiffs' motion for summary judgment, under this standard,

MP3tunes cannot credibly claim DMCA safe harbor.  Pls. Mem. at 12-15, 16-19, and 33-34.

### 2. In Any Event, MP3tunes Had Both Actual Knowledge And "Specific and Identifiable Knowledge Of Particular [Infringing] Items"

Even if the Court were to apply a "specific knowledge" standard, MP3tunes

demonstrably had disqualifying knowledge of specific infringing works.  *See* Pls. Mem. at 12-15

and 16-19.  First, every member of its executive team infringed specific works.  Pls. Mem. at 13-

14. Moreover, MP3tunes was told repeatedly by its users about specific infringing works. Pls. Mem. at 19.

MP3tunes also turned a blind eye to red flags of specific infringing songs. From Plaintiffs' notices, MP3tunes had "red flag" knowledge that other copies of those same *specific* songs, and other songs from those same *specific* artists, were infringing. These "particular [infringing] items" were at all times in full view of MP3tunes, which maintained records of each of these specific works (and others) in readily accessible databases. SUF ¶¶ 70-71; Horowitz ¶¶ 56-57. Moreover, the home page of the Sideload Website included extensive lists of the "Most Popular Tracks" and "Newest Tracks." Pls. Mem. at 7. Each routinely consisted of *specific* songs by the most popular artists, many coming from websites that would have put any reasonable person on notice of likely infringement. Pls. Mem. at 18. MP3tunes also had "red flag" knowledge of *specific* pirate source sites that any reasonable person would have known were not authorized to distribute Plaintiffs' songs. Pls. Mem. at 18-19.

Under any standard, MP3tunes had a level of knowledge that makes it ineligible for DMCA safe harbor. *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003) ("willful blindness" to specific infringements "is knowledge, in copyright law").

### D.   MP3tunes Is Disqualified from Safe Harbor Because It Failed To Comply With The "Representative List" Provided In Plaintiffs' Notices

In enacting the DMCA, Congress fully understood that copyright infringement at some sites is so widespread that notifications identifying each work infringed would be impracticable. S. Rep. No. 105-190 at 46, 48. Thus, the DMCA provides that, when identifying infringed works in a DMCA notice, "if multiple copyrighted works at a single online site are covered by a single notification, *a representative list* of such works at that site" is all that a copyright owner must provide. 17 U.S.C. § 512(c)(3)(A)(ii)(emphasis added). This was not stray language. The legislative history is explicit and speaks directly to the Sideload Website:

19

Where multiple works at a single online site are covered by a single notification, a representative list of such works at that site is sufficient.  Thus, where a party is operating *an unauthorized Internet jukebox* from a particular site, it is not necessary for a compliant notification to list every musical composition or sound recording that has been or could be infringed at that site, so long as a representative list of those compositions or recordings is provided *so that the service provider can understand the nature and scope of the infringement being claimed.*  S. Rep. No. 105-190 at 46 (emphasis added).

The Sideload Website promotes itself as "FREE MUSIC ON THE INTERNET," Ex. 86 (emphasis in original) – a destination where users can go to find and listen to (or sideload) hundreds of thousands of popular songs.  It contains multiple ways to search for songs – *e.g.*, a search box; and lists of featured songs, most popular songs and newest songs; and browsable lists of artists.  For each song, it even provides a "Track Details" page recommending other available songs by the same artist.  Horowitz ¶ 24 & Ex. F; SUF ¶ 18.  When Congress added an express "representative list" provision to the DMCA it was addressing "jukebox" sites precisely like the Sideload Website.

Plaintiffs' notices identified hundreds of Referenced Song Files as representative of the "hundreds, if not thousands, of additional copies of Plaintiffs' copyrighted works [that were] being made available on or by MP3tunes."  SUF ¶¶ 38-39; Exs. 24-26.  Plaintiffs further told MP3tunes that "EMI ha[d] not authorized any of its recordings to be copied, distributed, or performed in this manner on or by MP3tunes or its users."  SUF ¶¶ 38-39; Exs. 24-26 (emphasis in original DMCA notice).  Though not required, Plaintiffs further identified websites that list artists for whose songs Plaintiffs controlled the appropriate exclusive rights.  SUF ¶¶ 38-39; Exs. 24-26.  Plaintiffs plainly gave MP3tunes sufficient notice of "the nature and scope of the infringement being claimed."  S. Rep. No. 105-190 at 46.  Pursuant to the DMCA, if MP3tunes wanted to be eligible for safe harbor, it was required to block not only the specific Referenced Song Files but other of Plaintiffs' songs that were fairly identifiable from Plaintiffs' notices.

The Fourth Circuit has made this clear:

20

> This subsection specifying the requirements of a notification does not seek to burden copyright holders with the responsibility of identifying every infringing work – or even most of them – when multiple copyrights are involved.  Instead, the requirements are written *so as to reduce the burden on holders of multiple copyrights who face extensive infringements of their works*.  Thus, when a letter provides notices equivalent to a list of representative works *that can be easily identified by the service provider*, the notice complies with the notification requirements.

