**DUANE MORRIS LLP**
Gregory P. Gulia
John Dellaportas
Vanessa Hew
R. Terry Parker
1540 Broadway
New York, NY 10036
(212) 692-1000
*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC; CAROLINE RECORDS, INC.; EMI CHRISTIAN MUSIC GROUP INC.; PRIORITY RECORDS LLC; VIRGIN RECORDS AMERICA, INC.; BEECHWOOD MUSIC CORP.; COLGEMS-EMI MUSIC INC.; EMI APRIL MUSIC INC.; EMI BLACKWOOD MUSIC; EMI FULL KEEL MUSIC; EMI GOLDEN TORCH MUSIC CORP.; EMI LONGITUDE MUSIC; EMI VIRGIN MUSIC, INC.; EMI VIRGIN SONGS, INC., EMI AL GALLICO MUSIC CORP., EMI ALGEE MUSIC CORP., EMI FEIST CATALOG, INC., EMI GOLD HORIZON CORP., EMI GROVE PARK MUSIC, INC., EMI HASTINGS CATALOG, INC., EMI MILLS MUSIC, INC., EMI MILLER CATALOG, INC., EMI ROBBINS CATALOG, INC., EMI U CATALOG, INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN GEMS-EMI MUSIC, INC., STONE AGATE MUSIC, and STONE DIAMOND MUSIC, <br><br> Plaintiffs, <br><br> v. <br><br> MP3TUNES, INC. and MICHAEL ROBERTSON, <br><br> Defendants. | CIVIL ACTION NO. 07-Civ. 9931 (WHP) <br> ECF Case <br><br><br><br> **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................1

COUNTERSTATEMENT OF FACTS ........................................................3

I.    MP3tunes Has Complied with the DMCA's Safe Harbor Requirements...........................3

     A.    MP3tunes Respects and Adheres to Copyright Law.................................. 4

     B.    MP3tunes Has Reasonably Implemented a Repeat Infringer Policy ..................... 5

     C.    MP3tunes' Services Are User-Directed and MP3tunes Does Not Exercise Control Over the Allegedly Infringing Activities.................................... 5

     D.    There Is No Direct Financial Benefit From the Alleged Infringement.................. 6

     E.    MP3tunes' Disabled Access to All Materials in Take-Down Notices.................. 6

     F.    Plaintiffs Widely Distribute Free Downloads on the Internet ............................... 8

     G.    Plaintiffs Falsely Claim that MP3tunes Has Disqualifying Knowledge................ 9

     H.    Plaintiffs Falsely Claim That Sideload.com Enables Users to Circumvent Access Requirements Imposed by Copyright Owners......................................... 10

II.   Plaintiffs Do Not Use a Single Master Storage System...................................10

III.  MP3tunes Uses Cover Art Pursuant to a Valid License from Amazon.com...................11

ARGUMENT ...........................................................................11

I.    Standard of Review...............................................................11

II.   MP3tunes Is Entitled to DMCA Safe Harbor Protection................................12

     A.    MP3tunes Has Reasonably Implemented a Repeat Infringer Policy ................... 12

     B.    MP3tunes Property Responded to All DMCA Compliant Notices ..................... 14

     C.    MP3tunes Did Not Have Disqualifying Knowledge ........................................... 16

          1.    MP3tunes Did Not Have Knowledge of the Alleged Infringements Because of Plaintiffs' Failure to Send Take-Down Notices .................................. 16

          2.    MP3tunes Also Did Not Have Constructive Knowledge ......................... 17

     D.    MP3tunes Does Not Receive a Financial Benefit Directly From Infringing Activity Which It Has The Right and Ability To Control .................................... 18

1.    MP3tunes Does Not Control The Allegedly Infringing Activity.............. 18

2.    MP3tunes Does Not Benefit from Allegedly Infringing Activity ........... 19

III.    MP3tunes Is Not Liable for Users' Allegedly Infringing Sideloads..................................19

   A.    There Is No Direct Infringement ................................................. 19

      1.    Plaintiffs Fail to Demonstrate Ownership.................................................. 20

      2.    Plaintiffs Fail to Demonstrate Unauthorized Copying............................. 20

   B.    There Is No Contributory Infringement ............................................... 21

      1.    Plaintiffs Have Failed to Demonstrate That MP3tunes Knew Its Sideload Services Were Used for Infringement....................................... 21

      2.    MP3tunes Did Not Materially Contribute to Allegedly Infringement...... 22

   C.    Plaintiffs Assert No Facts That Establish MP3tunes is Vicariously Liable for Its Users' Alleged Infringement............................................................... 23

      1.    MP3tunes Does Not Have the "Right and Ability to Supervise" the Alleged Infringement.................................................................. 24

      2.    MP3tunes Received N Direct Financial Benefit....................................... 25

   D.    Sideloading by MP3tunes Executives Is Not Copyright Infringement................ 26

IV.    MP3tunes Has Not Infringed Any Public Performance Right...........................................27

   A.    The DMCA Safe Harbor Protects MP3tunes From Plaintiffs' Claims of Infringement of Plaintiffs' Public Performance Right.......................................... 27

   B.    There Is No Infringement of Plaintiffs' Public Performance Right..................... 28

      1.    There Is No Volitional Conduct................................................. 28

      2.    There Are No Public Transmissions to MP3tunes' Users ....................... 29

      3.    MP3tunes' Use Of Deduplication Is Protected by Fair Use .................... 30

V.    MP3tunes Is Not Liable for Infringement of Plaintiffs' Copyrighted Cover Art .............31

   A.    Plaintiffs' Use of the Cover Art Images Does Not Constitute Infringement........ 31

   B.    Plaintiffs Lack Standing to Assert Claims of Infringement for Cover Art .......... 32

   C.    Plaintiffs Fail to Demonstrate Ownership or Copying of the Copyrights in the Allegedly Infringed Cover Art Images ............................................... 32

CONCLUSION................................................................................34

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A&M Records v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001) ................................................................. 23, 25-26

*In re Aimster Copyright Litig.*,
  334 F.3d 643 (N.D. Ill. 2002) .......................................................... 17,  n5, 23-24

*ALS Scan, Inc. v. Remarq*,
  239 F.3d 619 (4th Cir. 2001) ........................................................................22, 28

*Arista Records, Inc. v. Flea World, Inc.*,
  2006 U.S. Dist. Lexis 14988 (D.N.J. Mar. 31, 2006) .....................................22, 25

*Arista Records, Inc. v. MP3Board, Inc.*,
  2002 U.S. Dist. Lexis 16165 (S.D.N.Y. Aug. 28, 2002) ......................................16

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009)........................................................22-23, 25

*Artists Music, Inc. v. Reed Publishing*,
  1994 U.S. Dist. Lexis 6395 (S.D.N.Y. May, 17 1994)...................................24-25

*Ballas v. Tedesco*,
  41 F. Supp. 2d 531 (D.N.J. 1999) ................................................................20, n6

*Banff, Ltd. v. Limited, Inc.*,
  869 F. Supp. 1103 (S.D.N.Y. 1994)....................................................................24

*Burns v. Bank of Am.*,
  655 F. Supp. 2d 240 (S.D.N.Y. 2008).............................................................12, 26

*Campbell v. Acuff-Rose Music*,
  510 U.S. 569 (1994)............................................................................................30

*Caratzas v. Time Life, Inc.*,
  1992 U.S. Dist. Lexis 16285 (S.D.N.Y. Oct. 22, 1992)........................................33

*Cartoon Network, LP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008)........................................................................27, 29-30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................12

*Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*,
  749 F.2d 154 (3d Cir. 1984)................................................................................30

*Corbis Corp. v. Amazon.com, Inc.*,
  351 F. Supp. 2d 1090 (W.D. Wash. 2004)................................................*Passim*

*CoStar Group, Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688 (D. Md. 2001) ..................................................................19, 28

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. Cal. 2004) .........................................................................25

*Faulkner v. Nat'l Geographic Enters. Inc.*,
  409 F.3d 26 (2d Cir. 2005) ......................................................................................20

*Field v. Google, Inc.*,
  412 F. Supp. 2d 1106 (D. Nev. 2006) .....................................................................28

*Fonovisa v. Cherry Auction, Inc.*,
  76 F.3d 259 (9th Cir. 1996) .....................................................................................25

*Gal v. Viacom Int'l Inc.*,
  518 F. Supp. 2d 526 (S.D.N.Y. 2007) .....................................................................20

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*,
  443 F.2d 1159 (2d Cir. 1971) .............................................................................21, 22

*Hendrickson v. eBay Inc.*,
  165 F. Supp. 2d 1082, 1093 (C.D. Cal. 2001) ........................................................17

*Io Group, Inc. v. Veoh Networks, Inc.*,
  586 F. Supp. 2d 1132 (N.D. Cal. 2008) .............................................................*Passim*

*Jefferson Airplane v. Berkeley Sys.*,
  886 F. Supp. 713 (N.D. Cal. 1994) .........................................................................32

*Jorgensen v. Epic/Sony Records*,
  351 F.3d 46 (2d Cir. 2003) ......................................................................................20

*Laureyssens v. Idea Group, Inc.*,
  964 F.2d 131 (2d Cir. 1992) ....................................................................................32

*Linspire, Inc. et al. v. Long, et al.*,
  Case No. 37-20008-00092383-CU-CTL (Cal. Super. Ct. 2008) .............................2

*Livnat v. Lavi*,
  1998 U.S. Dist. Lexis 917 (S.D.N.Y. Feb. 2, 1998) ...............................................22

*Lulirama Ltd. v. Axcess Broadcast Servs.*,
  128 F.3d 872 (5th Cir. TExh. 1997) ........................................................................20

*Matthew Bender & Co. v. W. Publ. Co.*,
  158 F.3d 693 (2d Cir. 1998) ...............................................................................22-24

*Mauro v. Southern New Eng. Telecomms., Inc.*,
  208 F.3d 384 (2d Cir. 2000) ....................................................................................12

iv

*National Football League v. PrimeTime 24 Joint Venture,*
   211 F. 3d 10 (2d Cir. 2000)........................................................................30

