UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Capitol Records, LLC, Caroline Records, Inc., EMI Christian Music Group Inc., Priority Records LLC, Beechwood Music Corp., Colgems-EMI Music Inc., EMI April Music Inc., EMI Blackwood Music, EMI Full Keel Music, EMI Golden Torch Music Corp., EMI Longitude Music, EMI Virgin Music, Inc., EMI Virgin Songs, Inc., EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI Feist Catalog, Inc., EMI Gold Horizon Corp., EMI Grove Park Music, Inc., EMI Hastings Catalog, Inc., EMI Mills Music, Inc., EMI Miller Catalog, Inc., EMI Robbins Catalog, Inc., EMI U Catalog, Inc., EMI Unart Catalog, Inc., Jobete Music Co., Inc., Screen Gems-EMI Music, Inc, Stone Agate Music, and Stone Diamond Music,<br><br>    Plaintiffs,<br><br>  v.<br><br>MP3Tunes, LLC, and Michael Robertson,<br><br>    Defendants. | No. 07 Civ. 9931 (WHP) |

**BRIEF OF *AMICUS CURIAE* THE MOTION PICTURE ASSOCIATION OF AMERICA, INC. IN SUPPORT OF PLAINTIFFS**


The author block:

Kelly M. Klaus (*pro hac vice* pending)
Melinda LeMoine
L. Ashley Aull (*pro hac vice* pending)
Munger, Tolles & Olson LLP
355 South Grand Avenue
Los Angeles, CA 90071
(213) 683-9100

Attorneys for *Amicus Curiae*
Motion Picture Association of America, Inc.

## I.     STATEMENT OF INTEREST

*Amicus curiae*, the Motion Picture Association of America, Inc. ("MPAA"), respectfully submits this brief in support of Plaintiffs on these cross-motions for summary judgment.[1]

Founded in 1922, the MPAA is a trade association that advocates for the domestic motion picture, home video and television industries.  The MPAA's members and their affiliates include the largest producers and distributors of motion pictures and television programs in the United States.  The members' businesses depend upon effective copyright protection.  As a result, they have a significant interest in the important questions that these motions present concerning the interpretation of the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, including the Digital Millennium Copyright Act provisions codified at § 512 (the "DMCA"), and issues concerning the interpretation of the Copyright Act's public performance right, §§ 106(4), (6).

In particular, the MPAA seeks to address here the flawed legal arguments on these issues presented by Defendants and their *amici* Public Knowledge, Electronic Frontier Foundation, Consumer Electronics Association, and Home Recording Rights Coalition.  *See* Dkt. No. 203 (hereinafter, "EFF Br.").  The arguments that Defendants and their *amici* raise on these important legal issues are contrary to the text of the statute and the case law interpreting it.  Those arguments, if accepted, would create severe negative consequences for the MPAA's members and for all copyright owners who suffer the devastating harms of mass Internet piracy.

## II.    INTRODUCTION AND SUMMARY OF ARGUMENT

Defendants and their *amici* urge this court to upend the fundamental balance that Congress codified in the DMCA's "safe harbors" and to write out of the Copyright Act an entire subsection defining the public performance right.  In some cases, Defendants and their *amici*

---

[1] MPAA's motion for leave to file this brief is filed separately.

simply ignore, and in others attempt to rewrite, the Copyright Act; they repeatedly disregard and contradict Congress's clearly expressed intent; and their arguments, if accepted, would vindicate and incentivize fundamentally culpable and unscrupulous business practices.

*First*: Advocating a non-literal definition of "actual knowledge" and "awareness" of infringing activity under 17 U.S.C. § 512(c), Defendants and their *amici* urge the Court to reward Internet service providers for turning a blind eye to massive infringing activity occurring on or through their sites.  This result contradicts the DMCA's plain language and Congress's expressed intent to provide "strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment."  S. Rep. No. 105-190, at 20 (1998) ("Senate Report").  Adopting Defendants' and their *amici*'s erroneous interpretation of § 512(c) would create a regime in which service providers that have actual knowledge or awareness of infringement, as a matter of fact, do not have "actual knowledge" or "awareness" as a matter of law.  That result is untenable under the DMCA.  Also wrong is *amici*'s argument that a service provider's awareness of infringing activity on its site may *never* come from information provided by copyright owners.  That proposed rule has no support in precedent, text, or common sense.

*Second*:  Defendants and their *amici* erroneously argue that the performance of a copyrighted work is not made "to the public" if the performance is streamed to different users in different locations and at different times.  That argument is directly contrary to the Copyright Act's plain language and decades of on-point authority.  The Copyright Act makes it clear that a performance is transmitted "to the public" regardless "whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or different times."  17 U.S.C. § 101.  Applying this clear and unambiguous

language, numerous courts have held that separate, on-demand performances to different users at different times and in different places constitute a performance "to the public."  Indeed, the transmission of a performance to numerous discrete users at the time and place of each user's choosing is the essence of video on-demand (or "VOD") services.  The popularity of VOD services continues to grow among consumers, and the legitimate proprietors of VOD services have properly recognized the need to obtain authorization from the copyright owners whose content is at the core of those services' commercial offering.

