Barry I. Slotnick (BS-9796)
Christian D. Carbone (CC-6502)
Thomas D. Nolan, III (TN-4363)
LOEB & LOEB LLP
345 Park Avenue
New York, New York 10154-1895
(212) 407-4000
(212) 407-4990
Attorneys for *Amici Curiae*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CAPITOL RECORDS, INC., CAROLINE RECORDS, :
INC., EMI CHRISTIAN MUSIC GROUP INC.,
PRIORITY RECORDS LLC, VIRGIN RECORDS      :
AMERICA, INC., BEECHWOOD MUSIC CORP.,
COLGEMS-EMI MUSIC INC., EMI APRIL MUSIC   :
INC., EMI BLACKWOOD MUSIC, EMI FULL KEEL
MUSIC, EMI GOLDEN TORCH MUSIC CORP., EMI  :
LONGITUDE MUSIC, EMI VIRGIN MUSIC, INC.,
EMI VIRGIN SONGS, INC., EMI AL GALLICO     :
MUSIC CORP., EMI ALGEE MUSIC CORP., EMI
FEIST CATALOG, INC., EMI GOLD HORIZON      :    07 Civ. 9931 (WHP)
CORP., EMI GROVE PARK MUSIC, INC., EMI          ECF Case
HASTINGS CATALOG, INC., EMI MILLS MUSIC,   :
INC., EMI MILLER CATALOG, INC., EMI
ROBBINS CATALOG, INC., EMI U CATALOG,      :
INC., EMI UNART CATALOG, INC., JOBETE
MUSIC CO., INC., SCREEN GREMS-EMI MUSIC,   :
INC., STONE AGATE MUSIC, and STONE
DIAMOND MUSIC,                             :

                    Plaintiffs,           :

              v.                          :

MP3TUNES, LLC, and MICHAEL ROBERTSON,      :

                    Defendants.           :

------------------------------------------------------------------X

## BRIEF OF AMICI CURIAE SOUNDEXCHANGE, ASCAP, BMI, SESAC, AND NMPA
## IN SUPPORT OF PLAINTIFFS

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES .................................................................................................... ii

STATEMENT OF INTEREST ............................................................................................... 1

INTRODUCTION ................................................................................................................... 7

ARGUMENT ......................................................................................................................... 10

I.     MP3tunes Engages in Public Performances of Copyrighted Works ............................. 10

     A.     MP3tunes' Transmissions are Public Performances ........................................... 10

     B.     MP3tunes' Conduct Easily Satisfies Any Required Showing of Volition ......... 15

CONCLUSION ...................................................................................................................... 20

**TABLE OF AUTHORITIES**

**PAGE(S)**

CASES

*A&M Records, Inc. v. Napster, Inc.*,
  114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part and rev'd in part*, 239 F.3d 1004
  (9th Cir.), *remanded*, 2001 WL 227083 (N.D. Cal. Mar. 5, 2001), *aff'd*, 284 F.3d
  1091 (9th Cir. 2002)..................................................................................................................9

*Arista Records LLC v. Usenet.com, Inc.*,
  633 F. Supp. 2d 124 (S.D.N.Y. 2009)....................................................................................18

*Bonneville Int'l Corp. v. Peters*,
  347 F.3d 485 (3d Cir. 2003)............................................................................................. 19-20

*Broadcast Music, Inc. v. Columbia Broadcast Sys., Inc.*,
  441 U.S. 1 (1979)......................................................................................................................2

*Cartoon Network LP, LLLP v. CSC Holdings, Inc.*,
  536 F.3d 121 (2d Cir. 2008)..............................................................................................*Passim*

*Columbia Pictures Indus., Inc. v. Aveco, Inc.*,
  612 F.Supp. 315 (M.D. Pa. 1985), *aff'd*, 800 F.2d 59 (3d Cir. 1986) ............................. 12-13

*Columbia Pictures Indus. v. Redd Horne Inc.*,
  749 F.2d 154 (3d Cir. 1984)..................................................................................................12, 15

*Costar Group, Inc. v. Loopnet, Inc.*,
  164 F. Supp. 2d 688 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004) ..........................16. 18

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*,
  574 F.3d 748 (D.C. Cir. 2009) ................................................................................................1

*Nat'l Football League v. Primetime 24 Joint Venture*,
  211 F.3d 10 (2d 2001).............................................................................................................17

*On Command Video Corp. v. Columbia Pictures Indus.*,
  777 F. Supp. 787 (N.D. Cal. 1991) ....................................................................................12, 15

*Religious Tech. Ctr. v. Netcom Online Commc'ns Servs.*
  907 F. Supp. 1361, 1373 (N.D. Cal. 1995) ...........................................................................16

*Sony Corp. of America v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)................................................................................................................14

**PAGE(S)**

*Twentieth Century Fox Film Corp. v. Cablevision,*
    478 F.Supp.2d 607 (S.D.N.Y. 2007), *rev'd in part, vacated in part by, Cartoon Network LP, LLLP v. CSC Holdings, Inc.,* 536 F.3d 121 (2d Cir. 2008) ...............................18

