**DUANE MORRIS LLP**
Gregory P. Gulia
John Dellaportas
Vanessa Hew
R. Terry Parker
1540 Broadway
New York, NY 10036
(212) 692-1000

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC; CAROLINE RECORDS, INC.; EMI CHRISTIAN MUSIC GROUP INC.; PRIORITY RECORDS LLC; VIRGIN RECORDS AMERICA, INC.; BEECHWOOD MUSIC CORP.; COLGEMS-EMI MUSIC INC.; EMI APRIL MUSIC INC.; EMI BLACKWOOD MUSIC; EMI FULL KEEL MUSIC; EMI GOLDEN TORCH MUSIC CORP.; EMI LONGITUDE MUSIC; EMI VIRGIN MUSIC, INC.; EMI VIRGIN SONGS, INC., EMI AL GALLICO MUSIC CORP., EMI ALGEE MUSIC CORP., EMI FEIST CATALOG, INC., EMI GOLD HORIZON CORP., EMI GROVE PARK MUSIC, INC., EMI HASTINGS CATALOG, INC., EMI MILLS MUSIC, INC., EMI MILLER CATALOG, INC., EMI ROBBINS CATALOG, INC., EMI U CATALOG, INC., EMI UNART CATALOG, INC., JOBETE MUSIC CO., INC., SCREEN GEMS-EMI MUSIC, INC., STONE AGATE MUSIC, and STONE DIAMOND MUSIC, | CIVIL ACTION NO. 07-Civ. 9931 (WHP)<br>ECF Case<br><br>**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | |
| v. | |
| MP3TUNES, INC. and MICHAEL ROBERTSON, Defendants. | |

# TABLE OF CONTENTS

Page

**Table of authorities** ..........................................................................Error! Bookmark not defined.

**Preliminary statement** ..................................................................................................1

**Argument** ......................................................................................................................2

I. **MP3tunes Is Entitled to the DMCA's Safe-Harbor** ...........................................2

    A.    **MP3tunes Disabled All the Material Identified in DMCA Notices** .................. 2

    B.    **No Court Supports Plaintiffs' General Awareness Standard** .......................... 2

    C.    **Plaintiffs' "Representative Lists" Are Not DMCA Compliant** ....................... 4

    D.    **MP3tunes Has No Constructive Knowledge of Infringement** ......................... 6

    E.    **MP3tunes Has Reasonably Implemented a Repeat Infringer Policy** ............... 7

    E.    **MP3tunes Does Not Control the Alleged Infringements** ................................. 7

    F.    **The DMCA Applies to "Pre-'72" Recordings** ..................................................... 8

II. **MP3tunes Is Not Liable for the Alleged Infringement of Its Users** ...............................9

    A.    **There Is No Basis for Contributory Liability** ..................................................... 9

    B.    **Plaintiffs Offer No Basis for a Finding Vicarious Liability** ............................ 11

III. **MP3tunes Is Not a Direct Infringer** ..................................................................12

IV. **There Is No Basis for Plaintiffs' Unfair Competition Claim** ........................................12

V. **Plaintiffs Have Not Demonstrated Ownership of a Majority of the Works at Issue** ...................................................................................................................13

## TABLE OF AUTHORITIES

**Cases**

*A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) ..................................... 4, 7-8

*Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. Lexis 16165 (S.D.N.Y. Aug. 28, 2002) ....................................................................................................................................... 5

*Arista Records, Inc. v. MP3Board, Inc.*, 2002 WL 1997918 (S.D.N.Y. Aug. 29, 2002) ................ 4

*Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 66355911 (C.D. Cal. Dec. 21, 2002) ................................................................................................................................... 3, 8

*Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004) ......................... 3, 7

*Perfect 10, Inc. v. CCBill*, 488 F. 3d 1102 (9th Cir. 2007) ......................................................... 3, 6

*Perfect 10, Inc. v. Visa*, 494 F.3d 788 (9th Cir. 2007) .................................................................... 4

*UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099 (C.D. Cal. 2009) ................ 4

