UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS., *et al.*,<br><br>        Plaintiffs,<br><br>  v.<br><br>MP3TUNES, LLC, *et al.*,<br><br>        Defendants. | No. 07 Civ. 9931 (WHP)(FM)<br><br>ECF Case<br><br><u>ELECTRONICALLY FILED</u> |

**BRIEF OF AMICUS CURIAE GOOGLE INC. IN SUPPORT OF DEFENDANTS**

## TABLE OF CONTENTS

**Page**

BRIEF OF AMICUS CURIAE GOOGLE INC. IN SUPPORT OF DEFENDANTS ..................... 1

I.  STATEMENT OF INTEREST ................................................................................................ 1

II. INTRODUCTION .................................................................................................................... 1

III. ARGUMENT ........................................................................................................................... 2

    A.    The DMCA's safe harbors apply to state common law claims for infringement of pre-1972 sound recordings. ........................................................... 2

        1.    Adopting Plaintiffs' view would frustrate the purpose of the safe harbors. ................................................................................................ 2

        2.    The statutory language of the safe harbors reaches all copyright claims. ............................................................................................................ 6

    B.    Copyright law protects the interests of legitimate consumers in "space-shifting" and similar protected fair uses. ............................................................... 9

IV. CONCLUSION ...................................................................................................................... 11

## TABLE OF AUTHORITIES

**Page(s)**

### Federal Cases

*Ellison v. Robertson*
  357 F.3d 1072 (9th Cir. 2004) .................................................................................................. 2

*Keene Corp. v. United States*
  508 U.S. 200 (1993) ................................................................................................................. 6

*Perfect 10, Inc. v. CCBill LLC*
  488 F.3d 1102 (9th Cir. 2007) .................................................................................................. 7

*Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys.*
  180 F.3d 1072 (9th Cir. 1999) .................................................................................................. 9

*Russello v. United States*
  464 U.S. 16 (1983) ................................................................................................................... 6

*Sony Corp. of America v. Universal City Studios*
  464 U.S. 417 (1984) ................................................................................................................. 9

*The Cartoon Network LP, LLP v. CSC Holdings, Inc.*
  536 F.3d 121 (2d Cir. 2008) ................................................................................................ 9, 10

*The Football Assoc. Premier League v. YouTube Inc.*
  No. 07 Civ. 3582 (LLS) (S.D.N.Y. Aug. 10, 2010) .................................................................. 1

*UMG Recordings, Inc. v. Escape Media Group, Inc.*
  No. 100152/2010, complaint filed Jan. 6, 2010 (N.Y. Supr. Ct.) ............................................ 5

*United States v. Estate of Romani*
  523 U.S. 517 (1998) ................................................................................................................. 8

*Viacom Int'l Inc. v. YouTube, Inc.*
  No. 07 Civ. 2103 (LLS), 2010 WL 2532404 (S.D.N.Y. June 23, 2010) .................................. 6

*Zeran v. America Online, Inc*
  129 F.3d 327 (4th Cir. 1997) .................................................................................................... 7

### Federal Statutes

17 U.S.C. § 114(d)(4) ..................................................................................................................... 6

17 U.S.C. § 115(c)(3)(I) .................................................................................................................. 6

17 U.S.C. § 301(c) ...................................................................................................................... 2, 8

17 U.S.C. § 512(a) ...................................................................................................................... 2, 6

17 U.S.C. § 512(b) ...................................................................................................................... 2, 6

17 U.S.C. § 512(c) .................................................................................................................. 1, 6, 7

17 U.S.C. § 512(c)(1)(C) ................................................................................................................ 6

17 U.S.C. § 512(d) ...................................................................................................................... 2, 6

17 U.S.C. § 512(h) .......................................................................................................................... 6

17 U.S.C. § 512(j) ........................................................................................................................... 8

17 U.S.C. § 512(m) ......................................................................................................................... 7

47 U.S.C. § 230(c) .......................................................................................................................... 7

# TABLE OF AUTHORITIES
## (cont'd)

**Page(s)**

Copyright Act of 1976, Pub. L. 94-553, Oct. 19, 1976, 90 Stat. 2541 ...........................................8

