# PRYOR CASHMAN LLP

New York | Los Angeles

7 Times Square, New York, NY 10036   Tel: 212-421-4100   Fax: 212-326-0806        www.pryorcashman.com

December 15, 2010

Honorable William H. Pauley
U.S. District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 2210
New York, New York 10007

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/19/11

RECEIVED
DEC 1  2010
CHAMBERS OF
WILLIAM H. PAULEY
U.S.D.J.

      *Re:*    *Capitol Records, LLC et al. v. MP3tunes, Inc., No. 07 Civ. 9931 (WHP)*

Dear Judge Pauley:

      The parties respectfully submit this joint letter regarding Plaintiffs' renewed request for leave to move to strike the testimony of Defendants' proffered music industry expert, attorney Steve Gordon.

**Plaintiffs' Position**

      By letter dated September 2, 2010, Plaintiffs requested leave to move to strike the testimony of Steve Gordon on several grounds which are summarized in that letter, a copy of which is attached as Exhibit A.

      At the September 23 pre-motion conference, Your Honor expressed a preference that Plaintiffs not make a motion to strike prior to seeing how MP3tunes made use of Mr. Gordon's testimony. MP3tunes's counsel, Mr. Gulia, stated that if MP3tunes was to rely on Mr. Gordon, only "snippets" of his deposition testimony or a short declaration of "a couple of sentences" would be cited. In response, I noted that the "expert report" that had already been submitted by Mr. Gordon was, in fact, in the form of a declaration, and expressed concern that MP3tunes would just submit that existing declaration on summary judgment. Your Honor noted that Mr. Gulia said he was not going to do that, and Mr. Gulia agreed. Your Honor concluded that if any use of testimony from Mr. Gordon by MP3tunes on summary judgment "startles," then Plaintiffs, at that time, can make a formal request to strike.

      In opposing Plaintiffs' motion for summary judgment, MP3tunes has now submitted the entirety of the pre-existing Gordon report/declaration that Plaintiffs had previously objected to. In MP3tunes' brief, Mr. Gordon's report is the sole citation offered for the otherwise unsupported proposition that "viral marketing campaigns are standard practice in the music business."

      Defendant's characterization of this citation as merely a "snippet," to use Mr. Gulia's term, is grossly misleading. While the specific pages cited by MP3tunes contain the general, conclusory assertion that "it is a standard practice in today's music business for copyright owners to make free downloads of songs available to users of the Internet," that statement is a summary of Mr. Gordon's

36787.1

*The parties may address this issue at oral argument on January 28, 2011.*

SO ORDERED:

*[signature]*
WILLIAM H. PAULEY III U.S.D.J.

1/19/2011

## PRYOR CASHMAN LLP

speculative "findings" in the remainder of his report, none of which are based on facts or even diligent research. (See September 2 letter, p. 2.) Indeed, Mr. Gordon admitted in his deposition that he did not know whether the downloads referenced in his report were authorized, but only that they appeared to be available for free.

As reflected in the attached letter and throughout Plaintiffs' summary judgment papers, Plaintiffs fully object to the accuracy of Mr. Gordon's conclusions related to Plaintiffs' promotional practices. MP3tunes's inappropriate use of this plainly inadmissible testimony (see September 2 letter, pp. 1-2) is troubling because the unsupported theory that Plaintiffs authorized "free downloads" for "viral" marketing on the Internet is MP3tunes' justification for virtually every act of infringement alleged in this case. Again, Mr. Gordon's report is based only on his review of the evidence in this case and his "experience," which he has admitted is completely unrelated to the marketing of digital music. (*Id.* p. 2.) Defendant claims that despite this clear dearth of relevant experience, his testimony meets the standard of FRE 702, citing to cases where the court specifically found that the proffered expert, unlike Mr. Gordon, had the relevant experience to avoid disqualification. *See Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 U.S. Dist Lexis 2676, *18-19 (S.D.N.Y. Feb. 20, 2004) (rejecting FRE 702 challenge upon a finding that proffered expert had the relevant experience); *Bullock v. H.B. Fuller Co.* 61 F.3d 1038, 1043-44 (2d Cir. 1995) (finding expert had the relevant experience and rejecting arguments based on "strength of credentials"); *Figueroa v. Boston Scientific Corp.*, 254 F.Supp. 2d 361, 368 (S.D.N.Y. 2003)(finding three experts had relevant experience). The law is quite clear that to be admissible under FRE 702, an expert positing an opinion based on experience "must do more than aver conclusorily that his experience led to his opinion." *Figueroa* at 366, *citing Primavera Familienstiftung v. Askin*, 130 F. Supp. 2d 450, 530 (S.D.N.Y. 2001). Mr. Gordon's conclusions regarding "industry practice" must be precluded under this standard, and any consideration by the Court of Mr. Gordon's report or conclusions in connection with Plaintiffs' motion for summary judgment would unfairly prejudice Plaintiffs in this action.

