USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/22/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CAPITOL RECORDS, INC. et al.,                     :

                    Plaintiffs,          :          07 Civ. 9931 (WHP)

      -against-                     :          MEMORANDUM & ORDER

MP3TUNES, LLC et al.,                     :

                  Defendants.          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          Plaintiffs, EMI, Inc. and fourteen record companies and music publishers

(collectively, "EMI"), bring this copyright infringement action against Defendants MP3tunes,

LLC ("MP3tunes") and Michael Robertson ("Robertson"). All parties move for summary

judgment. For the following reasons, EMI's motion is granted in part and denied in part and

MP3tunes and Robertson's motion is granted in part and denied in part.

## BACKGROUND

I.  MP3tunes' Websites and Services

          Robertson is an online music entrepreneur familiar with high-stakes copyright

litigation. Years ago, he founded MP3.com, an entity which was the subject of a copyright

infringement action in this District. See UMG Recordings, Inc. v. MP3.com, Inc., 92 F. Supp. 2d

349 (S.D.N.Y. 2000). MP3.com offered users online access to music if they could demonstrate

they already owned the same music on CD. Various record labels brought suit and a multi-

million dollar judgment was entered against MP3.com for copying thousands of music files.

UMG Recordings, Inc. v. MP3.com, 56 U.S.P.Q.2d 1376 (2000). In the wake of that judgment,

MP3.com was sold and its locker service abandoned.  MP3tunes—the subject of this litigation—is Robertson's current foray into online music services.

Robertson founded MP3tunes in February 2005 and launched the website MP3tunes.com to sell independent artists' songs in the mp3 file format.  (Declaration of Andrew H. Bart, dated Oct. 29, 2010 ("Bart Decl.") Exs. 2-5, 12-13.)  In the fall of 2005, MP3tunes added a storage service allowing users to store music files in personal online storage "lockers." (Bart Decl. Exs. 5, 6, 12, 14.)  Songs uploaded to a user's locker could be played and downloaded through any internet-enabled device.  (Plaintiffs' Statement of Undisputed Facts ("PSUF") ¶ 5.)  MP3tunes offers free lockers with limited storage space and premium lockers with expanded storage for a subscription fee.  (PSUF ¶ 6.)  Over 300,000 users have signed up for a locker.  (PSUF ¶ 6.)  LockerSync, a free software program provided on the website, enables users to automatically upload to their lockers mp3 files stored on their personal hard drives. (PSUF ¶ 7.)  Another feature of the website called Webload allows a user to enter the web address of a music file stored on a third-party server connected to the internet, and transfer the file to the user's locker.  (PSUF ¶ 10.)

MP3tunes uses a standard algorithm known as a Content-Addressable Storage system to store music files on its servers.  (Defendants' Statement of Undisputed Facts ("DSUF") ¶ 37.)  Based on the sequence of data bits in a particular music file, the algorithm creates an identification number called a hash tag.  (DSUF ¶ 40.)  If different users upload the same song containing identical blocks of data to MP3tunes' servers, those blocks will be assigned the same hash tag and typically saved only once.  (DSUF ¶¶ 41, 46.)  If a user plays or downloads a song from a locker, the storage system uses the hash tags associated with the

2

uploaded song to reconstruct the exact file the user originally uploaded to his locker.  (DSUF ¶¶ 46-47.)

MP3tunes owns and operates a second website located at www.sideload.com. That website allows users to search for free song files on the internet.  (PSUF ¶ 8.)  Like other search engines, a user can enter keywords (e.g., "Sinatra" or "Watchtower") and Sideload.com returns a list of potential matches.  (PSUF ¶ 16.)  That list is generated by searching an index or list of websites with free song files and cross-referencing the keywords with information associated with each song file.  (Declaration of Ellis Horowitz, dated October 29, 2010 ("Horowitz Decl.") ¶¶ 22-23.)  The index is maintained on MP3tunes' servers.  (Horowitz Decl. ¶ 23.)  By clicking on a search return, the user is taken to a page where he can play the song, follow a link to the third-party website hosting the song, or download the song to another computer.  (Horowitz Decl. ¶¶ 23-24.)  If the user has a locker on MP3tunes.com, Sideload.com displays a link that if clicked, will "sideload" (i.e., download) the song from the third-party website and save it to his locker.  (Horowitz Decl. ¶ 24.)  Sideload.com is free as is storage of sideloaded-songs in MP3tunes.com lockers.  MP3tunes keeps track of the sources of songs in its users' lockers.  (PSUF ¶ 71d.)  Thus, MP3tunes can identify the third-party websites from which users copied songs to their lockers.  Apart from its search function, Sideload.com servers automatically generate lists of "Most Popular," "Featured," and "New" songs that users can browse.  (PSUF ¶ 17.)

Sideload.com also offers users free Sideload Plug-in software.  (PSUF ¶ 9.) When a user with the Sideload Plug-in surfs the internet and comes across a website with a free song file, a button appears on the third-party website that will copy the song directly to the user's MP3tunes locker, without visiting sideload.com.  (PSUF ¶¶ 9-10.)  When a user sideloads a song

from a third-party site, either through the Sideload Plug-in or Webload software, that third-party website is added to Sideload.com's index of searchable songs. (PSUF ¶ 11.) Information associated with the song, such as artist, album, title, and track is automatically stored on a "Track Details" page, and the information becomes part of the searchable index. (PSUF ¶ 18; Horowitz Decl. ¶ 27.) From then on, Sideload.com returns a potential match whenever any other user searches for that song on Sideload.com by entering keywords that match the song file. (Horowitz Decl. ¶ 27.) Thus, as users discover free songs on the internet, the number of songs available through Sideload.com increases. When a downloadable song is removed from a third-party source, the sideload feature becomes inoperable and users can no longer add the song to their lockers. (PSUF ¶ 71b.) But, users who sideloaded the song before it was removed from the third-party source may continue to access the song through their MP3tunes lockers. (PSUF ¶ 86.)

