UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

CAPITOL RECORDS, LLC, *et al,*               :
                                             :
                              *Plaintiffs,*   :       07 Civ. 9931 (WHP)
                 v.                          :
                                             :
MP3TUNES, LLC and MICHAEL ROBERTSON,         :
                                             :
                              *Defendants.*   :

------------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF RECONSIDERATION (INDIVIDUAL
LIABILITY AND *VIACOM* ISSUES) AND FOR SUMMARY JUDGMENT (VICARIOUS
LIABILITY)**

Ira S. Sacks
Mark S. Lafayette
AKERMAN SENTERFITT LLP
335 Madison Avenue
Suite 2600
New York, NY 10017
(212) 880-3800
(212) 880-8965 (fax)
*Attorneys for Defendant Michael Robertson*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

MEMORANDUM OF LAW IN SUPPORT OF  RECONSIDERATION (INDIVIDUAL
     LIABILITY AND *VIACOM* ISSUES) AND FOR SUMMARY JUDGMENT
     (VICARIOUS LIABILITY) ..................................................................................... 1

I.   THE COURT ERRED IN GRANTING SUMMARY JUDGMENT, *SUA SPONTE*,
     AGAINST ROBERTSON ........................................................................................ 1

II.  ISSUES OF FACT EXIST REQUIRING A TRIAL OF PLAINTIFFS' CLAIMS
     THAT ROBERTSON'S SIDELOADING WAS INFRINGING ............................... 3

    A.  There Is, At The Very Least, A Factual Dispute As To Whether Plaintiffs
        Engaged In Unrestricted Viral Dissemination Of Songs ..................................... 4

    B.  There Is, At The Very Least, A Factual Dispute As To Whether Plaintiffs Had A
        Policy of Securing Marketing Information In Return For Free MP3s............................ 10

    C.  There Is, At The Very Least, A Factual Dispute As To Whether Plaintiffs
        Themselves Can Distinguish Between Authorized and Unauthorized Websites,
        And Plaintiffs Have Violated Their Oaths and Discovery Obligations............................ 12

    D.  There Are Issues Of Fact For Trial As The Claims That Robertson's Sideloading
        Infringed Plaintiffs' Copyrights.................................................................................... 15

III. THERE ARE ISSUES OF FACTS FOR TRIAL AS TO WHETHER PLAINTIFFS
     MAY ASSERT COPYRIGHT INFRINGEMENT AGAINST ROBERTSON WITH
     RESPECT TO NUMEROUS SONGS........................................................................ 18

    A.  Plaintiffs Reliance on Copyrights In Compilations Is Misplaced...................................... 18

    B.  Plaintiffs Have No Copyrights On Numerous Songs Specified In The Takedown
        Notices And On Two Of The Songs Robertson Is Alleged To Have Infringed .............. 19

    C.  Section 412 of the Copyright Act Makes Statutory Damages And Attorney's Fees
        Unavailable With Respect To Numerous Songs............................................................ 19

    D.  Plaintiffs May Not Assert Copyright Infringement For Works For Hire ......................... 20

    E.  The EMI Publisher Plaintiffs Lack A Good Faith Basis To Assert Certain Of
        Their Claims.................................................................................................................. 22

i

    F.  Many Of The 47 Songs Allegedly Infringe The Same Copyright ..................................... 23

IV. PLAINTIFFS' UNFAIR COMPETITION CLAIM MUST BE DISMISSED; AT
    THE VERY LEAST, SUMMARY JUDGMENT AGAINST ROBERTSON IS
    IMPROPER............................................................................................................................. 23

V. SUMMARY JUDGMENT MUST BE DENIED OR DEFERRED PURSUANT TO
    RULES 56(d) and (e) ........................................................................................................... 24

VI. MP3TUNES' USE OF COVER ART WAS NOT INFRINGING ......................................... 25

    A.  MP3tunes' Retrieval and Storage of Cover Art Is Protected By The § 512(c)
        DMCA Safe Harbor Provision Under *Viacom*.................................................................. 26

    B.  All Cover Art Was Licensed; Plaintiffs Lack Standing To Raise The Issue of
        Breach 28

    C.  Plaintiffs Have Not Proven Copyright Ownership Of The Cover Art............................. 30

        1.       Visual Artwork Cannot Be Properly Registered Using A Form SR.................... 31

        2.       Plaintiffs Have Refused To Provide Evidence Of Ownership Of Cover Art
              Copyrights Under Work For Hire Agreements...................................................... 32

VII.    ROBERTSON IS ENTITLED TO SUMMARY JUDGMENT THAT HE IS NOT
        VICARIOUSLY LIABLE FOR ANY ACTS OF MP3TUNES........................................... 33

    A.  Plaintiffs Are Collaterally Estopped From Arguing Robertson Is Vicariously
        Liable 33

    B.  Robertson Did Not Personally Benefit From Any Alleged Infringement ........................ 34

CONCLUSION............................................................................................................................... 35

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*Aymes v. Bonelli*, 980 F.2d 857 (2d Cir. 1992) ..................................................................21

*Ballas v. Tedesco*, 41 F. Supp. 2d 531 .................................................................................21

*Bean v. John Wiley & Sons, Inc.*, 2011 WL 3348959 (D. Ariz. Aug. 3, 2011) ...............32

*Boguslavsky v. Kaplan*, 159 F.3d 715 (2d Cir. 1998) .......................................................34

*Bridgeway Corporation v. Citibank*, 201 F.3d 134 (2d Cir. 2000) ....................................1

*Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services*, 746 F. Supp. 320 (S.D.N.Y. 1990) ...........................................................................................................16, 17

*Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702 (N.D. Ill 2007) .........21

*Caffey v. Cook*, 409 F. Supp. 2d 484 (S.D.N.Y. 2006) .....................................................19

*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) ......... passim

*Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471 (2d Cir. 2004) ...............17

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................2

*Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982) ............20, 22

*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990) ...........................................17

*Empresa Cubana del Tabaco v. General Cigar Co.*, 385 F. App'x 29 (2d Cir. July 14, 2010) .................................................................................................................................24

*F.D.I.C. v. Giammettei*, 34 F.3d 51 (2d Cir. 1994) ..........................................................16

*Feist Pub. Inc. v Rural Tel. Serv. Co.*, 499 U.S. 340 (1991) .......................................18, 20

*Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159 (2d Cir. 1971) ..........................................................................................................................33

*Gurary v. Winehouse*, 190 F.3d 37 (2d Cir. 1999) ...........................................................25

*Hampton v. Paramount Pictures Corp.*, 279 F.2d 100 (9th Cir. 1960) ...........................17

*In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087 (N.D. Cal. 2002) ................22

*In re PCH Associates*, 949 F.2d 585 (2d Cir. 1991) .........................................................34

*Jefferson Airplane v. Berkeley Sys.*, 886 F. Supp. 713 (N.D. Cal. 1994) ......................................31

*Jorgensen v. Epic/Sony Records*, 351 F.3d 46 (2d Cir. 2003) ......................................................15

*Key Publications, Inc. v. Chinatown Today Pub. Enterprises*, 945 F.2d 509 (2d Cir. 1991)..18, 19

*Korman v. HBC Fla., Inc.*, 182 F.3d 1291 (11th Cir. 1999) ........................................................17

*Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106 (2d Cir. 1998) .............................22

*Lulirama Ltd. V. Axcess Broadcast Servs.*, 128 F.3d 872 (5th Cir. 1997) ....................................21

*McClellan v. Smith*, 439 F.3d 137 (2d Cir. 2006) ........................................................................15

*MDY Industries, LLC v. Blizzard Ent't, Inc.*, 629 F.3d 928 (9th Cir. 2010) .................................30

*Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, 712 F. Supp. 2d 84
   (S.D.N.Y. 2010) ......................................................................................................................32

*Pavlica v. Behr*, 397 F. Supp. 2d 519 (S.D.N.Y. 2005) ...............................................................22

*Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103 (2d Cir. 2009) .........................................29

*Priestly v. Headminder, Inc.*, 647 F.3d 497 (2d Cir. 2010) ...........................................................2

*Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304 (2d Cir. 1963) ................................33

*Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57 (D.D.C. 1999) ..........................................21

*U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158 (S.D.N.Y. 2001) ............................20

*Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318 (2d Cir. 2004) .................................16

*Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ("*Viacom*") ......................1, 27, 28

**STATE CASES**

*Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540 (2005) ...............................................24

*Jumax Associates v. 350 Cabrini Owners Corp.*, 46 A.D.3d 407, 849 N.Y.S.2d 35 (1st
   Dep't 2007) .......................................................................................................................17, 18

*Shodel J. v Mark D.*, 7 N.Y.3d 320 (2006) ..................................................................................16

**FEDERAL: STATUTES, RULES, REGULATIONS, CONSTITUTIONAL PROVISIONS**

37 C.F.R. § 202.3 ........................................................................................................................31

17 U.S.C. § 101 .....................................................................................................................18, 20

17 U.S.C. § 106 ...................................................................................................................30

17 U.S.C. § 201 ...................................................................................................................20

17 U.S.C. § 409 ...................................................................................................................32

17 U.S.C. § 412(2) .........................................................................................................19, 20

17 U.S.C. § 512 ........................................................................................................26, 27, 28

Fed. R. Civ. P. 56(c) ...........................................................................................................25

Fed. R. Civ. P. 56(d) .....................................................................................................24, 25

Fed. R. Civ. P. 56(e) .....................................................................................................24, 25

**OTHER AUTHORITIES**

4 Nimmer on Copyright § 13.07[A] ....................................................................................17

2 Nimmer on Copyright § 7.06[C][1][a][i] ..........................................................................20

## MEMORANDUM OF LAW IN SUPPORT OF RECONSIDERATION (INDIVIDUAL LIABILITY AND *VIACOM* ISSUES) AND FOR SUMMARY JUDGMENT (VICARIOUS LIABILITY)

Defendant Michael Robertson ("Robertson") respectfully submits this Memorandum of Law in support of his motion for reconsideration of this Court's October 25, 2011 summary judgment decision (*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) (the "Summary Judgment Order")) in two respects: (i) the Court's *sua sponte* grant of summary judgment against Robertson (*id.* at 649) is contrary to controlling law and prejudices Robertson; and (ii) the Court's finding that there are disputed issues of fact precluding summary judgment to MP3tunes, LLC ("MP3tunes") – and therefore Robertson – for the use of cover art (*id.* at 650) is incorrect in light of the Second Circuit's recent decision in *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ("*Viacom*") and for other reasons. Robertson further respectfully submits this Memorandum of Law in support of his motion for summary judgment that he is not vicariously liable for any infringement by MP3tunes.

