# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

_____
                                    )
CAPITOL RECORDS, Inc., *et al.,*    )
                                    )
                    *Plaintiffs*,   )          No. 07 Civ. 9931 (WHP)(FM)
        v.                          )
                                    )          ECF Case
MP3TUNES, LLC, and MICHAEL ROBERTSON )
                                    )
                    *Defendants*.   )
_____)


## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
## <u>MOTION FOR RECONSIDERATION</u>

## TABLE OF CONTENTS

CITATION FORMAT ........................................................................................... v

INTRODUCTION ............................................................................................... 1

BACKGROUND .................................................................................................. 2

LEGAL STANDARD ........................................................................................... 9

ARGUMENT ....................................................................................................... 9

I.  EVIDENCE THAT DEFENDANTS WERE WILLFULLY BLIND TO
    INSTANCES OF INFRINGEMENT ON THEIR SITES PRECLUDES ENTRY
    OF SUMMARY JUDGMENT ON DEFENDANTS' DMCA DEFENSE........................ 9

    A.  Legal Standard. ............................................................................... 11

    B.  Defendants' Willful Blindness. ........................................................ 12

II. *VIACOM* REQUIRES RECONSIDERATION OF THE COURT'S DISMISSAL
    OF PLAINTIFFS' STANDALONE INDUCEMENT CLAIM. ....................... 17

III. FACTUAL ISSUES PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF
     WHETHER DEFENDANTS HAD "RED FLAG" KNOWLEDGE OF SPECIFIC
     INSTANCES OF INFRINGEMENT UNDER *VIACOM*. ............................. 20

    A.  Legal Standard. ............................................................................... 21

    B.  Application to Defendants. ............................................................. 22

CONCLUSION ................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ALS Scan, Inc. v. RemarQ Communities, Inc.*,
    239 F.3d 619 (4th Cir. 2001) ...............................................................19

*Arista Records LLC v. Lime Group LLC*,
    784 F. Supp. 2d 398 (S.D.N.Y. 2011)............................................18, 19

*Arista Records LLC v. Usenet.com, Inc.,*
    633 F. Supp. 2d 124 (S.D.N.Y. 2009).............................................7, 18

*Capitol Records, Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) ................ passim

*Columbia Pictures Indus., Inc. v. Fung*,
    2009 U.S. Dist. Lexis 122661, 96 U.S.P.Q.2d (BNA) 1620 (C.D. Cal. 2009).......................19

*David v. CBS Interactive Inc.*,
    No. CV 11-9437 (C.D. Cal. July 13, 2012) ................................................18

*Gordon v. N.Y. City Bd. Of Educ.*,
    232 F.3d 111 (2d Cir. 2000)....................................................................14

*In re Aimster Copyright Litig.*,
    334 F.3d 643 (7th Cir. 2003) ...........................................................10, 18

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*,
    454 F. Supp. 2d 966 (C.D. Cal. 2006) ...............................................25

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005)..............................................................17, 18, 19, 20

*Rosetta Stone, Ltd. v. Google, Inc.*,
    676 F.3d 144 (4th Cir. 2012) ...............................................................12

*Shrader v. CSX Transp., Inc.*,
    70 F.3d 255 (2d Cir. 1995).......................................................................9

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984)...............................................................................19

*Tiffany (NJ) Inc. v. eBay Inc.*,
    600 F.3d 93 (2d Cir. 2010)...................................................11, 12, 14

*Tischmann v. ITT/Sheraton Corp.,*
    145 F.3d 561 (2d Cir. 1998)...................................................................9

*Torrington Extend-A-Care Empl. Ass'n v. NLRB,*
  17 F.3d 580 (2d Cir. 1994) ......................................................................... 14

*UMG Recordings, Inc. v. MP3.Com, Inc.,*
  92 F.Supp.2d 349 (S.D.N.Y. 2000) ............................................................. 15

*UMG Recordings, Inc. v. Shelter Capital Partners LLC,*
  667 F.3d 1022 (9th Cir. 2011) .............................................................. 21, 23

*United States v. MacPherson,*
  424 F.3d 183 (2d Cir. 2005) ....................................................................... 14

*Viacom Int'l Inc. v. YouTube, Inc.,*
  718 F. Supp. 2d 514 (S.D.N.Y. 2010) ........................................................ 11

*Viacom International, Inc. v. YouTube, Inc.,*
  676 F.3d 19 (2d Cir. 2012) .................................................................. passim

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.,*
  956 F.2d 1245 (2d Cir. 1992) ....................................................................... 9

*Woodman v. WWOR-TV, Inc.,*
  411 F.3d 69 (2d Cir. 2005) ......................................................................... 14

STATUTES

17 U.S.C. § 512 ................................................................................... passim

OTHER AUTHORITIES

*Viacom v. YouTube, Inc.*, Brief of Appellee YouTube, Inc. ............................. 24

18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* ............ 9

Memorandum and Order, *Capitol Records, Inc. v. MP3tunes, LLC* (Oct. 16, 2009), ECF
  No. 120 .............................................................................................. passim

S. Rep. No. 105-190 (1998) ............................................................................ 20

S.D.N.Y. Local Rule 6.3 ................................................................................... 1

iv

## CITATION FORMAT

Plaintiffs use the following citation forms in their Memorandum of Law in Support of their Motion for Reconsideration:

1.      "Pls. MSJ" refers to Plaintiffs' Memorandum of Law in Support of their Motion for Summary Judgment, dated October 29, 2010.

2.      "PSUF" refers to Plaintiffs' Statement of Undisputed Facts in Support of Plaintiffs' Motion for Summary Judgment, dated October 29, 2010.

3.      "Bart Ex." refers to Exhibits to the Declaration of Andrew H. Bart filed in support of Plaintiff's Motion for Summary Judgment, dated October 29, 2010.

4.      "Horowitz Decl." and "Horowitz Ex." refer to the Declaration of Professor Ellis Horowitz filed in support of Plaintiff's Motion for Summary Judgment, dated October 29, 2010, and the exhibits attached thereto.

5.      "Bart Recon Decl." and "Bart Recon Decl. Ex." refer to the Declaration of Andrew H. Bart filed in support of Plaintiff's Motion for Reconsideration, dated November 12, 2012.

In accordance with Local Rule 6.3 and this Court's November 7, 2012 Order [Docket No. 332], Plaintiffs respectfully submit this motion for reconsideration of this Court's October 25, 2011 Amended Memorandum and Order on the Parties' respective cross-motions for summary judgment, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) ("*MSJ Order*") [Docket No. 275], and its October 16, 2009 Memorandum and Order on MP3tunes' motion to dismiss ("*MTD Order*") [Docket No. 120].

## INTRODUCTION

In *Viacom International, Inc. v. YouTube, Inc.*, 676 F.3d 19 (2d Cir. 2012) ("*Viacom*"), the Second Circuit reversed a district court opinion that, like the *MSJ Order* here, granted summary judgment to the defendant based on a finding that the defendant was entitled to one of the safe harbors from liability provided by the Digital Millennium Copyright Act ("DMCA"). The decision in *Viacom* provides clarity as to the standards applicable to the DMCA's safe harbors, and requires reconsideration of both the *MSJ* and *MTD Orders*. Specifically, three holdings in *Viacom* support the conclusion that this Court should reconsider its prior orders and permit jury consideration of fact issues that *Viacom* held preclude summary judgment.

