

Ira S. Sacks

Akerman LLP
666 Fifth Avenue
20th Floor
New York, NY 10103
Tel: 212.880.3800
Fax: 212.880.8965

Dir: 212.880.3827
ira.sacks@akerman.com

February 23, 2014

**BY ECF**
Hon. William H. Pauley, III
United States District Judge
United States District Court for the Southern District of New York
500 Pearl Street, Room 2210
New York, NY 10007

     Re:  *Capitol Records, LLC v. MP3tunes, LLC, Civil Action No. 07 Civ. 9931* **(WHP)**

Dear Judge Pauley,

     We represent Defendant Michael Robertson (n/k/a Michael Hammer) in this action. We write to raise certain issues to be discussed at the upcoming pretrial conference and in response to Plaintiffs' letter dated February 21, 2014 "seeking guidance" on certain matters in advance of trial (Doc No. 549). While we intend to further address the matters raised by counsel at the conference, we also will briefly address them below.

     **Defendant's Issues to Be Raised at the Pre-trial Conference**:

     Robertson asks that the following issues be addressed at the final pretrial conference:

1. Plaintiffs have been adding exhibits, including several revised charts for their expert witness, Dr. Horowitz. That included PX 446 through PX 453 served on February 18, and further revisions to PX 449 though PX 453 served this evening at 10 PM, as well as a new revision to Dr. Horowitz' chart, PX 17, which has over 10,500 lines and 9 columns. The last round of changes must be precluded.

2. Similarly, Plaintiffs, without prior permission from the Court or express disclosure to Defendant, have completely changed the theory behind, and evidence supporting, category IV of their red-flag knowledge/willful blindness submitted to Defendants on July 12, 2013, pursuant to this Court's July 3, 2013 Order, and subsequently filed with the Court.

     Initially, Plaintiffs stated that MP3tunes' receipt of multiple takedown notices ***from copyright holders other than Plaintiffs*** referencing the same web domain constituted

Hon. William H. Pauley, III
February 23, 2014
Page 2

> red-flag knowledge and/or willful blindness such that MP3tunes should have disabled access to such website and removed works from lockers that originated from such website. Now, subsequent to your Honors' ruling on all *in limine* motions, has submitted new exhibits (PX 447 and PX 452) to Defendant to support a new theory of red-flag knowledge. That new theory asserts if ***Plaintiffs'*** takedown notices made reference to 10 or more songs from the same web domain, that Defendants should have disabled access to such websites and removed all songs originating from such website from use's lockers.
>
> However, in connection with Defendant's motion *in limine* with respect to red-flag knowledge and willful blindness, Defendant demonstrated that Plaintiffs have admitted that they made free MP3 downloads available on the same websites that they have asserted that MP3tunes' users allegedly downloaded unauthorized songs. Accordingly, Plaintiffs' new theory of liability has already been undermined. In any case, Plaintiffs should not be permitted to assert new theories and claims on the eve of trial, seven months after their disclosures concerning red-flag knowledge/willful blindness were due. Accordingly, this Court should order this new claim and category stricken from the trial of this action.

3. We have requested an unredacted copy of the Amazon-EMI license from the Label Plaintiffs' counsel but, to date, it has not been provided. We believe that an unredacted copy is necessary to evaluate the meaning of its terms. We have also asked a modified redacted agreement from Plaintiffs to be used at trial but Plaintiffs have thus far refused to provide such copy, awaiting permission from Amazon.

4. We request sequestration of witnesses pursuant to F.R.E. 615.

5. Documents produced during discovery have been marked "confidential" and "highly confidential" or "attorneys eyes only" in accordance with the Protective Order and other Orders in this action. We ask that the trial not be encumbered in that fashion;

6. To resolve an issue of ownership, Defendant has requested an unredacted copy of an agreement regarding the musical artists "Coldplay" from the Label Plaintiffs' counsel, but, to date, it has not been provided. We believe that an unredacted copy is necessary to evaluate whether Robertson should withdraw his dispute of ownership.