*ALS Scan*, 239 F.3d at 625 (emphasis added).  MP3tunes does not dispute that Plaintiffs provided such notices and that MP3tunes took no action with respect to any of Plaintiffs' infringed songs beyond removing from the Sideload Website the specific URL links to the specific Referenced Song Files.  SUF ¶¶ 82-87; Horowitz ¶¶ 73-77 & Ex. Y; Ex. 102 (Krause) at 36:24-37:7.

In response, MP3tunes submits the Mekkawy Declaration and argues from it that the websites Plaintiffs identified in their notices "do not identify over 80% of the artists on Plaintiffs' song list."  Defs. Mem. at 20.  But the DMCA does not require a plaintiff to identify all its works or artists; the very point of the "representative list" provision is to avoid having to do that.  *ALS Scan*, 239 F.3d at 625.  MP3tunes had fair notice of thousands of specific song files and did nothing to remove them from sideload.com or the MP3tunes lockers:

- The Referenced Song Files identified hundreds of distinct songs (*i.e.*, title and artist combinations).  At least 393 other files containing the exact same distinct songs appeared on the Sideload Website and in MP3tunes lockers.  Horowitz ¶ 77 & Ex. Y.  MP3tunes did nothing.

- The Referenced Song Files identified 136 different EMI Label artists.  At least 5,506 files by the exact same artists appeared on the Sideload Website and in MP3tunes lockers.  MP3tunes did nothing.  Horowitz ¶ 77 & Ex. U.

- Finally, MP3tunes acknowledges that, from the websites Plaintiffs' identified in their notices, almost 6,000 of Plaintiffs' artists, songs, and compositions were readily identifiable.  *See* Mekkaway ¶¶ 6-7.  At least 10,500 files containing these specific songs appeared on the Sideload Website and in MP3tunes lockers.  MP3tunes did nothing.  Supp. Horowitz ¶ 42 & Exs. C-D.

MP3tunes could have "easily identified" all of those song files on its system.  MP3tunes collects that data and assembles it into databases and tables, and uses it to enhance its subscribers' experience and its own business.  SUF ¶¶ 70-71.  MP3tunes simply chose not to.

Ultimately, MP3tunes' entire defense of its conduct comes down to the argument that, again, this Court should simply accept the decision in *Viacom*, which in a single paragraph, effectively writes the "representative list" language right out of the statutory text.  2010 WL 2532404, at *14.  Respectfully, Judge Stanton's interpretation of the DMCA is incorrect in this respect as well, and this Court should not adopt it.  Judge Stanton incorrectly perceived a tension between the "representative list" provision in Section 512(c)(3)(A)(ii) and Section 512(m), which provides that DMCA safe harbor is not conditioned upon a service provider "monitoring its service."  As an initial matter, Section 512(m) is titled "Protection of Privacy" and the legislative history makes clear that it "is designed to protect the privacy of Internet users."  S. Rep. No. 105-190 at 55.  It is not a license for service providers to do nothing.  *See* 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 12B.09[B], at 12B-99 (2009); *Brotherhood of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528-29 (1947)(titles inform meaning of text).

More fundamentally, the minimal effort it would have taken for MP3tunes to look at its pre-existing database records in response to Plaintiffs' "representative list" notices is not the sort of "monitoring" envisioned by Section 512(m).  "Monitoring," by its plain definition, means "[t]o observe, supervise, or keep under review."  *Oxford English Dictionary* (2010 Online ed.).  It does not extend to the concept of taking limited action in response to a specific notice or other tangible information.  Section 512(m) at most relieves service providers, in the *absence of* notices or "red flags" of infringement, from an obligation to "affirmatively seek[] facts indicating infringing activity."  17 U.S.C. § 512(m)(1).  Taking action after being given explicit notice of "infringing activity" – particularly if that requires only a modest effort to take down other "easily

identifiable" works – is not the "monitoring" eschewed in Section 512(m) to protect user

privacy.  This interpretation gives meaning to both Section 512(c)(3)(A)(ii) and Section 512(m),

and does not make the express "representative list" statutory text superfluous in the way Judge

Stanton's interpretation does.  *Hibbs v. Winn*, 542 U.S. 88, 89-90 (2004) (statutes should be

interpreted so as not to render any provisions superfluous); *KP Permanent Make-Up, Inc. v.

Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004) (same).[13]

> ### E. MP3tunes Is Further Disqualified From DMCA Safe Harbor Because It Received A "Financial Benefit" From And Had The "Right And Ability To Control" The Infringing Activity

As an independent eligibility requirement, a service provider seeking safe harbor must

demonstrate that it "does not receive a financial benefit directly attributable to the infringing

activity, in a case in which the service provider has the right and ability to control such activity."