*Newborn v. Yahoo!, Inc.,*
   391 F. Supp. 2d 181 (D.D.C. 2005) ................................................21, 28

*Perfect 10, Inc. v. Amazon.com, Inc.,*
   487 F.3d 701 (9th Cir. 2007) .........................................................21, 31

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
   213 F. Supp. 2d 1146 (C.D. Cal. 2002) ...............................................14

*Perfect 10 v. CC Bill,*
   488 F.3d 1102 (9th Cir. 2007) ........................................ 13-14, 17, 31

*Religious Technology Center v. Netcom On-Line Communication Services, Inc. ("Netcom"),*
   907 F. Supp. 1361 (N.D. Cal. 1995) ................................................21, 28

*Roe v. City of Waterbury,*
   542 F.3d 31 (2d Cir. 2008).....................................................................12

*Shapiro, Bernstein & Co. v. H. L. Green Co.,*
   316 F.2d 304 (2d Cir. 1963)............................................................ 23-25

*Staggers v. Real Authentic Sound,*
   77 F. Supp. 2d 57 (D.D.C. 1999) ..........................................................20

*Sygma Photo News, Inc. v. High Society Magazine, Inc.,*
   778 F.2d 89 (2d Cir. 1985)....................................................................24

*UMG Recordings Inc. v. Veoh Networks, Inc.,*
   665 F. Supp. 2d 1099 (C.D. Cal. 2009) ....................................*Passim*

*United States v. Am. Soc'y of Composers (In re Cellco P'ship),*
   663 F. Supp. 2d 363 (S.D.N.Y. 2009).................................................28

*Viacom Int'l v. YouTube,*
   2010 U.S. Dist. Lexis 62829 (S.D.N.Y. June 23, 2010)................*Passim*

*Warner Bros. Entertainment c. RDR Books,*
   575 F. Supp. 2d 513, 534 (S.D.N.Y. 2008)........................................21

*Whimsicality, Inc. v. Rubie's Costume Co., Inc.,*
   891 F.2d 452 (2d Cir. 1989).................................................................32

## Statutes and Rules

17 U.S.C. § 101.....................................................................................20, n6

17 U.S.C. § 201 (a) ..................................................................................... 20, 32-33

17 U.S.C. § 411(a) ............................................................................................... 32

17 U.S.C. § 512(c)(3)(A) ..................................................................................... 14

Fed. R. Civ. P. 10(c) ............................................................................................ 22

Fed. R. Civ. P. 56(c) ............................................................................................ 11

**Other Authorities**

"Citigroup Prevails in Lawsuit Over EMI Deal," *New York Times* (Nov. 4, 2010) ....................... 4

"EMI Agrees to Fine to Resolve Payola Case," *New York Times* (June 16, 2006) ........................ 4

H.R. Rep. No. 105-551, Part 2 ................................................................................ 19

http://emichrysalis.co.uk ..................................................................................... 1

John Hood, "Amazon Faces Kindle Class Action." ConsumerAffairs.com (July 28, 2009)
    http://www.consumeraffairs.com/news04/2009/08/kindle_class.html. ................................... 15

## PRELIMINARY STATEMENT[1]

Plaintiffs ask this Court to impose liability for copyright infringement on the grounds that MP3tunes' websites enable users to locate and store content that is available on the Internet.  As Michael Robertson shows in three videos accompanying this brief, the links on Sideload.com are the very same ones that Internet users can find through  any search engine such as Google or Yahoo!  *See* Robertson (MR) Opp. Decl. DVD Exhs. 1-3.  Plaintiffs know this but have not sued the countless other search engines which similarly find music available on the Internet because they know there is no legitimate claim of infringement.

According to their own sworn testimony and records, Plaintiffs have made a regular practice of making music available on the Internet with the express intention that it spread virally among users.  While Plaintiffs have long possessed the technology to prevent their music from being illegally distributed, they have purposely eschewed such security measures so as not to hamper the very real monetary benefits they receive from their "viral" marketing efforts.

Plaintiffs have finally retracted their earlier, adamant representation to this Court that: "The notion that we at EMI put up material for free is pure fantasy."  2/18/08 Trans. 30:24-31:5.  They now openly concede, as they must, that they make tracks available for free download on the Internet.  However, Plaintiffs now shift gears and allege that MP3tunes infringes their rights because it enables users to circumvent Plaintiffs' access restrictions on such materials.  For example, Plaintiffs cite to a download available at http://emichrysalis.co.uk.  Plaintiffs allege that, while this EMI website at one time offered this song as a free download, the promotion is no longer available.  Plaintiffs claim that MP3tunes circumvents Plaintiffs' access restrictions by making this download available through Sideload.com, but users are only able to sideload this file because Plaintiffs have not removed it from their servers.

---

[1]     All capitalized terms retain the definitions set forth in Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment filed on October 29, 2010.

Plaintiffs also trot out an attenuated theory that somehow MP3tunes' method of storage of authorized music is illegal: specifically, that MP3tunes' use of an industry standard storage technology which employs deduplication methods is copyright infringement. Plaintiffs base their deduplication claim on confused and inaccurate facts, and on a misapplication of the law.  First, they misrepresent how the MP3tunes system stores and retrieves data.  Second, they point to no evidence that MP3tunes committed the volitional act of copying, as opposed to merely providing access to a tool that others use to store legitimate data.  Finally, and in any event, the DMCA— which Plaintiffs begrudgingly discuss for a few pages at the end of their brief—keeps Plaintiffs from dictating how MP3tunes stores and retrieves data.

Where Plaintiffs once claimed that MP3tunes made <u>too many</u> copies in storing and retrieving data, they now complain that MP3tunes makes <u>too few</u>.  As Internet service providers cannot possibly hope to divine how many copies the record business will deem to be the right number of copies from one day to the next, Congress enacted the DMCA specifically to address this issue.  Congress knew that Internet companies needed to be protected from these claims because "service providers must make innumerable electronic copies by simply transmitting information over the Internet," and thus the DMCA shields Internet companies like MP3tunes from infringement liability so that "the Internet will continue to improve and that the variety and quality of services on the Internet will continue to expand."  S. Rep. No. 105-190.  The DMCA applies in this case because MP3tunes satisfies all the requirements for safe harbor protection.

Incredibly, to support their allegation that MP3tunes had knowledge of alleged infringement, Plaintiffs rely on hearsay testimony from Kevin Carmony and Emily Richards, both of whom this Court has already found to be unreliable, and Cody Brocious, a former teenage employee at MP3tunes whom Mr. Carmony encouraged to testify for Plaintiffs in this case.  Indeed, a jury in San Diego County recently rendered a verdict adjudging Mr. Carmony liable for conversion and fraud against another company in which Mr. Robertson is involved.  *See Linspire, Inc. et al. v.*

2

*Long, et al.*, Case No. 37-20008-00092383-CU-CTL (Cal. Super. Ct. 2008). *See* Gulia Opp. Decl. ¶ 2, Exh. EE. The fact that Plaintiffs would base their motion on the testimony of a known thief with a vendetta against Michael Robertson demonstrates the depths to which they will plunge to try to fashion a case out of thin air.

Meanwhile, Plaintiffs scrupulously avoid the one subject that Your Honor specifically asked them at the pre-motion conference to distinguish: Judge Stanton's decision in *Viacom Int'l v. YouTube*, 2010 U.S. Dist. Lexis 62829 (S.D.N.Y. June 23, 2010). Notwithstanding the Court's request, Plaintiffs do not get around to addressing the case until page 31 of their brief, wherein they devote two sentences to YouTube's repeat infringer policy. They then pretend, contrary to the undisputed record, that MP3tunes does not have its own repeat infringer policy, and quickly change the subject. Plaintiffs do not try to distinguish *YouTube* because there is no material distinction. As set forth below, Judge Stanton's decision is absolutely correct, and therefore Plaintiffs' case here must be dismissed on the same grounds.

In short, Plaintiffs have woefully failed to establish entitlement to summary judgment. The uncontroverted evidence of record and prevailing case law clearly establish that Defendants have not infringed any rights of Plaintiffs, are entitled to DMCA protection and are entitled to summary judgment on their own motion. At the very minimum, however, material issues of fact exist which preclude any grant of summary judgment in Plaintiffs' favor on any claim or issue.

## COUNTERSTATEMENT OF FACTS[2]

### I.    MP3tunes Has Complied with the DMCA's Safe Harbor Requirements

The facts demonstrate that MP3tunes has complied with the requirements set by the DMCA. Def. SUF ¶¶ 68-76. Plaintiffs do not offer any facts challenging, and thus concede, that MP3tunes

---

[2]    The background for this case is set forth in Defendants' Memorandum of Law In Support of Their Motion for Summary Judgment dated October 29, 2010 (Dkt. #196), which is incorporated herein by reference under Fed. R. Civ. P. 10(c). Defendants are also filing a Counterstatement to Plaintiffs' Local Rule 56.1 Statement of Uncontroverted Facts In Support of Plaintiffs' Motion for Summary Judgment. The following material factual disputes, however, are grounds enough to deny Plaintiffs' motion.

meets the DMCA's requirements as an "Internet Service Provider" and regarding its use of standard technical measures.  Indeed, Plaintiffs have limited their argument to whether or not MP3tunes: (1) adopted and reasonably implemented a repeat infringer policy; (2) responded expeditiously to remove, or disable access to, works identified in the letters sent by EMI Entertainment World & EMI Music Group North America (collectively, the "EMI Third-Party Entities"); (3) had knowledge of allegedly infringing conduct; and (4) received a direct financial benefit from, and had the right and ability to control, the alleged infringement.  Defendants therefore limit their factual discussion to only those material factual misrepresentations that form the basis for Plaintiffs' motion.