Defendants and their *amici* argue that the Second Circuit's decision in *Cartoon Network LP, LLLP v. CSC Holdings, Inc.* ("*Cablevision*"), 536 F.3d 121 (2d Cir. 2008), dictates that Defendants' transmissions of performances from a single-source copy of a work to numerous users is not a performance of the work "to the public."  *See* EFF Br. at 17–19.  *Amici's* argument is demonstrably wrong.  *Cablevision* held that a performance of content licensed to the cable company for performance to paying subscribers was not "to the public" where it was transmitted from one discrete copy created pursuant to a user's request and accessible only to that user by means of a closed transmission to the same user's dedicated set-top box.  *See* 536 F.3d at 135. *Amicus* here respectfully disagrees with even that narrow holding, but that disagreement is beside the point concerning Defendants' system, which streams performances from a single copy of a sound recording to mass numbers of users.  Furthermore, the underlying content in this case, unlike in *Cablevision*, has not been licensed to Defendants to stream to anyone, at any time, and in many (if not most) cases is comprised of pirated copies of sound recordings.  The court in *Cablevision* emphasized that its holding was limited to the specific facts of that case, *id.* at 139, and those facts do not fit Defendants' service.

*Amici* claim that Defendants (and others) should not have "to use a deliberately inefficient system," as they assert Cablevision did, in order to sidestep the public performance right, but instead should be permitted to "deduplicate[] . . . redundant data" and still get to the same result. EFF Br. at 12, 25. But that argument ignores that the "inefficien[cy]" of Cablevision system's is what spared Cablevision from liability under the Second Circuit's analysis. Under the court's reasoning in that case, if Cablevision had implemented the "efficient" model that *amici* trumpet—transmitting performances from a single copy to a dispersed audience—Cablevision would have been liable under longstanding case law. Defendants here cannot implement a more technologically "efficient" means of exploiting copyright owners' exclusive rights without violating that same longstanding law.

Contrary to *amici's* rhetoric, the Copyright Act's language cannot be rewritten, and copyright owners' rights cannot be ignored, simply because someone claims to have found a more "efficient" way of delivering content to consumers. The conflict that *amici* hypothesize between technological efficiency and copyright owners' rights under the statute is a false one. Technologists can always build more efficient systems, but where the operation of the system requires the exercise of a copyright owner's rights, then the owner's authorization is simply one of the many requirements for the system to operate lawfully.

## III.   DEFENDANTS' AND *AMICI*'S PROPOSED INTERPRETATION OF THE DMCA WOULD PROVIDE SAFE HARBOR PROTECTION TO CULPABLE SERVICE PROVIDERS

### A.   Congress Enacted The DMCA to Reduce Legal Uncertainty For Innocent Providers—Not To Provide Safe Harbor To Service Providers That Build Their Business On Copyright Infringement

The cornerstone of *amici's* arguments concerning the DMCA is that courts are obligated to construe the statute's "safe harbors" broadly. *Amici* insist that a broad reading in favor of service providers is justified by Congress's stated intent to reduce "uncertainty" for service

providers "concerning their legal exposure for infringements that may occur in the course of their activities." EFF Br. at 8. *Amici* is only telling half the story. Congress's purposes in enacting the DMCA were not one-sided in favor of service providers. The DMCA legislates a careful balance, aimed to reduce legal uncertainty for service providers to the extent that they are *innocent* with respect to infringements occurring on or through their sites while preserving liability for culpable service providers. While Congress recognized that uncertainty about liability could make service providers "hesitate to make . . . necessary investment in the expansion of the speed and capacity of the Internet," Senate Report at 8, Congress was at least as concerned that unscrupulous service providers could "recklessly facilitate infringement." *The Copyright Infringement Liability of Online and Internet Service Providers: Hearing on S. 1146*, 105th Cong. 1–2 (1997) (Sen. Hatch).[2] In enacting the DMCA, Congress sought to strike a balance that would result in "a regime for copyright protection in the digital age." 144 Cong. Rec. 9242 (Sen. Thompson).