*Video Views, Inc. v. Studio 21, Ltd.,*
    925 F.2d 1010 (7th Cir.), *cert. denied,* 502 U.S. 861 (1991)......................................................12

**STATUTES**

17 U.S.C. § 101.......................................................................................... 2, 10-11, 16

17 U.S.C. § 106(4) .............................................................................................10

17 U.S.C. § 106(6) .............................................................................................10

17 U.S.C. § 114(d) .............................................................................................19

17 U.S.C. § 114(g) ...............................................................................................1

17 U.S.C. § 114(j)(7) ..........................................................................................19

17 U.S.C. § 116..................................................................................................19

**OTHER AUTHORITIES**

H.R.Rep. No. 94-1476 (1976), reprinted in 1976 U.S.C.C.A.N. 5659 .............................. 11-12, 17

H.R.Rep. No. 90-83 (1967)...............................................................................12, 17

S.Rep. No. 104-128 (1995) .....................................................................................20

2 Nimmer § 8.14[C][3] ........................................................................................12

David Goldman, *Music's lost decade: Sales cut in half,* CNNMoney.com (February 3, 2010), *available at*
    http://money.cnn.com/2010/02/02/news/companies/napster_music_industry/ ........................5

Stephen E. Siwek, *The True Cost of Sound Recording Piracy to the U.S. Economy,* Institute For Policy Innovation (August 21, 2007), *available at* www.ipi.org..........................5

## STATEMENT OF INTEREST

SoundExchange, Inc. ("SoundExchange"), the American Society of Composers, Authors and Publishers ("ASCAP), Broadcast Music, Inc. ("BMI"), SESAC, Inc. ("SESAC"), and the National Music Publishers Association ("NMPA") (collectively, "Amici") respectfully submit this brief pursuant to the accompanying motion seeking leave to file as *amicus curiae.*

**SoundExchange.** *Amicus curiae* is a non-profit performing rights organization representing tens of thousands of recording artists and record labels.  SoundExchange was designated by the Copyright Royalty Board to collect and distribute statutory royalties owed by service providers for the public performance of sound recordings made via satellite radio, Internet radio, cable television's music channels and similar platforms.  Pursuant to the Copyright Act, SoundExchange collects royalties, not just for the owners of copyrights in sound recordings, but also for both featured and non-featured recording instrumentalists and vocalists in those sound recordings.  17 U.S.C. § 114(g).  SoundExchange also works with many foreign performance rights organizations to collect and distribute sound recording performance royalties throughout the world on its members' behalf.  Digital music services such as those offered by Sirius XM, Pandora, Clear Channel, and the hundreds of other services that use the statutory license to make digital audio transmissions via the Internet or otherwise are a major source of revenue for the music industry as a whole and a crucial source of income for artists and rights owners.[1]  The statutory royalties for streaming radio on the Internet—also known as webcasting—are substantial and have been growing by leaps and bounds.  Whereas webcasting

---

[1] The statutory licensing and royalty system is described generally in *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 574 F.3d 748, 753-54 (D.C. Cir. 2009).

royalties paid under the statutory license amounted to tens of thousands of dollars in 1998, webcasting royalties now account for tens of *millions* of dollars per year, representing a crucial portion of the revenues earned by recording artists and rights owners.

**ASCAP.** *Amicus curiae*, established in 1914 as a membership organization of America's leading songwriters, composers and music publishers, is the oldest U.S. performing rights society as defined in the Copyright Act.  17 U.S.C. § 101.  On behalf of its nearly 400,000 members, ASCAP licenses the right of non-dramatic public performance in millions of its members' musical works; collects license fees on behalf of those members; and distributes those fees as royalties to members whose works have been performed on media such as cable television, radio, and the Internet.  Through its affiliation with foreign performing rights societies, ASCAP also represents, in the United States, writers and publishers of music throughout the world.  Typical ASCAP licensees include local television and radio stations, broadcast, cable and satellite television networks, cable system operators and direct broadcast satellite services, Internet service providers and websites, restaurants, night clubs, and other businesses that perform music publicly.  Given the vast number and variety of works in the ASCAP repertory, ASCAP's licenses provide music users with efficient access to public performance licenses for the quantity and variety of music the public demands.[2]  Performance rights royalties constitute the largest single source of income for many individual composers, lyricists, and songwriters.  The right of public performance at issue in this matter is of vital interest to the individual music creators whom ASCAP represents.

---

[2] The role of performing rights organizations in giving practical effect to the performing rights granted by Congress to the creators of music is described generally in *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1 (1979).