*Viacom Int'l v. Youtube*, 2010 U.S. Dist. Lexis 62829 (S.D.N.Y. June 23, 2010) ...................... 1-4

**Statutes**

17 U.S.C. § 301(c) ........................................................................................................................... 8

17 U.S.C. §512(c)(3)(A)(v) ............................................................................................................. 5

28 U.S.C. § 1367 ............................................................................................................................. 8

**PRELIMINARY STATEMENT**

Plaintiffs had only one real task in their opposition papers: to distinguish this case from Judge Stanton's decision in *Viacom Int'l v. Youtube*, 2010 U.S. Dist. Lexis 62829 (S.D.N.Y. June 23, 2010). They did not do so. Instead, they declare that decision "simply incorrect." Plaintiffs cite no case law in support of their position. Instead, they contend that the Court must disregard *Youtube* based only on a self-serving reading of the legislative history that no Court has ever adopted. Judge Stanton, by contrast, grounded his *Youtube* ruling in a dozen cases, all of which must also be "simply incorrect." In short, Plaintiffs are asking this Court to upend more than a decade of DMCA jurisprudence. Plaintiffs do not contest, and thus concede, that absent such a ruling, summary judgment must be awarded to Defendants.

Plaintiffs' brief is an exercise in obfuscation. Cutting through the rhetoric, the questions here are straightforward, and go to the core of how the Internet works and how Congress sought to protect it by the DMCA. First, does an Internet search engine such as Sideload.com infringe, merely because it links to third-party infringing material? Congress says no, unless the copyright holder serves a DMCA-compliant take-down notice and the Service Provider refuses to take down the material. Plaintiffs opted out of that system here. Second, does an Internet storage site such as MP3tunes.com infringe merely because it employs software functionality that conserves server space by eliminating needless duplication? Again, Congress says no – the way in which a Service Provider stored data does not subject it to liability.

As Congress has already answered these dispositive questions against them, Plaintiffs are left to resort to concocted claims of "massive" and "obvious" infringement, devoid of citation to the record. But the time for <u>adjectives</u> has passed. This Court gave Plaintiffs years of discovery to locate actual <u>evidence</u>. That Plaintiffs still cannot do so compels this Court to finally pull the plug on this case, and thereby safeguard the Internet for future generations.

1

**ARGUMENT**

I. <u>**MP3tunes Is Entitled to the DMCA's Safe-Harbor**</u>

    A. **MP3tunes Disabled All the Material Identified in DMCA Notices**

Plaintiffs concede that MP3tunes is a DMCA "Service Provider" which, in response to the take-down notices it received, disabled access to all of the material identified therein. In a rational world, that would have been the end. Here, however, Plaintiffs try to skirt these case-determinative facts by contending that MP3tunes was obligated not merely to disable the links, but also to invade the personal storage lockers of its 700,000 users and destroy any material therein resembling that found on the allegedly infringing links. Plaintiffs, of course, cite no authority for such an extraordinary proposition, because there is none.

The DMCA does not obligate service providers to conduct an investigation to locate every copy of the material that is identified in a take-down notice. *See Viacom*, 2010 U.S. Dist. Lexis 62829, at *29 (holding that Youtube was not obligated to remove other copies of material identified in take-down notices). Indeed, removing files from personal lockers on the assumption that they are a copy of an allegedly infringing work could expose MP3tunes to liability such as Amazon faced when it deleted infringing electronic books from users' personal Kindles. *See* John Hood, "Amazon Faces Kindle Class Action." *ConsumerAffairs.com* (July 28, 2009). The DMCA does not require MP3tunes to destroy users' personal property.