Copyright Term Extension Act, Pub. L. 105-298, Oct. 27, 1998, 112 Stat. 2827 .........................................................................................................................8

Digital Millennium Copyright Act, Pub. L. 105−304, Oct. 28, 1998, 112 Stat. 2860 ...............................................................................................................................8

### Other Authorities

3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12B.01[A][1] (2010) ...............................................................................................5

David Armano, *It's the Conversation Economy, Stupid,* BUSINESS WEEK......................................3

Lev Grossman, *Time's Person of the Year: You*, TIME, Dec. 13, 2006..........................................3

Arik Hesseldahl, *Review: Apple's iPod Updates,* BUSINESS WEEK, Sept. 7, 2010 .................................................................................................................................2

Edward Lee, *Warming up to User-Generated Content*, 2008 U. ILL. L. REV. 1459, 1500 (2008).........................................................................................................3

Richard Metzger, *Deconstructing Gimme Shelter: Listen to the Isolated Tracks of the Rolling Stones in the Studio,* DANGEROUS MINDS, Nov. 29, 2010 ................................................................................................................................4

Paul Resnikoff, *Universal Music Group Now "Declaring Legal Jihad" Against Grooveshark . . .,* DIGITAL MUSIC NEWS, Sept. 3, 2010..................................5

Jon Swartz, *Once Fading MySpace Focuses on Youthful Reincarnation,* USA TODAY, Mar. 10, 2010 ........................................................................................4

Hunter Walk, *Great Scott! Over 35 Hours of Video Uploaded Every Minute to YouTube,* THE OFFICIAL YOUTUBE BLOG, Nov. 10, 2010............................................4

## I.     STATEMENT OF INTEREST

Amicus curiae Google Inc. ("Google") regularly hosts digital material at the direction of users of its services, including services such as Blogger (web logs), Gmail (electronic mail), Google Docs (word processing, spreadsheet, and presentation documents), Google Sites (web sites), Picasa Web Albums (photos), and YouTube (videos). Millions of users every day post material on the Internet (i.e. "in the cloud") in real-time using Google services. Google's world-renowned Web Search index also provides links to myriad content posted on the Internet, including sound recordings posted by third parties. In providing those services, Google depends on the safe harbor provisions of the Digital Millennium Copyright Act ("DMCA") that are applicable to online service providers, set forth in section 512 of the Copyright Act. Accordingly, Google has a strong interest in the proper interpretation of those provisions, and copyright law generally, and files this brief in order to assist the Court in that effort.

## II.     INTRODUCTION

Defendant MP3Tunes, Inc. ("MP3Tunes") and Proposed Amici Public Knowledge, the Electronic Frontier Foundation, the Consumer Electronics Association, and the Home Recording Rights Coalition (collectively, "PK et al.") have ably described the purpose and proper application of the DMCA safe harbors, as well as the scope of the public performance right as applied to "cloud-based" services. In this amicus brief, Google does not re-hash their arguments, but focuses instead on two issues for which it believes the Court would benefit from further briefing.

First, the parties have briefed only sparingly the issue of whether the DMCA safe harbors apply to state common law copyright claims for infringement of pre-1972 sound recordings. This is a question of first impression in the federal courts.[1] The safe harbors provide qualifying service providers with immunity from monetary liability and certain injunctive relief for

---

[1] Note, however, that the plaintiffs in *The Football Assoc. Premier League v. YouTube Inc.* conceded that the district court's order holding that YouTube was entitled to the protections of the hosting safe harbor disposed of all of their claims, which included state law claims for infringement of pre-1972 sound recordings. *See* Final Judgment, No. 07 Civ. 3582 (LLS), at 2 (S.D.N.Y. Aug. 10, 2010), *available at* http://docs.justia.com/cases/federal/district-courts/new-york/nysdce/1:2007cv03582/305574/332/.

"infringement of copyright." The statutory provision is not by its terms limited to federal copyright law. 17 U.S.C. § 512(c); *see also id.* § 512(a), (b), (d) (same). The Court should conclude that Congress meant what it said, and hold that this immunity applies to all *copyright* claims, including those arising under state common law. Plaintiffs' contrary view would create disruption and uncertainty of precisely the sort that Congress meant to mitigate by enacting the DMCA safe harbors.