Plaintiffs respectfully request that the Court strike Mr. Gordon's report as not based on any admissible evidence. In the alternative, Plaintiffs respectfully request leave to file a formal motion to strike report from the record on the pending summary judgment motion.

**Defendants' Position**

Plaintiffs' request is their latest attempt to delay adjudication of the substantive issues of this case with specious motion practice. It should be rejected out of hand.

As an initial matter, Plaintiffs have completely mischaracterized the discussions at the September 23, 2010 pre-motion conference. When Plaintiffs raised the issue at that conference, we assured the Court that Defendants would not submit a lengthy new declaration from Mr. Gordon and indeed that Defendants would make very little use of Mr. Gordon's report. True to our word, we did not rely upon Mr. Gordon's Report at all in our own summary judgment papers, and in our papers opposing Plaintiffs' motion, we only made passing reference to it. Rather, the principal evidence Defendants used to demonstrate that Plaintiffs engage in viral marketing practices (contrary to their earlier, false representations to this Court that it was "pure fantasy") is Plaintiffs' own documents and sworn testimony. Defendants limited their use of Mr. Gordon's Report only to demonstrate that Plaintiffs' practice was consistent with wide industry practice. Use of this one "snippet" from Mr.

# PRYOR CASHMAN LLP

Gordon's Report is consistent with Defendants' assurances to the Court. Tellingly, Plaintiffs do not deny the truth of Mr. Gordon's conclusions, for the simple reason they cannot. Indeed, one of the allegedly "infringing" downloads Plaintiffs chose to highlight comes from the EMI website www.chrysalis.co.uk. It is no secret that the record companies distribute free music on the Internet for promotional purposes. Indeed, an article in today's *New York Times* (attached as Exhibit B) discusses this practice, noting:

> As a result, [music blogs] have a complex symbiosis with the music business. While the Recording Industry Association of America wants to shut them down, the rank and file of the record labels — particularly in hip-hop circles — uses them as marketing tools and publicity outlets.

Ben Sisario, *Piracy Fight Shuts Down Music Blogs*, N.Y. Times, Dec. 14, 1991, at B1.

Plaintiffs also engage in mischaracterization and spin when they claim that Your Honor merely "expressed a preference" that they not file a motion to strike Mr. Gordon's report. Our recollection is dramatically different. Specifically, we recall Your Honor instructing Plaintiffs that a motion to strike at this stage was unnecessary because any issues Plaintiffs had with Mr. Gordon's testimony could be made in a footnote in their motion papers. Your Honor further noted that such motion practice would be an inefficient use of judicial resources at this time, given that Your Honor, as opposed to a jury, was more than capable of determining the appropriate weight to grant Mr. Gordon's testimony.