MP3tunes' executives, including Robertson, have personal accounts with MP3tunes and sideload songs from various third-party websites. (PSUF ¶¶ 41a-g.)

In October 2006, MP3tunes' program LockerSync began allowing users to retrieve and display relevant album cover art while uploading or playing a song from their lockers. (PSUF ¶¶ 26-27.) If cover art was not part of a music file or stored on a user's computer, LockerSync retrieved the cover art from Amazon.com and displayed a link to that website. (PSUF ¶ 28.) MP3tunes is licensed to display cover art from Amazon.com for the "principal purpose" of driving traffic to Amazon.com's website. (PSUF ¶ 34.)

II.  MP3tunes' Anti-Infringement Policies and Reaction to EMI's Takedown Notices

Before users activate an MP3tunes locker, they must agree to abide by MP3tunes' policy prohibiting the storage of content that infringes copyrights.  (DSUF ¶ 49.)  Users must also acknowledge MP3tunes' right to sever its relationship with repeat infringers.  (DSUF ¶¶ 57-58.)  Sideload.com does not impose similar conditions for use, but MP3tunes places links to its anti-infringement policy on both Sideload.com and MP3tunes.com.  (DSUF ¶ 59.)

MP3tunes registered an agent with the Copyright Office to receive notices of alleged infringement from copyright owners.  (DSUF ¶ 54.)  MP3tunes displays the contact information of its agent on both of its websites.  (DSUF ¶ 55.)

On September 4, 2007, MP3tunes received a takedown notice from non-party EMI Music Group North America ("EMGNA") identifying 350 song titles and web addresses that allegedly infringed EMI's copyrights.  (PSUF ¶ 26; Bart Decl. Ex. 24.)  EMGNA also provided a list of EMI artists and demanded that MP3tunes "remove all of EMI's copyrighted works, even those not specifically identified."  (Bart Decl. Ex. 24.)  MP3tunes responded by removing links to the specific web addresses listed in EMGNA's letter, but did not remove infringing songs from its users' lockers.  (DSUF ¶ 69.)  In addition, by letter dated September 13, 2007, MP3tunes asked EMGNA to identify any other infringing links.  (DSUF ¶ 72.)  EMGNA declined to identify other links and asserted that its representative list was sufficient to obligate MP3tunes to takedown all other infringing material.  (DSUF ¶ 73.)

On October 25, 2007, MP3tunes received two additional takedown notices: another from EMGNA and one from non-party EMI Entertainment World ("EEW").  (PSUF ¶ 26; Bart Decl. Exs. 25-26.)  Each notice identified specific infringing songs and URLs and demanded that MP3tunes takedown all other EMI copyrighted works.  (Bart Decl. Exs. 25-26.)

Once again, MP3tunes removed the specific links on Sideload.com but did not remove any content from users' lockers. (DSUF ¶ 76.) MP3tunes reiterated its earlier request that EMGNA and now EEW specifically identify any other infringing links. (DSUF ¶ 76.) Neither EMGNA nor EEW responded. Rather, on November 9, 2007, EMI filed this lawsuit.

EMI contends that it owns or controls copyrights in 3,189 sound recordings, 562 musical compositions, and 328 images of album cover art that are at issue on this motion. (PSUF ¶¶ 1-3.)

DISCUSSION

I. Legal Standard

To prevail on a motion for summary judgment, the moving party must demonstrate each essential element of its infringement claim or defense. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Davis v. Blige, 505 F.3d 90, 97 (2d Cir. 2007). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). Once the moving party has made the initial showing that there is no genuine dispute of material fact, the non-moving party cannot rely on the "mere existence of a scintilla of evidence" to defeat summary judgment but must set forth "specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis in original); Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (citation omitted).

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita, 475 U.S. at 586-87). The Court resolves all factual ambiguities and draws all inferences in favor of the non-moving party. Liberty Lobby, 477 U.S. at 255; Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005).

II. DMCA Safe Harbors

This case turns in large part on whether MP3tunes is eligible for protection under the safe harbors created by the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §512. The DMCA seeks to balance the interests of copyright owners and online service providers by promoting cooperation, minimizing copyright infringement, and providing a higher degree of certainty to service providers on the question of copyright infringement. See ALS Scan, Inc. v. RemarQ Communities, Inc., 239 F.3d 619, 625 (4th Cir. 2001). Toward that goal, the DMCA provides certain safe harbors (i.e., limitations on remedies for copyright infringement), but only to qualifying service providers. As courts have emphasized, "[t]his immunity . . . is not presumptive, but granted only to 'innocent' service providers . . . ." ALS Scan, 239 F.3d at 625. Moreover, the DMCA's safe harbors, as with all immunities from liability should be narrowly construed. United States v. Texas, 507 U.S. 529, 534 (1993); see also Fame Publ'g Co. v. Ala. Custom Tape, Inc., 507 F.2d 667, 670 (5th Cir. 1975) (statutes that provide exceptions to liability under the Copyright Act should be strictly and narrowly construed).

EMI argues that MP3tunes is ineligible for protection under the DMCA because it (1) failed to reasonably implement a repeat-infringer policy by not identifying users who had sideloaded works identified in EMGNA's and EEW's takedown notices; (2) failed to act

expeditiously to remove the sideloaded works identified in EMGNA's and EEW's takedown notices; (3) ignored red flags of widespread infringement; and (4) controlled and benefitted from the infringing activity.

MP3tunes argues that it is protected under the DMCA because MP3tunes (1) implemented a repeat infringer policy and did not interfere with standard industry practices to prevent and police infringement; (2) removed expeditiously the specific infringements for which it was properly noticed; (3) lacked actual or constructive knowledge of the specific alleged infringements; and (4) did not control or benefit from the infringing activity.

A. Subsection 512(i)—Repeat Infringer Policy

EMI argues that MP3tunes failed to reasonably implement a repeat infringer policy and is therefore ineligible for protection under subsection 512(i), which states:

> **(i) Conditions for Eligibility.—**
> (1) Accommodation of technology.— The limitations on liability established by this section shall apply to a service provider only if the service provider—
>> (A) has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers . . . .

17 U.S.C. § 512(i). This requirement is a threshold prerequisite for every DMCA safe harbor and is a fundamental safeguard for copyright owners. As described by Judge Posner, "[t]he common element of [the DMCA's] safe harbors is that the service provider must do what it can reasonably be asked to do to prevent use of its service by 'repeat infringers.'" In re Aimster Copyright Litig., 334 F.3d 643, 655 (7th Cir. 2003); see also Columbia Pictures Indus., Inc. v. Fung, No. 06 Civ. 5578, 2009 WL 6355911, at * 18 (C.D. Cal. Dec. 21, 2009). Other courts have described enforcement of this provision as essential to "maintain the 'strong incentives' for service providers to prevent their services from becoming safe havens or conduits

8

for known repeat copyright infringers." Perfect 10 v. Cybernet Ventures, 213 F. Supp. 2d 1146, 1178 (C.D. Cal. 2002).

The key terms "reasonably implemented" and "repeat infringer" are not defined by the DMCA. Circuit courts have held that implementation is reasonable if the service provider (1) has a system for dealing with takedown notices, (2) does not interfere with the copyright owner's ability to issue notices, and (3) under "appropriate circumstances," terminates users who repeatedly or blatantly infringe copyrights. See Perfect 10 v. CCBill, 488 F.3d 1102, 1109-1110 (9th Cir. 2007). The purpose of subsection 512(i) is to deny protection to websites that tolerate users who flagrantly disrespect copyrights. Corbis Corp. v. Amazon.com, 351 F. Supp. 2d 1090, 1100-01 (W.D. Wash. 2004). Thus, service providers that purposefully fail to keep adequate records of the identity and activities of their users and fail to terminate users no matter how persistent and flagrant their infringement, are not eligible for protection under the safe harbor. CCBill, 488 F.3d at 1110; see also In re Aimster Copyright Litig., 252 F. Supp 634, 659 (N.D. Ill. 2002) (service provider ineligible where users' data was intentionally encrypted, making enforcement of non-infringement policy impossible). On the other hand, service providers have no affirmative duty to police their users. CCBill, 488 F.3d at 1111. In cases of video and file sharing sites, reasonable implementation has been found where service providers terminated the accounts of users who had been warned yet continued to upload material that had been the subject of a takedown notice. See, e.g., UMG Recordings, Inc. v. Veoh Networks Inc., 665 F. Supp. 2d 1099, 1117-18 (C.D. Cal. 2009).

EMI argues that MP3tunes purposefully blinded itself to its users' infringement and failed to take any action against hundreds of users who sideloaded copies of songs identified in EMGNA's and EEW's takedown notices. EMI also maintains that MP3tunes ignored blatant

infringement by its executives.  Defendants counter that they have implemented a procedure for dealing with takedown notices and have complied with the notices sent by EMGNA and EEW by removing the identified infringing links on sideload.com.  In addition, MP3tunes terminated the accounts of 153 repeat infringers who violated copyrights by sharing the content of their lockers with other users.

Blatant infringers typically are those who upload or post unauthorized content, allowing others to experience or copy the work.  See Viacom v. YouTube, 718 F. Supp. 2d 514, 528-29 (S.D.N.Y. 2010) (finding policy reasonable that terminated users who upload content after warning); Io Grp., Inc. v. Veoh Networks, Inc., 586 F.Supp.2d 1132, 1143 (N.D. Cal. 2008) (same).  The record reveals that MP3tunes' users do not upload content to the internet, but copy songs from third-party sites for their personal entertainment.  There is a difference between users who know they lack authorization and nevertheless upload content to the internet for the world to experience or copy, and users who download content for their personal use and are otherwise oblivious to the copyrights of others.  The former are blatant infringers that internet service providers are obligated to ban from their websites.  The latter, like MP3tunes users who sideload content to their lockers for personal use, do not know for certain whether the material they are downloading violates the copyrights of others.

Indeed, the cases cited by EMI require the termination of users who repeatedly upload copyrighted material to service providers' websites, but absolve service providers from policing users who merely consume that content.  See Viacom, 718 F. Supp. 2d at 529; Io Grp., 586 F. Supp. 2d at 1143; see also UMG Recordings, 665 F. Supp. 2d at 1116; Corbis Corp., 351 F. Supp. 2d at 1100-01.  This applies to MP3tunes executives.  Like their users, they do not post content to the internet and cannot be certain whether content on third-party sites actually

infringes.  For example, MP3tunes employee e-mails reveal discussions about the legitimacy of some third-party sites and on at least one occasion a recommendation that a site be removed from Sideload.com.  But ultimately, there is no evidence that MP3tunes executives or employees had firsthand knowledge that websites linked on Sideload.com were unauthorized.  (See Bart Decl. Exs. 64-66.)

Moreover, MP3tunes does not purposefully blind itself to its users' identities and activities.  In Aimster, defendants "adopted" a detailed repeat infringer policy but encrypted user communications, making it impossible to identify infringers.  In that case, the court held that "[a]dopting a repeat infringer policy and then purposefully eviscerating any hope that such a policy could ever be carried out is not an 'implementation' as required by § 512(i)."  Aimster, 252 F. Supp. 2d at 659.  In contrast, MP3tunes tracks the source and web address of every sideloaded song in its users' lockers and can terminate the account of a repeat infringer.  And MP3tunes employed those resources to implement its policy by terminating the accounts of 153 users who blatantly allowed others to access their lockers and copy music files without authorization.

Finally, MP3tunes demonstrated that it has a procedure for responding to DMCA takedown notifications and does not interfere with copyright owners' ability to issue such notices.  MP3tunes responded to EMGNA's and EEW's notices and removed the links listed on sideload.com.  Accordingly, there is no genuine dispute that MP3tunes satisfies the threshold requirements to qualify for safe harbor under the DMCA.