## I.   THE COURT ERRED IN GRANTING SUMMARY JUDGMENT, *SUA SPONTE*, AGAINST ROBERTSON

This Court erred in granting summary judgment against Robertson on claims that his sideloading directly infringed Plaintiffs' copyrights. After the Court and the parties expressly agreed that the parties' summary judgment motions would not reach the issue of Robertson's personal liability, the Court, *sua sponte*, granted summary against Robertson. *See* 821 F. Supp. 2d at 649. The Court's *sua sponte* grant of summary judgment against Robertson was wrong.

The Second Circuit has firmly discouraged the *sua sponte* grant of summary judgment. *See, e.g., Bridgeway Corporation v. Citibank*, 201 F.3d 134, 139 (2d Cir. 2000). Summary judgment, *sua sponte*, is only proper if the district court finds "that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that

there is no genuine issue of material fact to be tried[.]" *Priestly v. Headminder, Inc.*, 647 F.3d 497, 504 (2d Cir. 2010) (citations omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 326 (1986) (summary judgment, *sua sponte*, proper only if the losing party was on notice that it had to come forward with all of its evidence). That is plainly not the case here.

Robertson was not given notice that summary judgment would be considered as to his individual liability. On the contrary, the opposite was true. The parties expressly agreed, ***and the Court ordered***, that "briefing with respect to all issues relating to Mr. Robertson's personal liability will be raised with the Court, if necessary, after a determination of the liability of MP3tunes, LLC." (*See* letter, "So Ordered" on October 22, 2010, Doc. No. 182). Plaintiffs thereafter noticed a motion seeking summary judgment only against "*MP3tunes* on claims 1, 2, 3, 6, 7, and 8 in the Second Amended Complaint[.]" (*See* Doc. No. 186). Additionally, the parties' extensive summary judgment briefs do not address Robertson's individual liability or defenses. Notwithstanding, this Court mistakenly determined that Robertson "is directly liable for the songs he personally sideloaded from unauthorized sites." *See* 821 F. Supp. 2d at 639.

Robertson had no opportunity to submit evidence that he was not liable for infringement or brief any of the legal issues in connection therewith. Although the number of copyrights MP3tunes was accused of infringing was in the thousands, the number of copyrights which Robertson is alleged to have infringed is quite limited – 47 distinct sideloads – according to Plaintiffs' own expert. (*See* Declaration of Ira S. Sacks, dated November 12, 2012 ("Sacks Dec."), ¶¶ 2, 9 and Exs. 1, 8 (Declaration of Ellis Horowitz, dated October 29, 2010 ("Horowitz Dec."), ¶¶ 82, 85 and Ex. X)). The *sua sponte* grant of summary judgment also prejudices Robertson because, if the ruling is not vacated, Plaintiffs will be able to inform the jury that Robertson has already been determined to be liable for copyright infringement.

Accordingly, the Court should:  (a) grant Robertson's motion for reconsideration and vacate the portion of the Summary Judgment Order which determined that Robertson "is directly liable for songs he personally sideloaded from unauthorized sites"; and (b) direct the parties to proceed to trial with respect to Robertson's individual liability for direct infringement.

## II.   ISSUES OF FACT EXIST REQUIRING A TRIAL OF PLAINTIFFS' CLAIMS THAT ROBERTSON'S SIDELOADING WAS INFRINGING

Issues of fact exist requiring a trial of Plaintiffs' claims that Robertson's sideloading was infringing.  This Court has correctly found that "the record reveals numerous instances where EMI authorized the free distribution of songs listed on the takedown notices as part of 'viral' marketing campaigns[.]"  821 F. Supp. 2d at 647.  However, the Court mistakenly observed that "MP3tunes has not established that the websites involved in that marketing were identical to the URLs identified in the [takedown] notices."  *Id.*  In so doing, the Court misapprehended the intent and scope of Plaintiffs' "viral" marketing campaigns. As more fully set forth below, Plaintiffs ***intended*** that free songs uncontrollably spread to, and become available on, numerous websites (and URLs), and also be passed from one user to another.  As a result, once Plaintiffs authorized a song for free download, it is irrelevant if the song was sideloaded from a URL different from the URL on which Plaintiffs originally authorized the song.

In addition, issues of fact exist as to the credibility of Plaintiffs' declarations, which set forth under oath which songs allegedly were not available for free download. Further, contrary to the Court's finding, issues of fact exist whether "the record reveals that EMI placed careful restrictions on the use of its promotional songs and required consumers to visit certain websites or provide valuable marketing information before downloading a song" (821 F. Supp. 2d at 648). Finally issues of fact exists as to Robertson's defenses to the direct infringement claims against him.

3

**A. There Is, At The Very Least, A Factual Dispute As To Whether Plaintiffs Engaged In Unrestricted Viral Dissemination Of Songs**

As this Court will recall, when this litigation commenced, counsel for Plaintiffs denied that Plaintiffs made any song available as a free download. (Evidence cited by MP3tunes in its Statement and Reply Statement of Undisputed Facts, Doc. No. 236 ("SUF"), ¶ 84; the SUF is attached to the Sacks Dec. as Ex. 28)). Notwithstanding this early gambit, the Court correctly found that discovery revealed "numerous instances" where Plaintiffs authorized the free distribution of songs listed on takedown notices as part of "viral" marketing. 821 F. Supp. 2d at 647. Discovery revealed that despite the fact that Plaintiffs tried to avoid such discovery and have still not fully complied.

The evidence provided to the Court on the summary judgment motions, and additional evidence presented by Robertson in connection with this motion, provide ample evidence of Plaintiffs' viral marketing to avoid summary judgment, including that Plaintiffs partnered with numerous companies to make free downloads available, as follows:

**Retailers**: Wal-Mart, Amazon.com, Borders, Best Buy, iTunes, Toyota, Pepsi, Citibank, Microsoft, Coke, Starbuck's, Push Entertainment; **Social Networking**: MySpace, Facebook, Buzznet, Bebo; **Media Sites**: Google, AOL, CNN , Seventeen, People, KCRW, Clear Channel, New York Post, Village Voice, Minnesota Public Radio; **Music Sites**: Spin, MTV, MTV2, VH1, SXSW, LastFm, Stereogum, ilike.com, Pitchfork, 944 Magazine, Buzzgrinder.com, Fluxblog, Prefixmag, Cocaineblunts.com, Absolutepunk.com, Fader, Delicious Vinyl, Myplaydigital.com, Hipdigital.com, Tool Shed, BetterPropaganda.com, Freeallmusic.com, Spinner, Sixeyesmedia.com, Rolling Stone, EW's, Popwatch, Top Spin, Pure Volume; **Record Company Sites**: Parlophone, Astralwerks, Columbia Records, Definitive Jux Records, Golden Horse; Angel Records, Virgin Records, EMI (US and UK); **Artist Sites**: Cold Play, Alice in Chains,

4

Beastie Boys, Radio Head, Lily Allen, Joss Stone, Decemberists, Korn, Angel Taylor, Joanna Cotton, Jamey Johnson, Saving Abel, Varsity Fan Club, Natasha Marsh, The Last Goodnight, Tristan Prettyman, New Adelitas Way, Jet, The Last Goodnight, Melanie C, Yellow Card, Ak'Sent, Air, Kristina Train, A Fine Frenzy, Nine Inch Nails; **Viral Marketing Firms**: Toolshed, Cornerstone Promotions, For the Win!, Better Propaganda.  (SUF, ¶¶ 85-89, 92, 97, 98; Sacks Dec., Exs. 29-36, 50).

The Court failed to understand fully the ***unrestricted nature of "viral" marketing***.  "Viral marketing" consisted of the release of material with the intent that it be passed from website to website, and then from person to person, and eventually appear "everywhere," not just on the website on which the material was first placed.  In other words, the material spreads like a virus. This is not a novel definition, and is one used by Plaintiffs.  (*See* SUF, ¶ 92, 93).