First, *Viacom* clarified that the longstanding doctrine of willful blindness must be analyzed before the DMCA safe harbors can be applied. Willful blindness constitutes "knowledge" under Section 512(c)(1)(A) of the DMCA, and thus disqualifies a service provider from the safe harbor. Where, as here and in *Viacom*, the summary judgment record creates a question of fact as to whether a service provider was willfully blind to specific acts of infringement on its site, the service provider has no entitlement to safe harbor prior to trial. Plaintiffs briefed this issue, but it was not addressed by the *MSJ Order*.

Second, *Viacom* confirmed that inducement of copyright infringement is a basis for secondary liability separate and distinct from "contributory" liability based on knowledge and

1

contribution.  Since inducement (unlike traditional contributory liability) is predicated on bad-faith conduct, for which there is no statutory safe harbor under the DMCA, this distinction requires not only reconsideration of the *MTD Order* (which mistakenly dismissed Plaintiffs' standalone inducement claim as redundant), but also modification of the Court's grant of summary judgment to MP3tunes on the DMCA safe harbor in the *MSJ Order.*  To prove its entitlement to the DMCA safe harbor, MP3tunes must prove, *inter alia*, that it did not induce the infringements sued upon.  It cannot conceivably carry that burden at the summary judgment stage.  Indeed, Defendants' inducement liability was not even before the Court on summary judgment because the claim was wrongly dismissed; it should be reinstated.

Finally, *Viacom* established that disqualifying "red flag" notice of infringement need not come from formal DMCA takedown notices; it can also be proved from other kinds of evidence, including internal and third-party communications.  The *MSJ Order* rejected this argument, and disregarded the voluminous record evidence showing that Defendants were on notice of a substantial number of *specific* infringements because that evidence came from sources other than formal takedown notices.  In light of *Viacom*, that holding cannot stand.

## BACKGROUND

Plaintiffs assume the Court's general familiarity with the background to the *MSJ Order* and the *MTD Order*, and incorporate by reference the recitation of the facts in Plaintiffs' briefing on those motions.  *See* Docket Nos. 106, 207, 209, 234, 269 & 274.  Facts in the summary judgment record most pertinent to this motion are summarized below.

**Defendants' Business Model:**  Defendants' business was built around two websites: www.mp3tunes.com, which offered users "lockers" to host and listen to online music (and sold subscriptions to premium features), and www.sideload.com, which hosted links to music on the Internet that users could "sideload," *i.e.*, copy, into their mp3tunes.com lockers.  Defendants'

business model was premised on their ability to attract paying subscribers to the mp3tunes.com website by using the lure of the free infringing popular music found on sideload.com. *See, e.g.*, Bart Ex. 4 (Robertson Tr.) at 207:17-208:4. Consequently, to make the sideload.com website as attractive as possible to potential purchasers of lockers, Defendants encouraged their users to "sideload" tracks and had their executives personally "seed" the sideload site with links to popular music files, most of which they knew were infringing. PSUF ¶¶ 8-10 (users sideloading); ¶¶ 41-46 (executives sideloading); ¶¶ 48-49, 52-53 (knowledge of infringement).

Since these sideloaded tracks were an important component of Defendants' strategy of attracting users, they deliberately ignored abundant indicators that those links were not authorized. In fact, Michael Robertson enacted a policy that they would not remove any infringing files from sideload.com unless MP3tunes received a statutorily compliant DMCA notice, and even then, MP3tunes only removed the specific link listed in the takedown notice, did not remove files from lockers, and did not remove any other links to the same songs or to the same artists, even though it had the ability to do so. 821 F. Supp. 2d at 643; Bart Ex. 77.

**Specific, Work-By-Work Awareness**: Unlike passive service providers that merely offered storage on their system, Defendants' business model of attracting paying customers by helping them find and download free popular music required them to maintain a database identifying, for each music file on their system, the name of the song and the name of the artist. *See* Horowitz Decl. ¶¶ 22-24, 57. Not only was Defendants' system set up to obtain this information from the music files themselves, but Defendants also licensed third-party "fingerprinting" software from AllMusicGuide ("AMG") so that they would be able to scan music files and identify both the song and the artist that each file represents. *See* Horowitz Decl. ¶¶ 59-60. With this information, Defendants were able to market the availability of the most

3

popular tracks to prospective customers and to promote and optimize their service, including by: (i) publicizing "most popular," "new," and "featured" lists of mp3s to its users to help them locate music through the site; (ii) enabling users to search for specific songs or artists; (iii) providing users with artist, track names, and additional song file details; and (iv) presenting users with a list of other songs from the same artist available through the Sideload Website.  PSUF ¶¶ 17-18.  The lists Defendants created highlighted works by popular, well-known artists. Horowitz Ex. D.  A simple word search for the Beatles, for instance, whose work was known not to have been authorized for online distribution during the relevant time periods, would identify a number of works by the band available for sideloading or listening.  *Id.* at Ex. E.  It is important to note that the AMG software Defendants licensed to identify artists and titles also provided copyright information about each song.  *See* Horowitz Decl. ¶¶ 59-60.  Thus, Defendants could readily confirm whether the relevant copyrights were owned by parties that had not licensed their music to Defendants.  *Id.*  Tellingly, Defendants chose not to utilize this information.

Given Defendants' model of attracting paying customers with free popular music while turning a blind eye to whether that the music was authorized, it is hardly surprising that the record is replete with communications from users to Defendants pointing out that the sideload.com website was offering infringing music by popular artists.  *See* PSUF ¶¶ 48(a)-(c), 63.  Several of these communications came directly from the owner or administrator of the website to which Sideload was connecting, and informed Defendants that he or she was not legally authorized to make the MP3 files available.  *See* PSUF ¶ 48(a); Bart Ex. 70.  For instance, a user notified Defendants that since he "obviously [didn't] own the rights," to the music contained on his website, Defendants needed to "stop directly linking to Johnny Cash and Biff-Five Feet High and Rising" on his website.  PSUF ¶ 48(a).  Another notified Defendants that

4

they were linking to copies of The Clash's version of "I Fought the Law" on a "website that blatantly acknowledges that it contains infringing MP3's."  PSUF ¶ 48(b).  Yet another warned Defendants that a number of songs by Madonna "were all sideloaded from some weird site that doesn't exist anymore," and which was obviously illegal.  PSUF ¶ 48(c).

In addition, Defendants received both formal takedown notices and informal complaints from copyright owners, including Plaintiffs, and individual artists and their representatives.  *See e.g.*, PSUF ¶¶ 38-40.  These notices and complaints notified Defendants not only of particular infringing MP3s being made available through the Sideload website, but also informed them in several instances that *any* MP3 containing performances by the named artists was infringing because Defendants were not authorized to exploit any of those copyrights.  *Id.*; PSUF ¶ 64.  For instance, Plaintiffs informed Defendants that "EMI has not authorized any of its recordings to be copied, distributed, or performed … by MP3tunes or its users."  PSUF ¶ 38 (citing Bart Exs. 24-26).  Significantly, Defendants also knew that none of the major record labels made authorized music available in "MP3" format prior to 2007.  Bart Ex. 95.  Thus, any files being made available through the sideload.com website in that format were almost certainly infringing.  In fact, over 300 of Plaintiffs' works claimed as infringing in this case appeared on sideload.com before the MP3 format was authorized by EMI in April 2007.  *See* Horowitz Ex. Q.