7. We have asked the Publishing Plaintiffs' counsel to accept a "Highly Confidential Outside Counsel – Attorneys Eyes Only" designation with respect to a document produced by third party, Hopeless Records in order to evaluate whether they object to the use of a redacted version at trial. Hopeless Records' counsel has requested such designation because his client has concerns that the agreement will be viewed by a competitor. The Publishing Plaintiffs have refused to accept such designation, even temporarily, so that that the parties can attempt to reach agreement as to the issue of whether downloads from Hopeless Records website were authorized (and the plain language of the agreement makes clear that they were), or in what way the agreement can be redacted in a manner acceptable to the Publishing Plaintiffs and Hopeless Records.

8. The Parties met and conferred over deposition designations to resolve objections. While Defendant's counsel was prepared to review each line of the designations so that objections can be resolved, Plaintiffs' attorneys refused to do so. Defendant's counsel also suggested that, in light of the Court's recent rulings, each party prepare a list of designations that they actually intend to read to or play for the jury so that fewer objections require resolution. Plaintiffs' counsel also rejected that proposal as premature. We also suggested that deposition designations be prepared jointly such that each deposition witness's transcript is read only once to the jury during the liability phase of the trial. Plaintiffs again would not reach an agreement on that issue. We thus seek the Court's guidance as to how deposition designations, along with their objections, should be resolved and presented at trial.

### Response to Mr. Bart's February 21, 2014 letter

**Works Listed In Takedown Notice.** With respect to works listed in the takedown notices, Plaintiffs were granted summary judgment with respect to those works for which they had then proven ownership at the time of the motion and decision. For example, although the Publishing Plaintiffs listed 100 songs on their takedown notice, the declaration of Publishing Plaintiff employee Aubrey Ashby only established ownership as to 11 of these songs. Through subsequent production of documents and meet and confers, ownership issues no longer exist with respect to an additional 37 of the Publisher's works on the takedown notice. The Publishing Plaintiffs have now asserted that 52 songs on the takedown notice are not works-in-suit. However, the Publishing Plaintiffs have not withdrawn any claims with respect to such songs. The same is true with respect to the Label Plaintiffs although the percentages are less.

With respect to works in takedown notices for which Plaintiffs were not granted summary judgment, Defendant intends to prove that the Publishing Plaintiffs' takedown notice was only sufficient to cause MP3tunes to disable the sideload link, and insufficient, under applicable law to require MP3tunes to remove songs from lockers because the notice only listed a sideload id and did not list particular URLs from which works were sideloaded, and, as such, would have required investigation by MP3tunes to remove such works from lockers. Therefore, we would like to establish as a matter of fact that investigation would have been required to take the songs specified by the Publishing Plaintiffs' takedown notices out of lockers, and, thereafter, have the jury determine (or the Court to determine as a matter of law) whether Defendant has DMCA protection and, therefore, no liability with respect to such works, unless such works have been also identified by Plaintiffs as part of their willful blindness/red-flag knowledge disclosures.

Language was also included in the jury instructions regarding the DMCA because it must be made clear to the jury that with respect to the songs for which Plaintiffs are attempting to prove liability on the basis of red-flag and/or willful blindness, unless red flag knowledge or willful blindness is established by the Plaintiffs, the DMCA protects MP3tunes, and Robertson, from any liability with respect to such works.

**Affirmative Defenses.** Plaintiffs were only granted summary judgment with respect to certain songs for which Plaintiffs had proved ownership and MP3tunes had not removed from user lockers. Over the last two weeks, as modified frequently, including today (Sunday), Plaintiffs have finally identified the sound recordings and compositions which they contend are actually in issue in this case.

Previously, Plaintiffs produced only a song list of almost every composition and sound recording that they claimed to own (and are now taking the position that even songs on the takedown notices are not at issue in this case). During summary judgment briefing, Plaintiffs only specifically referred to songs in the takedown notices and songs referenced in the declarations of Ms. Ashby, Mr. Abitbol and Mr. McMullan. In the declaration of Mr. Abitbol submitted in support of summary judgment, he claimed that 562 of the Publishing Plaintiffs' composition were at issue, now approximately 620 are allegedly at issue, plus 52 from the takedown notice that they claim are not in suit. Therefore, to our understanding, many of the works at issue were not before the Court during the briefing on summary judgment and reconsideration.