17 U.S.C. § 512(c)(1)(B).  This language directly parallels the common law standard for

vicarious copyright infringement.  *See Gershwin Pub. Corp. v. Columbia Artists Mgmt., Inc.*, 443

F.2d 1159, 1162 (2d Cir. 1971).  As such, "a court must infer, unless the statute otherwise

dictates, that Congress means to incorporate the established meaning of these terms."  *Perfect 10,

Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (internal quotations omitted); *accord

Neder v. United States*, 527 U.S. 1, 21 (1999); *Barfield v. New York City Health and Hospitals

Corp.*, 537 F.3d 132, 141 (2d Cir. 2008).  As explained below, *infra* at pp. 28-29, and in

Plaintiffs' motion for summary judgment, Pls. Mem. at 20-22, there is no triable issue of fact as

to MP3tunes' ability to control or financial benefit.  MP3tunes, therefore, is not entitled to

DMCA safe harbor for this independent reason.

---

[13] This interpretation of the "representative list" provision is further supported by other express statutory text, discussed *supra* pp. 15-18, which makes clear that, from a DMCA notice, a service provider can be charged not only with actual knowledge of the identified works, but also with "aware[ness] of facts and circumstances from which infringing activity is apparent."  17 U.S.C. § 512(c)(3)(B).  Thus, Congress plainly anticipated that DMCA notices could fairly put service providers on notice of more than the individual works or links specifically identified in the notice itself.

MP3tunes points out, Defs. Mem. at 22-23, that some courts have concluded that the DMCA's "right and ability to control" element must mean more than the ability to remove infringing works from its system.  However, that issue is far from settled.  *See Napster*, 239 F.3d at 1023; *Fung*, 2009 WL 6355911, at *16 n. 27.[14]  That interpretation, moreover, should not prevail.  There is no reason why courts should contort the plain meaning of the language – language which has gained accepted meaning over decades of common law development. Unlike direct copyright infringement, which is a strict liability offense, vicarious infringement is a *fault-based* theory of liability.  *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 513, 935 (2005). The DMCA is designed to protect only "innocent" service providers.  There is no reason to believe – and every reason to doubt – that Congress intended the 512(c)/(d) safe harbors to immunize vicarious copyright infringers.  *See CoStar Group, Inc. v. LoopNet, Inc.*, 164 F.Supp.2d 688, 704 (D. Md. 2001) (holding that Section 512(c)(1)(B) is coterminous with the common law vicarious infringement standard).[15]

Even if, as some courts have concluded, the DMCA requires "something more" than the traditional common law elements of right and ability to control, *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F.Supp.2d 1146, 1181 (C.D. Cal. 2002), MP3tunes plainly evidences that "something more."  Beyond controlling all aspects of its system and maintaining databases that give it unfettered ability to remove the specific links and files on its system, *see* Pls. Mem. at 20-

---

[14] In contrast, courts uniformly have concluded that the DMCA and common law tests for "financial benefit" are the same.  *See, e.g., CCBill, LLC*, 488 F.3d at 1117-18; *Io Group, Inc. v. Veoh Networks, Inc.*, 586 F.Supp.2d 1132, 1150 (N.D. Cal. 2008).

[15] Interpreting § 512(c)(1)(B) to be coterminous with vicarious liability does not render the DMCA safe harbors superfluous.  The DMCA provides four distinct safe harbors for different service provider activities.  17 U.S.C. §§ 512(a)-(d).  Congress very deliberately gave certain service provider activities more protection than others.  Thus, whereas vicarious copyright infringers are disqualified from DMCA safe harbor under § 512(c) (for storage of infringing content) and § 512(d) (for assisting users in locating infringing content), the DMCA still protects service providers from vicarious liability for more *passive* functions under § 512(a) ("mere conduit") and §512(b) ("caching").

21, MP3tunes itself was responsible for adding every link to the Sideload Website in the first place.  Supp. Horowitz ¶¶ 10-15.  Once a user sideloads a song file, when that song file reaches MP3tunes' servers, MP3tunes checks its databases to see if it already has a link to that song file on sideload.com; if it does not, MP3tunes itself adds the link to sideload.com.  Supp. Horowitz ¶ 13.  The sideloading users have no input into or ability to control whether MP3tunes adds a link to the Sideload Website.   MP3tunes' decision to do so directly and dramatically increased the copyright infringement of Plaintiffs' songs.  *See* Pls. Mem. at 8-10.  In fact, the evidence shows that twice as many sideloads into MP3tunes lockers come from the Sideload Website than from the original source sites.  Supp. Horowitz ¶ 25.