### A.   MP3tunes Respects and Adheres to Copyright Law

MP3tunes operates two Internet websites, MP3tunes.com and Sideload.com.  Def. SUF ¶¶ 1-2.  MP3tunes.com offers online storage "lockers" for the storage of music.  Def. SUF ¶¶ 3-4, 6-8. Users can access their lockers, and thus their music collections, from any computer connected to the Internet, in the same way that email users can access messages on Gmail or Yahoo! from any such computer.  Def. SUF ¶ 15.  Sideload.com, in turn, is a search engine, like Google, Bing or Yahoo!, except that it searches only for links to music downloads as opposed to other content.  Def. SUF ¶ 20.  As Plaintiffs concede, Sideload.com is not a file-sharing service.  Rather, like any other search engine, it merely links to music files that are stored by third parties on the Internet.  Def. SUF ¶ 24-25.  Thus, when a download is removed from the Internet, any link to it that could have been found on Sideload.com becomes inoperable and is automatically removed.  Def. SUF ¶ 25.[3]

---

[3]     Because they have no real evidence against MP3tunes, Plaintiffs resort to their umpteenth reference to MP3.com, an unrelated web site once run by Mr. Robertson, which provides an entirely different service than MP3tunes.com or Sideload.com.  MP3.com was sold long ago to Vivendi Universal, still operates, and has nothing to do with this case.  Any prior activity of MP3.com is no more relevant to the instant motion than the $3.75 million fine that EMI recently paid to the New York State Attorney General's Office for continuing to make "payola" to radio stations, in violation of federal law, *see* "EMI Agrees to Fine to Resolve Payola Case," *New York Times* (June 16, 2006) (in which EMI admits that it "engaged in some promotional activities that were wrong and inappropriate"), or the recent jury verdict rejecting as meritless the fraud lawsuit EMI's owners brought against Citigroup. *See "Citigroup Prevails in Lawsuit Over EMI Deal," New York Times* (Nov. 4, 2010).  The wealthy investors who bought EMI apparently blame everyone for their failed business venture but themselves.

MP3tunes employs a policy that prohibits infringing activity on its websites.  Def. SUF ¶¶ 49-50.  MP3tunes takes copyright and other intellectual property laws very seriously and expects its users to do the same.  Def. SUF ¶¶ 48, 11.  To combat the potential for infringement, MP3tunes requires its users to agree to its copyright policy before opening an account with MP3tunes.  Def. SUF ¶ 49.  MP3tunes' copyright policy prohibits users from storing content that infringes the copyright of any third party.  Def. SUF ¶¶ 49-50.  A link to MP3tunes' copyright policy is published on each page of its websites.  Def. SUF ¶ 59, Def. SUF ¶ 51.  Furthermore, when a copyright owner sends a DMCA-compliant take-down notice to MP3tunes, MP3tunes expeditiously removes or disables such material.  Def. SUF ¶ 56.

Plaintiffs' claim that MP3tunes does not investigate claims of infringement is a gross misrepresentation.  Pl. Br. 15.  MP3tunes employees have the authority to disable infringing links and block entire domain names, which has been exercised on numerous occasions. *See* Def. SUF ¶ 56; Gulia Opp. Decl. ¶ 3, Exh. FF (Robertson 187-188).

### B.  MP3tunes Has Reasonably Implemented a Repeat Infringer Policy

MP3tunes has implemented and advises its users of its Repeat Infringer Policy.  Under its Policy, when MP3tunes identifies a repeat infringer, it disables that user's account and any other accounts associated with that user's email address.  Def. SUF ¶ 58.  Indeed, MP3tunes has terminated 153 user accounts suspected of infringing activity.  Def. SUF ¶ 61.  Plaintiffs' claim that MP3tunes cannot identify a single user whose services were terminated for repeat infringement (*see* Pl. Br. 30) demonstrates the cavalier approach they take in their representations to this Court.

### C.  MP3tunes' Services Are User-Directed and MP3tunes Does Not Exercise Control Over the Allegedly Infringing Activities

There is no factual support for Plaintiffs' claim that MP3tunes has "complete dominion and control over" the song files in its users' lockers and the links at Sideload.com.  Pl. Br. 20.  The storage services offered at MP3tunes.com are entirely user-directed.  Def. SUF ¶ 10.  To store

5

content at MP3tunes.com, a user must create an account by providing a valid email address and password.  Def. SUF ¶ 5.  MP3tunes does not control the songs stored by users.  Def. SUF ¶ 10.  The storage process is fully automated and does not involve the intervention of MP3tunes' personnel.  Def. SUF ¶ 12.  To listen to music stored on MP3tunes.com, a user must first log-in with secure credentials and select the desired song from his or her own collection.  Def. SUF ¶ 14.  The MP3tunes system then automatically plays the requested file over the Internet to the specific user's computer or other Internet-enabled device.  Def. SUF ¶ 15.

MP3tunes' employees do not monitor or police content uploaded to users' lockers—indeed, it would be impossible for MP3tunes to do so given that there are roughly 700,000 users and millions of files on its servers.  Def. SUF ¶ 11.  Furthermore, the record provides no support for Plaintiffs' loose claim that MP3tunes can "easily locate and delete [infringing] files and links." *See* Pl. Br. 21.  Not even Plaintiffs are able to identify which links to their works are infringing and which are not.  *See* Facts Section I(F), *infra*.  MP3tunes cannot be charged with *greater* knowledge of Plaintiffs' digital marketing practices than Plaintiffs have.

### D.    There Is No Direct Financial Benefit From the Alleged Infringement

Sideload.com's search engine services are provided free of charge.  Def. SUF ¶ 112.  MP3tunes.com offers basic storage with two gigabytes for free.  Def. SUF ¶ 108. This two-gigabyte storage limit applies only to files that are uploaded from users' local hard drives, but not to files that are sideloaded from the Internet.[4]  Def. SUF ¶¶ 109-10.  Thus, MP3tunes received no direct, or even indirect, financial benefit from Sideload.com.

### E.    MP3tunes Disabled Access to All Materials in Take-Down Notices

Whenever MP3tunes receives a DMCA compliant take-down notice, MP3tunes removes the referenced material. Def. SUF ¶ 56.  MP3tunes has received several purported take-down notices,

---

[4]   The term "download" refers to the transfer of a file from the Internet to a local hard drive.  The term "sideload" refers to the transfer from one server on the Internet to another server on the Internet.

although none in the last two years, and has responded by removing the material identified therein and blocking those domains from its search engine. Def. SUF ¶ 56. In September 2007, MP3tunes received a cease and desist letter from "EMI Music Group North America" with an enclosed spreadsheet listing 350 song titles with artist names and URLs for links that EMI claimed infringed its copyrights. Def. SUF ¶ 68. Some of the representations in the letter, sworn under penalty of perjury, were plainly false. Among other things, the letter identified links to websites used by Plaintiffs to virally market their content. SUF ¶ 85. The letter impossibly demanded that MP3tunes remove all "EMI" content without identifying either the specific content or location of the purportedly infringing materials. Def. SUF ¶ 68. MP3tunes promptly removed from its website each and every one of the materials specifically identified in the September 4, 2007 letter. Def. SUF ¶ 69.

A month later, MP3tunes received two additional demand letters from the Third-Party EMI Entities. These letters again identified several links which were clearly not infringing. Def. SUF ¶ 75. These letters again also instructed MP3tunes to remove "all EMI" content without identifying either the specific content or the location of that content. Def. SUF ¶ 75. Once again, MP3tunes disabled access to all of the materials specifically identified in the letters, and offered to remove any other materials identified. Def. SUF ¶ 76. Tellingly, almost none of the works Plaintiffs now allege are at issue in their summary judgment motion, Pl. Br. 16, were identified as infringing by Plaintiffs, the Third-Party EMI entities, or anyone else, prior to this litigation. Peyronnel Opp. Decl. ¶ 4, Exh. J.

Indeed, MP3tunes has even removed allegedly infringing material in several instances when it did <u>not</u> receive a DMCA compliant notice. Def. SUF ¶ 69, 76. Plaintiffs claim that MP3tunes failed to act when users notified it that other users were making their personal music collections available for sideloading on the Internet. Pl. Br. at 9-10. Once again, the record is just the opposite: MP3tunes blocked these websites. Def. SUF ¶ 67; Bart Decl. Exh. 36, Exh. 73; Gulia Opp. Decl.

7

¶¶ 3, 4, Exh. FF (Robertson 214-217); Exh. GG (Reese 464; 818-821).

### F.    Plaintiffs Widely Distribute Free Downloads on the Internet

Despite all evidence to the contrary, Plaintiffs still insist that "major record labels and publishers authorize music to appear for 'free' on the internet" only on "the rare occasion."  Pl. Br. 11.  The record, however, shows that Plaintiffs employ teams of marketeers, artists, and agents who collectively have placed so many free music downloads on the Internet that Plaintiffs themselves cannot distinguish between authorized and unauthorized links.  Def. SUF ¶¶ 99-103.  Personnel at EMI even engage separate third-party marketing companies to disseminate EMI music downloads on music sites across the Internet.  Def. SUF ¶ 96.  Nor is this practice unique to EMI.  According to music industry expert Steve Gordon, who spent ten years as Sony Music's Director of Business Affairs and is now a major published author on the subject of digital music marketing, has testified that such viral marketing campaigns are standard practice in the music business.  GPG Opp. Decl. ¶ 13, Exh. PP (Gordon Report at 1-5).

As part of these "viral" marketing campaigns, Plaintiffs make free music downloads available with the goal that they will be broadly circulated.  Def. SUF ¶ 92.  As the Labels' own corporate designee himself explained: "By viral I mean giving fans the ability to disseminate to other fans, to spread like a virus." Def. SUF ¶ 92.  While Plaintiffs have long had digital rights management (DRM) technology that can easily prevent unauthorized distribution of their music on the Internet, they eschew such measures.  Def. SUF ¶ 90.

In fact, Plaintiffs have no idea how many songs that they have virally marketed on the Internet.  Def. SUF ¶ 92.  Their marketing personnel are not required to seek executive approval to make free downloads available on the Internet.  Def. SUF ¶ 94.  Nor is any written agreement required.  Def. SUF ¶ 95.  As the Executive President of Digital Strategy for EMI Recorded Music North America, Cory Ondrejka, testified,

There is no specialized responsibility for free downloads on the internet.  There are a

8

host of resources that generally reside within different marketing groups, where questions related to web sites go.  So if a band requests that they want to have a download, the flow that I have observed has been artist, through artist's management, coming in to whoever their point of contact is within EMI.