The DMCA's safe harbors embody the balance that Congress sought to strike. The DMCA does not give service providers *carte blanche*. Rather, Congress specifically designed the DMCA to "preserve strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements that take place in the digital networked environment." Senate Report at 20. The safe harbors in general, and the § 512(c) safe harbor in particular, draw a line between service providers that are innocent of infringement that occurs as

---

[2] Throughout the debate on the DMCA, members of Congress repeatedly expressed their concerns about the internet's potential to promote copyright infringement. *See, e.g.*, 144 Cong. Rec. 9239 (Sen. Ashcroft) ("Billions of dollars in pirated material is lost every year and [a]n impact is felt directly at our national bottom line."); 144 Cong. Rec. 25808 (Rep. Dreier) ("[A]s we look at the problems that we face as a Nation, and as we move rapidly towards [a] global economy, it is difficult to imagine an issue that is much more important than theft of intellectual property.").

a purely technical matter on or through their sites and service providers that are culpable with

respect to infringing activity.  As the Fourth Circuit explained:

> The DMCA's protection of an innocent service provider disappears at the moment
> the service provider loses its innocence, *i.e.*, at the moment it becomes aware that
> a third party is using its system to infringe.  *At that point, the Act shifts
> responsibility to the service provider to disable the infringing matter, preserving
> the strong incentives for service providers and copyright owners to cooperate to
> detect and deal with copyright infringements that take place in the digital
> networked environment.*

*ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (quotations and

alterations omitted) (emphasis added).

Hence, the DMCA is not simply a statute to limit the liability of service providers

indiscriminately.  The statute only limits the liability of innocent service providers.

**B.**     **Section 512(c) Limits Liability Only for Service Providers That Act
         Expeditiously to Stop Infringement When They Acquire Either "Actual
         Knowledge" or "Awareness" of Infringement**

Section 512(c) embodies Congress's careful balance.  To claim protection under this

"safe harbor," a service provider must satisfy *all* of a number of statutory requirements,

including the requirements that the service provider cannot receive "a financial benefit directly

attributable to the infringing activity" if it has the right and ability to control it, *id*.

§ 512(c)(1)(B); that the service provider must "respond[] expeditiously" to notices of

infringement from copyright holders, *id*. § 512(c)(1)(C); and that the service provider must have

a reasonably implemented policy for termination of repeat infringers, *id*. § 512(i)(1)(A).  The

requirements for safe harbor protection *begin* with the requirement relevant to the issue

discussed in this brief:  The service provider must act expeditiously to stop infringing activity

occurring on its site as soon as the provider has either "actual knowledge" of such activity or

"aware[ness] of facts or circumstances" that make such activity "apparent."  *Id*. § 512(c)(1)(A).

Defendants and their *amici* advocate contradictory but equally erroneous interpretations of what counts as a service provider's "actual knowledge" or "awareness" of infringing activity under § 512(c)(1)(A).  Defendants, relying on *Viacom Int'l, Inc. v. YouTube*, 718 F. Supp. 2d 514 (S.D.N.Y. 2010) (appeal pending), argue that "actual knowledge" or "awareness" may arise only when the service provider knows of "specific" infringing material "identified" by copyright owners, *i.e.*, through "takedown" notices sent by the copyright owners.  *See* Defts' Mot. for Summ. Jmt. 2, 16.  Defendants' *amici*, in contrast, make the inconsistent argument that information from copyright owners does not count for purposes of adjudging "actual knowledge" or "awareness" under the statute.  EFF Br. at 9.  Both arguments are wrong.

As to Defendants' argument that only knowledge of "specific" infringing material set forth in takedown notices counts:  Section 512(c)(1)(A) does not impose such a high standard for knowledge.  Rather, the statute says that the provider must act to stop infringing activity on its site as soon as it has *either* "actual knowledge" of "material or [] activity" that is infringing *or* "aware[ness] of facts or circumstances from which infringing activity is apparent."  17 U.S.C. § 512(c)(1)(A)(i)–(ii).  Both parts of this disjunctive standard are broad:  Subsection (A)(i) specifically refers to knowledge of infringing "*activity*," not just specific infringing material.  *Id.* § 512(c)(1)(A)(i).  Thus, a provider's "actual knowledge" is not limited to knowledge of an identifiable, individual infringement—but, rather, to any knowledge of infringing "activity." Section (A)(ii) on its face is even broader: it requires only "aware[ness] of facts or circumstances from which infringing activity is apparent."  *Id.* § 512(c)(1)(A)(ii).

Even assuming a narrow construction of (A)(i), subsection (A)(ii) is not susceptible to an interpretation requiring item-specific knowledge of infringement.  Because § 512(c)(1)(A) is phrased in the disjunctive, a service provider with knowledge under *either* (A)(i) or (A)(ii) is

-7-

obligated to act.  Furthermore, principles of statutory construction teach that the two subsections cannot mean the same thing: thus, subsection (A)(ii)'s reference to "aware[ness] of facts or circumstances" that make "infringing activity . . . apparent" must mean something different— and even more encompassing—from "actual knowledge" of infringing activity under (A)(i).