**BMI.** *Amicus Curiae* is a music performing rights society as defined in the Copyright Act, 17 U.S.C. § 101. BMI issues blanket licenses to music users for the public performing rights of its affiliated songwriters', composers' and music publishers' musical works, collects license fees on behalf of its affiliates, and distributes those fees as royalties to those BMI affiliates whose works have been performed on media such as cable television, radio, and the Internet. BMI licenses the non-dramatic public performing right in approximately 6.5 million musical works on behalf of its affiliates, which comprise over 475,000 American songwriters, composers, lyricists, and music publishers. Through affiliation with foreign performing rights societies, BMI also represents in the United States thousands of works of many of the world's foreign writers and publishers of music. Typical BMI licensees include Internet music services and websites, mobile entertainment services, television and radio broadcasting stations, broadcast and cable/satellite television networks, cable system operators and direct broadcast satellite services, restaurants, night clubs, universities and colleges, hotels, concert promoters, background music services, municipalities, sports arenas, and other businesses that perform music publicly. Given the vast number and variety of musical works in the BMI repertory, BMI's licenses provide music users with legal and efficient access to public performance licenses for the quantity and variety of music the public demands.

BMI also protects its affiliates' works from infringement by ensuring that businesses that perform music publicly are licensed to do so. In part, this entails monitoring the public performance of musical works on the Internet, in bars and restaurants and in other establishments open to the public. The ability of BMI to protect the rights of its affiliates is of critical importance to the economic well-being of the songwriters and composers that BMI represents.

**SESAC.** *Amicus curiae* is a musical performing rights society that services both the creators and the users of non-dramatic musical works through licensing and royalty collection and distribution. SESAC licenses the public performance of more than 250,000 songs on behalf of its many thousands of affiliated songwriters, composers, and music publishers. SESAC is one of three performing rights societies recognized under the Copyright Act. Established in 1930, SESAC is the second oldest and fastest growing organization representing the public performance rights of songwriters and music publishers in the United States.

**NMPA.** *Amicus curiae* is the principal trade association of music publishers in the United States and has over 2,500 members, which own or control the majority of musical compositions available for licensing in the United States. Its mission is to protect, promote, and advance the interests of music's creators. The goal of NMPA is to protect its members' property rights on the legislative, litigation, and regulatory fronts.[3]

Amici seek leave to file the brief below because MP3tunes, and services like it, present a direct and serious threat to the livelihood of the artists, songwriters, composers, music publishers and copyright owners Amici represent. Like the legitimate services from which Amici collect royalties, MP3tunes makes available and digitally transmits to the public at large vast quantities of copyrighted sound recordings and musical works. But unlike these legitimate services, MP3tunes doesn't pay a nickel for any of them. This is copyright infringement, pure and simple.

The public performance right is a major source of revenue for the copyright owners and creators that Amici represent. MP3tunes' reading of the public performance right, and especially that advanced by its supporting amici, could be used to argue that there can be *no* public

---

[3] NMPA is a trade association which, unlike the other Amici, is not responsible for the collection and distribution of royalties attributable to public performances.

performances on the Internet at all—a clearly absurd result. If accepted by this Court, the public performance right could be effectively eviscerated online, to the great detriment of Amici and all those whom they represent. Accordingly, Amici respectfully offer their unique views on the history and operation of the public performance right and the implications and likely consequences to the creators and copyright owners they represent should MP3tunes' position prevail.

As illegal sites such as Napster and Grokster have shown in the past, and as continued illegal file-sharing shows to this day, it is extremely difficult if not impossible for legitimate, royalty-paying services to compete with free. The logical result of MP3tunes' assault on the creative music community will be fewer legitimate avenues for the public to obtain or listen to music, fewer musicians and songwriters able to earn a living, and fewer companies able to supply the American public and the world with a vital piece of American popular culture. This is not idle speculation or hyperbole. In the past decade, record company revenues have declined by an astonishing 43%. According to the Institute for Policy Innovation, global music piracy causes $12.5 billion of economic losses every year, 71,060 U.S. jobs lost, a loss of $2.7 billion in workers' earnings, and a loss of $422 million in tax revenues, $291 million in personal income tax and $131 million in lost corporate income and production taxes.[4] These precipitous declines mean that fewer artists get signed, fewer records get made and the ones that do get made find a less receptive, much smaller commercial market. A lone silver lining in this extraordinarily dark cloud has been the growth of legitimate webcasting and other digital and Internet technologies which signal a growth in online streaming or other public performances on the Internet.

---

[4] David Goldman, *Music's lost decade: Sales cut in half*, CNNMoney.com (February 3, 2010), *available at* http://money.cnn.com/2010/02/02/news/companies/napster_music_industry/; Stephen E. Siwek, *The True Cost of Sound Recording Piracy to the U.S. Economy*, Institute For Policy Innovation (August 21, 2007), *available at* www.ipi.org.

Approximately fifty percent of the royalties collected by Amici are distributed directly to artists, musicians and songwriters. The royalties that they receive have helped offset the devastating loss of income which has afflicted every corner of the music industry. Now, MP3tunes and their ilk seek to find yet another way to steal from the creative community and their families, and ultimately, through the diminution of these creative energies, from the public at large.