    B. **No Court Supports Plaintiffs' General Awareness Standard**

Contrary to Plaintiffs' claim, a Service Provider need not respond to a supposed general awareness of infringing activity by users, but only to actual or constructive knowledge of "specific and identifiable infringements of particular items." *Viacom Int'l v. Youtube*, 2010 U.S. Dist. Lexis 62829 (S.D.N.Y. June 23, 2010). As Judge Stanton held, "[m]ere knowledge of the

prevalence of such activity in general is not enough." *Id.* Rather, "[t]he DMCA notification procedures place the burden of policing copyright infringement—identifying the potentially infringing material and adequately documenting infringement—squarely on the owners of the copyright. We decline to shift a substantial burden from the copyright owner to the provider". *Id., citing Perfect 10, Inc. v. CCBill*, 488 F. 3d 1102, 1113 (9th Cir. 2007),

      Plaintiffs err in the same manner as the plaintiffs in *CCBill*. There, Perfect 10 claimed that CCBill should have known about infringements on its site because Perfect 10 sent notices and screenshots with URLs identifying where these infringements could be found, including alleged "hacker" sites. 488 F.3d at 1113. The Ninth Circuit disagreed, holding that these notices did not comply with the DMCA's requirements. *Id*. at 1114.

      Plaintiffs claim that *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1107-09 (W.D. Wash. 2004) supports the notion that general awareness standard is enough, but that case does no such thing. To the contrary, *Corbis* held that mere "general knowledge that photos may be the subject of online copyright infringement" does not disqualify a Service Provider from DMCA immunity. Plaintiffs also cite to *Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 66355911, at *5 (C.D. Cal. Dec. 21, 2002), but in that case the defendant ran several websites that allowed users to share movies and openly admitted that the purpose of his sites was to allow users to "steal" movies through file sharing. Neither of these cases contradicts Judge Stanton's holding in *Youtube*; if anything, they confirm that ruling.

      Lastly, Plaintiffs argue that "common sense" prohibits the DMCA from being used to "turn a blind eye" to "blatant" infringement. No one claims otherwise. But if a Service Provider needs to conduct an investigation to determine whether material is infringing, then the alleged infringement is not, by definition, blatant. In this case, where even Plaintiffs' own expert cannot tell an infringing from a non-infringing song on the Internet, the DMCA cannot be ignored.

### C.     Plaintiffs' "Representative Lists" Are Not DMCA Compliant

As Judge Stanton explained: "Although works may be described representatively, [the DMCA] requires that the identification of the infringing material that is to be removed must be accompanied by 'information reasonably sufficient to permit the service provider to locate the material.'" *Viacom*, 2010 U.S. Dist. Lexis 62829, at *45 (quoting 17 U.S.C. 512(c)(3)(A)(iii)). "An example of such sufficient information would be a copy or description of the allegedly infringing material and the so-called 'uniform resource locator' (URL) (i.e., web site address) which allegedly contains the infringing material." *Id.* (*quoting* House Report at 55; Senate Report at 46); *accord UMG Recordings*, 665 F. Supp. 2d at 1109-10 (DMCA does not require removal of other recordings by artists named in take-down notices).

In any event, Plaintiffs provided no DMCA–compliant "representative lists" here. That choice strips Plaintiffs of the right to claim actual knowledge of infringement. *See Perfect 10, Inc. v. Visa*, 494 F.3d 788 (9th Cir. 2007) ("Congress addressed the issue of notice in the DMCA, which grants a safe harbor against liability to certain service providers, even those with actual knowledge of infringement, if they have not received statutorily compliant notice."). Plaintiffs, however, claim they can cure this failure by relying on letters sent by other entities, EMI Music Group North America and EMI Entertainment World.

These notices do not meet DMCA requirements. First, they lack a sworn statement that their authors are authorized to act on behalf of any of the Plaintiffs in this action. *See* Def. SUF ¶¶ 68, 73, 75. Plaintiffs' cases on this point are all inapposite. In each of the cases they cite, the plaintiffs sought to rely upon notices sent on their behalf. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1022 n. 6 (9th Cir. 2001); *Arista Records, Inc. v. MP3Board, Inc.*, 2002 WL 1997918, at *9 (S.D.N.Y. Aug. 29, 2002); *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 665 F. Supp. 2d 1099, 1104 (C.D. Cal. 2009). Those cases lend no support here.