Second, to the extent it reaches Plaintiffs' secondary liability claims, Google calls the Court's attention to the importance of "space-shifting" to the perfectly legitimate activities of today's digital consumers. For example, more than 275 million Apple iPods have been sold,[2] each enabling a consumer to copy his or her music from lawfully acquired CDs. Rather than attack the activities of MP3Tunes users who copy lawfully acquired music to their personal online music lockers, Plaintiffs have instead focused on users who allegedly obtain music from infringing sources. One of the amici supporting Plaintiffs, however, conflates these two categories in its zeal to condemn MP3Tunes and its users. Were this imprudent conflation accepted by the Court, it would put both legitimate music fans and technology innovators in jeopardy, an outcome unnecessary to any decision in this case.

### III.   ARGUMENT

**A.   The DMCA's safe harbors apply to state common law claims for infringement of pre-1972 sound recordings.**

**1.   Adopting Plaintiffs' view would frustrate the purpose of the safe harbors.**

As ably explained by Proposed Amici PK et al., Congress enacted the safe harbors to provide "greater certainty to service providers concerning their legal exposure for infringements that may occur in the course of their activities." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (quoting S. Rep. No. 105-190, at 20 (1998)). By leaving service providers exposed to the common law copyright regimes of the 50 states with respect to pre-1972 sound recordings,[3]

---

[2] *See* Arik Hesseldahl, *Review: Apple's iPod Updates,* BUSINESS WEEK, Sept. 7, 2010, at 1 ("Apple has sold 275 million iPods in various forms over the years…."), *available at* http://www.businessweek.com/technology/content/sep2010/tc2010097_126804.htm.

[3] More specifically, "sound recordings fixed before February 15, 1972." 17 U.S.C. § 301(c).

2

Plaintiffs' view would render the statute's promise of "greater certainty" largely illusory for service providers of all kinds.[4]

Adopting Plaintiffs' positions would create uncertainty for service providers regarding their legal exposure for alleged copyright infringements committed by users or unrelated third parties. This would inhibit the growth and development of user-centric online models that, day after day, make the Internet and the world more democratic. TIME famously named "You" the "Person of the Year" in 2006, recognizing that the Internet was "a tool for bringing together the small contributions of millions of people and making them matter."[5] Nearly half of Internet users between the ages of 13 and 75 have "created content—blogs, music, photos, videos, and Web sites—for others to view online." *See* Edward Lee, *Warming up to User-Generated Content,* 2008 U. ILL. L. REV. 1459, 1500.[6] Through the DMCA's safe harbors, Congress sought to promote these sorts of developments (and investment in the innovations that enable them), not to hinder them.

Congress's foresight has been and continues to be amply rewarded. Today, Google's innovative technologies connect millions of people around the world with information every day. Google's Web Search index makes the more than one trillion web pages useful and accessible to hundreds of millions of Internet users. On Google's Blogger service, over 270,000 words are written each minute—388 million words a day—including many words about, and links to, sound recordings posted by enthusiastic music fans. Users of Google-owned YouTube post more than 35 hours of video every minute. If three television networks were broadcasting 24 hours a day, 7 days a week, 365 days a year for 60 years, they still would not have broadcast as much

---

[4] The various section 512 safe harbors apply to the activities of different Internet intermediaries. Section 512(a) applies to service providers that provide subscribers with Internet access, section 512(b) to providers of caching services, section 512(c) to hosting providers, and section 512(d) to search engines. Accordingly, a ruling that the DMCA safe harbors do not reach state common law copyright claims would disrupt expectations for the entire ecology of Internet commerce, from access providers to web hosting services to search engines.

[5] Lev Grossman, *Time's Person of the Year: You*, TIME, Dec. 13, 2006, *available at* http://www.time.com/time/magazine/article/0,9171,1569514,00.html.