Your Honor's instruction then remains the case today. If this litigation reaches the point of trial, Plaintiffs can then make a *Daubert* motion where Your Honor can serve as a gatekeeper to determine whether or not Mr. Gordon's testimony should be heard by a jury. Even then, however, there would be no merit to Plaintiffs' claim that Mr. Gordon's testimony is "inadmissible." "An expert may base his opinion on experience alone, and [Defendant's] arguments implicate the weight of the evidence, rather than its admissibility." *Figueroa v. Boston Scientific Corp.*, 254 F. Supp. 2d 361, 368 (S.D.N.Y. 2003). Mr. Gordon has ample experience to testify. He has spent 27 years in the music industry, ten of which as Director of Business Affairs for Sony Music where he personally oversaw marketing efforts for that company. His book, *The Future of the Music Business*, is among the top-selling treatises on the subject of music marketing in the digital age. He is also a two-time Fulbright scholar who has taught and lectured on digital music marketing at various institutions such as CUNY, Columbia, and the Wharton School. On top of all that, Mr. Gordon continues to represent music websites like Pitchfork.com, as well as recording artists, producers and managers. A motion to preclude Mr. Gordon from testifying on the basis of his credentials would be frivolous, given that "[d]isputes as to the strength of [an expert's] credentials ... go to the weight, not the admissibility, of his testimony." *Bullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995). Indeed, courts routinely admit testimony from music industry experts. *See, e.g., Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 U.S. Dist. Lexis 2676, *18 (S.D.N.Y. Feb. 20, 2004) (holding that practical experience in music industry was sufficient to qualify expert witness for *Daubert* purposes even though he had no prior experience in the specific subject matter of his report).

Accordingly, Your Honor remains capable of determining whether or not Mr. Gordon's Report, or at least the brief snippet of it referenced in Defendants' opposition brief, is made upon a

## PRYOR CASHMAN LLP

reliable foundation and relevant to the matters at hand. Indeed, Plaintiffs' claims to the contrary ring particularly hollow given their reliance upon the very dubious declarations of their own "expert," Ellis Horowitz, who has made a career out of testifying for Plaintiffs. Plaintiffs' request should therefore be denied, so the Court can finally address the substance of this dispute.

Respectfully submitted,

*/s/ John Dellaportas*

John Dellaportas
DUANE MORRIS LLP
1540 Broadway
New York, NY 10036
*Attorneys for the Defendants*

*/s/ Frank P. Scibilia*

Frank P. Scibilia
PRYOR CASHMAN LLP

Enclosures

**EXHIBIT A**



# PRYOR CASHMAN LLP

New York | Los Angeles

7 Times Square, New York, NY 10036-6569   Tel: 212-421-4100   Fax: 212-326-0806

www.pryorcashman.com

**Frank Scibilia**
Partner

Direct Tel: (212) 326-0445
Direct Fax: (212) 798-6375
fscibilia@pryorcashman.com

September 2, 2010

**BY HAND**

Honorable William H. Pauley III
U.S. District Court
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street, Room 2210
New York, New York 10007

   Re: *Capitol Records, LLC et al. v. MP3tunes, Inc., No. 07 Civ. 9931 (WHP)*

Dear Judge Pauley:

  We submit this joint letter on behalf of all parties regarding Plaintiffs' request for leave to move to strike the report of Defendants' proffered "music industry" expert, attorney Steve Gordon (the "Report") and to preclude Mr. Gordon's proposed testimony in this action.

**Plaintiffs' Position**

  Mr. Gordon asserts two primary "opinions": (1) that "it is a standard practice in today's music business for copyright owners to make free downloads of songs available to users of the Internet," and (2) that EMI "aggressively engage[s]" in that practice. These statements are factual assertions not opinions and are not based upon any "scientific, technical, or other specialized knowledge" as required by FRE 702. Defendants have repeatedly espoused a theory that major record labels and publishers such as the plaintiffs give away tens of thousands of songs on the internet with no restrictions or access controls. Exhaustive discovery has not produced evidence to support that theory, and defendants have now simply turned to a lawyer willing to repeat it.

  Mr. Gordon testified that the primary factual foundation for his conclusions about the distribution of EMI's musical works was the deposition testimony of two of Plaintiffs' witnesses. Aside from the fact that he mischaracterizes that deposition testimony in his report, and ignores other record evidence that refutes his conclusions, Mr. Gordon's conclusions are simply his interpretation of factual evidence that the trier of fact will understand without his assistance. Thus, Mr. Gordon's testimony should be excluded. *See Andrews v. Metro N. C. R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989) (excluding expert when testimony was directed to lay matters which a jury is capable of understanding and deciding for itself).