B.  Subsections 512(c)(3) and (d)(3)—Compliance with EMI's Takedown Notices

EMI argues that MP3tunes failed to comply with the DMCA takedown notices sent by EMGNA and EEW as required by subsections 512(c)(3) and (d)(3).  Specifically, EMI

asserts that MP3tunes failed to remove songs from users' lockers that were sideloaded from specific websites identified in the notices.

Subsection 512(c) governs material stored on the service provider's servers at the direction of a user.  17 U.S.C. § 512(c).  This safe harbor potentially applies to MP3tunes' locker service.  Subsection 512(d) governs information location tools, e.g., search engines.  17 U.S.C. § 512(d).  This safe harbor potentially applies to sideload.com.  The parties agree that, in relevant part, the eligibility requirements for subsections 512(c) and (d) protection are the same and that each service must independently qualify.  The pertinent language of subsections (c) and (d) is as follows:

> **(c) Information Residing on Systems or Networks At Direction of Users.—**
> (1) In general.— A service provider shall not be liable . . . for infringement of copyright[1] by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
>     (A)
>         (i) does not have actual knowledge that the material . . . is infringing;
>         (ii) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
>         (iii) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
>     (B) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
>     (C) upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.
>         . . .
> **(d) Information Location Tools.—** A service provider shall not be liable for . . . infringement of copyright by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference, pointer, or hypertext link, if the service provider—

---

[1]  This Court agrees with Defendants that the plain meaning of the statutory language makes the DMCA safe harbors applicable to both state and federal copyright claims.  Thus, the DMCA applies to sound recordings fixed prior to February 15, 1972.

(1)
    (A) does not have actual knowledge that the material or activity is infringing;
    (B) in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
    (C) upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
(2) does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
(3) upon notification of claimed infringement as described in subsection (c)(3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity, except that, for purposes of this paragraph, the information described in subsection (c)(3)(A)(iii) shall be identification of the reference or link, to material or activity claimed to be infringing, that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate that reference or link.

17 U.S.C. §§ 512(c) and (d).

    The notification requirements of subsections 512(c)(3) and (d)(3) are identical:

**(3) Elements of notification.—**
(A) To be effective under this subsection, a notification of claimed infringement must be a written communication . . . that includes substantially the following:
. . .
    (ii) Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site. . . .
    (iii) Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

17 U.S.C. § 512(c).

    A proper DMCA notice must, inter alia, identify the copyrighted work or provide a representative list, if multiple works on a single site are subject to the same notice, and identify the infringing material with enough information to locate it. 512(c)(3)(iii) and (iv) (same provisions apply to subsection (d)(3)). A notice that identifies copyrighted work or representative lists of that work and supplies the web addresses of the infringing material is

sufficient. <u>Viacom</u>, 718 F.Supp.2d at 528-29. However, a notice merely stating "all songs" by a particular artist, or some other vague descriptor, and nothing more, is inadequate because it does not enable the service provider to locate the allegedly infringing material. <u>UMG</u>, 665 F. Supp. 2d at 1109-10. After proper notice, a service provider must act expeditiously to remove identified content. Service providers must take down the specific infringing material identified in the notice but are not required to search for and take down other material that may infringe the identified copyrighted works. <u>Viacom</u>, 718 F. Supp. 2d at 529.

The EMGNA and EEW letters list hundreds of copyrighted works and provide web addresses for the infringing links on Sideload.com. EMI argues that such notice required MP3tunes to remove all of the songs sideloaded from those links to users' lockers. Defendants counter that <u>Viacom</u> only requires removal of the identified link from Sideload.com because that was the only infringing material listed in the notices. In addition, MP3tunes argues that it would be subject to lawsuits by users if it removed personal property from user lockers.

While <u>Viacom</u> does not require service providers to locate additional infringing copyrighted work other than the specific work noticed, MP3tunes was obligated to remove specific works traceable to users' lockers. Because MP3tunes keeps track of the source and web address for each sideloaded song in each user's locker, EMI's notices gave sufficient information for MP3tunes to locate copies of infringing songs in user lockers. All MP3tunes had to do was search for the offending web address in its database of information regarding user lockers.

MP3tunes interprets the reach of a notice too narrowly. Under its reading, EMI would be required to identify each and every user who copied a song from an unauthorized web site to a locker. Of course, EMI could not meet that burden because it has no way of identifying such users without conducting burdensome discovery. Thus, this case is distinguishable from

<u>Viacom</u>. There, the copyright owner could freely search YouTube for its copyrighted work and identify infringing material. Where service providers such as MP3tunes allow users to search for copyrighted works posted to the internet and to store those works in private accounts, to qualify for DMCA protection, those service providers must (1) keep track of the source and web address of stored copyrighted material, and (2) take content down when copyright owners identify the infringing sources in otherwise compliant notices.

MP3tunes exaggerates the potential liability of removing content from users' lockers. MP3tunes' Terms of Use clearly authorize it to block a user's access to material in lockers. And the DMCA provides MP3tunes with immunity and a procedure for dealing with claims from its users. 17 U.S.C. § 512(g). Accordingly, there is no genuine dispute that MP3tunes does not qualify for safe harbor protection for songs stored in users lockers that were sideloaded from the unauthorized websites identified in the EMGNA and EEW takedown notices.

EMI also contends that MP3tunes should have taken down all EMI content because the notices provided a representative list. However, EMI's argument misconstrues the DMCA and applicable case law. Even assuming the representative lists properly identified EMI's copyrighted works, EMI had to provide sufficient information—namely, additional web addresses—for MP3tunes to locate other infringing material. <u>See, e.g.</u>, <u>Wolk v. Kodak Imaging Network, Inc.</u>, No. 10 Civ. 4135 (RWS), 2010 WL 940056, at *11 (S.D.N.Y. Mar. 17, 2011). EMI's notifications provided only enough information for MP3tunes to remove the noticed websites from Sideload.com and to find and remove copies of songs sideloaded from those websites. They did not identify the location of additional infringing material, let alone all of EMI's copyrighted works. Absent adequate notice, MP3tunes would need to conduct a

burdensome investigation in order to determine whether songs in its users' accounts were unauthorized copies.  As discussed, the DMCA does not place this burden on service providers. Thus, there is no genuine dispute that MP3tunes complies with the requirements of the DMCA with respect to songs sideloaded from websites not listed in the takedown notices.