There are two types of viral marketing used by Plaintiffs and other labels:  first, ***Internet site to Internet site viral marketing***, where a label retains an viral Internet marketing firm to distribute promotional material, including free tracks, to other sites; and second, ***user to user viral marketing***, where a label authorizes a user to download a song, and expects that user to pass the song on to others.  That viral marketing was open and widespread, engaged in by virtually all labels, including virtually all EMI labels.  (*See* Declaration of Michael Robertson, dated November 11, 2012 ("Robertson Dec."), ¶ 20).

Evidence of Plaintiffs' intent to engage in viral marketing (as defined above) was before the Court as part of the parties' motions for summary judgment.  (*See* SUF, ¶¶ 85-89, 92, 93; Sacks Dec., Exs. 15-18, 20-22, 24-27, 52-53, 55-57).  Additional evidence exists, submitted herewith, ***not produced by Plaintiffs in discovery and obtained recently informally by Robertson***.  For example, Definitive Jux (an EMI label) entered into an agreement with viral

marketing firm, Better Propaganda, which granted Better Propaganda the right "to use, copy, distribute, display and perform [a specified song] on and through the Internet and the World Wide Web . . ." (Robertson Dec., ¶ 24 and Ex. 6).  This song remains available on the Better Propaganda site. *Plaintiffs did not produce this document*.   (Sacks Dec., ¶30 and Ex. 47).

Similarly, Astralwerks (another EMI label) engaged Toolshed, Inc. ("Toolshed"), a viral marketing firm, to distribute sound recordings pursuant to a marketing program by which Toolshed would virally distribute free MP3 downloads through various blogs and Toolshed's own website.  Importantly, Toolshed's webpage for downloads notes clearly that "*All songs . . . are pre-licensed for use on your site.  Simply browse, find music you like, and copy it to your page*." (Sacks Dec., ¶ 31 and Ex. 30) (emphasis added).  Toolshed has done projects for numerous labels, including EMI labels Astralwerks, Capitol Records, Caroline Records and Definitive Jux (*id.*); Toolshed distributed free MP3s for numerous of Plaintiffs' artists – including Air, Willy Mason, Bat for Lashes, Pacific!, Carbon/Silicon, The Perceptionists, and Amos Lee – including one of the same artists that Robertson is accused of wrongfully sideloading. (*See* Robertson Dec., ¶¶ 21-22 and Ex. 3; Sacks Dec., ¶ 31 and Ex. 30). *Plaintiffs did not produce documents they exchanged with Toolshed relating to those projects*.  (Sacks Dec., ¶ 31).

One project by Toolshed is especially important:  as emails (dated March 5, 2007) provided to Robertson from Toolshed indicate, Astralwerks paid Toolshed to get websites to give away MP3s for the new release of the album "Pocket Symphony" by Air, to be released on March 6, 2007. (Robertson Dec., ¶ 22). Toolshed achieved coverage, including free downloads of a track and/or video placement, with numerous sites, including 3Hive, Donewaiting, Kevchino, Music for Kids Who Can't Read Good, Muzzle of Bees, PopMatters, Sixeyes,

Stereogum, Antville, and Kingbline (*id.*, Ex. 3), some of the same sites and the same artist from which Robertson is accused of wrongfully downloading Plaintiffs' songs and which Plaintiffs have alleged are unauthorized sources of MP3's. (Sacks Dec., Exs. 1, 36). ***Plaintiffs did not produce such documents.*** (Sacks Dec., ¶ 31).

There is ample other evidence of Plaintiffs' unrestricted viral marketing: EMI labels and/or their artists engaged Girlie Action Media, Plus One Media, Cornerstone Promotions and For The Win! Media for viral digital marketing, who then made available free MP3 downloads without limitation or restriction. (*See* Sacks Dec., Exs. 31, 33, 34) (Bat for Lashes and other songs provided to AOL "***for free open download worldwide***"; also songs by Trouble Andrew, Royksopp, Miranda Lee Richards, Juan MacLean, Jamie T., Fireman, Doves, The Decemberists and Peter Doherty). Past clients of For the Win! include The Verve, another of Plaintiffs' artists, a song of whose Plaintiffs allege was illegally sideloaded by Robertson. (*See* Sacks Dec., Ex. 34). ***Plaintiffs did not produce such documents, even those to which they were a party.*** (*See* Sacks Dec., Exs. 31, 33, 34).

AOL distributes free MP3s of Plaintiffs' artists through its own music page or through its affiliate, spinner.com. (Sacks Dec., Exs. 31, 32, 33). For the Win! and Cornerstone Productions distributed free MP3 downloads to Prefix Media, a website which Plaintiffs allege was an unauthorized source of numerous illegal downloads. Astralwerks directly retained For The Win! for viral marketing, including numerous partner sites. (*See* Sacks Dec., ¶ 34, 35, 37 and Exs. 33, 34, 36). Further, EMI labels Astralwerks and Mute Records distributed free MP3 downloads without restriction to Prefix Media. (Sacks Dec., ¶ 35 and Ex. 34). ***Plaintiffs did not produce such documents.*** (*Id.*, ¶¶ 34, 35).

The EMI Labels' viral marketing practices are exemplified by a release they issued in

connection with making a free MP3 download available of "The Rake Song" by The Decemberists: "Go immediately to www.decemberists.com to redeem said FREE DOWNLOAD! Share it with your friends! Post it as your Facebook Update! Play it for your grandmother! On second thought, don't play it for your grandmother." (Sacks Dec., Ex. 48). In addition, Plaintiffs posted links for free downloads on hundreds of sites. (*Id.*, Ex. 49).

Plaintiffs admit that they distributed free music downloads through MTV.com, amazon.com, spin.com, stereogum.com, South by Southwest (sxsw.com, a large music festival) and Toolshed; and that, through freeallmusic.com, Plaintiffs made available 20 free downloads per month. (Sacks Dec., Exs. 16 (at 60-61), 36-38, 50). Again, these are some of the same sites from which Plaintiffs allege numerous songs were illegally downloaded by MP3tunes users and by Robertson individually. (Sacks Dec., Exs. 1, 14).

EMI Labels distributed free MP3 downloads of both new and established artists, including Air, Alice in Chains, KT Tunstall, Suzanne Vega, Coldplay, The Last Goodnight, Spice Girls, LCD Soundsystem, and Corrine Bailey Rae, many of the same artists that Robertson is alleged to have downloaded illegally. (Sacks Dec., Exs. 1, 16 (exhibits), 36, 51, 53).

Thus, the EMI Labels make extensive use of the Internet to distribute free music as a marketing and sales tool for both new and established artists. In fact, the EMI Labels are among the most aggressive labels in this regard. The EMI Labels distribute free files from its own record label sites, from a wide range of music-related websites, and through content delivery networks, like Akamai, which Plaintiffs pay to circulate music files. (Robertson Dec., ¶ 16 and Ex. 1). There are many EMI-copyrighted songs available for download with Akamai URLs, such as "edgeboss." For example, in 2007, Astralwerks used Akamai and AOL to promote the artist Athlete, with free tracks for two songs. (*Id.*)

As the foregoing shows, free – and legal – music downloads from EMI Labels are available on the Internet from a variety of sources, including through music magazines such as Spin and Filter and other popular online sources such as Salon.com and MTV.com. Similarly, Amazon, at present, has over 33,000 free MP3s available for download, including from at least 73 EMI artists. Free promotional downloads are also available on the websites associated with music events such as South by Southwest, with numerous free downloads from EMI artists. (Robertson Dec., ¶¶ 18-19, 23 and Exs. 2, 5; Sacks Dec., Ex. 36).

Tracks from dozens of Plaintiffs' artists have been available for free on Spin.com, including "The Difference Between Martyrdom and Suicide is Press Coverage" by Panic! at the Disco, a song Robertson is accused of illegally sideloading. (Robertson Dec., ¶ 23 and Ex. 4). As a result of such viral marketing by the EMI Labels, there are over 1,300 songs by EMI artists available for free download. (Robertson Dec., ¶ 23 and Ex. 5).

There also is evidence that EMI Publishing authorized free downloads of songs in their catalog. EMI Publishing permitted free downloads of tracks by prominent artists, such as Counting Crows, Depeche Mode, John Legend, Jewel, Amy Winehouse and David Bowie, and emerging artists, through numerous websites, such as walmart.com, facebook.com, indaba.com, sxsw.com, amazon.com, itunes.com, napster.com, borders.com, mtv.com, allhiphop.com, myspace.com, spinner.com, aol.com and through third party digital and marketing vendors. (Sacks Dec., Exs. 17, 18, 28, 39, 54; SUF ¶¶ 85-89, 102). Again, these are many of the same sites from which Robertson and other users of MP3tunes were alleged to have wrongfully downloaded material.

An example of viral marketing by EMI Publishing, was a request by Stephen Gullberg, an employee of EMI Publishing:

> Free Promotional MP3 of one song to the public for free download from Peter Moréns album (as do most indie labels). They would offer "Social Competence" for free download on touchandgorecords.com, Peter and Touch and Go's Myspace pages, plus *encourage as many third party online zines, podcasts, blogs, major web portals to host the MP3 for free download on their site*. We are being told that historically the track which is offered for free like this is usually still the top selling track in digital retail. They would like to offer this promotional MP3 download for nine months. After that initially period the promotional partners will replace the MP3 download with a stream for the duration of the license of the album – including offering a stream of the song on their website and on their Myspace page and Peter's Myspace page, or until they decide to ask these partners to remove the stream. (Sacks Dec., Ex. 40) (emphasis added).