Because Defendants maintained information concerning the artist and title of each song on their system, upon learning that works by particular artists were not authorized, they had the ability to remove or block all such songs from their websites.  PSUF ¶¶ 71(f)-(g).  Of course, since Defendants had no licenses to copy or distribute any such recordings, such confirmation was not really necessary.  Defendant Robertson, however, set a policy that turned a blind eye to such information, instructing his employees that "[w]e do not remove songs unless we are

5

presented with a DMCA compliant request to do so." Bart Ex. 16. Thus, Defendants ignored all of the notifications listed above. When notified of specific infringing activity on sideload.com, MP3tunes simply recited its policy that it would not take action unless it received a formal takedown notice. *See* PSUF ¶ 48(a) & Bart Exs. 12 (at 62:3-63:30), 67-68, 77.

**Awareness of Specific Infringing Websites:** Defendants also maintained database records identifying the originating website of every music file that was sideloaded using the sideload.com website. If a music file was available on or through Defendants' websites, they knew the "source" website from which the file originated. PSUF 70, 71(d); *see also* PSUF ¶¶ 49, 56, 61-62; *MSJ Order* at 634.

Defendants regularly reviewed information that confirmed that many of these source websites were not authorized to distribute the files that sideload.com was helping users locate and copy. Many of the websites to which Defendants linked were small "personal" websites, or were so-called "locker" sites where individual users could upload their personal music collections. PSUF ¶¶ 41, 47-48. Neither of these categories of websites were even arguably licensed by copyright owners to distribute sound recordings and musical compositions freely over the Internet. Again, adhering to Robertson's policy, the infringing files from these unlicensed sources were never removed from www.sideload.com.

Often in the same communications that drew Defendants' attention to specific infringing files, users identified source websites offering such infringing content, which no person could mistake as authorized distributors for major label content. *See, e.g.*, Bart Exs. 92 (user notifying Defendants of "www.officerjellynutz.com," which "blatantly acknowledges that it contains infringing MP3's"); Ex. 67 (informing Defendants that user had reviewed multiple source sites for sideload.com and that "[w]ithout exception ALL of the sources [the user] checked were sites

that had no legal right to provide access to the MP3 files.").  In some cases the source websites *themselves* even reached out to Defendants to request that they stop referring users to their sites, in order to avoid attracting attention to their own infringement.  *See* Bart Ex. 96 (communication from user advising Defendants to stop linking to particular files on his site because, *inter alia*, "I obviously don't own the rights"); Bart Ex. 68 (email complaining that sideload.com was drawing attention to five named Peter Gabriel songs hosted on personal website); Ex. 69 & 70 (bloggers complaining about sideload.com attracting traffic to download music posted on their blogs); Ex. 72 (operator of personal site asking sideload.com to stop linking to music files on site "for a multitude of reasons including legality…").

Not only did Defendants' personnel regularly review the list of websites from which most music was sideloaded, they also personally used many of the sites themselves, as part of their deliberate effort  to "seed" the sideload.com website with desirable content that would attract users.  PSUF ¶¶ 41, 43, 45-46, 56.  In doing so, they obtained direct personal knowledge that these "source" websites were not authorized distributors of Plaintiffs' works.  For instance, Robertson personally sideloaded songs by The Police, Michael Jackson, and Madonna from a high school swim team website (for the "Roseville Sugarbears"), from a website urging people to download its music before it was shut down "under censorship pressure of a few billionaires," and from a website offering "10 million mp3z,"[1] respectively.  PSUF ¶¶ 41(b)-(d).  Other MP3tunes executives personally sideloaded files by popular, well-known artists such as Billy Joel, Coldplay, The Beatles, The Beastie Boys, Radiohead, Sting, and John Lennon from

---

[1] The use of the letter "z" as a plural – such as "filez," "warez," "mp3z," and so on – is a very common way for pirate websites to advertise that they make unauthorized works available.  *See, e.g.*, *Arista Records LLC v. Usenet.com, Inc.,* 633 F. Supp. 2d 124, 133 (S.D.N.Y. 2009).

websites that were obviously storage locations for individuals' personal files and were, thus, not for distribution to the public.  PSUF ¶¶ 41-42; Bart Exs. 47-48.

Defendants' testimony confirmed that Defendants were aware that many websites accessible through sideload.com were not authorized to distribute copies by the copyright owner. Defendants' Chief Technology Officer, Doug Reese, admitted that he knew that many of the "top" source sites for sideloading MP3s into users' lockers were "personal sites," *i.e.*, "non-commercial sites" including "some college address book site…" – sites that clearly were not authorized or licensed distributors of major label or publisher content.  PSUF ¶ 49.  Defendant Robertson knew that some "locker" sites made files that users had posted online available for public download, admitted that he knew that it infringed copyrights for users to post copyrighted music for public downloading in this manner, and admitted that he knew that Defendants' users were, in fact, sideloading such songs using Defendants' services.  Bart Ex. 4 (Robertson Tr.) at 188:9-18, 425:13-431:14.  MP3tunes employees were also aware that one such popular personal "locker" site, Rapidshare, was at one time was the 13th most popular source of music on sideload.com, but they took no action to prevent sideloading from the site.  PSUF ¶¶ 52, 55, 57-58.  Another employee pointed out that sideload.com was offering files from Streamload.com, a similar "locker" site, that were "surely someone's personal files, and should not be shown on sideload.com."  Bart Ex. 64.[2]  Indeed, as of January 29, 2006, the top source sites on sideload.com were various archive, personal, and other small amateur sites that no reasonable person could believe were authorized to provide free downloads.  PSUF ¶ 50.

---

[2] *See also, e.g.*, Bart Exs. 66 (Reese admitting that of the top websites sideload.com referred to, "some might not be legit[.]") & 65 (email from Reese, referring to particular song available on Sideload.com, and admitting that although "it's not clear if this is copyright [sic] material," that "[i]t probably is, though.").

8

While Defendants reviewed and utilized this information for their business purposes, they took no action to delete or remove access to the infringing files.  Moreover, because Defendants maintained records of the originating website for each "sideloaded" music file on their websites, once they learned that a site was not authorized to distribute copyrighted music files, they had the ability to block copying from  those sites (as well as to remove files from those sites from the lockers of mp3tunes.com users after they had already been copied).  *See* PSUF ¶¶ 71-75.  However, since Defendants' business was premised on building a library of free, unlicensed popular music to lure users to their websites, Defendants took no action.  Instead they simply repeated Defendant Robertson's instruction that "[w]e do not remove songs unless we are presented with a DMCA compliant request to do so."  Bart Ex. 16.