We recognize that the Court previously considered evidence submitted at summary judgment and, thereafter, evidence submitted on reconsideration, as to whether such evidence was sufficient to bar entry of the summary judgment, it has not considered the evidence to be submitted at trial to determine if that evidence supports Defendant's affirmative defenses so as to bar entry of judgment with respect to Plaintiffs' other asserted infringements. Plaintiffs have never moved for summary judgment with respect to Defendants' affirmative defenses, and the Court has not entered an order making dispositive findings of fact such that would preclude Defendant's defenses.

We also recognize that this Court has expressly rejected the theory of an implied license in connection with this action and, therefore, will hereby withdraw jury instructions with regard to such defense. We have likewise withdrawn the affirmative defense of abandonment as a result of the express language in the Court's opinions. However, while we recognize that the defenses of estoppel, unclean hands and waiver have been previously raised in connection with the motions for summary judgment and/or reconsideration, the Court did not expressly reject such defenses, but rather rejected as a result of the failure of the abandonment and implied license defenses. Accordingly, we believe those defenses should be permitted to go to the jury with respect to the songs as to which summary judgment was not granted. At the very least, we would like an express ruling barring them.

**Promotional Downloads Evidence Postdating December 8, 2008.** Plaintiffs here attempt to take this Court's February 11, 2014, four sentence order regarding the deposition of Devin Krug (Doc. No. 535) and turn it into an *in limine* motion with respect to all evidence which may, through evidence at trial, be shown to reflect upon and/or raise inferences with respect to Plaintiffs' practices within the period before December 8, 2008. In addition, such evidence may be used to challenge Plaintiffs' credibility, where appropriate.

Hon. William H. Pauley, III
February 23, 2014
Page 5

Plaintiffs attempt to inflame the Court by providing a single screenshot recently designated as an exhibit by Defendant reflecting that in 2012 Amazon continued to offer free downloads.  First, the Court should be aware that on almost a daily basis over the past two weeks, we have been bombarded with new exhibits from the Plaintiffs. Second, the purpose of this exhibit was simply to show a connection between other exhibits reflecting free downloads available earlier in the period of 2005 to 2008 to establish Amazon's continued practice of making a great quantity of free music available.  Although Mr. Bart asserts other examples abound, he does not identify any such other examples.  Simply put, we are prepared to link Plaintiffs' post-2008 practices with practices in 2008 and prior.  Accordingly, Plaintiffs' request must be denied.

Plaintiffs' request to preclude Devin Krug from trial should be denied for a number of reasons.  First, the Court should be aware that the deposition of Mr. Krug was inherently incredible, at least with respect to that portion of his testimony concerning his knowledge of practices of the Label Plaintiffs *a mere one week* before he commenced employment with Astralwerks, an EMI label.  That is because it was discovered early on in his deposition that it appeared clear that Mr. Krug had been advised that if his testimony supported the fact that he no knowledge of events or policies at EMI prior to his employment, that he would not have to testify in this matter. Thus, Mr. Krug was asked the following typical questions and gave the following answers:

> Q. When you met in person [with counsel in preparation for your deposition] did you review any documents?
> A. Yes.
> Q. Did those documents refresh your recollection as to the events on or around the date of those documents?
> A.  Yes.  The specific documents that I think that were reviewed were all after the -- at least to my understanding were **after the time in question for the case. (emphasis added)**
>
> \*     \*     \*
>
> Q. You just mentioned they [the documents referred to above] were after the time period, what are you referring to?
> A. **It's my basic understanding that the time period that this case refers to was previous to my employment with EMI, therefore, these emails were after said period of the case, so they are going forward.**
> Q. Were you told any significance with respect to that?
>         MR. BART:  That's going to be privileged communication, you don't have to answer that.
>          THE WITNESS:  Okay.
> Q. How did you learn about the time period that you're referring to?
>         MR. BART:  I told him.
> A. Actually, when I said --

{28198958;4}

Hon. William H. Pauley, III
February 23, 2014
Page 6

> MR. BART:  That's as far as we're going into my conversations with you.