That is plainly the "something more" that courts have found necessary to satisfy the conditions of DMCA Section 512(c)(1)(B).  *Cybernet Ventures*, 213 F.Supp.2d at 1181-82 (role in screening websites deemed "something more" and disqualified service provider from safe harbor).[16]

### F.    The DMCA Does Not – And By The Express Terms Of The Copyright Act Cannot – Apply To Plaintiffs' "Pre-72" Sound Recordings

Sound recordings were not given federal copyright protection until February 15, 1972. *Goldstein v. California*, 412 U.S. 546, 552 (1973).  Federal protection for sound recordings, however, was not retroactive.  Instead, sound recordings first fixed prior to February 15, 1972 continue to be governed exclusively by state law.  *Capitol Records, Inc. v. Naxos of Am.*, 372 F.3d 471, 478 (2d Cir. 2004) ("*Naxos I*"); *Capitol Records, Inc. v. Naxos of Am.*, 4 N.Y.3d 540, 559-61 (2005)("*Naxos II*").

---

[16] Being responsible for adding the links additionally gives MP3tunes "some antecedent ability to limit or filter the copyrighted material," which also has been held to be sufficiently "something more."  *Tur v. YouTube, Inc.*, No. 06 Civ. 4436 (FMC), 2007 WL 1893635, at *3 (C.D. Cal. June 20, 2007); *see also IO Group*, 586 F.Supp.2d at 1151 (same).

When Congress extended federal copyright protection to sound recordings in 1972, it was acutely aware that the new federal protection had the potential to confuse and upset the pre-existing state law protections afforded to owners of sound recordings.  H.R. Rep. No. 94-1476, at 133.  To avoid that, Congress enacted 17 U.S.C. § 301(c), which provides that:

> With respect to sound recordings fixed before February 15, 1972, *any rights or remedies* under the common law or statute of any State shall not be *annulled or limited* by [the Copyright Act] until February 15, 2067.  (Emphasis added.)

MP3tunes wholly ignores Section 301(c), as it must, since that section is dispositive of its DMCA argument as to pre-1972 recordings.[17]  The DMCA is simply not a defense to infringement of pre-1972 recordings.

## II.   MP3TUNES IS LIABLE FOR THE INFRINGEMENT OF ITS USERS

### A.   MP3tunes Is Liable as a Contributory Infringer

#### 1.   MP3tunes Knew of the Infringement on Its Websites

In their motion, Plaintiffs presented conclusive proof that MP3tunes had "actual or constructive" knowledge of the rampant infringement occurring through its websites.  *See* Pls. Mem. at 16-19.  Defendant wholly ignores those facts and authorities.  Its motion, insofar as it is premised on a purported lack of knowledge of infringement, must be denied.[18]

#### 2.   MP3tunes' "*Sony*" Defense is Legally Baseless

MP3tunes' argument based on *Sony Corp. of America, Inc. v. Universal City Studios, Inc.*, 464 U.S. 417 (1984), misapprehends *Sony* and ignores the Supreme Court's own subsequent interpretation in *Grokster* and every judicial decision since.  Simply put, the *Sony* defense is

---

[17] Nor could MP3tunes argue that the DMCA caused the repeal by implication of the broad effect of Section 301(c).  At nearly the same time Congress enacted the DMCA it is also extended the exemption in Section 301(c) from 2047 to 2067.  *See* 17 U.S.C.A. § 301(c) (revision history); *Auburn Hous. Auth. v. Martinez*, 277 F.3d 138, 145 (2d Cir. 2002) ("The 'cardinal rule' that repeal by implication is disfavored…is even stronger when the two acts were enacted close in time") (citation omitted).

[18] By making no argument at all on the point, MP3tunes concedes that Plaintiffs have satisfied the "material contribution" element of their contributory infringement claim.  *See* Defs. Mem. at 29-31; *see also* Pls. Mem. at 20 (detailing MP3tunes' "material contribution").

inapplicable as a matter of law, where, as here, MP3tunes maintains an ongoing relationship with its subscribers throughout the copyright infringement.

In *Sony*, the Supreme Court held that the manufacturer of a *product* (a VCR device) that had "substantial noninfringing uses" could not be liable as a contributory infringer where the only evidence of the distributor's knowledge of infringement was the fact that the product was capable of being used for infringement. *Id.* at 456; *see also Grokster*, 545 U.S. at 933-34. However, key to the Supreme Court's ruling was that, after the point of sale, the manufacturer had no ongoing relationship with the purchaser, and no ongoing role in the purchaser's use of the product to infringe. *Sony,* 464 U.S. at 438.

In contrast to Sony, MP3tunes maintains an ongoing relationship with subscribers, and provides ongoing material contribution, throughout the entire course of infringement. Absent that ongoing relationship and contribution – which involves the active participation of MP3tunes and its computer servers in the infringement – Defendant's subscribers could not use the MP3tunes service to engage in copyright infringement.

This critical distinction of an ongoing relationship with both the direct infringer and the infringing activities was expressly recognized in *Flea World*, where the court rejected the defendant flea market's effort to invoke the *Sony* staple article of commerce doctrine:

> Here, the corporate Defendants are not distributors of a device or product that has non-infringing uses like in *Grokster* and *Sony*. In those cases, once the defendant released the device into commerce, the defendant had no control of the end-user's use of the device (whether for infringing or non-infringing use). In contrast, here, the corporate Defendants operate an ongoing business in which they exert substantial and continuous control over the operations of the Market, the types of goods sold there, and the behavior and actions of the direct infringers.