Def. SUF ¶ 96.  Even Sanford Schwartz, the EMI Senior Vice President who oversees all of

Plaintiffs' digital marketing efforts, admitted that he personally could not distinguish between

authorized and unauthorized downloads.  Def. SUF ¶ 100.  Finally, EMI artists are also permitted to

make free downloads available on the Internet without authorization.  Def. SUF ¶ 97.  As it was

explained: "artists are individuals, and when working with and managing individuals, it is

ineffective to try to impose global polices upon them."  Def. SUF ¶ 98.

### G. Plaintiffs Falsely Claim that MP3tunes Has Disqualifying Knowledge

Given that Plaintiffs themselves concede that they do not know which downloads on the

Internet are authorized and which are not, Def. SUF ¶¶ 99-103, it is astounding that Plaintiffs can

then allege that MP3tunes possesses or should possess this knowledge.  Plaintiffs claim that

MP3tunes has disqualifying knowledge because Sideload.com displays links from "patently

infringing sources."  Pl. Br. 33.  Plaintiffs cherry-pick a few examples from personal websites from

among the hundreds of thousands of Sideload links.  However, even these few examples undermine

their claims.  For example, Plaintiffs list the site rapidshare.com despite the fact that Plaintiffs

themselves have used this same site to virally distribute their music.  Gulia Decl. ¶ 8 Exh. KK

(EMI-R004451-53 Filed Under Seal).

Plaintiffs claim that Defendants were aware of "systematic infringement"  because

MP3tunes executives sideloaded tracks by well-known artists.  Pl. Br. ¶ 13-14.  However, the record

shows that Plaintiffs authorized personal sites to promote countless free downloads of well-known

artists, up to and including their best-selling artist, Coldplay.  Def. SUF ¶ 88.  Thus, this cannot be

"systematic infringement," nor does it prove that MP3tunes had knowledge of any specific alleged

infringements.

Each time DMCA take-down notices have identified purportedly infringing material, MP3tunes has expeditiously removed such material.  Def. SUF ¶ 56.  MP3tunes has also blocked entire domain names from being listed at Sideload.com when appropriate.  For example, MP3tunes blocked access to 297 separate domains, preventing any songs from being sideloaded from those domains and preventing links to those domains from appearing on Sideload.com.  Gulia Opp. Decl. ¶ 4, Exh. GG (Reese 821:22-822:19); Def. SUF ¶ 67.

### H.   Plaintiffs Falsely Claim That Sideload.com Enables Users to Circumvent Access Requirements Imposed by Copyright Owners

When a user chooses to sideload a song, Sideload.com sends a request to the web server hosting the song file which transfers a copy of the file to the user's locker.  Reese Opp. Decl. ¶ 2. Files can be transferred from source sites to a locker only if that file contains a suffix identifying it as a downloadable file.  *Id.*  MP3tunes does not alter this suffix, or convert files to enable them to be downloaded.  *Id.*  MP3tunes' users are only able to download those songs that are available on the Internet without access restrictions.  *Id.* ¶ 5.  Offering a song at one Internet location and hosting the actual download at another is not an access control.  *Id.* ¶ 6.

## II.   Plaintiffs Do Not Use a Single Master Storage System

Plaintiffs use an industry standard storage solution method that employs MogileFS software. Def. SUF ¶¶ 36-41; Gulia Opp. Decl. ¶ 9, Exh. LL (Bestavros Report ¶¶ 33-36).  This is not a "Single Master" storage system, but a common open source distributed file system software that enables MP3tunes to efficiently store and retrieve the millions of audio files put on to MP3tunes' servers by its users. *Id.* The MogileFS storage system utilizes a Content-Addressable Storage (CAS) architecture to store and retrieve data based on content rather than location, using a unique hash tag that is created based on the files' contents.  CAS is hardly unique to MP3tunes.  *Id.*  It has been used since the 1980s and is prevalent in modern operating systems to prevent storage of multiple instances of bit identical data.  *Id.*

10

MP3tunes' system disassembles files into lower level data blocks, which are moved within the system and duplicate copies are removed to best utilize storage space and combat data loss. Def. SUF ¶¶ 40-46; Gulia Opp. Decl. ¶ 9, Exh. LL (Bestavros Report); Gulia Opp. Decl. ¶ 10, Exh. MM (Bestavros Rebuttal Report).  Hash tags for these data blocks allow the system to monitor them as they move throughout the system.  *Id.*  Data blocks with duplicate hash tags are reconciled by MogileFS.  *Id.*  Such bit identical representations of data blocks are rare because various factors, such as the type of software used in copying a file, can alter the bit rate of the lower level data blocks.  *Id.*  Fewer than 5% of the hash tags on MP3tunes' servers are in fact deduplicated.  *Id.*  The bottom line is that when users wish to retrieve these files, they retrieve the same unique file that they uploaded.  *Id.*

### III.   MP3tunes Uses Cover Art Pursuant to a Valid License from Amazon.com

Amazon  licenses to MP3tunes the use of content which includes the artwork at issue in this litigation.  Tarpay Decl. ¶ 4, Exs. A-C.  Plaintiffs do not challenge Amazon's right to issue a license to use the cover art at issue.  This license is intended to facilitate the sale of music, as well as other products, at Amazon.com.  *Id.*.  Specifically, Amazon allows MP3tunes "to copy and display" artwork so that when users at MP3tunes.com listen to a song, a portion of the MP3tunes interface displays artwork associated with that song along with a link to Amazon.com and instructions on how to purchase the album or related tracks.  *Id.*  This cover art function has generated significant traffic to Amazon.com: MP3tunes has directed its users to Amazon.com on 20,472 occasions.  MR Opp. Decl. ¶ 4, Exh. A.  Amazon has never alleged that MP3tunes' use of its cover art exceeds the scope of its license.  MR Opp. Decl. ¶ 4.

### ARGUMENT

### I.   Standard of Review

Summary judgment may not be granted unless "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In

determining whether the moving party has shown the absence of a material factual question, all facts must be viewed in the light most favorable to the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Roe v. City of Waterbury*, 542 F.3d 31, 35-36 (2d Cir. 2008).  Plaintiffs cannot, and do not, meet this burden.

"It is well-established that a party cannot move for summary judgment on an issue that was not raised in the pleadings."  *Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 251 (S.D.N.Y. 2008) (emphasis added); *accord Mauro v. Southern New Eng. Telecomms., Inc.*, 208 F.3d 384, 386 n.1 (2d Cir. 2000).  Plaintiffs' summary judgment runs roughshod over this rule, raising new issues that appear nowhere in its pleadings, and over which no discovery and/or depositions has been conducted.  Specifically, Plaintiffs now allege that MP3tunes is liable for the allegedly infringing activity of its employees and that it infringes a "right of public performance."  These arguments were raised for the first time in Plaintiffs' letter to Judge Pauley dated August 20, 2010.  Nowhere were these issues raised in Plaintiffs' Second Amended Complaint, their First Amended Complaint, or in their original Complaint.  Plaintiffs' motion for summary judgment on these brand new, post-discovery claims must necessarily be denied.

## II.     MP3tunes Is Entitled to DMCA Safe Harbor Protection

### A.     MP3tunes Has Reasonably Implemented a Repeat Infringer Policy

Plaintiffs first argue that MP3tunes does not meet the DMCA requirements to implement a reasonable repeat infringer policy because certain users stored copies of songs that were identified in prior correspondence sent by Third-Party EMI Entities.  Pl. Br. 30.  There is no legal or factual support for Plaintiffs' contention that a user who has stored a song that appears on a single take-down notice is a *de facto* repeat infringer.  Plaintiffs' argument improperly conflates the service provider's responsibility to respond to take-down notices with its obligation to implement a reasonable repeat infringer policy.  *See, e.g., Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1102-03 (W.D. Wash. 2004) (holding that DMCA compliant take-down notices did not

provide evidence of repeat infringement).

The legislative purpose of the repeat infringer policy requirement was to ensure that "those who repeatedly and flagrantly . . . disrespect . . . the intellectual property rights of others should know that there is a realistic threat of losing that access."  Pl. Br. 29 (*citing* 17 U.S.C. § 512(i)(1)(A) and S. Rep. No. 10-190 at 52).  As many Courts have noted that, "[t]he key term, 'repeat infringer,' is not defined"  because Congress intended "to leave the policy requirements, and the subsequent obligations of the service providers, loosely defined."  *Corbis*, 351 F. Supp. at 1100-01.  However, the Ninth Circuit in *Perfect 10 v. CC Bill*, 488 F.3d 1102, 1109 (9th Cir. 2007) clarified what the courts require by way of a "repeat infringer" policy:

> We hold that a service provider 'implements' a policy if it has a working notification system, a procedure for dealing with DMCA-compliant notifications, and if it does not actively prevent copyright owners from collecting information needed to issue such notifications. . . . [A]n implementation is reasonable if, under 'appropriate circumstances,' the service provider terminates users who repeatedly or blatantly infringe copyright. . . .  To identify and terminate repeat infringers, a service provider need not affirmatively police its users for evidence of repeat infringement.

*Id.; accord UMG Recordings Inc. v. Veoh Networks, Inc.,* 665 F. Supp. 2d 1099, 1111 (C.D. Cal. 2009) (same).

MP3tunes clearly complies with the foregoing.  It has a working notification system.  Def. SUF ¶ 53-54, 58.  It has a procedure for dealing with DMCA compliant notifications.  Def. SUF ¶ 56.  It does not prevent copyright owners from collecting information needed to issue such notifications.  Def. SUF ¶ 55.  Moreover, under the appropriate circumstances, MP3tunes has terminated users who repeatedly or blatantly infringe copyright.  Def. SUF ¶ 61.  On 153 occasions where users were found to be using its services to abuse copyrights, MP3tunes has terminated those users' accounts.  Def. SUF ¶ 61.