Contrary to Defendants' contention, the information that may give rise to "actual knowledge" or "awareness" of infringing activity does *not* necessarily have to come from a copyright owner in a takedown notice.  Service providers of course are obligated to remove infringing material identified in notices that substantially comply with § 512(c)(3)(A); that is one of the independent requirements to obtain safe harbor protection.  *Id.* § 512(c)(1)(C).  But a takedown notice is not required to trigger a service provider's obligation to act.  A service provider must take down or disable infringing material or activity if it has knowledge or awareness of it, "*even if the copyright owner . . . does not notify it of a claimed infringement*." Senate Report at 45 (emphasis added).

C.  **_Amici's_ Argument That Knowledge Based On Information From The Copyright Owner Must Be Disregarded in Analyzing "Actual Knowledge" or "Awareness" Under § 512(c)(1)(A) Is Baseless And Makes For Bad Public Policy**

Defendants' *amici* argue that knowledge under § 512(c)(1)(A) must "*come[] from sources independent of the copyright owner.*"  EFF Br. at 9 (emphasis added).  *Amici* claim that this rule springs from § 512(c)(3)(B), asserting that it creates an "exclusionary rule" whereby any information from a copyright owner other than an item-specific takedown notice is excluded from the § 512(c)(1)(A) standards for "actual knowledge" or "awareness" of infringing activity. EFF Br. at 8–9.

*Amici's* argument is specious.  Section (c)(3)(B)(i) provides:

[A] notification from a copyright owner or from a person authorized to act on behalf of the copyright owner that fails to comply substantially with the

provisions of subparagraph (A) shall not be considered under paragraph (1)(A) in determining whether a service provider is aware of facts or circumstances from which infringing activity is apparent.

17 U.S.C. § 512(c)(3)(B)(i). Thus, under this section, if a service provider maintains a notice-and-takedown policy (as it must, if it wants to be eligible for the § 512(c) safe harbor), and if a copyright owner utilizes that procedure to send a notice, the notice will not count for knowledge or awareness under subsections (A)(i) or (A)(ii) if it does not substantially comply with the statutory requirements. *Id.* § 512(c)(1)(A) (emphasis added). The negative implication of this statutory command is clear: notifications that do substantially comply with statutory requirements *will* and *do* count toward the service provider's knowledge or awareness of infringing activity. *See id.* §§ 512(c)(1)(A)(i)–(ii), (c)(3)(B)(i).

*Amici*, however, assert that Congress intended compliant notifications from copyright owners to be relevant only to § 512(c)(1)(C)—the requirement that the service provider respond to such notices to be eligible for the safe harbor—but for no other purpose. That reading simply cannot be squared with § 512(c)(3)(B): if information (including notices) from copyright owners *never* counted for purposes of the service provider's knowledge or awareness, Congress would have said just that. There would have been no reason to address the effect of non-compliant notices specifically. But Congress *did* address the effect of non-compliant notices, *see id.* § 512(c)(3)(B)(i), thus demonstrating the fallacy in *amici's* argument.[3]

---

[3] *Perfect 10, Inc. v. CCBill LLC* ("*CCBill*"), 488 F.3d 1102 (9th Cir. 2007) and *UMG Recordings, Inc. v. Veoh Networks Inc.*, 665 F. Supp. 2d 1099 ("*Veoh*") (C.D. Cal. 2009)—both cited by *amici*—do not remotely support *amici's* erroneous reading of the statute. In *CCBill*, the Ninth Circuit simply held that the *names* of third-party hosting sites did not give rise to "red flag" knowledge of infringing activity; given the nature of the material at issue, such names likely could be used for marketing purposes, to increase the apparently salacious nature of the content. *CCBill*, 488 F.3d at 1114. *Veoh* simply followed *CCBill*. *See Veoh*, 665 F. Supp. 2d at 1108–09. Here, the evidence of "red flag" knowledge is not merely the *names* of the sites where content is "sideloaded" into "lockers" on Defendants' services. Rather, as outlined in Plaintiffs' motion, MP3Tunes *ignored* DMCA-compliant notices of infringement sent by Plaintiffs. This,

*Amici*'s proposed rule also contradicts Congress's explicit objective to "preserve[] strong incentives for service providers and copyright owners *to cooperate* to detect and deal with copyright infringements that take place in the digital networked environment."  Senate Report at 20.  Information that the copyright owner provides may be critical to forcing recalcitrant service providers to live up to their obligations under the Act.  *Id.*  The upshot of *amici's* argument is that service providers may simply turn a blind eye to the prevalence of widespread infringing activity if that information comes from the copyright owner.  Such a rule would have radically negative policy consequences.  Service providers would have no incentive to take responsibility for rampant infringement occurring on or through their sites; in fact, doing anything to take responsibility for such infringing activity would run counter to the service provider's interests, since that might lead to the discovery of information concerning specific infringing material, which (even under Defendants' interpretation of  § 512(c)(1)(A)) would require service-provider action.  At the same time, *amici's* proposed rule would deny the parties most directly harmed by widespread infringing activity—the copyright owners—an avenue for bringing that infringing activity directly and undeniably to the service provider's attention.  Congress could not have intended the anomalous and counterproductive result that the parties directly affected by infringing activity would be the only parties in the world unable to supply information relevant to a service provider's knowledge.