## INTRODUCTION

Amici have moved to file this brief because defendant MP3tunes and its supporting amici are advancing a view of the Copyright Act that would essentially ignore the Act's public performance right when musical works and sound recordings are performed (or transmitted) over the Internet.

While MP3tunes attempts to characterize this dispute as pitting the "giants" of the music industry against the developers of innovative technology, nothing could be further from the truth. Countless companies have designed successful and innovative services that offer consumers a wide array of new and exciting choices while staying within the bounds of copyright law— including by seeking licenses and paying royalties when required by law.  Whether it involves downloading a song from iTunes, listening to traditional radio over the web, or creating a uniquely personalized experience on Pandora Internet radio, the creative community and copyright holders of the music industry have embraced and collaborated with the developers of these technologies and services.  In many cases, licensed new media services have expanded the audience for musical works and enabled musicians to earn a living from the exploitation of their work, while unlicensed services like MP3tunes.com steal audiences from legitimate businesses.

MP3tunes, by contrast, has built and is promoting a totally unlicensed commercial service that exploits valuable work without paying anything at all to the owners and creators of these works.  MP3tunes employs and profits from a technology model that purposefully encourages users to scour the Internet for infringing copies of sound recordings and musical works which are then transferred to MP3tunes' servers and made available, via streaming technology, to members of the general public for performances on-demand.  Once these infringing copies have been

obtained, in order to maximize its profit, MP3tunes takes the files its users collected, identifies and discards the duplicates of the most popular works, and then transmits the very same individual "master" copy of musical works to its users.  Under the Copyright Act, exploitation of this type requires the authorization of the copyright owner and the payment of royalties. Countless legitimate services do precisely this, but MP3tunes has never acknowledged the rights of copyright owners or its obligations to compensate the creators of music.  Instead, it offers copyrighted music on a massive scale, pays nothing for it, charges users for the privilege, and pockets the proceeds.

MP3tunes contends it is immune from liability under the cloak of the Second Circuit's decision in *Cablevision*.[5]  However, the *Cablevision* decision turned on the detailed analysis of its unique facts, none of which are present here.  In *Cablevision*, the defendant already had a license to publicly perform copyrighted works and sought to make those works available to its paying customers through a storage device located on Cablevision's premises, rather than in the subscribers' homes.  In each instance, Cablevision retained a separate copy of each work requested by each customer, and transmitted that separate copy to that requesting customer and only that requesting customer.  Here, neither MP3tunes nor its subscribers have obtained a license to publicly perform the works in issue.  On this basis alone, the MP3tunes' scheme should be held to be fatally flawed as it created a means for unauthorized public performance of copyrighted music.  But even if MP3tunes *did* have legitimate licenses for *all* of the files on its system—and it most certainly does not—MP3tunes did not even act within the narrow scope of *Cablevision*; instead of time-shifting the licensed content by making one copy at the request of, and limited to, that specific user, MP3tunes makes a single copy available for streaming by the

---

[5] *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (hereinafter "*Cablevision*").

public at large.  In short, by its own choices, the "non-public" performance defense is not available to MP3tunes.

Online infringement is a now-familiar but constantly evolving threat to copyright holders. Ten years ago music publishers and record companies brought suit contending that Napster was liable for both vicarious and contributory copyright infringement for establishing a vast peer-to-peer file-sharing service that facilitated copyright violations of musical works on a massive scale. Rather than maintaining copies of the infringing works on its own servers, Napster's free MusicShare software "merely" acted as a middle-man and permitted individual users to transfer files among themselves.  Napster's service was shut down on a finding of a likelihood of success on direct, vicarious and contributory copyright infringement.[6]

Instead of offering a site for *exchange* of infringing files like Napster, MP3tunes now offers a site for *public storage and streaming* of infringing files.  But this is no defense—indeed, the circumstances presented by MP3tunes are in many respects significantly more egregious than those posed by Napster.  In *Napster*, the infringing copies were stored on the computers of the individual users, not by Napster itself.  Moreover, with Napster, if a given user decided to stop using the service, the user could prevent further file sharing and his or her music collection would no longer be made available to the public.  While MP3tunes characterizes its service as a personalized "locker" of data, what it actually has done is to (a) provide a ready source of infringing music via its Sideload.com companion website, and (b) enlist its users—many of which pay fees to MP3tunes —to scour the Internet for "free" music, often using the

---

[6] *A&M Records, Inc. v. Napster, Inc.*, 114 F. Supp. 2d 896 (N.D. Cal. 2000), *aff'd in part and rev'd in part*, 239 F.3d 1004 (9th Cir.), *remanded*, 2001 WL 227083 (N.D. Cal. Mar. 5, 2001), *aff'd*, 284 F.3d 1091 (9th Cir. 2002).