-4-

Second, the notices do not identify the alleged infringements in this litigation, which were first identified a year and a half into this case.  *See* Def. Br. 17.  "In order for a notice to be effective pursuant to the DMCA, it must provide identification of the reference or link to material or activity claimed to be infringing and information reasonably sufficient to permit the service provider to locate that reference or link."  *Arista Records, Inc. v. MP3Board, Inc.*, 2002 U.S. Dist. Lexis 16165, *25 (S.D.N.Y. Aug. 28, 2002).  As noted above, MP3tunes promptly removed each and every song identified in those letters, a fact that Plaintiffs do not dispute.

Further, a notice must contain, under penalty of perjury, that "the use of the material complained of is not authorized by the copyright owner, its agent, or the law . . . ."  17 U.S.C. §512(c)(3)(A)(v).  The letters from the non-party EMI entities contained links to many sites (*e.g.*, "sxsw.com") which Plaintiffs now concede were authorized to provide free music downloads.  Plaintiffs' lawyers apparently did not consult with Plaintiffs' marketing personnel to ask whether the material at Sideload.com was authorized.  This disconnect between lawyers and marketers was aptly articulated just this week in the *New York Times*:

> . . . material is often leaked to [music blogs] by managers, music labels and even the artists themselves.
>
> As a result, these sites have a complex symbiosis with the music business.  While the Recording Industry Association of America wants to shut them down, the rank and file of the record labels — particularly in hip-hop circles — uses them as marketing tools and publicity outlets.
>
> "To Joe Q. Public, 'leak' sounds like a bad word," Mr. Hoffman said in an interview at a pizzeria on the Lower East Side, his lawyer by his side. "But if you've ever been in a marketing meeting at a record label, it's 'Hey, can you leak this to the blogs?' Leak is now a marketing verb."

Ben Sisario, "Piracy Fight Shuts Down Music Blogs," *N.Y. Times*, Dec. 14, 2010, at B1 (http://www.nytimes.com/2010/12/14/business/media/14music.html?_r=1).

-5-

### D. MP3tunes Has No Constructive Knowledge of Infringement

Plaintiffs' supposed evidence of "constructive knowledge" is illusory. First, they claim that MP3tunes' executives purportedly used Sideload.com to sideload tracks by popular artists and Sideload.com, many of whom were not even EMI artists, promoted itself as a source of "Free Music," and published a list of "Most Popular Tracks." This argument would only work if, as Plaintiffs first falsely represented to this Court, the fact that they put music for free on the Internet was mere "fantasy." But now that discovery has turned fantasy into reality (Def. SUF ¶¶ 99-101, 103, 105), the mere use of the sideload function by MP3tunes' employees is evidence of nothing other than that those employees use the site.

Plaintiffs now concede that they virally market their popular works but argue that they do not waive their copyrights when they do so. That is utterly irrelevant. The issue is not whether Plaintiffs waive their copyrights when they virally market their works. Rather, the point is that Defendants are not able to determine – unless Plaintiffs tell them – which of their works on the Internet have been virally marketed and which have not.

Plaintiffs' next example of supposed "constructive" knowledge is that MP3tunes was aware that some of the sources of music on Sideload.com were from alleged "pirate locker sites, like www.rapidshare.com." But these sites host authorized material as well as unauthorized material. Indeed, Plaintiffs themselves use the same www.rapidshare.com to distribute music. Def. Opp. Br. 9. Even if they did not, the case law has explicitly rejected Plaintiffs' proposition. See, e.g., *CCBill*, 165 F. Supp. 2d at 1114 (evidence of constructive knowledge insufficient where service provider knew that it provided services to known "hacker" sites). As the Ninth Circuit instructed, "[w]e do not place the burden of determining whether photographs are actually illegal on a service provider." Rather, the burden of identifying and notifying the Service Provider of "hacker sites" rests with Plaintiffs.

### E.  MP3tunes Has Reasonably Implemented a Repeat Infringer Policy

It is undisputed that MP3tunes implemented an active repeat infringer policy, pursuant to which it has terminated 153 accounts for copyright abuse. Def. SUF ¶ 61. Plaintiffs argue, however, that MP3tunes should have investigated whether its users appeared on more than one take-down notice and then should have terminated the accounts of these users. The law is clear, however, that MP3tunes has no such affirmative obligation. *See* Def. Br. 14-15.