[6] *See also* David Armano, *It's the Conversation Economy, Stupid,* BUSINESS WEEK, April 9, 2007, *available at* http://www.businessweek.com/innovate/content/apr2007/id20070409_372598.htm.

content as is uploaded to YouTube every 30 days.[7] Some of this content doubtless includes pre-1972 sound recordings, whether in the form of a song unintentionally captured playing on a radio in the background or a track intentionally deconstructed for critical review.[8] And it's not just Google services—for example, more than 13 million bands have established web pages on MySpace, including uploading sound recordings and posting links to other sites that include related musical content.[9]

The ability of Google and other Internet companies to provide these services (and future services that have yet to be thought of) depends on the protections afforded to them by the DMCA's safe harbors. Google services today allow millions of users each to contribute to a global conversation on a vast array of topics (including music recorded before 1972). While the vast majority of those contributions are entirely lawful, inevitably some will not be. Without the protections of the safe harbors, the possibility of common law copyright actions brought in dozens of different states—multiplied by thousands of works—could threaten innovation on the Internet.

The importance of the DMCA's safe harbors to the continued development of online services cannot be overstated. It is a simple technological fact that most individuals and organizations cannot do anything on the Internet without relying on online service providers. When a user sends an email, the user must rely on service providers to connect to the Internet, to process and send the email to its destination, and to store that email until it is read by its recipient. When a user offers an item for sale to the Internet at large, a service provider must host

---

[7] Hunter Walk, *Great Scott! Over 35 Hours of Video Uploaded Every Minute to YouTube,* THE OFFICIAL YOUTUBE BLOG, Nov. 10, 2010, http://youtube-global.blogspot.com/2010/11/great-scott-over-35-hours-of-video.html.http://youtube-global.blogspot.com/2010/11/great-scott-over-35-hours-of-video.html.

[8] *See, e.g.,* Richard Metzger, *Deconstructing Gimme Shelter: Listen to the Isolated Tracks of the Rolling Stones in the Studio,* DANGEROUS MINDS, Nov. 29, 2010, *available at* http://www.dangerousminds.net/comments/deconstructing_gimme_shelter_listen/. Interestingly, the copyright owner in the Rolling Stones track in question appears to have availed itself of the DMCA's notice-and-takedown provisions in order to have the relevant material removed from YouTube, demonstrating that the DMCA works both for rights holders and service providers.

[9] *See* Jon Swartz, *Once Fading MySpace Focuses on Youthful Reincarnation,* USA TODAY, Mar. 10, 2010, *available at* http://www.usatoday.com/tech/techinvestor/corporatenews/2010-03-10-myspace10_CV_N.htm.

the offer. When a proud parent wants to show friends and family the latest picture or video of a growing child, a service provider needs to provide the infrastructure to hold it and allow people to view it. None of these examples suggests an unlawful enterprise, yet the services that support them each can be used in manners that infringe copyright (including state common law copyrights in pre-1972 recordings)—and each depends fundamentally on the protections of the DMCA's safe harbors. If those service providers could be held liable for each act of infringement by their users, their ability to offer the services we all depend on every day could be seriously impaired.

In enacting the DMCA safe harbors, Congress responded to the uncertain legal environment that faced online service providers in 1998 as courts struggled to apply federal copyright statutes to new Internet technologies. 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 12B.01[A][1] (2010) (describing conflicting jurisprudence prior to 1998). Today, the scope of state common law copyright as applied to Internet intermediaries is even less developed than federal copyright law was in 1998. If Plaintiffs' views are allowed to prevail, many companies undoubtedly will conclude that the risk of litigation under unpredictable state common law principles warrants diverting resources away from the user-focused collaborative models that today are giving users unprecedented power and choice, and that are currently driving innovation and investment. The burden of this legal uncertainty will fall especially heavily on new start-up innovators—stripped of the legal certainty provided by the DMCA's safe harbors, the *next* innovation like YouTube might never get off the ground in the first place.[10]

Nor will uncertain litigation waged in state courts serve the interests of those who own state law copyrights. Under the DMCA, copyright owners were granted a tremendous boon—the ability to get material expeditiously taken down without resort to judicial action (and even to