# Pryor Cashman LLP

Honorable Judge William H. Pauley III
September 2, 2010
Page 2

In addition, Mr. Gordon's opinions are also unsupported by any data or research or methodology applied by experts in the field. For example, the basis for his opinion that major record labels and publishers routinely "authorize" blogs to give away free music is the "fact" that, to his knowledge, there have been no lawsuits filed against blogs offering free downloads. Mr. Gordon admitted that he had never contacted any blog or website about the conclusions in his report, or any record label, publisher, producer or artist, to determine whether any download was, in fact, "authorized." Mr. Gordon also claimed that because two of plaintiffs' witnesses testified to a small number of free downloads that were authorized, "based on common sense," EMI must have authorized other sites that those witnesses could not remember. Lastly, Mr. Gordon further concluded that authorizing free downloads must be an industry-wide practice because "all four [major record] labels basically act alike." Mr. Gordon has no factual basis for any of these opinions, and his testimony should therefore be excluded. See, e.g., Gray v. Briggs, 45 F. Supp. 2d 316, 325 (S.D.N.Y. 1999) (striking expert who could not testify in deposition to any facts supporting his conclusions).

Mr. Gordon also has no experience which would qualify him to opine on the purported subject of his testimony, i.e., the "standard practice" of copyright owners making music available for free downloads at times pertinent to this action. FRE 702; see generally Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147-48 (1999). Mr. Gordon admitted that he has never negotiated a licensing agreement for the free download of any musical recording or composition, and his last experience working as a music executive was in 2001, before the prevalence of online distribution of digital content. Cf. Montefiore Med. Ctr. v. Am. Prot. Ins. Co., 2003 U.S. Dist. LEXIS 7986 at *6-7 (S.D.N.Y. May 14, 2003) (excluding expert where experience was not relevant to proposed testimony).[1]

For the reasons set forth above, the plaintiffs request leave to move to exclude Mr. Gordon's Declaration and preclude his proposed testimony in this action.

**Defendants' Position**

It is understandable why Plaintiffs would not want the ultimate finder of fact to hear the testimony of Steve Gordon. It puts the lie to the dubious representations Plaintiffs have made to this Court. For instance, the Court may recall Plaintiffs' claim that: "[t]he notion that we at EMI put up material for free is pure fantasy . . . there is no evidence in the complaint or anywhere else that reflects that EMI has ever put any of its music out for free. There's no allegation that they know of a single one that's been put out for free." 2/18/08 Court Trans. 30:24-31:5. Similarly, in their summary judgment letter, Plaintiffs claim that: "all sideloaded files are obtained in violation of the copyright law – and defendants know it."

---

[1] Mr. Gordon's Report also offers legal conclusions regarding the application of copyright law to this case, as well as other points which he admitted he had not investigated or did not understand. Plaintiffs' motion will address these other points in addition to those described above.

# PRYOR CASHMAN LLP

Honorable Judge William H. Pauley III
September 2, 2010
Page 3

Discovery has shown these representations to be false. While Plaintiffs tried to hide this fact by claiming they could not search their email servers, Court-ordered searches of just a few EMI marketing executives turned up a vast amount of emails showing that Plaintiffs authorized free downloads for "viral" marketing on the Internet. Third-party subpoenas showed numerous others. EMI even has a website, www.insoundfromwayout.com, distributing countless free downloads of its music. Given Plaintiffs' extensive viral marketing practices, it is impossible for MP3tunes to know which music files sideloaded by its users were from authorized sites. Even Plaintiffs' own expert has conceded that: "I find it difficult to know what's authorized and what's not authorized." Massarsky Trans. 280:16-18.

Nonetheless, Plaintiffs continue to insist that these thousands of free downloads on the Internet are mere "exceptions" because the Digital Millennium Copyright Act protects MP3tunes from copyright infringement claims unless MP3tunes knows of specific instances of infringement on its websites and fails to remove them. *See* 17 U.S.C. § 512.