    C.  Subsections 512(c)(1)(A) and (d)(1)—Actual or "Red Flag" Knowledge of Infringement

        An internet service provider does not qualify for safe harbor protection under either subsections (c)(1)(A) or (d)(1) if it had actual knowledge that the material on its websites infringed another's copyrights, or was aware of facts and circumstances, i.e, it saw "red flags," that made such infringement apparent.  Viacom, 718 F. Supp. 2d at 520-21.  These provisions are designed to deny safe harbor protection to internet service providers operating or linking to pirate sites whose illegal purpose is obvious to a reasonable person.  Senate Committee on the Judiciary Report, S. Rep. No. 105-190 (1998) ("Senate Report").  Such pirate sites are ones that typically employ terms such as "pirate" or "bootleg" or use other slang terms in their URL or header so that their infringing nature is "apparent from even a brief and casual viewing."  Senate Report. In addition, "'actual knowledge . . .' and 'facts and circumstances . . .' describe knowledge of specific and identifiable infringements of particular individual items."  Viacom, 718 F. Supp. 2d at 523.  General awareness of rampant infringement is not enough to disqualify a service provider of protection.  Viacom, 718 F. Supp. 2d at 523.; Corbis, 351 F. Supp. 2d  at 1108.

        EMI claims that MP3tunes had both actual and "red flag" knowledge of infringement because (1) executives sideloaded songs by popular artists from obviously infringing sites, (2) MP3tunes compiled lists of songs on Sideload.com by popular artists from obviously infringing sites, (3) EMI and other copyright owners notified MP3tunes of widespread infringement, and (4) users sent emails complaining of specific instances of infringement.

EMI has not shown that MP3tunes'executives sideloaded songs from clearly pirate websites. The same can be said for the websites used to populate Sideload.com. For instance, the websites rapidshare.com, fileden.com, and filefactory.com, as well as the other sites used by MP3tunes executives to sideload songs do not use the words "pirate" or "bootleg" or other slang to indicate their illegal purpose and they are not otherwise clearly infringing. They are simply popular file sharing sites.

While a reasonable person might conclude after some investigation that the websites used by MP3tunes executives were not authorized to distribute EMI's copyrighted works, the DMCA does not place the burden of investigation on the internet service provider. UMG, 665 F. Supp. 2d at 1108; Corbis, 351 F. Supp. 2d at 1109. The DMCA is explicit that safe harbor shall not be conditioned on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m)(1). Put another way, if investigation is required to determine whether material is infringing, then those facts and circumstances are not "red flags". CCBill, 488 F.3d at 1114. As other courts have held, that rule makes sense where infringing works might be a small fraction of works posted to a website. See, e.g., Viacom, 718 F.Supp.2d at 524.

EMI would have this Court construe the terms "free," "mp3," or "file-sharing" as tantamount to "red flag" knowledge of infringement. But those terms are ubiquitous among legitimate sites offering legitimate services. Moreover, adopting EMI's view would undermine Congress's goal of fostering development and innovation of internet services. Indeed, as part of its innovative marketing, EMI itself regularly distributes works on the internet for free. Because of these activities, EMI's executives concede that internet users, including MP3tunes' users and executives, have no way of knowing for sure whether free songs on the internet are unauthorized.

Further, notices by EMI or third parties that do not substantially comply with the DMCA or that simply give representative lists of copyrighted works do not establish actual or "red flag" knowledge of infringement. See, e.g., Wolk, 2010 WL 940056, at *11; Viacom, 718 F. Supp. 2d at 523; Corbis, 351 F. Supp. 2d at 1109.   Therefore, e-mails from MP3tunes users indicating possible or even likely infringement did not put MP3tunes on notice or disqualify it from safe harbor protection.

Undoubtedly, MP3tunes is aware that some level of infringement occurs.   But, there is no genuine dispute that MP3tunes did not have specific "red flag" knowledge with respect to any particular link on Sideload.com, other than the URLs noticed by EMGNA and EEW.

D.   Subsections 512(c)(1)(B) and (d)(2)—Benefit and Control of Infringing Activity

EMI argues that Defendants directly benefit from and have the right and ability to control their users' infringing activity and are therefore ineligible under subsections (c)(1)(B) and (d)(2).

As to direct financial benefit, EMI argues that infringing activity on Defendants' sites acts as a draw and increases user traffic.   However, the financial benefit must be attributable to the infringing activity. See, e.g., CoStar Grp.,164 F. Supp. 2d at 704-05.   The authorities relied on by EMI involved sites that promoted infringing activity to enhance the sale of user accounts or advertising revenue. Usenet, 633 F. Supp. 2d at 156-57; Fonovisa v. Cherry Auction, Inc., 76 F.3d 259, 263-64 (9th Cir. 1996); Flea World, 2006 WL 842883, at *12.   While Sideload.com may be used to draw users to MP3tunes.com and drive sales of pay lockers, it has non-infringing uses.   Moreover, MP3tunes did not promote infringement.   Rather, it removed

infringing links to Sideload.com when given notice, and terminated the accounts of users who blatantly shared copyrighted files with others.

        In addition, any link between infringing activity and a direct benefit to MP3tunes is attenuated because sideloaded songs were stored free of charge and infringing and non-infringing users of Sideload.com paid precisely the same or nothing at all, for locker services. See CoStar Grp., 164 F. Supp. 2d at 704-705 (quoting H.R. Rep. No. 105-551, Part 2, at 54 ("In general, a service provider conducting a legitimate business would not be considered to receive a financial benefit directly attributable to the infringing activity where the infringer makes the same kind of payment as non-infringing users of the provider's service.")).