It is clear that Plaintiffs used viral marketing; and intended to disseminate free MP3s throughout the Internet to be downloaded, not just from the website (URL) of the entity to which Plaintiffs initially distributed the free MP3, but from whatever website the free MP3 was eventually distributed to by third parties. Therefore, the fact that a song was not sideloaded from a URL to which Plaintiffs initially distributed a song is irrelevant.

**B. There Is, At The Very Least, A Factual Dispute As To Whether Plaintiffs Had A Policy of Securing Marketing Information In Return For Free MP3s**

In the Court's Summary Judgment Order, the Court found, as a matter of undisputed fact, that "EMI placed careful restrictions on the use of its promotional songs and required consumers to visit certain websites or provide valuable marketing information before downloading a song." 821 F. Supp. 2d at 648. That finding was error; it is plainly disputed, requiring trial. As set forth above, Plaintiffs did *not* require consumers to visit certain websites; rather, it was Plaintiffs' intent that free MP3s virally appear on unspecified websites. What is more, Plaintiffs admittedly had an *inconsistent policy* concerning the requirement of marketing information. Further, even if such "marketing information" was required from the first person downloading a song, the nature of viral marketing is such that it was not expected from other sites or users.

In connection with its finding that Plaintiffs required marketing information in exchange for free downloads, the Court cited to the declarations of Robert Heinemann, filed November 24, 2010 ("Heinemann Dec.") (Doc. No. 212), ¶¶ 5-9, and Michael Abitbol, dated November 23, 2010 ("Abitbol 11/23/2010 Dec.") (Doc. No. 213), ¶¶ 15-20,. Neither Heinemann nor Abitbol stated that Plaintiffs *always* required receipt of marketing information in connection with the free downloading of MP3s. Rather they, and Plaintiffs, hedged and stated that "downloads are offered only to users who visit specific authorized websites as part of an approved promotional context and *often* also require the exchange of valuable information." (*See, e.g.*, SUF, ¶ 85) (emphasis added). "Often", not always.

In addition, the EMI Label Plaintiffs grudgingly admit that, in the case of South by Southwest (sxsw.com), a site where Plaintiffs admit over 75 free MP3 downloads were authorized, no marketing information was secured. (*See* Heinemann Dec., ¶¶ 6, 20). Further, Exhibits A to the foregoing Heinemann and Abitbol Declarations make clear that numerous recordings were made available for free for promotional purposes without capturing marketing information. (Sacks Dec., ¶ 43 and Exs. 41, 42) (highlighted songs).

What is more, Plaintiffs entered into agreements with viral marketers such as Toolshed, For The Win! and Better Propaganda, which do not limit downloads to specific sites and do not require marketing information. *Again, as referred to above, those documents were not produced by Plaintiffs*. (Sacks Dec., ¶¶ 30-32, 34-36 and Exs. 29-31, 33-35; Robertson Dec., ¶¶ 16-23 and Exs. 1, 3). Further, documents produced by Plaintiffs evidence that, before 2009, Plaintiffs had no coherent policy regarding capturing consumer information in exchange for free downloads. (Sacks Dec., Ex. 43).

Therefore, there is, at the very least, a factual dispute for trial as to whether Plaintiffs

allowed the copying and distribution of free MP3s on unspecified websites without the requirement of marketing information.

## C. There Is, At The Very Least, A Factual Dispute As To Whether Plaintiffs Themselves Can Distinguish Between Authorized and Unauthorized Websites, And Plaintiffs Have Violated Their Oaths and Discovery Obligations

In the Summary Judgment Order, the Court found that, Plaintiffs' executives acknowledged that it would be difficult or impossible for *Internet users* – but not Plaintiffs' executives – to distinguish between authorized and unauthorized websites. 821 F. Supp. 2d at 647. However, the evidence is, at the very least, disputed that it was also impossible for *Plaintiffs' executives* to do so.

First, as set forth above, Plaintiffs engaged in viral Internet marketing with the intent to spread free MP3 downloads to numerous *unspecified* websites. (*See also* Sacks Dec., ¶ 59, Ex. 57). Second, Plaintiffs are unable to state under oath what songs were authorized for free MP3 downloads. For example, in Plaintiffs' September 4, 2007 takedown notice, Plaintiffs' counsel swore under oath that they were authorized to act on behalf of EMI and had a good faith belief that "use of the material in the manner complained of is not authorized by EMI, its respective agents, or the law." (*See* Sacks Dec., Ex. 14). This takedown notice listed the songs "Black Horse and the Cherry Tree" by KT Tunstall and "Ninth Degree" by the Morningwood, as being unauthorized. *Plaintiffs have now admitted, under oath in interrogatory answers, that these two recordings were, in fact, authorized and were made available by EMI for free download.* (*See* Sacks Dec., Ex. 36, ## 534, 692).

That is not the only oddity in the interrogatory answers and takedown notices. The interrogatory answers admit that Plaintiffs authorized a download on Spin.com, a site on which Robertson is alleged to have illegally downloaded a different song. (Sacks Dec., Exs. 1, 36, # 1015). Similarly, while the documents that Plaintiffs did *not* produce prove that Plaintiffs

12

distributed MP3s for free download, Plaintiffs, despite their viral marketing practices, have denied that the same MP3 was authorized for free download on a different magazine site. *Compare* Sacks Dec., Exs. 31, 33-35 *with* Sacks Dec., Exs. 14, 36, 41, 42.

Importantly, as set forth above and below, Plaintiffs have failed to produce documents relating to free downloads which Robertson informally has obtained from Plaintiffs' marketing partners. Undoubtedly, Plaintiffs have other documents they have failed to produce which would provide further evidence of Plaintiffs' inability to distinguish authorized from unauthorized websites. For example, Plaintiffs have asserted that the download of the song "Once Upon A Time" by Air from insound.com and spin.com was illegal. (*See* Sacks Dec., Ex. 36). Plaintiffs, however, failed to produce documents concerning its agreement with Toolshed which paid Toolshed to post on its website, and distribute to other websites, for downloading "Once Upon A Time" by Air. (*See* Robertson Dec., Ex. 3; Sacks Dec., Exs. 30, 35). As noted above, the Toolshed site expressly provides that all downloads set forth on the site are authorized and freely available to all users. Plaintiffs only belatedly admitted that they made this song available for free download by Toolshed, but still assert that Robertson's sideload of other Air songs and downloads from other URLs were illegal. (*See* Sacks Dec., Exs. 1, 36, ## 44-46).

Plaintiffs have also been disingenuous under oath regarding authorizations. For example, the Abitbol declaration, dated October 29, 2010 ("Abitbol 10/29/10 Dec.") (Doc. No. 187), asserts that *none* of the songs compositions listed on Exhibits P or S to the Horowitz Dec. (relating to the songs on the takedown notices and to the songs sideloaded by MP3tunes executives, including Robertson) have *ever* been authorized for free download by any of the EMI Publishers. (*See* Abitbol 10/29/10 Dec., ¶¶ 3-4; Horowitz Dec., ¶¶ 55, 71-76 and Exs. P, S). *That is disingenuous.*

As Abitbol explained in his deposition, the EMI Publishers only hold the copyrights in the compositions, not the recordings. Labels hold the copyrights in the recordings, and the labels for the songs at issue have a pass through right to use the compositions under federal law. A website with a free download can get the rights from the labels for the MP3 and the label is only required to pay the publisher at a statutory rate. Abitbol provides no analysis of whether any of the compositions which were allegedly infringed were posted or authorized by the artists' labels. (*See* Sacks Dec., Ex. 44).

That is not a frivolous issue. Robertson is accused of illegally sideloading the song "Eternal Rest" by Avenged Sevenfold, as to which the Publishing Plaintiffs claim copyright. (*See* Sacks Dec., ¶ 46 and Ex. 45 (Declaration of Audrey Ashby, dated October 29, 2010 ("Ashby Dec."), Ex. A, at 3)). Avenged Sevenfold is a Hopeless Records artist; and Robertson downloaded that track from the Hopeless Records site. (*See* Robertson Dec., ¶ 27). In fact, Hopeless Records has confirmed that it had all required authority to post a free MP3 download of "Eternal Rest" on its website. (*Id.*, Ex. 7).

Furthermore, Plaintiffs have no central reporting system from which authorized free downloading may be ascertained. (*See* Sacks Dec., Ex. 28; SUF, ¶¶ 95-98). Finally, if Plaintiffs wished to avoid the viral spread of their music, all they needed to do was to have their music made available as streaming only and not for download; but that would have hampered their viral marketing efforts. For streaming only, a multimedia format such as flash (like YouTube does), .asx or .ram would be used, instead of .mp3 format. Use of streaming only would have avoided downloads, and also would not have been detected by sideload.com, which only functions with music in mp3 format. However, as explained in the email from viral marketing firm Toolshed, "Note – I've pointed out in this proposal that, ***without a MP3, blog attention will be fickle***. This

is due to the nature of blogs - most are MP3 blogs." (*See* Robertson Dec., Ex. 3, at 3 (emphasis added)). Consistent with the showing above that Plaintiffs vigorously and intentionally pursued unrestricted viral marketing of their music, Plaintiffs did not limit its marketing to streaming. (Robertson Dec., ¶ 23).

Therefore, there is, at the very least, a factual dispute for trial as to whether Plaintiffs can identify all authorized websites from which free downloading occurred, and that Plaintiffs lack credibility to assert that any particular downloaded song was unauthorized.