## LEGAL STANDARD

Reconsideration of a court's prior decision is justified where there has been an intervening change in the controlling law.  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting 18 C. Wright, A. Miller & E. Cooper, *Federal Practice & Procedure* § 4478 at 790.); *see, e.g.*, *Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561, 564 (2d Cir. 1998) (holding that reconsideration "was justified by [the Second Circuit's] intervening decision").  An intervening change in the controlling law of this Circuit is sufficient to meet the standard where it "might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

## ARGUMENT

I.   **EVIDENCE THAT DEFENDANTS WERE WILLFULLY BLIND TO INSTANCES OF INFRINGEMENT ON THEIR SITES PRECLUDES ENTRY OF SUMMARY JUDGMENT ON DEFENDANTS' DMCA DEFENSE.**

The *MSJ Order* held that MP3tunes was not disqualified from the DMCA safe harbor under Section 512(c)(1)(A) or 512(d)(1)(A) by reason of its knowledge of infringement, except

with respect to specific songs listed in takedown notices or sideloaded by the Defendants themselves.  *See MSJ Order*, 821 F. Supp. 2d 643-45.  Under *Viacom,* the standard for establishing entitlement to the DMCA safe harbor at summary judgment is substantially higher, and the grant of summary judgment to MP3tunes must be reconsidered.

　　　*Viacom* makes clear that for purposes of the DMCA, disqualifying knowledge of particular acts of infringement may be imputed to a defendant who chooses to willfully blind itself to those acts.  *Viacom*, 676 F.3d at 34.  Plaintiffs have, at a minimum, established a question of fact as to whether Defendants adopted a systematic policy of blinding themselves to acts of infringement on their system so that they could keep desirable, popular music available.  Therefore, Defendants are not entitled to a safe harbor on a motion for summary judgment.

　　　Plaintiffs presented this argument in their briefs, but the *MSJ Order* did not address it.  *See* Pls. MSJ at 34 ("[w]illful blindness is knowledge, in copyright law…as it is in the law generally") (quoting *In re Aimster Copyright Litig.*, 334 F.3d 643, 650 (7th Cir. 2003)).  The *MSJ Order* addressed willful blindness only in a separate context: whether MP3tunes should be disqualified from the safe harbor due to the insufficiency of its repeat infringer policy.  *See* 821 F. Supp. 2d at 637-39.[3]  *Viacom* clearly holds that the District Court's failure to also "expressly address the principle of willful blindness or its relationship to DMCA safe harbors" was an error and remanded for reconsideration of this issue.  676 F.3d at 35.  The same result is required here, and upon reconsideration, there is ample evidence on which the jury could conclude that Defendants were willfully blind to the many acts of infringement on their sites.

---

[3] The *MSJ Order*'s willful blindness analysis considered whether MP3tunes adequately tracked the activities of its users (an inquiry under Section 512(i)), but not whether it blinded itself to infringing content (an inquiry under Sections 512(c)(1)(A) and 512(d)(1)(A)).  These questions are distinct.  *Compare* Pls. MSJ at 29 & 32 *with id.* at 34.

A.     **Legal Standard.**

*Viacom* holds that knowledge of specific infringing acts on a system will be imputed to a service provider if the provider is willfully blind, *i.e.*, is "aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *Viacom*, 676 F.3d at 35 (quoting *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003)). Specifically, a service operator is willfully blind if it suspects infringement, but "shield[s] itself from learning of the particular infringing transactions by looking the other way." *Viacom* 676 F.3d at 35 (quotation marks omitted). Critically, *Viacom* holds that such willful blindness is "a fact question." *Id.*; *see also id.* at 35 n. 10 ("the *Tiffany* [*(NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010)] holding counsels in favor of explicit fact-finding on the issue of willful blindness").

The willful blindness doctrine was well-established in copyright law as of the time of the *MSJ Order*. *See Tiffany*, 600 F.3d at 109-10. However, in the order that was reversed by the *Viacom* decision, as in the *MSJ Order*, the district court limited its DMCA inquiry to whether the defendant had been aware of specific instances of infringement on its system identified on DMCA-compliant takedown notices. *See Viacom Int'l Inc. v. YouTube, Inc.*, 718 F. Supp. 2d 514, 523 (S.D.N.Y. 2010), *aff'd in part, rev'd in part*, 676 F.3d 19 (2d Cir. 2012). The Second Circuit held that this limitation was erroneous, because it failed to "expressly address the principle of willful blindness or its relationship to the DMCA safe harbors." 676 F.3d at 35. Disqualifying knowledge under the DMCA, the Second Circuit held, is not limited to awareness of specific acts of infringement, but can also be imputed to a defendant that "shield[s] itself from learning of the particular infringing transactions by looking the other way." *Id.* (quoting *Tiffany*, 600 F.3d at 109). Accordingly, "the willful blindness doctrine may be applied, in appropriate circumstances, to demonstrate knowledge or awareness of specific instances of infringement under the DMCA." *Id.* This holding requires reconsideration of the *MSJ Order*, which did not

11

address whether a reasonable jury could find that Defendants had been willfully blind to the specific infringing acts on their system.  821 F. Supp. 2d at 643.

While this Court held that actual awareness of infringing activity must be item-specific to disqualify a defendant from the safe harbor, a service provider that is willfully blind to particular acts of infringement by definition *cannot* have item-specific awareness thereof.  A willfully blind defendant is one that "intentionally shield[s] itself from discovering the offending listings …" *Tiffany*, 630 F.3d at 109.  But it is precisely such conscious efforts to *avoid* awareness of particular infringing items that cause such a defendant to be "charged with knowledge" thereof. *Id*.  Under *Viacom*, this imputed knowledge makes the safe harbor unavailable.  676 F.3d at 35.

The *MSJ Order* had resolved MP3tunes' entitlement to the DMCA safe harbor at the summary judgment stage.  However, *Viacom* makes clear that willful blindness is "a fact question"[4] and thus must be determined by the trier of fact.  676 F.3d at 35; *see also id.* at 35 n.10 (law requires "explicit fact-finding on the issue of willful blindness").[5]  As discussed below, there is extensive evidence in the record here from which a reasonable jury could conclude that Defendants were willfully blind to the many acts of infringement proved by Plaintiffs.

**B.**   **Defendants' Willful Blindness.**

A service provider's willful blindness of specific acts of infringement on its system or network, under *Viacom*, has two elements: a defendant must be both "aware of a high probability

---

[4] *Viacom* discussed the exception in Section 512(c)(1)(A) for liability by reason of storage, and not the exception in Section 512(d)(1)(A) for liability by reason of information location tools. However, as the Court recognized in the *MSJ Order*, "in relevant part, the eligibility requirements for subsections 512(c) and (d) protection are the same…"  821 F. Supp. 2d at 639.

[5] The seminal case, *Tiffany*, is particularly instructive.  There, the question of willful blindness was resolved not on summary judgment, but at trial.  *See* 600 F.3d at 96.  The Fourth Circuit recently relied on *Tiffany* to reverse a district court's grant of summary judgment absolving a defendant from a claim of willful blindness, reasoning that willful blindness must be determined by the trier of fact.  *See Rosetta Stone, Ltd. v. Google, Inc.*, 676 F.3d 144, 164 (4th Cir. 2012).

of the fact in dispute" and "consciously avoid[] confirming that fact."  *Viacom*, 676 F.3d at 35

(quotation marks omitted).  The record in this case contains evidence of both:  Defendants were

aware of a high probability that much of the content on their websites was infringing, and

adopted a policy of ignoring those acts of infringement absent a formal takedown notice.