\*       \*       \*

This led to some follow up questions later in the deposition, the response to which Mr. Bart directed the witness not to answer:

> Q.   Earlier in the deposition you made reference to a relevant date for the purposes of this deposition, can you tell me what you mean by a relevant date?
> MR. BART:  We've already discussed that.  We're done.  We talked about this already.
> MR. LAFAYETTE:  We did?
> MR. BART:  Yes.
> MR. LAFAYETTE:  I want to know what his understanding of that was.
> MR. BART:  We already discussed it.
>     I told him -- you know what, we're done.
> MR. LAFAYETTE:  I have one more question.  Please sit.
> MR. BART:  You can have one question.
> Q.   Mr. Krug, were you told that if you had no recollection of marketing practice at EMI prior to the time you were employed by Astralwerks that you would not have to testify at the upcoming trial?
> MR. BART:  Instruction not to answer.  We're out of here.
> MR. LAFAYETTE:  Let the record reflect that the witness and his attorney are walking out of the room.

Notwithstanding that Mr. Krug, with certain exceptions discussed below, generally denied knowledge of Plaintiffs' marketing practices even though he commenced employment with Astralwerks (an EMI label) as Director of Interactive Marketing (or Digital Marketing), only a mere week after the end of so-called relevant period, it appears incredible that Mr. Krug was not advised about how EMI marketed some of the same musical artists for which he was now leading promotional campaigns and which promotional companies EMI used, since Mr. Krug continued to use them.  At a minimum, Mr. Krug's credibility should be presented to the jury for evaluation. Notwithstanding, Mr. Krug did have interesting and relevant testimony regarding his knowledge of promotional downloads on some of the very websites at issue in this action.

Among other things, he testified that at previous employers, an independent record label and an independent label group, between 2005 and 2008, he had made digital files of songs available for download, without monetary consideration by the consumer, at spin.com, a website from which Mr. Robertson is accused of illegally downloading, and other sites (although Mr. Krug asserted such rights were always granted in exchange for promotional consideration, data capture or other value). He also testified that these uses were approved by the applicable publisher and record label.  Mr. Krug also confirmed that when employed at Astralwerks

Hon. William H. Pauley, III
February 23, 2014
Page 7

(commencing December 15, 2008), he was involved with promotional campaigns for EMI artists where free MP3 downloads were made available to consumers without monetary compensation from such consumers and that no one told him this was a new practice.

> Mr. Krug also had this to say about digital partners upon arriving at Astralwerks:
>
> Were you advised of any marketing partners that Astralwerks or other EMI labels had dealt with prior to the time you were employed by Astralwerks?
> A.   There were certain partners as I've mentioned, large retail partners, iTunes and Best Buy, for instance. Digital partners such as MySpace that I also mentioned. Publications which are widely regarded and spoken about in the industry such as those I mentioned, Rolling Stone, Billboard, Spin and internet sites like Pitchfork, for example.
> Q.   So you were advised that EMI labels had worked with these sites before?
> A.   Not specifically advised that they had worked with them. More specifically, moving forward advised that these would be targets of partners that we would consider working with, or would like to work with to feature our artists.

The forgoing testimony is important because alleged infringements in this action include songs sideloaded from Spin.com and Pitchfork, which he considered reputable sites, and, therefore, the testimony goes directly to the issue of red-flag knowledge and willful blindness and quantum of damages.

Mr. Krug also testified 1) that when he joined Astralwerks he understood that Astralwerks would work with music blogs for reviews of music, and 2) he was aware before he joined Astralwerks that providing a free digital track was a promotional mechanism that labels used to promote their artists and that the practice was condoned by artists and condoned by the labels.

Mr. Krug explained that shortly after commencing employment with Astralwerks, he provided spin.com, stereogum.com and pitchfork.com with MP3s and/or material containing links from which MP3s could be obtained and the jury may judge Krug's credibility and determine if it is credible that EMI made certain files available during the relevant period on certain of these websites, notwithstanding EMI's denial.