*Arista Records, Inc. v. Flea World*, No. 03-2670, 2006 WL 842883, at *15 (D.N.J. Mar. 31, 2006); *see also id.* at n.16. The Second Circuit too has very recently acknowledged this important distinction:

> In *Sony Corp. of America v. Universal City Studios, Inc.*, the lack of an "ongoing relationship" between Sony and its VCR customers supported the Court's conclusion that it should not impose contributory liability on Sony for any infringing copying done by Sony VCR owners.

*Cartoon Network L.P. v. CSC Holdings, Inc.*, 536 F.3d 121, 132-33 (2d Cir. 2008); *see also Sony*, 464 U.S. at 437-38.

For exactly these reasons, in a case indistinguishable from this one, this Court found that the very argument MP3tunes is making "rides roughshod over a critical part of the Supreme Court's reasoning in *Sony*"; the Court rejected any *Sony* defense precisely because the defendants – like MP3tunes here – "maintain an ongoing relationship with their users." *Arista Records LLC v. Usenet.com, Inc.*, 633 F.Supp.2d 124, 156 (S.D.N.Y. 2009).[19]

### B.     Defendant Is Liable for Vicarious Infringement

The Second Circuit does not "set a high standard" for vicarious infringement or in any way "limit[]" the doctrine in the way MP3tunes suggests.  Defs. Mem. at 31.  To the contrary, the seminal vicarious cases come from the Second Circuit, and they make clear that the level of "control" MP3tunes argues for is *not* required.  *Gershwin*, 443 F.2d at 1163 (ability to supervise found even where defendant "had no formal power to control"); *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 309 (2d Cir. 1963) (rejecting argument that "a fairly constant system of surveillance is thought too burdensome").  Indeed, the Second Circuit has long recognized that "[w]hen the right and ability to supervise coalesce with an obvious and direct financial interest in the exploitation of copyrighted material," imposing vicarious copyright liability will both encourage defendants to properly police their environs and "plac[e] responsibility where it can

---

[19] Accordingly, Defendant's argument that MP3tunes' services have "substantial noninfringing uses," Defs. Mem. at 30-31, even if true, is immaterial.  The issue of "substantial noninfringing uses" is relevant only if *Sony* applies.  *Usenet*, 633 F.Supp.2d at 156.

and should be effectively exercised." *Id.* at 308.[20]  This Court, in *Usenet*, found more than sufficient "ability to control" on indistinguishable facts.  633 F.Supp.2d at 157.

MP3tunes also flatly misrepresents the record when it says "there have never been any advertisements on either MP3tunes.com or Sideload.com."  Defs. Mem. at 6.  The Sideload.com homepage and the tens of thousands of "Track Detail" webpages contain overt advertisements promoting MP3tunes "lockers," including the "Premium" subscriptions through which users pay MP3tunes a monthly fee.  Horowitz Exs. D-F.  Those advertisements are the heart of Defendant's business plan:  MP3tunes uses the "draw" of popular (and infringing) music to attract users to Sideload.com, where it promotes sales of MP3tunes "locker" accounts.  That is quintessential "financial benefit" for vicarious infringement.  Pls. Mem. at 21-22.

For the reasons presented in Plaintiffs' own motion for summary judgment, Pls. Mem. at 20-22, the undisputed facts compel the conclusion that MP3tunes is a vicarious infringer.

## III.    MP3TUNES IS A DIRECT COPYRIGHT INFRINGER

Defendant audaciously claims that Plaintiffs "cannot assert a single fact showing a single volitional act by MP3tunes that violates Plaintiffs' alleged copyrights."  Defs. Mem. at 29.  In fact, the uncontroverted evidence, discussed fully in Plaintiffs' motion for summary judgment, manifests Defendant's liability for direct infringement in three distinct ways.

### A.    MP3tunes' Executives Directly Infringed Plaintiffs' Copyrights

Plaintiffs identified 171 copyrighted works that were sideloaded by MP3tunes executives and employees, many of them from obviously unauthorized sources.  SUF ¶¶ 41-46; Exs. 47-49, 87.  This evidence – which is not even addressed in Defendant's motion, let alone rebutted –

---

[20] The cases MP3tunes cites, Defs. Mem. at 31, either do not say what MP3tunes says they do or are the cases suggesting a higher *DMCA statutory* standard, which have no bearing on the common law copyright standard.

conclusively demonstrates that MP3tunes is liable for direct infringement.  *See* Pls. Mem. at 13-14, 22.

### B.    MP3tunes Directly Infringed Plaintiffs' Copyrighted Cover Art

Whenever anyone used MP3tunes' "Lockersync" software to upload songs to their MP3tunes' locker, MP3tunes directed the software to automatically search the Amazon.com website for related Cover Art and copied that Cover Art to MP3tunes' servers.  SUF ¶¶ 28-31. As set forth in Plaintiffs' motion for summary judgment, that is blatant copyright infringement and MP3tunes is directly liable for it.  Pls. Mem. at 26-27.   In its motion, MP3tunes does not deny the infringement of Plaintiffs' Cover Art; rather, it argues incredibly that it did not engage in any "volitional" conduct that could render it liable as a direct infringer.  Defs. Mem. at 29.