The DMCA does not require MP3tunes to terminate user accounts merely because songs in the user's lockers appear on a take-down notice.  *See Viacom Int'l v. Youtube,* 2010 U.S. Dist. LEXIS 62829 (S.D.N.Y. June 23, 2010), at *29 (holding "DMCA compliant notices" did not

"provide evidence of blatant copyright infringement") (citations omitted); *Corbis*, 351 F. Supp. 2d at 1102-03 (same).  Indeed, the Courts do not require service providers to "act on or address difficult infringement issues."  *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1176 (C.D. Cal. 2002); *see also Corbis*, 351 F. Supp. 2d at 1101 ("Given the complexities inherent in identifying and defining online copyright infringement, § 512(i) does not require a service provider to decide, *ex ante*, the specific types of conduct that will merit restricting access to its services.").

### B.    MP3tunes Properly Responded to All DMCA Compliant Notices

Plaintiffs argue that MP3tunes does not qualify for the DMCA's safe harbor because, while MP3tunes removed the links identified in the take-down notices sent by the two Non-Party EMI Entities (which are not among the Plaintiffs in this action), it did not search for and remove other copies of those files from storage lockers.  *See* Pl. Br. 32-33.  First, MP3tunes' compliance with the letters sent by the Third-Party EMI Entities is irrelevant.  Take-down notices from third-parties are insufficient to disqualify a service provider from the DMCA's protection.  *See Corbis*, 351 F. Supp. 2d at 1108.  Furthermore, the DMCA limits a service provider's duty to act to only those occasions where it receives proper notice of infringing activity.  *See CCBill*, 488 F.3d at 1113.  The DMCA requires that proper notification must include, *inter alia*, the location of the material.  *See* 17 U.S.C. § 512(c)(3)(A));  *Viacom*, 2010 U.S. Dist. Lexis 62829, at **11-12 (citation omitted).  As noted above, the take-down letters from the Third-Party EMI Entities failed this basic requirement.  Furthermore, the Third-Party EMI Entities' notices identified almost none of the works at issue here.  Peyronnel Opp. Decl. ¶5.

Moreover, the DMCA does not require MP3tunes to search for other copies of purportedly infringing material whose locations are not specifically identified in the take-down notice.  *See Viacom*, 2010 U.S. Dist. Lexis 62829, at *29.  In *Viacom*, the Court specifically rejected this argument, holding that the defendants were only required to remove copies of the infringed works

whose URLs were identified in the take-down notices, and were not obligated to search for and remove unidentified copies of the infringed works, to maintain their safe harbor protection. *Id.* at *44-45; *UMG*, 665 F. Supp. 2d at 1109-10 (holding service providers not obligated to conduct investigation in response to take-down notice).

Plaintiffs' position also fails to recognize that MP3tunes.com, which offers storage services, and Sideload.com, which is a search engine, are separate websites that offer entirely different services. MP3tunes does not have the capability to conduct concurrent searches of these separate websites and the databases housed on these websites. Reese Opp. Decl. ¶¶ 13-14. Nor does the DMCA impose the burden upon MP3tunes to create such new technology to maintain its safe harbor protection.

Further, Plaintiffs' argument is based on the false assumption that the other copies of the identified works were obtained illegally. There is no evidentiary basis for such an assumption MP3tunes has no way of determining which copies are authorized or which are not. Such a practice would be unsound. Indeed, unauthorized removal of content from users' lockers could expose MP3tunes to a flood of consumer complaints such as Amazon faced when it deleted infringing electronic books from users' personal Kindles, causing a national scandal, and forcing Amazon to promise never to do that again. *See* John Hood, "Amazon Faces Kindle Class Action." ConsumerAffairs.com (July 28, 2009) http://www.consumeraffairs.com/news04/2009/08/kindle_class.html.

The bottom line is that MP3tunes has scrupulously complied with the DMCA requirements for the take-down notices it received from the Third-Party EMI Entities and disabled all the links identified therein. Def. SUF ¶ 69, 76. The notion that MP3tunes was somehow obligated to investigate and search millions of files from 700,000 users, to try to find and delete other copies of allegedly infringing materials, is wholly unsupported by the law.

15

### C.      MP3tunes Did Not Have Disqualifying Knowledge

#### 1.      MP3tunes Did Not Have Knowledge of the Alleged Infringements Because of Plaintiffs' Failure to Send Take-Down Notices

Plaintiffs next claim that "MP3tunes' actual knowledge is undeniable" which disqualifies it from the DMCA's protection.  Pl. Br. 17.  Here, Plaintiffs' failure to send take-down notices for almost any of the songs at issue disqualifies them from arguing actual knowledge of infringement. *See Io Group, Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1148 (N.D. Cal. 2008) ("Plaintiff provided no notice to Veoh of any claimed copyright infringement. Thus, there is no question on the record presented that Veoh lacked actual knowledge of the alleged infringing activity at issue."); *Corbis*, 351 F. Supp. 2d at 1107 ("decision to forego the DMCA notice provisions … stripped [plaintiff] of the most powerful evidence of a service provider's knowledge—actual notice of infringement from the copyright holder.").

The letters on which Plaintiffs hope to rely identified neither the specific songs that now are the subject of this suit, nor the location of the purportedly infringing material.  They merely demanded that MP3tunes remove all "EMI" songs, which MP3tunes was instructed to figure out by conducting an investigation of EMI's websites.  SUF ¶ 70.  These noticed clearly did not comply with the DMCA.  *See Corbis*, 351 F. Supp. 2d at 1109 ("Notices of infringement must substantially comply with the DMCA's notice requirements to be considered evidence of a service provider's knowledge."); *Viacom*, 2010 U.S. Dist. Lexis 62829, at *44 (take-down notice that provided only a "representative list" held insufficient to establish knowledge); *Arista  Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. Lexis 16165 (S.D.N.Y. Aug. 28, 2002) (mere listing of artists fell short of "substantially complying with notification requirement"); *UMG Recordings*, 665 F. Supp. 2d at 1109-10 (notice inadequate where it failed to identify specific works infringed and their location). Thus, MP3tunes did not have actual knowledge of the specific alleged infringements in this case.

## 2.    MP3tunes Also Did Not Have Constructive Knowledge

Plaintiffs erroneously claim that constructive knowledge does not "require knowledge of specific infringements." Pl. Br. 34. Tellingly, Plaintiffs fail to cite a single case in support of this claim.[5] The reason is obvious—there are none. The DMCA requires "knowledge of specific and identifiable infringements of particular individual items." *See Viacom*, 2010 U.S. Dist. Lexis 62829 at *29; *Corbis Corp.,* 351 F. Supp. 2d at 1108 ("The issue is not whether Amazon had a general awareness that a particular type of item [celebrity photos,] may be easily infringed;" rather, whether Amazon knew of specific infringements.). "Mere knowledge of prevalence of such activity in general is not enough." *Viacom*, 2010 U.S. Dist. Lexis 62829, at *29. *See also UMG Recordings*, 665 F. Supp. 2d at 1111 ("If such general awareness were enough to raise a 'red flag,' the DMCA safe harbor would not serve its purpose of facilitating the robust development and world-wide expansion of electronic commerce ...."); *CC Bill LLC*, 488 F.3d at 1114 (service provider's knowledge of source site's advertisements for "illegal" content insufficient to constitute red flag knowledge); *Io Group,* 586 F. Supp. 2d at 1149 (service provider's knowledge of source site's advertisements for "stolen" content insufficient for red flag knowledge); *Hendrickson*, 165 F. Supp. 2d at 1093 (same).

Plaintiffs purport to rely on "evidence" of various activity by MP3tunes characterized in Plaintiffs' brief as providing "red flag" knowledge. Pl. Br. 34, 18-19. None of the examples cited by Plaintiffs demonstrate MP3tunes' constructive knowledge of the *specific* infringements necessary to deprive it of safe harbor protection. Each example constitutes the same type of "general" knowledge that has been rejected as constructive knowledge.

---

[5]    Plaintiffs cite *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (N.D. Ill. 2002), in their discussion of constructive knowledge for the proposition that "willful blindness is knowledge." However, Plaintiffs misconstrue the holding in that case, which did not address the DMCA's standard for constructive knowledge, but held that the service provider was not entitled to safe harbor protection because of its failure to terminate repeat infringers and active encouragement of the infringing activity. *Id* "[T]he question is whether the service provider deliberately proceeded in the face of blatant factors of which it was aware." *Corbis Corp.*, 351 F.Supp.2d at 1108.

First, the fact that MP3tunes executives sideloaded songs from popular artists fails to demonstrate a general awareness of infringing activity, much less *specific knowledge* of the infringements at issue here.  There is no evidence that any of the songs sideloaded by MP3tunes' executives infringed <u>anyone's</u> copyrights, let alone Plaintiffs'.  As for the "Most Popular Tracks" on Sideload.com, Ms. Laura Stamm, a Managing Principal with Analysis Group, Inc., examined the source links and determined that 60% of the top songs sideloaded originated from plainly legitimate promotional offers from music labels, artists, distributors, and music media sites.  GPG ¶ 13, Exh. PP (Stamm Report ¶¶ 43-45).  Ms. Stamm also concluded that there was no way to determine whether the remaining 40% were authorized or unauthorized.  *Id.*  As discussed above, Plaintiffs have made so many downloads available for free on the Internet that even they cannot distinguish between an authorized or unauthorized download.

Furthermore, Plaintiffs cannot establish constructive knowledge by citing to emails and messages from users because third-party notices are insufficient to satisfy the requirement for constructive knowledge under the DMCA.  *Corbis*, 351 F. Supp. 2d at 1108.  Finally, Plaintiffs' claim that MP3tunes "lamented" that none of the major labels made sound recordings available in MP3 format (Pl. Br. 19) is simply untrue.  In the email cited by Plaintiffs, representatives from the record label UMG declined to sell MP3 formatted songs through MP3tunes.  Pl. BR. 19, Exh. 95.  These statements are also entirely unrelated to Plaintiffs' claims in this case.