In short, there is nothing to commend and much to condemn in *amici's* proposed rule concerning service provider knowledge.  The Court should reject it.

---

standing alone, should disqualify Defendants from the safe harbor.  *See* 17 U.S.C. §§ 512(c)(1)(A), (c)(3).

IV.    **UNAUTHORIZED PERFORMANCES FROM A SINGLE-SOURCE COPY TO NUMEROUS MEMBERS OF THE PUBLIC INDISPUTABLY VIOLATE THE PUBLIC PERFORMANCE RIGHT, 17 U.S.C. §§ 106(4), (6)**

The core facts of Plaintiffs' claim against Defendants for directly violating the public performance right are not in dispute.  When users of the MP3Tunes service upload or "sideload" copies of sound recordings to Defendants' servers, the servers are programmed to see if Defendants already have a forensically identical file.  If Defendants already have the identical file, then the MP3Tunes' servers are programmed to delete the later-added file, and to stream to those users performances from the single master copy of the recording that Defendants store on their servers.  *See* Pltfs' Mot. at 22–23; Defts' Opp. at 11; EFF Br. at 24–25.  Defendants' *amici* euphemistically call this "dedpulicat[ion] of redundant data."  EFF Br. at 25.  In reality, what is happening is blatant copyright infringement.  The very fact that users are uploading and "sideloading" forensically identical files is but one of many facts indicating that the files being copied to Defendants' servers—including the "master copy"—are pirated copies of copyrighted works.  As discussed below, Defendants' streaming performances from a single-source copy to mass numbers of users is a textbook violation of copyright owners' exclusive right to perform their works publicly, as the Copyright Act, decades of authority, and even the decision in *Cablevision* make clear.

A.    **Performances Are "To The Public" Regardless Whether Those Capable Of Receiving Them Do So "In The Same Place Or In Separate Places And At The Same Time Or At Different Times"**

The Copyright Act secures to the owners of copyrights in "literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures" the exclusive right, *inter alia*, "to perform the[ir] copyrighted work[s] publicly."  17 U.S.C. § 106(4).  In the case of copyrighted sound recordings (owned by some of the Plaintiffs in this case), the copyright owner has the

exclusive right "to perform [them] publicly by means of digital audio transmission." *Id.*

§ 106(6).

Section 101 of the Act defines what it means to perform—or to display, which right is secured for certain works by § 106(5)—a copyrighted work "publicly":

> To perform or display a work "publicly" means—
>
> (1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of family and its social acquaintances is gathered; or
>
> (2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

*Id.* § 101.

Subsection (2) of this definition is referred to as the "transmit" clause. That clause makes it clear that a performance remains public when it is transmitted by "any device or process" "to the public," *regardless* whether the potential audience for the transmission is gathered in one location to receive the transmission or whether the audience is dispersed in numerous, otherwise "private" places. This is why, for example the broadcast of an over-the-air television program or the playing of a song on the radio is a public performance, even though recipients watch shows in their private homes or listen to radio broadcasts in their cars.

It is for these reasons that courts have held for decades that separate, on-demand transmissions of a performance to different users at different times and in different places are public performances. For instance, in *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, 749 F.2d 154 (3d Cir. 1984), the Third Circuit addressed an infringement claim brought against the proprietor of a video-rental store, which permitted customers to view rented videos in on-site private booths. The proprietor would simply place the videocassette into a playback machine at

the front desk and then transmit the performance to the private booth. *Id.* at 157. The proprietor argued that the performances were private because they were transmitted to small viewing booths, rather than being shown in public movie theaters. *Id.* at 159. The court rejected this argument and held that "the transmission of a performance to members of the public, even in private settings . . . constitutes a public performance. . . . [T]he fact that members of the public view the performance at different times does not alter this legal consequence." *Id.* The court in *On Command Video Corp. v. Columbia Pictures Industries*, 777 F. Supp. 787 (N.D. Cal. 1991), reached the identical conclusion regarding on-demand Pay-Per-View movies transmitted to hotel rooms. The court said: "the relationship between the transmitter of the performance, On Command, and the audience, hotel guests, is a commercial, 'public' one regardless of where the viewing takes place." *Id.* at 790. *See also Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.*, 866 F.2d 278, 282 nn.6–7 (9th Cir. 1989) (recognizing that hotel makes public performances when it separately transmits performances to individual hotel rooms on request).