Sideload.com site, and transfer those files to MP3tunes servers where copies are maintained. Indeed, rather than a series of private, secure data lockers, MP3tunes is, in reality, a potentially limitless public warehouse of unauthorized copies—infringing music comes in, but apparently does not ever come out—with virtually endless potential for unauthorized public performances. Given its way, there might be no need to purchase a CD, or a file from iTunes, or pay a license for online transmissions, when music is available for free on MP3tunes.com. The result: MP3tunes makes a profit, its users get free music on demand, and the creators of music—the people the Copyright Act is meant to protect—get nothing.

As a matter of statutory language, legal doctrine, and any basic sense of fundamental fairness, the Copyright Act and this Court cannot and should not countenance such a result. MP3tunes' twisted conception of the public performance right must be rejected.

## ARGUMENT

### I.  MP3tunes Engages in Public Performances of Copyrighted Works

#### A.  MP3tunes' Transmissions Are Public Performances

One of the "bundle of rights" protected by the Copyright Act is the exclusive right to publicly perform a copyrighted work. 17 U.S.C. §§ 106(4) and (6). In the digital vernacular, a work "streamed" over the Internet constitutes a performance of that work. MP3tunes and its *amici* misconstrue *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (hereinafter "*Cablevision*") to hold that any point-to-point transmission over the Internet is not a public performance because the transmission is to "an audience of one user." (See Deft. Mem. Opp. Summ. J. at 29). However, the Copyright Act makes clear that to "perform" a work "publicly" includes:

to transmit or otherwise communicate a performance or display of the work ... to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101. As such, under the clear language of the Copyright Act, the performance right is infringed when a work is streamed or transmitted over the Internet to multiple members of the public, without authority, even if the recipients of the performance are dispersed geographically and/or temporally.

In *Cablevision*, the Second Circuit engaged in a thorough analysis of the parameters and meaning of the public performance right. The *Cablevision* court confronted a technology made available by Cablevision, a cable provider, that allowed a subscriber to create a copy of a television program or movie on a Cablevision server and view that particular copy later, at his or her request. Of utmost importance to the issues before this Court, in *Cablevision* the Second Circuit recognized that a performance is "public" even when it is received privately at different times and places and by different people. 536 F.3d at 134 ("[I]t is of no moment that the potential recipients of the transmission are in different places, or that they may receive the transmission at different times.").

The Second Circuit's analysis, as it noted, was consistent with both the plain reading of the Copyright Act and its legislative history:

[A] performance made available by transmission to the public at large is "public" even though the recipients are not gathered in a single place, and even if there is no proof that any of the potential recipients was operating his receiving apparatus at the time of the transmission. The same principles apply whenever the potential recipients of the transmission represent a limited segment of the public, such as the occupants of hotel rooms or the subscribers of a cable television service.

H.R.Rep. No. 94-1476, at 64-65 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5678.[7]

Not only do *Cablevision* and the Copyright Act itself require a finding of infringement here, such a finding is also wholly consistent with the law outside the Second Circuit. For example, in *Columbia Pictures Industries, Inc. v. Redd Horne, Inc.*, the Third Circuit held that the video store operator directly infringed the public performance right by playing the same copy of a video tape to individual customers seriatim, even though each transmission may have been seen by only one person at a time. 749 F.2d 154 (3d Cir. 1984). In *On Command Video Corp. v. Columbia Pictures Indus.*, where a hotel operator provided a similar video rental service to its guests, the potential audience for the transmission included all guests of the hotel, even though a given tape could only be viewed by one guest at a time. 777 F. Supp. 787, 790 (N.D. Cal. 1991). Similarly, in *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010 (7th Cir.), *cert. denied*, 502 U.S. 861 (1991), the Seventh Circuit followed *Redd Horne* and found that performances of videos in viewing booths at an adult book store were "public" performances under the Copyright Act. *See also* 2 Nimmer § 8.14[C][3] ("when the same copy of a given work gives rise to numerous performances by different members of the public [] each such performance (although it is not received by the public generally) will be regarded as public performance because the public at large receives performances 'at different times,' all emanating from the same copy"). And in *Columbia Pictures Indus., Inc. v. Aveco, Inc.*, 612 F. Supp. 315 (M.D. Pa. 1985), *aff'd*, 800 F.2d 59 (3d Cir. 1986), the Third Circuit ruled that store owners violated the public performance right

---

[7]   Additional legislative history further confirms that a transmission is "to the public" even if it is made "automatically" in response to a request from an individual. *See* H.R. Rep. No. 90-83, at 29 (1967) (transmission is "made to the public" if it is "capable of reaching different recipients at different times, as in the case of sounds or images stored in an information system and capable of being performed or displayed at the initiative of individual members of the public").

by renting rooms and equipment for viewing videocassettes, even though the renters could bring videocassettes from outside the store and play the tapes themselves. *Id.* at 62 n.3. These cases are on all-fours with MP3tunes' service and support a finding that MP3tunes infringes the public performance right.