Lacking any legal authority for their position, Plaintiffs instead comb through the four full days of deposition testimony to which Mr. Robertson was subjected and attempt to put a semantic spin on an isolated exchange where Mr. Robertson testified that he could not remember the different types of conduct that had resulted in users having their accounts terminated, other than file sharing. Plaintiffs conceal the contrary testimony from Kendall Dawson and Sharmain Lindahl, cited in Defendants' opening papers. Defs. SUF ¶ 51. In any event, the fact that Mr. Robertson did not remember all of the specifics in his live deposition testimony does not contravene the corporate records. There is no dispute that MP3tunes has a repeat infringer policy and implemented it in an eminently reasonable manner.

### E.  MP3tunes Does Not Control the Alleged Infringements

"Courts have routinely held that the right and ability to control infringing activity, as the concept is used in the DMCA, cannot simply mean the ability of a service provider to remove or block access to materials posted on its website or stored in its system." *Corbis*, 351 F. Supp. 2d at 1110 (citations omitted); *see also* Def. Br. 18 (citing cases). Notwithstanding all of the case law to the contrary, Plaintiffs argue that the ability to remove infringing works is sufficient control to disqualify a service provider from the DMCA's protection because the DMCA does not "immunize vicarious copyright infringers."

Plaintiffs' citations to *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1021 (9th Cir.

2001), and *Fung*, 2009 WL 66355911, at *16 n. 27, are tellingly without explanation.  The Court in *Napster* expressly rejected Plaintiffs' position.  239 F.3d at 1025 ("The limitations in [the DMCA] protect qualifying service providers from liability for all monetary relief for direct, vicarious, and contributory infringement.").  As for *Fung*, that was a file-sharing case in which the ability to block access was secondary; the key fact was that Fung directly participated in and actively encouraged users to "steal."  *See* 2009 WL 66355911, at *16 n. 27.

Plaintiffs allege that MP3tunes controls which songs its users link to on the Internet because MP3tunes engineered the system that allows users to search for and store Internet files and indexes these links to other web sites.  However, creating an index of links through an automated system is not evidence of control.  The Courts have uniformly rejected that argument.  *See* Def. Br. 18, Def. Opp. Br. 28 (citing cases).  Indeed, were it otherwise, Google and every other search engine would be out of business.  Second, the control at issue in this analysis should be over the infringing act, not over the automated systems that users allegedly use to perform the act.  Here, it is undisputed that the indexing of links on Sideload.com, which occurs with any search engine, is a user-initiated, automated process which, as previously noted, did not earn MP3tunes any financial benefit.  *See* Def. Opp. Br. 6, 18-19.

   **F.**  **The DMCA Applies to "Pre-'72" Recordings**

Absent any viable claims under the Copyright Act, this Court lacks supplemental jurisdiction over Plaintiffs' "Pre-1972" common law claims and thus Plaintiffs' common law claims should be dismissed.  28 U.S.C. § 1367.  Even in a case where there is supplemental jurisdiction, Section 301(c) requires that the Copyright Act not annul or limit the common law rights or remedies in pre-'72 sound recordings. 17 U.S.C. § 301(c).  However, the DMCA's safe harbor provision exists concurrently with the rights and protections afforded under section 301(c). Indeed, the application of the DMCA to Plaintiffs' pre-'72 sound recordings does not

limit plaintiffs' rights or remedies in these works. The DMCA permits Plaintiffs to enforce their rights in these Pre-'72 works but merely requires that Plaintiffs comply with the DMCA's requirements. The DMCA does not limit this right. Indeed, any other result would make no sense, as it would force Internet Service Providers to adopt one set of procedures for works from 1972 onwards, and another for "Pre-72" works, which would be infeasible and would frustrate the policy objectives of the DMCA. No Court has ever adopted this position.

## II.     MP3tunes Is Not Liable for the Alleged Infringement of Its Users

### A.     There Is No Basis for Contributory Liability

The DMCA bars Plaintiffs' contributory infringement claims. 17 U.S.C. (c) (barring monetary liability for infringement of copyright). Nevertheless, even absent the DMCA, Plaintiffs' claims are meritless as they fail to establish a dispute as to the facts and law on the issue of contributory liability.