---

[10] *See, e.g., UMG Recordings, Inc. v. Escape Media Group, Inc.*, No. 100152/2010, complaint filed Jan. 6, 2010 (N.Y. Supr. Ct.) (state common law copyright claims brought against online music start-up Grooveshark); Paul Resnikoff, *Universal Music Group Now "Declaring Legal Jihad" Against Grooveshark . . .*, DIGITAL MUSIC NEWS, Sept. 3, 2010 (describing litigation against Grooveshark), *available at* http://www.digitalmusicnews.com/stories/090310groovesharkumg.

subpoena the identities of alleged infringers), *see* 17 U.S.C. § 512(c)(1)(C) & (h).[11] A finding that the DMCA's safe harbors do not apply to pre-1972 sound recordings would cast service providers and rights holders alike back in time to the mutual uncertainty that prevailed prior to 1998. Congress meant to resolve precisely these sorts of uncertainties—which give the advantage to those with the larger litigation budget—by enacting the DMCA's safe harbors.

### 2. The statutory language of the safe harbors reaches all copyright claims.

The Court should begin with in the plain words of the statute. The statute provides that a qualifying hosting provider "shall not be liable for monetary relief . . . for infringement of copyright . . . ." 17 U.S.C. § 512(c); *see also id.* § 512(a), (b), (d) (same). When Congress intended that its pronouncements be limited to rights and remedies under the federal Copyright Act, it knew how to say so. *See, e.g.,* 17 U.S.C. § 114(d)(4) (nothing in Section 114 affects remedies "under this title" pursuant to certain exclusive rights); *id.* § 115(c)(3)(I) (certain claims of infringement "under this title" are precluded). "[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). In contrast to other provisions in the Copyright Act, the safe harbors are not applicable only to remedies "under this title," demonstrating Congress's intent to extend the safe harbors to *all* copyright claims, whether under federal law or otherwise.

The DMCA's express rejection of any obligation on service providers to monitor user activities for infringement offers further support for this interpretation. Congress well understood the dangers of requiring that service providers screen all material they transmit, cache, host, or link to; that is why Congress expressly stated that the protection of the safe harbors is not

---

[11] This distinguishes section 512(c) cases from those that have been brought against peer-to-peer file-sharing services, in which the services do not host the allegedly infringing materials and copyright owners do not have recourse to the extrajudicial options in section 512(c)(1)(C) & (h). *See also Viacom Int'l Inc. v. YouTube, Inc.,* No. 07 Civ. 2103 (LLS), 2010 WL 2532404, at *11 (S.D.N.Y. June 23, 2010) (distinguishing peer-to-peer file-sharing cases). The DMCA safe harbors apply to hosting providers and search indices, providing rapid recourse to rights holders in the form of clearly articulated, extra-judicial notice-and-takedown and pre-complaint subpoena procedures.

conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity . . . ." 17 U.S.C. § 512(m).[12] Plaintiffs' argument that the safe harbors have no application to state common law copyright claims would undermine this crucial feature of the DMCA's statutory scheme for service providers of all types. If service providers have no safe harbor for pre-1972 sound recordings, they may find themselves forced to screen the material they transmit, cache, host, and link to in order to determine whether it includes infringing pre-1972 sound recordings, or else face indeterminate state common law liability. This would require some means for *identifying* each sound recording, as well as a way to determine, once the identity of a sound recording is known, when it was fixed. Upon a determination that a sound recording was fixed before February 15, 1972, the service provider would need to determine whether the copyright in the recordings had lapsed (and which state's laws apply to that determination), or whether the user's use is licensed, a fair use (assuming the state law in question recognizes such a doctrine), or otherwise lawful. This process would need to be repeated for each and every sound recording the provider hosts for each and every user, for every link that might lead to a sound recording, and for every transmission carried for a user. This is a monumental task, and cannot possibly be what Congress intended when it decreed that qualifying service providers "shall not be liable for monetary relief . . . for infringement of copyright," 17 U.S.C. § 512(c), and that this safe harbor would not be conditioned on the service provider "monitoring its service or affirmatively seeking facts indicating infringing activity," *id.* § 512(m).