Defendants will rebut this claim, in part, with the testimony of Steve Gordon. Mr. Gordon is perhaps the nation's foremost expert on Internet music marketing, having spent 27 years in the music industry, including ten years as Director of Business Affairs for Sony Music where he personally oversaw marketing efforts for that company. His book, *The Future of the Music Business* (Hal Leonard 2nd ed. 2008), is a top-selling treatise on the subject. He is a two-time Fulbright scholar who has taught courses and lectured on digital music marketing at CUNY, Columbia, the Wharton School and other institutions. He also continues to represent music websites like Pitchfork.com, recording artists, producers and managers. Mr. Gordon will testify at trial that the practice in the music industry of giving away music on the Internet is not the exception but the rule and indeed has a long history, such that it is impossible for an Internet Service Provider such as MP3tunes to know what has and has not been authorized without the record company identifying the unauthorized site. His opinions are based on, *inter alia*, his decades of industry experience, his research, scholarship and teachings, and his interviews of industry figures for his Internet radio show, which is all confirmed by the documents produced by EMI and the sworn testimony of senior EMI executives in this case.

Plaintiffs' purported challenge to Mr. Gordon's credentials has no legitimate basis. Courts routinely admit expert testimony based on industry experience. *See, e.g., Point Prods. A.G. v. Sony Music Entm't, Inc.*, 2004 U.S. Dist. Lexis 2676, *18 (S.D.N.Y. Feb. 20, 2004) (qualifying expert in music industry under *Daubert*). At most, Plaintiffs' quibbles are the grist for *voir dire* and/or cross-examination at trial. *See, e.g. Bullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials ... go to the weight, not the admissibility, of his testimony.").

Plaintiffs also contend that Mr. Gordon's opinions are "unsupported" by the evidence. Besides being untrue, such arguments are irrelevant or, at best, premature. Mr. Gordon's report clearly lists the bases for his report, all of which have been produced. Plaintiffs, of course, can try to undermine his positions through cross-examination, but their criticism goes only to the

## PRYOR CASHMAN LLP

Honorable Judge William H. Pauley III
September 2, 2010
Page 4

weight to be accorded to his opinions, not their admissibility. *See Raskin v. The Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997) ("disputes as to the validity of underlying data go to the weight of the evidence"); *see also Ulico Casualty Co. v. Clover Capital Management, Inc.*, 217 F. Supp. 2d 311, 318 (N.D.N.Y. 2002) ("Attacks relating to faults in the expert's methodology and lack of textual authority for the opinion all are improper criteria for advancing a motion under 702.").

In sum, Plaintiffs' application for leave to move to strike the report and preclude the testimony of Steve Gordon should be denied. To do otherwise would be to allow Plaintiffs to perpetrate a fiction, while censoring the facts that undermine their entire case.

Respectfully submitted,

*[signature]*

Frank P. Scibilia

**EXHIBIT B**

*Business Day*
*The New York Times*

**TUESDAY, DECEMBER 14, 2010** BL

# Piracy Fight Shuts Down Music Blogs

**By BEN SISARIO**

Thanksgiving Day had barely begun when Kevin Hofman's BlackBerry buzzed. It was one of the technical operators of OnSmash.com, Mr. Hofman's popular hip-hop blog, telling him that the site had gone mysteriously blank just after midnight.

"At first I thought it was hackers," Mr. Hofman said. But within hours a notice went up on the site saying that its domain name had been seized by the United States Immigration and Customs Enforcement unit of the Department of Homeland Security; it was one of dozens of sites shut down, accused of copyright infringement and selling counterfeit goods.

But Mr. Hofman, a brawny Long Islander in his early 30s who formerly worked for a major record label, does not think of himself as a pirate.

OnSmash.com and the handful of other music blogs shut down by the government post brand-new songs and videos without licenses, but much of that material is often leaked to them by managers, music labels and even the artists themselves.

As a result, these sites have a complex symbiosis with the music business. While the Recording Industry Association of America wants to shut them down, the rank and file of the record labels — particularly in hip-hop circles — uses them as marketing tools

Continued on Page 7

# Battle Over Online Piracy Shuts Down Music Blogs

*From First Business Page*

and publicity outlets.

"To Joe Q. Public, 'leak' sounds like a bad word," Mr. Hofman said in an interview at a pizzeria on the Lower East Side, his lawyer by his side. "But if you've ever been in a marketing meeting at a record label, it's 'Hey, can you leak this to the blogs?' Leak is now a marketing verb."