        As to the issue of control, EMI contends that MP3tunes can prevent the infringing activity of its users and has physical possession of its systems and servers. Specifically, MP3tunes can monitor songs downloaded by users and the third-party sites listed on Sideload.com and remove those songs and sites at will. However, "control of infringing activity" under the DMCA requires something more than the ability to remove or block access to materials posted on a service provider's website. Corbis, 351 F. Supp. 2d at 1110; Io Grp., 586 F. Supp. 2d at 1151 ("[T]he pertinent inquiry is not whether [the service provider] has the right and ability to control its system, but rather, whether it has the right and ability to control the infringing activity.") (emphasis in original).

        MP3tunes users alone choose the websites they link to Sideload.com and the songs they sideload and store in their lockers. MP3tunes does not participate in those decisions. At worst, MP3tunes set up a fully automated system where users can choose to download infringing content. Io Grp., 586 F. Supp. 2d at 1147 (granting safe harbor protection to a website that automatically created content from user submissions of unauthorized copyrighted work). If

enabling a party to download infringing material was sufficient to create liability, then even search engines like Google or Yahoo! would be without DMCA protection. In that case, the DMCA's purpose—innovation and growth of internet services—would be undermined. See CoStar Grp., 164 F. Supp. 2d at 704, n.9 (if the "standard could be met merely by the ability to remove or block access to materials[, it] would render the DMCA internally inconsistent"). Accordingly, this Court finds that there is no genuine dispute that MP3tunes neither received a direct financial benefit nor controlled the infringing activity.

In sum, there is no genuine dispute that MP3tunes may claim safe harbor protection for EMI works stored on MP3tunes.com and EMI works linked to Sideload.com. However, MP3tunes does not qualify for safe harbor protection for songs sideloaded from links identified in EMGNA's and EEW's takedown notices which it failed to remove from user lockers.

III. EMI's Infringement Claims

Having determined the scope of MP3tunes safe harbor protection, this Court turns to the question of whether MP3tunes is secondarily liable for storing material at the direction of its users. EMI contends that MP3tunes is either contributorily or vicariously liable for that activity. EMI also claims that MP3tunes is directly liable for 1) songs sideloaded by MP3tunes executives in the course of their employment, 2) songs stored using a master copy, and 3) album cover art displayed on MP3tunes.com.

A. Contributory Infringement Claim

Secondary liability for copyright infringement is based on a showing of direct infringement by a third party for whom the secondary infringer is liable. As one commentator notes, "[due] to the far-flung nature of much alleged infringement on the Internet, facilitated by software that usually has both infringing and noninfringing applications, contributory infringement has become increasingly important . . . ." William F. Patry, Patry on Copyright § 21:42. Contributory liability is premised on "personal conduct that encourages or assists the infringement." See Arista Records LLC v. Doe 3, 604 F.3d 110, 118 (2d Cir. 2010); see also Arista Records LLC v. Lime Grp. LLC, No. 06-CV 5936, 2010 WL 2291485, *13, (S.D.N.Y. May 25, 2010). Contributory infringement by personal conduct arises through "intentionally inducing or encouraging direct infringement." Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005); see also Faulkner v. Nat'l Geo. Enters., 409 F.3d 26, 40 (2d Cir. 2005) ("One who, with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another, may be held liable."). To establish the underlying direct infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) unauthorized copying by a third party. See Island Software & Computer Serv., Inc. v. Microsoft Corp., 413 F.3d 257, 260 (2d Cir. 2005). Additionally, a plaintiff must demonstrate compliance with § 411 of the Copyright Act, which requires preregistration or registration for U.S. copyrights as a prerequisite for suit. 17 U.S.C. § 411(a); Reed Elsevier Inc. v. Muchnick, 130 S. Ct. 1237, 1245 (2010).

Through declarations of two of its employees, EMI presented evidence of ownership and registration of 3,189 sound recordings, 562 musical compositions and 328 images of album cover art. Specifically, EMI's witnesses listed and attested to the copyright registration

numbers for each of those works. (McMullin Decl. ¶ 4, Ex. A; Ashby Decl. ¶ 8-10, Ex. A and

B.) Additionally, EMI provided proof of chain of title for those works that EMI did not register.

(Ashby Decl. ¶ 10, Ex. B.) Such evidence creates a rebuttable prima facie case of ownership. 17

U.S.C. § 410 (c); Boisson v. Banian, Inc., 273 F.3d 262, 267 (2d Cir. 2001). Attempting to rebut

that proof, MP3tunes argues that many of EMI's copyrights were registered as "works for hire"

and that EMI failed to provide proof that the recordings or compositions were created by an

employee within the scope of employment. (Pyronnel Decl. ¶ 6, Ex. J.) However, because EMI

produced the registrations, MP3tunes bears the burden of proving the works were not "made for

hire." 17 U.S.C.§410(c) (facts stated within a valid registration are presumed true). MP3tunes

has not introduced evidence showing that any of the artists listed on EMI's registrations were not

employed by EMI. Thus, there is no genuine dispute as to whether EMI owns the copyrights

listed in its supporting declarations.[2]

   EMI has also established that users of MP3tunes unlawfully copied songs from

unauthorized third party websites. Specifically, EMI submitted documents showing that the

songs listed in the takedown notices were sideloaded into users' lockers. (Horrowitz Decl. Ex.

S.) Further, EMI's executives testified that either the songs in question were never authorized

for free distribution or the third party URLs listed in the takedown notices were never authorized

to distribute Plaintiffs' works. (Ashby Decl. ¶¶ 3-4, McMullin Decl. ¶ 4;[3] Horowitz Decl. ¶ 69,

Ex. R.) Contrary to MP3tunes' argument, EMI need not offer actual copies of the works at issue.