## D. There Are, At The Very Least, Issues Of Fact For Trial As To The Claims That Robertson's Sideloading Infringed Plaintiffs' Copyrights

Based on the foregoing, there is, at the very least, a disputed issue of fact for trial as to whether Robertson's sideloads infringed Plaintiffs' copyrights.  As this Court is aware, on summary judgment, the "Supreme Court teaches that 'all that is required [from a nonmoving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (citations omitted).  "It is a settled rule that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" *Id.* (citations omitted)

"In a copyright infringement case, the plaintiff must show: (i) ownership of a valid copyright; and (ii) *unauthorized* copying of the copyrighted work." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51 (2d Cir. 2003) (emphasis added).  As set forth above, issues of fact abound as to whether the songs at issue were authorized for free download and as to Plaintiffs' credibility regarding their bald assertions that certain downloads were unauthorized.  As the Court knows, on a motion for summary judgment it remains the Plaintiffs' burden to show the

absence of genuine issues of material fact with respect to a defendant's defenses. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994). Because a jury could reject the testimony of Abitbol, Ashby, Heinemann, and McMullan, this Court may not base summary judgment on it.

Numerous legal theories support Robertson's defenses. Among other theories, as set forth above, Robertson was authorized to sideload the tracks in question. As shown above, there is a factual dispute for trial as to which websites were authorized for free downloads, and whether Plaintiffs authorized the widespread viral distribution of free downloads.

Additionally, Plaintiffs are equitably estopped from asserting that Robertson infringed their copyrights:

> "The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position[.]" *Shondel J. v. Mark D.*, 7 N.Y.3d 320, 326 (2006).

Equitable estoppel has been applied in this Circuit in copyright infringement cases. *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Services*, 746 F. Supp. 320, 329 (S.D.N.Y. 1990) (equitable estoppel "applies both in law and in equity to deny a party the right to plead or prove an otherwise important fact – here, the act of infringement – because of something he has done or omitted to do"). Equitable estoppel "'is properly invoked where the enforcement of rights of one party would work an injustice upon the other party due to the latter's justifiable reliance upon the former's words or conduct.'" *Veltri v. Building Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).

A copyright defendant invoking equitable estoppel must show that: plaintiff had

16

knowledge of defendant's infringing acts; plaintiff intended that defendant rely on his acts or omissions or acted or failed to act in such a manner that defendant had a right to believe that it was intended to rely on plaintiff's conduct; defendant was ignorant of the true facts; defendant relied on plaintiff's conduct to its detriment. *See* 4 Nimmer on Copyright § 13.07[A]; *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir. 1960).

Here, there is a factual dispute for trial as to whether: (i) Plaintiffs had knowledge of widespread infringing conduct by the targets of viral marketing, such as Robertson; (ii) Plaintiffs intended that Robertson and others rely on Plaintiffs offering of free downloads; (iii) Robertson and other viral marketing targets were ignorant of the alleged true facts, and (iv) Robertson and other viral marketing targets relied on Plaintiffs' conduct to their detriment. (*See* Robertson Dec., ¶¶ 16-24). As set forth above, Plaintiffs engaged in viral marketing to spread numerous free MP3s throughout the Internet. In addition, this Court has already found that Plaintiffs' "executives acknowledge that it would be difficult or impossible for *internet users* to distinguish between authorized or unauthorized websites[.]" 821 F. Supp. 2d at 647.

Although this Court need not reach such remedies, these same facts raise issues of fact for trial as to whether Plaintiffs should be denied relief against Robertson due to their unclean hands (*Broadcast Music, Inc.*, 746 F. Supp. at 330), abandonment (*Capitol Records, Inc. v. Naxos of America, Inc.*, 372 F.3d 471, 483–84 (2d Cir. 2004) (abandonment requires "(1) an intent by the copyright holder to surrender rights in the work; and (2) an overt act evidencing that intent"; intent to abandon is normally inappropriate for summary judgment)), implied license (*Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990); *Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293-94 (11th Cir. 1999) (conduct of copyright holder may establish an implied license to use the work), or waiver (*Jumax Associates v. 350 Cabrini Owners Corp.*, 46 A.D.3d

17

407, 410, 849 N.Y.S.2d 35 (1st Dep't 2007) ("A waiver is an intentional abandonment or relinquishment of a known right … [and] the question of whether waiver has occurred is generally a question left to the finder of fact[.]") (citations omitted)).

For all of those reasons, there is a factual dispute for trial on Robertson's liability for direct copyright infringement.

## III. THERE ARE ISSUES OF FACTS FOR TRIAL AS TO WHETHER PLAINTIFFS MAY ASSERT COPYRIGHT INFRINGEMENT AGAINST ROBERTSON WITH RESPECT TO NUMEROUS SONGS

Many of the 47 songs which Robertson is alleged to have illegally sideloaded are not infringing for a variety of reasons.

### A. Plaintiffs Reliance on Copyrights In Compilations Is Misplaced

Numerous of the copyrights relied upon by Plaintiffs are for compilations. (*See* Sacks Dec., Ex. 1). In each case, Robertson is accused of copying only one sound recording of the numerous other sound recordings in the compilation. To establish copyright infringement in a compilation, the plaintiff must prove: (1) that it owns a valid copyright in the work, and (2) that the defendant copied the constituent elements of the work that are original. *Feist Pub. Inc. v Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). A compilation of pre-existing work may be copyrightable. A compilation is defined as "a work *formed by the collection and assembling* of pre-existing materials or of data *that are selected, coordinated or arranged in such a way that the resulting work as a whole constitutes an original work of authorship*." 17 U.S.C. § 101 (emphasis added).

In a compilation, the ordering and selection is the alleged original work protected by Plaintiffs' alleged copyright. The use of an *element* of a compilation work, which is not substantially similar to or a copy of *the constituent elements of the work that make the compilation original*, is not copyright infringement. *See Key Publications, Inc. v. Chinatown*

*Today Pub. Enterprises*, 945 F.2d 509, 514 (2d Cir. 1991); *Caffey v. Cook*, 409 F. Supp. 2d 484, 501-502 (S.D.N.Y. 2006) (performance of a fifty minute set of a two hour and fifteen minute compilation of songs, with a change in ordering of the songs, is not copyright infringement).

The protectable element of the compilation – that is, the selection and ordering of the songs within the compilations – is not infringed by Robertson's alleged copying of a single song which may be part of the compilation. Accordingly, there is, at the very least, a factual dispute as to Robertson's defense to Plaintiffs' copyright claims with respect to those songs which they have alleged infringe a compilation copyright.

**B. Plaintiffs Have No Copyrights On Numerous Songs Specified In The Takedown Notices And On Two Of The Songs Robertson Is Alleged To Have Infringed**

As set forth in Sacks Dec., Ex. 1, Plaintiffs have failed to produce copyright certificates covering numerous recordings which were the subject of the takedown notices they served, and two sideloads by Robertson ("White Christmas" by Frank Sinatra and "Devil In Me" by 22-20s). Accordingly, there is, at the very least, a factual dispute as to Plaintiffs' copyright claims with respect to such songs.

**C. Section 412 of the Copyright Act Makes Statutory Damages And Attorney's Fees Unavailable With Respect To Numerous Songs**

For three of the 47 songs Robertson is accused of illegally sideloading (Air's "Redhead Girl", "Napalm Love", "Mer du Japon"), the act of sideloading occurred before the issuance of the copyright alleged to be infringed. Section 412 of the Copyright Act expressly provides that "[i]n any action under this title  . . . no award of statutory damages or of attorney's fees, as provided by Sections 504 and 505, shall be made for . . . (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after first publication of the work." 17 U.S.C. § 412(2). Accordingly, for those three songs, Plaintiff is not entitled to an award of

statutory damages or attorney's fees under the Copyright Act.  *See, e.g., Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 33 n.5 (2d Cir. 1982); *U-Neek, Inc. v. Wal-Mart Stores, Inc.*, 147 F. Supp. 2d 158, 170-71 (S.D.N.Y. 2001); 2 Nimmer on Copyright § 7.16[C][1][a][i] (§ 412(2) bars statutory damages and fees even if the infringement continues after the registration date).

### D. Plaintiffs May Not Assert Copyright Infringement For Works For Hire

Plaintiffs' claims for copyright infringement with respect to works asserted in their copyright certificates to be "works for hire" must be dismissed because:  (1) Plaintiffs have failed to prove of ownership of the sound recordings and musical compositions at issue and (2) neither sound recordings nor musical compositions may be copyrighted on the basis of an alleged "work for hire."  That applies to numerous of the claims against Robertson (and MP3tunes).

Plaintiffs in a copyright infringement case must show "ownership of a valid copyright." *Feist*, 499 U.S. at 361.  Copyright ownership "vests initially in the author or authors of the work."  17 U.S.C.  § 201(a).  However, in certain limited situations, where the work is prepared as a "work for hire," the copyright vests in the person for whom the work was prepared.  17 U.S.C. § 201(b).