**Subjective Suspicion**:  Evidence that Defendants were "aware of a high probability" of

widespread infringements on their websites to infringe is pervasive.  Defendants:

- knew that many of their "top" source sites were "personal sites" and "non-commercial sites," admitted that sideload.com was improperly offering access to users' "personal files" on such locker sites, and conceded their own awareness of the issues about the legitimacy of many of those sites, PSUF ¶¶ 49, 52-58, 62;

- were notified by multiple users and in some cases even by source sites themselves that sideload.com was linking to infringing songs to which the source sites lacked rights, and/or that many source websites that were not authorized distributors of major label content, *see* PSUF ¶¶ 48(a)-(c), 63;

- received many complaints and takedown notices, both formal and informal, from labels, music publishers, and artists, including Plaintiffs, which identified artists and notified Defendants that none of the labels' or artists' works were licensed to Defendants, *see* PSUF ¶¶ 38-40, 64;

- promoted the availability of works by popular, recognizable major label artists on their websites for their independent business purposes and utilized computer software to identify such works so that they could better exploit and market them to their users, *see* PSUF ¶ 17-18, 60; Horowitz Decl. ¶¶ 22, 57, 59-60; *MSJ Order* at 634; and

- knew that, prior to 2007, the "mp3" format had not been authorized for legitimate distribution by the major labels, *see* Ex. 95, yet songs in that format were appearing on their websites, *see* Horowitz Ex. Q.

But the jury need not rely on Defendants' own admissions that they suspected

infringement on their websites to find that they knew there was a "high probability" that such

infringement was occurring.  *Viacom*, 676 F.3d at 35 (quotation marks omitted).  A reasonable

jury could also *infer* that Defendants suspected the infringements because the information

available to them would normally trigger such suspicion in a reasonably observant person.[6]

---

[6] It is well-established in the Second Circuit that knowledge need not be proved by direct evidence such as admissions, but "can often be proved through circumstantial evidence and the

The repeated instances in which Defendants were made aware that there was a high probability that particular MP3s or groups of MP3s on their system were infringing, *see supra* pp. 4-9, support an inference that Defendants must have been similarly aware of the likelihood that other MP3s on their system sharing the same characteristics – such as those emanating from the same websites, or featuring music by the same artists – were also infringing.[7]   A jury could easily conclude that Defendants had to at least suspect that the many recognizable copyrighted works on the sideload.com and mp3tunes.com websites came from unauthorized sources.  *See supra* pp. 4-9.  And as set forth above, the notices that Defendants received from Plaintiffs and other copyright owners, and the fact that these parties at times relevant to this case did not support the mp3 format, made it clear to Defendants that major record labels and music publishers did not authorize the content available from their sites.  *See supra* p. 5.  A reasonable jury could draw the inference that a company aware of all of these facts must have been correspondingly "aware of a high probability," *Viacom*, 676 F.3d at 35 (quotation marks omitted), that many of the songs on its system were not authorized by the copyright owner.  A reasonable jury could also conclude from this evidence that Defendant Robertson, a sophisticated businessman with significant experience in the digital music business, whose previous similar business had been found liable for infringement, and who engaged in significant illegal

---

reasonable inferences drawn therefrom."  *United States v. MacPherson*, 424 F.3d 183, 189 (2d Cir. 2005); *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 83-84 & n.8 (2d Cir. 2005) ("[T]he law does not equate 'knowledge' with certitude, nor does it demand direct proof of knowledge.  A jury may reasonably infer a defendant's knowledge from the totality of circumstantial evidence."); *Gordon v. N.Y. City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (same); *Torrington Extend-A-Care Empl. Ass'n v. NLRB*, 17 F.3d 580, 596 (2d Cir. 1994) (same).

[7] Because the willful blindness doctrine *imputes* knowledge of specific infringements, it does not require a separate showing that Defendants were also aware of each individual file.  *See Viacom*, 676 F.3d at 35 (willful blindness imputes knowledge to defendant that "shield[s] itself from learning of the particular infringing transactions by looking the other way") (quoting *Tiffany*, 600 F.3d at 109).  However, there can be no question that MP3tunes was, at the very least, willfully blind to the infringement of named artists and from named websites cataloged in Part III *infra*.

sideloading himself, was fully aware that many of the obviously copyrighted works on his company's systems were infringing.[8]  *See UMG Recordings, Inc. v. MP3.Com, Inc.*, 92 F. Supp. 2d 349 (S.D.N.Y. 2000).

**Deliberate Avoidance**: The second element of willful blindness – that Defendants "consciously avoided confirming" their suspicions as to the infringing status of much of the music on the Sideload and MP3tunes websites – is satisfied as well.  *Viacom*, 676 F.3d at 35 (quotation marks omitted).  Robertson made clear that MP3tunes had a policy that "[w]e do not remove songs unless we are presented with a DMCA compliant request to do so."  Bart Ex. 16. Defendants thus deliberately turned a blind eye to any other sources of information, such as those listed above, that might confirm that particular music files were infringing or that particular websites linked to by sideload.com were not authorized to distribute them.  Indeed, even when Defendants learned of infringing or likely infringing content from parties who could not send a statutorily compliant DMCA takedown notice, they still responded with a boilerplate recitation that they would not act absent a takedown notice.  *See* PSUF ¶ 48(a); *see also* Bart Ex. 12 62:10-63:63:20.  Moreover, Defendants' failure to follow up on their suspicions about many of the websites from which Sideload.com was assisting users to download, or to the obvious indicia of infringement listed above, create a jury question.  *See supra* pp. 6-9.

This evidence is compounded by the fact that Defendants *did* have information that – if they had considered it – would have identified and allowed Defendants to remove much of the infringing content on their websites.  As noted above, Defendants already knew which artists and musical works were on the files on their websites because, unlike passive Internet hosts, they

---

[8] Defendants have touted Robertson's expertise in the music industry.  *See* Bart Recon Decl. Ex. 10, Status Conf. Tr. 17:8-16, April 15, 2010 (Robertson's counsel arguing that "Mr. Robertson is one of the most knowledgeable people in the country in the field of digital music" and "absolutely an expert in this field.").

gathered this information for their own purposes.  *See supra* pp. 3-4.  Thus, Defendants already had in their possession everything they needed to follow up on allegations or suspicions of infringement and remove or block infringing content from their sites.  It is uncontested that they elected not to utilize this available information.  *See* Horowitz Decl. ¶¶ 57, 60.

Whatever disagreements may exist regarding the reading of the DMCA safe harbors in the context of websites that passively host files, Defendants were not a passive host.  This fact is critical, and makes Defendants very different from DMCA defendants who have prevailed in other cases:  MP3tunes affirmatively gathered information identifying the musical works on its websites for its own commercial use, including using third-party "fingerprinting" software from AllMusicGuide to identify the songs on their service (software that provides copyright information in addition to artist and title).  *See supra* pp. 3-4.  Therefore, Section 512(m) of the DMCA, which for the "protection of privacy" does not require service providers to engage in "monitoring its service or affirmatively seeking facts" about activities by their users, is inapplicable.  17 U.S.C. § 512(m).  Defendants' willful blindness arises not from a *failure* to monitor the activities of their users – they *were* monitoring those activities – but rather their failure to act upon the information so acquired.  Horowitz Decl. ¶ 61.  *See Viacom*, 676 F.3d at 35 (Section 512(m) is not incompatible with liability for willful blindness because willful blindness "cannot be defined as an affirmative duty to monitor").