Mr. Krug also confirmed certain information regarding industry practice during the relevant period and confirmed that one could not tell, even if visiting a reputable website, whether an offered download was authorized or not:

> Q.   But certainly before you were employed by Astralwerks you were aware that providing a free digital track was a promotional mechanism that labels use to promote their artists?
>             MR. BART:  Objection to form.
> A.   Sure.
> Q.   Do you recall any websites in connection with which that was done?

{28198958;4}

    A.      Any websites in connection with which that was done through a label?
    Q.      Yes.
    A.      Condoned by the label?
    Q.      Yes.
    A.      Again, I don't know that I recall the specific websites that that was done at that time.

    \*        \*        \*

    Q.      What about with respect to a free MP3 download available on South By Southwest; would you, by the fact that it was on South By Southwest, know that it was an authorized MP3 download?
    A.      I would not know unless I would see the exchange with regard to that specific download.
    Q.      Do you consider South By Southwest to be a reputable website?
    A.      I consider it to be a reputable organization. The website I'm not all that familiar with.
    Q.      What about a website called Imeem, are you familiar with a website called Imeem?
    A.      No.
    Q.      How about a website called Spinner?
    A.      Spinner I believe was part of AOL, so I'm familiar with them.
    Q.      If Spinner featured a free MP3 download to the visitors of its website would you expect that to be authorized?
    A.      I would expect it to be authorized. I would not know 100 percent, but I would expect it to be authorized by the copyright owners.
    Q.      What about Spin.com. If a free MP3 download was featured on Spin.com would you expect that it was authorized?
    A.      I would hope that it would be, but unless I see the specifics of the incidences I would not be able to conclude definitively.
    Q.      What about Pitchfork.com. If there was a free MP3 download featured on Pitchfork.com, would you expect that to be an authorized download?
    A.      Again, I would hope that it was an authorized download, as Pitchfork has been around and are a fairly reputable source.
        Unless I see the specifics, unless it was a promotion I was directly involved with, I could not conclude definitively if it was authorized by the copyright holders.

Mr. Krug also testified to at least on instance when he received an e-mail describing a prior promotion:

    Q.      Is this an email that you received, Mr. Krug?
    A.      It looks as though it was, yes.
    Q.      As part of that chain does that refer to a promotion that EMI undertook in 2007 involving Katy Perry?

          MR. BART:  Objection to form, you can answer the question.
A.    Yes.  It looks as though the email that was forwarded was from a time period previous to my employment.
Q.    Mr. Heinemann is saying to you that, "here's an example of the kind of exchange we'd ideally have for the data capture/special initiatives for MP3 giveaways."  Is that correct?
A.    It's my understanding what Mr. Heinemann was saying in this email was that in order to authorize an MP3 giveaway there would have to be an exchange for data capture or some other special initiative.
Q.    He's pointing to the example being Katy Perry in 2007, isn't that correct?
A.    It seems that he's pointing to that, which part of it I'm looking to see.  Right, yes.
Q.    In fact, in connection with that promotion EMI leaked the password out to as many people as possible to download the MP3, is that correct?
A.    It seemed so from this email.  That was before my time at EMI.

      \*      \*      \*

Q.    With reference to the Katy Perry promotion, did Mr. Heinemann ever say to you this is something that we never want to do again, or words to that effect?
A.    I don't recall that being said.  I truthfully don't recall this promotion, mostly because it happened before my time period and I didn't think it pertained to me.  This was likely an email which I may have not reviewed all that thoroughly until just now.