The notion that MP3tunes did not "volitionally" participate in the Cover Art infringement requires a suspension of reality.  MP3tunes – not its users: (i) made the decision to offer Cover Art to enhance the MP3tunes experience; (ii) made the decision to get Cover Art from Amazon; (iii) entered into a legal agreement with Amazon (albeit fraudulently) that gave MP3tunes technical access to the Cover Art on Amazon's servers; and (iv) wrote the software to retrieve the Cover Art and copy it to MP3tunes' servers.  Horowitz ¶¶ 78-81.  MP3tunes further programmed its "Lockersync" program to obtain Cover Art whenever a user uploaded songs – by default, without any input by the user, and without even telling the user that Cover Art was being obtained, much less from Amazon.  SUF ¶¶ 26-37.  The import of MP3tunes' argument is that every one of its users is a direct infringer of Cover Art without having any clue how MP3tunes was obtaining Cover Art or that MP3tunes did not have a license for it.  Even under Defendant's warped sense of "volition," MP3tunes users do not "press[] the button" to copy Cover Art, they "press[] the button" to upload their songs.  Supp Horowitz ¶¶ 10-17.

When a defendant is an "active participant[] in the process of copyright infringement," even one that ultimately is automated, that defendant is liable for direct infringement. *See Usenet*, 633 F.Supp.2d at 148-49; Supp. Horowitz ¶¶ 10-17. All the authorities cited by defendants involved users who were themselves making a conscious decision to reproduce the infringed work. They are simply inapposite.[21]

### C.      MP3tunes Directly Infringed Plaintiffs' Right of Public Performance

When more than one user sought to store digitally identical song files on Defendant's system, only one copy of that song file was stored. Thereafter, MP3tunes performed that one "single master" to multiple users. Horowitz ¶¶ 48-50. MP3tunes admitted that this was how the system worked. *See* Pls. Mem. at 22-23; SUF ¶ 21; Ex. 6 (Brocious) at 47:12-49:22; Ex. 113.

Although nowhere in its papers does Defendant deny it used a single master system, it tries to sow confusion through semantics. *See* Reese Decl. ¶ 17 (referring to "different instances of the same content"); *but see* Supp. Horowitz ¶¶ 33-35. But not only did Reese admit to the single master architecture in his deposition, *see* SUF ¶ 21, he had no difficulty describing it without any ambiguity when the system was developed:

> By "shared file" I mean files that have been uploaded by the user more than one time. Since the file is identified by its MD5, it is likely users will upload the file in different accounts. **We will only store the file once in the system.**

Ex. 112 (emphasis added). MP3tunes allows multiple users to share access to a single file, thereby making performances of that file "public" within the meaning of the Copyright Act. *See* Pls. Mem. at 22-26. As a result, whenever MP3tunes played a "master" song to a user, it violated Plaintiffs' exclusive right of public performance. *Id.*

The only legal argument MP3tunes posits is that its conduct was not sufficiently "volitional" for it to be a direct infringer. As with Cover Art, however, Defendant's cited

---

[21] If MP3tunes is not liable as a direct infringer of Cover Art, it undeniably is liable as a secondary infringer for both inducing and knowingly contributing to the infringement. Pls. Mem. at 27 n.10.

authority (Defs. Mem. at 28-29) is inapposite.  It was MP3tunes' decision to discard users' files – unbeknownst to those users – and to store on its server only a single "master" copy of digitally identical files.  Supp. Horowitz ¶¶ 10-17.  It was also MP3tunes that made the decision to "play back" or perform that single master copy from its servers to multiple users in violation of copyright law.  *Id.* ¶ 34.  Just as with Cover Art, MP3tunes was an "active participant[] in the process of copyright infringement."  *Usenet*, 633 F.Supp.2d at 148-49; *see also Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159-60 (9th Cir. 2006) (the direct infringer of the analogous public display right is the operator of the server transmitting the display).  The "volition" to infringe copyright via the single master system belongs to MP3tunes, not the users who requested to listen to a song without knowing anything about MP3tunes' system design decisions or infringement.

## IV.   PLAINTIFFS HAVE PROVEN THEIR UNJUST ENRICHMENT CLAIM

The law of unfair competition is available as a cause of action against an individual that engages in the unauthorized use of sound recordings *and* satisfies one of the following three requirements: (i) the defendant competes with the plaintiff in the marketplace; (ii) the defendant's actions are designed for commercial benefit; *or* (iii) the defendant deceives the public.  *Naxos II*, 4 N.Y.3d at 563-64.