### D.   MP3tunes Does Not Receive a Financial Benefit Directly From Infringing Activity Which It Has The Right and Ability To Control

### 1.   MP3tunes Does Not Control The Allegedly Infringing Activity

MP3tunes does not, and cannot, control the allegedly infringing activity.  "Courts have routinely held that 'the right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system."  *Corbis*, 351 F. Supp. 2d. at 1110; *Io Group*, 586 F.

18

Supp. 2d at 1151 (holding that "the pertinent inquiry is not whether Veoh has the right and ability to control its system, but rather, whether it has the right and ability to control the *infringing activity*")(emphasis in original); *CoStar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 704 n.9 (D. Md. 2001) (if the "standard could be met merely by the ability to remove or block access to materials [it] would render the DMCA internally inconsistent").

Here, MP3tunes does not select the material that is stored on its system.  The songs at issue were stored by or searched for by the users of MP3tunes' services, not MP3tunes itself, and were the result of automated processes.  The storage process is fully automated and does not involve the intervention or active involvement of MP3tunes or its personnel.  *See Io Group*, 586 F. Supp. 2d at 1147 (defendant entitled to safe harbor despite the fact that automated functions created Flash and still-image files from user-submitted content).

### 2.     MP3tunes Does Not Benefit from Allegedly Infringing Activity

The legislative history of the DMCA indicates that direct financial benefits of infringing activities were not contemplated to be benefits accrued "where the infringer makes the same kind of payment as non-infringing users of the provider's service." H.R. Rep. No. 105-551, Part 2, at 54. MP3tunes does not benefit from the allegedly infringing activity.  MP3tunes does not benefit from sideloading of allegedly infringing content.  There is no charge for Sideload.com search services, nor for the sideloading of files to lockers.  MP3tunes' principal income is from storage fees paid by users who upgrade from the free basic storage plan to the premium plan which provides users with a higher storage limit.  Def. SUP ¶¶ 107-11.  This storage limit only applies to files that are uploaded from users' local hard drives—not to files that are sideloaded from the Internet.  Def. SUP ¶¶ 109-10.  Thus, there is no financial benefit to MP3tunes.

### III.     MP3tunes Is Not Liable for Users' Allegedly Infringing Sideloads

#### A.     There Is No Direct Infringement

To establish that MP3tunes is liable for the infringing sideloads of its users, Plaintiffs must

first demonstrate direct infringement by the users.  *See Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 40 (2d Cir. 2005) (holding there can be no contributory infringement absent the direct infringement by a third party).  They have not done so.

### 1.    Plaintiffs Fail to Demonstrate Ownership

"In a copyright infringement case, the plaintiffs must show: (i) ownership of a valid copyright; and (ii) unauthorized copying of the copyrighted work."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003).  Copyright ownership "vests initially in the author or authors of the work."  17 U.S.C. § 201 (a).  Plaintiffs have failed to demonstrate ownership for the majority of the works they claim are at issue.  Peyronnel Opp. Decl. ¶ 6.  Nor have they demonstrated ownership of <u>any</u> of the 328 cover art images at issue.[6]

### 2.    Plaintiffs Fail to Demonstrate Unauthorized Copying

"In the absence of direct evidence, copying is proven by showing (a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectable material in the two works."  *Gal v. Viacom Int'l Inc.*, 518 F. Supp. 2d 526, 536-37 (S.D.N.Y. 2007).  Here, the Labels rely solely on the self-serving declaration of Alasdair McMullen, an in-house lawyer.  In this declaration, Mr. McMullen represents that he has viewed a list of the works at issue and declares that none of them were authorized for free download.  (Tellingly, the Publishers decline to make such a statement in a sworn declaration.)  Given the extensive testimony from Plaintiffs, cited above, that they have no idea, and no way to monitor, what has and has not been authorized by their

---

[6]    Many of the works at issue are listed as a "work made for hire."  Section 101 of the Copyright Act explicitly defines a "work made for hire" as a work:  (1) prepared by an employee within the scope of his or her employment; or (2) specifically ordered or commissioned provided that it falls under one of the nine categories enumerated in the statute.  *See Lulirama Ltd. v. Axcess Broadcast Servs.*, 128 F.3d 872, 876 (5th Cir. TExh. 1997).  Neither sound recordings, nor musical compositions fall within the nine types of works listed in the "specially commissioned" prong of the statute.  *Id.* at *878 (holding that sound recordings are not listed in section 101); *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 (D.N.J. 1999) (holding that sound recordings cannot be works made for hire because sound recordings "do not fit within any of the nine enumerated categories"); *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57, 64 (D.D.C. 1999) (same).  Sound recordings and musical compositions can be deemed works made for hire only if an employee creates the work within the scope of employment.  See 17 U.S.C. § 101.  Here, Plaintiffs have not produced any evidence that the disputed works were created by employees within the scope of their employment.  They have produced no employment contracts or records—nor identified any employees.  Accordingly, Plaintiffs have failed to meet their burden.

artists, agents, marketing representatives, *etc.*.  Mr. McMullen's assertion is utterly bogus and cannot form the basis for summary judgment.  Furthermore, and in any event, Plaintiffs have not event entered the alleged infringing works into evidence, and therefore they cannot obtain judgment at this stage of the case on any of those works.  *See Warner Bros. Entertainment c. RDR Books*, 575 F. Supp. 2d 513, 534 (S.D.N.Y. 2008).

### B.    There Is No Contributory Infringement

In order to establish contributory infringement, a plaintiff must demonstrate that a defendant, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another."  *See Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) (emphasis added).  Plaintiffs cannot demonstrate undisputed facts in support of such a claim.

### 1.    Plaintiffs Have Failed to Demonstrate That MP3tunes Knew Its Sideload Services Were Used for Infringement

To establish contributory infringement, courts require knowledge of the specific acts of infringement.  *See Religious Technology Center v. Netcom On-Line Communication Services, Inc. ("Netcom")*, 907 F. Supp. 1361, 1374 (N.D. Cal. 1995) (denying summary judgment for contributory liability where plaintiffs failed to show knowledge of specific acts of infringement); *Amazon.com*, 487 F.3d at 729 (knowledge must be of specific infringing material); *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (same).  General awareness is insufficient.  *See Netcom*, 907 F. Supp. at 1374.   Here, there has never been any notice of infringement as to the specific songs at issue, and Defendants vehemently deny knowledge of any infringement.  Plaintiffs cannot obtain summary judgment on this record.

Indeed, Plaintiffs have failed to provide any evidence of constructive knowledge of the specific infringements at issue.  As purported evidence of MP3tunes' constructive knowledge specific infringement, Plaintiffs offer only conclusory statements such as: "even a casual viewing

would have put any reasonable person on notice of <u>likely</u> copyright infringement"; "MP3tunes executives and employees knew that some of their top sideloading domains were not legitimate"; "MP3tunes also received numerous notices from users"; *etc.*  None of these statements evidence knowledge of *specific* infringement necessary for contributory liability.

The cases that Plaintiffs rely upon for contributory liability are inapposite.  In *Arista Records LLC v. Usenet.com, Inc.,* 633 F. Supp. 2d 124 (S.D.N.Y. 2009), at no point did the Court hold that knowledge of the specific acts of infringement is not required, or that knowledge of a general prevalence of infringement is sufficient, to demonstrate contributory infringement.  Indeed, in *Arista Records, Inc. v. Flea World, Inc.,* 2006 U.S. Dist. Lexis 14988, *49 (D.N.J. Mar. 31, 2006), the Court distinguished its holding from other contributory infringement cases involving technology that could be used for non-infringing purposes.  And in *ALS Scan, Inc. v. Remarq*, 239 F.3d 619, 625 (4th Cir. 2001), the Court did not address whether the defendants had sufficient knowledge to constitute contributory liability but instead focused on whether the plaintiff failed to comply with the notice provisions of 17 U.S.C. § 512(c)(3)(A)(ii) and (iii).  That is not the issue here.  In sum, there is simply no legal support for Plaintiffs' position, which would radically alter existing copyright law.

### 2.     MP3tunes Did Not Materially Contribute to Alleged Infringement

For contributory liability, a plaintiff must prove that the defendant "induces, causes or materially contributes to the infringing conduct."  *Gershwin Publishing Corp.*, 443 F.2d at 1162.  "Participation sufficient to establish a claim of contributory infringement may not consist of merely providing the means to accomplish an infringing activity ... [it] must bear a direct relationship to the infringing acts, and the contributory infringer must have acted in concert with the direct infringer."  *Livnat v. Lavi*, 1998 U.S. Dist. Lexis 917, *9 (S.D.N.Y. Feb. 2, 1998).  The provision of equipment "that facilitate[s] the infringement ... does not amount to contributory infringement if the equipment is capable of substantial noninfringing uses."  *Matthew Bender & Co. v. W. Publ. Co.*, 158 F.3d

22

693, 706 (2d Cir. 1998).

For their claim that MP3tunes materially contributed to the infringement, Plaintiffs merely offer the following conclusory statement:  "By any standard, defendants provide the 'site and facilities' through which [] infringement occurred."  Def. Br. 20.  However, the mere  provision of 'site and facilities' alone does not constitute material contribution.  In each of the cases Plaintiffs cite, the Court found that the defendants substantially participated in the infringing activities and acted in concert with the direct infringer.  *See Usenet*, 633 F. Supp. 124; *Aimster,* 252 F. Supp. 2d at 635; *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir. 2001).   In each of these cases, the defendants actively sought users they knew to be engaged in massive file-sharing, advertised their ability to facilitate infringement, and offered instructions on infringement.  That sort of conduct is completely antithetical to the entirely law-abiding means by which MP3tunes has always conducted its operations.

Furthermore, the services provided by Sideload.com and MP3tunes.com are not only capable of, but indeed with rare exceptions are exclusively used for legitimate, non-infringing purposes.  With MP3tunes.com, users can store their music collections on MP3tunes' servers.  With Sideload.com, users can search for links to third-party websites offering music downloads on the Internet, the same links they can find on any other search engine.  The provision of such search and storage services cannot constitute contributory infringement.