As technology has progressed from transmitting signals within buildings to streaming them across the Internet, the courts have continued to hold that separate, on-demand transmissions to multiple users are "to the public," even though Internet users receive those streams at different times and in different places. For example, the federal court in New Jersey held that streaming video clips to users' personal computers on demand constituted a public performance: "Because transmission of the clip previews to individual computers occurs when any member of the public selects an icon that redirects him or her to Video Pipeline's website, from which the video clips are then shown, such actions by Video Pipeline constitute a 'public performance.'" *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 192 F. Supp. 2d 321, 332

(D. N.J. 2002), *aff'd*, 342 F.3d 191 (3d Cir. 2003).  *Accord Twentieth Century Fox Film Corp. v. iCraveTV*, Nos. 00-121, 120, 2000 WL 255989 at *7 (W.D. Pa. Feb, 8, 2000) (transmissions of television programs over the Internet violated the plaintiffs' public performance rights "by transmitting (through use of 'streaming' technology) performances of the works to the public by means of the telephone lines and computers that make up the Internet.").

Against the background of this clearly established legal authority, interactive "on-demand" services, including VOD, have experienced rapid growth over the last decade.  As early as 2005, the number of "intensive on-demand media consumers" (those who use networked on-demand services in multiple ways) doubled from 11% to 21% of the public.  Joel Russell, *The Age of Media On-Demand Looks Like It's Close at Hand*, L.A. Bus. J., May 29, 2006, at 16. That same year, 23% of the U.S. audience used VOD, and 10% watched television programming via streaming video on the Internet.  *Id.*  This market sector has experienced exponential growth since then.  *See* Brooks Barnes, ABC, Cox Bar Ad Skipping in Video on Demand, Wall St. J., May 8, 2007, at B1.  Current research indicates that over *half* of all households regularly use VOD.  *See* Gale Group, *American Attitudes Towards Gadgets: Smartphones, 3-D TV, VOD & DVR*, Oct. 15, 2010, at 2.  Providers of lawful VOD and similar interactive on-demand services such as iTunes, Amazon, and Netflix have recognized that authorization from content owners is a necessary input to their commercial offering, and such providers have obtained the necessary rights to proceed with their services.

### B.     Defendants' And Their *Amici*'s Arguments Based On *Cablevision* Are Demonstrably Wrong

Defendants and their *amici* insist that the Second Circuit's decision in *Cablevision* rewrote the rules governing the interpretation of the public performance right, and did so in ways that render Defendants' admitted on-demand transmission streams private rather than public

performances.  *Amicus* believes that in *Cablevision*, the Second Circuit improperly departed from precedent and thus upended well-established rules regarding the public performance right.  In any case, however, the Second Circuit made it clear that its decision did *not* go so far as to shelter Defendants' indisputably public performances.

As analyzed in that case, Cablevision created a "Remote Storage Digital Video Recorder" system ("RS-DVR"), pursuant to which its cable customers could select programs to record.  Unlike a set-top DVR system (such as TiVo), the actual copying of the programs was effected by Cablevision's computers and stored on Cablevision's servers.  *Cablevision*, 536 F.3d at 124.  Cablevision had a license to transmit the programs in question to its end-users; in other words, the underlying copyrighted content that Cablevision was copying and thereafter transmitting from its servers was authorized content.  What Cablevision did not have authority to do was to copy the programs and later transmit them to users.  Plaintiffs (including some of *amicus*'s members) sued to enjoin Cablevision from deploying the system.  The district court granted Plaintiffs' summary judgment; the Second Circuit reversed.  As to the reproduction right, the court held that the individual RS-DVR user, and not Cablevision, engaged in "volitional" copying of the programs that Cablevision recorded on its servers.  *Cablevision*, 536 F.3d at 130–33.[4]  The court expressly declined, however, to hold that Cablevision customers (but not Cablevision itself) performed the copyrighted works, and instead held that the performances were not infringing because they were not made "to the public."  In particular, the court held that

---

[4] The district court had found a second, independent violation of the reproduction right in the RS-DVR's automatic copying of every program transmitted across the cable system to a "buffer."  The Second Circuit held that, in the circumstances of the case, Cablevision did not retain these copies for a sufficiently long period of time to satisfy what the court said was a duration requirement to make a reproduction actionable.  *Id.* at 129–30.  Contrary to *amici's* suggestion, EFF Br. at 12, the Second Circuit's holding regarding the RS-DVR service's "buffer" copying has no relevance to Defendants' violation of the public performance right.

each transmission from Cablevision to a subscriber was not "to the public" because each such "transmission is made using a single unique copy of a work, made by an individual subscriber, one that can be decoded exclusively by that subscriber's cable box[.]" *Id*. at 135.

*Amicus* believed then, and believe now, that *Cablevision*'s interpretation of both the reproduction and public performance rights was deeply flawed.[5]  That disagreement notwithstanding, however, it is clear that *Cablevision* provides no sanction for Defendants' service in this case.  Defendants' service is fundamentally distinct from the service in *Cablevision* in ways that make Defendants' liability clear, even with *Cablevision* constituting Second Circuit law with respect to its unique facts.  Defendants and their *amici* rely on *Cablevision* for three distinct arguments, none of which withstands scrutiny.