Nevertheless, the Court in *Cablevision* ultimately concluded that the performances at issue were not *public* performances because each transmission corresponded to an individual user's personal, i.e., private, copy of a licensed broadcast that was stored on Cablevision's servers and could be re-transmitted only to that specific user. Thus, *Cablevision* stands for the limited proposition that, in the context of a licensed cable subscription television service, where a subscriber makes a personal recording of a lawfully obtained and licensed program for time-shifted viewing, the subsequent re-transmission of that particular recording to that particular individual (and only that individual) who made it in the first place is not a public performance. The *Cablevision* holding is limited to its unique facts.

MP3tunes presents a starkly different set of facts. MP3tunes provides what it characterizes as an online "locker" into which users may upload music files from their own computer or "sideload" (i.e. copy) music files from other websites, and then listen to music files by streaming them from the "locker" to their computer or other wireless device. *See, e.g.,* MP3tunes MSJ at 5. Crucially, however, MP3tunes does not operate a licensed subscription cable television service with a companion "personal storage service." Instead, MP3tunes provides the Sideload.com website, which not only includes a tool enabling the user to easily collect infringing music, but also automatically collects infringing music by itself. Moreover, as MP3tunes concedes in opposition to Plaintiffs' Motion for Summary Judgment, its so-called "locker" storage system does not simply store and then return whatever files users upload or

"sideload"—rather, the system "disassembles files into lower level data blocks, which are moved within the system and duplicate copies are removed." MP3tunes MSJ Opp. at 10-11. MP3tunes actively identifies and discards duplicate copies of music files, and then transmits the remaining "master" file to multiple users seriatim. As a simple matter of law, this is a public performance.[8]

These facts cannot be more different than the remote digital video recorder system addressed in *Cablevision*. As the Second Circuit recognized, the circumstances presented there could readily be seen as the functional equivalent of a viewer operating a VCR or DVR in his or her own living room; regardless of where the copy was stored, the paying subscriber was merely engaging in time-shifting and, the court presumably reasoned, there was no discernable harm to the copyright owner.[9] Moreover, in *Cablevision* the plaintiffs expressly reserved any claim of contributory infringement and did not contend that the underlying activity of Cablevision's subscribers—recording and replaying lawfully obtained transmissions of television programming—was unlawful. With MP3tunes, however, there is no apt analogy to any purportedly lawful time-shifting performance activity; its service, like Napster, is fundamentally premised on the dissemination of infringed works and no amount of clever technical maneuvers should be permitted to render the fruits of this tree any less poisonous.

Moreover, as Amici understand the factual record here, MP3tunes employs a "de-duplication" system intentionally creating a system where a single copy of a recorded musical

---

[8] To the extent MP3tunes contends that it does not discard <u>all</u> duplicate files, that contention is irrelevant. The mere fact that MP3tunes has created a process where in many instances it discards duplicate files, and in <u>all</u> instances <u>decides</u> if files are to be stored or discarded, makes itself a primary player in its subscribers' unlawful activity, if not its ringleader.

[9] It bears noting that this is the very same "time-shifting" issue addressed by the Supreme Court in *Sony Corp. of America v. Universal City Studios, Inc.*, 464 U.S. 417 (1984) (finding no liability for similar "time-shifting" via videocassette recorders, rather than digital recorders).

work is repeatedly performed to multiple members of the public.  Based on such facts, MP3tunes is publicly performing these works because it transmits a performance of a work to the public "at the same time or at different times," falling within the specific definition of public performance in the Act.  As a simple matter of law, as followed by numerous courts, including *Redd Horne*, *On Command*, and *Cablevision* (*cited supra*), and explained by the leading copyright treatise, this is a public performance of the remaining "master" file.

MP3tunes and its amici would have this Court ignore this well-settled interpretation of the Copyright Act and completely ignore the analysis made by such courts.  They argue that any transmission made to a single user must be private.  *Redd Horne*, *On Command* and *Cablevision* itself refuted that bizarre reading of the Act.  Indeed, were this Court to accept the construction of the public performance right urged by MP3tunes and its supporting amici, the Court would have to find that the public performance right has essentially no application to musical performances over the Internet because virtually all transmissions on the Internet are made to a single user.  Taking MP3tunes and its Amici's position to its extreme, any on-demand transmission to a single user would be considered "private."  Such a reading runs counter to, and would eviscerate, decades of copyright law, conflict with thousands of licenses already entered into by Amici and legal users (many of whom are attempting to compete with MP3tunes) and wipe out millions upon millions of dollars in royalties rightfully belonging to music creators.

## B.    MP3tunes' Conduct Easily Satisfies Any Required Showing of Volition

MP3tunes argues that "volitional conduct" is a necessary pre-requisite to all direct infringement, and that it does not engage in any such "volitional conduct" in the provision of its service.  It is wrong on both counts.  The requirement of volitional conduct that MP3tunes urges

is far from "well-established" and it cannot be disputed that MP3tunes has "volitionally" designed, operated and charged fees for the transmission of infringing public performances.