Plaintiffs make no effort to address MP3tunes' arguments but refer the Court to their own motion for summary judgment, which Defendants have already addressed. As for the material contribution prong, there are simply no facts from which a reasonable jury could infer that MP3tunes, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." Def. Br. 29-31 (*quoting Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971). Defendants' opening papers make clear that MP3tunes offers storage services and enables searching and sideloading material that is publically available on the Internet. Def. Br. 3-8, 29-31. While some infringement exists on the Internet, MP3tunes does not encourage, induce or participate in those activities. Def. Br. 7-8.

Plaintiffs focus their contributory infringement argument on an attempt to distinguish *Sony Corp. of America, Inc. v. Universal City Studios Inc.*, 464 U.S. 417 (1984), and align

MP3tunes' services with those of a flea market, *Arista Records, Inc. v. Flea World,* 2006 U.S. Dist. Lexis 14988 (D.N.J. Mar. 31, 2006), and a file sharing service. *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124 (S.D.N.Y. 2009). Despite the multitude of cases dealing with the availability of music on the Internet, Plaintiffs must resort to a case involving a flea market.

Plaintiffs' attempt to distinguish *Sony* on the grounds that MP3tunes has a relationship with its users, whereas *Sony* involved a one-off sale, fails. The Seventh Circuit rejected this very argument in *In re Aimster Copyright Litig.*, 334 F.3d 643 (7th Cir. 2003). The Seventh Circuit explained that the issue is not whether there is a relationship but an "ability of a service provider to prevent its customers from infringing." *Id.* at 648. However, even then, the Seventh Circuit instructed that the imposition of liability on such grounds could have alarming effects where a service facilitated both infringing and non-infringing uses. *Id.* For example, such liability could result in legitimate businesses being shut down where the prevention of infringement was too burdensome—which the Supreme Court held was "contrary to the clear import of the *Sony* decision." *Id.*

Furthermore, the attempt to liken MP3tunes to the defendants in *Fleaworld* and *Usenet* is clearly mistaken. Both cases involved substantial control and involvement in the infringing activity. The *Fleaworld* defendants exercised control over the primary infringers by policing them with daily visits to their stalls and approving the counterfeit goods sold. 2006 U.S. Dist. Lexis 14988, at *9-10. Similarly, the *Usenet* defendants actively induced infringement by seeking users known for file-sharing, promoting their site's infringing uses and instructing users in infringing activities. 633 F. Supp. 2d at 133. The facts of the instant case present no such control, active participation and/or approval. They show just the opposite, that MP3tunes' sideload feature merely facilitates the search for downloads already on the Internet.

### B. Plaintiffs Offer No Basis for a Finding Vicarious Liability

The DMCA safe harbor provisions bar Plaintiffs' vicarious liability claims in their entirety. 17 U.S.C. (c) (barring monetary liability for infringement of copyright). Nevertheless, Plaintiffs' claims are meritless even absent the DMCA. It is a fallacy that courts impose a low standard for determining control for vicarious liability purposes. Although Plaintiffs attempt to distinguish *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971) and *Shapiro Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963), Plaintiffs misinterpret the holdings in these cases. In *Gershwin*, the defendant was vicariously liable for "organizing, supervising and controlling the [direct infringer] and by knowingly participating in its infringement." 443 F.2d at 1160. Similarly, in *Shapiro*, the defendant was "in a position to police the conduct of the 'primary' infringer." 316 F.2d at 309. Plaintiffs' reliance upon these outdated cases is without merit because in these cases the direct infringer worked in concert and under the direct control of the vicarious infringer. This level of control is a far cry from that of the search engine and storage services offered by MP3tunes. MP3tunes is not required to and cannot police the activities of its 700,000 users to determine which of the millions of files on its system are authorized. Def. Br. 4-7.