---

[12] The DMCA is not the first example of Congress's recognition of the problems that would arise were service providers required to screen their users' content for unlawful material. The Communications Decency Act, enacted in 1996, broadly immunizes service providers from tort liability for republishing users' content. *See* 47 U.S.C. § 230(c). "The amount of information communicated via interactive computer services is . . . staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems." *Zeran v. America Online, Inc*, 129 F.3d 327, 331 (4th Cir. 1997). Congress's purpose in enacting section 230 was "to avoid any such restrictive effect." *Id*. As Defendants do not appear to have raised section 230 as a defense, there is no occasion for the Court to address its application to state common law copyright claims, and Google accordingly expresses no view on that issue here. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) (reading section 230 to preempt state law claims, including state law intellectual property claims).

Holding that section 512 applies to all copyright claims, including state law claims, would not conflict with section 301(c). That provision states that for pre-1972 sound recordings, "any rights or remedies under the common law or statutes of any State shall not be annulled or limited by this title until February 15, 2067." 17 U.S.C. § 301(c). The safe harbors do not annul or limit rights or remedies available under state common law. Instead, they merely affect who the proper defendants are for claims seeking to enforce such rights, and from whom remedies may be sought. Plaintiffs retain all of the rights they have in their pre-1972 sound recordings, and they may pursue claims of infringement against individuals (including MP3Tunes users) they reasonably believe to have directly infringed those rights. They also are free to seek any appropriate remedies, whether monetary or otherwise, from those individuals. Section 512 provides only that Plaintiffs cannot seek monetary relief (or, except as provided in section 512(j), injunctive relief) from innocent intermediaries—from service providers that fall within the safe harbors. The full panoply of rights and remedies under state common law for pre-1972 sound recordings remain available to Plaintiffs—the only effect of section 512 is on the persons from whom certain remedies can be obtained. Thus, section 512 does not "annul[] or limit[]" any of Plaintiffs' rights and remedies under state common law for pre-1972 sound recordings, but only affects whom those rights and remedies can be enforced against.

To the extent the Court concludes that there is a conflict between the plain language of section 512 and section 301(c), the Court must construe the law in section 512's favor, because section 512 is the later-enacted provision. *See United States v. Estate of Romani,* 523 U.S. 517, 530-31 (1998) ("a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it ha[s] not been expressly amended"). Section 301(c) was enacted as part of the Copyright Act of 1976. Pub. L. 94-553, Oct. 19, 1976, 90 Stat. 2541. Section 512 was enacted in 1998. Pub. L. 105−304, Oct. 28, 1998, 112 Stat. 2860.[13]

---

[13] Congress did amend Section 301(c) in 1998 to change its sunset date from February 15, 2047 to February 15, 2067, but that amendment did not alter any of the other language in the provision. *See* Pub. L. 105-298, Oct. 27, 1998, 112 Stat. 2827. In any event, section 512's enactment post-dates the 1998 amendment to section 301(c).

**B.     Copyright law protects the interests of legitimate consumers in "space-shifting" and similar protected fair uses.**

As MP3Tunes explains in its motion for summary judgment, its services allow users to synchronize their music libraries for "cloud" storage on MP3Tunes's servers. *See* MP3Tunes Memo. of Ps & As In Supp. Of Mot. for Summ. J. ("MP3Tunes Br.") at 4. Conceptually, this is no different than what users do when they store music purchased on CDs on their personal computer hard drives, or on their iPods or other digital music players. Countless well-known consumer products rely on the fair use status of time- and space-shifting, including CD and DVD burners, TiVos[14] and other digital video recorders, and next-generation devices like the Slingbox[15] that allow consumers to enjoy their media on any Internet connected device. *See also The Cartoon Network LP, LLP v. CSC Holdings, Inc.*, 536 F.3d 121 (2d Cir. 2008) (discussing "remote storage" digital video recorder). Just as the Supreme Court has held that "time-shifting"—recording television broadcasts for later viewing—is a lawful fair use, *Sony Corp. of America v. Universal City Studios,* 464 U.S. 417, 455 (1984), so too is "space-shifting" lawfully acquired music onto digital music players or cloud-based equivalents. *Recording Indus. Assoc. of Am. v. Diamond Multimedia Sys.,* 180 F.3d 1072, 1079 (9th Cir. 1999). A contrary holding would treat tens of millions of iPod owners who lawfully acquire their media as no better than those who misuse new technologies to pirate music and movies.