In addition to OnSmash.com, the music sites shut down included Dajaz1.com, RapGodFathers.com and rmx4u.com; another, torrent-finder.com, is a search engine for users of BitTorrent, a file-sharing system that can be used for any kind of data.

The seizures over Thanksgiving weekend — most of the 82 sites involved were shut down for selling knockoff handbags, sunglasses and other goods — were

## Was the unlicensed song a 'leak' or just a marketing move?

made without warning. Internet advocacy groups like the Electronic Frontier Foundation have expressed alarm at the precedent the action might set.

Victoria A. Espinel, the White House's intellectual property enforcement coordinator, said on Dec. 6 that more shutdowns could be expected soon as the government pursued "pirates and counterfeiters."

Some of the people most surprised by the shutdowns are within the music business itself.

"The industry and my artists don't have any issues with most of these sites," said Corey Smyth, a manager of rappers and producers like Lil Jon and Talib Kweli. "When you're trying to get something out, this is where the kids go."

For artists, blogs that traffic in the latest leaks are not always beneficial, nor is it always clear where a leak is coming from. Fabolous, a Brooklyn rapper on the Def Jam label who has worked with OnSmash.com, said competition among blogs had resulted in a free-for-all in which e-mail accounts for artists and producers had been hacked in search of any snippets of new music that could attract readers.

"It's a double-edged sword," Fabolous said. "It's a great, great promotional tool to get whatever you're trying to get out to the masses. But on the other side it is a little bit of piracy, because sometimes it's not always stuff that's given — there's certain things that are taken."

More than a decade since the advent of the file-sharing service Napster, the big labels are still struggling to reconcile the promise and the threat of digital music.

Immigration and Customs Enforcement has not explained how it selected sites that deal in downloadable music, but a spokesman for the Recording Industry of Association of America, which represents the major music labels, said it had worked with ICE and other federal agencies in identifying infringing sites.

"The sites and services we identify are flagrantly violating federal copyright laws, illegally offering songs of well-known artists or pre-release content not commercially available online or in any store," said the trade group spokesman, Jonathan Lamy.

Mr. Hofman, who began his career working in the new media and marketing departments of a major record label (he would not say which one), enjoys easy access to artists and labels. His site regularly hosted showcase concerts in New York clubs, and had been festooned with artist shout-outs. The Miami rapper Rick Ross, in the liner notes to his re-




Kevin Hofman, above, the founder of OnSmash.com, found his hip-hop Web site had been blacked out on Thanksgiving Day. Labels for artists like Rick Ross, top right, and Kanye West often turn to such sites as outlets for early publicity on their latest music.

cent Top 10 album "Teflon Don," thanked OnSmash.com before mentioning his own record company.

"I get nothing but open-arm receptions," said Mr. Hofman, who is prominent enough in the music world that Kanye West links to him on Twitter. "I turn down more industry invites than I accept."

Mr. Hofman said tracks and videos were leaked to his site regularly, adding that if he received a cease-and-desist letter about unauthorized material on his site, he took it down.

Sites like OnSmash.com and Dajaz1.com had advertising, but their operators said the income from it was minimal. The operator of Dajaz1.com, who calls himself Splash (he would not give his real name), described himself in an interview as a married father of two in Queens who once worked in the music industry.

"I have a regular, Joe Schmo job," he said. But running an influential rap blog does have its privileges. "I'm on the phone with Busta Rhymes once every three to four days," Splash said.

For now the seized domains are in legal limbo. David Snead, a lawyer specializing in Internet cases who is representing the owner of torrent-finder.com, speculated that it might be 30 to 60 days before he would be able to see a seizure order. "The government is providing zero information to help us determine what he is being charged with," he said. "It's a black hole."

Some of the sites have resumed their postings by simply relocating to other domains: RapGodFathers.com is now operating on RapGodFathers.info, and torrent-finder.com is now torrent-finder.info.

Mr. Hofman said he was "extremely nervous" about his legal situation, but also puzzled.

"I see myself as a legitimate source of content online, and I have no reason to believe that I was ever perceived as otherwise. If what I'm doing is so wrong and is harming the artist, then why is he retweeting stuff to two million-plus people?" Mr. Hofman said, referring to Kanye West. "It just doesn't make sense to me."