---

[2] It is unclear whether the McMullin and Ashby declarations provide a registration or other
proof of ownership for each song listed in the takedown notices. (Pyronnel Decl. ¶ 5, Ex. I.)
For example, the song "Crazy" by Aerosmith listed in EEW's takedown notice does not appear
to be included in either declaration. (Comp. Bart Decl. Ex. 26, with McMullin Decl. Ex. A, and
Ashby Decl. Exs. A and B.) For those songs not listed, ownership remains a disputed issue
requiring further proof, and cannot be resolved on summary judgment.

[3] While McMullin erroneously references Ex. H to the Horowitz Declaration, it is clear that he
intended to reference Ex. R.

In the context of unauthorized duplication of digital works, testimony and other documents are sufficient to establish that copying occurred. Island Software, 413 F.3d at 260 (finding that unauthorized duplication of software had occurred based on unrebutted testimony of two witnesses).

MP3tunes does not rebut this evidence. While the record reveals numerous instances where EMI authorized the free distribution of songs listed on the takedown notices as part of "viral" marketing campaigns, MP3tunes has not established that the websites involved in that marketing were identical to the URLs identified in the notices. MP3tunes also attempts to raise an issue of fact by asserting that the testimony of EMI executives is inconsistent. Specifically, MP3tunes argues that EMI executives admitted they are unable to distinguish between authorized and unauthorized songs available on the internet. However, that argument misconstrues their testimony. While EMI executives acknowledged that it would be difficult or impossible for internet users to distinguish between authorized or unauthorized websites, they made no such assertion about their own ability to do so. (See GPG Decl. ¶¶ 11, 12, 15, 14, 18-21, 26-29.)

At bottom, MP3tunes contends that by offering a promotional download from an authorized website, Plaintiffs either abandoned their copyrights altogether or authorized downloads outside of the promotional context. In either event, MP3tunes has the burden to prove the existence of such a broad implied license. Ulloa v. Universal Music and Distribution Corp., 303 F. Supp. 2d 409, 416 (S.D.N.Y. 2004). It failed to identify any evidence that, if credited, would meet that burden. Capitol Records, Inc. v. Naxos of America, Inc., 372 F.3d 471, 483-84 (2d Cir. 2004) (abandonment requires an infringer prove an intent to surrender all rights in a work and an overt act demonstrating that intent). Far from proving EMI's intent to

abandon its rights, the record reveals that EMI placed careful restrictions on the use of its

promotional songs and required consumers to visit certain websites or provide valuable

marketing information before downloading a song. (See Heinemann Decl. ¶¶ 5-9, Supp. Arbitol

Decl. ¶¶ 15-20); see also SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharm.,

Inc., 211 F.3d 21, 25 (2d Cir. 2000) (holding that implied licenses are limited to "narrow

circumstances"). Accordingly, there is no genuine dispute that MP3tunes users sideloaded

EMI's copyrighted songs identified in the takedown notices without authorization.

   Having established the underlying infringement, MP3tunes is contributorily liable

only if it (1) knew or had reason to know of the infringement and (2) materially contributed to

the infringement. See Matthew Bender & Co. Inc. v. West Publ'g Co., 158 F.3d 693, 706 (2d

Cir. 1998); Gershwin Publ'g Corp. v. Columbia Artists Mgm't, Inc., 443 F.2d 1159, 1162 (2d

Cir. 1971); Usenet, 633 F. Supp. 2d at154. EMI has established both prongs of contributory

liability.

   MP3tunes' knowledge of the unauthorized use of infringing sideloaded material is

manifest. EMI sent three separate takedown notifications identifying hundreds of specific

copyrighted works and the specific links on the Sideload website unlawfully distributing those

works. (Bart Decl. Exs. 24-26.) EMI also established that thousands of MP3tunes users visited

those infringing links and sideloaded EMI's copyrighted works into their lockers. Moreover, it is

undisputed that MP3tunes kept track of that activity. (Horrowitz Decl. ¶¶ 63-72, Exs. O-S.)

Although MP3tunes removed the infringing links from Sideload.com, it chose not to block any

of its users from having unrestricted access to infringing copies of Plaintiffs' recordings stored in

user lockers. (Horrowitz Decl. ¶¶ 63-66, Ex. Q.) Those users remained free to download and

experience those infringing copies from MP3tunes' servers. (Horrowitz Decl. ¶¶ 63-66, Ex. Q.)

Thus, there is no genuine dispute that MP3tunes had actual knowledge its users had stored and continued to have access to infringing copies of Plaintiffs' works.

To find material contribution, "the alleged . . . infringer must have made more than a mere quantitative contribution to the primary infringement: in other words, the participation or contribution must be substantial." Usenet, 633 F. Supp. 2d at155 (quoting Faulkner v. Nat'l Geographic Soc'y, 211 F. Supp. 2d 450, 474 (S.D.N.Y. 2002)).  A contribution is substantial where the defendant provides the "site and facility" for the infringing activity.  See Fonovisa v. Cherry Auction, Inc., 76 F.3d 259, 264 (9th Cir. 1996); Napster, 239 F.3d at 1022. In particular, substantial contribution is found where an internet service provider's servers "are the sole instrumentality of their subscribers' infringement."  See Usenet, 633 F. Supp. 2d at 155. Here, the record shows that MP3tunes' users exclusively used MP3tunes' servers to download, store, and playback infringing works.