Section 101 of the Copyright Act defines a "work made for hire" as a work:  (1) created by an employee within the scope of his employment; or (2) specifically ordered or commissioned provided it falls within the nine types of works enumerated under the statute.  17 U.S.C. § 101. *However, neither sound recordings nor musical compositions fall within the nine types of works listed in the "specially commissioned" prong of the statute.*

The nine categories of works which may be specially commissioned works for hire are work specially ordered or commissioned for use as (i) a contribution to a collective work, (ii) a part of a motion picture or other audiovisual work, (iii) a translation, (iv) a supplementary work,

(v) a compilation, (vi) an instructional text, (vii) a test, (viii) answer material for a test, or (ix) an atlas. *Id.*; *see, e.g., Lulirama Ltd. V. Axcess Broadcast Servs.*, 128 F.3d 872, 875 (5th Cir. 1997); *Ballas v. Tedesco*, 41 F. Supp. 2d 531, 541 ((D.N.J. 1999); *Staggers v. Real Authentic Sound*, 77 F. Supp. 2d 57, 64 (D.D.C. 1999); *Bucciarelli-Tieger v. Victory Records, Inc.*, 488 F. Supp. 2d 702, 709 (N.D. Ill 2007) ("Sound recordings are notably excluded from the list of works that can be specially commissioned as work for hire."). Indeed, "the only way [a sound recording] can be a work for hire is if plaintiffs are employees of defendants." *Bucciarelli-Tieger*, 488 F. Supp. 2d at 709 (N.D. Ill 2007); *Lulirama Ltd. V. Axcess Broadcast Servs.*, 128 F.3d 872, 875 (5th Cir. 1997).

Plaintiffs have not claimed that the works for hire were by employees. Rather, they have produced numerous recording agreements and copyright assignments. (Sacks Dec., ¶ 47). While "employee" and "employment" are undefined in the 1976 Act, the Second Circuit requires evidence of: "(1) the hiring party's right to control the manner and means of creating; (2) the skill required; (3); the provision of employee benefits; (4) the tax treatment of the hired party; and (5) whether the hiring party has the right to assign additional projects to the hired party." *Aymes v. Bonelli*, 980 F.2d 857, 861 (2d Cir. 1992). However, Plaintiffs failed to demonstrate any of these factors in connection with their motion for summary judgment and simply relied on the *prima facie* presumption of validity from their copyright certificates. This is insufficient under *Aymes*.

In addition, during discovery, Defendants served document requests seeking production of works for hire documents and agreements. Requests 29, 30 sought documents concerning songs that are "works for hire." Plaintiffs objected to such production on the ground that a copyright infringement defendant lacked standing to challenge the work for hire status, citing

*Eden Toys, Inc. v. Floral Lee Undergarment Co.*, 697 F.2d 27 (2d Cir. 1982). That objection was sustained, finding that such production would be a fishing expedition (*see* Endorsed Memo, dated October 16, 2009, Doc. No. 119; Endorsed Memo, dated November 2, 2009, Doc. No. 126).

Plaintiffs' objection was baseless. The standing doctrine does not preclude a copyright defendant from challenging plaintiffs' ownership under the works-for-hire doctrine. *Pavlica v. Behr*, 397 F. Supp. 2d 519, 526 (S.D.N.Y. 2005) (infringement defendants allowed to challenge work for hire status); *Langman Fabrics v. Graff Californiawear, Inc.*, 160 F.3d 106, 108-11 (2d Cir. 1998) (same; the "statutory presumption is by no means irrebuttable"); *In re Napster, Inc. Copyright Litig.*, 191 F. Supp. 2d 1087, 1097, 1100 (N.D. Cal. 2002) ("the court is ... reticent to allow plaintiffs ... to railroad Napster into potentially billions of dollars of statutory damages without adequately proving ownership"). Plaintiffs are bound by their refusal to produce work for hire agreements and documents.

Plaintiffs cannot use work for hire agreements as a shield and a sword – refusing to produce them, but then relying on them to support most of their copyrights. Because Plaintiffs failed to produce documents which could have allowed Robertson to challenge the alleged assertion of a work for hire arrangement in connection with Plaintiffs' copyrights, Plaintiffs may not rely on a *prima facie* presumption of a *bona fide* work for hire arrangement.

Accordingly, for this additional reason, Robertson has a defense to Plaintiffs' copyright claims where copyright ownership is based upon alleged "work for hire" arrangements.

### E.  The EMI Publishers Lack A Good Faith Basis To Assert Certain Claims

The EMI Publishers have also asserted claims which are devoid of any good faith basis. For example, as noted above, the EMI Publishers have alleged that Robertson infringed its copyright in the song "Eternal Rest" by Avenged Sevenfold, as a result of downloading that song

from *www.hopelessrecords.com*. (*See* Sacks Dec., Ex. 1). However, ***Hopeless Records is the record label with which Avenged Sevenfold is signed and which released the album on which the subject track appears***. (*See* Robertson Dec., ¶ 28). As also noted above, EMI's Abitbol explained in his deposition that the EMI Publishers only hold the copyrights in compositions, not recordings. Labels hold the copyrights in the recordings, and the labels for the songs at issue have a pass through right to use the compositions under federal law. A website with a free download can get the rights from the labels for the MP3 download and the label is required to pay the publisher at a statutory rate. Abitbol never asserts – and provides no analysis of – whether the compositions which allegedly were infringed were posted or authorized by the artists' labels. (Sacks Dec., Ex. 44).

Clearly, the EMI Publishers did not check with Hopeless Records before asserting their claim for copyright infringement against Robertson. That is also true with respect to all 13 songs as to which the EMI Publishers claim Robertson infringed:  the EMI Publishers did not determine whether the label authorized the download.

### F.  Many Of The 47 Songs Allegedly Infringe The Same Copyright

Many of the 47 songs which Robertson is accused of illegally sideloading infringe the same copyright. For example, "All I Need" and "Talisman" by Air, are both alleged to infringe copyright SR 295-787; and "Like A Star" and "Put Your Records On", by Corinne Bailey Rae are alleged to infringe SR 385-316. (Sacks Dec., Ex. 1).

For all of the foregoing reasons, there are factual disputes for trial as to whether many of the 47 songs which Robertson is alleged to have illegally sideloaded are infringing.

### IV.  PLAINTIFFS' UNFAIR COMPETITION CLAIM MUST BE DISMISSED; AT THE VERY LEAST, SUMMARY JUDGMENT AGAINST ROBERTSON IS IMPROPER

Plaintiffs' unfair competition claim against Robertson is legally baseless. Unfair

competition "in addition to unauthorized copying and distribution requires competition in the marketplace or similar actions designed for commercial benefit...or deception of the public[.]" *Capitol Records, Inc. v. Naxos of Am., Inc.*, 4 N.Y.3d 540, 563-64 (2005).  In addition, Plaintiffs must demonstrate Robertson acted in bad faith.  *See Empresa Cubana del Tabaco v. General Cigar Co.*, 385 F. App'x 29, 32-33 (2d Cir. July 14, 2010).  Robertson is entitled to summary judgment on this claim, as it is undisputed that he personally does not compete with Plaintiffs, and received no commercial benefit from any of the sound recordings he allegedly downloaded, all of which were downloaded for his personal use. (*See* Robertson Dec., ¶¶ 7, 12-14).  At the very least, summary judgment against Robertson must be denied.

## V.   SUMMARY JUDGMENT MUST BE DENIED OR DEFERRED PURSUANT TO RULES 56(d) and (e)

Although, for the reasons set forth above, issues of fact exist to justify denial of any motion for summary judgment against Robertson, summary judgment also should be denied or deferred until such time as Plaintiffs have complied with their discovery obligations and Robertson has had sufficient time to complete limited third party discovery.

Through recent informal discovery, and a review of formal third party discovery, it is clear that Plaintiffs have failed to comply with their discovery obligations.  Pursuant to formal document requests, Defendants requested:  (1) all documents concerning the streaming and downloading of EMI-Copyrighted Songs on any Music Site; and (2) all contracts and communications between any EMI Party and any person involved in the streaming or downloading of music files on any Music Site. (*See* Declaration of Mark S. Lafayette, dated November 12, 2012 ("Lafayette Dec."), Ex. 1).  Notwithstanding these requests, as referenced repeatedly above, Plaintiffs failed to produce agreements and communications related to the streaming and downloading of EMI-Copyrighted Songs on any Music Site.  None of the

24

documents annexed as Robertson Dec., Exs. 1, 3 or Sacks Dec., Exs. 29, 31, 33-35 – even ones to which Plaintiffs were a party – were produced by Plaintiffs.

Under Rule 56(d), if "a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:  (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."  Rule 56(d).  Further, if "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:  (1) give an opportunity to properly support or address the fact; … or (4) issue any other appropriate order."  Rule 56(e).

As set forth above, and in the Lafayette Dec. (complying with the requirements of *Gurary v. Winehouse*, 190 F.3d 37, 43 (2d Cir. 1999)), it is clear that Plaintiffs and third parties have additional documents which would support Robertson's defenses to Plaintiffs' claims.   In addition, third parties have stated that they would not make documents available to Robertson without a subpoena.  (Robertson Dec., ¶ 22 and Ex. 3; Lafayette Dec., ¶ 11).

That alone is sufficient to require the denial of summary judgment against Robertson.  At the very least, a decision on summary judgment should be deferred until Plaintiffs properly supplement their productions to include all documents concerning their viral marketing and permitting free downloading; and Robertson should be permitted to serve ten third party subpoenas directed to his individual liability.

## VI.   MP3TUNES' USE OF COVER ART WAS NOT INFRINGING

This Court should reconsider its decision that there are disputed issues of fact precluding summary judgment to MP3tunes – and therefore Robertson[1] – for the use of cover art.  821 F.