A reasonable jury, on these facts, could readily conclude that Defendants deliberately avoided learning of specific infringing transactions (despite having been presented with information sufficient to confirm those infringements) precisely because Defendants wanted to manufacture a claim of ignorance.  Indeed, a jury could readily find that Defendants had a *motive* to remain willfully blind: their business model required them to keep popular, infringing music

available through sideload.com in order to drive sales of mp3tunes.com subscriptions, and thus they had every incentive to ignore evidence of infringement so that they would not be compelled to act on it. Thus, there is a fact question as to Defendants' entitlement to the safe harbor.

## II. *VIACOM* REQUIRES RECONSIDERATION OF THE COURT'S DISMISSAL OF PLAINTIFFS' STANDALONE INDUCEMENT CLAIM.

In the *MTD Order*, the Court dismissed Plaintiffs' claim for inducement of copyright infringement based on *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005), holding that it "cannot find that inducement to infringe is a separate claim from contributory infringement." *MTD Order*, Docket No. 120 at 7. However, *Viacom* confirms that inducement is a separate claim that, unlike contributory infringement, is predicated on bad faith conduct and intent to facilitate infringement. As discussed below, there is no statutory safe harbor under the DMCA for bad faith conduct. Therefore, if Defendants induced the infringements in this case, they cannot claim safe harbor for those infringements. At a minimum, there is a fact question on this issue that precludes the entry of summary judgment and entitles Plaintiffs to present the question of Defendants' inducement liability to the jury.

Defendants engaged in conduct that constitutes prototypical inducement of copyright infringement. Although, in the interest of brevity, Plaintiffs will not recite the voluminous evidence on this topic, it was Defendants' business model to attract paying users to buy lockers on the mp3tunes.com website by helping them find and copy infringing music through the sideload.com website. It speaks volumes that:

- Defendants' own executives themselves repeatedly infringed copyrights with the explicit objective of attracting users with "desirable" content, *see* PSUF ¶¶ 41, 45-46, including Robertson himself, who added hundreds of works under the alias "sideload king" to attract users to Sideload.com and created the "Sideload Plugin" to encourage users to further grow the index, Bart Exs. 76, 93;

- Defendants touted sideload.com as the "SOURCE FOR FREE MUSIC ON THE INTERNET," encouraged users to add mp3s on the Internet to sideload.com, Horowitz

Ex. D; Bart Ex. 66, and even sent out email "blasts" to users advertising that major label artists' works were available for free on their system, Bart Recon. Decl. Exs. 1-6;[9] and

- Robertson celebrated Defendants' top sideloaders with a "Hall of Fame," thereby incentivizing users to maximize their sideloading volume by disregarding whether the songs they sideloaded were infringing, Bart Recon. Decl. Ex. 7.

Moreover, MP3tunes' "ostrich-like refusal to discover the extent to which its system was being used to infringe copyright," confirms Defendants' infringing intent. *In re Aimster Copyright Litigation*, 334 F.3d 643, 655 (7th Cir. 2003). For example, Defendants made no effort to weed out infringing material on their websites, despite using content identification software for their own business purposes. *See* Horowitz Decl. ¶¶ 57, 60.

At the time of the *MTD Order*, it was still unresolved whether inducement and contributory infringement were distinct bases for liability.[10] However, *Viacom* articulated that "contributory, vicarious and inducement liability" were each distinct doctrines. 676 F.3d at 29, n.5 (citing *Grokster*, 545 U.S. at 930). Other recent opinions do the same. *See Arista Records LLC v. Lime Group LLC*, 784 F. Supp. 2d 398, 424-25 (S.D.N.Y. 2011) (analyzing claims separately). A defendant can, in fact, be liable for inducement even if *not* liable for contribution. *See David v. CBS Interactive Inc.*, No. CV 11-9437 DSF(JCx), slip op. at 4-7 (C.D. Cal. July 13, 2012) (dismissing contribution claim but denying motion to dismiss inducement claim).

While bad faith conduct is not even an element of contributory liability, it is the centerpiece of liability for inducement. Liability for inducement exists when a defendant is "(1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to

[9] Because Plaintiffs' inducement claim was dismissed at the pleading stage, evidence in support such as Bart Recon. Exs. 1-6 were not comprehensively included in the record on Plaintiffs' summary judgment motion. Nevertheless, Plaintiffs are prepared to proffer, at trial, significant further evidence demonstrating that Defendants intended to induce infringing uses of their websites, and that MP3tunes actively used advertising and marketing materials for that purpose.

[10] *Arista Records LLC v. Usenet.com, Inc.*, 633 F. Supp. 2d 124, 150 n.17 (S.D.N.Y. 2009), which the *MSJ Order* cited, had opined that the two claims might be one and the same.

encourage such infringement." *Lime Group*, 784 F. Supp. 2d at 425 (citing *Grokster*, 545 U.S. at 937). Contributory liability, by contrast, requires only that a service provider provided a platform with knowledge that it would be used to infringe. *See Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 437 n.18 (1984) (contributory liability premised on knowledge of direct infringement and a material contribution to same).[11]

Because inducement liability is premised upon bad faith conduct, the DMCA safe harbor is unavailable. The intentional nature of inducement is incompatible with the basic premise of DMCA immunity, which "is not presumptive, but granted only to 'innocent' service providers…." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001). A defendant who acts with the purpose of inducing infringement is not an "innocent" service provider entitled to safe harbor. As the Court held in *Columbia Pictures Indus., Inc. v. Fung*, 2009 U.S. Dist. Lexis 122661, 96 U.S.P.Q.2d (BNA) 1620 (C.D. Cal. 2009):

> … inducement liability and the Digital Millennium Copyright Act safe harbors are inherently contradictory. Inducement liability is based on active bad faith conduct aimed at promoting infringement; the statutory safe harbors are based on passive good faith conduct aimed at operating a legitimate internet business.

*Id.* at *67-68 ("[t]here is no safe harbor for such conduct [inducement]").

The text of the statute confirms that the DMCA limits liability only when it arises "by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider …," or "by reason of the provider referring or linking users to an online location containing infringing material or infringing activity…" 17 U.S.C. § 512(c) & (d). It is a limitation on liability for an innocent passive service provider –

---

[11] Because it hinges on bad faith and intent rather than knowledge, inducement liability relieves a plaintiff of any burden to show that a defendant was aware of particular infringements. *See Grokster*, 545 U.S. at 934 (holding that it was "error" for Ninth Circuit to require "specific knowledge" of infringement where defendant was liable for inducement).

one for whom liability would arise simply from storing or linking to infringing content.  Liability for inducement, however, does *not* arise simply because infringing material is stored on (or linked to by) a defendant's system with the defendant's knowledge; inducement rather "premises liability on purposeful, culpable expression and conduct."  *Grokster*, 545 U.S. at 937.[12]

Because the Court dismissed Plaintiffs' inducement claim at the pleading stage, it has never addressed the applicability of the safe harbor to Plaintiffs' inducement claim.  Moreover, by limiting Plaintiffs to a contributory infringement claim, the *MTD Order* never analyzed whether there was a material factual dispute as to Defendants' intent to induce infringement.  And that is a burden Defendants never could have met.  Plaintiffs are entitled to prove Defendants' inducement liability – a claim not subject to the DMCA safe harbor – to the jury.[13]

## III.   FACTUAL ISSUES PRECLUDE SUMMARY JUDGMENT ON THE ISSUE OF WHETHER DEFENDANTS HAD "RED FLAG" KNOWLEDGE OF SPECIFIC INSTANCES OF INFRINGEMENT UNDER *VIACOM.*

*Viacom* also requires partial reconsideration of the *MSJ Order*'s grant of summary judgment to Defendants on the DMCA safe harbor for an additional reason: for at least a subset

---

[12] The legislative history similarly states that the DMCA "protect[s] qualifying service providers from liability for all monetary relief for direct, vicarious and contributory infringement," S. Rep. No. 105-190, at 20 (1998), but nowhere mentions inducement liability.