      Therefore Mr. Krug's testimony is very telling regarding both the practices of EMI during the relevant time period, the practices in the industry during the relevant time when he was an executive at other media companies, including with respect to some websites at issue in this action, and his view regarding whether anyone can know for certain whether even reputable websites were offering free downloads.  Mr. Krug should be permitted to testify.[1]

      **Cover Art Ownership and Licensing.**  This issue was raised and addressed in a separate letter from the parties *(see* Doc. No. 545). Again, **_we do not challenge the ownership of any of the sound recording copyrights at issue_**, but rather challenge whether the "work for hire" box on the copyrights applies to audio artists only or also graphic artists; and whether the authorship detail and other information set forth in the copyright certificate relates to the cover art.  That is, we challenge scope of the copyrights under the *prima facie* presumption.  As to cover art, **_we listed Mr. McMullan on our witness list_** in the proposed joint pretrial order.  We intend to call

---

[1] Indeed, even Mr. Krug's experience with Plaintiffs after the relevant time period is instructive; no record evidence exists to suggest that a sudden and drastic shift occurred concerning policies governing promotional downloads either at EMI or in the music industry in general precisely when Mr. Krug began his employment with Plaintiffs.  It is only reasonable to believe that a fair degree of continuity existed concerning these policies.  Mr. Krug's knowledge of such policies after the relevant period is thus informative as to the policies during that same period.  *See* Fed. R. Evid. 401 (evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence").

Hon. William H. Pauley, III
February 23, 2014
Page 10

him, or cross-examine him, on the cover art issue. We do not believe Mr. McMullan's testimony will support the *prima facie* claims made in Plaintiffs' copyright certificates as to cover art. If on cross-examination Mr. McMullan attempts to support the broad cover art claims asserted by Plaintiffs, Defendant believes it has a rebuttal witness to refute such claim. This will not be a major trial undertaking, although with $49.2 million in requested statutory damages ($150,000 times 328) even a major undertaking should be permitted.

Plaintiffs are disingenuous by stating to the Court that they can only find ten copyright registrations that do not list an author for the cover art images. But for one certificate, none of the certificates disclose the name of the author of the cover art images. To our knowledge, the certificates name the author of the sound recording and Defendant is entitled to test the *prima facie* facts set forth in the copyright certificate and attempt to rebut it at trial.

With respect to the issue of standing to sue for cover art copyright infringement, we respectfully submit that the Court simply denied Defendant's motion *in limine* with respect to cover art by finding that Plaintiffs' allegation that MP3tunes copied cover art images in a way that exceed the scope of the license, raised an issue of fact. However, Defendant believes that if at trial it is established that Plaintiffs conveyed an assignable right to Amazon to allow others to copy and display the cover art, the issue is one of breach of contract and not copyright infringement because Plaintiffs no longer have an exclusive right to copy and display, at least as to a licensee of Amazon's.

**Examination of Plaintiffs' Witnesses Regarding Works Allegedly Not in Suit.** As Plaintiffs have indicated, all parties have addressed this in a letter to the Court. (Doc. No 536). Plaintiffs specifically raise the issue of Defendant calling Aubrey Ashby. Ms. Ashby is on Defendant's witness list and has been since the filing of the proposed joint pre-trial order. Plaintiffs improperly seek the subjects upon which Ms. Ashby will be questioned by Defendant, by blindly alleging that prejudice will ensue from that unknown questioning. Plaintiffs' query is nothing more than an unwarranted attempt to secure disclosure of Defendant's trial strategy.

Further, it would be the ultimate in chutzpah, if what, in fact, the Plaintiffs are seeking is to interfere with Defendant's questioning of Plaintiffs' witnesses regarding the fact that they swore in takedown notices that they owned certain sound recordings and compositions, which a) resulted in MP3tunes disabling links to such recordings and compositions, b) MP3tunes being subject to a motion for summary judgment with respect to such sound recordings and compositions, and a witch hunt of litigation for over 5 years, only to be told at the eve of trial (indeed, in the last week) that the compositions and sound recordings on the takedown notice and not set forth in their disclosures of last Wednesday and Thursday were not at issue in this litigation. Not only is this fair and fertile ground for cross-examination, if for nothing but to challenge Plaintiffs' bogus takedown notices, but such conduct is sanctionable.