Here, Plaintiffs sell their sound recordings and license them for online listening purposes. Heinemann ¶ 5.  MP3tunes, through the Sideload Website, assists users in copying and listening to these sound recordings for free.  SUF ¶¶ 12-18.  The free dissemination of what other licensees pay for undermines the value of Plaintiffs' licenses and sales and clearly constitutes competition in the marketplace.  *Roy Export Co. v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982) ("unfair competition…concerns the taking and use of plaintiff's property to compete against the plaintiff's own use of the same property"); *Mutual Broadcasting*

32

*System, Inc. v. Muzak Corp.*, 30 N.Y.S.2d 419, 420 (Sup. Ct. N.Y. County 1941) (defendant's free distribution of world series broadcast, which the plaintiff had the exclusive rights to distribute, constituted unfair competition). The undisputed facts show that the Sideload Website, and its dissemination of free music, was clearly designed to benefit MP3tunes by driving paying traffic to their Locker Website. SUF ¶ 77. Plaintiffs therefore have conclusively established the elements of this cause of action.[22]

## V.   PLAINTIFFS ESTABLISHED OWNERSHIP OF THE WORKS AT ISSUE

Through the declarations of Alasdair McMullan and Audrey Ashby, filed in support of Plaintiffs' motion for summary judgment, Plaintiffs presented evidence of ownership of 3,189 sound recordings, 562 musical compositions, and 348 works of Cover Art that are at issue on the motion for summary judgment.[23] After voluminous discovery, including taking the depositions of Plaintiffs' executives, MP3tunes has failed to cite *any* evidence to controvert Plaintiffs' ownership of the works in dispute.[24] Instead, MP3tunes makes a blanket legal challenge to all

---

[22] While MP3tunes cites *Naxos I* for the proposition that unfair competition requires some "bad faith" on the part of the defendant, *Naxos I* was overruled by the New York Court of Appeals in *Naxos II* on exactly this point. *Naxos II*, 4 N.Y.3d at 563 ("fraud or bad faith is not an element [of unfair competition]…in modern New York law"). Similarly, there is no need to debate MP3tunes' contention that its users and third-party hosts are the parties "reproducing" or "distributing" the works at issue. The law of unfair competition does not turn on the technical question of what party actually made the copy, rather unfair competition covers an "incalculable variety" of practices, *Ronson Art Metal Works, Inc. v. Gibson Lighter Manufacturing Co.*, 159 N.Y.S.2d 606, 609 (1957), and the standard is "adaptable and capacious." *Roy Export*, 672 F.2d at 1105.

[23] MP3tunes' motion repeatedly cites a much larger number of works, which consists of every work owned by Plaintiffs that was on Defendant's servers. However, as Plaintiffs have made clear, including in pre-motion letters, Plaintiffs' claims in this case are limited to the infringed Cover Art, and those songs that were: (a) unlawfully sideloaded, (b) publicly performed to multiple MP3tunes subscribers using a "single master" copy, and (c) directly infringed by MP3tunes executives.

[24] MP3tunes has submitted (but does not cite) a declaration from Sarah Peyronnel, an intern at Defendant's counsel's law firm, in which Peyronnel simply asserts – in a conclusory and *inadmissible* manner – that "Plaintiffs have failed to produce suitable ownership records for at least 13,584 songs." Peyronnel Decl. ¶ 9. Peyronnel offers no explanation whatsoever as to how Plaintiffs have failed to establish ownership. Nor, as demonstrated by the Ashby and McMullan Declarations, could she. Moreover, while the Peyronnel declaration attaches several spreadsheets which purport to document so-called "findings," those spreadsheets – which lack any headings, descriptions, categories, or other

sound recordings and musical compositions that are listed as "works for hire" on the copyright

registration forms produced by Plaintiffs.  That argument is baseless and also irrelevant.

*First*, the copyright registration certificates produced by Plaintiffs constitute *prima facie*

evidence of ownership.  17 U.S.C. § 410(c); *Boisson v. Banian, Inc.*, 273 F.3d 262, 267 (2d Cir.

2001).  Having failed to submit any evidence to the contrary, MP3tunes has not rebutted

Plaintiffs' *prima facie* case.

*Second,* the agreements through which Plaintiffs acquire their rights consistently provide

two *independent* bases of ownership: (i) that works created pursuant thereto are works made for

hire, and (ii) a separate *assignment* of all copyright interest in the sound recordings.  Supp.

McMullan ¶ 3, Ex A; Ashby Ex. B.  MP3tunes' "work for hire" arguments do not controvert

Plaintiffs' ownership by assignment.

*Third*, MP3tunes cannot challenge Plaintiffs' ownership because it lacks standing to do

so.  The Second Circuit has long held that where there is no ownership dispute between the true

interested parties to a copyright, "it would be anomalous to permit a third party infringer" to

challenge ownership.  *Eden Toys, Inc. v. Florelee Undergarments Co., Inc.*, 697 F.2d 27, 36 (2d

Cir. 1982); *Pem-American, Inc. v. Sunham Home Fashions, LLC*, 83 Fed. Appx. 369, 371 (2d

Cir. 2003); *Arthur A. Kaplan Co., Inc. v. Panaria Int'l, Inc.*, No. 96 Civ. 7973 (HB), 1998 WL

603225, at *2 (S.D.N.Y. Sept. 10, 1998).  Here MP3tunes has shown absolutely no dispute

between Plaintiffs and any performing artist, producer or composer over the ownership of even a

single work at issue in this litigation.