### C.    Plaintiffs Assert No Facts That Establish MP3tunes is Vicariously Liable for Its Users' Alleged Infringement

For vicarious liability, Plaintiffs must establish undisputed facts showing that MP3tunes:  (1) has the right and ability to control the infringer's acts; and (2) receives a <u>direct financial</u> benefit from the infringement.  *See Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963).  A principal rationale for vicarious liability in the copyright area is to provide relief against "someone who bears a relation to the direct infringers that is analogous to the relation of a

principal to an agent." *Aimster*, 334 F.3d at 654.  Plaintiffs fail to demonstrate such a relationship exists between MP3tunes and its users.[7]

1.      **MP3tunes Does Not Have the "Right and Ability to Supervise" the Alleged Infringement**

The right and ability to supervise the allegedly infringing activity requires more than the legal right to block the access of users.  *See Io Group,* 586 F. Supp. 2d at 1151 ("the right and ability to control infringing activity . . . cannot simply mean the ability of a service provider to block or remove access to materials posted on its website or stored on its system.").  A defendant must "participate in" and "exercise control over ... the infringement."  *See Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 92 (2d Cir. 1985); *Banff, Ltd. v. Limited, Inc.*, 869 F. Supp. 1103, 1106-11 (S.D.N.Y. 1994) (mere legal right to control held insufficient for vicarious liability).  Indeed, "the mere fact that [defendant] could have policed [direct infringers] at great expense is insufficient to impose vicarious liability."  *Artists Music, Inc. v. Reed Publishing*, 1994 U.S. Dist. Lexis 6395, *16 (S.D.N.Y.  May, 17 1994).

MP3tunes simply does not have the right and ability to control the infringing activity.  The Sideload.com search engine merely locates links to any third-party websites offering free music downloads on the Internet.  These search services and MP3tunes.com's storage services are both entirely user-directed.  The search and storage functions provided by MP3tunes are all performed by automated processes and do not require action by MP3tunes' personnel.  Finally, as noted above, MP3tunes' right to monitor and block access to its services clearly does not constitute the "ability and right to control" the infringing activity, and thus cannot be used to establish vicarious liability. Def. SUF ¶ 10-15.

---

[7]      As with contributory infringement, Plaintiffs must first demonstrate the direct infringement of a third party before they can establish vicarious liability.  *See, e.g., Matthew Bender*, 158 F.3d at 706.  However, as discussed above, Plaintiffs' failure to demonstrate ownership and unauthorized copying of their works vitiates their claim for vicarious infringement.  *See* Section III(A), supra.  Accordingly, Plaintiffs' request for summary judgment on their vicarious liability claim must be denied.

24

The vicarious liability cases cited by Plaintiffs have no application here.  Each case concerns direct actual participation in and control of the infringing activities by the defendants.  In addition, all the defendants in those cases derived direct financial benefits that were dependent on the infringing activity at issue.  *See Usenet*, 633 F. Supp. 2d at 124 (Usenet encouraged and instructed its users on how to infringe copyright); *Flea World, Inc.*, 2006 U.S. Dist. Lexis 14988 (D.N.J. Mar. 31, 2006) (flea market operators controlled and supervised the sale of the pirated CDs); *Fonovisa v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996) (same).  Here, by contrast, MP3tunes controls neither what is offered on the Internet, nor what its users choose to search for and store on the Internet.

## 2.    MP3tunes Received No Direct Financial Benefit

Only "[w]hen the right and ability to supervise, coalesce with an obvious and direct financial interest in the exploitation of copyrighted materials" is vicarious liability possible.  *Shapiro,* 316 F.2d at 307.  A direct causal relationship between the financial benefit and the infringing activity is required.  *See, e.g., Artists Music*, 1994 U.S. Dist. Lexis 6395, at *17-*18 (no liability for vicarious infringement where defendant's revenue was generated from both infringing and non-infringing activities).

Plaintiffs try to circumvent the direct financial benefit requirement by arguing that the alleged infringing activity at a website acts as a "draw" for users, an argument the Second Circuit Court of Appeals does not follow.  *See Shapiro,* 316 F.2d at 307.  Even if it did, Plaintiffs 'draw theory' simply would not help their case.  As the Ninth Circuit explained in *Ellison v. Robertson,* to prevail on the "draw theory," the infringing activity must be the "draw," "not just an added benefit." *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. Cal. 2004).  Here, Plaintiffs offer no facts (nor could they) that MP3tunes' users sign up for storage services to participate in infringing activities.  By contrast, in the file-sharing cases relied on by Plaintiffs such as *Napster*, the infringing content was the main draw, and thus any financial benefit was directly related thereto.

25

*See Napster*, 239 F3d at 1021.

Unlike in Plaintiffs' cases, MP3tunes does not benefit financially, either directly or indirectly, from the alleged infringing activities of its users. Sideload.com's search engine services are provided free of charge, and generate no advertising revenue. Rather, MP3tunes' revenue comes almost entirely from its premium storage locker services, and sideloaded works do not count towards these storage limits. Def. SUF ¶ 112. Thus, there is zero evidence that MP3tunes derives a direct financial benefit from alleged infringing activities.

### D.      Sideloading by MP3tunes Executives Is Not Copyright Infringement

Despite multiple opportunities, Plaintiffs have never actually pled this particular claim. On that ground alone, the Court should deny summary judgment to Plaintiffs. *See Burns v. Bank of Am.*, 655 F. Supp. 2d 240, 251 (S.D.N.Y. 2008).

Plaintiffs contend that "MP3tunes executives sideloaded 171 works from blatantly infringing sites." Pl. Br. 22. As proof, Plaintiffs offer Horowitz Exs. X and Z, in which Mr. Horowitz alleges that the source sites for works downloaded by MP3tunes' executives were not authorized to distribute these works based on statements made by Plaintiffs' in-house counsel. Horowitz Decl. ¶ 44. But these statements are plainly false, as these exhibits list links to some of the very same websites that, through discovery, it has been uncovered that Plaintiffs have used to market their works, such as Pastestore.com, Purevolume.com and SXSW.com. *See* Gulia Decl. ¶ 3, Exh. FF (Robertson 226-228; 275-276). Moreover, even if Plaintiffs did not explicitly authorize these websites to post these downloads, these source sites may feature authorized downloads obtained through one of Plaintiffs' viral marketing campaigns.

In any event, Plaintiffs do not demonstrate that the sideloading activities of MP3tunes' employees was conducted within the scope of their employment. As one former employee, Sharmaine Lindahl, explained: "MP3tunes employees were customers. I mean, I was a customer of MP3tunes working there. I had my own locker. I did my own thing with it." Bart Decl., Exh. 11.

26

Plaintiffs also cite to an email exchange between two MP3tunes employees discussing populating an index with tracks from MP3tunes' "artist café" program—not the tracks at issue in this litigation. *Id.*, Exh. 56.   However, the artist café tracks were promotional downloads for certain featured artists.   Robertson Decl. ¶ 2.   Nor do Plaintiffs offer evidence that such sideloading activities directly financially benefitted MP3tunes.   In short, Plaintiffs' newly concocted, post-discovery claim fails on multiple levels.

**IV.   MP3tunes Has Not Infringed Any Public Performance Right**

This claim as well appears in none of Plaintiffs' pleadings, and so should not be considered. It is also without any basis under the law.

**A.   The DMCA Safe Harbor Protects MP3tunes From Plaintiffs' Claims of Infringement of Plaintiffs' Public Performance Right**

Plaintiffs claim that when users stream music that has been stored using the above-described process, such conduct constitutes direct infringement of Plaintiffs' public performance right. Plaintiffs' theory of liability is based on dicta from *Cartoon Network, LP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (hereinafter "*Cablevision*").   However, this case is inapposite because the DMCA safe harbor protection was not available in *Cablevision* because the defendant was not an Internet service provider.   *See id.   See also* S. Rep. No. 105-190, at 54-55 (1998)  ("No DMCA safe harbor protection because cable television provider did not qualify as an internet service provider.") Furthermore, Courts have routinely held that an on-line service provider does not forfeit the safe harbor protection merely because of the manner in which content is stored and retrieved.   *See, e.g., Viacom Int'l v. YouTube*, 2010 U.S. Dist. Lexis 62829, at *39 (S.D.N.Y. June 23, 2010) (storage methods "facilitating user access to material on its website do not cost the service provider its safe harbor.") (internal quotations omitted); see also *UMG Recordings*, 620 F. Supp. 2d 1081 (C.D. Cal. 2008) (defendant entitled to DMCA safe harbor protection despite the fact that defendant's automated software created flash files of content to facilitate storage and access to materials.)  *Id.* at

1088.  Here, MP3tunes' reproduction, distribution, and playback of the content at issue occurs *via* software functions that are passive and automatically triggered by users to store or retrieve content on the Internet and thus are entitled to safe harbor protection.

### B.      There Is No Infringement of Plaintiffs' Public Performance Right

Plaintiffs claim that MP3tunes violates their public performance right because MP3tunes allows users to playback and listen to songs that they have stored at MP3tunes.com.  To demonstrate a claim for direct infringement of the public performance right, a defendant must have engaged in conduct that is volitional or causally related to that purported infringement."  *United States v. Am. Soc'y of Composers (In re Cellco P'ship)*, 663 F. Supp. 2d 363, 370 (S.D.N.Y. 2009) (*citing Cablevision*).

Plaintiffs' claim is both legally and factually deficient.  First, MP3tunes does not engage in the volitional conduct required for direct infringement.  MP3tunes' users, not MP3tunes, perform or play the works at issue.  Second, the "performances" at issue are not public performances.  Third, Plaintiffs have not established the elements of ownership and copying necessary for a finding of direct copyright infringement as discussed above.