### 1.    Defendants' *Amici* Manufacture Support For their "Volition" Argument

Defendants and *amici* first argue that *Cablevision's* holding that the defendants there did not engage in volitional copying (violating the reproduction  right) necessarily means that Defendants here could not volitionally violate the public performance right.  Defts' Opp. at 28–29; EFF Br. at 13–17.  Both Defendants and *amici* argue that, because the users of MP3Tunes are the ones that actually hit the "play" button, only those users engage in the volitional act of performing the copyrighted works.

*Cablevision* provides no support for this argument.  In fact, the defendants in *Cablevision* made this same argument, but the Second Circuit explicitly declined to address it.

---

[5] As to the public performance right, the court's analysis conflicts with the language of 17 U.S.C. § 101, which makes clear that multiple transmissions of the same performance of a work are "to the public," even if the "members of the public capable of receiving the performance . . . receive it . . . at the same time or at different times."  The decision further conflicts with the longstanding authority, discussed above, which holds that public performances may occur through separate on-demand transmissions, regardless whether each transmission is closed point-to-point.  *See Redd Horne*, 749 F.2d at 154; *On Command*, 777 F. Supp. at 790; *Video Pipeline*, 192 F. Supp. 2d at 332; *iCraveTV*, 2000 WL 255989, at *7.

536 F.3d at 134.  The Second Circuit expressed skepticism that a requirement of "volitional" conduct with respect to the *reproduction* right automatically would apply to the *public performance* right.  In particular, referring to the language of 17 U.S.C. § 101, the court stated that "[t]he definitions that delineate the contours of the reproduction and public performance rights vary in significant ways."  *Id*.  Among other things, the court noted, § 101 defines "perform," but does not provide definitions for "reproduce" or "copy."  *Id.* at 134.  That definition of "perform" requires that the person performing the work, *inter alia*, "render" it, or in the case of motion pictures "show" it.  17 U.S.C. § 101.  Furthermore, to "publicly" perform the work, under the statute, the person need only, *inter alia*, "transmit" the performance.  *Id*.  Neither of these statutory definitions requires the party performing the work to hit the "play" button, which is what Defendants and their *amici* claim constitutes the necessary "volitional" act.  *See* Defts' Opp. at 29; EFF Br. at 16.  What is more, the definition of public performance does not actually require the members of the audience to "do" anything for a public performance to occur; rather, those audience members need only be "capable of receiving the performance."  *Id*.

In short, nothing in *Cablevision* or the statutory language supports Defendants' and *amici's* volitional argument.

>     **2.      The Fact That Potential Recipients Of Defendants' Transmission Streams May Receive Them At Different Times And In Different Places "Is Of No Moment," As *Cablevision* Makes Clear**

Defendants and *amici* next argue that their performances of transmissions are not "to the public" because each transmission stream reaches only a single device of an MP3Tunes user.  *See* Defts' Opp. at 29; EFF Br. at 17–18 ("The nature of the storage mechanism, though different from Cablevision's, does not change the fact that each transmission has an extraordinarily limited potential audience.").

In the first place, this argument is just contrary to the facts:  MP3Tunes enables a potentially unlimited audience to access a performance from the same copy of a work on demand at the time and place of each audience member's choosing.  Moreover, the argument has no support in any case—not even *Cablevision*, which expressly said that "it is of no moment that the potential recipients of the transmission are in different places or that they may receive the transmission at different times."  *Cablevision*, 536 F.3d at 134.  If accepted, the argument would write the "transmit" clause out of existence, since, as discussed above, that clause makes it clear that to perform a work "publicly" means, *inter alia*, "to transmit or otherwise communicate a performance . . . of the work . . . to the public . . . by means of any device or process, *whether the members of the public capable of receiving the performance . . . receive it . . . at the same time or at different times.*"  17 U.S.C. § 101 (emphasis added).  This definition plainly encompasses performances of a single copy of the work via separate, non-simultaneous transmissions to individual customers on demand.  *See, e.g.*, *Redd Horne*, 749 F.2d at 159 (discussed *supra*); *Prof. Real Estate Investors*, 866 F.2d at 282 nn.6–7 (discussed *supra*).