MP3tunes principally relies upon *Costar Group, Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 695 (D. Md. 2001), *aff'd*, 373 F.3d 544 (4th Cir. 2004), along with a handful of other out-of-circuit lower court decisions, most notably *Religious Tech. Ctr. v. Netcom Online Commc'ns Servs., Inc.*, 907 F. Supp. 1361, 1373 (N.D. Cal. 1995). As an initial matter, none of these cases is binding in the Second Circuit. More importantly, *CoStar* and *Netcom* are completely inapposite to MP3tunes. Both cases involved infringement of the reproduction right, not the public performance right, a crucial difference the *Cablevision* court correctly identified:

> [W]e note that our conclusion in Part II that the customer, not Cablevision, "does" the copying does not dictate a parallel conclusion that the customer, and not Cablevision, "performs" the copyrighted work. The definitions that delineate the contours of the reproduction and public performance rights vary in significant ways.

*Cablevision*, 536 F.3d at 134.

This difference is confirmed by the plain language of the Copyright Act, which shows why MP3tunes, and not its customer, "does" the public performance here. For example, the Copyright Act itself does not specifically define the verbs "reproduce" or "copy," but it *does* specifically define the verb "perform" and provide that transmissions will be deemed "to the public" in a wide variety of circumstances, and it further defines "to transmit" as "to communicate [] by any device or process whereby images or sounds re received beyond the place from which they are sent." 17 U.S.C. § 101. Thus, when an MP3tunes user "plays" a song listed in his or her "locker," the user is *requesting* a transmission or communication from MP3tunes and that transmission or communication comes from MP3tunes' server, using the infrastructure that MP3tuns designed and implemented for that very purpose. The customer is

not *transmitting or communicating* the song. The transmit clause demonstrates the Act's intention to place strict liability on any party transmitting or communicating "by means of any device or process." [10] Unless some specific exemption in the Copyright Act applies, under the transmit clause any streaming transmission, whether "passive" or "active," is a performance. [11]

Legislative history further confirms that the Copyright Act does not define the public performance right in the same way that it defines the reproduction right and that a transmission is "to the public" even if it is made "automatically" in response to a request from an individual. *See* H.R. Rep. No. 90-83, at 29 (1967) (transmission is "made to the public" if it is "capable of reaching different recipients at different times, as in the case of sounds or images stored in an information system and capable of being performed or displayed at the initiative of individual members of the public"). [12] Simply put, MP3tunes is the transmitter and is therefore performing publicly under the Act.

Moreover, MP3tunes is an active performer, and accordingly this case is wholly distinguishable from *Netcom* and *Co-Star* which addressed liability for passively hosting

---

[10] *See National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 12 (2d Cir. 2001), citing legislative history ("[e]ach and every method by which []images or sounds comprising a performance or display are picked up and conveyed is a 'transmission,' and if the transmission reaches the public in [any] form, the case comes within the scope of [§106(4) or 106(5)].").

[11] Similar to the reasoning in *PrimeTime,* if MP3tunes and its amici's argument had any weight, Congress would not have needed to include a specific exemption for passive carriers. 17 U.S.C. §111(a)(3). *PrimeTime*, 211 F.3d at 12.

[12] *See, e.g.*, H.R. Rep. No. 94-1476, at 63 ("Under the definition of 'perform,' 'display,' 'publicly,' and 'transmit' in section 101 ... the concepts of public performance and public display cover . . . any further act by which that rendition or showing is transmitted or communicated to the public.").

electronic "bulletin boards" when some (but hardly all) users posted infringing material.[13]  Both

courts concluded that the hosts were not directly liable for infringement by users because they

lacked the requisite involvement in the infringing activity of the "real" infringers—i.e. the

posters of infringing material.  MP3tunes is not this kind of a service.  It edits and manipulates

the contents of that "locker" service in many ways, including by de-duplicating files (to save on

storage costs) and arranging and displaying various lists of recommended and available songs.  It

created and makes available Sideload.com and the "Sideload Plug-in"—a website, service, and

plug-in program that work hand-in-hand with the "locker" systems, allowing "users to search for

free music downloads that are available on the Internet"—and then, of course, add such "free"

downloads to their "lockers" on MP3tunes.com where these recordings can be performed by

members of the public on-demand.  *See* MP3tunes MSJ at 4-5.  This combination of factors far

exceeds "mere ownership of a machine used by others to create illegal copies." *CoStar*, 373

F.3d 544.[14]  Like the Napster and Grokster services—and indeed, like Defendants' prior

---

[13] While the Second Circuit's opinion in *Cablevision* did not address the "volition" issue
in connection with the public performance claim, the district court did consider this issue, and
explicitly rejected a "passivity" claim very similar to the one MP3tunes makes now.
Specifically, Cablevision conceded that streaming of recorded programming at a customer's
request was a "performance," but argued "that it is passive in this process—that it is the
customer, not Cablevision, that is 'doing' the performing." *Twentieth Century Fox Film Corp. v.
Cablevision*, 478 F. Supp. 2d 607, 622 (S.D.N.Y. 2007), *rev'd in part, vacated in part by,
Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008).  The court
disagreed, reasoning as follows:

> I reject [Cablevision's argument] for the same reasons that I reject the argument
> that the customer is "doing" the copying involved in the RS-DVR.  …The
> customer's command triggers the playback process, but again, it is Cablevision
> and its operation of an array of computer servers at the head-end that actually
> make the retrieval and streaming of the program possible.