Moreover, a defendant cannot be held vicariously liable unless plaintiffs demonstrate a direct causal relationship between the financial benefit and the infringing activity. *See, e.g., Artists Music, Inc. v. Reed Publ'g (USA), Inc.*, 1994 U.S. Dist. Lexis 6395, at *17-*18 (S.D.N.Y. May 17, 1994). Plaintiffs refer the Court to arguments and cases cited in their opening brief on the issue of whether Defendants directly earned advertising revenue through the number of users drawn to their website. The bottom line is that, unlike these cases, there is simply no similar financial benefit here and what little fees MP3tunes earns from its premium locker services are not linked to advertisements at Sideload.com.

### III. MP3tunes Is Not a Direct Infringer

A person must engage in volitional conduct – i.e., the act constituting infringement – to constitute a direct infringer. *Id.*; *accord, e.g., Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 907 F. Supp. 1361, 1372-73 (N.D. Cal. 1995) (volitional conduct required for direct infringement). "To establish direct liability under §§ 501 and 106 of the Act, something more must be shown than mere ownership of a machine used by others to make illegal copies." *CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 551 (4th Cir. 2004). The law in the Second Circuit is clear: "the person who actually presses the button to make the recording supplies the necessary element of volition, not the person who manufactures, maintains, or, if distinct from the operator, owns the machine." *Cartoon Network LP, LLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131 (2d Cir. 2008) (following Netcom). MP3tunes does not engage in volitional conduct needed to support a finding of direct infringement.

### IV. There Is No Basis for Plaintiffs' Unfair Competition Claim

Plaintiffs attempt to resuscitate their unfair competition claim by alleging that MP3tunes competes with Plaintiffs. However, this characterization is grossly inaccurate. MP3tunes does not sell musical recordings, nor does it license them. Plaintiffs do not offer storage services, nor search engine services. While Plaintiffs imply that other search engines or storage companies pay a license fee to Plaintiffs, they have not offered any evidence of such licenses. Moreover, Plaintiffs' claims fail because they have not put forth evidence of direct infringement.

Likewise, Plaintiffs' reliance on *Roy Export Co. v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1105 (2d Cir. 1982), is misplaced. This is a classic unfair competition case involving "palming off," whereby both the defendant and the plaintiff were in direct competition making and distributing films and the defendant palmed off the plaintiffs' work as if it were his own. Similarly, direct competition was involved in Plaintiffs' 1941 case, *Mutual Broadcasting*

*System, Inc. v. Muzak Corp.*, 30 N.Y.S.2d 419, 420 (Sup. Ct. N.Y. County 1941). Unlike in these cases, MP3tunes and Plaintiffs offer radically different products and services. Moreover, as Plaintiffs' own cases demonstrate, central to unfair competition practices is an act of bad faith that creates confusion among consumers. Such bad faith is absent here.

Plaintiffs deliberately misrepresent that in *Naxos II*, the New York Court of Appeals held that "fraud or bad faith is not an element of [unfair competition]…in modern New York law." However, this is a pure fiction. In *Naxos II*, the New York Court of Appeals held that "fraud or bad faith is not an element of an infringement action in modern New York law….", but that the "causes of action for copyright infringement and unfair competition are not synonymous under New York law." *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563-64 (N.Y. 2005) (emphasis added). Plaintiffs' convenient substitution of the word "infringement" for "unfair competition" is clearly a deliberate attempt to mislead and confuse this Court as to the relevant elements necessary to demonstrate their claims.

Despite Plaintiffs' deliberate attempts to deceive this Court, New York law is clear on this point: "[s]ome element of bad faith" is "central" to the notion of unfair competition by misappropriation under New York law." *Empresa Cubana del Tabaco v. General Cigar Co.*, 2010 U.S. App. LEXIS 14448 (2d Cir. N.Y. July 14, 2010) (*citing Saratoga Vichy Spring Co., Inc. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). The reason for this legal deception is obvious. Plaintiffs have not, and, indeed, cannot, demonstrate the requisite bad faith necessary to establish a cause of action for unfair competition.