Plaintiffs are fittingly circumspect about urging such an extreme result on the Court. Rather than attack the activities of MP3Tunes users who copy lawfully acquired music to their personal online music lockers, Plaintiffs instead focus on users who allegedly obtain music from infringing sources. Proposed Amicus Curiae the Motion Picture Association of America ("MPAA") supporting Plaintiffs, however, conflates these two categories in its zeal to condemn MP3Tunes and its users. *See* MPAA Br. at 19 n.6. Were this imprudent conflation accepted by the Court, it would put both legitimate music fans and technology innovators in jeopardy, an

---

[14] In addition to allowing recording for later viewing, TiVo digital video recorders also allow recordings to be exported to iPhones, iPods, and other portable devices. *See* https://www3.tivo.com/store/accessories-desktoppluspc.do.

[15] *See* http://slingmedia.com/go/placeshifting (describing the Slingbox and its space-shifting capabilities).

9

outcome unnecessary to any decision in this case.

The efforts of Plaintiff and its supporting amici to undermine the volitional act requirement for the public performance right also represents a threat to next-generation space-shifting services. With respect to the legal merits of this issue, Google endorses the arguments ably set out by Defendants (MP3Tunes Br. at 28-29), and PK et al. (PK et al. Br. at 11-17).

In addition, however, the approach of Plaintiffs and their supporting amici on this point should be rejected because it would create an unsupportable and arbitrary burden on next-generation, remote, "cloud-based" storage services, precisely the outcome the Second Circuit sought to avoid in its recent *Cartoon Network* ruling. The Second Circuit found it unnecessary to decide in *Cartoon Network* whether Cablevision had engaged in volitional acts sufficient to directly infringe the public performance right. 536 F.3d at 134. Nevertheless, that court's analysis in the context of the reproduction right applies equally to providers of cloud-based services that users employ for personal *transmissions* as well as those employed for personal *copying*:

> Here, by selling access to a system that automatically [transmits] copies on command, Cablevision more closely resembles a store proprietor who charges customers to use a [transmitter] on his premises, and it seems incorrect to say, without more, that such a proprietor "[transmits]" any copies when his machines are actually operated by his customers.

*Id.* at 132. Plaintiffs and their supporting amici ignore this teaching of *Cartoon Network*, and instead take the view that any service that enables users to *transmit* their own lawfully acquired music to their own devices should be treated as a "video on demand" (VOD) service, insisting that "authorization from content owners is a necessary input" for any and all services that provide any kind of transmission capabilities to users. MPAA Br. at 14. *Cartoon Network* makes clear that it is the user who "makes" the reproduction when operating a remote system that enables copying. 536 F.3d at 132. It should be equally clear that it is the user who "makes" the transmission when she operates a remote system that enables her to transmit those copies to her own devices. Any other result would arbitrarily stymie cloud-based services in favor of services

that rely on transmission technologies located in the user's own home.[16]

## IV.   CONCLUSION

For the foregoing reasons, Google requests that the Court reject the unwarranted interpretations of the safe harbors and copyright status of space-shifting advanced by Plaintiffs and their supporting amici.

Dated:  January 3, 2011                    By:   /s/ Asim M. Bhansali
                                                                                    Asim M. Bhansali
                                                                                   KEKER & VAN NEST LLP
                                                                                   710 Sansome Street
                                                                                   San Francisco, CA 94111-1704
                                                                                   Telephone: (415) 391-5400
                                                                                   Facsimile: (415) 397-7188
                                                                                   *Attorneys for Amicus Curiae Google Inc.*

*Of Counsel:*

Michael S. Kwun
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: (415) 391-5400
Facsimile: (415) 397-7188

---

[16] *See* http://slingmedia.com/go/placeshifting (describing Slingbox set-top box that enables transmission of video content to any Internet-connected device); https://www3.tivo.com/store/accessories-desktoppluspc.do (describing software that enables owners of TiVo digital video recorders to export recordings to portable video players); http://www.elgato.com/elgato/na/promotions/2010-Dec-liveTV-iPad.en.html (describing software that enables users to time-shift television and transmit resulting recordings to iPads).

11