MP3tunes argues that this action is distinguishable from cases like Usenet and Napster because MP3tunes' servers and lockers have substantial non-infringing uses.  That argument, however, was specifically rejected in Usenet, because the defendants were aware of the specific infringement at issue and had a continuing relationship with users.  Usenet, 633 F. Supp. 2d at 155.  Indeed, in cases where defendants are not found to have contributorily infringed because their products have substantial non-infringing uses, the defendants did not have an on-going relationship with the underlying infringers.  See, e.g., Sony Corp. of America v. Universal Studios, Inc., 464 U.S. 417, 438 (1984).  Here, MP3tunes continued to provide locker services to its users even though it knew they had unlawfully downloaded EMI's protected material.  More particularly, MP3tunes allowed users to continue to store and access those works on its servers.  Accordingly, EMI's motion for summary judgment on its claim for

contributory infringement with respect to the songs listed in EMI's takedown notices and which MP3tunes failed to remove from users' lockers is granted.[4]

B.  Direct Infringement Claims

1.  Songs Sideloaded by MP3tunes Executives and Employees

EMI claims that 171 of its recordings were sideloaded by MP3tunes executives and employees and that MP3tunes is vicariously liable for that activity under the doctrine of respondeat superior.  For an employer to be liable for the conduct of its employees, a plaintiff must demonstrate that the alleged wrongful conduct was performed in the course of employment. See Gershwin Publ'g, 443 F.2d at 1161-62.  EMI conclusively demonstrated that EMI executives and employees downloaded its songs.  (Horowitz Decl. Ex X, Z.)  However, it is not clear that they downloaded those songs during the course of their employment.  At most, EMI has demonstrated that MP3tunes executives directed activities where MP3tunes employees would "seed" Sideload.com with quality songs to attract users.  (Bart Decl. Ex 11, 55-57.)  But there is no proof that any of the 171 songs in question were part of those "seeding" projects.  (Bart Decl. Ex 56.)  Moreover, MP3tunes employees testified that they maintained private accounts and used MP3tunes lockers for their personal benefit.  (Bart. Decl. Ex 11.)  Because a genuine dispute exists as to whether any of the 171 songs in question were downloaded by employees in the course of their employment, EMI's motion for summary judgment on this claim is denied.

On the other hand, Robertson, a named defendant in this action, is directly liable for the songs he personally sideloaded from unauthorized sites.

---

[4] Because MP3tunes is liable for contributory infringement with respect to songs listed in the takedown notices and not removed from users' lockers, this Court does not reach EMI's claim of vicarious infringement of that material.

2.  <u>EMI's Public Performance Rights</u>

EMI argues that MP3tunes' storage system violates its right to public performance because, much like Robertson's earlier effort at online music storage with MP3.com, MP3tunes employs a "master copy" to rebroadcast songs to users who uploaded different copies of the same song.  EMI relies on the Second Circuit's holding that a cable provider did not violate television studios public performance rights in its digital recording and play back services because the cable provider did not use a master copy to play back shows recorded by their viewers.  <u>Cartoon Network, LP v. CSC Holdings, Inc.</u>, 536 F.3d 121, 138 (2d Cir. 2008).  EMI's argument, however, mischaracterizes MP3tunes' storage system.  The record demonstrates that MP3tunes does not use a "master copy" to store or play back songs stored in its lockers.  Instead, MP3tunes uses a standard data compression algorithm that eliminates redundant digital data.  Importantly, the system preserves the exact digital copy of each song uploaded to MP3tunes.com.  Thus, there is no "master copy" of any of EMI's songs stored on MP3tunes' computer servers.

Apart from the fact that MP3tunes does not employ a "master copy" storage system, EMI's reliance on <u>Cartoon Network</u> is inapposite.  There, the cable-provider defendant was not an internet service provider and thus was ineligible for DMCA safe harbor protection. <u>Cartoon Network</u>, 536 F.3d at 138.  In contrast, MP3tunes' online storage system utilizes automatic and passive software to play back content stored at the direction of users.  That is precisely the type of system routinely protected by the DMCA safe harbor.  <u>See, e.g.</u>, <u>Viacom</u>, 718 F. Supp. 2d at 523 ("[F]acilitating user access to material on its website do[es] not cost the service provider its safe harbor.").

3. Cover Art

EMI claims that MP3tunes' use and storage of cover art on its website infringes EMI's copyrights. Both parties agree, however, that Defendants are licensed through Amazon.com to display that art and that EMI's claim boils down to an alleged breach of the license agreement. MP3tunes' license only permits the use of cover art for the "principal purpose" of driving traffic to Amazon.com and limits the storage of cover art on MP3tunes' servers. Therefore, the question is whether MP3tunes' use and storage of the art contravenes the terms of the license. "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." Merill Lynch Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007).

The parties submit contradictory proof on MP3tunes use and storage of cover art and the direction of traffic to Amazon.com. Because the evidence is inconclusive, genuine issues of fact exist as to whether MP3tunes breached its license with Amazon.com. Therefore, EMI's motion for summary judgment on its infringement claim with respect to its cover art is denied.


IV. Unfair Competition

MP3tunes moves for summary judgment dismissing EMI's claim of unfair competition. To establish a common-law claim of unfair competition, a copyright owner must show that defendant used plaintiff's works without authorization and either: (i) the defendant competed with the plaintiff in the marketplace; (ii) the defendant acted for commercial benefit; or (iii) the defendant deceived the public. Capitol Records, Inc. v. Naxos of Am., Inc., 4 N.Y.3d 540, 563-564 (2005). MP3tunes argues that it did not use EMI's works and that EMI failed to

show any evidence of competition or deception.  However, as discussed, MP3tunes contributed to the unauthorized use of EMI's copyrighted works.  (See supra, III B.)  In addition, EMI distributes its works over the internet, while MP3tunes offers free copies and storage of those works to internet users.  Thus, there is a genuine dispute as to whether MP3tunes competes with EMI.  Accordingly, MP3tunes' motion is denied.


## CONCLUSION

For the foregoing reasons, EMI's motion for summary judgment on its claim of contributory copyright infringement against MP3tunes and Robertson for songs noticed in EMGNA's and EEW's takedown notices and not removed from user lockers is granted.  EMI's motion for summary judgment on its claim of direct infringement against Robertson for the songs he personally sideloaded from unauthorized sites is granted.  EMI's motion for summary judgment is denied in all other respects.  MP3tunes and Robertson's motion for summary judgment on its defense under the DMCA safe harbors is granted except with respect to songs noticed in EMGNA's and EEW's takedown notices and not removed from user lockers.  MP3tunes and Robertson's motion for summary judgment is denied in all other respects.

Dated: August 22, 2011
       New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of record.*