---

[1] Robertson's liability for alleged cover art infringement is derivative only, and arises only if MP3tunes is liable.

Supp. 2d at 650.  That is so for several independent reasons:

(1) Cover art was copied in a fully automated, user-directed process and is thus subject to Digital Millennium Copyright Act ("DMCA") protection under *Viacom*; and, because Plaintiffs failed to provide takedown notices with respect to the cover art, MP3tunes is protected from liability;

(2) MP3tunes was licensed to copy cover art from Amazon.com, Inc. ("Amazon"), and Plaintiffs lack standing to assert that MP3tunes breached that license; and

(3) Plaintiffs have failed to establish that they own valid copyrights for the cover art because:  (i) the cover art was not properly copyrighted under sound recording copyrights; and (ii) Plaintiffs are estopped from claiming that valid work for hire agreements support the cover art because Plaintiffs have refused to provide evidence of work for hire agreements.

## A.  MP3tunes' Retrieval and Storage of Cover Art Is Protected By The § 512(c) DMCA Safe Harbor Provision Under *Viacom*

All of the cover art at issue here comes within the DMCA § 512(c) safe harbor.  As this Court recognized, § 512(c) provides that a "service provider shall not be liable ... for infringement of copyright by reason of the ***storage at the direction of a user*** of material that resides on a system or network controlled or operated by or for the service provider" if the service provider meets certain other requirements.  821 F. Supp. 2d at 639 (emphasis added) (citations omitted).  This Court also found that MP3tunes met the other requirements to qualify for such protection, except to the extent it failed to respond to a valid takedown notice.  *Id.* at 646 ("there is no genuine dispute that MP3tunes may claim safe harbor protection for EMI works stored on MP3tunes.com and EMI works linked to Sideload.com").

Thus, MP3tunes' retrieval and storage of cover art is protected by § 512(c) if the cover art was stored "at the direction of the user."  There is no dispute in that regard in light of *Viacom*.

26

There, the Second Circuit addressed whether the DMCA's safe harbor provision applied to YouTube's "'related videos' function, by which a YouTube computer algorithm identifies and displays 'thumbnails' of clips that are 'related' to the video selected by the user." *Viacom*, 676 F.3d at 40. Broadly reading § 512(c) to "clearly … cover more than mere electronic storage lockers" (*id.* at 39), the *Viacom* Court found safe harbor protection because the copying, storage and display of thumbnails was "fully automated and operates solely in response to user input without the active involvement of YouTube employees." *Id.* at 40. Thus, under *Viacom*, the § 512(c) safe harbor extends to service providers that make architectural decisions which (i) enhance user experiences, (ii) through a fully automated system, (iii) operating solely in response to user input, without the active involvement of employees. That is plainly the case with respect to cover art here, as a matter of undisputed fact.

*First*, like YouTube, MP3tunes made an architectural choice to enhance user experience. YouTube's "computer algorithm identifies and displays 'thumbnails' of clips that are 'related' to the video selected by the user." *Viacom*, 676 F.3d at 39. Similarly, MP3tunes' computer algorithm retrieves, copies, stores and displays cover art related to sideloads selected by the users. (*See* Sacks Dec., ¶¶ 12-14 and Exs. 11-13 (Gulia 11/24/10 Dec., Exs. FF (Robertson Tr. at 334), GG (Reese Tr. at 332), II (Goodwin Tr. at 68))).

*Second*, MP3tunes retrieves, copies and stores visual art as a result of a complex, fully automated process which "first attempt[s] to retrieve cover art that is embedded within the file itself (in the ID3 tag) or from the user's personal computer before utilizing the Amazon.com API." *Id.* Plaintiffs admit that the cover art query and copying was done "automatically" as a "default" process. (*See* Plaintiffs' Memorandum of Law in Opposition to the Motion of MP3tunes, LLC for Summary Judgment, dated November 24, 2010, ("P. MSJ Opp.") at 30, Doc.

No. 209; SUF ¶¶ 26-37; Horowitz Dec., ¶¶ 78-79).

*Third*, as in *Viacom*, MP3tunes retrieves, copies and stores cover art solely in response to user input, without the active involvement of employees. Here, Plaintiffs' admit that it was "software" – not employees – which searched "automatically" for cover art as a result of user input. (P. MSJ Opp. at 30).

Thus, Plaintiffs' expert admits:

> When a *user* attempts to upload music to the MP3tunes system using defendants' LockerSync program, the LockerSync *program* uses the Amazon API to query Amazon.com for cover art to associate with the files the *user* is uploading. When the music file is uploaded to the defendants' system, defendants then copy the cover art associated with that music file to the MP3tunes servers. The cover art is then stored on the defendants' servers based on a unique File Key that is a combination of values, including the user_id, such that separate cover art images were stored for each user. (Horowitz Dec., ¶ 79) (emphasis added).

As a result, it is undisputed that MP3tunes' cover art algorithm "'is closely related to, and follows from, the storage itself, and is 'narrowly directed toward providing access to material stored at the direction of users[.]'" *Viacom*, 676 F.3d at 40 (quoting *UMG Recordings, Inc. v. Veoh Networks, Inc.*, 620 F. Supp. 2d 1081, 1092 (C.D. Cal. 2008)). For those reasons, the cover art stored by MP3tunes is protected by the safe harbor of § 512(c).

As a result, as this Court has held, in such circumstances, MP3tunes' obligation under § 512(c) merely was to remove cover art in response to a proper takedown notice. 821 F. Supp. 2d at 646. It is undisputed that Plaintiffs never served MP3tunes with a takedown notice relating to cover art. (Sacks Dec., ¶ 15 and Ex. 14). Therefore, MP3tunes has § 512(c) safe harbor protection for cover art retrieved and stored on MP3tunes' servers.

## B. All Cover Art Was Licensed; And Plaintiffs Lack Standing To Raise The Issue of Breach

Even if the cover art was not within the § 512(c) safe harbor, the cover art was licensed.

Plaintiffs admit that, during the relevant time period, the cover art was copied from Amazon.com. *See* Horowitz Dec., ¶ 78. Also, it is undisputed that "MP3tunes is licensed to display cover art from Amazon.com for the 'principal purpose' of driving traffic to Amazon.com's website." 821 F. Supp. 2d at 635. In the Summary Judgment Order, this Court denied MP3tunes motion for summary judgment because "genuine issues of fact exist as to whether MP3tunes breached its license with Amazon.com." *Id.* at 650. That was error. It was undisputed that Amazon never terminated the license agreement (Robertson Dec., ¶¶ 30-32); and Plaintiffs do not have standing to raise breach of the license.

Plaintiffs, as non-parties to the Amazon agreement, lack standing to raise the issue of MP3tunes' alleged breach. "A non-party to a contract governed by New York law lacks standing to enforce the agreement in the absence of terms that 'clearly evidence[] an intent to permit enforcement by the third party" in question.'" *Premium Mortg. Corp. v. Equifax, Inc.*, 583 F.3d 103, 108 (2d Cir. 2009) (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)). There is no such evidence in the Amazon license. (*See* Sacks Dec., ¶ 48 and Ex. 46 (Declaration of Anne Tarpey, filed October 29, 2010, Dec., ¶ 2 and Exs. A-C)).

Plaintiffs concede that Amazon licenses use of cover art to MP3tunes through its "Associates Program." Sacks Dec., Ex. 46 (Tarpey Dec., ¶ 2). The Amazon Agreements allow MP3tunes to "copy and display" artwork. *Id.* (Tarpey Dec., Exs. A and B). That is all MP3tunes did – copy and display cover art. Beyond that, Plaintiffs do not have standing to argue that MP3tunes did not use the copies of the cover art for the "'principal purpose' of driving traffic to Amazon.com's website." 821 F. Supp. 2d at 650.

First, as the record reflects, MP3tunes used the cover art for the principal purpose of driving traffic to Amazon.com's website. (*See* Robertson Dec., ¶¶ 30-32 and Ex. 8).

But even if there was an alleged breach, Plaintiffs cannot raise a claim for copyright infringement as a result of that alleged breach by MP3tunes, a sublicensee, unless the "[sub]licensee's action (1) exceeds the [sub]license's scope (2) in a manner that implicates one of the [copyright owner's] exclusive statutory rights." *MDY Industries, LLC v. Blizzard Ent't, Inc.*, 629 F.3d 928, 940 (9th Cir. 2010) (citing *Sun Microsystems, Inc. v. Microsoft Corp.*, 188 F.3d 1115, 1121-22 (9th Cir. 1999)).

That second element is concededly not present here – MP3tunes alleged exceeding the scope of the Amazon license did not implicate Plaintiffs' exclusive statutory rights. A copyright holder has the exclusive right to reproduce the copyrighted work; to prepare derivative works; to publicly distribute copies of the copyrighted work; to perform the copyrighted work publicly; to display the copyrighted work publicly; and to perform the copyrighted work publicly. 17 U.S.C. § 106. The Amazon license gave MP3tunes the right to copy cover art. Thus, copying the cover art was licensed. The alleged breach was copying the cover art *for a principal purpose other than* driving traffic to Amazon. That is not an exclusive right held by Plaintiffs. Driving traffic to Amazon is not independently protectable under copyright law. Thus, this alleged "violation" cannot constitute an act of copyright infringement.

For all of those reasons, the Amazon license protects MP3tunes from any claim of copyright infringement for copying the cover art.