[13] Although the applicability of the safe harbor to inducement claims was not briefed or otherwise before the court in *Viacom*, *Viacom* provides further support for the proposition that inducement liability operates as a disqualifier from DMCA safe harbor. *Viacom*, 676 F.3d at 38. The Second Circuit noted that under the "control and financial benefit" exception in Section 512(c)(1)(B), "inducement of copyright infringement under [*Grokster*], which 'premises liability on purposeful, culpable expression and conduct,' might also rise to the level of control under § 512(c)(1)(B)." *Id.* (quoting *Grokster*, 545 U.S. at 937). Therefore, even if the Court were inclined to hold, contrary to the text of the statute and to *Fung*, that the DMCA extends to immunize service providers against inducement liability, that would not be the end of the matter. *Viacom* would then require reconsideration, in light of Defendants' inducement liability, of the *MSJ Order's* holding that the Section 512(c)(1)(B) and 512(d)(2) "right and ability to control" exceptions do not apply to Defendants. *See* 821 F. Supp. 2d at 645-46. At a bare minimum, there is a jury question as to Defendants' liability for inducement, and accordingly as to their "control" over infringements on their system and ability to claim DMCA safe harbor.

of the infringements proved by Plaintiffs, there is a question of fact as to whether Defendants were "aware of facts or circumstances from which infringing activity [wa]s apparent." 17 U.S.C. §§ 512(c)(i)(A)(ii), (d)(1)(B).  Plaintiffs presented substantial evidence to the Court on this subject, but it was disregarded because the Court determined that only DMCA-compliant takedown notices could suffice to provide red flag knowledge.  *See* 821 F.3d at 644-45.  That holding is no longer viable after *Viacom*.

      A.     **Legal Standard.**

     *Viacom* "decline[d] to adopt the reasoning" of the *MSJ Order* "*in toto*."  676 F.3d at 32 (emphasis in original).  *Viacom* agreed with this Court that, to avoid so-called "red flag" disqualification from the DMCA safe harbor, a defendant's burden can be satisfied by proving that it lacked knowledge of the *particular* instances of infringement sued upon.  However, *Viacom* applied a looser standard than the *MSJ Order* in defining the types of evidence on which a plaintiff can rely to create a triable issue of fact as to disqualifying "red flag" knowledge.

     The Second Circuit held that the *Viacom* plaintiffs "may have raised a material issue of fact regarding YouTube's knowledge or awareness of specific instances of infringement" based on "internal . . . communications" in which YouTube personnel acknowledged the presence of recognizably copyrighted television programs and sporting event footage on YouTube.  676 F.3d at 33-34.  The Second Circuit also cited with approval a portion of the Ninth Circuit's recent decision in *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022 (9th Cir. 2011), also postdating this Court's *MSJ Order*, a case in which the Ninth Circuit specified "emails sent to . . . executives and investors by … users identifying infringing content" as an example of evidence that may satisfy the red flag standard, notwithstanding that such emails are not formal DMCA-compliant takedown notices.  667 F.3d at 1040.  The explicit reliance of *Viacom* on such evidence (as well as *Shelter Capital*'s opining that such evidence may overcome

21

the safe harbor) – including the *Viacom* court's reversal of a district court opinion that had declined to find disqualifying knowledge where such evidence was present – merits reconsideration of the *MSJ Order*'s dismissal of similar evidence in the record here.

      **B.**    **Application to Defendants.**

      The record in this case includes internal and external communications, short of takedown notices, in which specific files or categories of files were identified to or by Defendants as infringing.  Under *Viacom* (and *Shelter Capital*), this type of evidence creates a factual dispute as to disqualifying knowledge of "facts and circumstances" indicating infringement.

      First, Defendants unquestionably had notice of at least several hundred additional infringing works from third-party notifications.  The *Viacom* Court viewed as significant internal documents showing that YouTube personnel were aware of at least some specific episodes of well-recognized, copyrighted television programs and sporting events, which any reasonable person would know they did not have the right to reproduce or perform publicly.  *See, e.g.,* 676 F.3d at 33 (examples of episodes of "Family Guy, South Park, MTV Cribs, Daily Show, Reno 911, [and] Dave Chapelle"); *id*. at 33-34 ("budlight [sic] commercials"); *id*. at 34 (space shuttle clip from CNN); *id*. at 34 ("official broadcast footage" of soccer games).  The record here includes repeated emails from users putting Defendants on notice that similar high-profile, popular works available through the Sideload website were unlikely to be licensed for public distribution.  For instance, emails from third parties notified Defendants of the presence of infringing music on their system.  *See, e.g.*, Bart Ex. 61 (email questioning legality of songs by Coldplay and the Beatles available on sideload.com); Bart Ex. 16 (same, for songs by Madonna).[14]  This is no trivial matter: the infringements proved by Plaintiffs at summary

---

[14] A link to a particular URL is not a requirement of "specific" knowledge under *Viacom*; it suffices that "the service provider knows with particularity which items to remove."  676 F.3d at

judgment or provable by Plaintiffs at trial include at least 44 MP3s by Coldplay and 177 by the

Beatles.  PSUF ¶¶ 1-2, 79-80; Horowitz Decl. ¶ 54 & Ex. O.  Pursuant to the holding in *Viacom*,

Defendants may not avail themselves of the safe harbor for these hundreds of infringements.

       Second, as previously discussed above, Defendants were on notice that many of the

websites from which sideload.com was encouraging users to sideload were not sites authorized

to distribute copyrighted musical works.  Defendants both suspected many of those sites as

infringing and were so notified by third-party communications.  *See supra* pp.4-7.  Rapidshare

alone, which Defendants knew was such a personal locker site and did nothing about, alone

accounted for 115 works listed on the Plaintiffs' takedown notices.  Horowitz Ex. R.