Plaintiffs specifically argued in their summary judgment motion in support of contributory copyright infringement that, by reason of the takedown notices, MP3tunes had notice of the specific songs set forth in the notices "and did not remove those infringing recordings from its servers. Nor did MP3tunes block any of its users from having unfettered

{28198958;4}

Hon. William H. Pauley, III
February 23, 2014
Page 11

access to the infringing copies of plaintiffs' recordings that they had copied to their lockers." (Doc. No. 207, at 17, *see id*., at 33).

In addition, as recently as December 2, 2013, Mr. Bart wrote to Your Honor regarding an alleged attempt of "streamlining" the upcoming trial with respect to ownership issues:

> "The Court's Summary Judgment Order also observed that there were additional works not listed in the McMullan/Ashby declarations as to which Defendants' liability was either shown or remains in issue. *See* SJ Opn. at n.1 ("[f]or those songs not listed" on Plaintiffs' declarations "ownership remains a disputed issue *requiring further proof*") (emphasis added). Accordingly, in the JPTO, Plaintiffs have designated documents establishing their ownership of such works (the "non-McMullan/Ashby works"). **The majority of the non-McMullan/Ashby works (approximately 180 for the Label Plaintiffs, and 84 for the Publishing Plaintiffs) are works for which liability has already been proved because they were listed on Plaintiffs' takedown notices.")** (emphasis added)

Thus at a minimum, Plaintiffs were either hiding that such songs were not at issue in this case from both the Court and Defendant, or disingenuously hoping to secure liability for songs not at issue and for songs that they did not own, or both. Accordingly, at a minimum there is no basis for precluding Defendant from challenging Plaintiffs with respect to works they swore they owned and listed in takedown notices and now state were not songs at issue.

### Issues Related to Organization and Conduct of Trial

**Bifurcation**: Plaintiffs strategically appear to be seeking – at the eleventh and one-half hour (if not 11:59) – a rationale to undo the Court's bifurcation order in a way that would prejudice Robertson. Defendant would agree to the trial not being bifurcated if Plaintiffs agree to not place before the jury the evidence that led the Court to order that the trial be bifurcated. Defendants respectfully request that the Court re-examine whether evidence regarding Defendants' awareness of alleged infringement of copyrights belonging to other copyright holders is irrelevant and/or, even if relevant, not unduly prejudicial. Plaintiffs have no evidence that Defendants infringed others' copyrights and takedown notices, as evidenced by this action, are mere allegations of ownership and infringement. Therefore, the Court would be allowing completely unsubstantiated allegations of copyright infringement to be placed before the jury. Further, Plaintiffs bald assertion that they will put before the jury evidence to establish "bad faith" or "purposeful, culpable expression and conduct" it is impossible for Defendant to respond without knowing to what evidence Plaintiffs refer. As set forth above, if Plaintiffs agree to forego use of the evidence that led to the Court deciding to bifurcate the trial, Defendant has no objection to the trial not being bifurcated.

**Out of Town Witnesses.** We have no objection to attempting to accommodate Ms. Tarpey and we may have a similar issue with one of Defendant's witnesses. Plaintiffs have identified no other out of town witnesses to Defendant. If there are other witnesses, we request disclosure of such witnesses.

Hon. William H. Pauley, III
February 23, 2014
Page 12

**Opening Statements.**  Defendant has written separately regarding questions we have concerning opening statements.  (*See* Doc 548).

**Expected MP3tunes Default.**  Although Defendant believes that MP3tunes will not appear at trial, Defendant believes that any entry of default or reference to default before the jury will result in prejudice to Robertson, as to whom Plaintiffs seek to impose vicarious liability for all damages against MP3tunes.  Robertson is entitled to his jury trial unencumbered by that default.  Moreover, much of the trial will impact the extent to which MP3tunes is liable, and Robertson has requested specific jury special verdicts on such issues.  Therefore, Defendant believes that any default can and should await the completion of trial.  We believe a simple jury instruction, as drafted by the parties, indicating that MP3tunes is in bankruptcy and will not appear at the trial, is sufficient until after the trial.

We thank Your Honor in advance for your consideration.

Respectfully.

*Ira S. Sacks*

Ira S. Sacks

{28198958;4}