*Finally*, courts have long recognized the "innocent error" doctrine which holds that:

> Someone who lawfully owns a copyright but in seeking registration inaccurately
> denominates the basis of ownership (as here, allegedly by checking the "work for

---

identifying or explanatory information, let alone any "findings" – do nothing to support MP3tunes'
argument.  Apparently, MP3tunes realizes this, because it does not cite or refer to the Peyronnel
declaration in this regard, in either its brief or Statement of Undisputed Facts.

hire" box on the application form) does not thereby become subject to having the registration invalidated by an infringing party unless, at a minimum, the infringing party can show that the inaccuracy was both material and made in bad faith.

*TeeVee Toons, Inc. v. MP3.com, Inc.*, 134 F.Supp.2d 546, 549 (S.D.N.Y. 2001);[25] *see also Whimsicality, Inc. v. Rubie's Costume Co.*, 891 F.2d 452, 455 (2d Cir. 1989); *Eckes v. Card Prices Update*, 736 F.2d 859, 861-62 (2d Cir. 1984).

Congress expanded the innocent error doctrine in 2008 through the "Pro-IP Act," Pub. L. No. 110-403, codified at 17 U.S.C. § 411(b), which provides that a certificate of registration is valid "regardless of whether the certificate contains any inaccurate information" unless the inaccurate information was included with knowledge of the fact that it was inaccurate *and* had the true information been included the Register of Copyrights would have refused registration. 17 U.S.C. § 411(b).  MP3tunes failed to come forth with *any* evidence that, under the Pro-IP Act, could even begin to call into question the validity of Plaintiffs copyright registrations.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that their motion for summary judgment be granted and MP3tunes' motion for summary judgment be denied.

DATED:  November 24, 2010          Respectfully submitted,

By: _Andrew H Bart_

Andrew H. Bart
Joseph J. McFadden
JENNER & BLOCK LLP
919 Third Avenue
37th Floor
New York, NY 10022

---

[25] MP3tunes' argument on ownership is particularly frivolous and disingenuous in that Defendant Robertson's previous company, MP3.com, made the same blanket challenge to all sound recordings as works made for hire in the *TeeVee Toons* case.  As noted, the court readily dismissed that challenge.

tel. (212) 891-1690
fax (212) 891-1699

*-and-*

Steven B. Fabrizio
JENNER & BLOCK LLP
1099 New York Avenue, NW
Suite 900
Washington, DC 20001
tel. (202) 639-6000
fax (202) 639-6066

*Attorneys for Plaintiffs Capitol Records, LLC,
Caroline Records, Inc, EMI Christian Music
Group Inc., Priority Records LLC, Virgin
Records America, Inc.*

By: _____

Donald S. Zakarin
Frank P. Scibilia
Jacob B. Radcliff
M. Mona Simonian
PRYOR CASHMAN LLP
7 Times Square
New York, New York  10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806

*Attorneys for the Beechwood Music Corp.,
Colgems-EMI Music Inc., EMI April Music Inc.,
EMI Blackwood Music, EMI Full Feel Music,
EMI Golden Torch Music Corp., EMI Longitude
Music, EMI Virgin Music, Inc., EMI Virgin
Songs, Inc., EMI Al Gallico Music Corp., EMI
Algee Music Corp., EMI Feist Catalog, Inc.,
EMI Gold Horizon Corp., EMI Grove Park
Music, Inc. EMI Hastings Catalog, Inc., EMI
Mills Music, Inc., EMI Miller Catalog, Inc.,
EMI Robbins Catalog, Inc., EMI U Catalog,
Inc., EMI Unart Catalog, inc., Jobete Music
Co., Inc., Screen Gems-EMI Music, inc., Stone
Agate Music, and Stone Diamond Music*

36

## Certificate of Service

I, Joseph J. McFadden, do hereby certify that on this 24th day of November 2010, I caused true and correct copies of the within Supplemental Declaration of Andrew Bart, Supplemental Declaration of Ellis Horowitz, Supplemental Declaration of Alasdair McMullan, Supplemental Declaration of Michael Abitbol, Rule 56.1 Counterstatement of Undisputed Facts, Memorandum of Law in Opposition to Motion for Summary Judgment, and Plaintiffs' Evidentiary Objections to be served via the Court's Electronic Filing System, electronic transmission, and overnight delivery upon the following individual:

> John Dellaportas, Esq.
> Duane Morris
> 1540 Broadway
> Suite 1400
> New York, NY 10036-4086

_____
Joseph J. McFadden