### 1.      There Is No Volitional Conduct

A person has to engage in volitional conduct to be a direct infringer. *See ALS Scan, Inc. v. RemarQ Cmtys., Inc.*, 239 F.3d 619, 622 (4th Cir. Md. 2001) ("As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another."); *accord Netcom,* 907 F. Supp. at 1373 (requiring volitional conduct for direct infringement); *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1115 (D. Nev. 2006) (same); *Newborn v. Yahoo!, Inc.*, 391 F. Supp. 2d 181, 186 (D.D.C. 2005) (same).  "[W]hen an Internet provider serves, without human intervention, as a passive conduit for copyrighted material, it is not liable as a direct infringer." *CoStar Group*, 164 F. Supp. 2d at 695.  Indeed, the law in the Second Circuit comports with the requirement of volitional and not passive holding for a finding of direct

infringement:  "the person who actually presses the button to make the recording supplies the necessary element of volition, not the person who manufactures, maintains, or, if distinct from the operator, owns the machine."  *Cablevision*, 536 F.3d at 131.

As the case law makes clear, merely providing a passive conduit for copyrighted material does not render MP3tunes liable for infringement.  The songs at issue in this litigation were stored by or searched for by the users of MP3tunes' search engine.  MP3tunes merely searches for and locates available third-party links through the automated process of its search engine.  Furthermore, the storage, transmission and playback of the music files are entirely user-directed and fully automated and thus operate without the intervention of MP3tunes or any of its personnel. Accordingly, Plaintiffs have once again failed to demonstrate the requisite volitional conduct necessary for a finding of direct infringement.

### 2.      There Are No Public Transmissions to MP3tunes' Users

Moreover, Plaintiffs have failed to demonstrate that when a user listens to a song that he or she has stored at MP3tunes.com, such playback constitutes a public performance of the song.  The Copyright Act defines public performance as:

> To  perform or display a work "publicly" means (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Cablevision*, 536 F.3d at 134.

Playback of songs on MP3tunes does not constitute a public performance because the audience of the "performance" is limited to a sole user.  In *Cablevision*, the plaintiffs argued, *inter alia*, and the district court agreed, that a Remote Storage DVR playback to a particular customer was a "public" performance.  *See Cablevision*, 536 F.3d at 135.  However, the Second Circuit,

rejected this theory because "[it] obviates any possibility of a purely private transmission" and that such a theory would render the "public" element of a public performance meaningless.  *Id.* at 136.

Plaintiffs cite to various outdated cases for their argument that MP3tunes is infringing their public performance right, but these cases all involved public performances to an audience.  *See National Football League v. PrimeTime 24 Joint Venture*, 211 F. 3d 10, 13 (2d Cir. 2000) ("public performance" constituted a satellite broadcast of a game to cable subscribers); *Columbia Pictures Indus., Inc. v. Redd Horne, Inc.*, 749 F.2d 154, 158-59 (3d Cir. 1984) ("public performance" constituted a transmission in a public mini theater).

Plaintiffs attempt to argue that *Cablevision* "avoid[ed] violating the public performance right" because "*Cablevision* did not use a 'single master' storage system."  Pl. Br. 25.  However, this interpretation of *Cablevision* is erroneous.  Tellingly, Plaintiffs offer no citation for this proposition.  A full reading of *Cablevision* demonstrates that Cablevision was not liable for various reasons, most significantly that the private playback of the recording did not constitute a "public performance."  Indeed, the most salient point of *Cablevision* was that to permit private performance to constitute public performance would obviate the "public" requirement of this claim.  Furthermore, Plaintiffs offer no explanation as to why the manner of storage would be at all relevant to the issue of whether a performance is a "public performance."  As in *Cablevision*, when an MP3tunes user listens to a song that he or she has stored at MP3tunes.com, the system transmits that song to that individual user, not to the public.

### 3.   MP3tunes' Use Of Deduplication Is Protected by Fair Use

The fair use defense permits the use of copyrighted works without the copyright owner's consent under certain situations.  *See Campbell v. Acuff-Rose Music*, 510 U.S. 569, 577 (1994) ("The fair use doctrine thus permits and requires courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.").  One such situation is when a online service provider copies a work in order to better facilitate a user

access to the Internet. *See Perfect 10, Inc. v. Amazon.com, Inc.,* 487 F.3d 701, 726 (9th Cir. 2007) ("The copying function performed automatically by a user's computer to assist in accessing the Internet is a transformative use.")  MP3tunes' deduplication facilitates users' access to information stored in the cloud.  As in *Perfect 10*, this use is noncommercial, transformative, and no more than necessary to achieve the objectives of minimizing unnecessary bandwidth usage, which is essential to the Internet use.  The impact on the potential market for the original work is in no way affected by this use.

**V.      MP3tunes Is Not Liable for Infringement of Plaintiffs' Copyrighted Cover Art**

      **A.      Plaintiffs' Use of the Cover Art Images Does Not Constitute Infringement**

Plaintiffs spill a good bit of ink describing how MP3tunes, through its Lockersync function, obtains cover art images from Amazon.com to display at MP3tunes.com in an attempt to mischaracterize MP3tunes' use as infringement.  But, at the end of the day, nothing in that description amounts to copyright infringement.  As Plaintiffs readily concede, Amazon.com licenses to MP3tunes through its "Associates Program" the use of content, which includes the artwork purportedly at issue in this litigation.  Pl. SUF ¶ 33.  This license is intended to facilitate the sale of music, as well as other products, at Amazon.com.  Robertson Decl. ¶ 4.  Specifically, Amazon.com permits MP3tunes "to copy and display" artwork so that when users at MP3tunes.com listen to a song, the artwork associated with that song and a link to Amazon.com are displayed with a suggestion to purchase the album or related tracks at Amazon.com.  This function has generated considerable traffic to Amazon.com.  Robertson Decl. ¶ 4, Exh. A.  Thus, Plaintiffs' claim that MP3tunes' use of the cover art contravenes its agreement with Amazon is not correct.  Nor has Amazon.com expressed any concern that such activities are outside the scope of MP3tunes' license. In light of the existence of a valid license governing such cover art, there can be no claim for copyright infringement of Plaintiffs' cover art.

**B.      Plaintiffs Lack Standing to Assert Claims of Infringement for Cover Art**

Plaintiffs cannot demonstrate the requisite elements of registration, ownership and copying

such as to be entitled to object on their copyright infringement claim.  *See* 17 U.S.C. § 411(a).  First,

Plaintiffs have not proven they comply with the Copyright Act's requirement that they register or

preregister the cover art images at issue.  *See Whimsicality, Inc. v. Rubie's Costume Co., Inc.*, 891

F.2d 452, 453 (2d Cir. 1989) ("Registration is a prerequisite to an action for infringement.").

Nowhere do Plaintiffs present before the Court certificates, or even copies of certificates, of

registration with the Copyright Office for these works of visual art.  Indeed, Plaintiffs' failure to

attach actual copies of the alleged certificates of copyright registration for the cover art images is no

accident as a review of the certificates produced by Plaintiffs in discovery demonstrate that the

registrations at issue are for sound recordings and not visual artworks.  *See* Peyronnel Decl. ¶ 7.

Certificates of registration for sound recordings may not be used to confer standing in an

infringement claim regarding works of visual art pursuant to Section 411(a).  Copyright

registrations for sound recordings that list associated cover art are insufficient as evidence that the

cover art has been registered.  *Jefferson Airplane v. Berkeley Sys.*, 886 F. Supp. 713, 714-717 (N.D.

Cal. 1994) ("separate registration was required for the sound recording and the album cover art").

Here, Plaintiffs purport to have produced during discovery copyright registration certificates for the

cover art at issue in this dispute.  However, the produced certificates are all for sound recordings

and do not protect Plaintiffs' visual artworks.  Accordingly, Plaintiffs have not demonstrated that

they possess the requisite standing to bring these claims.

**C.      Plaintiffs Fail to Demonstrate Ownership or Copying of the Copyrights in the
          Allegedly Infringed Cover Art Images**

The plaintiff in a copyright infringement action has the burden of proving that it is the valid

owner of the copyrights in the artwork at issue.  *See Laureyssens v. Idea Group, Inc.*, 964 F.2d 131,

139 (2d Cir. 1992).  Section 201(a) of the Copyright Act provides that ownership "vest initially in

the author or authors of the work." 17 U.S.C. § 201(a). However, where work was prepared as a "work made for hire," the copyright vests in the person for whom the work was prepared in certain limited conditions. *See Caratzas v. Time Life, Inc.*, 1992 U.S. Dist. Lexis 16285 (S.D.N.Y. Oct. 22, 1992). "[A] work is considered a work made for hire where the work was: (1) created by an employee within the scope of his employment; or (2) specially commissioned and the parties expressly agree in writing that the work shall be deemed a work made for hire. See *Id.* (Plaintiffs' infringement claims regarding artwork failed because plaintiffs produced "no evidence that the creators of [artwork] at issue here were employees of plaintiffs or their predecessors in interest" and "failed to provide the Court with express agreements designating [the artwork] as works made for hire"). *Id.*

In the instant action, Plaintiffs have failed to produce: (1) any evidence that the authors of the images at issue were employees of Plaintiffs; or (2) any express agreements designating that [the cover artworks] were created on a work for hire basis and should be deemed works made for hire. Plaintiffs have produced no employment records or agreements, nor provided the names of any employees or any job descriptions. *See* Peyronnel Decl. ¶ 7. Nor have Plaintiffs produced evidence that they obtained the copyrights of these works by transfer or assignment. *Id.* Moreover, Plaintiffs have failed to provide any evidence that MP3tunes copied Plaintiffs cover art. Neither the registered works nor the purported infringements have been provided to determine whether the requisite substantial similarity exists for a finding of copying. Plaintiffs' motion for summary judgment for the infringement of its cover art must be denied.

## CONCLUSION

Accordingly, Plaintiffs' motion for summary judgment should be denied in all respects.


Dated:  New York, NY
          November 24, 2010

DUANE MORRIS LLP

By: /s/ _____
Gregory P. Gulia
John Dellaportas
Vanessa Hew
R. Terry Parker
1540 Broadway
New York, NY 10036
(212) 692-1000

Edward M. Cramp (*pro hac vice*)
Michelle Hon (*pro hac vice*)

*Counsel for Defendants*

DM1\2413372.6

34