### 3. The Statute And The Case Law (Including *Cablevision* Itself) Make It Clear That Separate On-Demand Transmissions From A Single Source To Multiple Users Unequivocally Violate The Public Performance Right

Finally, Defendants and their *amici* argue that it would be improper to read *Cablevision* as limited to closed transmissions from one unique copy to one dedicated end-point.  Defs' Opp. at 29-30; EFF Br. at 12, 17-25.  As *amici* frame the argument: "Cablevision's decision to use a deliberately inefficient system"—*i.e.*, a closed transmission from a unique copy to the set-top box of the user who directed the making of that copy—"to reduce [Cablevision's] potential

-18-

liability does not mean that others must do the same or risk copyright liability, and nothing in the Second Circuit's holding suggests otherwise."  EFF Br. at 12.[6]

Contrary to Defendants' and *amici's* argument, dispensing with *Cablevision*'s limitation of its holding to a closed transmission from a unique copy would eviscerate the transmit clause and create a manifest conflict with decades of precedent.  The Second Circuit's decision is replete with language emphasizing how closely the court tethered its decision to the existence of a closed transmission from a single, unique copy accessible only to the user that requested the copy be made.  In particular, the court held that this distinguishing fact was critical to avoiding a conflict with the Third Circuit's decision in *Redd Horne*, the case that held that transmissions of performances from videocassettes to private viewing booths were performances "to the public." The Second Circuit expressly said that *Redd Horne* "supports *our decision to accord significance to the existence and use of distinct copies* in our transmit clause analysis."  *Cablevision*, 536 F.3d at 138 (emphasis added).  The court stressed that "the use *of a unique copy* may limit the potential audience of a transmission and is therefore relevant to whether that transmission is made 'to the public.'"  *Id.* (emphasis added).  The court repeated that its holding was tied to the existence of a single copy in a closed transmission no less than three additional times throughout its discussion.  *See id.* at 137, 138, 139.  Indeed, it is clear that Cablevision designed its system in

---

[6] Defendants additionally argue that even if their service violates the copyright owners' public performance right, the affirmative defense of fair use excuses their violation.  *See* Defts' Opp. at 30–31 (Defendants' service "is noncommercial, transformative, and no more than necessary to achieve the objectives of minimizing unnecessary bandwidth usage, which is essential to the Internet use [sic].").  Contrary to Defendants' *ipse dixit*, their service is self-evidently commercial; and there is nothing transformative about Defendants' service, which simply transmits full-length recorded music over Defendants' website.  Indeed, the *non*-transformative nature of MP3Tunes is made clear by the court's rejection of a directly analogous claim to fair use by MP3.com, which also was owned by defendant Robertson.  *See UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349, 351 (S.D.N.Y. 2000).

such a way *specifically* to attempt to avoid precedents indicating that their service would violate the public performance right. *See id.*

The Copyright Act is clear that a performance is transmitted "to the public" "whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times." 17 U.S.C. § 101. If an Internet service provider can stream the performance from a single copy to limitless numbers of users, then the statutory language has no meaning; decades of cases properly interpreting that language are a dead letter; and the developing and growing market for new and authorized ways to bring on-demand performances to consumers will be imperiled by businesses that simply misappropriate the intellectual property of others as the core of their offering.

*Amici*'s argument ultimately boils down to a polemic on letting purported technological efficiency drive the job of statutory construction. *See* EFF Br. at 23–25. *Amici* argue that because the user does not notice or care whether a transmission is coming from a master copy, or a separate, unique copy of the work, the court likewise should be indifferent to the design of Defendants' system in analyzing the public performance right. *See id.* at 23 ("courts should not have to delve into the workings of hard disks and the design of file systems to decide a case."). If *amici* are right that courts should defer to whatever is said to be the most technologically efficient means of doing something, then the courts' role in construing statutes is at an end. The short answer to *amici*'s argument is that the specific idiosyncratic design of Cablevision's system made all the difference to the Second Circuit's resolution of the public performance issue in that case. It is disingenuous, to say the least, for *amici* to argue that a similar analysis of how the legal definition applies to the technological facts in this case is unwarranted and inappropriate.

In all events, *amici* are wrong to frame the issue as a choice between following the law as written and construed, on the one hand, and promoting efficient technologies, on the other. *See* EFF Br. at 24–25. That is a false dichotomy. The rapid growth of legitimate, authorized VOD services demonstrates that technological advancement and respect for copyright can and do complement and sustain each other. Nothing in the Copyright Act says that a technologist cannot build an efficient system. If, however, achieving efficiency requires an exercise of one of the copyright owner's exclusive rights, then the technologist must do what anyone else must do when faced with another's exclusive right: obtain authorization for the exercise of that right.

## V.   CONCLUSION

For the foregoing reasons, *amicus* respectfully submits that the arguments of Defendants and their *amici* discussed herein must be rejected. *Amicus* appreciates the opportunity to share its arguments with the Court.


Dated: December 17, 2010                    Respectfully submitted,

                                            MUNGER, TOLLES & OLSON LLP
                                            355 South Grand Avenue
                                            Thirty-Fifth Floor
                                            Los Angeles, CA  90071-1560
                                            (213) 683-9100


                                            By:  */s/ Melinda E. LeMoine*
                                            Melinda E. LeMoine
                                            Attorneys for *Amicus Curiae*
                                            Motion Picture Association of America,
                                            Inc.

12552609.1