478 F. Supp. 2d at 622.

[14] *See also Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 148-49
(S.D.N.Y. 2009) (finding volitional conduct and direct infringement when "Defendants were
well aware that [infringing] digital music files were among the most popular articles on their

operation of an earlier infringing music service called MP3.com—MP3tunes provides the site, facilities, method, means, and motive for infringement, and charges for the privilege.

MP3tunes' suggestion to the contrary—namely, that the "public performer" in an on-demand service is the user, not the provider—is directly contrary to well-settled copyright law and would effectively eviscerate parts of the Copyright Act and many decades of established law and licensing activity. The Act on its face explicitly recognizes the right of public performance in connection with numerous activities where the performance is only made at the request of the individual. *See, e.g.*, 17 U.S.C. §§ 116 (providing for the payment of royalties for the public performance of musical works through a "coin-operated phonorecord player"—or jukebox) and 114(j)(7) (in connection with the public performance of sound recordings, defining an interactive service as "one that enables a member of the public to receive a transmission of a program specially created for the recipient, or on request, a transmission of a particular sound recording, whether or not as part of a program, which is selected by or on behalf of the recipient"). The public performance right has always covered on-demand, interactive transmissions, and Congress re-confirmed that in the DPRA. As the Third Circuit has recognized, this right is quite broad with respect to interactive performances:

> Interactive, on-demand services are subject to an almost unconditional performance right in the copyright holder: the purveyors of such services are required to negotiate individual, discretionary licenses with individual copyright holders subject to certain time limitations for exclusive licenses. *See* § 114(d)(3). The unconditional public digital performance right with respect to interactive digital audio transmissions corresponds to Congress's perception that interactive digital audio services pose the greatest threat to recording sales.

service, and took active measures to create servers dedicated to mp3 files and to increase the retention times of newsgroups containing digital music files [and when] Defendants took active steps, including both automated filtering and human review, to remove access to certain categories of content, and to block certain users [and] admit that they have control over which newsgroups their servers accept and store and which they reject, and that they routinely exercised that control.").

*Bonneville Int'l Corp. v. Peters*, 347 F.3d 485, 488-89 n.7 (3d Cir. 2003) (affirming administrative rule that particular form of broadcasting was not exempt from the public performance right). *See also* S.Rep. No. 104-128, at 36 (1995) ("The purpose of [the DPRA] is to ensure that performing artists, record companies and others whose livelihood depends upon effective copyright protection for sound recordings, will be protected as new technologies affect the ways in which their creative works are used."). As above, for years, hundreds of companies have recognized this simple fact and have paid licenses for such services. MP3tunes presents precisely the sort of threat Congress anticipated—an attempted circumvention of the performance right by digital means. It should not be allowed to continue. MP3tunes' cramped reading of the public performance right would effectively gut many of these specific statutory protections online, to the detriment of the artists, songwriters and rights holders it is meant to protect.

The Copyright Act places strict liability for any streaming transmitter of copyrighted material to the public, regardless of intention or volition. Accordingly, even assuming, *arguendo,* that some modicum of volition is required, any such requirement should be readily satisfied where, as here, MP3tunes' intended use of the system in question leads to the claim of infringement. MP3tunes designed, created, operates, maintains and markets a transmission system with the intention that it would be used to infringe copyrights. MP3tunes should not be permitted to hide behind a self-serving "volition" argument when its system is being used precisely for the infringing purpose for which it was intended.

## CONCLUSION

MP3tunes' defense relies upon a fundamental and potentially perilous erosion of the exclusive public performing rights granted by the Copyright Act. The explosion of the digital

music marketplace has demonstrated beyond any inkling of doubt the enormous possibilities for innovation and collaboration among the creative rights holders and equally creative designers of technologies that expand and improve the ways that music can be enjoyed.  The Internet is overflowing with countless examples of legitimate businesses that feature legitimate technological innovations coupled with an underlying appreciation of value of first class content. MP3tunes is not one of those technologies.

Dated: New York, New York
       December 17, 2010

                        LOEB & LOEB LLP


                        By:___/s/ Barry I. Slotnick_____
                             Barry I. Slotnick
                             Christian D. Carbone
                             Thomas D. Nolan, III
                             345 Park Avenue
                             New York, New York 10154-1895
                             (212) 407-4000

                        Attorneys for *Amici Curiae*

NY876411

21