**V.     Plaintiffs Have Not Demonstrated Ownership of a Majority of the Works at Issue**

While Plaintiffs' lack of ownership is not necessary for the Court to grant summary judgment for Defendants, Defendants have previously sufficiently challenged Plaintiffs' ownership of the works at issue.

-13-

Although Plaintiffs claim to have presented evidence that they own the copyrights at issue, they have not met their burden of proof on this issue. They have listed registration numbers from the Copyright Office for the 3,189 sound recordings and 562 musical compositions, and 348 works for Cover Art allegedly at issue. However, not one certificate covers Cover Art, which Plaintiffs concede in their opposition brief. In addition, 1,610 of the sound recordings and compositions are listed as works made for hire (this includes the sound recording certificates that Plaintiffs claim establish registration of their Cover Art). *See* Def. Opp. Br. 33. Because sound recordings and compositions are purposefully excluded from the types of works that can be specially commissioned, Plaintiffs cannot possibly demonstrate ownership under the work for hire doctrine in sound recordings and compositions without evidence that the artists and composers of these works were employees of the Plaintiffs. Def. Br. 33-34.

Plaintiffs' standing argument is misguided. Ownership is a critical element in a cause of action for copyright infringement. *See Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991). Accordingly, courts routinely allow defendants to challenge claims of ownership in copyright cases. *See, e.g., Langman Fabrics v. Graff Californiawear*, 160 F.3d 106, 114 (2d Cir. N.Y. 1998) (permitting defendants to challenge ownership under work for hire doctrine). Contrary to Plaintiffs' claim, MP3tunes need not show a dispute between Plaintiffs and their recording artists to rebut their purported evidence of ownership, otherwise those accused of copyright infringement would be denied a valid defense. Nor do the cases cited by Plaintiffs hold otherwise.

Furthermore, Plaintiffs use of *Eden Toys, Inc. v. Floral Lee Undergarment Co.*, 697 F.2d 27 (2nd Cir. 1982) is misapplied. The court in that case did not accept the plaintiffs' copyright certificates as evidence of ownership but required Plaintiff to produce other evidence of

-14-

ownership at pleadings stage. *See* 697 F.2d at 36 (remanding ownership issue because certificates were inconclusive of ownership). *See also Pem-American v. Sunham Home Fashion, LLC*, 83 Fed. Appx. 369, 371 (2d Cir 2003) (employment contract used to demonstrate ownership); *Arthur A. Kaplan Co., Inc. v. Panaria Int'l, Inc.*, 48 U.S.P.Q.2D (BNA) 1315 (S.D.N.Y. 1998) (assignment used to demonstrate ownership).

Similarly, Plaintiffs' "innocent error" claim is based on a false premise because Plaintiffs' did not make any error. They intentionally claimed ownership that rightfully belongs to the authors and artists. However, plaintiffs have the burden of demonstrating present evidence of ownership. *See TeeVee Toons, Inc. v. MP3.com, Inc.*, 134 F. Supp. 2d 546, 549 (S.D.N.Y. 2001) (plaintiffs countered defendant's work for hire challenge with evidence that the works were assigned to them). Here, Plaintiffs have failed to offer any such evidence. Instead, Plaintiffs offer a self-serving, conclusory declaration from one of their attorneys, Alasdair McMullen, who testifies that, "[a]s far as he is aware", work for hire contracts also irrevocably transfer ownership to the "EMI Labels." McMullen Opp. Dec. ¶ 3. Plaintiffs pointedly fail to produce a single agreement as evidence of ownership, nor even attest that such an agreement exist for the works at issue. Instead, Mr. McMullen quotes sample language of what he alleges is from the type of agreement that EMI's artist would have entered. *Id.* However, at summary judgment, this Court must rely on evidence, not speculation, conjecture, or hypothetical allegations, of ownership.

Dated: New York, NY
December 17, 2010

DUANE MORRIS LLP

By: /s/
Gregory P. Gulia
John Dellaportas
Vanessa Hew
R. Terry Parker
1540 Broadway
New York, NY 10036

(212) 692-1000

Edward M. Cramp (*pro hac vice*)
Michelle Hon (*pro hac vice*)

*Counsel for Defendants*

-16-

-17-