## C. Plaintiffs Have Not Proven Copyright Ownership Of The Cover Art

Plaintiffs also have not proven copyright ownership of the cover art. All of the copyrights for cover art are ancillary to sound recording copyrights, based on works for hire. That is improper for two reasons: (i) the cover art – a visual arts work – cannot be registered ancillary to a sound recording; and (ii) Plaintiffs are estopped from asserting work for hire agreements relating to the cover art.

1.  **Visual Artwork Cannot Be Properly Registered Using A Form SR**

Visual artwork cannot be properly registered ancillary to a sound recording copyright. 37 C.F.R. § 202.3(b)(1) limits the types of works that may be combined in a single copyright. As to sound recordings, it provides:

> Class SR: Sound recordings. This class includes all published and unpublished sound recordings fixed on and after February 15, 1972.
>
> Claims to copyright in *literary, dramatic, and musical* works embodied in phonorecords may also be registered *in this class* under paragraph (b)(4) of this section if:
>
> (A)  Registration is sought on the same application for both a *recorded literary, dramatic, or musical work* and a sound recording;
> (B)  The recorded literary, dramatic, or musical work and the sound recording are *embodied in the same phonorecords*; and
> (C)  The same claimant is seeking registration of both the recorded literary, dramatic, or musical work and the sound recording.

37 C.F.R. § 202.3(b)(1)(iv) (emphasis added).

All of the cover art copyrights are allegedly within the purview of numerous sound recording copyrights on Form SR. *See* Declaration of Alasdair McMullan, filed October 29, 2010 (Doc. No. 191), ¶ 5 and Ex. B.  The cover art copyrights here were never properly registered because:  (i) the cover art is not a recorded literary, dramatic, or musical work, the only types of works which are allowed to be registered with sound recordings on a Form SR; and (ii) the cover art was not embodied in the same phonorecord as a sound recording. *Jefferson Airplane v. Berkeley Sys.*, 886 F. Supp. 713, 714-717 (N.D. Cal. 1994) ("separate registration [is] required for the sound recording and the album cover art").

The importance of distinct registrations for sound recordings and cover art cannot be overstated.  The SR copyrights allegedly covering the cover art do not reflect the names of the artists for the cover art, or the dates of first publication or creation of such work.  (*See, e.g.,* Declaration of Andrew H. Bart, dated December 17, 2010 ("Bart Dec.")(Doc. No. 230), ¶ 6 and

Ex. 121). That is improper. *See, e.g.*, 17 U.S.C. § 409; *Bean v. John Wiley & Sons, Inc.*, 2011 WL 3348959, at *3 (D. Ariz. Aug. 3, 2011) (because failure "to provide titles of individual photographs, the names of all the authors, and the connection between the individual author and the photograph ... did not comply with the registration requirements of 17 U.S.C. § 409, plaintiff's claims for infringement fail[] as a matter of law"); *Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, 712 F. Supp. 2d 84, 93-95 (S.D.N.Y. 2010), *on reconsideration in part*, 2010 WL 3958841, at * 2 (S.D.N.Y. Sept. 27, 2010) (failure to include names of all authors is fatal). Thus, Plaintiffs do not have valid copyrights in the cover art.

## 2. Plaintiffs Have Refused To Provide Evidence Of Ownership Of Cover Art Copyrights Under Work For Hire Agreements

Plaintiffs' cover art infringement claim fails for an additional reason: Plaintiffs refused to produce work for hire agreements and documents during discovery despite the fact that the copyright certificates, under which Plaintiffs assert their ownership of the cover art, indicate that the cover art works were works for hire. (*See, e.g.*, Bart Dec., Ex. 121). As noted above, during discovery, Plaintiffs objected to producing work for hire documents and agreements on the ground that a copyright infringement defendant lacked standing to challenge work for hire status. As explained above, Plaintiffs' objection was baseless, but that is now beside the point. As a result of Plaintiffs' refusal to produce such documents, Plaintiffs cannot be permitted to rely on the work for hire agreements to support the cover art copyrights. For this additional reason, Plaintiffs have not met their burden of proving ownership the copyrights for the cover art.

For all of the foregoing reasons, this Court should reconsider the Summary Judgment Order and grant MP3tunes – and Robertson – summary judgment on the claims relating to the cover art.

## VII.   ROBERTSON IS ENTITLED TO SUMMARY JUDGMENT THAT HE IS NOT VICARIOUSLY LIABLE FOR ANY ACTS OF MP3TUNES

As this Court is aware, MP3tunes may be liable to Plaintiffs for contributory infringement for failing to remove 472 songs from users' lockers and from retrieving and copying 328 pieces of cover art at the direction of users. Robertson is accused of being vicariously liable for those acts of infringement, as an officer and shareholder of MP3tunes. That is baseless as a matter of undisputed fact and law, and Robertson is entitled to summary judgment dismissing those claims.

To establish such vicarious liability, Plaintiffs must prove that Robertson (i) had the right and ability to supervise the infringing conduct, and (ii) received a financial benefit directly attributable to the infringing conduct. *See Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *Shapiro, Bernstein & Co. v. H. L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963).

This Court has already determined, *as a matter of undisputed fact*, that MP3tunes has not benefited from any alleged infringing activity. As a result, Plaintiffs are collaterally estopped and barred by the law of the case from arguing that Robertson – an executive of MP3tunes and a trustee and beneficiary of trusts owning shares of MP3tunes – received a financial benefit directly attributable to the infringing conduct. Further, the undisputed facts compel a similar conclusion.

### A.   Plaintiffs Are Collaterally Estopped From Arguing Robertson Is Vicariously Liable

Plaintiffs are collaterally estopped from arguing that Robertson is vicariously liable for MP3tunes' alleged infringement. As this Court is aware, "a party is collaterally estopped from relitigating an issue if a four-part test is met:  (1) the identical issue was raise in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the

33

party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (citations omitted).  That is precisely the case here.

This Court has already expressly found "that there is no genuine dispute that MP3tunes neither received a direct financial benefit nor controlled the infringing activity." *See* 821 F. Supp. 2d at 646.  This Court has also already found that "any link between infringing activity and a direct benefit to MP3tunes is attenuated because sideloaded songs were stored free of charge and infringing and noninfringing users of Sideload.com paid precisely the same or nothing at all, for locker services." 821 F. Supp. 2d at 645 (citing *Costar Grp., Inc. v. Loopnet, Inc.*, 164 F. Supp. 2d 688, 704-05 (D. Md. 2001)).

The issue of Robertson's direct financial benefit:  (i) raises an identical issue previously raised (*i.e.*, direct financial benefit); (ii) that was actually previously litigated and decided in the Summary Judgment Order; (iii) which Plaintiffs fully briefed and argued; and (iv) the resolution of which was necessary to support the Court's summary judgment decision.  Plaintiffs are collaterally estopped from relitigating that issue.  Finally, not only are Plaintiffs collaterally estopped from relitigating the issue of direct financial benefit, they are also barred from doing so by the law of the case doctrine.  *See, e.g.*, *In re PCH Associates*, 949 F.2d 585, 592 (2d Cir. 1991) ("a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation").

Robertson, thus, is not vicariously liable for any infringement by MP3tunes and is entitled to summary judgment dismissing such claims.

**B.  <u>Robertson Did Not Personally Benefit From Any Alleged Infringement</u>**

Not only are Plaintiffs collaterally estopped and barred by the law of the case doctrine from relitigating the issue of Robertson's direct financial benefit from MP3tunes' infringements,

the undisputed facts also make clear that Robertson did not receive a direct financial benefit from MP3tunes' infringements. Robertson is not a shareholder of MP3tunes, Inc. and did not hold a membership interest in MP3tunes since March 2006. (*See* Sacks Dec., Ex. 7, at ¶ 17; Robertson Dec., ¶2). Rather, he is a co-trustee of trusts that own MP3tunes, Inc. stock. (Robertson Dec., ¶2; Sacks Dec., ¶¶ 8, 11 and Exs. 7, 10, at Stipulated Facts ## 14, 15). One of those trusts (the SKL Trust) owns 45.93 % of the fully diluted shares and the other (the Robertson Descendants Irrevocable Trust) owns 21.72% of the fully diluted shares of MP3tunes, Inc. or 44.81% and 40.39% before dilution. Robertson and his wife were the sole beneficiaries of the SKL Trust. (*See* Sacks Dec., ¶¶ 6, 10 and Exs. 5, 9, at ¶ 6). In March 2005, Robertson owned 19% of the membership interests of MP3tunes; as of March 2006, he owned no membership interests, and the two trusts held 75% of the membership interests. (*See* Steiner Declaration, dated October 29, 2009 (Doc. No. 127), Exs. 1, 2). Therefore, it is undisputed that Robertson did not receive any direct financial benefit from MP3tunes, much less from any alleged infringement by MP3tunes.

## CONCLUSION

For all of the foregoing reasons, Robertson's motions for reconsideration (individual liability and cover art) and summary judgment (vicarious liability) should be granted in all respects.

Dated: New York, New York
      November 12, 2012

Respectfully Submitted,

AKERMAN SENTERFITT LLP

By _____
Ira S. Sacks
Mark S. Lafayette
335 Madison Avenue, Suite 2600
New York, New York 10017
Telephone: (212) 880-3800
Facsimile: (212) 880-8965
*Counsel for Defendant Michael Robertson*

35