       The *MSJ Order* dismissed these categories of evidence on two bases, neither of which is

viable in light of *Viacom*.  With respect to communications from users and third parties, the *MSJ*

*Order* reasoned – relying on the now-defunct district court opinion in *Viacom* – that  "notices …

[from] third parties that do not substantially comply with the DMCA or simply give

representative lists of copyrighted works do not establish actual or 'red flag' knowledge of

infringement." 821 F. Supp. 2d at 644-45.  But that is precisely the sort of evidence that has

been identified as possible proof of item-specific, "red flag" knowledge.  *See Shelter Capital*,

667 F.3d at 1041.  As for evidence that Sideload.com was linking to websites that clearly lacked

authorization, the *MSJ Order* – again, relying on the *Viacom* district court decision – reasoned

that facts and circumstances indicating likely infringement "are not 'red flags'" if "investigation

---

30.  *Viacom* explicitly acknowledged that a defendant could acquire disqualifying knowledge as
to "particular clips *or groups of clips*."  *Id*. at 33 (emphasis added).  As previously discussed
MP3tunes indexed all songs on the Sideload system by artist and also maintained data
identifying the websites from which songs were being sideloaded.  *See* Horowitz Decl. ¶¶ 56-60.
Thus, once it knew that it was making available songs by a particular artist without authorization,
or that particular websites were not authorized distributors for copyrighted MP3s, MP3tunes had
the ability to remove all MP3s by the particular artist or from the infringing website.

is required to determine whether material is infringing." 821 F. Supp. 2d at 644. Of course, as discussed *supra* pp. 3-4, no investigation was necessary for Defendants to identify the infringing songs on their system because they already identified them for their own business purposes. And the evidence cited does more than demonstrate that infringement by sideload.com's host sites was apparent; it also shows that Defendants were affirmatively notified that some of those sites were infringing, were aware that some of the sites at issue were being used to sideload users' personal files that they lacked rights to distribute, were subjectively aware that this practice was inconsistent with the copyright laws, and had actual knowledge that works by particular artists were *never* authorized on their system. *See supra* pp. 4-8. As *Viacom* makes clear, this type of evidence warrants presenting the question of a defendant's knowledge before a jury, rather than resolving it on summary judgment. *See Viacom*, 676 F.3d at 32-34. The Court should permit the Plaintiffs to do the same here.

*Viacom* also declined to accept the defense that MP3tunes relied upon here: that the availability of *some* legitimate "free" music on the Internet establishes *as a matter of law* there is "no way of knowing" that commercially distributed music is usually infringing, thereby making infringements non-obvious and preventing them as operating as red flags. 821 F. Supp. 2d at 644. In *Viacom*, one of the central defenses by the defendants was nearly identical: that some of the plaintiffs' programs had been freely distributed, preventing the service provider from being able to know whether copyrighted television and motion picture content on its service was authorized or not. *See Viacom v. YouTube, Inc.*, Brief of Appellee YouTube, Inc. at 44-50. The Second Circuit, however, did not credit this argument, and had no difficulty concluding that the well-known copyrighted content referenced in YouTube's internal documents was sufficiently

identifiable as infringing *to create a jury issue* under the "red flag" standard.[15] *See* 676 F.3d at

33.  Here, claims that the alleged ubiquity of free downloads on the Internet made Defendants

unable to discern whether works were authorized or not cannot stand in light of this Court's

finding (in rejecting Defendants' related copyright abandonment defense) that "EMI placed

careful restrictions on the use of its promotional songs and required consumers to visit certain

websites or provide valuable marketing information before downloading a song."  *MSJ Order* at

648.  At a bare minimum, Defendants are not entitled to summary judgment on this defense.

## CONCLUSION

A reasonable jury could find, on this record, that Defendants operated their business with

the objective of building up their user base through infringement, and that in pursuit of that goal,

they induced users to infringe and blinded themselves to or outright ignored information

confirming the resulting infringement.  Under *Viacom*, these facts – if found by a jury – would

defeat Defendants' claimed DMCA defense.  Therefore, Plaintiffs respectfully request that the

Court (1) reconsider its grant of summary judgment to Defendants with respect to their DMCA

defense and permit Plaintiffs to argue at trial that Defendants may not claim Section 512(c) or

512(d) protection with respect to infringements as to which they were willfully blind; (2)

reconsider its dismissal of Plaintiffs' inducement claim and permit Plaintiffs to argue at trial that

Defendants may not claim Section 512(c) or 512(d) protection with respect to infringements they

induced; and (3) reconsider in part its grant of summary judgment to Defendants on their DMCA

defense insofar as evidence in the record supplies notice that specific categories of MP3s, such as

works from particular artists and sideloaded from particular websites, are infringing.

---

[15] *Accord Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 992 (C.D. Cal. 2006) (dismissing as "implausible" claim "that [defendant] was unaware of the copyrights at issue" because "it is common knowledge that most popular music and movies are copyrighted").

DATED:  November 12, 2012        Respectfully submitted,

By:  /s/ Andrew H. Bart_____

    Andrew H. Bart
    Joseph P. Fishman
    JENNER & BLOCK LLP
    919 Third Avenue
    37th Floor
    New York, NY 10022
    tel. (212) 891-1690
    fax (212) 891-1699

    *-and-*

    Steven B. Fabrizio
    Luke C. Platzer
    J. Douglas Wilson
    JENNER & BLOCK LLP
    1099 New York Avenue, NW
    Suite 900
    Washington, DC 20001
    tel. (202) 639-6000
    fax (202) 639-6066

    *Attorneys for Plaintiffs Capitol Records, LLC, Caroline Records, Inc, EMI Christian Music Group Inc., Priority Records LLC, Virgin Records America, Inc.*

By: /s/ Frank P. Scibilia_____

Frank P. Scibilia
Jacob B. Radcliff
M. Mona Simonian
PRYOR CASHMAN LLP
7 Times Square
New York, New York  10036-6569
Telephone: (212) 421-4100
Facsimile: (212) 326-0806

*Attorneys for the Beechwood Music Corp., Colgems-EMI Music Inc., EMI April Music Inc., EMI Blackwood Music, EMI Full Feel Music, EMI Golden Torch Music Corp., EMI Longitude Music, EMI Virgin Music, Inc., EMI Virgin Songs, Inc., EMI Al Gallico Music Corp., EMI Algee Music Corp., EMI Feist Catalog, Inc., EMI Gold Horizon Corp., EMI Grove Park Music, Inc. EMI Hastings*

*Catalog, Inc., EMI Mills Music, Inc., EMI Miller*
*Catalog, Inc., EMI Robbins Catalog, Inc., EMI U*
*Catalog, Inc., EMI Unart Catalog, Inc., Jobete*
*Music Co., Inc., Screen Gems-EMI Music, Inc.,*
*Stone Agate Music, and Stone Diamond Music*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be served by electronic mail a copy of Plaintiffs' Memorandum of Law in Support of the Motion for Reconsideration, along with the accompanying Declaration of Andrew H. Bart and the exhibits attached thereto, on this 12th day of November, 2012 to the following persons:

Gerald H. Davis (via email and overnight delivery)
Chapter 7 Trustee
P.O. Box 121111
San Diego CA 92112-1111
davisatty@aol.com

Richard C. Norton (via email and overnight delivery)
Norton Moore & Adams LLP
525 B Street, Suite 1500
San Diego, CA 92101

Christopher Celentino (via email and overnight delivery)
Foley & Lardner LLP
402 West Broadway, Suite 2100
San Diego, CA 92101
ccelentino@foley.com

Ira S. Sacks
Mark S. Lafayette
Akerman Senterfitt LLP
335 Madison Avenue, 26th Floor
New York, NY 10017
ira.sacks@akerman.com
mark.lafayette@akerman.com

*/s/ Luke C. Platzer*
Luke C. Platzer