E3HBCAP1                      Trial

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   CAPITOL RECORDS, INC., et al.,

4                 Plaintiffs,

5        v.                              07 CV 9931 (WHP)

6   MP3TUNES, LLC, et al.,

7                 Defendants.

8   ------------------------------x
                                        New York, N.Y.
9                                       March 17, 2014
                                        8:59 a.m.
10

11  Before:

12                HON. WILLIAM H. PAULEY III,

13                                           District Judge

14                      APPEARANCES

15  JENNER & BLOCK
         Attorneys for EMI Record Plaintiffs
16  BY:  ANDREW HARRISON BART
         LUKE C. PLATZER
17       LINDSAY W. BOWEN
         J. DOUGLAS WILSON
18
    PRYOR CASHMAN LLP
19       Attorneys for EMI Publishing Plaintiffs
    BY:  FRANK PHILLIP SCIBILIA
20       MONA SIMONIAN
         ROSS BAGLEY
21
    AKERMAN LLP
22       Attorneys for Defendant Robertson
    BY:  IRA S. SACKS
23       MARK S. LAFAYETTE
         VINCENT Y. LIU
24       JAMIE B. ROBBINS

25

E3HBCAP1                         Trial

1              (Trial resumed)

2              (In open court; jury not present)

3              THE COURT:  Good morning, Counsel.  Please be seated.

4    All right.  First, a few moments ago we e-mailed to all of you

5    a slightly revised jury verdict sheet.  I'll provide a paper

6    copy.

7              I have adopted the defendant's view with respect to

8    the jury verdict sheet; that is to say, to separate out

9    vicarious liability and contributory infringement liability.  I

10   think that that determination needs to be made.

11             I've also changed certain instructions that read that

12   "you need not fill in certain columns" to "do not fill in the

13   columns."  For example, in instructions following question

14   1.2A.

15             I will tell you that I think that this jury verdict

16   sheet is mind-numbing.  With the tables that are going to

17   accompany the verdict sheet, you're essentially asking the jury

18   to answer thousands of questions.  But that's a product of

19   having 1,800 works in suit, hundreds of which have never been

20   mentioned at the trial, but they're buried in the tables and

21   exhibits.  I think it's almost an insurmountable task that

22   you're all asking the jury to do.

23             Now, I have four points that I want to go over with

24   you.  First, over the weekend I considered further the parties'

25   additional proposals relating to corporate officer liability--

E3HBCAP1                          Trial

```
 1    relating to the corporate officer liability theory of secondary

 2    infringement.  I reaffirmed my decision to exclude this theory.

 3    Judge Wood's decision in LimeWire does not recognize the theory

 4    of liability based on mere status as a corporate officer

 5    independent of the standard for vicarious liability.  And I

 6    found no decision recognizing a distinct theory of corporate

 7    officer liability apart from vicarious liability for

 8    infringement.

 9            With respect to the tertiary liability arguments, I've

10    reviewed the Napster case from the Northern District of

11    California.  In my view it stands for the proposition that

12    liability cannot attach merely because an individual is an

13    officer of the corporation so long as the standards for

14    secondary infringement liability are met for Robertson; that

15    is, that his right and ability to supervise and his receipt of

16    a direct financial benefit are established with respect to

17    MP3tunes' infringement.  I do not see any controlling case law

18    that precludes a theory of tertiary liability.

19            Now, with respect to the charge, at page 25, on

20    "Contributory liability for MP3tunes' copyright infringement

21    through executives (as to Michael Robertson)," at line 21 I

22    think that "MP3tunes" should be removed and it should just be

23    plaintiffs' claim that Robertson is liable for contributing to

24    the direct infringement of MP3tunes executives.

25            I'm not sure that we discussed this on Friday, but is
```

E3HBCAP1                          Trial

1    that correct, that MP3tunes should be removed there?

2               MR. PLATZER:  Yes, your Honor.  I believe that the

3    Court's original draft jury charge had included contributory

4    liability as a theory for holding MP3tunes liable for the

5    executives' infringement, and the parties both agreed that the

6    plaintiffs were not asserting that theory.

7               So I believe that this language with MP3tunes here on

8    line 21 of page 25 is just some vestigial language of where

9    this instruction used to be located.

10              THE COURT:  Fine.

11              Next, on page 27 at line 10, this is under "Willful

12   Blindness," the sentence that ends on line 10 ends with-- or

13   not ends.  States "confirming that fact."  Given that the

14   standard is having reason to suspect specific instances of

15   infringement, as set forth at line 9, it seems to me that the

16   word "fact" should be displaced and the word "suspicion" put in

17   its place instead.

18              Any objection to that?

19              MR. PLATZER:  No objection from plaintiffs, your

20   Honor.

21              THE COURT:  Mr. Sacks, any objection to that?

22              MR. SACKS:  Just waiting on Mr. Lafayette, your Honor.

23              MR. LAFAYETTE:  Your Honor, I think if we're going to

24   put in the word-- I just wanted to make sure that the word

25   "suspicion" relates back to specific instances of infringement.

E3HBCAP1                    Trial

1    That's just what I'm looking at.

2              MR. SACKS:  We're okay with that.

3              THE COURT:  All right.

4              MR. LAFAYETTE:  Your Honor, there was --

5              THE COURT:  Wait.  Let me finish my points.

6              MR. LAFAYETTE:  Okay.

7              THE COURT:  Page 28, line 20 reads "To establish the

8    subjective knowledge prong, you must find that MP3tunes was

9    subjectively aware of information identifying specific

10   instances of infringement."  That, as I said before, is

11   exquisite language from the Second Circuit, but it seems to me

12   that the following-- that it should be changed to read as

13   follows:  "To establish the subjective knowledge prong, you

14   must find that MP3tunes was subjectively aware – that is,

15   actually aware – of information identifying specific instances

16   of infringement."

17             It just offers the jury a little more guidance on the

18   subjective or objective task.

19             MR. SACKS:  Your Honor, could you just read that

20   again?

21             THE COURT:  Yes.  The only thing I'm doing is after

22   the word "subjectively "– that is, actually aware – "

23             MR. SACKS:  That's fine with us, your Honor.

24             MR. PLATZER:  No objection from plaintiffs' position,

25   your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3HBCAP1                    Trial

1              THE COURT:  Finally, at page 43.  This is the

2     promotional download evidence charge.

3              MR. SACKS:  What page, your Honor?

4              THE COURT:  Page 43, the sentence beginning at line

5     16:  "You may consider the promotional activities of the

6     plaintiffs in deciding whether the defendant was willfully

7     blind to, or had red flag knowledge of, the infringement of

8     particular works by their users."

9              I am suggesting here, just to provide some further

10    guidance to the jury, that a clause be added after "the

11    infringement of particular works by their users," "including

12    whether any alleged infringements were objectively obvious to a

13    reasonable person."  So that the whole sentence reads as

14    follows:  "You may consider the promotional activities of the

15    plaintiffs in deciding whether the defendants were willfully

16    blind to, or had red flag knowledge of, the infringement of

17    particular works by their users, including whether any alleged

18    infringements were objectively obvious to a reasonable person.

19    You may give such evidence the weight you deem appropriate, or

20    no weight, as you see fit from the evidence presented."

21             MR. PLATZER:  Your Honor, we believe that that

22    language applies to the red flag knowledge standard, but risks

23    confusing the jury with respect to the willful blindness

24    standard where that would not be-- where ever that is not the

25    purpose for which promotional evidence would be used, because

1    the jury does not need to find that the infringement would have

2    been objectively obvious to a reasonable person under willful

3    blindness.

4             THE COURT:  All right.  But without something, it just

5    seems like it isn't particularly helpful to the jury.

6             MR. PLATZER:  Your Honor, perhaps if the sentence

7    beginning on line 16 were split up into a separate sentence

8    about willful blindness and a separate sense about red flag and

9    then the modification that your Honor suggested were applied to

10   the red flag sentence rather than the willful blindness

11   sentence.  I think that would resolve our objection.

12            THE COURT:  All right.  So propose some language,

13   Mr. Platzer.

14            MR. PLATZER:  You may consider the promotional

15   activities of the plaintiffs in deciding whether the defendants

16   were willfully blind to --

17            THE COURT:  -- the infringement of particular works by

18   their users.

19            MR. PLATZER:  You may also consider the promotional

20   activities of the plaintiffs in deciding whether the defendants

21   had red flag knowledge of the infringement of particular works

22   by their users," and then the language that your Honor stated.

23            THE COURT:  "Including whether any alleged

24   infringements were objectively obvious to a reasonable person."

25            MR. PLATZER:  Yes.

E3HBCAP1                    Trial

1                    THE COURT:  All right.

2                    MR. SACKS:  That's fine with us, your Honor.

3                    THE COURT:  All right.  I'll make that change.  That

4      was my laundry list.

5                    Mr. Lafayette, do you want to be heard?

6                    MR. LAFAYETTE:  We sent an e-mail to Mr. Gosnell last

7      night with an omission that was in the instructions on page 25,

8      line 18.

9                    THE COURT:  Hold on.  All right.  This is the charge

10     for "Contributory liability for MP3tunes' copyright

11     infringement for executives (as to Michael Robertson)"?

12                   MR. LAFAYETTE:  Yes.

13                   THE COURT:  All right.

14                   MR. LAFAYETTE:  Basically the same sentence that's the

15     lead-in to the vicarious liability standard on page 24:  "If

16     and only if you find that MP3tunes is liable for its

17     executives' direct infringement under the doctrine of

18     respondeat superior, you must go on to consider whether Michael

19     Robertson himself is liable for MP3tunes' infringements," and

20     then into the contributory infringement.

21                   THE COURT:  I think that should be added.  I'm sorry I

22     didn't draw that to your attention.

23                   MR. PLATZER:  We have no objection to that, your

24     Honor.

25                   THE COURT:  All right.

E3HBCAP1                         Trial

1           MR. LAFAYETTE:  And then the last clarification I

2    spoke with Mr. Platzer about was on page 34, line 1-- line 2,

3    actually.  We wanted to change out --

4           THE COURT:  Hold on.

5           MR. LAFAYETTE:  I'm sorry.

6           THE COURT:  Go ahead.

7           MR. LAFAYETTE:  We wanted to take out the line

8    underneath the common law copyright infringement claim heading

9    as to MP3tunes and Michael Robertson because the direct

10   infringement --

11          THE COURT:  I'm sorry, I'm not following this.  Page

12   34?

13          MR. LAFAYETTE:  Right, line 2.

14          THE COURT:  "Therefore, you should only consider

15   plaintiffs' distribution..."?

16          THE DEPUTY CLERK:  Our pages are off.

17          MR. LAFAYETTE:  No, now we're not jiving.  It's the

18   common law copyright infringement claim heading.

19          THE COURT:  All right.  I'm there.

20          MR. LAFAYETTE:  So right underneath it it says, "as to

21   MP3tunes and Michael Robertson."  We want to delete that line

22   since the direct infringement claim -- I don't want to be

23   confusing to the jury that the direct infringement claim goes

24   to MP3tunes or Michael Robertson.

25          So it's really that they're considering the secondary

 1   liability if they find direct liability with respect to users

 2   or, I guess, executives for whom respondeat superior liability

 3   has been established.

 4          THE COURT:  Any objection to deleting line 2 so that

 5   it would just read "common law copyright infringement claims"?

 6          MR. PLATZER:  If all we are doing is deleting the

 7   subheading, I agreed to that with Mr. Lafayette before we began

 8   this discussion, so, yes.

 9          THE COURT:  All right.  We'll delete it.

10          Anything else with respect to the charge?

11          MR. LAFAYETTE:  On the vicarious liability standard,

12   your Honor, I believe there's a typo that we wanted to correct.

13   I'm trying to find where the vicarious liability standard is.

14   It starts on page 25, line 6.  It's page 25, line 10 in my

15   charge.

16          THE COURT:  Why don't you just read it since I can see

17   that we're working off slightly different versions.  I'm behind

18   the times as usual.

19          MR. LAFAYETTE:  Okay.  It's on the line which begins

20   with "Infringing material acts as a 'draw' to attract

21   subscribers..."  Do you see that line? "Draw" is in quotes.

22          THE COURT:  Okay.  I've got it.

23          MR. LAFAYETTE:  It should be-- that line has

24   defendants' business.  It should be defendant's instead of the

25   apostrophe "s."

E3HBCAP1                    Trial

```
 1                THE COURT:  Okay.
 2                MR. LAFAYETTE:  The other thing I want to get
 3      clarification --
 4                THE COURT:  So it just should read "to attract
 5      subscribers to defendants' business."
 6                MR. LAFAYETTE:  No, no.  Apostrophe "s."
 7                THE DEPUTY CLERK:  We fixed it.
 8                THE COURT:  We fixed it.  We're fixed.
 9                MR. LAFAYETTE:  Okay.  And the only other point,
10      really, of clarification is we had raised at the charging
11      conference in two places to have an instruction with respect to
12      Aereo.  And I know your Honor said-- I think we had left it
13      that you would consider it.
14                Since it's not in here, can we assume that that's
15      rejected?
16                THE COURT:  It's not in here, but it can be put in
17      here I think is the way I left it.  If there's an argument-- if
18      Mr. -- no.  I think it's out because it's confusing and
19      misleading, in my view.  I mean, it depends on whether each
20      website had a single master recording copy or not.  And that's
21      going to be very hard to explain so I don't think it belongs in
22      the charge.
23                MR. LAFAYETTE:  I think that's all we have, your
24      Honor.
25                THE COURT:  All right.
```

E3HBCAP1                    Trial

1              MR. PLATZER:  Your Honor, the one request we would

2     make is that on page 25, the vicarious liability instruction,

3     line 9, where the instruction reads "The direct financial

4     benefit does not need to be substantial in proportion to a

5     defendant's overall profits," we would request that the

6     addition of the words, comma, "nor need financial benefit be

7     actually realized" in accordance with the Court's holding on

8     page 17 of the reconsideration decision where that point was

9     litigated.

10             The language from the Court's opinion is quoting the

11    *Napster* decision that direct financial benefit does not require

12    earned revenue, so long as the defendant has economic

13    incentives for tolerating unlawful behavior.

14             MR. SACKS:  Your Honor, we've said many times we do

15    not believe that's the law of this circuit under *Shapiro* and

16    *Gershwin*.

17             THE COURT:  Mr. Platzer, I'm going to decline to give

18    that additional charge.

19             Anything else?

20             All right.  We'll circulate copies of the verdict

21    sheet in paper form to you so that you have it and we'll ship

22    off electronically straight away, a copy of the jury charge as

23    it now stands amended on the record here.  And we'll get you

24    paper copies of that too.

25             Mr. Bart, have you made any final decision with

E3HBCAP1                    Trial

 1   respect to how you'd like your time allocated?

 2              MR. BART:  Not by the minute, your Honor.  As I was

 3   going through it, my initial remarks are longer than I thought

 4   they would be, so I think it will probably be closer to an hour

 5   and then 15 minutes of rebuttal.

 6              THE COURT:  All right.

 7              MR. BART:  That may vary within five minutes.

 8              THE COURT:  Okay.  Well, then let's say at 55 minutes

 9   shall I give you --

10              MR. BART:  That's fine.

11              THE COURT:  Okay.

12              MR. BART:  But I trust that it's my own risk and if I

13   run over in the first, it just comes off my back end, right?

14              THE COURT:  Yes, that's fine.

15              MR. BART:  Okay.  Great.

16              MR. LAFAYETTE:  Your Honor, I do not think we resolved

17   the unfair competition claim charge; that we had sent in some

18   slightly different competing languages with the corporate

19   officer unless that came out as part of your Honor's ruling

20   about corporate officer liability.

21              THE COURT:  I'm using the plaintiffs' on unfair

22   competition with a few revisions.

23              MR. LAFAYETTE:  Okay.  Are we going to get a copy of

24   that before it goes to the jury?

25              THE COURT:  I took out-- for example, I thought that

E3HBCAP1                    Trial

1    the plaintiffs' charge was closer to the law, but I took out

2    the word "inspire," because I thought that that, Mr. Platzer,

3    was a bridge too far.  Okay?

4              MR. PLATZER:  Fair enough, your Honor.

5              THE COURT:  Anything else?

6              MR. PLATZER:  Your Honor, I was going to inquire, with

7    respect to the charts that the parties submitted this morning,

8    I know with regards to artists and tracks listed, and what's

9    mentioned and not mentioned during the trial, does the Court

10   intend to provide those to the jury in any form?  We were

11   working on those through the night and, of course, this

12   morning.  We realized that there were a couple of errors in one

13   of the charts that we would want to correct if they're going to

14   be used for some purpose.

15             THE COURT:  At this juncture it's not my intention to

16   provide that to the jury, but I suspect that the jury may well

17   request such information early on in their deliberations.  And

18   as I was looking at all of this yesterday, I was trying to

19   think of a way to make it simpler.  I think that the task that

20   we're presenting the jury with is so daunting that I can't

21   predict how deliberations are going to go.

22             I think that the defendants' charts with the extra

23   columns breaking out vicarious liability and contributory

24   liability are ones that I will adopt for the jury

25   deliberations.  So we'll have to make copies of all of the

E3HBCAP1                    Trial

1    charts.  I let the jurors all take a verdict sheet with them

2    into the jury room, and I'm going to give each of them a set of

3    all the charts.

4             MR. PLATZER:  Your Honor, the parties struggled with

5    the same issue regarding the complexity of the instructions.

6    And the difficulty, as we expressed to the Court, was that

7    because some works recur across different categories, at the

8    end of the day the parties need to know how many-- we need the

9    works the jury has found liability on.  And we weren't able to

10   figure out how, other than by giving them the option of

11   checking charts, would we be able to deduplicate at the end and

12   actually count the number of infringements.

13            That was what we were struggling with in coming up

14   with these instructions, which proved to be a very challenging

15   task as the Court has realized.

16            THE COURT:  I haven't done the math, but how many

17   thousands of answers are you asking the jury for?

18            MR. PLATZER:  Well, your Honor, it's certainly our

19   expectation, given the nature of the evidence and arguments

20   presented at the trial, that the jury would never need to

21   actually resort to those charts.

22            THE COURT:  But if they check the "some" box...

23            MR. SACKS:  It's over 20,000, your Honor.  Because if

24   there's two thousand in suit and 11 columns on the big chart,

25   we're at least at 20,000.

E3HBCAP1                    Trial

```
 1          THE COURT:  Should I leave the month of March on the
 2   verdict sheet?  I'm going to live in hope.
 3          MR. SACKS:  I did the same, your Honor.  When I got it
 4   from Mr. Platzer, it said "[blank] 2014" and I decided we'll go
 5   for March.
 6          THE COURT:  All right.  Anything else?  Let's take a
 7   short recess.  I'll get these papers turned around to you and
 8   we'll look forward to counsel's closing arguments.
 9          (Recess)
10          THE COURT:  The jury is all here.  I think what we'll
11   do is we will take literally a five-minute recess between each
12   closing argument, but a real five minutes, because I'd still
13   like to charge them before they take their luncheon recess.
14          All right.  Let's bring in the jury.
15          I thought all the jurors were here, but I'm wrong
16   about that.
17          (Pause)
18          (Continued on next page)
19
20
21
22
23
24
25
```

1          (In open court; jury present)

2          THE COURT:  Everyone may be seated.  Good morning,

3    members of the jury.

4          THE JURY:  Good morning, your Honor.

5          THE COURT:  Members of the jury, we're coming to one

6    of the concluding phases in any trial:  Closing arguments.

7    Remember what I told you at the beginning of the trial:

8    Closing arguments are not evidence.  They're arguments about

9    what the lawyers believe has been proved or not proved in the

10   course of this case.

11         You're going to hear first from plaintiffs' counsel

12   and then we're going to take literally a five-minute recess and

13   then you'll hear from defendant's counsel and then we'll take

14   another five-minute recess and you'll hear a brief rebuttal

15   from plaintiffs' counsel.  And we'll see where we are at that

16   point in time.  All told, these arguments should span about two

17   and a half hours.

18         So, of course, I hope that you all had a relaxing and

19   enjoyable weekend and we're ready to get down to business.

20   Even though it's St. Patrick's Day, we're ready for business.

21         So at this time, members of the jury, I ask that you

22   give your undivided attention to Andrew H. Bart, Esquire, as he

23   delivers his closing argument on behalf of the plaintiffs.

24         MR. BART:  Thank you, your Honor.  Thank you, ladies

25   and gentlemen, of the jury.  Thank you for your time, your

E3HBCAP1                          Trial

1    obvious attention, your punctuality, and your interest in the

2    case.  And happy St. Patrick's Day, although I don't see a

3    tremendous amount of green in the crowd.

4         I'm sure that there have been times over the last

5    three weeks when you've wondered whether you'd ever see this

6    day, whether you'd ever see the end, but here we are.

7    Hopefully you found it interesting.  You've seen quite a lot.

8    I'm going to tell you what the plaintiffs believe that we have

9    proved.  At its most basic level, the evidence shows that

10   MP3tunes was a fully integrated music company featuring

11   lockers, downloading, sideloading, song indexes, specialized

12   search software and user friendly tables of songs.  In short,

13   one of the most complex music sites in the world and,

14   shockingly, one that had no licenses for any of its content.

15        Aside from the handful of artists who were on their

16   independent music store, no artist, composer, record company or

17   publisher had any agreements with MP3tunes and none of them

18   received a penny from its operations.

19        (Continued on next page)

20

21

22

23

24

25

1          MR. BART:  (Continuing)  How is that possible?

2     Because the defendant, Michael Robertson, lives in a world

3     where the guiding principle is that any content he can find on

4     the Internet that is not locked down is free for him to use as

5     he sees fit, with no license and no compensation.  It's a

6     morality, if one can call it that, that doesn't exist anywhere

7     in this society, where ownership of property is the cornerstone

8     of our economy.

9          Yet it forms the basis for everything that Robertson

10    has done for the last 20 years and has made him a fortune many

11    times over.  Even when his last major music venture was found

12    guilty of copyright infringement based on similar conduct in

13    this very courthouse 14 years ago, Robertson scooted away with

14    over $150 million worth of cash.  In this case, you have the

15    opportunity to tell him that he needs to play by the same rules

16    that all of us play by:  We get permission before we use other

17    people's property.

18         You, the jury will have the opportunity to finally

19    tell him that he can't create businesses based on the

20    unauthorized use of other people's property, no matter how

21    smooth and practiced his explanations are.

22         But before we get to the story at hand, let me remind

23    you the building blocks that we've heard from the witnesses

24    from the various plaintiffs that may seem basic after your

25    crash course in the music industry, but I'll try and be brief.

E3HKCAP2                    Summation - Mr. Bart

1            You've learned that every digital music file consists

2      of two copyrights, the rights to a song, which are generally

3      owned by a music publisher, and the rights to a recording of

4      that song, owned by record labels.  You've learned how record

5      companies and music publishers enter into agreements with

6      digital companies providing services very much the same as what

7      was offered by MP3tunes without authorization.

8            You've learned about different digital formats,

9      particularly the difference between files protected by DRM and

10     files like MP3s, which have no copy protection; and you have

11     gotten a little bit of a course in the history of the music

12     business from the period from 1997 to 2008; how the music

13     industry was confronted by the rushing wave of technology, that

14     overwhelmed it with digital files and piracy; how the industry

15     reacted cautiously with this new technology and didn't even

16     authorize the sale of digital files until 2003; how the

17     industry's first clearly defined digital phase, from 2003 to

18     2007, was marked by DRM protection and a continued distance

19     from the MP3 format; how EMI led the way to the DRM-free era

20     and tried to figure out a way to compete with free, both in

21     licensing and marketing; and you have learned a lot about the

22     principal player in this case, Michael Robertson.

23           When you strip away all the explanations and

24     digressions, one thing is clear:  Robertson is a man who has

25     repeatedly demonstrated his willingness -- no, his appetite --

E3HKCAP2                    Summation - Mr. Bart

 1    for playing outside the rules.  For nearly 20 years he's made a

 2    career and a fortune by using other people's property without

 3    compensation as the basis for his various businesses.

 4           At the very beginning of this case, Judge Pauley told

 5    you that your common sense and experience would be the tools

 6    that would help you resolve the disputed issues of fact in this

 7    case.  That experience and the detailed factual record before

 8    you will help you decide what kind of man he is and why he did

 9    what he did, because you are the arbiters of fact in this case.

10    And there are so many facts before you, but they tell a

11    consistent and clear story, and that's what I'm going to talk

12    to you about, that consistent and clear story.

13           During this trial, you've seen that the MP3tunes

14    websites were Robertson's personal creations and part of his

15    calculated plan to get market dominance in the music industry

16    through the use of infringing content.  But that behavior and

17    that plan had roots that went back over a decade before

18    MP3tunes.

19           When we first meet him, he is the CEO of a company

20    called FileZ in the mid-'90s.  By his own admission, FileZ was

21    a company based on a software product that searched private

22    computer servers for unprotected files and created an index of

23    links where users could go and click on the link and get a copy

24    of all those unprotected files.  Does that sound a lot like

25    Sideload?  Well, it should.  Robertson was building a business

 1    by exploiting other people's property without authorization.

 2    He will argue, as he has in this case, that everything on the

 3    Internet is free and that if you don't lock it down, he can

 4    simply take it without permission.  That may be Robertson's

 5    law, but it's not the law of any civilized society.

 6           While at FileZ, he became aware of the existence of

 7    MP3 files and realized they were the key to his future.  It was

 8    almost too easy, because they were at their core unlocked files

 9    that he could grab easily and use as the basis for a business.

10    So he bought the MP3.com name and became the CEO of the

11    company.

12           When it first started, it was a website promoting and

13    selling recordings of independent bands.  But that was never a

14    big enough dream for him.  So he made the decision to expand

15    the business to try and become what he called a music service

16    provider.  His idea was to convince a huge user base to use his

17    lockers to store their music.  He believed that once he had

18    sold enough lockers, that any business wanting to connect to

19    music consumers had to go through him, whether it was record

20    companies or the companies that make the players for the music.

21    He believed that he could convert virtually all the value of

22    recorded music into his own pocket by controlling how it would

23    be transmitted.  In his view, the creators and the owners get

24    nothing but the transmitter got it all.

25           How did he plan to get that big user base?  By

1    attracting users with infringing content.  At MP3.com, he

2    illegally copied tens of thousands of CDs as the way to lure in

3    customers.

4         Why did he take that obvious risk of infringement?

5    Because one of his core principles is that when you're running

6    a startup business, it's important to get an uncatchable

7    advantage in the market before competition appeared.  And he

8    would do anything, anything, to get that uncatchable advantage.

9    And so at MP3.com, he decided to use the infringing content to

10   grow the business.  His business was actually doing very well

11   before he did that.  The business was worth about $2 billion at

12   the time of its initial public offering, and his share was

13   worth about $700 million.

14        But he wanted more.  He wanted the uncatchable

15   advantage.  So he began infringing and, not surprisingly, he

16   was sued.  It didn't deter him.  He publicly bragged that if he

17   won the case, the entire value of the recorded music industry

18   would flow into his business and fantasized about what it would

19   be like to be a trillionaire.  Make no mistake, these were not

20   plans or decisions made by committee; this was the Michael

21   Robertson Show.  He admitted he made every key decision at

22   MP3.com, while comparing himself to Steve Jobs and Bill Gates.

23        In the MP3.com case, Robertson made the same arguments

24   of consumer choice and Internet freedom that he's making here.

25   But the Court had little difficulty finding that MP3tunes was

E3HKCAP2                    Summation - Mr. Bart

1    liable for infringement and while he slithered away with

2    $150 million, he never lost the hunger for the power and

3    celebrity that he had.

4         After the collapse of MP3 in 2001, Apple took a run at

5    this but was one step smarter.  Steve Jobs also understood that

6    the party that controlled the distribution of music would get a

7    huge share of the pie, but he didn't try to steal it; he

8    licensed the content from its owners, he made sure that artists

9    and composers were paid, he made the world dependent on his

10   hardware, the iPod, and succeeded wildly.

11        By early 2005, Robertson was focused on other start

12   newspaper technology companies that would net him over

13   $50 million more over the next five years, but he still had an

14   appetite for creating a music company.  So he started an

15   independent music store, calling it MP3tunes and chose a former

16   independent artist from MP3.com, Emily Richards, to run the

17   business -- to run the store.

18        But that wasn't enough for Robertson.  He had been at

19   the pinnacle with MP3.com and it frustrated him to see Steve

20   Jobs and Apple up there where he used to be.  So being the man

21   he is, his first thought was to hack the iTunes store and to

22   divert traffic to his own store.

23        So he hired a brilliant young man known for reverse

24   engineering the iTunes store to come up with a wholly

25   unauthorized interface for the iTunes store.  The project was

E3HKCAP2                        Summation - Mr. Bart

1    called Bad Apple, and the young man was Cody Brocious, who you

2    met during the trial.  Bad Apple was one of the many examples

3    that unmasked the core elements of Robertson's personality --

4    hacking a competitor and trying to hide the fact that he was

5    the one doing it, so that he could appear as a choir boy

6    despite his dirty tricks.

7             Three quick notes about Bad Apple:

8             First, while Robertson tried in this case to justify

9    hacking the store, such an attempt to reverse engineer the

10   MP3tunes site would have been a violation of MP3tunes' own

11   terms of use.  So Robertson knew full well how wrong this

12   behavior was.

13            Second, when confronted with the obvious immorality of

14   doing this, Robertson made the bald assertion that he spoke to

15   Steve Jobs about the issue.  In fact, whenever he was

16   confronted with his bad behavior in this case, he somehow

17   managed to remember hearsay conversations with important people

18   from Apple or Amazon or Warner or Spin, who allegedly forgave

19   him for his multiple transactions.  The problem is, there's no

20   documentary record of any of those conversations, and there's

21   every reason to simply believe he made them all up.

22            Third, the Bad Apple project convinced him that

23   hacking the iTunes store was really of very little value unless

24   he had a bigger platform than the independent music store, and

25   that's the pivotal moment in our story.  At that point, in the

E3HKCAP2                      Summation - Mr. Bart

1    summer of 2005, Robertson alone decided to ditch the music

2    store and take a second stab at creating the music service

3    provider he had tried to establish at MP3.com.

4          Recognizing that apart from Apple no one had really

5    achieved any market position in the field of lockers since he

6    left MP3.com, he saw a great opportunity.  He still believed

7    that the party that controlled the distribution would control

8    the market.  Don't be deceived for a moment by the modesty of

9    the launch of MP3tunes.  Robertson had huge dreams and was

10   shooting for nothing less than the dominance he had had before.

11   He described the Oboe locker and his most ambitious technical

12   project of his entire career.  More importantly, he still

13   believed he had could still create that multi-billion-dollar

14   business that he had at MP3.com, but, as before, he knew that

15   everything in this plan depended upon being the early mover in

16   the market, getting that large early market share.  As he told

17   his team, "As the CEO of MP3tunes, my job is to predict where

18   the music locker business will trend and be the first to build

19   an uncatchable lead on the eventual competition."

20         And that brings us to Sideload, which was his early

21   mover advantage and is the reason that we're here today.

22         When he introduced the idea -- and he introduced it --

23   Robertson described it as a viral tool for growing the locker

24   service.  It was without question the largest driver of traffic

25   to the MP3tunes locker.  It was a carefully integrated

E3HKCAP2                      Summation - Mr. Bart

 1   infrastructure intended to drive traffic to the locker site

 2   where users could be upsold to purchase premium lockers.  It

 3   started with the Sideload plug-in.  The plug-in was designed to

 4   copy any file that had an MP3 extension that was anywhere on

 5   the Internet.

 6          Tellingly, the plug didn't distinguish between

 7   websites.  Any site that had an unprotected MP3 was a target.

 8   It didn't matter whether it was a file-sharing site, whether it

 9   was a site that was set up for only streaming and not

10   downloading; the plug would be able to get it.

11          And if your software device copies everything, what

12   will you get?  Well, in 2005, illegal file-sharing had run

13   amuck and there was online piracy, everywhere.  When Robertson

14   created the plug-in, what did he think was going to happen if

15   the plug operated as a giant vacuum cleaner sweeping up music

16   that was posted all over the Internet?  He was going to get a

17   lot of unlicensed major-label content.  And that's exactly what

18   he wanted to get.

19          Then he created the Sideload website, which was a

20   music site offering an index of available music links created

21   from prior sideloads.  The index allowed users to get unlimited

22   copies of unauthorized sound recordings from one central

23   location without ever having to leave the Sideload site.  The

24   website also had a music player to listen to all of those files

25   and lots of features to make customers interested in browsing.

1              In essence, he created a giant infrastructure that

2     took content created on file-sharing sites, content delivery

3     sites, personal websites, college student sites, all over the

4     web and consolidated them as a giant on-demand music service

5     that provided free music to potential customers and benefited

6     nobody but him.  Any one of these sites on its own might have

7     been a small time infringer, but put them all together like

8     Robertson did and they became a giant engine of infringement.

9              Given the importance of the site to obtaining that

10    early market advantage, Robertson's sideloaded himself and

11    encouraged his executives to do so also.  In Plaintiffs'

12    Exhibit 90, which you've seen, Sharmaine Lindahl provides the

13    entire MP3tunes team with a list of sites featuring free MP3

14    files, quote, as requested by Michael, for sideloading

15    purposes.

16             Ms. Lindahl also testified directly that Robertson

17    encouraged employees to sideload for the benefit of the

18    company.  While Robertson tried to explain this away by saying

19    it was referring to the plug-in rather than the website, this

20    exhibit is damning, no matter which way you look at it.  It

21    seems to me undeniable that the email was talking about the

22    website which was being designed at the very time the email

23    went out, but even if it only related to the testing the

24    plug-in, it shows you the types of sites that Robertson knew

25    would be used for sideloading when he had people use the

E3HKCAP2                    Summation - Mr. Bart

1    plug-in.  And that's why he got pirate sites and torrent sites

2    and illegal sites like the WebJay playlist site, which you've

3    seen in evidence here.  While Robertson testified under oath

4    that the Sideload site was a vehicle to obtain authorized

5    promotional download, his email demonstrates his understanding

6    that the site would be used to link to illegal sites.

7        Robertson knew the copyright risks of this endeavor,

8    and Emily Richards, among others, testified that she strongly

9    encouraged him not to do it, because it raised copyright

10   exposure.  But Robertson made all the final decisions at

11   MP3tunes, and he was happy to cross the line of legality to try

12   and grow his business.  With millions at stake and his prior

13   history, this was a small gamble.

14       If it wasn't for his desire to get an early-mover

15   advantage, he would never have done this.  Potential partners

16   like Philips and Best Buy wouldn't do business with him because

17   of it, recorded companies wouldn't do business with him, but

18   that was all an irrelevance.  He had no interest of intention

19   of getting a license from content owners anyway.  Robertson

20   doesn't even contest his reason for creating Sideload.  All he

21   does is make irrelevant economic arguments.  He argues he never

22   made any money from Sideload but he never intended to.  What he

23   cared about was that Sideload would be the draw that would lure

24   in thousands and thousands and hundreds of thousands of free

25   lockers to attract potential users.

E3HKCAP2                       Summation - Mr. Bart

1          He also argues that MP3tunes as a whole made no money,

2     but he intended to make as much or more money from MP3tunes as

3     he did from MP3.com, and he intended to get there using the

4     infringing content from Sideload as the draw from those new

5     consumers.  And also, as you'll hear from the judge later,

6     having money coming in is not the only way that he can be held

7     liable here.  He was a contributory infringer and is

8     responsible on that basis as well.

9          But most startups are unprofitable, but if they turn

10    the corner, they can become wildly profitable in a hurry, as

11    MP3.com and Facebook and dozens of other Internet companies had

12    proven.  Had he succeeded and signed up millions of users, he

13    could have taken the company public, gotten investors or sold

14    the company.  That's enough to show his financial interest in

15    the infringement.

16         But have no doubt, he shot for the moon.  And had he

17    succeeded, the infringing Sideload website would have been a

18    primary reason for that success.  But he didn't succeed, and

19    now he's responsible to answer for the infringements that he

20    willfully authorized to try and jumpstart the business.

21         The final factor that you should think about in

22    evaluating this website is when it was rolled out.  As you

23    heard, the digital music world went through various different

24    phases in the last decade.  Before 2003, there was no

25    major-label music available for purchase in any digital files.

E3HKCAP2                    Summation - Mr. Bart

1    Between 2003 and 2007, the industry made music available only

2    in DRM-protected format, and it was only in 2007 and

3    thereafter, led by EMI, that they started to put their toe in

4    the water of MP3 files.

5         Sideload was developed and released in that second

6    period, so distribution of major-label content on MP3 files was

7    extremely rare, and anybody who built a business based on those

8    files knew for a fact that the major-label files it would be

9    getting were infringing.

10        Throughout this case, Robertson has alleged that his

11   business was based on major-label content gotten from music

12   blogs, but there is no evidence in this case that any

13   major-label content was available on music blogs before 2007.

14   Let me say that again:  There is no evidence in this case that

15   any major-label content was available on music blogs prior to

16   2007, when the major labels started to drop DRM.  The entire

17   argument is based on events that took place over a year after

18   Sideload was released.  So this is Robertson using later events

19   to try and excuse earlier conduct, and is the major part of

20   this case.

21        In 2007, Robertson negotiated a deal that he expected

22   to catapult his small startup business into the success he had

23   hoped for, a deal with Warner Music that would enable him to

24   sell major-label content in both CDs and digital file format.

25   He thought the deal would immediately resulted in 8 to

E3HKCAP2                    Summation - Mr. Bart

1    10 million dollars of venture capital investment and transform

2    his business from 12 people operating on a shoestring to 25

3    people or so with pay on scale.

4           But, as both Cody Brocious and Emily Richards

5    testified, Robertson tried to be too clever with Warner and

6    concocted an interpretation of the contract to allow him to

7    throw aware the CDs and only ship the digital files and thus

8    become an MP3 store for Warner content.  That destroyed the

9    relationship.

10          But you don't have to rely on Cody or Emily's

11   testimony; you have Robertson's words as to his intents and

12   motives:  We actually have a tricky way of presenting it so it

13   will appear to the consumer that they can buy the MP3s only,

14   basically we never ship the CD.  Our contract says that the

15   MP3s have to be with a CD purchase, but it doesn't say anything

16   about having to actually ship them the CD.

17          Ultimately, Robertson's decision to cheat was the

18   ultimate demise of MP3tunes.  As Emily Richards put it in her

19   resignation letter, Our two biggest partners have explicitly

20   stated they will not work in any closer capacity with MP3tunes

21   unless you are out of the picture due to the negative attention

22   you attract to yourself, your litigious nature and the risk you

23   poses to their businesses.  In my most recent discussions, you

24   have been referred to by our partners as a loose cannon,

25   badgering, and someone that may turn on those closest to him.

1          After the collapse of the Anywhere CD deal, EMI served

2    a takedown notice on MP3tunes pursuant to the DMCA.  While

3    Robertson has tried to portray himself as a victim looking for

4    peace, the facts show he was very aggressive in responding to

5    this takedown notice.  First, while he removed the sideload

6    links from the Sideload website, he didn't remove the

7    infringing files from the MP3tunes server.  This Court has

8    already determined that those actions or omissions constitute

9    copyright infringement.

10         Second, while Robertson testified under oath that he

11   didn't want a fight and was looking for a nonlitigation

12   solution, that was a demonstrable lie.  In fact, he responded

13   to the takedown notice by filing suit against EMI in San Diego,

14   alleging fraud.

15         I'm sure you'll remember that during his questioning

16   from Mr. Sacks, when he recited a chronology of events that

17   followed the takedown notice, there was something missing.  The

18   something missing, because he was trying to portray himself as

19   a innocent peace-loving victim of the process, was the fact

20   that he brought two suit two weeks after the notice for fraud

21   in San Diego.

22         And what was the basis for that allegation?  Out of

23   the hundreds and hundreds of infringing files on the takedown

24   notices, seven of them came from music magazines, and he used

25   that basis of alleging fraud.  Does that sound like someone

E3HKCAP2                    Summation - Mr. Bart

1    wanting a resolution?  Of course, whether or not those

2    magazines were even authorized to make those seven files

3    available, Sideload didn't have any such right to do it -- they

4    had no licenses -- but Robertson did what he's done for the

5    last six years:  He ignored the infringement of the Sideload

6    operation, which is the issue before you, ladies and gentlemen

7    of the jury, and tried to refocus the case to focus on EMI.

8            The Court in San Diego dismissed that lawsuit.  This

9    Court dismissed similar claims when they were brought here.

10   You shouldn't be fooled by that attempt either.

11           And his attempt to use infringing content was not

12   limited to Sideload.  It was also about cover art.  The

13   evidentiary record conclusively demonstrates that MP3tunes and

14   Robertson pulled and stored copyrighted album art from Amazon,

15   and that the album art was provided by default to users who

16   were listening to the music.  Again, the decision to obtain and

17   display the art was his decision.  Not only did he make every

18   substantive decision as to the policy and direction of the

19   company, but documents reflect that this decision was part of

20   his ongoing continuous attempt to compete with Apple and

21   iTunes.

22           Needless to say, Robertson wouldn't think of getting a

23   license to use EMI's cover art even though you heard from Mark

24   Piibe that there were licensed sources available to make that

25   product available under license.  But Robertson saw the ability

E3HKCAP2                    Summation - Mr. Bart

1    to cheat again using the Amazon associates program.

2            And you've seen you've heard the testimony from Ann

3    Tarpey.  You've seen the agreement.  Amazon made images

4    available to associates so they could display them as

5    advertisements and direct traffic to Amazon.  But it didn't let

6    the associates make and store their own copies.

7            But, just like FileZ, just like Sideload, Robertson

8    operated with the same philosophy -- if it's not locked down,

9    I'm going to take it.  MP3tunes may not have been allowed to

10   copy the images on Amazon's system but there was no technical

11   impediment from their doing it, and that means Robertson did

12   it.

13           So what he did was used the associates program as a

14   Trojan Horse to get access to the Amazon server, and once he

15   got it, he raided those servers to build his own cover library

16   without permission from Amazon or anyone else.

17           Moreover, the Amazon license only permitted the use of

18   cover art to drive traffic to Amazon.  But Emily Richards

19   testified that the album art was intended to enhance the user

20   experience and it was being offered to people who already owned

21   the music.

22           Robertson alleges, without evidence, that some album

23   art might have come from users; however, the system was set up

24   by default to pull the art from Amazon.  So a user would have

25   had to manually override that setting to add his own art.

E3HKCAP2                    Summation - Mr. Bart

1    Moreover, the evidence put forth by Dr. Horowitz in Plaintiffs'

2    Exhibit 22 resolves any doubt.  MP3tunes has dozens, if not

3    hundreds, of identical copies of the same image, which tells

4    you where they came from.  They didn't come from users; they

5    came from Amazon.

6            So the first decision before you, ladies and

7    gentlemen, relates to whether Michael Robertson is personally

8    liable for MP3tunes' infringement of EMI's copyrights by

9    responding to the takedown notices by removing the content from

10   the Sideload site but not from the lockers.  As I mentioned

11   before, and as you've heard before, this Court has already

12   decided that MP3tunes was liable for that.

13           Robertson in this case tries to pretend that it's

14   somehow unfair for him to be held responsible for the actions

15   of his corporation, but there are two theories of law that a

16   Court will instruct you on later -- contributory liability and

17   vicarious liability -- that provide the basis for holding him

18   responsible.

19           Contributory liability exists when there's knowledge

20   of the infringing conduct, coupled with behavior that induces,

21   causes or materially contributes to the conduct.  That's

22   Robertson.  He not only contributed to the conduct, he made all

23   the relevant decisions.  He was the CEO, sole director,

24   ultimate decider.  He also blogged about the services, spoke

25   about them at conferences and tried continuously to promote the

E3HKCAP2                    Summation - Mr. Bart

1    infringing services.

2         Vicarious liability consists of the right and ability

3    to control the infringing conduct and the financial benefit.

4    There's no question that Robertson could control the conduct --

5    he controlled everything -- and the financial interest just

6    simply needed to be the draw of the infringing conduct in

7    creating future profits using the lure of free music in driving

8    locker sales.

9         Both of these standards are easily satisfied.  In all

10   of his companies, Robertson was the decider.  At MP3.com, he

11   made every single key decision at the company.  The same is

12   true here.  In my initial questioning of him two weeks ago, we

13   established that he controlled every technical decision as to

14   strategy, he controlled all marketing decisions, he controlled

15   all legal and copyright decisions.  In fact, he admittedly

16   instructed Emory Richards on how to proceed on copyright policy

17   in general and on takedown notices specifically.  So he was the

18   one directing this very act of taking down the files from the

19   Sideload index but not from the servers.

20        And he stood to benefit enormously if the plan

21   succeeded.  His trusts, which benefited him and his family,

22   owned the overwhelming majority of the company.  If his plan

23   paid off and the infringing content attracted the company's

24   user base to the point that he could get venture capital

25   funding or do another IPO or sell the company, he was going to

E3HKCAP2                    Summation - Mr. Bart

1  win, and he personally was going to win big.

2          To allow him to walk away from the infringements he

3  personally directed and caused, merely because he created a

4  corporate shell, would be the ultimate iniquity.  It is for

5  that very reason that the law provides you with these means to

6  address his liability.

7          Finally, this Court will instruct you that Robertson's

8  endless, endless arguments about promotional downloads after

9  2007 have nothing to do with this claim and are wholly

10  irrelevant to it.

11         Let's turn to cover art.  There's no issue as to

12  whether EMI owned the copyrights in the cover art at issue.

13  That issue has been resolved by stipulation.  There are 306

14  pieces of cover art at issue here, and they are listed in the

15  parties' ownership stipulation.  You can see the images

16  themselves at Plaintiffs' 22.  Robertson's liability for these

17  infringements is similar to his infringement on the takedown

18  works.  He directed the decision to grab the cover art and

19  stood to benefit from the album art, attracting more users.  As

20  with the takedown notices, promotional downloads have nothing

21  to do with this claim and are irrelevant to it.

22         The next claim is a claim for unfair competition.  And

23  this is a good theory for analyzing what Robertson and MP3tunes

24  did.  Is he responsible for the fact that MP3tunes used EMI's

25  content without authorization, that it competed with EMI in the

E3HKCAP2                    Summation - Mr. Bart

marketplace and that MP3tunes acted for commercial benefit or

deceive the public and acted in bad faith?  It satisfies all of

those tests.  There's no question it used its content without

authorization.  They stored it, they copied it, and they played

it.

There's also no question that they competed with EMI

in the marketplace, because they provided an alternate avenue

for users to obtain EMI's copyrighted content without obtaining

it from EMI.

Mark Piibe testified that such activities interfered

with EMI's attempts to digitally license its content, impacted

its revenue its efforts to develop a digital market and its

attempts to control the use of its property.

On behalf of the publishers, Michael Abitbol provided

you with the very same testimony and gave you instances of all

the different digital licenses that the publishing parties were

instrumental in creating to help create a new digital

marketplace.

There's also no question that they were acting for

their own commercial benefit; they're making our content

available to sell their lockers.

Moreover, Robertson directly deceived the public.

Remember that in PX 102, the frequently asked questions from

the MP3tunes website, there was a question about whether it was

legal for users to get their music from Sideload.  Robertson

E3HKCAP2                         Summation - Mr. Bart

corrected Emily Richards' answer and simply lied.  The only

correct answer to that question is no.  Sideload had no

licenses to distribute product from any major record labels.

Even if some of the music might have come from legitimate

promotional sources, Sideload wasn't authorized to distribute

them without the user visiting the host site.

          But what did MP3tunes tell their users?  That it was

all legal because MP3tunes was protected by the DMCA.  But

that's intentionally deceptive.  In appropriate circumstances,

the DMCA will protect a website like MP3tunes, but it doesn't

provide any protection for the user.  The user is still liable

for its infringement.  And MP3tunes deceived the public by

telling them that, It was all legal and use our service.

          Finally, there's no question that they were acting in

bad faith.  They set up a carefully structured infrastructure

to scoop up autopsy all the unprotected content on the Internet

without license or consent, to benefit themselves.  They even

directly competed with us after this lawsuit was filed, by

sending out Sideletters about EMI artists and using EMI cover

art to sell their own product.

          The next theory that I want to talk to you about is

the area of executive sideloads.  You've seen the email where

Robertson gave his employees lists of sites to use for

sideloading purposes and invited them to come back if they need

more, and you've heard the testimony of Sharmaine Lindahl that

1    she was aware of projects where people at MP3tunes specifically

2    sought out websites on the Internet to locate files and

3    sideload them into the index for the benefit of the company,

4    not for their own personal benefit.

5            Other evidence confirms this testimony as well.

6    Dr. Horowitz testified that, based on the IP address stored in

7    the MP3tunes' database, that it was clear that these executives

8    sideloaded these tracks and accessed their accounts from inside

9    the office.  And the tracks that they were sideloading were

10   recognizable popular music, exactly the kinds of songs that

11   would benefit the MP3tunes system.  Remember, Lindahl testified

12   that MP3tunes wanted popular tracks to move up the chart so

13   that they'd be more visible to users and attract more users to

14   the site.

15           So you have evidence of Robertson directing MP3tunes

16   executives and employees to Sideload, you have evidence that

17   when they sideloaded, it builds up the index and makes the

18   website more desirable, you have the executives using their

19   accounts from the office and sideloading popular tracks.

20   You'll be able to connect the dots.

21           Remember Robertson's excuse that he didn't ask the

22   executives to sideload these songs?  Well, that's not the

23   issue.  The issue is whether they were sideloading popular

24   music on behalf of and for the benefit of the company.  And

25   what we've seen time and time again is that what was good for

1    MP3tunes is good for Robertson's pocketbook and that he called

2    every shot.

3            Now, we get into a theory called willful blindness,

4    and this is an area of the law that we're all sort of entering

5    kind of stage one -- you may be the first jury that's

6    addressing these issues -- so we're going to address them

7    together.  But basically the notion here is that they knew, and

8    turned a blind eye, to the massive infringements that were

9    going on on their site and specific works that were on their

10   site.

11           So what's the starting point for this analysis?  It's

12   that they set up a corporate policy where they didn't take down

13   or disable any infringing content without DMCA-compliant

14   takedown notices.  You undoubtedly remember Michael Robertson's

15   email stating that corporate policy -- We do not remove songs

16   unless we are presenting with a DMCA compliant request to do

17   so -- and his testimony on my direct examination, unequivocally

18   confirming that policy and confirming that he told Ms. Lindahl

19   how to respond to customer complaints about infringement.

20           So MP3tunes had a corporate supply of willful

21   blindness:  It doesn't matter what the users tell us, it

22   doesn't matter what else is going on, we won't do any unless

23   you send us a DMCA takedown notice.

24           Why?  Because they didn't want to take down anything.

25   This content was important for them in building up their base,

E3HKCAP2                    Summation - Mr. Bart

1    selling lockers, and they were going to do everything in their

2    power to ignore the evidence of what was on that site.

3            Moreover, Robertson confirmed repeatedly that MP3tunes

4    took no steps to investigate the legality of any of the

5    400,000-plus tracks on the site.

6            Indeed, he even brazenly asserted on cross-examination

7    that all unprotected files on the Internet were fair game and

8    that it was the obligation of the link site to lock up all the

9    content it wanted protected instead of his obligation to take

10   down and remove obviously infringing material.  He even

11   admitted that Sideload was premised on the notion that every

12   song on the Internet that was not locked down could be

13   sideloaded into the site and become part of the index.  This

14   assertion reveals the key to this business model:  Everything

15   that's unlocked I can steal, and will.

16           Knowing that this evidence hadn't played well,

17   Mr. Sacks immediately asked Mr. Robertson whether this was a

18   quote-unquote firm policy, and, as they had practiced,

19   Robertson fabricated a wholly inconsistent story of how they

20   were good corporate citizens who monitored content and even

21   invalidated certain domains.

22           How does this fit with his prior sworn testimony on

23   repeated occasions that he believed that all unprotected

24   content on the Internet was free for his own use?  How could it

25   be reconciled with his conceded blindness to consumer

1    complaints that weren't in a DMCA notice or the fact that he

2    never looked to see whether any of it was infringing?  And how

3    can it be reconciled with Sharmaine Lindahl's video testimony

4    that she was instructed and directed to give a stock or canned

5    answer in response to customer complaints of infringement?  And

6    who do you think told her to respond to those questions with a

7    stock answer?

8            The fact is that nothing was ever disabled unless it

9    affected Robertson's bottom line.  As Robertson testified at

10   deposition and trial, domains were only taken down when users

11   were gaming the system.  And what does that mean?  Well,

12   remember Robertson was giving away free lockers with a small

13   amount of storage.  And what he was trying to get was people

14   interested so that they would upload their entire music

15   collections and pay for the premium lockers.

16           And he didn't charge people for the content that they

17   were sideloading in, which tells you a couple of things.  It

18   tells you how important Sideload was to his business model, how

19   important it was for him to build up this infringing index of

20   music to attract other customers.  But there were people who

21   played around with that and took all of their music, put it on

22   a private website and sideloaded it into their lockers.  They

23   didn't have to pay for that.  That's what made Robertson crazy,

24   because it was taking money out of his pocket, and he called

25   that gaming the system.

1          He wasn't interested in protecting copyrights.  He's

2     never been interested in protecting copyrights.  He's the man

3     who built his business on stealing other people's property for

4     the last 20 years.  His real copyright policy was that he would

5     not take down any files without a DMCA-compliant takedown

6     notice and that it was the duty of the link site, not him, to

7     deal with infringement.

8          You should also remember that MP3tunes concededly took

9     no steps to keep track of repeat infringers, and Robertson

10    couldn't remember any instance where a user account was

11    terminated except for sharing a password or one instance of

12    hate speech.

13         Another factor that should be kept in mind, as we

14    consider the willful blindness of the company and of Robertson,

15    is that the company monitored the referral sites regularly.

16    They knew and reviewed where all their sideloads were coming

17    from and they compiled statistics showing the source of all of

18    these sideloads.  There was no need for them to do any

19    investigation.  They were using that content all the time and

20    they were publishing it on their site.  So they knew that there

21    were file-sharing sites there, they knew that there were

22    college student sites there, they knew that there were content

23    delivery sites there.

24         And, by the way, a content delivery site is a site

25    being used by a record company or a publisher as a stage to

E3HKCAP2                    Summation - Mr. Bart

1    provide music to consumers or retailers.  And what basically

2    Robertson did through his plug-in was he ran down the truck and

3    stole it because the back of the truck was open.  This was

4    never something that was supposed to be available for

5    commercial use, but because his tool was able to get it, he had

6    it on the site.

7         It is very powerful evidence of what this business

8    model was about.  It wasn't about promotional downloads.  As

9    we'll see later, promotional download accounts for two percent

10   of everything or less that's on the site.  This is 98 percent

11   stolen file servers, personal site material, and they knew it

12   because they compiled the statistics.

13        And not only did they know it because they compiled

14   the statistics, but they had a commercial service called AMG

15   that would give them all of this information.  They were using

16   it for track and artist information, but that service also

17   provided copyright information.  They didn't want copyright

18   information, so they just threw that away, but it's part of

19   their business model, it was available to them, and it was

20   telling that they decided that they were just going to throw it

21   away rather than use it.

22        So what types of willful blindness are we talking

23   about here?  There are a couple of categories.  The first one

24   deals with The Beatles.  You've heard uncontradicted evidence

25   that The Beatles status as holdouts against digital

distribution was known by everyone in the music business.  Ask

yourselves, would someone as immersed in the economics of the

music business who had spent as much time writing about it and

opining about it as Robertson, really be ignorant of that fact

as he testified under oath?

His unbelievable assertion he didn't know that EMI

owned The Beatles catalogue and thought it was owned by Apple

Corp. has no relevance to this.  That only deals with who owns

it, not in terms of whether he was willfully blind that it was

on his site.  He admitted all he had to do was punch in one

word into the index and it would print out everything that was

there.  Moreover, while he repeatedly was willing to deny

things, even if they were in his documents that we later showed

him, he was unable to deny -- he just simply said he didn't

remember -- whether he used The Beatles as a demonstration tool

when he was showing what Sideload could do to business

partners.

There's no evidence whatsoever that any Beatles track

was available digitally for sale or as a promotional download

prior to 2010.

The second willful blindness category relates to

pre-2007 works.  Remember what I said before:  Robertson has

asserted that his operation was justified due to the large

amount, he said, of authorized promotional materials through

blogs and music magazines on the Web.  However, prior to 2007,

E3HKCAP2                        Summation - Mr. Bart

major record labels only sold digital files in DRM-protected

format because of their concerns about piracy, the use of MP3

files was extremely rare and aberrational.  Thus, when he set

up this service in 2005, he knew full well that it would be

based almost exclusively on infringing MP3 files and

major-label content.

At the trial, despite all of their allegations,

there's no evidence of any EMI promotional downloads being made

available from music blogs or magazines.  Indeed, aside from

two tracks from the South By Southwest Festival and three from

Amazon, neither of which is a blog or music magazine, there's

no evidence of any EMI promotional MP3s being made available

during that time period, despite the fact that Robertson has

been desperately searching for this material for the last six

years.  In short, this is an after-the-fact excuse.

Robertson is hoping that you get dizzy from the number

of exhibits and questions, but as long as you keep the year

2007 in mind, the story is easy to follow.  Prior to 2007,

there are some streams, there were some files sold with DRM,

and virtually no MP3 promotions and none from blogs.  Yet

that's when Robertson created Sideload.

Over a year later, in 2007, when EMI lifted the DRM

restriction, it started exploring the use of MP3 promotions

under carefully monitored programs.  But none of that has any

relevance to the issue of whether Robertson and MP3tunes were

E3HKCAP2                    Summation - Mr. Bart

1    willfully blind when they set up the business in 2005 and '6

2    that there were no MP3 files in major-label works available.

3           The situation is even stronger, if that's possible, on

4    the publishing side.  Mr. Abitbol made it clear that the EMI

5    Publishing plaintiffs never made any promotional downloads

6    available and only agreed to request from labels a handful of

7    times prior to the filing of this lawsuit.  At the end of the

8    day, after hundreds of thousands of music files on

9    Sideload.com, there was one track that was the subject of a

10   promotional download request granted by the publishers, and

11   that track timed out after 30 days.

12          So, being wholly unable to counter the evidence that

13   no EMI content was available in MP3 format during this period,

14   Robertson is left to argue that he had no way to know which

15   songs belonged to EMI or other major labels.  However, remember

16   that they subscribed to and used the AMG database and that that

17   reported the owner and label information to MP3tunes and they

18   just ignored the data.

19          Moreover, MP3tunes isn't some storage provider that

20   just stores whatever files users sent to it.  It's a music

21   storage site that keeps meticulous records of every file that

22   the users upload and makes users tell them the artist and track

23   information.  They knew exactly what songs they had available

24   at all times and when popular recognizable acts like The

25   Beatles and Coldplay and Katy Perry started showing up.  They

E3HKCAP2                    Summation - Mr. Bart

1    knew it.  Of course Robertson is the very man who worked on the

2    Beam-it technology for MP3.com seven years earlier that enabled

3    them to listen to a file and know exactly what album and artist

4    it came from.  His helplessness here is feigned and incredible.

5           He's also going to claim that he couldn't be legally

6    responsible because he needed to conduct an investigation to

7    confirm it.  But if you know that everything from a major label

8    during a particular period is infringing and you know exactly

9    what's on your system and you throw out the electronic data

10   that tells you the copyright and release information, you don't

11   get to make that excuse.

12          The next area I want to talk to you about is the

13   domains that the executives sideloaded.  Remember, willful

14   blindness is about information that comes to your attention,

15   and you know that there are specific infringements out there.

16   In this case, the executives personally sideloaded, they

17   personally went to websites that they could tell, because they

18   were on those websites, contained infringing material college

19   student material, file-sharing material, things along those

20   lines, that placed any reasonable person on notice that it

21   wasn't going to be authorized.

22          And it wasn't something that required an

23   investigation.  The executives visited the sites, they saw the

24   sites.  You don't need to do anything to know that a file

25   storage site or a college student's web page isn't licensed to

E3HKCAP2                    Summation – Mr. Bart

1    be distributing content.  All you have to do is flick the

2    switch and turn off the domain, as both Robertson and Reese

3    testified it was easy to do; just mark it with a negative 1

4    number once you look at the site.  But they didn't do that.

5    They left it up because they wanted the content up.  The

6    business was based on willful blindness because it was

7    important for them to build that user base and to sell their

8    lockers.

9           Finally, there are some websites that were listed

10   many, many, many times on EMI's takedown notices.  It's

11   possible that an otherwise legitimate site might be noticed

12   once or twice, but there comes a point at which it rises beyond

13   that level.  We submit to you that a reasonable point for that

14   is ten times.  You may or you may not agree with that.  There's

15   no law on the subject -- as I said, we're all starting on this

16   together -- but you should ask yourselves, how many times does

17   something have to be noticed in a takedown notice before

18   somebody is required to respond to it?  There must be some

19   number.  Is it a thousand?  Is it five?  Is it ten?  You, the

20   jury, can make that determination.  We provided you the data

21   from which you could make it.

22          Now, that you know our claims, what's Robertson's

23   response?  Well, his first and most obvious one is to blame the

24   plaintiffs.  From the time he got his first takedown notice,

25   Robertson decided to double down and try and make this a fight

E3HKCAP2                    Summation - Mr. Bart

 1    not about the infringement on his service but about our

 2    promotional practices.  I told you in my opening that Robertson

 3    would try to highjack this trial and focus on that subject.

 4    And that prediction has certainly come true.

 5           You've heard Robertson's case, and it must have struck

 6    you that so little of it attempted to provide a justification

 7    for his own licensed music source and so much of it was just

 8    based upon arguing that EMI's attempt to survive in this

 9    DRM-free world freed him to do whatever he wanted to with our

10    content.

11           And it must have been very difficult to even

12    understand what all of these dozens of exhibits and hours of

13    testimony related to.  Well, the fog is about to finally lift.

14    Prior to this trial, the Court decided that promotional

15    downloads don't constitute an abandonment of copyright or an

16    implied license for other parties to use our works; in other

17    words, EMI lost none of its rights in its copyrighted work by

18    engaging in promotional downloads.  Moreover, it found that EMI

19    tied its promotions to authorized websites in exchange for a

20    marketing message or data capture, which is exactly what you've

21    seen here.

22           Therefore, the Court decided that Robertson's

23    arguments about promotional practices only have to do with a

24    willful blindness category and don't have anything to do with

25    the takedown notices, executive sideloading, unfair

E3HKCAP2                    Summation - Mr. Bart

competition, or cover art.  When you're dealing with those four

claims, nothing that they said about promotional downloads has

any relevance.  It's only with regard to the willful blindness

categories.

          And since the Court has ruled that evidence of

promotional downloads must relate to the willful blindness

claims, we can ask:  Do they?  Well, The Beatles tracks, none

of the promotional downloads mentioned by Robertson bear on

that at all.  Domains that are identified multiple times on a

takedown notice -- we have the charts -- none of the

promotional downloads that they have offered in this case have

anything to do with the works on that category.

          Domains visited by executives?  There are no

promotional downloads dealing with that category at all.  And

so that leaves us with the pre-2007 sound recordings.  And

we've already discussed that.

          The service began in 2005 and '6, and the

consideration of providing a promotional download to music

magazines and blogs did not begin for another year and a half.

Nick Clift clearly stated that he was unaware of any EMI MP3

download promotions with blogs before the one he initiated in

February 2007.  That's consistent with the evidence at trial.

Indeed, as I said, aside from two tracks at South By Southwest

and three from Amazon, neither of which are blogs or music

magazines, there's nothing from this time period.

E3HKCAP2                    Summation - Mr. Bart

1          Moreover, the whole issue of promo downloads is really

2     just the tail wagging the dog.  We've got hundreds and hundreds

3     and hundreds of thousands of tracks here.  And Mr. Sacks has

4     introduced dozens of screenshots that have nothing to do with

5     any of the willful blindness category.  But the fact remains,

6     as I told you during the opening, that if you took all the

7     sites that Mr. Robertson claims were authorized and look at all

8     of the tracks that came on the Sideload index from those

9     tracks, it would amount to two percent of what's on the site.

10         All of this that you have been hearing is a lot of

11    noise.  We're talking about something that has no real

12    relevance for the Sideload website.  It wasn't why the website

13    was built, it wasn't built on promotional sideloads.

14         In fact, the evidence that's presented here was even

15    worse than what they presented on summary judgment.  If you

16    look at all of the sites that are mentioned in the evidence

17    that's before you in this trial, it's about a half a percent

18    even lower.  And when we talk about that, when I said to you

19    before, that it's about two and a half percent or two percent

20    of what's on the website, that's every track that came from all

21    of these sites -- from South By Southwest, from Amazon, from

22    Pitchfork, from Stereo Gum, from all these wonderful blogs that

23    you have heard about 10,000 times during this trial, Cocaine

24    Blunts, Brooklyn Vegan.  I'm sure these are major market

25    leaders in their own communities and they have been put forth

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3HKCAP2                    Summation - Mr. Bart

1    before you like they're the New York Times and so full of

2    integrity, but if you put all of these things together, they're

3    the flee on the tail.  It's not even the tail wagging the dog;

4    it's the flee on the tail.

5        So while they want to drag you down into the weeds of

6    individual promotions, the simple fact is that Sideload was

7    never about capturing promotional downloads.  It was based on

8    the software tool that couldn't distinguish where it was

9    getting files from.  Therefore, not only isn't it surprising

10   that file-sharing sites, open directory sites, personal sites,

11   CDNs that I told you about, account for 98 percent of the

12   database.  That's what they expected, that is what they knew

13   was going to happen.  That's what Robertson told them when he

14   gave them the list of sites to sideload from.  Why was he

15   giving them list of pirate and torrent sites?  Because he knew

16   that's where the file was going to go from.  There aren't

17   promotional sites there.

18       And you'll see that what you get are things like

19   online storage solutions, Beatlecollectors.com.  And even the

20   things that were sideloaded by MP3tunes' own executives are

21   full of file-sharing sites, college sites and numerous Beatles

22   ripoff sites.  And it's just not credible for Mr. Robertson to

23   ignore all of that evidence and to point out the same

24   promotions of single songs by Coldplay, Joss Stone and

25   KT Tunstall in 2007 and later, as a defense to the other

E3HKCAP2                    Summation - Mr. Bart

1    98 percent and willful blindness claims that come at an earlier

2    period of time.

3            And remember, while he spent the better part of the

4    trial trying to tell you that he only sideloaded from

5    authorized sites, he was ultimately forced to admit he

6    sideloaded numerous files from personal student websites and

7    from homepage.mac.com, a site he himself characterized as a

8    personal storage site.

9            Moreover, whenever EMI did something like this, they

10   did it for promotional value, and when Robertson took these

11   links and made them available to the public, it stripped EMI of

12   that marketing value.  We were giving away tracks in certain

13   circumstances to get consumer attention.  He took it, used it

14   for his own benefit, and deprived us of that value.

15           Finally, it's certain, from Robertson's bizarre

16   decision to call Nick Clift as his final witness, that

17   Robertson will attempt to make a big deal out of two songs --

18   yes, two songs -- that were authorized by Nick Clift using the

19   Toolshed marketing firm after the time period covered by the

20   willful blindness category.

21           But even those two songs are completely consistent

22   with our theory.  Clift worked for Astralwerks, a very small

23   division of EMI that didn't have its own digital marketing

24   staff.  So he simply subcontracted out the work that the other

25   divisions did in-house, and it wound up -- you saw the pages

E3HKCAP2                    Summation - Mr. Bart

1    all of the pages provided marketing information along with the

2    download as part of an approved program.  And that's the best

3    they have.

4            He was the only live witness in this case other than

5    Robertson, from the defendant.  It's all smoke and mirrors.

6            Aside from promotional downloads, Robertson also

7    repeatedly blames EMI for his own infringements by alleging

8    that EMI somehow lost its rights in the property because he

9    didn't lock it down with a password.  In other words, I won't

10   be able to control myself from stealing your bike if you leave

11   it unlocked.  One of the great ironies of this case is that

12   Robertson repeatedly argues that he was a big opponent of DRM

13   and that he did it for the sake of consumer choice.  Don't

14   believe it.  He did it because once it was locked, he felt he

15   was free to steal it.

16           He also attempts to portray this lawsuit as being an

17   attack on music locker services.  We hear it over and over

18   again -- we have a password-protected locker, we have a secure

19   locker.  This case isn't about the locker.  Other than the

20   cover art, it's not about the locker.  It's about Sideload, and

21   this is another diversion, and there are so many diversions.

22   The defense is a series of diversions, promo downloads,

23   lockers, blaming Dr. Horowitz, blaming his employees.  There

24   are so many different excuses for why it's not the man behind

25   the curtain.  But that's the man who's responsible for all of

E3HKCAP2                    Summation - Mr. Bart

1    this.

2              THE COURT:  Mr. Bart, please begin to conclude.

3              MR. BART:  Thank you.

4              Most remarkably, when push comes to shove, Robertson

5    claims everything was a group decision and that he was a busy

6    man who didn't control all the shots.  Mr. Robertson, give us a

7    break.  Admit you were the top banana.  You admitted it with

8    regard to MP3.com, even though you initially denied it under

9    oath here.  You said you made every key decision at MP3.com,

10   and everyone in this room knows you did the same with MP3tunes.

11   Your employees all testified that you called the shots, the

12   documents show that you called all of the shots, there's not a

13   single piece of evidence to suggest that anyone other than you

14   made the tactical and legal decisions that are at issue in this

15   case.  Your inability to tell the truth on this obvious fact --

16   you need to contest even the most apparent truth that you ran

17   this business and called all the shots -- is something you must

18   consider in evaluating the rest of his claims.

19             Given this clear evidentiary record, we are asking

20   that you find Mr. Robertson liable for the secondary

21   infringement of EMI's copyrights in 292 label works and 85

22   publisher works covered by the takedown notices, for

23   infringement of EMI's copyrights in 306 pieces of cover art,

24   for infringement of 97 copyrights in EMI's works as a result of

25   executive sideloading, for infringement of 1760 EMI copyrights

1    as a result of its willful blindness for the period prior to

2    January of 2007, for 172 more copyrights as a result of its

3    red-flag knowledge and willful blindness, for 226 copyrights

4    with regard to the sites from which the executives sideloaded

5    content.  And if you agree with us that ten times is the

6    appropriate number of times from which a willful blindness

7    standard arises, there are another 223 in that category.

8           We also ask you to find that MP3tunes and Robertson

9    unfairly competed with EMI by copying, distributing and

10   performing our works without authorization.  There are further

11   points that we need to discuss, particularly about the

12   credibility of the major witnesses, but I'm going to defer them

13   until my rebuttal presentation.

14          Plaintiffs, on both sides of the recording and

15   publishing EMI entities, thank you for your time and attention

16   to this matter.

17          THE COURT:  Members of the jury, we'll take a short

18   recess.  Keep an open mind, come to no conclusions, and don't

19   discuss the case.  Please recess the jury.

20          (Jury not present)

21          THE COURT:  Everyone may be seated.  We will reconvene

22   in five minutes.

23          (Recess)

24

25

E3HBCAP3

1              (In open court; jury not present)

2              THE COURT:  All right.  Are you ready to proceed?

3              MR. SACKS:  I am, your Honor.

4              THE COURT:  All right.  I'll let you know when you

5    have five minutes left.

6              MR. SACKS:  Thank you.

7              THE COURT:  Let's bring in the jury.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3HBCAP3

 1              (In open court; jury present)

 2              THE COURT:  Everyone may be seated.  Members of the

 3      jury, at this time I'm going to ask that you give your

 4      undivided attention to Ira S. Sacks, Esquire, as he delivers

 5      his closing argument on behalf of the defendant, Michael

 6      Hammer.

 7              You may proceed.

 8              MR. SACKS:  Good morning.  First, let me say thank

 9      you.  You have been incredibly attentive through some very

10      complex and lengthy evidence.  On behalf of Michael, myself and

11      my team, we sincerely appreciate all of your hard work.

12              This is the last time I get to speak with you before

13      you deliberate.  In this closing, I will try to explain some

14      things to make sense out of the chaos of some of the numbers.

15      I will sometimes forcefully tell you what I think the evidence

16      shows.  I'm not trying to substitute my judgment for yours.

17      You, not me, and not Mr. Bart, are the judges of the facts

18      here.

19              Before I go on to what I was going to say, I want to

20      comment on two things that Mr. Bart said, one of which was

21      false and one of which omitted some things.

22              First, Mr. Bart told you that the promotional download

23      evidence was only relevant on red flag knowledge and willful

24      blindness.  That is not what Judge Pauley will tell you.  He

25      will also tell you that you may also consider promotional

1    download evidence in the context of a witness's credibility.

2    And when you assess what Mr. Abitbol and Mr. McMullan told you,

3    remember the promotional download evidence in assessing what

4    they tell you.

5           The other thing that was incomplete was Mr. Bart told

6    you a lot about what the Court has previously decided.  What he

7    didn't-- and he said this case is just about Sideload.com.

8    What he didn't tell you was that they brought a claim that

9    every song stored by the locker service was illegal because of

10   something called single master.  The judge ruled on summary

11   judgment that there was no single master throughout that claim.

12          With respect to Sideload.com, which is supposed to be

13   what this whole case is about, what the judge has ruled is that

14   under the Digital Millennium Copyright Act, Sideload.com did

15   exactly what it was supposed to do under the Digital Millennium

16   Copyright Act because it has a safe harbor.

17          Now, you learned a lot about Michael Robertson in this

18   trial.  He's an idea man.  But more than that, he makes ideas

19   real.  His ideas help the little guy and often upset the big

20   guys.

21          We also learned about the early days of digital music

22   and how music went from a stack of CDs to the PC to the

23   universal locker.  You learned about Michael's vision for a

24   universal locker and the responsible way MP3tunes built the

25   locker, with a secure locker.  Google, Amazon and Apple are now

1    offering similar services.  And they're licensed, but only

2    because they also sell music.

3            You also learned that MP3tunes blocked dozens of

4    domains -- and that was in Exhibit 2046 -- and also terminated

5    dozens of user accounts.  And that's in Exhibit 1580.  And had

6    special security provisions to block file sharing that exceeds

7    even the security provisions currently available in music

8    locker services.

9            Now, this case started with three takedown notices.

10   And as you heard evidence about those takedown notices, you

11   learned why this case started.  EMI does not believe that

12   consumers have rights with their music.  For example,

13   Mr. Abitbol told you right from that witness stand that if a

14   consumer got an authorized free download from using an E-card

15   at Walmart, downloaded it to her computer and then uploaded it

16   to her locker at MP3tunes to be able to listen to it on several

17   devices, EMI in the takedown notice is demanding that it be

18   removed from her locker.

19           The takedown notices are part of a vendetta that EMI

20   has against Michael Robertson.  There's no other way to say it.

21   They ignored efforts by Michael to strike a business deal.

22   They sued Michael for the exact same conduct that the other

23   record labels and publishers have ignored.  They were all just

24   fine with the songs being removed in response to a takedown

25   notice from the Sideload.com index.

1          They did not send-- EMI did not send a takedown notice

2     or sue Amazon, South by Southwest, or even what Mr. Bart has

3     said are file-sharing sites like Fileden, Box.net or EZArchive,

4     who are the supposed sources of the illegal sideloads.

5          And then EMI made up a fairytale:  That free

6     promotional downloads were very, very rare.  Mr. McMullan said

7     that twice.  You sat way closer than I did to EMI's lawyers,

8     Mr. McMullan and Mr. Abitbol, and also to Mr. Robertson.  You

9     can use your common sense and life experiences to tell you who

10    was telling the truth.

11         Now, in evaluating who was telling the truth, you

12    learned the truth through some of EMI's current and former

13    executives -- Mr. Pandiscia, Mr. Krug, Mr. Clift, and

14    Mr. Schwartz, who was the last witness by deposition -- and

15    some documents that slipped between the cracks in EMI's

16    document production.

17         EMI knew what viral marketing was and that it was

18    using it.  Here is what Mr. Pandiscia said:

19    "Q.  What did you mean by viral marketing when you used it?

20    "A.  My definition of viral marketing would be having a dynamic

21    where consumers get exposed to any type of content, music or

22    otherwise, by a consumer-to-consumer relationship, as opposed

23    to being mandated or editorilized by an authority such as

24    Spin."

25         You also saw Exhibit 347, which was a September 16,

E3HBCAP3                           Summation - Mr. Sacks

1    2008 e-mail that says "I've obtained approval to use the

2    Chemical Brothers' Hey Girl Hey Boy (Soul Wax '2 Many DJ's

3    remix) as a completely unrestricted free MP3 download to help

4    promote the 'Best Of.'"

5              "The MP3 is attached.  Please spread it far and wide."

6              That was an EMI promotion with Cornerstone, a music

7    promotion company like Toolshed.

8              And you saw Exhibit 1947 from Mr. Clift to Prefix

9    Magazine with the hope that Prefix would post a free download.

10             You heard from the experienced Mr. Clift, who worked

11   for EMI for 20 years.  Mr. Clift told you about agreements that

12   EMI had with MTV, which we marked as Defendants' Exhibit 1833,

13   1830, 1823 and 1822 -- and I'm mentioning some of the exhibit

14   numbers so that when you go back to deliberate, you can ask for

15   them -- data capture was not required by those agreements.  EMI

16   was just happy with the publicity and gave away the tracks for

17   free to the consumer.

18             Mr. Clift told you how he used Toolshed for an

19   important marketing campaign.  And here is what else he said:

20   He needed Toolshed's help urgently.  That's Exhibit 2366.  They

21   sent him a proposal.  It gave a partial list of their blog and

22   music partners.  And what Mr. Clift told you was that he was

23   already familiar with virtually every one of them and

24   considered them to be reputable outlets.

25             Now, what can you infer from that if in February of

E3HBCAP3                    Summation - Mr. Sacks

1    2007 Mr. Clift was already familiar with virtually every single

2    one of them?  He knew about them.  They had been used before.

3    This didn't spring whole bloom from the earth in February of

4    2007.

5              Mr. Clift pointed out-- Toolshed pointed out to

6    Mr. Clift that without an MP3, a free MP3, blog attention will

7    be fickle."  EMI agreed to the Toolshed proposal.  This was not

8    new or controversial.  Toolshed went forward.  No data capture

9    was required.  And Toolshed had discretion as to where to place

10   the free MP3s.

11             And here is the results of their work.  Mr. Clift

12   testified that free downloads were on 3Hive, DoneWaiting, Music

13   for Ants, Muzzle of Bees, and Stereogum.  And he even threw in

14   an anecdote as to how Stereogum had named their company after

15   the lyrics of an earlier aired track.

16             Mr. Clift did other promotions with Toolshed and

17   Prefix.  Again, he did not get data capture.  All that EMI got

18   was increased visibility.

19             Now, that's not a bad thing, or illogical, but the

20   exchange for that was the virality of the MP3.  EMI knew it and

21   wanted it, and not just for Astralwerks or small foreign

22   artists.

23             Coldplay -- and I talked about Coldplay with

24   Mr. Pandiscia -- was one of EMI's biggest artists.  And their

25   new free single was put out virally, knowing the consequences,

E3HBCAP3                    Summation - Mr. Sacks

1   and the consequences are up on this screen.  "From this point

2   what happens to the track is beyond our control and within

3   seconds it will appear on music blogs, fan sites, community

4   sites, as well as mainstream online media outlets all over the

5   world."  It was a huge success despite -- or, rather, because

6   of -- virality.

7       You heard about more artists and authorized websites

8   with authorized free downloads, free MP3s, from Mr. Schwartz

9   during our deposition readings:

10  "Q.  Okay.  You said an early viral experiment.  When you used

11  the term "viral," what do you mean by that?

12  "A.  By viral, I mean giving fans the ability to disseminate to

13  other fans to spread like a virus."

14      Mr. Schwartz testified to authorized free downloads on

15  Amazon, Spin, Stereogum, Pitchfork, ILike/Myspace, iTunes,

16  radio stations and AbsolutePunk.  And also for artists such

17  agency Coldplay, Katy Perry, the Decemberists, KT Tunstall,

18  Spice Girls and meatloaf.

19      Mr. McMullan swore under oath from that witness stand

20  that free promotional downloads were very rare.  And

21  Mr. McMullan swore under oath that only 76 tracks were

22  authorized for free download and that 73 of them were from

23  South by Southwest.

24      Now, we now know from hearing from Mr. Clift and

25  Mr. Schwartz that the supposed investigation leading up to

E3HBCAP3                    Summation - Mr. Sacks

1    those interrogatory answers that we've just put up, which were

2    Defendants' Exhibit 1599A, was intentionally designed to turn

3    up no, or as few, free downloads as possible.  Why do I say

4    that?  Well, they didn't talk to Mr. Clift and they didn't talk

5    to Mr. Schwartz or his team, who were in charge of such work.

6            And here's what Mr. Schwartz said:

7    "Q.  Is there someone within the last three or four years who's

8    been-- who would have the particular focus of providing tracks

9    to music blogs?

10   "A.  Those would be members-- Bob Heinemann and members of his

11   team.

12   "Q.  Did anyone ask you to review a list of songs or albums or

13   tracks in connection with this litigation to determine whether

14   or not they were infringing?

15   "A.  No.

16   "Q.  To the best of your knowledge, did anyone ever ask a

17   member of your staff to do that?

18   "A.  To the best of my knowledge, no."

19           As I said, Mr. McMullan only identified three

20   authorized free downloads for the entire period in suit other

21   than South by Southwest.  On the other hand, as you saw on the

22   screen and from Mr. Clift on the witness stand, Mr. Clift alone

23   told you about seven or eight on one project with Toolshed.

24           And also recall that Mr. McMullan barely knew who

25   Mr. Heinemann was, despite the fact that Mr. Schwartz said he

1    was in charge of all this.  But lest there be any doubt, here

2    is what the evidence shows about free downloads:  There were

3    126 songs identified in evidence where EMI had offered them for

4    free download.  There were 64 MP3 tracks mentioned in

5    screenshots of third-party websites.  And Mr. Robertson

6    testified about seven tracks that were available for him to

7    download from Toolshed.  And he also mentioned another ten in

8    his letter, Defendants' Exhibit 521 to Doug Merrill.

9              Very, very rare?  That was just false.

10             I asked in my opening that you listen for the answer

11   to why we are here.  Plaintiffs put MP3tunes out of business.

12   They threw the kitchen sink at MP3tunes, including that single

13   master argument.  They included songs that they had made

14   available for free download.  They included songs from sites

15   like Spin.com, MTV and Amazon.  They demanded that MP3tunes

16   take songs out of user lockers even if the user owned the song.

17   You buy a CD, you rip the songs to your locker, you wake up in

18   September of 2007 and you find your music vanished.

19             They started this case in September 2007.  Six and a

20   half years of litigation for a small company and an individual

21   against music industry behemoths.  Over $1.4 million in fees

22   for a tiny company and individual who was already hemorrhaging

23   money.

24             I'm not asking for sympathy.  Just ask yourselves why.

25   Why sue MP3tunes and not the sources of the illegal songs?  You

E3HBCAP3                         Summation – Mr. Sacks

1    always try to cut the wrong at the source.  Why not send a

2    takedown notice or sue South by Southwest, Amazon, Myspace,

3    MTV, AOL, Spin and all the other supposedly illegal sources?

4    Why?  Because they did exactly what EMI wanted:  They spread

5    free downloads like a virus.  And make no mistake, EMI got the

6    marketing bang for that.  They got music listeners to love the

7    track and buy more.

8           And then EMI turned around, having spread the music

9    everywhere, and sued MP3tunes and Michael.  And they persisted

10   in the suit even after they drove MP3tunes out of business.

11   Why?  They have an ax to grind with Michael.  He has been right

12   about the importance of MP3s to music lovers.  He has been

13   right about the importance of MP3s to protect labels and to

14   prevent illegal file sharing.  He tried to make music better

15   for artists and consumers since the late 1990s.  He's been

16   right about DRM, he's been right about music lockers and about

17   music in the cloud, and he has been a staunch opponent of

18   piracy.

19          Does he push the envelope?  Sometimes.  Has he ever

20   intentionally infringed?  Nope.  He sat there, looked you in

21   the eye, and told you the truth.

22          On the other hand, EMI's case is built on a series of

23   lies.  The takedown notices were false.  If you look at page 2

24   at the bottom of Exhibit 375, "The information in this

25   notification is accurate and we have a good-faith belief that

1   use of the material in the manner complained of is not

2   authorized by EMI."

3        As discussed with Mr. McMullan, the notices included a

4   track by Morningwood, called Nth Degree, and a track by Katy

5   Tunstall called Black Horse and the Cherry Tree.  But the

6   interrogatory answers sworn to under oath by Mr. McMullan

7   admitted that those same two songs were authorized for free

8   downloads from the same URLs.

9        As I've said, Mr. McMullan told you they very, very

10  rarely did free downloads, but he based that on the lawyers

11  working for him and he didn't ask Mr. Clift and they didn't ask

12  Mr. Schwartz and they didn't ask Mr. Heinemann, because they

13  didn't want to know.

14       EMI has dropped songs from the works in suit.

15  Someplace between a quarter and a third of the songs in the

16  takedown notices will not be before this jury.  Because they

17  feel charitable to Michael?  I don't think so.

18       One of the works in suit -- actually, there's two of

19  the works in suit -- are by Joss Stone.  One of them is called

20  Fell in Love with a Boy.  And that is copyright 343788.  Joss

21  Stone is an EMI artist.  And here is what Amazon showed in

22  2003.  That's right, 2003.  Two tracks from Joss Stone's CD

23  Soul Sessions in MP3 format, according to what a consumer saw

24  from Amazon in 2003.  Consider that Amazon screenshot when

25  you're determining whether Mr. McMullan was telling you the

1    truth.

2            Now, you have spent a lot of time looking at the

3    charts by Dr. Horowitz.  I'll go over some of them specifically

4    with you later, but I want to talk about them now generally.

5    The charts are not worth the electrons hitting the pixels on

6    your monitor.  Dr. Horowitz was paid to come up with claims

7    against MP3tunes and Michael.  The errors he made, his lack of

8    understanding of the MP3tunes system, were pervasive.  He got

9    results he should have known were wrong and designed his

10   queries to only look for EMI artists.

11           He said that seven thousand tracks were sideloaded by

12   Famille Bartlett and Dogma-- this was one of the red flag

13   knowledge/willful blindness theories that Mr. Bart didn't tell

14   you about because they withdrew it over the weekend-- when only

15   two, not seven thousand tracks, were sideloaded.  He said

16   dozens of tracks were in Michael's lockers when they weren't

17   there.  He said Michael was the first sideloader for many songs

18   when he wasn't.  He kept changing his tune as to how many cover

19   art images were in the system and from where.  He testified

20   that executives visited pages that the executives didn't visit,

21   and that no other MP3tunes user would have visited because of

22   how the system worked.

23           His analysis can't be trusted in any respect.  As

24   Judge Pauley will tell you, you can reject some or all of

25   Dr. Horowitz's work.  Dr. Horowitz has had MP3tunes' source

1    code since sometime in 2009.  He had plenty of time to

2    understand exactly how it works.  He still doesn't.

3          Now, as Michael explained, we sort of stumbled on what

4    was called the AMG error by accident.  We served a subpoena on

5    Amazon and they said, We've never heard of those songs.  So we

6    dug into the songs and found out that they didn't exist in

7    Michael's locker.

8          Now, Dr. Horowitz tried to explain how he linked the

9    wrong fields for the AMG data.  Why?  Because he guessed that

10   two fields that ended in track ID should be linked.  But let me

11   show you what really happened.  Because when you made that

12   error, you got lots and lots of results.

13         So Dr. Horowitz decided that he would use what he

14   called a GROUP BY query.  And the GROUP BY query meant that

15   when AMG was analyzing song names, Dr. Horowitz limited the

16   result to one result so that he didn't get all of those

17   connections; he got one connection.  But instead of asking the

18   program to find the best match, he asked it to find the best

19   match to one of plaintiffs' artists.  And that led to a

20   startling number of errors.  The supposed illegal sideloads by

21   Michael went from 47 to 26.  The executives went from 123 to

22   104.

23         And you can see on the screen the other impact of the

24   AMG errors.

25         It doesn't matter that the AMG data is not in the

1    final charts except for Plaintiffs' Exhibit 62.  It matters why

2    the errors occurred.  Dr. Horowitz does not understand the

3    architecture.  It matters that the errors occurred.

4    Dr. Horowitz was focusing on attacking MP3tunes and Michael

5    rather than analyzing data.  You just cannot trust the works he

6    claimed were sideloaded were actually sideloaded.

7             Now I want to turn now to the takedown notices.  And

8    you've seen them.  They're PX 375B, C and D.  EMI asked

9    MP3tunes on page 2 to remove or disable the works.  MP3 did

10   that.  They disabled the works on Sideload.

11            EMI asserted, on the bottom of page 1, that they had

12   not authorized any of the works to be copied, performed or

13   distributed in this matter on or by MP3tunes or its users.

14   That was false.  As you've seen, numerous of the tracks were

15   authorized for free download, such as the tracks by Morningwood

16   and KT Tunstall.

17            EMI told MP3tunes to figure out and remove all of the

18   EMI labels' and publishers' songs and works.  And EMI told them

19   to look at the website and get a list of songwriters and

20   singers.  EMI knew that was impossible.  There were 1.3 million

21   works in the publishers' catalog alone.

22            Michael wrote back and asked for a further list.  What

23   did EMI do?  They ignored Michael's letter and sued.  As

24   Mr. Abitbol put it, just because Mr. Robertson asked them for a

25   list of works didn't mean that EMI had to send them one.

1              Mr. McMullan told you that was because MP3tunes had

2       filed a declaratory judgment action in San Diego, and Mr. Bart

3       mentioned that too.  But consider what happened when AnywhereCD

4       got into a similar dispute with Warner Music.  AnywhereCD

5       brought a declaratory judgment action, but, despite that,

6       Warner sat down with AnywhereCD and worked out a settlement.

7       And that is because Warner does not have a blood feud with

8       Michael.

9              The takedown notices were intentionally overbroad.

10             EMI asked MP3tunes to remove undisputedly legal songs

11      in lockers.  Remember we looked at PX 44 with Dr. Horowitz.

12      And this is the labels' song list.  It has almost 16,000 lines.

13      But all of the lines from roughly 10,000 have no sideloads at

14      all.  That reflects about 5,782 songs where the user uploaded

15      the song from his or her own collection.  So you buy a CD, rip

16      it, upload it to your locker, and EMI demands that MP3tunes

17      takes it out of your locker.

18             There were other undisputedly legal songs in the

19      lockers.  Purchases.  And you heard Dr. Horowitz.  He could not

20      tell which songs in the lockers were purchased and which songs

21      were free sideloads.  So right at the bottom.  "That would be a

22      no.  I don't know the percentage."

23             EMI would will tell you it would have been easy for

24      MP3tunes to figure out the number of uploads, the number of

25      purchases and the number of sideloads.  But there's two reasons

E3HBCAP3                    Summation - Mr. Sacks

1    why that doesn't matter:  First, EMI has the burden of proof.

2    How many songs were illegally in lockers?  And, second, as

3    Judge Pauley will instruct you, federal law, the DMCA, does not

4    require service providers such as MP3tunes to do an

5    investigation except in very narrow circumstances.

6            There were 572 songs of works on the takedown notices;

7    472, after taking out duplicates.  Forty-eight of those songs

8    were dropped from the case by the EMI labels before we even got

9    ready for trial.  Another 86 were dropped right before trial:

10   35 by the labels and 51 by the publishers.

11           So that's 134 songs on the takedown notices that are

12   not in suit.  134 songs.  And that is, as I said before, not

13   out of charity to Michael or not to make this trial shorter.

14   If it was to make this trial shorter, we wouldn't have two

15   thousand tracks for red flag knowledge and willful blindness,

16   one of which, for over two hundred works, was withdrawn over

17   the weekend.  It is simple enough to figure out why those 134

18   songs were in the takedown notices and dropped.  It was to bury

19   MP3tunes and Michael.

20           As to the remaining songs, because MP3tunes did not

21   remove the songs from the lockers of the sideloaders, MP3tunes

22   is liable for contributory infringement.  The Court has already

23   found that.  And you have to decide whether Michael is liable

24   for that.  Michael had no control over what users decided to

25   sideload.

1          Michael explained that he did not benefit from the

2     sideloading of illegal songs.  It was a bad thing for us.  And

3     then he explained at length.  "Well, it would cost us money in

4     storage, it would cost us money in bandwidth.  But another big,

5     important one was that we wanted to partner with music stores.

6     Amazon's not going to partner with us if we're encouraging

7     people to not buy music.  They want to partner with-- we want

8     to encourage people to buy music so Amazon would partner with

9     us.  Similarly, we were-- we had a partnership with Nokia, the

10    phone company.  We wanted other partnerships with other

11    well-known companies, and they're not going to partner with if

12    you're doing things that are negative for the industry.  So it

13    wouldn't make any sense for us to encourage unauthorized

14    copying of files."

15         Michael didn't stand to benefit -- and did not

16    benefit -- from the sideloading of illegal songs.  In fact, it

17    hurt MP3tunes and Michael.  And, of course, Michael never

18    received a salary, bonus, or anything else from MP3tunes.

19    Instead, he poured money into it.  He wasn't a shareholder of

20    MP3tunes, Inc.  He never received a dividend and neither did

21    the trusts who were some of the shareholders.  Michael also

22    never received distributions from the trusts as a result of

23    their holdings in MP3tunes.

24         Now, whether the plaintiffs like it or not, Michael

25    was a part-time CEO at MP3tunes, busy running several companies

E3HBCAP3                    Summation - Mr. Sacks

1    and participating in two charities.  Gizmo5, the company he

2    sold to Google, was far larger than MP3tunes.  He didn't

3    micromanage MP3tunes.  He was too busy.  He came in and out as

4    needed.

5           As Judge Pauley will explain to you, to find Michael

6    vicariously liable for MP3tunes' contributory infringement for

7    not taking songs out of lockers, it is not enough that Michael

8    was the CEO.  There has to be proof by a preponderance of the

9    evidence that Michael had the right and ability to supervise

10   the infringing activity and that Michael received-- and this is

11   important-- an obvious and direct financial benefit

12   attributable to the infringing activities.

13          There is no evidence that Michael or MP3tunes received

14   any benefit, financial benefit, direct or otherwise, from the

15   sideloading of infringing songs.  EMI also claims that Michael

16   himself is contributorily liable for the contributory

17   infringement by MP3tunes.  But to show that, EMI must convince

18   you that Michael had knowledge of the infringing activity and

19   induced, caused or materially contributed to the infringing

20   conduct.

21          There is no evidence of that.  Michael did not provide

22   the software or the lockers.  MP3tunes did.  And despite what

23   Mr. Bart said, EMI does not contend in this case that MP3tunes

24   and Michael are one and the same.  What Mr. Bart said is that

25   the way that they get Michael responsible for what MP3tunes did

1   is through vicarious liability or contributory liability, not

2   what lawyers call piercing the corporate veil.  You should find

3   that Michael is not liable for MP3tunes' contributory

4   infringement.

5        Now, Plaintiffs' Exhibit 450.  Michael is accused of

6   illegally sideloading 26 songs out of 8,900 into his lockers.

7   Michael's sideloads is one of those charts that Dr. Horowitz

8   originally messed up because he did not understand how MP3tunes

9   worked.  Used to be 47 songs; now, 26.

10       And as I said before, we submit that you should reject

11  Dr. Horowitz's work in all respects.  Dr. Horowitz's

12  conclusions on this chart ignore reality as you, Michael, and

13  all the other witnesses other than Mr. McMullan and Mr. Abitbol

14  understood reality.

15       Michael explained in court his familiarity with viral

16  marketing, as did Mr. Pandiscia and Mr. Schwartz, and they all

17  described it the same way.

18       Michael also sideloaded from many of the very same

19  songs and blogs that Toolshed used on behalf of EMI, and that

20  many witnesses in this courtroom, witnesses who now or

21  previously worked for EMI, said were legitimate mainstream

22  blogs and sites.

23       There's more.  There were 3,028 songs from South by

24  Southwest in Michael's big locker.  Three thousand out of about

25  eight thousand.  All of those were legitimate.

E3HBCAP3                    Summation - Mr. Sacks

1          Now, there are more mysteries on Plaintiffs' Exhibit
2     450 of the list of songs by Michael.  Panic at the Disco, line
3     12, from Spin.com.  Every witness who testified on the subject
4     said Spin.com is top of the line.
5          Line 21, Hopeless Records.  You saw the sound
6     recording copyright in Hopeless Records' name.  You saw the
7     publisher's copyright, which even mentions Hopeless Records.
8     And you saw the screenshot of the website.  And Mr. Abitbol, in
9     a moment of candor, admitted that he didn't check to see if
10    Hopeless Records had paid any royalties, any mechanical
11    royalties, for the song.
12         In fact, Mr. Abitbol in another moment of candor said
13    he hadn't checked to see whether any label had paid any
14    mechanical royalties for any of the 562 songs on the
15    publishers' original song list.
16         Other songs on Exhibit 450 are from mainstream blogs,
17    such as Better Propaganda, Juno Records, which is a store, and
18    a song that was not-- mentioning a song that was not in
19    Michael's lockers.  Glide Magazine, Indietastic and SixEyes.
20    And, again, for example, Toolshed used SixEyes Media as one of
21    its partners for the work in EMI and Nick Clift.
22         Mr. Bart has mentioned two college sites that were the
23    host-- and this is an important distinction-- the host URL for
24    some of Michael's sideloads.  But, remember, Dr. Horowitz and
25    Michael both agree that the way Sideload works is that the

E3HBCAP3                     Summation - Mr. Sacks

1   first sideloader goes to the referrer URL, not the host URL.

2   The user then clicks on the sideload icon, which is a little

3   note, and click on the note, sideloads a song.  Even the first

4   sideloader doesn't go to the source URL.  No one goes to the

5   source URL.  Sometimes people visit the referrer URL, but no

6   one goes to the source URL.

7         Cover art.  Cover art was only displayed when users

8   uploaded their own music and then listened to it.  Users had

9   the option of adding their own cover art.  That's the button

10  right there.

11        MP3tunes is accused of illegally downloading 306 cover

12  art images from Amazon and illegally publicly displaying those

13  images.  Again, this is a mystery, at least to me, at several

14  levels.  First, there's a claim for public display of cover

15  art.  That claim even matched against some of the other claims

16  is nonsense.  The cover art was not publicly displayed.  The

17  judge will explain to you what that means.  It was shown to

18  only one user and only the user for which the cover art was

19  uploaded or sideloaded from Amazon.  It wasn't displayed to the

20  public.

21        Now, as to the copying claim, here's another mystery.

22  Mr. McMullan came up with 348 covers he said were infringed.

23  And Mr. Bart showed you the visual from Dr. Horowitz, which was

24  Plaintiffs' Exhibit 22, which has 328 images on it.  Now, a few

25  weeks ago the number was 314, and now there are 306.  Did

1    anyone explain why 10 percent of the cover art claims were

2    dropped?  How many came from Amazon?  You saw the button on the

3    cover art tab.  The user had the option to upload his or her

4    own cover art.  If you ripped a CD and uploaded it to your

5    locker, the track and artist name, album name and cover art

6    would go with it.  For those users who uploaded their own cover

7    art, EMI is saying they can't look at their own covers.

8            Dr. Horowitz was supposed to tell you -- this is their

9    burden -- how many covers came from Amazon rather than from

10   users.  Instead, he honestly said he couldn't tell whether the

11   covers came from Amazon or users or from some other source.

12   And the Court will instruct you that a volitional act, a

13   volitional act by MP3tunes, is required for it to be liable for

14   the cover art claim.  And that a volitional act by MP3tunes

15   does not include instances where the users upload the images

16   themselves.

17           How many users uploaded their own cover art?  How many

18   users from Amazon?  EMI has the burden on this and they haven't

19   met it.  But even if they did, there's another question you

20   have to answer, once again:  Is Michael legally responsible for

21   MP3tunes' actions regarding cover art?

22           As I mentioned with respect to the locker claim,

23   Michael has no control over what users decided to upload.  EMI

24   did not prove that Michael received a direct and obvious

25   benefit from the use of cover art when uploaders saw cover art.

1          EMI is also claiming that Michael has contributory

2     infringement liability relating to cover art, and there's no

3     evidence of that.

4          Once again, Michael didn't provide the cover art

5     software; MP3tunes did.  And EMI does not contend that there is

6     what the law calls veil piercing here.  Michael and MP3tunes

7     are not legally the same.

8          Now, copying by executives other than-- there is a

9     total failure of proof that these executives sideloaded files

10    in the course of their responsibilities and business.  You've

11    heard the deposition testimony of the executives.  They did not

12    testify to that.  Mr. Wooten, one of the executives, didn't

13    testify at all.

14         Now, EMI has told you that Sharmaine Lindahl was asked

15    to sideload.  But as you saw when her deposition was played,

16    she was only-- and from Michael.  She was only asked to test

17    popular free music sites for compatibility, and that was

18    before.  And the exhibit that Mr. Bart showed you was before

19    Sideload.com even existed.  Ms. Lindahl was not one of the

20    accused executives.

21         And you've heard Michael testify that he didn't ask

22    any executive to sideload.  Sharmaine Lindahl-- and I don't

23    know if you remember her video-- was a customer service rep.

24    The mistreatment of Ms. Lindahl at her deposition doesn't

25    substitute for proof that anyone, even her -- and certainly not

E3HBCAP3                    Summation - Mr. Sacks

1    the executives at issue -- sideloaded as part of their jobs.

2    Or which, if any, songs were sideloaded as part of their jobs

3    rather than for their listening pleasure.

4           But even if there was proof of that, that, again, only

5    makes MP3tunes liable, not Michael.  And, again, there's no

6    evidence that Michael received any obvious direct financial

7    benefit from the sideloading by executives.  He had no salary,

8    no bonus, no stock holdings, no nothing.

9           And, again, EMI claims Michael is liable for this by

10   contributory infringement as well, but, again, Michael did not

11   provide the software; MP3tunes did.  And as Michael has

12   explained, infringing songs in the Sideload.com index hurt

13   MP3tunes.

14          Now I now want to turn to red flag knowledge and

15   willful blindness and the five categories that we were dealing

16   with before this weekend.

17          First, why did this case need another 1,500 to two

18   thousand songs in suit?  When you go to deliberate in this

19   case, you're going to get questions that deal with over two

20   thousand songs and 10, 12 answers with respect to each song.

21   Why did anybody need that?  And think when you look at that how

22   many of those songs have you actually heard testimony about

23   rather than just seeing them listed on a chart from

24   Dr. Horowitz?  The reason that exists is they just wanted to

25   bury Michael and MP3tunes.

1              Second, when you hear the legal standard for these

2    claims from Judge Pauley, you're going to scratch your head.

3              Third, one of the claims for 209 works has been

4    dropped since the close of the evidence.

5              Now, as Judge Pauley will tell you, Michael and

6    MP3tunes have a safe harbor under the DMCA, which means they

7    have no obligation to do any investigation of potentially

8    infringing songs unless they get a takedown notice, subject to

9    one exception:  Is that if MP3tunes got information that

10   indicated that there were specific and identifiable infringing

11   tracks on its server.  For red flag knowledge, EMI must show

12   that MP3tunes was aware of facts or circumstances or red flags

13   that would have made it apparent or obvious to a reasonable

14   person that specific activity on its service -- specific

15   activity on its service -- was infringing.  There's no such

16   evidence of notice or knowledge of specific or identifiable

17   tracks at all.

18             And in terms of subject of an objective

19   reasonableness, which is another factor in red flag knowledge,

20   the pervasive availability of free authorized music on the

21   internet going back to 2003 and earlier made it impossible for

22   Michael or any internet user to tell whether a song was

23   authorized or not.  Michael told you that and EMI's

24   Mr. Schwartz told you that.

25             As to willful blindness as opposed to red flag

knowledge, there is, again, a total absence of truth.  Willful

blindness, as Judge Pauley will explain, requires proof that

the defendant had reason to suspect, again, specific instances

of infringement by its users and that your willful blindness

determination must be directed towards specific and

identifiable instances of infringement.  Thus, even if you find

MP3tunes was aware of a high probability of general

infringement by its users, that's not enough.  That's what

Judge Pauley will instruct you.  To establish willful

blindness, you must see if EMI has shown evidence of

specific -- of evidence sufficient to raise a suspicion of

specific and identifiable instances of infringement.  There is

no such evidence.

        And that really should end the issue, but since

Mr. Bart went on to the rest of the issue, unfortunately I will

too.

        The first issue, which is Plaintiffs' Exhibit--

Plaintiffs' Demonstrative Exhibit 33, this claim has been

dropped, but it's still worth seeing what the claim was to

evaluate whether you can trust Dr. Horowitz's analyses.

        Dr. Horowitz found 209 EMI works in this category,

but that begs the questions.  How did he do that?  Can his work

be trusted?  And can what he was told by the lawyers be

trusted?

        Now, Dr. Horowitz found that over seven thousand

E3HBCAP3                          Summation - Mr. Sacks

1    tracks were sideloaded by those two users, but Michael showed

2    you queries that demonstrated only two tracks ever got

3    successfully sideloaded.  Once again, Dr. Horowitz was focused

4    on attacking MP3tunes and Michael and not analytically accurate

5    results.

6           But there's more wrong with this.  The whole concept

7    of red flag knowledge and willful blindness is that you have to

8    act when you find out.  But Dr. Horowitz could not say whether

9    any of the sideloads on Plaintiffs' Exhibit 451, which is his

10   list, were after the dates of Exhibit 296, which was up on

11   Plaintiffs' Exhibit 33 for Dogma and 137, which was up on

12   Plaintiffs' Demonstrative Exhibit 33 with respect to Famille

13   Bartlett.  Even EMI cannot expect MP3tunes to disable URLs

14   before MP3tunes even knows there's something fishy going on.

15          The next category is domains that MP3tunes executives

16   supposedly used to sideload.  Well, this is another claim

17   totally unsupported by the evidence.  The whole concept here is

18   that executives actually visited the source -- remember,

19   source-- domains, like Fileden, Box.net, Sonoma and EZArchive.

20   And, by visiting these source domain, knew them to be of an

21   infringing nature.

22          Now, again, red flag knowledge and willful blindness

23   concepts requires at its core that the information received--

24   that is, viewing the source domain-- indicates the location of

25   specific and identifiable infringing or specific URLs on

 1    MP3tunes' servers.

 2            Now, behind me -- I'm going to have Molly scroll

 3    through the home pages -- there is nothing of the sort on those

 4    home pages.

 5            And then there was the list, Plaintiffs' Exhibit 448.

 6    It has on it -- the list that you see behind me and on your

 7    screens.  Dr. Horowitz said that he got this list first time,

 8    on cross, from the lawyers.  Then he remembered, in quotes, on

 9    redirect that he looked at the referrer URLs, but he did not

10    attach his referrer URL charts and does not know where they are

11    or why they weren't attached to his declaration.

12            Here is what Dr. Horowitz said before his memory was

13    supposedly refreshed.  That, again, reflects a fundamental

14    misunderstanding by Dr. Horowitz of how the MP3tunes system

15    worked.  The first sideloader has to wander the internet until

16    he comes to a page with a sideload icon, the referrer URL.  As

17    I said before, if the user wants to sideload the songs, he or

18    she clicks on the little note, the sideload link.  That

19    sideloads the song, but that doesn't take the user to the

20    source URL page.  No user ever goes there.  Dr. Horowitz should

21    know that.  Apparently he doesn't, or he chooses to ignore it.

22            Typically only the first sideloader visits a site, the

23    referrer URL.  And Dr. Horowitz admitted that he never did a

24    first sideloader analysis for anyone other than Michael.  And

25    that's in the testimony-- could we go back to the other one?

1    That's in that testimony right up there.  That he didn't do one

2    for Doug Reese, didn't do one for Emily Richards, and did one

3    for Michael.

4           Now, the analysis for Michael is not only overstated

5    by the AMG error by 14 tracks, but it also contains none --

6    none -- of the sites even as to the source URL, much less the

7    referrer URL.  This category must be rejected.

8           Ten-plus takedown notices, another mysterious claim.

9    Originally this category was URLs that appeared in two or more

10   takedown notices from someone other than EMI.  And now the

11   category is moved so that it's URLs that supposedly appeared

12   ten or more times in three EMI takedown notices.

13          Again, that is deficient under the legal standing for

14   red flag knowledge and willful blindness that Judge Pauley will

15   give you.  The fact that a source URL, a website, appears more

16   than ten times in a takedown notice does not give the recipient

17   any information about other specific identifiable infringing or

18   suspicious URLs allegedly from the same source domain on its

19   server.  To find others, you'd have to do an investigation.

20   And after the investigation, you still wouldn't know whether

21   the tracks were authorized for free download.

22          In fact, in this case you've seen evidence of the same

23   sites that had authorized songs and, according to the labels

24   and publishers, unauthorized songs, such as Toolshed, which

25   supposedly was authorized according to two lines on that long

E3HBCAP3                          Summation – Mr. Sacks

1    interrogatory answer, Defendants' 1599A, and Spin.com.

2              And you also saw Google's numbers.  They had one URL

3    that appeared 675,000 times in a single month on takedown

4    notices.  And Google, which according to Dr. Horowitz was a

5    copyright -- totally respected, respecting, copyright site,

6    didn't block the domain.  But even if you scratch deeper, the

7    evidence doesn't support the theory.

8              Dr. Horowitz got this list from the lawyers.  And he

9    admitted on cross that the numbers for Dougmoon, one; Oregon

10   State, four; Divided Highway, three; Beatles collectors, eight;

11   and Bubblegum-Machine, eight, came up less than ten.

12             Now, the publishers' takedown notice didn't have URLs.

13   They just had Sideload IDs.  So Dr. Horowitz on redirect said

14   he converted the publishers' takedown notice, which only had

15   sideload IDs to URLs, and that made the difference.  But he

16   never showed you the calculation for the conversion.  This

17   category needs to be rejected, too.

18             Plaintiffs' Exhibit 378 was the only basis for

19   claiming that Michael Robertson knew that all songs before

20   January 25, 2007, were illegal in digital format.  Again,

21   there's no list or information in this exhibit identifying

22   specific infringing tracks on MP3tunes' servers.  Instead,

23   there's just this one e-mail indicating that as of January 25,

24   2007, MP3tunes had received the first license from one company

25   to sell-- sell-- MP3s.

1          Michael explained that that only dealt with sales of

2    MP3s, not promotional tracks.  Promotional tracks in MP3 format

3    had been around since 1997.  If you visited Amazon in 2003, you

4    would have seen two tracks by Joss Stone displayed on

5    Amazon.com in late 2003 in MP3 format.

6          You have seen substantial evidence regarding Amazon,

7    Spin and others.  And Mr. Krug testified as to his practices at

8    another record company of making free downloads available in

9    the years 2005 through 2008.  This category should be rejected

10   by you as well.

11         The Beatles.  There's no basis for willful blindness

12   or red flag knowledge.  There is no information in this record,

13   not a shred of evidence, identifying a specific and

14   identifiable instance of infringement on MP3tunes' servers.

15   Instead, there's a couple of random e-mails from users asking,

16   for example, if Strawberry Fields was really authorized.  Or a

17   statement by Michael in 2009, 16 months after this litigation

18   started, that he believed it was EMI's position that The

19   Beatles did not authorized the availability of digital music on

20   the internet.

21         But that position was litigation posturing by EMI and

22   not agreed to by Michael.  Michael explained, and he sat there,

23   he looked at you, he explained this to you, that he didn't like

24   The Beatles, he didn't know who owned The Beatles, and a lot of

25   people don't.

1          In the takedown notice, EMI listed a bunch of Beatles

2     tracks.  If they wanted more Beatles tracks removed, all they

3     had to do was list them or reply to Michael's October 31, 2007

4     letter, which we marked as Defendants' Exhibit 1730, and that

5     you saw a little bit ago.

6          But relying on, as Mr. McMullan did, the assertion

7     that everybody reads trade press, and trade press that it turns

8     out, when I asked him what trade press he reads, that even he

9     didn't read.  And, therefore, everyone knows that The Beatles

10    did not authorize the digital sale of Beatles tracks until 2010

11    is no basis to impose substantial liability on Michael or

12    MP3tunes on the assumption that they had knowledge, red flag

13    knowledge, or were willfully blind with respect to specific and

14    identifiable Beatles tracks on their servers.

15         Some miscellaneous claims.  Not to leave any stone

16    unturned, EMI asserts common law infringement claims for

17    pre-1972 sound recordings.  That claim is totally disposed of

18    under principles I have previously mentioned, including, as

19    Judge Pauley will tell you, DMCA protection, except for the

20    songs, if any, that you find red flag knowledge and willful

21    blindness.

22              (Continued on next page)

23

24

25

E3HKCAP4                        Summation - Mr. Sacks

1              MR. SACKS:  (Continuing)  Common law unfair

2      competition for pre-1972 sound recordings:  Again, that's

3      baseless.  MP3tunes didn't compete with EMI.  If you look at

4      the structure, maybe MP3tunes competed with Amazon, because

5      Amazon sold or gave away MP3s and MP3tunes had something to do

6      with making MP3s available.  It has nothing to do -- it's a

7      totally separate level of distribution that we're talking about

8      with respect to the EMI publishers or the EMI labels.

9              Just because one business can do something which might

10     hurt another business doesn't mean they're competitors.  And

11     MP3tunes did not act in bad faith.  As Mr. Schwartz admitted,

12     and as we put up on the screen behind me and on your monitors,

13     there was no way for MP3tunes to know that track on the

14     Internet was authorized.  It's not stealing.  It's the Digital

15     Millennium Copyright Act, and it's what somebody can figure out

16     by looking at a track on the Internet because of viral

17     marketing that's been going on since 1999.

18             In fact, even EMI didn't know whether MP3s were

19     authorized, given the number of errors by them in the takedown

20     notices, interrogatory answers, and withdrawals of tracks from

21     works in suit.  In any event, Michael didn't participate in any

22     of the unfair competition.

23             And finally, EMI asserts that MP3tunes and Michael

24     infringed what's called public performance and public

25     distribution rights.

1          Turning first to public performance:  There is no

2    evidence that any specific songs played by a user were played

3    by a user on a specific third-party website.  Dr. Horowitz

4    admits that he doesn't know whether the plays he counted on --

5    some of those really long charts which had columns for unique

6    user plays and unique user sideloads and combined user plays

7    and sideloads -- he doesn't know if any of the plays he counted

8    related to sideloads or otherwise.  Thus, Dr. Horowitz doesn't

9    know if the songs that were being played were songs purchased

10   by the user who was playing.

11         Second, it is not a public performance if a user is

12   playing a song for himself or herself.  That is necessarily the

13   case in this circumstance because the user can click on a play

14   link.

15         Third, there's no list of songs which were played on

16   third-party websites.

17         Fourth, there's also no proof that MP3tunes had

18   red-flag knowledge or willful blindness related to a specific

19   identifiable song that was performed.

20         And finally, as to the public performance claim, even

21   if MP3tunes is liable, Michael isn't.  He received no obvious

22   and direct financial benefit from the alleged public

23   performance.

24         Now, public distribution, the last claim, public

25   distribution:  First, the testimony establishes that plaintiffs

E3HKCAP4                    Summation - Mr. Sacks

1    do not know -- plaintiffs do not know -- what websites were

2    authorized or not.

3           Second, there's no proof of red-flag knowledge or

4    willful blindness as to the infringing nature of any track that

5    was distributed, for the reasons stated.

6           The other thing that the judge will tell you is that

7    for the distribution claim, there has to be a copy or transfer

8    of a file by a user to a third party.  That just is not what

9    was being claimed here.  I mean, no one is claiming that with

10   this secure locker, with all the security features, that a user

11   who went on, pressed a sideload button and got a song and

12   thereby visited this third-party website, then transferred the

13   song to a third party.

14          Mr. Bart has said this is about stealing.  This isn't

15   about stealing.  You've listened to what Michael has done,

16   whether it's a locked bike or a truck with CDs or a truck with

17   CDs and a sign.  This isn't about stealing.  This is about the

18   rights of consumers to enjoy their own music.  If you go back

19   to what Michael was trying to do in 1997 and 1999, no one was

20   getting hurt by that.  Songs were being purchased, CDs were

21   being purchased, people were buying songs, artists would have

22   been getting paid.  And that's what's happening now.

23          Same thing with MP3tunes:  The mistake that Michael

24   made was or the mistake that MP3tunes made -- sorry -- was not

25   taking the songs out of the lockers.  The DMCA is there to

E3HKCAP4                    Summation - Mr. Sacks

1    allow companies like MP3tunes to flourish.

2           It's not there to allow companies like MP3tunes to be

3    ground into the dust.  MP3tunes was facing virality on the

4    Internet and was making it easy for people to find free music,

5    not because they were stealing it, making it easy for people to

6    find free music, put it into their locker, and listen to it

7    anywhere; as opposed to what was happening with Apple at the

8    time, which is that you were stuck to your Apple devices and

9    couldn't listen to it anywhere.

10          If songs had been removed from the lockers, maybe we

11   wouldn't be here, or maybe we would on 2000 willful blindness

12   and red-flag knowledge songs.

13          What I really want to say, in conclusion -- and I am

14   going to make up for my opening being a little long by having

15   my closing being a little short, does it feel short? -- at some

16   level, this case is about a corporate bully that is pursuing a

17   vendetta against Michael Robertson since 1999.  I don't know

18   whether that vendetta is because he has been a gadfly or

19   because he made money from MP3.com, but a vendetta since 1999,

20   because at another level Michael has been right about the

21   direction of Internet music since 1999 and was far ahead of the

22   curve with MP3s, the role of music in the cloud, DRM-free

23   music, and how that would help consumers and record companies

24   alike.  And that's part of the reason why he was hired by

25   Google after he sold Gizmo5.

1          But mostly, this is about telling the truth to the

2    eight of you and a failure of proof.  EMI's lawyer witnesses

3    did not tell you the truth.  EMI's marketing witnesses and

4    Michael told you the truth.

5          Dr. Horowitz didn't pay attention to what he should

6    have known or intentionally misrepresented what he knew.  And

7    EMI failed to meet its burden of proof in any respect, in part

8    because of overreaching, and in part because Dr. Horowitz was

9    biased by design and never understood how the MP3tunes system

10   worked.

11         I want to thank you again for your careful attention

12   this morning and for the last three weeks.  Mr. Bart gets to

13   finish up now.  Remember to rely on the evidence, not my

14   argument or Mr. Bart's argument.  You, not we, are the judges

15   of the facts.

16         Thank you.

17         THE COURT:  Members of the jury, we'll take another

18   five-minute recess, and then we'll hear a brief rebuttal by

19   Mr. Bart.  Keep an open mind and don't discuss the case.

20         Please recess the jury.

21         (Continued on next page)

22

23

24

25

E3HKCAP4                    Summation – Mr. Sacks

 1              (Jury not present)

 2              THE COURT:  Everyone may be seated.

 3              We'll reconvene in a few minutes.  Mr. Bart, by my

 4     reckoning, you have about 18 minutes.

 5              MR. BART:  Thank you, your Honor.  That's about mine

 6     too.

 7              (Recess)

 8              THE COURT:  Shall we bring in the jury?

 9              What I think I'm going to do is, immediately after

10     Mr. Bart concludes, I'm going to give the jury some of the

11     preliminary instructions.  I've ordered their lunch, so we'll

12     be taking a recess after I get through the first 19 pages of

13     the charge, we'll take a short luncheon recess, and then I'll

14     bring them back out and continue charging.

15              MR. BART:  OK.

16              THE COURT:  Would you like me to gently interrupt you

17     when you have two minutes left?

18              MR. BART:  As long as it's gentle.

19              THE COURT:  It's always gentle.  It's only when you

20     don't stop that it becomes more abrupt.

21              (Continued on next page)

22

23

24

25

E3HKCAP4                    Summation - Mr. Sacks

 1           (Jury present)

 2           THE COURT:  Members of the jury, I ask that you give

 3     your undivided attention once again to Mr. Bart as he delivers

 4     a brief rebuttal on behalf of the plaintiffs.

 5

 6           MR. BART:  Thank you, your Honor.

 7           And good afternoon.

 8           I was struck listening to Mr. Sacks talk about what

 9     this case is about because I didn't really hear very much about

10     that.  Remember the story that I told you and the narrative of

11     how this company came about, and how there was a desire to

12     drive the locker business with the creation of this infringing

13     website, driven by a plug-in and a website that made it

14     possible for people to get copies of music without going to

15     these sites.  And what was the purpose for doing it?  And who

16     did it?  And the fact that it was filled and knowingly filled

17     with all of this infringing material?  And it wasn't discussed

18     at all.  And the fact that I told you that on this website,

19     98 percent-plus of it came from file-sharing sites and college

20     sites and storage sites and content delivery sites?  And it

21     wasn't talked about at all.

22           What was talked about was the same misdirections that

23     have dominated this case, the series of half-truths since the

24     very beginning.  It would take way too much time to delve into

25     all of them.  But the bottom line is, they don't deal with the

E3HKCAP4                          Rebuttal - Mr. Bart

1   issues that you are being asked to address.

2            Take a look for a minute at what I told you about the

3   promotional downloads.  I told you that there were no blog

4   promotional downloads before 2007.  And I told you keep an eye

5   out for the dates.  And Mr. Sacks got up here and he put 20

6   exhibits up on the board, too small for you to probably read,

7   but there was not one of them that was before 2007, most of

8   them in 2008.  It's the same misdirection we've gotten all

9   along.

10           The question is:  Why did Michael Robertson personally

11  create a locker service?  Why did he personally decide to

12  create this Sideload website to drive the traffic?  It's his

13  site.  Robertson and his counsel love to use the term "viral"

14  and they misuse it a million times a day.  But it was Robertson

15  who said that the sideload tool and the Sideload website would

16  be a great viral tool to sell his lockers.  And we don't hear

17  anything about that.  Rather, we hear all these side things

18  about personal vendettas based on what?  About Michael's

19  charities, about Michael's vision about the locker service,

20  about all of these half-truths about irrelevances, instead of

21  looking at:  Why did Michael Robertson create the locker

22  service? why did Michael Robertson create the sideload plug-in?

23  why did Michael create the Sideload website?  All to drive the

24  sale of lockers and make himself a ton of money, just like he

25  did at MP3.com.  And it was all based on the illegal use of

1    content.  It was knowingly based on the illegal use of content,

2    and the evidence of what came in at the end of the day

3    demonstrates all of that.

4         Now, I'm just going to deal in very, very quick form

5    with a couple of the things that Mr. Sacks said.

6         As I said, think about the dates when it comes to the

7    promotional downloads.  There was nothing that you saw that was

8    from 2005 or '6, before the cutoff that I mentioned.  He

9    pointed out the Joss Stone promotion.  That was admitted just

10   to show you what was on the screen at that point, and the judge

11   specifically instructed you that it was not to be viewed as

12   proof that there was any download available on that site at

13   that time.

14        There was a lot of discussion about discovery in this

15   case, about whether or not we gave them the documents we were

16   supposed to give them.  That's not your job as jurors; that's

17   for a federal magistrate to decide.  If somebody thinks that we

18   didn't give the proper amount of discovery, there are

19   procedures in litigation to address it.  They want to cloud

20   your mind with things that have nothing to do with what you

21   have to decide in this case.  We undertook tremendous effort to

22   comply with the discovery requests.

23        And this ties into another point that they were

24   making, which is that we have a vendetta against them and we

25   drove them into the dust.  Well, Chad Olson testified -- and

E3HKCAP4                    Rebuttal - Mr. Bart

1    you heard this -- that Michael Robertson told him that if he

2    ever got sued for copyright infringement, he was going to bury

3    the other side in discovery requests.  You saw those

4    interrogatories.  EMI was asked to answer 1300 interrogatories.

5         So Mr. McMullan, deputized a team that went out in a

6    great effort, scoured the records.  Whether they spoke to those

7    people, they looked at everything that was there.  And if they

8    found two errors -- that's what they pointed out -- two errors

9    in 1300 answers, that's not the basis for anything other than

10   saying, you know what, you did a pretty good job.

11        But Olson said they're going to bury you in discovery.

12   It was, as far as you know and as far as I know, as much or

13   more likely Robertson's decision to extend the case and to

14   impose costs and to extend discovery as it was anybody else's.

15   And don't draw any inferences to the contrary, because there

16   are none to be drawn here.

17        Now, another diversion -- and there are so many of

18   them -- is, why didn't we sue other people, why didn't we sue

19   Spin, why didn't other people sue him?  But let me address

20   these other marketing concerns and these blogs, which, again,

21   are the New York Times as far as Robertson's concerned.  That's

22   because in 2008, when EMI was doing promotional marketing, they

23   were getting value in exchange.  There was none of this going

24   on in 2006 or early 2007, but in 2008, when this was going on,

25   we were either getting data capture for names and addresses for

E3HKCAP4                    Rebuttal - Mr. Bart

1    a mailing list or exposing consumers to a marketing message.

2                And you saw all the marketing messages up on the

3    board.  Why did we sue Robertson and not sue them?  Because he

4    deprived us of those benefits.  He set up a business where the

5    marketing advantage went to him instead of to us.  When you

6    went to Sideload to get a link, unlike seeing the band up there

7    and seeing their tour schedule, seeing reviews of them, having

8    an opportunity to get a link to buy the songs or the album on

9    the store, you didn't see any of that.  You got a link and you

10   saw an ad trying to sell Michael Robertson's lockers.  That's

11   what Sideload was about.  It was converting and stealing our

12   business opportunities.

13               Those business opportunities didn't exist in 2006,

14   when he was starting it out, because the major labels weren't

15   engaged in that business yet, but when we did engage in them,

16   that's what we were looking for.  We were dealing in a world of

17   piracy, and we were willing to give away a single track once in

18   a while if we got some marketing consideration back.  But

19   Robertson took it, stole it, and used it for his own business.

20   And that's why we didn't sue them and that's why we did sue

21   him.

22               Now, they also talk a lot about the takedown notice.

23   Well, you know what, there's no claim in this case about the

24   takedown notice.  There were two claims about the takedown

25   notice -- one in San Diego and one in this court -- and both of

E3HKCAP4                         Rebuttal - Mr. Bart

1      them were dismissed.  So we're not litigating whether or not

2      the takedown notice was proper or not.  Moreover, the takedown

3      notice, in language that Mr. Sacks glosses over, said MP3tunes

4      is not authorized to use the music in the manner it was used,

5      in the manner complained of.

6           Well, Mr. McMullan was up here and he told you they

7      were running an integrated music service.  He said, I don't

8      know whether we would have made a claim if they were just

9      running the locker service, but they were doing a lot more.

10     They were doing a locker service, at the time, with a single

11     master.  They were also running this Sideload site where they

12     were making links available.  They had this plug-in.  They were

13     doing streaming.  It was an integrated music service.  So when

14     he said nobody authorized you to do this in the manner

15     complained of, it was talking about all of it.  And the courts

16     have already determined there's no claim here.

17          Another diversion:  The fact that songs were dropped.

18     Well, the fact is that there are a couple of major causes for

19     that, and none of them have to do with Dr. Horowitz.  One of

20     them is that the Court directed us to reach agreement on the

21     issues that would be presented to you so you didn't have to sit

22     here for another four weeks hearing disputes on ownership

23     issues, that we were, with a little bit of jawboning from the

24     Court, directed to try and work this out on our own.  And we

25     did, and as part of our process, a few songs dropped out.  And

E3HKCAP4                          Rebuttal - Mr. Bart

1    now no good deed goes unpunished.  And it's pointed out that

2    somehow we're guilty or that shows some sort of bad knowledge.

3         The other thing is that there are different claims and

4    rulings made by the Court.  Sometimes those rulings by the

5    Court weaken their case, sometimes they weaken our case, and we

6    adjusted to those two things.  There was nothing in the drop of

7    numbers of works that is anything that you should be concerned

8    about.  It all related to a good-faith attempt to present the

9    best evidence to the jury and evidence that we could rely on.

10        Frankly, why did we drop the claim over the weekend?

11   Because we researched it and we said we do not feel in good

12   faith that we want to pursue that with this jury.  We've looked

13   at it, and even though it was a valid claim at the time that it

14   was presented and there were 7,000 records on the database of

15   MP3tunes and nothing was fabricated, that the explanation

16   sounded like it made sense.

17        The same thing with the takedown notice category:  I

18   told you there's no black-letter law here, there's no bright

19   line saying what is and what isn't.  So when I presented it to

20   you, I presented it to you that you're going to decide at what

21   point that reaches a level where it's actionable, not us.

22        And so we are operating with you in good faith.  We're

23   trying to deal with these categories.  And as I said, we're

24   dealing with a brand new area of law.  They said to us, why did

25   you have to assert all these new claims of willful blindness

E3HKCAP4                          Rebuttal - Mr. Bart

1    and red-flag knowledge?  They know the answer to that.  There

2    was a big decision that came down from the appellate court in

3    this circuit last year, which held that there was an exception

4    to the safe harbor in the DMCA, if you could show willful

5    blindness and red-flag knowledge.  As a result of that, the

6    Court gave us the opportunity to amend our claim to assert

7    those claims, which were not part of the case and were not part

8    of the law until the Second Circuit ruled last year.

9            Somehow that's also supposed to be something that we

10   did to show a vendetta.  There's no vendetta here.  He said,

11   you have a vendetta since 1999.  Where is there evidence that

12   EMI had any interaction with Michael Robertson until the

13   takedown notice in 2007?  This is all just completely

14   fabricated and an attempt to present one of the most aggressive

15   and conniving people in the music industry as a victim, which

16   is a story that I just simply don't think that you can buy.

17           The idea that he was a part-time CEO?  Every single

18   witness that came in here from the company said he was

19   hands-on, he treated Reese and Richards as subordinates, he was

20   abusive to his employees, he was always there.  Now, is it

21   possible that he was there every day 16 hours a day when they

22   were setting up the site, when they were deciding how to do it,

23   when they were deciding what the locker service was going to

24   be, and then the sideload plug-in and the Sideload website and

25   once all of that got enacted, after a year of heavy

E3HKCAP4                          Rebuttal - Mr. Bart

1    engineering, that he backed off a little bit?  Perhaps.  But

2    during that year, from the time they pivoted from this music

3    store to the locker service, through the launch of Sideload,

4    when all the significant legal decisions were made that brought

5    us to this courtroom, he was there every day, and every single

6    witness testified to it.  Not only was he there every day, he

7    made every single decision.

8         So the notion that he's not contributorily liable,

9    that he's not personally inducing and contributing and causing

10   this conduct is craziness.  He's the person who's directing

11   absolutely everything -- not only in his capacity as president

12   but even going out on the circuit tour, sending out blogs,

13   advertising for all of this.  He is personally advocating for

14   the service that they're doing and making all of the decisions

15   as well.  And the notion that he's a passive officer is just

16   something that doesn't fly at all.

17        So let's just go back and look a little bit more at

18   the Michael Robertson Show, because I think that's really what

19   this case comes down to.  As I told you in my initial

20   statements, he made a career of playing outside the rules, and

21   we've already talked about FileZ, we've already talked about

22   MP3tunes, but there's another little thing that happened with

23   MP3tunes, and, that is, that they invested in this company

24   Voquette, and I mentioned this in the last cross that I had

25   with Mr. Robertson.  He is now trying to portray himself as a

E3HKCAP4                        Rebuttal - Mr. Bart

1    dedicated advocate of copyright interests.  He invested money

2    from MP3tunes in a company that was looking for technology that

3    would take streaming content, like when you're listening to

4    Pandora and Spotify, and enable you to catch it and make it a

5    permanent file and keep it on your server.  That was a business

6    that he wanted because his business was always about

7    capitalizing on other people's content.

8            And that's what I was trying to tell you during my

9    opening statement, that this is a man who created Sideload for

10   a reason.  He created Sideload to sell his product.  It's what

11   he's been doing all along.  And he knew that it was all going

12   to be infringing content, and that from 1997 to the present

13   he's made -- actually before that, because FileZ even goes back

14   before that -- he's made a career out of finding unlocked

15   content on the Internet and stealing it.  Is that too harsh a

16   word?  No, it's not too harsh a word.  It's what he has done.

17   He's taken files and he used them for his own benefit without

18   authorization; and that, frankly, is what this Court and what

19   this jury should be considering.

20           Are you going to take his manipulative words to you,

21   about what a good guy he is, how good he is to his employees --

22   I mean you heard that also in his last speech -- I'm so good to

23   my employees, I've given them stock, I've given them this,

24   that.  Well, there's precious little in the record to reflect

25   that.  What there is in the record is the bankruptcy chart from

E3HKCAP4                    Rebuttal – Mr. Bart

1    MP3tunes, which reflects that he stiffed a bunch of employees

2    when he closed down the business and put his own trusts higher

3    on the priority in the bankruptcy charts.

4            So consider that when you're thinking about just how

5    generous this person is.  Think also about him sitting up here

6    on the witness stand by himself.  This is his case.  This is a

7    multi, multi, multimillionaire, this is a guy who's made

8    hundreds of millions of dollars.  He didn't get a single person

9    who's ever worked for him, ever, to come in and stand up for

10   him, not one, because once he stops paying their salary,

11   there's nobody around who's going to stand up and testify for

12   Michael Robertson.  It's a pretty powerful statement.

13           We got one of his former employees to testify –– we

14   took their depositions –– but the cheese stands alone, and the

15   bright light flashes, and there's nobody here except Michael

16   Robertson telling you what he thinks you want to hear.  And

17   that's partially because you know what his relationship with

18   his employees was.  You've seen all of the records of it,

19   you've seen the emails, you've seen his own statement, that I'm

20   a jerk sometimes, and that's putting it nicely.

21           THE COURT:  Please begin to wrap up, Mr. Bart.

22           MR. BART:  Thank you, yes.

23           So what you see is that he controlled everything, he

24   was the final decision-maker, that he told his employees:

25   Never put anything in an email; if you're ever deposed, just

E3HKCAP4                    Rebuttal - Mr. Bart

1    play that Bill Clinton type of answer.  Camille Wood said that

2    in the day-to-day interactions, he was very involved, he made

3    all of the decisions, he treated Reese and Richards like

4    subordinates.  Krause testified that he understood that he

5    received instructions on takedown policies orally so it

6    wouldn't be in legal papers.  And Emily Richards ultimately

7    told you what you needed to know -- she said that MP3tunes is

8    the Michael Robertson Show.  She fought Sideload, she fought

9    Anywhere CD, but she said, ultimately it's out of my hands even

10   though I'm the president, he decides what he wants to decide.

11           And you have her testimony and email she sent when she

12   was forced to resign.  You remember her face when she recounted

13   how he told her that she was leaving, that he was abusive to

14   employees, that he directed her how to testify, that business

15   partners didn't want to work with him.

16           And ultimately, at the end of the day, he really comes

17   across like a professional athlete taking performance-enhancing

18   drugs.  This is a guy with a ton of talent -- you can see it on

19   the stand, he's practiced, he's bright -- but there's just

20   something in him that needs to cheat, there's something in him

21   that needs that unlevel playing field in order to succeed.  You

22   saw it with Bad Apple, you saw it with Anywhere CD, you saw it

23   with FileZ, you saw it with Sideload.  There's always an

24   attempt to do something underhanded and to tilt the balance in

25   his favor.

E3HKCAP4                        Rebuttal - Mr. Bart

1          And it's good that you have heard all that you have

2    heard and watched his demeanor on the stand and you have heard

3    him try and manipulate you on the stand, although I'm not going

4    to go back into that, but nothing that happened in this trial

5    happened without a purpose, and he was clearly out there to

6    manipulate this jury through his testimony.

7          But this jury is a cross-section of our community.

8    And we trust you to come together -- having never met before,

9    bringing your collective insights, perceptions, and

10   understanding of the human experience -- to unravel the

11   conflicting assertions, excuses and lies.  And while hiss

12   personality is not directly on trial, his basic arguments to

13   you have been -- that he is a man of the people, a member of a

14   team and certainly not someone who should be individually

15   liable.

16         But having heard all of the evidence, don't you feel

17   that you have a pretty good idea of who he is?  Is he someone

18   who's ever going to relinquish control and direction?  Is he a

19   passive participant?  Is he just a member of a team?  He's

20   insulting your intelligence.  He's the decider.  He made every

21   single key decision here.  He decided to do the lockers, he

22   decided to do Sideload, he decided to create the plug, he knew

23   that 98 percent or more of the music that was going to come in

24   was going to be infringing, and he was happy with it because it

25   was going to drive the business and make a ton of money for him

E3HKCAP4                    Rebuttal - Mr. Bart

1    and put him back into the glory that he had when he was with

2    MP3.com, so try to change the focus of the trial -- blame

3    everybody else and lie about your intent -- but don't tell us

4    that it's not the Michael Robertson Show, because that's the

5    one that I think that everyone in this room that's heard the

6    evidence knows for sure, the infringements here are as clear as

7    they were in MP3.com, and all the decisions resulting from

8    those infringements were decisions made by one man.

9            It would be a perversion of justice to let him walk

10   after having made so much money from his unauthorized use of

11   other people's property, to simply close down MP3tunes and walk

12   away, to stiff the artists and stiff the composers the way he

13   stiffed his lawyers and employees.  You have the power to

14   finally show him that people are responsible for the

15   consequences of their actions, that people shouldn't steal

16   other people's property just because it hasn't been locked, and

17   that we live in a better society than that.  And perhaps with a

18   proper lesson, which he never got in the MP3.com case, he can

19   take his manifest talents and use them for collective good

20   instead of making a career out of hurting other people just to

21   help himself.

22           Thank you.

23           THE COURT:  Members of the jury, we've concluded

24   closing arguments.  We're going to turn now for a short time

25   before your luncheon recess to the most important part of the

1    case, my instructions on the law to you, and then we're going

2    to take an abbreviated luncheon recess.  But in the interests

3    of using all of the time that we have, I'm going to begin my

4    instructions at this time.

5         Now, members of the jury, my charge to you on the law

6    is lengthy and covers many points.  You must listen closely as

7    I read the charge, and I will send a copy of these instructions

8    into the jury room for you to have during your deliberations.

9         We're now approaching the most important part of this

10   case -- your deliberations.  You've heard all the evidence in

11   the case as well as the final arguments of the lawyers for the

12   parties.  Before you retire to deliberate, it's my duty to

13   instruct you as to the law.  Your duty is to accept these

14   instructions of law and apply them to the facts as you

15   determine them.

16        Regardless of any opinion you may have as to what the

17   law may be or ought to be, it's your sworn duty to follow the

18   law as I give it to you.  If any attorney or witness has stated

19   a legal principle different from any that I state to you in my

20   instructions, it's my instructions that you must follow.

21        In listening to these instructions and reviewing them

22   later, you should not single out any particular instruction as

23   alone stating the law, but you should instead consider my

24   instructions as a whole.

25        Your duty is to decide the fact issues in the case.

E3HKCAP4                      Charge

1    You are the sole and exclusive judges of the facts.  You pass

2    upon the weight of the evidence.  You determine the credibility

3    of the witnesses.  You resolve such conflicts as there may be

4    in testimony.  You draw whatever reasonable inferences you

5    decide to draw from the facts as you determine them.

6          In determining the facts, you must rely upon your own

7    recollection of the evidence.  None of what the lawyers have

8    said -- in their opening statements, their closing arguments,

9    or in their objections -- is evidence.  It's only the answer,

10   in the context of a question, that is evidence.

11         You may not consider any answer that I directed you to

12   disregard.  And I remind you that nothing I've said during the

13   trial or will say during these instructions is evidence.

14         Similarly, the rulings I've made during the trial are

15   not any indication of my views of what your decision should be.

16         The evidence before you consists of the answers given

17   by witnesses, the exhibits that were received in evidence, and

18   the stipulations of counsel.  Exhibits marked for

19   identification but not received may not be considered as

20   evidence.  Anything that you may have seen or heard about this

21   case outside the courtroom is not evidence and must be

22   disregarded entirely.

23         Now, it's the duty of the attorney for each side of

24   the case to object when the other side offers testimony or

25   other evidence that the attorney believes is not properly

admissible.  Counsel also have the right and duty to ask the
Court to make rulings of law and to request conferences at the
sidebar, out of the hearing of the jury.  You should not harbor
any prejudice against any attorney or party because the
attorney objected to the admissibility of evidence or asked for
a conference out of the hearing of the jury, or asked me for a
ruling on the law.

     This is a civil case.  Accordingly, the parties have
the burden of proving the elements of their claims and
affirmative defenses by a preponderance of the credible
evidence.  To establish by a preponderance of the evidence
simply means that something is more likely so than not so.  A
preponderance of the evidence means the greater weight of the
evidence.  It refers to the quality and persuasiveness of the
evidence, not to the number of witnesses or exhibits.

     If you find that the credible evidence on a given
issue is evenly divided between the parties, that it is equally
probable that one side is right as it is that the other side is
right, then you must decide that issue against the party having
this burden of proof.  That is because the party bearing this
burden must prove more than a simple equality of evidence.  The
party must prove the element at issue by a preponderance of the
evidence.

     On the other hand, the party with the burden of proof
need prove no more than a preponderance.  So long as you find

E3HKCAP4                    Charge

 1   that the scales tip, however slightly, in favor of the party

 2   with this burden of proof, that what that party claims is more

 3   likely true than not true, then that element will have been

 4   proved by a preponderance of the evidence.

 5          If you conclude that the party bearing the burden of

 6   proof has failed to establish its claim or affirmative defense

 7   by a preponderance of the evidence, you must decide against

 8   that party on the issue you are considering.

 9          Some of you may have heard of proof beyond a

10   reasonable doubt, which is the proper standard of proof in a

11   criminal trial.  That requirement does not apply to a civil

12   case such as this, and you should put it out of your minds.

13          Now, the evidence in this case consists of the sworn

14   testimony of the witnesses, the exhibits received in evidence,

15   and the stipulations between the parties.  Exhibits which have

16   been marked for identification but not received may not be

17   considered by you as evidence.  Only those exhibits received

18   may be considered as evidence.

19          Similarly, you're to disregard any testimony that I've

20   stricken.  Anything you may have seen or heard about this case

21   outside the courtroom is not evidence and must be entirely

22   disregarded.

23          There are two types of evidence that you may consider

24   in reaching your verdict -- direct evidence and circumstantial

25   evidence.

E3HKCAP4                    Charge

1              Direct evidence is evidence that proves a disputed

2       fact directly.  For example, where a witness testifies to what

3       he or she saw, heard or did, that is called direct evidence.

4              Circumstantial evidence is evidence that tends to

5       prove a disputed fact by proof of other facts.  To give a

6       simple example, you may remember the story of Robinson Carusoe,

7       who was marooned on a deserted island.  He spent years thinking

8       he was alone until one day, as he walked along the beach, he

9       noticed large footprints in the sand.  Because his feet were

10      too small to have made them, Robinson concluded that somebody

11      else must have left the footprints even though he had not seen

12      anyone else.  In other words, he had no direct evidence of that

13      fact, but it would be reasonable for him to conclude from the

14      footprints on the beach that in fact he was not alone.  That's

15      all there is to circumstantial evidence -- using your reason

16      and experience, you infer from established facts the existence

17      or nonexistence of some other fact.

18             The law makes no distinction between direct and

19      circumstantial evidence.  Circumstantial evidence is of no less

20      value than direct evidence, and you can consider either/or both

21      and can give them such weight as you conclude is warranted.

22             Now, in their arguments, the parties have asked you to

23      infer -- on the basis of your reason, experience and common

24      sense -- from one or more established facts, the existence of

25      some other fact.  The process of drawing inferences from facts

E3HKCAP4                         Charge

1    in evidence is not a matter of guesswork or speculation.  An

2    inference is a reasonable deduction or logical conclusion which

3    you, the jury, are permitted, but not required, to draw from

4    the facts that have been established by either direct or

5    circumstantial evidence.  In drawing inferences, you should use

6    your common sense.

7            During the trial I permitted the taking of notes by

8    those of you who wished to do so.  At that time, I pointed out

9    that while I permit the taking of notes, the court reporters

10   take down everything that's said in the courtroom and will read

11   back to you during your deliberations any portion of the

12   transcript that you may ask for.

13           I also advised you to be careful because taking notes

14   presents the further problem that doing so may divert your

15   attention from some very important testimony given while you

16   are taking notes.

17           As to those jurors who did take notes during the

18   trial, I point out to you and your fellow jurors that notes are

19   simply an aid to memory for the particular juror who takes the

20   notes.  Therefore, I instruct you that your notes are only a

21   tool to aid in your individual memory, and you should not

22   compare your notes with other jurors' in determining the

23   content of any testimony or in evaluating the importance of any

24   evidence.

25           Further, those jurors who did take notes should rely

E3HKCAP4                    Charge

1   on their independent recollection of the evidence and not be

2   influenced by the fact that another juror has taken notes.

3           Your notes are not evidence and are by no means a

4   complete outline of the proceedings or a list of the highlights

5   of the trial.

6           In this case, I've heard evidence in the form of

7   stipulations.  A stipulation is simply an agreement among the

8   parties.  You've heard two types of stipulations in this case:

9           First, you heard evidence in the form of stipulations

10  that contain facts that were agreed to be true.  And in such

11  cases, you must accept those facts as true.

12          Second, you heard evidence in the form of stipulations

13  admitting certain exhibits into evidence.  I instruct you that

14  exhibits referenced in stipulations are in evidence like any

15  other exhibit.

16          Some of the exhibits in this case are charts and

17  summaries.  These charts and summaries were admitted merely as

18  analyses and summaries of voluminous documents.  It's for you

19  to decide whether the charts and summaries correctly present

20  the information contained in the testimony and exhibits on

21  which they're based.  You're entitled to consider the charts

22  and summaries if you find that they assist you in analyzing and

23  understanding the evidence.

24          Now, some exhibits are redacted.  Redacted means that

25  part of the document was taken out.  You're to focus on those

E3HKCAP4                    Charge

portions of exhibits that have been admitted into evidence, and

you should not consider any reason why parts of exhibits were

deleted or redacted.

You've had the opportunity to observe all the

witnesses.  How do you evaluate the credibility or

believability of these witnesses?  The answer is that you use

your plain common sense.  Was the witness candid, frank and

forthright, or did the witness appear evasive, as if he or she

was trying to hide something?

How much you choose to believe a witness may be

influenced by the witness' bias.  Does the witness have some

incentive, loyalty or motive that might cause him or her to

shade the truth?  Or does the witness have some bias, prejudice

or hostility that may have caused the witness, consciously or

not, to give you something other than a completely accurate

account of the facts?  You're not required to accept testimony

even though the testimony is uncontradicted and the witness'

testimony is not challenged.  You may decide -- because of the

witness' bearing or demeanor or because of the inherent

improbability of the testimony or for other reasons -- that the

testimony is not worthy of belief.

If you find that a witness willfully testified

falsely, that's always a matter of importance that you should

weigh carefully.  If you find that any witness has lied under

oath, you should view the testimony cautiously and weigh it

E3HKCAP4                        Charge

1   with great care.  It is, however, for you to determine how much

2   of the witness' testimony, if any, you wish to believe.

3          Thus, there is no magical formula by which you can

4   evaluate testimony.  You determine for yourselves every day,

5   and in a multitude of circumstances, the reliability of

6   statements made to you by others.  You may consider the

7   interest of any witness in the outcome of this case, regardless

8   of who called or questioned the witness.

9          The issue of credibility may, but need not be, decided

10  in an all-or-nothing fashion.  If you find that a witness

11  testified falsely in one part, you still may accept his or her

12  testimony in other parts or you may disregard all of it.

13  That's a determination for you, the jury.

14         You've heard evidence that at some earlier time

15  witnesses have said or done something or failed to say or do

16  something which counsel argues is inconsistent with the

17  witness' trial testimony.  Evidence of a prior inconsistent

18  statement is not to be considered by you as affirmative

19  evidence in determining the facts.  Evidence of a prior

20  inconsistent statement was placed before you for the more

21  limited purpose of helping you decide whether to believe the

22  trial testimony of the witness who contradicted a prior

23  statement.

24         If you find that the witness made an earlier statement

25  that conflicts with the witness' trial testimony, you may

1    consider that fact in deciding how much of the witness' trial

2    testimony, if any, to believe.  In making this determination,

3    you may consider whether the witness purposely made a false

4    statement or whether it was an innocent mistake, whether the

5    inconsistency concerns an important fact or whether it had to

6    do with a small detail, whether the witness had an explanation

7    for the inconsistency, and whether that explanation appealed to

8    your common sense.

9          It is exclusively your duty, based upon all of the

10   evidence and your own good judgment, to determine whether the

11   prior statement was inconsistent, and, if so, how much, if any,

12   weight to give to the inconsistent statement in determining

13   whether to believe all or part of the witness' testimony.

14         You've heard evidence during the trial that witnesses

15   have discussed the facts of the case and their testimony with

16   the lawyers before the witness appeared in court.  Although you

17   may consider that fact when you are evaluating a witness'

18   credibility, I should tell you that there is nothing either

19   unusual or improper about a witness meeting with lawyers before

20   testifying so that the witness can be aware of the subjects he

21   will be questioned about, focus on those subjects, and have the

22   opportunity to review relevant exhibits before being questioned

23   about them.  Such consultation helps conserve your time and the

24   Court's time.  In fact, it would be unusual for a lawyer to

25   call a witness without such consultation.  Again, the weight

E3HKCAP4                    Charge

1   you give to the fact or the nature of the witness' preparation

2   for his or her testimony and what inference you draw from such

3   preparation are matters completely within your discretion.

4         In determining what weight you will attach to a

5   witness' testimony, you should consider the interest or lack of

6   interest that a witness has in the outcome of this case.  That

7   means that in evaluating the credibility of the witness, you

8   should take into account any evidence that such witness may

9   benefit in some way from the outcome of the case.  Such

10  interest in the outcome creates a motive to testify falsely and

11  may sway a witness to testify in a way that advances his or her

12  own interests.

13        A witness who is interested in the outcome of the case

14  is not necessarily unworthy of belief, but the interest of a

15  witness is a factor or possible motive that you may consider in

16  determining the weight and credibility to be given to his or

17  her testimony.

18        You heard testimony from Dr. Ellis Horowitz.

19  Dr. Horowitz is a witness who, by education or experience, has

20  acquired learning or experience in a science or a specialized

21  area of knowledge.  Such a witness is permitted to give his

22  opinions as to relevant matters in which he professes to be

23  knowledgeable and to give his reasons for his opinions.  His

24  testimony is presented to you on the theory that someone who is

25  experienced in the field can assist you in understanding the

E3HKCAP4                    Charge

1    evidence or in reaching an independent decision on the facts.

2         Your role in judging credibility applies to

3    Dr. Horowitz as well as to other witnesses.  You should

4    consider Dr. Horowitz's opinions and give them as much or as

5    little weight as you think they deserve.

6         If you should decide that Dr. Horowitz's opinion was

7    not based on sufficient education or experience or on

8    sufficient data, or if you should conclude that his

9    trustworthiness or credibility is questionable for any reason,

10   or if his opinion was outweighed in your judgment by other

11   evidence in the case, then you may disregard Dr. Horowitz's

12   opinion entirely or in part.

13        On the other hand, if you find that Dr. Horowitz's

14   opinion is based on sufficient data, education and experience,

15   and the other evidence does not give you reason to doubt his

16   conclusions, you would be justified in placing reliance on his

17   testimony.

18        The law does not require any party to call as

19   witnesses all persons who may have been present at any time or

20   place involved in the case or who may appear to have some

21   knowledge of the matters in issue in this trial; nor does the

22   law require any party to produce as exhibits all papers or

23   things mentioned in the evidence in the case.

24        I'm now going to turn to the substantive claims in the

25   case, but before I do, we're going to have lunch, because your

E3HKCAP4                          Charge

1  lunches are waiting for you.  But there is no such thing as a

2  free lunch, so what we're going to do is we're going to take an

3  abbreviated luncheon recess, no more than 40 minutes, members

4  of the jury, so stay in the jury room and enjoy your lunches.

5  Talk about anything except this case.  Anything at all,

6  bracketology maybe -- the time draws near -- anything but not

7  this case, and we're going to reconvene in 40 minutes.

8          Please recess the jury.

9          (Continued on next page)

E3HKCAP4                        Charge

 1           (Jury not present)

 2           THE COURT:  Everyone may be seated for a moment.

 3           Are there any issues that counsel want to raise?

 4           MR. SACKS:  Yes.  Last night and this morning, your

 5   Honor, we submitted the joint exhibit list, and there was a

 6   note in the email to Wayne that there were two exhibits, and

 7   only two exhibits, that were in dispute and left off the list.

 8   They were the two videos that we played that Mr. Robertson had

 9   done.  And the testimony about them is at page 1733 of the

10   transcript.  It says:  "During the briefing stage of this case,

11   did you create videos, Mr. Robertson, that responded to

12   Dr. Horowitz's videos that he showed the other day in Court?

13   "A.  I did."

14           And then I said, "Your Honor, at this point we'd like

15   to play two of Mr. Robertson's videos, Defendants' Exhibit 1576

16   and 1574.  Neither of them relate to the subject of the one of

17   Dr. Horowitz's that was excluded that we agreed not to play.

18           "The Court:  Any objection?

19           "Mr. Bart:  No, your Honor, no objection.

20           "Mr. Scibilia:  No objection.

21           "The Court:  You may proceed, Mr. Sacks, with 1576 and

22   1574."

23           I think they're in evidence.

24           MR. WILSON:  On our review of the record, we didn't

25   see them admitted into evidence.  If they want to move --

E3HKCAP4                    Charge

1         THE COURT:  All right, it's not in the record that

2    they're in evidence, but certainly that's just an oversight

3    because they were played.  So I deem them admitted into

4    evidence, and they should be added to the exhibit list.

5         MR. SACKS:  We will revise the list, your Honor.

6         (Defendant's Exhibits 1576 and 1574 received in

7    evidence)

8         THE COURT:  I'm going to distribute to counsel now

9    jury verdict sheet, together with the various schedules.  And

10   this is the format in which it will be presented to each juror.

11   Kindly review it and let me know if there's any issue.

12         Let's reconvene at 1:30 here.  See you then.

13         (Luncheon recess)

14

15

16

17

18

19

20

21

22

23

24

25

E3HBCAP5                        Charge

1            (In open court; jury not present)

2            THE COURT:  Are there any issues with respect to the

3    jury verdict sheet and attached exhibits?

4            MR. SACKS:  No, your Honor.  Not from our side.

5            MR. PLATZER:  Not yet, your Honor.  It's my customary

6    practice to read the verdict sheet to the jury, but I'm not

7    going to do that because it's 3,300 words.  So I'm just going

8    to speak briefly, generally, to them about it.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3HBCAP5                    Charge

1                    (In open court; jury present)

2                    THE COURT:  All right.  Everyone may be seated.

3                    Ladies and gentlemen of the jury, I hope you were

4      fortified by your lunch.

5                    A JUROR:  Thank you for lunch.

6                    THE COURT:  No, we all paid for it.

7                    A JUROR:  I thought it was on your nickel.

8                    THE COURT:  We all paid for it.

9                    We're now going to get into the substantive charges,

10     the charges that relate to the claims in this case.

11                   The plaintiffs assert three categories of claims:

12     Federal copyright infringement claims, secondary copyright

13     infringement claims, and common law copyright infringement

14     claims.  Each of these categories will be explained in more

15     detail in a moment.  First I want to discuss the components of

16     plaintiffs' federal copyright infringement claims.

17                   Musical compositions, sound recordings recorded on or

18     after February 15, 1972, and images can be subject to federal

19     copyright protection.  But sound recordings recorded before

20     February 15, 1972 are not subject to federal copyright

21     protection.  Instead, they can be subject to protection as

22     common law copyrights under New York State law, which I'll

23     explain later.

24                   Now, the plaintiffs in this case allege copyright

25     infringement by MP3tunes and Michael Robertson under various

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

E3HBCAP5                    Charge

1    theories that I'll explain to you.  As I mentioned at the

2    beginning of trial, the term "copyright" is the name for the

3    rights Congress has decided that the law extends to an author

4    of an original work.  As relevant to this trial, those rights

5    include the exclusive rights to copy the work, to distribute

6    the work, to publicly perform the work, and to license others

7    to do so.

8            In any copyright infringement case, the first question

9    is whether plaintiffs own the copyrights at issue.  You will

10   recall that the parties in this case reached a stipulation

11   regarding ownership that was read aloud to you and received in

12   evidence.  Pursuant to that agreement, there's no dispute that

13   the plaintiffs own the copyrights to each of the works at issue

14   in this case.

15           The next question in a copyright infringement case is

16   whether the copyrights owned by the plaintiffs have been

17   infringed.

18           A copyright owner has the exclusive right to

19   reproduce-- or copy-- distribute, publicly perform, or publicly

20   display a work.  I'll explain the meaning of these exclusive

21   rights in greater detail later.  Because these rights are

22   exclusive, if a person or company, without other qualifying

23   defenses, copies, distributes, publicly performs or publicly

24   displays the work without a license or other authorization from

25   the copyright owner or someone the copyright owner has

1    authorized to give such permission, he or she is said to have

2    "infringed" the copyright.

3          In brief, there are two types of infringement at issue

4    in this case:  Direct infringement and secondary infringement

5    liability.  When a person or a company itself copies,

6    distributes, publicly performs, or displays the copyrighted

7    work without authorization or other defense, it is considered a

8    "direct infringement."  In order to be a direct infringer, a

9    person or company must have engaged in a volitional act that

10   causes the alleged copying.  Plaintiffs claim that certain of

11   their copyrights were directly infringed by certain MP3tunes

12   executives, by certain users of MP3tunes' system, and by

13   certain websites hosting files to which MP3tunes provided

14   links.

15         In certain circumstances, people and companies who do

16   not directly infringe copyrights themselves are liable for

17   direct infringements committed by others.  This is known as

18   "secondary liability."

19         Plaintiffs contend that both MP3tunes and Michael

20   Robertson are secondarily liable for the infringing acts of

21   MP3tunes executives, for the infringing acts of users of

22   MP3tunes' websites, and for the infringing acts of certain

23   websites hosting files to which MP3tunes provided links.  There

24   are several different theories under which secondary liability

25   may be imposed.  The plaintiffs' claims for secondary liability

E3HBCAP5                    Charge

1    in this case include:  Respondeat superior, vicarious

2    liability, and contributory liability.  I'll explain these

3    theories in greater detail shortly.

4           In circumstances where more than one person or company

5    is responsible for copyright infringement, a copyright owner is

6    entitled to sue all, one, or some of the infringers but not

7    others.  You should not draw any inferences from the fact that

8    the plaintiffs here have brought claims against Robertson and

9    MP3tunes, but not against other persons involved in the

10   infringement.

11          Now, one of the exclusive rights of a copyright owner

12   is to reproduce a copyrighted work.  As relevant here, to

13   reproduce a work means to copy it.

14          The plaintiffs claim that their exclusive right to

15   reproduce certain sound recordings and musical compositions was

16   directly infringed by certain MP3tunes executives when those

17   executives made copies of those works.  This issue was

18   previously decided by this Court and you will not need to

19   consider it, as I will describe later.

20          The plaintiffs also claim that certain MP3tunes users

21   directly infringed plaintiffs' exclusive right to reproduce

22   certain sound recordings and musical compositions by making

23   copies of those sound recordings and musical compositions to

24   MP3 servers.  You will need to decide whether MP3tunes users

25   directly infringed plaintiffs' reproduction rights.  As I told

E3HBCAP5                        Charge

1     you, to establish direct infringement of the plaintiffs'

2     reproduction rights, plaintiffs must prove by a preponderance

3     of the evidence that MP3tunes users who sideloaded songs in

4     their lockers, one, copied plaintiffs' works, and, two,

5     plaintiffs did not authorize such copying of the copyrighted

6     work.

7             Now, plaintiffs also claim that Michael Robertson and

8     MP3tunes are liable for secondary infringement of plaintiffs'

9     reproduction rights under various theories.  As I've mentioned,

10    in order for there to be secondary liability, there must be an

11    underlying direct infringement.  I'm going to begin with

12    secondary liability theories relating to direct infringement by

13    MP3tunes executives.

14            Earlier in this case, the Court found that certain

15    sideloading by certain MP3tunes executives directly infringed

16    plaintiffs' copyrights in certain musical compositions and

17    sound recordings by reproducing them without authorization.

18    You will decide whether MP3tunes is secondarily liable for the

19    direct infringements of those executives under the doctrine of

20    respondeat superior.

21            Under this doctrine, an employer is responsible for

22    the act of its employee if the act is in furtherance of the

23    employer's business and is within the scope of the employee's

24    authority.  An act is within the scope of an employee's

25    authority if it is performed while the employee is engaged

E3HBCAP5                    Charge

1    generally in the performance of his or her assigned duties or

2    if the act is reasonably necessary or incidental to the

3    employment.  The employer need not have authorized the specific

4    act in question.

5        If you find MP3tunes' executives were acting within

6    the scope of their authority as MP3tunes employees and in

7    furtherance of MP3tunes' business when they directly infringed

8    certain of plaintiffs' copyrights, then MP3tunes is legally

9    responsible for its executives' copyright infringement under

10   the doctrine of respondeat superior.  However, if you find that

11   MP3tunes' executives were acting for personal reasons, MP3tunes

12   is not secondarily liable for its executives' direct

13   infringements under the doctrine of respondeat superior.

14   Plaintiffs have the burden of proof on this issue.

15       In evaluating plaintiffs' claim with respect to

16   infringing sideloads by MP3tunes executives, you need not

17   consider sideloads by Michael Robertson personally.  Those have

18   been separately addressed by the Court, and need not form any

19   part of your consideration during this phase of the trial.

20       If and only if you find that MP3tunes is liable for

21   its executives' direct infringement under the doctrine of

22   respondeat superior, then you must go on to consider whether

23   Robertson himself is liable for MP3tunes' infringements,

24   through its executives, under the doctrine of vicarious

25   liability.

1          The doctrine of vicarious liability is another way

2     that a person can be secondarily liable for the direct

3     infringement of others.  In order to prove that Robertson is

4     vicariously liable for the infringements of MP3tunes, through

5     its executives, plaintiffs must prove by a preponderance of the

6     evidence that, one, Robertson had the right and ability to

7     supervise the infringing activity of MP3tunes and, two,

8     Robertson received a financial benefit directly attributable to

9     the infringing activity of MP3tunes.

10         A defendant has the "right and ability" to supervise

11    infringing behavior when the direct infringer depends upon the

12    defendant for direction in such matters.  The right and ability

13    to control infringing behavior can also exist where a defendant

14    has the ability to suspend or restrict direct infringers'

15    access to computer software used for the infringement at issue,

16    or to block their access to files that contain infringing

17    content.

18         A defendant derives a direct financial benefit from

19    infringing activity where there is a causal relationship

20    between the infringing activity and an obvious and direct

21    financial interest.  The direct financial interest does not

22    need to be substantial in proportion to a defendant's overall

23    profits.  For example, a direct financial benefit may be

24    established where infringing material acts as a "draw" to

25    attract subscribers to a defendant's business, even if it is

E3HBCAP5                          Charge

1    not the primary, or even a significant draw.  The mere fact

2    that a defendant is president and shareholder of a company

3    committing infringing acts or receiving benefits from

4    infringing acts is not sufficient by itself to establish a

5    direct financial interest.

6            A person does not need knowledge of the infringing

7    activity to be vicariously liable for copyright infringement.

8            If and only if you find that MP3tunes is liable for

9    its executives' direct infringement under the doctrine of

10   respondeat superior, then you must go on to consider whether

11   Robertson himself is liable for MP3tunes' infringements,

12   through its executives, under the doctrine of contributory

13   liability.

14           Contributory infringement is another form of secondary

15   liability for copyright infringement of another.  A defendant

16   is liable for contributory infringement if, one, with knowledge

17   of the infringing activity, two, that defendant introduces,

18   causes, or materially contributes to the infringing conduct of

19   another.  Plaintiffs claim that Michael Robertson is liable for

20   contributing to the direct infringement of MP3tunes'

21   executives.

22           Knowledge of the infringing conduct occurs when the

23   defendant either knows, or has reason to know, of the direct

24   infringement.  Without knowledge of infringing activity, a

25   defendant cannot be found liable for simply providing a

1    technology that may allow others to exchange copyrighted

2    material.

3            A defendant introduces, causes, or materially

4    contributes to the infringing conduct of another if the

5    defendant engages in personal conduct that is part of,

6    encourages, or assists the infringement.  A defendant also

7    materially contributes to infringement if it provides the

8    machinery, goods, site or facilities for the infringement.  The

9    site and facilities for infringement could consist of, for

10   example, the software and services necessary for the infringing

11   activities or the operation of servers that physically store

12   the infringing content.

13           Now I am going to instruct you on plaintiffs'

14   secondary liability claims regarding direct infringement by

15   MP3tunes users.  If and only if you determine that MP3tunes'

16   users directly infringed plaintiffs' copyrights applying the

17   standards I articulated earlier, then you must determine

18   whether MP3tunes was contributorily liable for those direct

19   infringements.

20           To make this determination, you must first decide

21   whether MP3tunes is protected by a defense under a law called

22   the Digital Millennium Copyright Act, or "DMCA."  As I

23   mentioned earlier, the DMCA provides online service providers

24   with a "safe harbor."  That safe harbor protects online service

25   providers, like MP3tunes, by limiting their liability for

E3HBCAP5                    Charge

1    infringing conduct by their users.  This safe harbor cannot be

2    used to protect a service provider against specific

3    infringements of which the provider has actual or apparent

4    knowledge.  Apparent knowledge is often called "red flag

5    knowledge."  A provider cannot avoid actual knowledge of

6    infringement by willfully blinding itself to facts indicating

7    infringement.

8         This Court has previously determined that MP3tunes is

9    entitled to the DMCA safe harbor defense except with respect

10   to, one, any instances where it was willfully blind to the

11   infringement of specific works by its users and, two, any

12   instances where it had red flag knowledge of the infringement

13   of specific works by its users.

14        A service provider is willfully blind to infringing

15   activity on its system if it, one, had reason to suspect

16   specific instances of infringement by its users of the specific

17   work and, two, it consciously or deliberately avoided

18   confirming that suspicion, or shielded itself from learning of

19   the particular infringing transactions by looking the other

20   way.  For each work as to which plaintiffs contend that

21   MP3tunes was willfully blind as to the infringement of the

22   work, you must conclude, based on the preponderance of the

23   evidence, whether plaintiffs have met that standard.

24        Your willful blindness determination must be directed

25   towards specific and identifiable instances of infringement.

E3HBCAP5                    Charge

1   Thus, even if you find MP3tunes was aware of a high probability

2   of general infringement by its users, that is not enough to

3   establish willful blindness.  Instead, MP3tunes must be aware

4   of specific facts or circumstances indicating that a particular

5   work belonging to plaintiffs was copied in violation of

6   copyright laws.  Then, MP3tunes must make a deliberate effort

7   to avoid confirming those specific facts or circumstances.

8           In determining whether MP3tunes was willfully blind to

9   specific acts of infringement, I instruct you that nothing in

10   the DMCA requires MP3tunes to affirmatively seek facts

11   indicating infringing activity.  MP3tunes has no obligation to

12   affirmatively monitor its sites for instances of infringement,

13   to use identification tools to locate infringements, or to take

14   commercially reasonable steps in response to a generalized

15   awareness of infringement.  Put another way, if investigation

16   is required to determine whether material is infringing, then

17   MP3tunes is not willfully blind to that specific and

18   identifiable instance of infringement.  Finally, you may not

19   consider evidence related to works not owned by plaintiffs in

20   determining willful blindness.

21           If you determine that MP3tunes was willfully blind to

22   any specific instance of infringement as I outlined above,

23   MP3tunes does not qualify for the DMCA safe harbor with respect

24   to that instance of infringement.  If, however, you determine

25   MP3tunes was not willfully blind to a specific instance of

E3HBCAP5                          Charge

1    infringement, the DMCA safe harbor applies and there can be no

2    liability for that particular work.

3          Another condition a service provider must meet in

4    order to be protected by the DMCA safe harbor is that the

5    service provider must not be aware of facts and circumstances--

6    or "red flags" -- that would have made it apparent or obvious

7    to a reasonable person that any specific activity on its

8    service was infringing.

9          For each work as to which plaintiffs contend that

10   MP3tunes had a red flag knowledge of infringement of the work,

11   you must conclude, based on the preponderance of the evidence,

12   whether plaintiffs have shown, one, that MP3tunes was

13   subjectively aware of facts that, two, would have made specific

14   and identifiable instances of infringement objectively obvious

15   to a reasonable person.  To establish the subjective knowledge

16   prong, you must find that MP3tunes was subjectively aware--

17   that is, actually aware-- of information identifying specific

18   instances of infringement.  General awareness of infringement

19   is not sufficient to establish red flag knowledge.  Put another

20   way, if further investigation of facts and circumstances is

21   required to identify the material as infringing, then those

22   facts and circumstances are not red flags.

23          In determining whether MP3tunes had red flag knowledge

24   of specific instances of infringement, I instruct you that

25   nothing in the DMCA requires MP3tunes to affirmatively seek out

E3HBCAP5                          Charge

1    facts indicating infringing activity.  MP3tunes has no

2    obligation to affirmatively monitor its site for instances of

3    infringement, use identification tools to locate infringements,

4    or take commercially reasonable steps in response to a

5    generalized awareness of infringement.  Finally, you may not

6    consider evidence related to works not owned by plaintiffs in

7    determining red flag knowledge.

8          If you determine that MP3tunes had red flag knowledge

9    of any specific instance of infringement as I've outlined

10   above, MP3tunes does not qualify for the DMCA safe harbor with

11   respect to that instance of infringement.  If, however, you

12   determine MP3tunes did not have red flag knowledge of a

13   specific instance of infringement, the DMCA safe harbor applies

14   and there can be no liability for that particular work.

15         If and only if you find that MP3tunes is not entitled

16   to the DMCA safe harbor because you found that it was willfully

17   blind or had red flag knowledge, then you must determine

18   whether MP3tunes is secondarily liable for the infringement of

19   its users, through either vicarious liability or contributory

20   liability.  In reaching this determination, you should apply

21   the same standards that I explained to you earlier.  You should

22   only consider MP3tunes' secondary liability with respect to

23   specific sound recordings and/or musical compositions as to

24   which you have found that MP3tunes was willfully blind or had

25   red flag knowledge.

E3HBCAP5                    Charge

1          If and only if you find that, one, MP3tunes is not

2     entitled to the DMCA safe harbor because it was willfully blind

3     or had red flag knowledge regarding any particular works and,

4     two, that MP3tunes is secondarily liable for its users'

5     infringements of those works through either vicarious liability

6     or contributory liability, you must further determine whether

7     Robertson is secondarily liable for such infringing copying.

8     In deciding Robertson's secondary liability, you should apply

9     to Robertson the standards for vicarious liability and

10    contributory liability I have previously discussed above.

11         In addition, this Court has already determined that

12    MP3tunes is not entitled to the DMCA safe harbor with respect

13    to copies of plaintiffs' works in suit listed on takedown

14    notices that MP3tunes did not remove from users' lockers.  You

15    must determine whether Robertson is secondarily liable for such

16    infringing copying.  To decide Robertson's secondary liability,

17    you should apply to Robertson the standards for vicarious

18    liability and contributory liability I have previously

19    discussed.

20         I'll now turn to plaintiffs' public performance

21    claims.  Plaintiffs claim that MP3tunes secondarily infringed

22    their exclusive rights to perform publicly their copyrighted

23    sound recordings and musical compositions under federal law by

24    allowing users to play back those works through the Sideload

25    website.  Plaintiffs also allege that Robertson is secondarily

E3HBCAP5                          Charge

1    liable for such infringement.

2            To "perform" a work means to render or play it, either

3    directly or by means of any device or process.

4            To perform or display a work "publicly" means to, one,

5    perform or display it at a place open to the public or at any

6    place where a substantial number of persons outside a normal

7    circle of a family and its social acquaintances is gathered;

8    or, two, to transmit or otherwise communicate a performance or

9    display of the work to a place specified in the first clause or

10   to the public by means of any device or process, whether the

11   members of the public capable of receiving the performance or

12   display receive it in the same place or in separate places, and

13   at the same time or at different times.  A mere download is not

14   a public performance.

15           The DMCA safe harbor is a defense to the public

16   performance claim for the musical compositions and sound

17   recordings at issue in this trial.  Therefore, you should only

18   consider plaintiffs' public performance claims with respect to

19   those works, if any, for which you already found that MP3tunes

20   was willfully blind or had red flag knowledge.

21           Now, with respect to secondary liability for

22   infringement of public performance rights, first, you must

23   consider whether any websites to which MP3tunes was providing

24   links through the Sideload.com website were publicly performing

25   those works without authorization.

E3HBCAP5                         Charge

1          If and only if you find that these other websites

2     directly infringed plaintiffs' public performance rights, you

3     must consider whether MP3tunes is secondarily liable for such

4     infringement by applying the standards of vicarious liability

5     and contributory liability that I have explained to you

6     previously.

7          If and only if you find that MP3tunes is secondarily

8     liable for the infringing public performance of plaintiffs'

9     sound recordings and musical compositions, you must also

10    determine whether Robertson is secondarily liable for that

11    public performance.  To decide Robertson's personal liability,

12    you should apply to Robertson the standards of vicarious

13    liability and contributory liability which I explained to you

14    previously.

15         Now I'll turn to plaintiffs' distribution claims.

16    Plaintiffs claim that MP3tunes secondarily infringed their

17    exclusive rights to distribute their copyrighted sound

18    recordings and musical compositions under federal law, and that

19    Robertson is personally liable for such infringement.

20         To "distribute" a work means to make it available to

21    the public by sale or other transfer of ownership, or by

22    rental, lease or lending.  This includes electronic transfers

23    of files containing copyrighted works.

24         The DMCA safe harbor is a defense to the distribution

25    claims at issue in this trial.  Therefore, you should only

E3HBCAP5                         Charge

1    consider plaintiffs' distribution claims with respect to those

2    works, if any, for which you have already found that MP3tunes

3    was willfully blind or had red flag knowledge.

4              To find that MP3tunes secondarily infringed

5    plaintiffs' distribution rights, you must consider whether

6    other websites to which MP3tunes was providing links through

7    Sideload.com made plaintiffs' works available for distribution

8    without authorization by allowing users to copy and transfer

9    files to a third party who did not have a right to the work.

10             If and only if you find these other websites were

11   distributing plaintiffs' works without authorization, you must

12   consider whether MP3tunes is secondarily liable for such

13   infringement of plaintiffs' distribution rights, applying the

14   standards of vicarious liability and contributory liability

15   which I explained to you previously.

16             If and only if you find that MP3tunes is secondarily

17   liable for the infringing distribution of plaintiffs' sound

18   recordings and musical compositions, you must also determine

19   whether Robertson is secondarily liable for those

20   distributions.  To decide Robertson's personal liability, you

21   should apply to Robertson the standards of vicarious liability

22   and contributory liability which I explained to you previously.

23             As I mentioned earlier, sound recordings recorded

24   before February 15-- and now I'm turning to the common law

25   copyright infringement claims.  So, as I mentioned, sound

E3HBCAP5                          Charge

1    recordings recorded before February 15, 1972 may be covered by

2    state "common law copyrights," and may be subject to protection

3    under the laws of the various states, including the State of

4    New York.  For these sound recordings, infringement claims are

5    judged not by the federal standard I just explained to you, but

6    are instead governed by the doctrine of common law copyright

7    infringement.

8          A claim for New York common law copyright infringement

9    consists of two elements:  One, the existence of a valid

10   copyright; and, two, unauthorized reproduction of the work

11   protected by the copyright.  I instruct you that the ownership

12   or existence of the copyrights at issue has previously been

13   decided for the works in suit.  You are considering the first

14   prong of the New York-- you are to consider the first prong of

15   the New York common law copyright infringement standard as

16   proven.

17         If and only if you determine that MP3tunes' users

18   directly infringed plaintiffs' common law copyrights, you must

19   determine whether MP3tunes is secondarily liable for those

20   direct infringements.

21         To make this determination, you must first decide

22   whether MP3tunes is protected by the DMCA safe harbor defense

23   that I previously instructed you on.  As before, you must

24   consider whether MP3tunes was willfully blind or had red flag

25   knowledge regarding any specific pre-February 15, 1972 sound

1    recording that you found MP3tunes' users directly infringed

2    under the New York common law standard.

3           If and only if you find that MP3tunes is not entitled

4    to the DMCA safe harbor because you found that it was willfully

5    blind or had red flag knowledge, then you must determine

6    whether MP3tunes is secondarily liable for the infringement of

7    its users, using either vicarious or contributory liability.

8    You should apply the same standards for vicarious and

9    contributory liability as I explained to you earlier.  You

10   should only consider MP3tunes' secondary liability with respect

11   to specific sound recordings and/or musical compositions as to

12   which you have found that MP3tunes was willfully blind or had

13   red flag knowledge.

14          If and only if you find that, one, MP3tunes is not

15   entitled to the DMCA safe harbor because it was willfully blind

16   or had red flag knowledge regarding any particular pre-February

17   15, 1972 works and, two, that MP3tunes is secondarily liable

18   for its users' infringements of those works through either

19   vicarious liability or contributory liability, you must further

20   determine whether Robertson is secondarily liable for such

21   infringing copying.  In deciding Robertson's secondary

22   liability, you should apply to Robertson the standards for

23   vicarious liability and contributory liability I have

24   previously discussed.

25          Now I will instruct you on plaintiffs' unfair

E3HBCAP5                    Charge

1    competition claim, which you must evaluate only with respect to

2    plaintiffs' sound recordings recorded before February 15, 1972.

3    To establish a claim for unfair competition under New York law,

4    plaintiffs must prove that, one, MP3tunes used plaintiffs'

5    works without authorization; two, that MP3tunes competed with

6    plaintiffs in the marketplace; and, three, that MP3tunes acted

7    for commercial benefit or deceived the public.  Plaintiffs must

8    also establish that MP3tunes committed these acts in bad faith.

9    Bad faith exists, for example, when a defendant engages in a

10   pattern of behavior evincing a gross indifference to the rights

11   of another or with knowledge that it lacks authorization to do

12   an act.

13          Earlier in this case, this Court determined that

14   MP3tunes contributed to the unauthorized use of plaintiffs'

15   works in suit that were set forth in a takedown notice for

16   purposes of the unfair competition claim only.  This finding is

17   irrelevant to the other determinations you are asked to make

18   regarding MP3tunes' secondary liability regarding plaintiffs'

19   other claims.  Thus, the remaining issues for your

20   determination are, one, whether MP3tunes competed with

21   plaintiffs in the marketplace and, two, whether MP3tunes acted

22   for commercial benefit or deceived the public and, three,

23   whether MP3tunes acted in bad faith.

24          If and only if you find that MP3tunes is liable for

25   unfair competition under New York law, you must further

E3HBCAP5                    Charge

1   determine whether Robertson is personally liable for such

2   unfair competition as a corporate officer of MP3tunes.  A

3   corporate officer is not liable for the wrongful acts of a

4   corporation merely by reason of his or her being a corporate

5   officer.  However, a corporate officer is liable for acts

6   committed by or for the benefit of a corporation if the officer

7   participates personally in the actions giving rise to

8   liability.  In order to prove that Robertson is liable for

9   unfair competition as a corporate officer, plaintiffs must

10  prove by a preponderance of the evidence that Robertson

11  participated personally in the acts constituting unfair

12  competition.

13          For purposes of this instruction, to "participate

14  personally" means to personally commit, consent to, or approve

15  the corporate conduct at issue, or to personally supervise it,

16  or to be personally responsible for a corporate policy that

17  underlies or causes it.

18          Now I'll turn to plaintiffs' infringement claims

19  regarding cover art images they own.  Images, like sound

20  recordings and musical compositions, can be subject to the

21  protection of the copyright laws.

22          A defendant is liable for infringing reproduction of

23  copyrighted images if it reproduces-- that is, copies-- the

24  copyrighted images without permission from the copyright owner

25  or someone the copyright owner has authorized to give such

E3HBCAP5                    Charge

1    permission.  To "reproduce" an image means to copy it, such as

2    by making copies of a computer file of the image.  Plaintiffs

3    claim that MP3tunes directly infringed certain cover art images

4    they own by making copies of those images on to MP3tunes'

5    servers.  They also claim that Robertson is secondarily liable

6    for such infringement under the theories I've been discussing.

7    It's your role to conclude, based on a preponderance of the

8    evidence, whether MP3tunes directly infringed plaintiffs' cover

9    art images and, if so, whether Robertson is secondarily liable

10   for that infringement.

11          First, you must determine whether plaintiffs have

12   proved that MP3tunes engaged in a volitional act causing the

13   copying of cover art images in which plaintiffs own copyrights,

14   without permission from the plaintiffs or someone the copyright

15   owner has authorized to give such permission.  A volitional act

16   does not include instances where a user uploaded images

17   themselves.

18          Unlike the public performance claims regarding musical

19   compositions and sound recordings, the DMCA safe harbor I

20   discussed earlier does not apply with respect to plaintiffs'

21   claim that MP3tunes directly infringed their rights in cover

22   art images from Amazon.com, and you should not consider it

23   here.

24          If you decide that MP3tunes copied cover art, you will

25   need to decide whether it had permission, in the form of a

1    license, to copy that cover art in the manner that it did, or

2    whether it exceeded the scope of what was permitted under that

3    license.  Reproduction is not unauthorized if the company doing

4    the copying has permission to do so from the copyright holder

5    or someone the copyright holder authorizes to give such

6    permission.

7            If and only if you determine that MP3tunes directly

8    infringed plaintiffs' cover art images, you must go on to

9    determine whether Michael Robertson is secondarily liable for

10   that infringement.  To decide Robertson's secondary liability,

11   you should apply to Robertson the standards of vicarious

12   liability and contributory liability, which I explained to you

13   previously.

14           Plaintiffs' next claim is for infringement of their

15   public display rights in connection with certain cover art.

16   Plaintiffs claim that MP3tunes directly infringed their

17   exclusive rights to publicly display their cover art, and that

18   Robertson is secondarily liable for such direct infringement.

19           As I mentioned before, to "display" a work means to

20   show a copy of it, either directly or by means of a film,

21   slide, television image, or any other device or process.  To

22   perform or display a work "publicly" means, one, to display it

23   in a place open to the public or at any place where a

24   substantial number of persons outside a normal circle of a

25   family and its social acquaintances is gathered; or, two, to

E3HBCAP5                    Charge

1    transmit or otherwise communicate a display of the work at a

2    place specified in the first clause or to the public, by means

3    of any device or process, whether the members of the public of

4    receiving the performance or display receive it in the same

5    place or in separate places, and at the same time or at

6    different times.

7         First, you must determine whether plaintiffs proved

8    that MP3tunes engaged in a volitional act causing the display

9    of the works as to which the plaintiffs claim infringement of

10   their public display rights without authorization.

11        Unlike the public performance claims regarding musical

12   compositions and sound recordings, the DMCA safe harbor I

13   discussed earlier does not apply with respect to plaintiffs'

14   claim that MP3tunes directly infringed their rights in cover

15   art images from Amazon.com, and you should not consider it

16   here.

17        If you decide that MP3tunes infringed plaintiffs'

18   rights to publicly display their cover art, you will need to

19   decide whether it had permission, in the form of a license, to

20   display the cover art in the manner that it did, or whether it

21   exceeded the scope of what was permitted under that license.

22   Public display is not authorized if the company making the

23   display has permission to do so from the copyright holder or

24   someone the copyright holder authorizes to give such

25   permission.

1          If and only if you determine that MP3tunes directly

2     infringed plaintiffs' public display rights in cover art

3     images, you must go on to determine whether Michael Robertson

4     is secondarily liable for that infringement.  To decide

5     Robertson's secondary liability, you should apply to Robertson

6     the standards of vicarious liability and contributory

7     liability, which I have explained to you previously.

8          Now, you have heard evidence in this case regarding

9     the plaintiffs' offering of "promotional downloads" over the

10    interest of certain copyrighted works.

11         At an earlier point in this proceeding, I decided that

12    the plaintiffs' promotion of some of their music through online

13    downloads during the times relevant to this litigation did not

14    have the effect of authorizing the defendants to make

15    plaintiffs' copyrighted works available for download, or of

16    abandoning plaintiffs' rights to enforce their copyrights in

17    those works.  Therefore, you should treat as decided that to

18    the extent that plaintiffs offered promotional downloads of

19    their copyrighted works during the relevant times, such conduct

20    by plaintiffs did not make it permissible for the defendants or

21    their users to infringe plaintiffs' copyrights, and you may not

22    excuse defendants from liability on that basis.

23         However, you may consider evidence of promotional

24    downloads for a more limited purpose:  That is, you may

25    consider it when deciding the issue of willful blindness and

E3HBCAP5                    Charge

1    red flag knowledge.  As I explained to you, in deciding

2    plaintiffs' claims regarding willful blindness and red flag

3    knowledge, you must decide whether the defendants were

4    willfully blind to, or had red flag knowledge of, particular

5    infringing activity on their websites.  You may consider the

6    promotional activities of the plaintiffs in deciding whether

7    the defendants were willfully blind to the infringement of

8    particular works by their users.  You may also consider the

9    promotional activities of plaintiffs in deciding whether the

10   defendants had red flag knowledge of the infringement of

11   particular works by their users, including whether any alleged

12   infringements were objectively obvious to a reasonable person.

13   You may give such evidence the weight you deem appropriate, or

14   no weight, as you see fit from the evidence presented.  You may

15   also consider promotional download evidence in the context of a

16   witness's credibility.

17          Now, let me turn to some concluding instructions,

18   members of the jury.  Your verdict must be based solely on the

19   evidence or the lack of evidence.  It would be improper for you

20   to consider any personal feelings you may have about a party's

21   race, national origin, sex, sexual orientation, or age.

22   Similarly, it would be improper for you to consider any

23   personal feelings you may have about the race, religion,

24   national origin, sex, or age of any witness or anyone else

25   involved in this case.  It would be equally improper for you to

E3HBCAP5                    Charge

1    allow any feelings you might have about the nature of the

2    parties' claims to interfere with your decision-making process.

3    Each of the parties are entitled to a trial free from

4    prejudice, and our judicial system cannot work unless you reach

5    your verdict through a fair and impartial consideration of the

6    evidence.

7              Shortly, you'll go into the jury room to begin your

8    deliberations.  In order to prevail on their claims, the

9    parties must sustain their burden of proof as I've explained to

10   you with respect to each element of their claims and

11   affirmative defenses.

12             As you deliberate, please listen to the opinions of

13   your fellow jurors, and ask for an opportunity to express your

14   own view.  Every juror should be heard.  No one juror should

15   hold center stage in the jury room, and no one juror should

16   control and monopolize the deliberations.  If, after listening

17   to your fellow jurors, and if, after stating your own view, you

18   become convinced that your view is wrong, do not hesitate to

19   change your view.  On the other hand, do not surrender your

20   honest convictions and beliefs solely because of the opinions

21   of your fellow jurors or because you are outnumbered.  Your

22   final vote must reflect your conscientious belief as to how the

23   issues should be decided.

24             Your verdict must be unanimous.  Each of you must

25   decide this case for yourself.  If at any time you are not in

E3HBCAP5                    Charge

1   agreement, you are instructed that you are not to reveal the

2   standing of the jurors, that is, the split of the vote, to

3   anyone, including the Court, at any time during your

4   deliberations.  Finally, I say this not because I think it's

5   necessary, but because it's the custom in this courthouse to

6   say this:  You should treat each other with courtesy and

7   respect in these deliberations.

8           Your duty is to decide the issues fairly and

9   impartially, and to see that justice is done.  Remember, at all

10  times, you are not partisans.  You are judges -- judges of the

11  facts.  Your sole interests are to seek the truth from the

12  evidence in the case, and to determine whether the parties have

13  proved their claims by a preponderance of the evidence or the

14  parties have proved their affirmative defenses by a

15  preponderance of the evidence.  Discuss and weigh your

16  respective opinions dispassionately, without regard to

17  sympathy, without regard to prejudice or favor for either

18  party, and adopt that conclusion which in your good conscience

19  appears to be in accordance with the truth.

20          Under your oath as jurors you are not to be swayed by

21  fear, prejudice, bias or sympathy.  You are to be guided solely

22  by the evidence in the case.  It is for you and you alone to

23  decide whether the plaintiffs have proven that MP3tunes and

24  Michael Robertson are liable for copyright infringement, solely

25  on the basis of the evidence or lack of evidence, and subject

E3HBCAP5                         Charge

1    to the law as I have instructed you.  It must be clear to you

2    that once you let fear or prejudice, or bias or sympathy

3    interfere with your thinking, there is a risk that you will not

4    arrive at a true and just verdict.

5           If you believe that the plaintiffs have not proven by

6    a preponderance of the evidence a defendant's liability, you

7    should not hesitate to render a verdict of not liable.  But, on

8    the other hand, if you should find that the plaintiffs have met

9    their burden of proving a defendant's liability by a

10   preponderance of the evidence, you should not hesitate because

11   of sympathy or any other reason to render a verdict of liable.

12          Your first duty in the jury room is to elect one

13   member of the jury as your foreperson.  The foreperson has no

14   greater voice or authority than any other juror, but is the

15   person who will communicate with the Court when questions

16   arise.

17          Shortly you will go into the jury room and begin your

18   deliberations.  If during those deliberations you want to see

19   any of the exhibits, they will be sent to you in the jury room

20   upon request.  A list of the exhibits received in evidence will

21   be forwarded to you in the jury room.  If you want any of the

22   testimony ready, that can also be done and will occur in open

23   court.  But please remember that it is not always to easy to

24   locate what you might want, so be as specific as you possibly

25   can in requesting exhibits or portions of testimony which you

E3HBCAP5                    Charge

1   may want.

2           Your requests for exhibits or testimony-- in fact, any

3   communication with the Court-- should be made in writing,

4   signed by your foreperson, and given to one of the marshals.  I

5   will respond to any questions or requests you have as promptly

6   as possible, by having you return to the courtroom so that I

7   can speak with you in person.

8           The most important part of this case is the part that

9   you as jurors are now about to play as you deliberate on the

10  issues of fact.  It is for you, and you alone, to decide

11  whether the party with the burden of proof has proven the

12  relevant elements of the claims or defenses by a preponderance

13  of the evidence.  In your oath, you promised that you would

14  well and truly try the issues joined in this case, and a true

15  verdict render.

16          As you deliberate, please listen to the opinions of

17  your fellow jurors, and ask for an opportunity to express your

18  own views.  All of you must be present together to hear one

19  another when you deliberate.  If one or more of you are not

20  present, all deliberations should cease until you are together

21  around the jury table.  That includes rest room breaks.  Every

22  juror should be heard.  No one juror should control or

23  monopolize the deliberations.  Each of you must decide this

24  case for yourself after consultation with your fellow jurors.

25  Your final vote must reflect your conscientious belief as to

E3HBCAP5                        Charge

1    how the issues should be decided.

2            Now, members of the jury, I ask for your patience for

3    a few moments longer because it's necessary for me to confer

4    with counsel and the reporter at the sidebar.  Please wait

5    patiently in the jury box without speaking to each other.

6            Counsel, come on up.

7            (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3HBCAP5                        Charge

1              (At the sidebar)

2              THE COURT:  First, through the miracles of Word

3    processing, a portion of the conclusion of my charge appeared

4    twice.  I skipped over most of it.  I'm going to remove that

5    redundancy in the printed charge that I'm going to send in.

6              Are there any additional requests to charge or

7    exceptions to the charge?

8              MR. SACKS:  I'm not sure that your Honor read this

9    line.

10              THE COURT:  What page?

11              MR. SACKS:  Right there.  I think you said "public

12   display is not authorized" rather than "unauthorized."  I think

13   you left out the "un."

14              THE COURT:  All right.  What page is that?

15              MR. SACKS:  That is on page 42, line 4.

16              THE COURT:  Just to be clear, I'll read that sentence

17   again now, but they'll see it in the charge, or I can just skip

18   it altogether.

19              What's your preference?

20              MR. BART:  I don't care.

21              MR. PLATZER:  Indifferent.

22              MR. SACKS:  I don't care either.

23              THE COURT:  All right.

24              MR. SACKS:  It's two letters in 50 pages.

25              MR. BART:  They'll get it.

E3HBCAP5                    Charge

1          THE COURT:  All right.  I'll read it just to be safe.

2          Anything else?

3          MR. BART:  No, your Honor.

4          MR. SACKS:  No.

5          THE COURT:  All right.  Any exceptions to the charge?

6          All right.  The court reporter cannot take a shake of

7    the head.

8          MR. SACKS:  No, your Honor.

9          MR. PLATZER:  No, your Honor.

10          MR. SCIBILIA:  No, your Honor.

11          THE COURT:  Okay.  Good.  I'll briefly review portions

12    of the jury verdict sheet and the exhibits with them and then

13    I'm going to send them in.  All right?

14          MR. SACKS:  I also sent to Mr. Gosnell the revised

15    exhibit list with the two --

16          THE COURT:  We'll send that in afterward.  Okay?  All

17    right.

18          (Continued on next page)

19

20

21

22

23

24

25

E3HBCAP5                        Charge

1              (In open court; jury present)

2              THE COURT:  Now, members of the jury, I told you last

3    week that we would be giving you a jury verdict sheet to assist

4    you in your deliberations.  I'm going to distribute to each of

5    you now copies of the jury verdict sheet together with various

6    exhibits that are referenced in the jury verdict sheet.

7              Do not be overwhelmed by the volume of paper in this

8    jury questionnaire.  As so many people say, I'm from the

9    government and I'm here to help you.  All right?  So let's take

10   a look at what we have here.

11             You have a jury verdict sheet of 17 pages that is

12   going to pose questions to you in a fashion that parallels the

13   charge on the substantive law that I have given you.  And

14   you'll take each of these issues in turn.  And after each

15   question-- for example, if you look at Question Number 1, and

16   this now is on the federal copyright infringement claims,

17   reproduction claims, first, secondary liability for sideloads

18   by MP3 executives under a respondeat superior theory.  "How do

19   you find the defendant MP3tunes with respect to this theory?

20   Not liable or liable?"  You check a box.

21             And then 1A, if you find MP3tunes liable, then you're

22   going to consult Table A for how many of the works listed under

23   the post-'72-- that's 1972-- recordings and musical

24   compositions on the attached table.

25             And if you turn to the first table, you will see that

E3HBCAP5                         Charge

1    it's titled "Works sideloaded by MP3tunes executives post-1972

2    sound recordings."

3           And if you check, as the instruction says under A, if

4    you answered-- if you checked the box "some," then you will go

5    to Table A and you will identify on Table A in the column

6    marked "MP3tunes liable" the works listed under "post-72

7    recordings and musical compositions for which you find MP3tunes

8    liable under this theory."But if you answered "all," you don't

9    have to look at Table A with respect to this question.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3HKCAP6                    Charge

```
 1              THE COURT:  (Continuing)  But if you found MP3tunes
 2    not liable on question number 1, then skip the following
 3    questions:  1.1, 1.2.
 4              The directions are lengthy but they're straightforward
 5    and clear.
 6              Let's just take a look at Table B.  If you look at
 7    question 2 on page 3, this bears on the issue of willful
 8    blindness, and you have four different tables that are referred
 9    to in this particular question:  Table B-1, which is a lengthy
10    33-page table, Table B-2, which is four pages; Table B-3, which
11    is five pages Table B-4, which is also five pages.  And you
12    will see that these tables are referred to repeatedly in
13    subsequent questions, and so there are different columns.
14              And let's just look the B-1 for a moment.  Is
15    everybody finding these tables?
16              JUROR:  I think I'm missing my Table A.
17              THE COURT:  Table what?
18              JUROR:  Table A.
19              MR. SCIBILIA:  We noticed we're missing it also in our
20    copy, Table A.
21              THE DEPUTY CLERK:  Is everybody missing Table A?
22              JUROR:  I have it.
23              THE DEPUTY CLERK:  You have it?
24              THE COURT:  Does he have it now?  Juror No. 5, do you
25    have Table A or not?
```

E3HKCAP6                    Charge

1              JUROR:  I have Table A.

2              THE COURT:  Forgive me.  Juror 6?

3              JUROR:  Yes, I have it.

4              JUROR:  I don't see --

5              JUROR:  I don't have my Table A.

6              JUROR:  Yeah, I'm missing it also.

7              THE COURT:  Bear with me for a moment because that's

8    why we go through this.  Take a look at B-1, the 33-page table.

9    Does everyone have that one?

10             JUROR:  Yes, I have it.

11             THE COURT:  If anybody doesn't have it, raise your

12   hand.

13             All right.  Let's look at B-1 for a second.  These

14   columns are important.  You'll see it identifies the artist and

15   the title in the first two columns.  And then there are

16   questions, issues regarding willful blindness and red-flag

17   knowledge for each of the works.  Then you can see that the

18   theories of liability are divided among the three different

19   copyright rights that are here; namely, reproduction, public

20   performance, and distribution.  And there's a column for

21   MP3tunes' liability, there's a column for Mr. Robertson's

22   vicarious liability, and a column for Mr. Robertson's

23   contributory liability.  And you will see that this framework

24   is used in each of the tables.

25             Each of you are going to have a set of these tables

E3HKCAP6                    Charge

1    with you in the jury room, and you're going to take your jury

2    verdict sheets with you.  Of course I'm also going to send in

3    one more jury verdict sheet, because the foreperson alone

4    should bring the one and only jury verdict sheet into the

5    courtroom at such time as you reach a verdict, because if

6    others bring jury verdict sheets in, I will have to question

7    you about it.  And you can see, from the length of the jury

8    verdict sheet, that that will take some time.

9              Juror No. 1, it looks like you have a question?

10             JUROR:  Oh, no, I'm just getting Table A from my

11   fellow juror.

12             THE COURT:  All right.

13             Yes, Juror No. 2.

14             JUROR:  I have two questions.  One is, then, since we

15   each have this, is this sort of a worksheet for us to use and

16   come to discussion or do we each --

17             THE COURT:  No, you can use this as a worksheet, but

18   the foreperson will have one extra set.

19             JUROR:  Right, so these --

20             THE COURT:  These you can do anything with that you

21   want.  I didn't want all of you trying to pore over one piece

22   of paper, so I gave everybody one, with the view that you could

23   sit around the table as you're discussing this.  But the

24   important thing is that only one set of these documents are

25   going to be brought back into the courtroom, and that's by the

E3HKCAP6                    Charge

1   foreperson, and the foreperson is going to put them in a sealed

2   envelope.

3          When the jury has reached a verdict, the foreperson is

4   going to advise the Court by a note that the jury has reached a

5   verdict.  And so, from now on, all of your communications with

6   the Court should be by note, signed by your foreperson, and put

7   in a sealed envelope and given to the marshal.

8          Juror No. 2, you have another question?

9          JUROR:  Yes.  When you give us the copy of your

10  instructions that you gave us, that have all the definitions,

11  will we each get a copy of that as well?

12         THE COURT:  No.  It's too lengthy.

13         JUROR:  OK.

14         THE COURT:  We have to save some paper.

15         Anything else?

16         All right, I'm going to ask you to work until at least

17  5:00 o'clock today.  If you wish to work longer, that's

18  entirely up to you; just let us know by note so that we can

19  make the proper arrangements here.  If you don't reach a

20  verdict today, then you will return tomorrow at 9:45 and resume

21  your deliberations.

22         Be advised that we will be in a position to receive

23  notes from you at any time except between 1:00 and 2:00 p.m.,

24  because we will be taking our luncheon recess during that time,

25  as will you.  So simply I ask that you keep that in mind.

E3HKCAP6                    Charge

1              At this time, I'm going to ask that my deputy

2      administer the oath to the marshal.

3              (Marshal sworn)

4              THE COURT:  Members of the jury, I will in a little

5      while send you a copy of the charge and another complete set of

6      these documents, and we will wait to receive a note from you

7      regarding this matter.  If we don't hear from you, at

8      5:00 o'clock, I will bring you back out into the courtroom and

9      give you some instructions and send you home for the evening.

10              Please recess the jury.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3HKCAP6                              Charge

```
 1                    (Jury not present)

 2                    THE COURT:  Everyone can be seated.

 3                    Any issues that counsel want to raise?

 4                    MR. BART:  No, your Honor.

 5                    MR. SACKS:  No, your Honor.

 6                    THE COURT:  I want to just conform the charge and the

 7       exhibit list.  We will mark them shortly, so why don't we take

 8       15 minutes, we'll reconvene and do that.

 9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

E3HKCAP6                     Charge

1          THE COURT:  I've revised the charge to eliminate the

2    duplicate charge altogether.  I'm going to mark it as Court

3    Exhibit 1.  Copies will be provided to counsel, and I will send

4    it into the jury room.  I've also printed out a joint list of

5    trial exhibits admitted into evidence.  The pages are not

6    numbered, but I believe it's 28 pages, according to the copier.

7          Is it acceptable to send this joint list of trial

8    exhibits into the jury room?

9          MR. SCIBILIA:  Yes, your Honor.

10          MR. BART:  Sure.

11          MR. SACKS:  Yes, your Honor.

12          THE COURT:  All right.  We will mark it as Court

13    Exhibit 2.

14          I've also decided I'll send a couple of additional

15    copies of the charge into the jury room, so they can start out

16    with three.

17          We'll wait to see what we hear.  I suspect it won't be

18    too long before we get a note.

19          MR. BART:  May I ask a question?

20          THE COURT:  Yes.

21          MR. BART:  What is your practice or expectation in

22    terms of moving on to the next phase once we get a verdict?

23          THE COURT:  I would want to move immediately to the

24    next phase --

25          MR. BART:  OK.

E3HKCAP6                    Charge

1          THE COURT:  -- I would think --

2          MR. BART:  That's why I'm asking.

3          THE COURT:  -- unless you tell me there's good reason

4   not to.  I'm concerned about Juror No. 9.  If the jury were

5   willing to come back, I'd be prepared to do that.

6          MR. SACKS:  The only issue, your Honor, is conforming

7   the testimony, particularly for Mr. Robertson, to the extent

8   that there's going to be further testimony, to exactly what

9   there's been an issue on, in terms of what the jury finds, and

10  the experts as well.

11         MR. LAFAYETTE:  The experts need to know what the

12  tracks at issue are.

13         THE COURT:  I'm open.

14         MR. SACKS:  To some degree, it depends what time of

15  the day the verdict comes back, but I think the notion of going

16  right from a verdict at 10:00 in the morning to starting the

17  damages phase is going to be very difficult, to adjust the

18  testimony.  Plus, we haven't even exchanged lists of damage

19  phase witnesses yet.

20         MR. BART:  No, but we can do that when you'd like,

21  but, sure.

22         And both of them are right -- it depends on what the

23  verdict -- how it looks when it comes back.  If we get mostly

24  alls or not liables, I don't think it's going to be that much

25  of an issue.  If there are a whole bunch of --

E3HKCAP6                    Charge

 1                    THE COURT:  Somes.

 2                    MR. BART:  -- somes, then we won't be getting an

 3    answer soon anyway.

 4                    THE COURT:  All right.  We'll revisit this at the time

 5    we get a verdict.

 6                    Also, it might be worth polling the jury at that time,

 7    to see what their desires are.  I moved the trial that I have

 8    for next week, out of fear of what might happen this week.

 9                    MR. SACKS:  Your Honor, in terms of tomorrow, what is

10    your preferences for counsel?  Should we come to the courtroom

11    at 9:45, those of us who are going to be here?

12                    THE COURT:  Yes, right, whoever is going to be here.

13    And I would say be here before 9:45 --

14                    MR. SACKS:  Very good.

15                    THE COURT:  -- so we can deal with any notes as soon

16    as they arise.

17                    Yes.

18                    MR. SCIBILIA:  I presume your Honor anticipates some

19    form of a damages closing?  I'm not sure whether you want a

20    brief opening or something of that nature?

21                    MR. BART:  Have you thought about that, whether you

22    would want an opening?

23                    MR. SACKS:  The honest answer is, I haven't.

24                    MR. BART:  OK.

25                    THE COURT:  I don't think there's anything wrong with

E3HKCAP6                    Charge

1    a little roadmap, so I think a short opening is fine and

2    probably helpful to the jury.

3            MR. BART:  OK.

4            THE COURT:  All right.  We will see what develops.

5            MR. BART:  Thank you.

6            (Recess pending verdict)

7            THE COURT:  For the record, the Court has received a

8    note from the jury which we're marking as Court Exhibit 3.  It

9    reads as follows:  "If you please:

10           "(1)  List of sites Michael Robertson recommended for

11   sideloading by his employees (might be Sharmaine Lindahl)

12   perhaps Plaintiffs' Exhibit 253;

13           "(2)  List of sites from which the employees actually

14   sideloaded.

15           "PX 34.

16           "Thank you."  It's signed by someone who didn't tell

17   us their juror number, so we will find out later.

18           And then there is a PS:  "Is it possible a couple more

19   copies of the jury charge?"

20           I'm going to send copies of the jury charge in for all

21   of the jurors.

22           I'll show Court Exhibit 3 to counsel and the record

23   should reflect that copies have been made and provided to

24   counsel.

25           (Pause)

E3HKCAP6

1          THE COURT:  What answers do we have to these

2     questions?

3          MR. PLATZER:  Your Honor, we believe that the

4     documents that the jury is requesting are actually not PX 253

5     and PX 34 but, rather, PX 90 and PX 449.  PX 453, which is

6     indicated with the "perhaps," is not the document that is

7     described here.  I believe the document that's described here,

8     list of sites Michael Robertson recommended for sideloading, is

9     clearly PX 90.

10          As for the list of sites from which the employees

11     actually sideloaded, PX 34 is an old, no longer operative,

12     version of that list, that had the AMG misidentification error

13     in it.  It's been superseded by PX 449, which is the same data

14     corrected, as presented by Dr. Horowitz at this trial.

15          PX 449 is essentially the same document as PX 34 but

16     corrected and was actually presented to the jury here.

17          MR. SACKS:  Your Honor -- I'm sorry, go ahead.

18          MS. SIMONIAN:  No, go ahead.  He's covered it.

19          THE COURT:  Ms. Simonian, anything else from the

20     plaintiffs?

21          MS. SIMONIAN:  Your Honor.

22          MR. SACKS:  OK.  I semiagree with Mr. Platzer on the

23     second question.  I think that both Exhibit 34 and 449 are

24     responsive to the second question, and I think that since they

25     asked for 34, we should give them both.

E3HKCAP6

1            THE COURT:  449 supersedes 34?

2            MR. SACKS:  449 and 34 are both in evidence, and they

3    are both responsive to the issue of sites sideloaded by

4    executives.  34 does have the AMG error in it, and 449 doesn't.

5            MR. PLATZER:  Your Honor -- I'm sorry.

6            MR. SACKS:  And with respect to the first one, I do

7    not believe that there is a document responsive to the first

8    one.

9            THE COURT:  Well, what's Exhibit 90?

10            MR. SACKS:  Exhibit 90 is that list of websites

11    including the torrent site -- I think Mr. Bart used it in his

12    closing -- that was passed on to Dave Yu, and it is not a list

13    of recommendations to employees for sideloading.

14            MR. BART:  I'm not going to argue the point, but in

15    terms of understanding what the jury said, it's an email from

16    Sharmaine Lindahl, saying, "Team, is requested by Michael for

17    sideloading purposes.  Here is a list of some sites."  So I

18    think that is what they meant.

19            I'm not arguing that that is in fact sites Robertson

20    recommended.  I think probably Mr. Sacks is right, that it is a

21    site compiled, in large part, by Ms. Lindahl, but I think

22    that's the document they're referring to.

23            MR. PLATZER:  And, your Honor, with respect to the PX

24    449 versus 34 issue, while Mr. Sacks is correct that PX 34 is

25    also in evidence, the reason it's in evidence is that Mr. Sacks

E3HKCAP6

1    put it in to impeach Dr. Horowitz with his earlier errors.  The

2    one that Dr. Horowitz testified was the one he was presenting

3    to the jury on this point was PX 449.

4              MR. SACKS:  I just don't think that when the jury asks

5    for something that they accurately describe and they ask for it

6    by exhibit number -- because Exhibit 34 --

7              THE COURT:  I'm going to bring them out.  I'm going to

8    give them both exhibits, and I am going to tell them that 34

9    contains the error and 449 is the corrected one.

10             Now, what is Exhibit 253 that they're asking for,

11   Plaintiffs' Exhibit 253?  That has no bearing on anything.

12             MS. SIMONIAN:  Your Honor, that's the document that

13   lists Mike Robertson stating that they don't take any songs out

14   of lockers without a DMCA-complaint takedown notice.  It's just

15   an email.  It doesn't actually fall under the category that

16   they're describing.

17             THE COURT:  But they have asked for it, so I'll give

18   it to them.

19             MR. SACKS:  OK.

20             THE COURT:  All right?

21             Let's bring out the jury.

22             (Continued on next page)

23

24

25

E3HKCAP6

 1              (Jury not present)

 2              THE COURT:  And Exhibit 90.

 3              MR. BART:  Nine-owe, yes.

 4              THE COURT:  Is a list of sites?

 5              MR. BART:  It's an email exchange, your Honor, and the

 6    back page of it, Bates numbered 6465, is the Lindahl email,

 7    saying, "As requested by Michael for sideloading purposes,

 8    here's a list of some sites --"

 9              THE COURT:  All right.

10              MARSHAL:  Jurors entering.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

E3HKCAP6

```
 1            (Jury present)

 2            THE COURT:  Everyone may be seated.

 3            Good afternoon, members of the jury.

 4            JURY MEMBERS:  Good afternoon, your Honor.

 5            THE COURT:  Members of the jury, we know you've been

 6   at work because we got a note from you that we marked as Court

 7   Exhibit 3, in which you asked for a couple of things:  "First,

 8   a list of sites Michael Robertson recommended for sideloading

 9   by his employees (might be Sharmaine Lindahl) perhaps PX 253."

10            We're going to give you PX 253 because you've asked

11   for it, but we don't think that that is exactly what you're

12   looking for there.  Our best guess is that you're looking for

13   PX 90, which includes an email from Sharmaine Lindahl telling

14   people about certain sites that were recommended.  So I'm going

15   to send Exhibit 90 and 253 in to the jury room, in response to

16   your first question.

17            And with respect to your second question, "a list of

18   sites from which the employees actually sideloaded, PX 34,"

19   we're going to send in PX 34, but, remember, PX 34 includes the

20   AMG errors that Dr. Horowitz made, and so Dr. Horowitz

21   corrected his errors in another list that was received as PX

22   449.  We're going to send both PX 34 and 449 into evidence jury

23   room.

24            And I am sending in a copy of the jury charge for each

25   of you.  We'll wait to hear further.
```

E3HKCAP6

1              Please recess the jury.

2              (Continued on next page)

E3HKCAP6

```
 1                (Jury not present)

 2                THE COURT:  Would you hand up Exhibits 253, 90, 34 and

 3      449.

 4                Is it acceptable to send these exhibits into the jury

 5      room at this time together with additional copies of the

 6      charge?

 7                MR. BART:  Yes, your Honor.

 8                MR. SCIBILIA:  Yes, your Honor.

 9                MR. SACKS:  I still disagree with 90, your Honor.

10                THE COURT:  OK.  Overruled.

11                Do you want to be here for a month, Mr. Sacks?

12                MR. SACKS:  No.

13                THE COURT:  OK.

14                MR. BART:  Haven't we been?

15                THE COURT:  I'm going to give the jury all the help I

16      can give them, for reasons that I have put on the record

17      previously about the size of the verdict form and the level

18      that they've got to drill through.  I'm not surprised that they

19      would mistake one exhibit for another in all the paper that

20      came in to this case.

21                I could just send all the exhibits in a wagon into the

22      jury room, but I've never thought that that's a good way to

23      proceed.  So there's absolutely no harm in sending Exhibit 90

24      in, especially with an explanatory instruction from the Court.

25                We'll wait to see what we get next.  If we don't hear
```

E3HKCAP6

 1    anything, I'll bring them out at 5:00 o'clock and give them

 2    some instructions for overnight.

 3            (Recess pending verdict)

 4            THE COURT:  Bring in the jury.

 5            (Jury present)

 6            THE COURT:  Everyone may be seated.

 7            Members of the jury, it's 5:00 o'clock.  We did not

 8    receive any further notes from you, and so I am going to assume

 9    that you are ready to head home for the day.

10            I neglected to raise with you when we marked Court

11    Exhibit 3:  We keep track of lots of things, including who the

12    foreperson is, and I can't make out the signature.  So

13    Juror No. 5, you were my suspect but I wasn't sure.

14            JUROR:  Oh, really?  Thank you, your Honor.  It's a

15    dubious distinction, but I will do my best.

16            THE COURT:  That is fine.  Just remember, you have no

17    greater voice --

18            JUROR:  Absolutely.

19            THE COURT:  -- in the deliberations than any other

20    juror.  You're just the scrivener who communicates with the

21    Court, and I must say that you have very good handwriting.

22            JUROR:  Thank you.

23            THE COURT:  That's important, but the signature was

24    rather distinctive, so I wasn't sure.

25            We're going to send you home for the evening.  Don't

E3HKCAP6

1     discuss the case, put it out of your minds until tomorrow,

2     don't be daunted or overwhelmed by what we have sent to you,

3     and don't hesitate tomorrow to raise a question with us.  And

4     we will try to respond to it as promptly as possible.  And keep

5     in mind that between 1:00 and 2:00 we will not be in a position

6     to respond to notes.

7            So I'd like you to report tomorrow at 9:45, when

8     you're all there.  I'd ask the foreperson to send us the

9     signal, because we keep track of when a jury has all convened

10    to deliberate, all right?  So you recall turn the light on so

11    that we know, and you will work tomorrow as long as you want

12    but at least until 5:00 o'clock if you don't reach a verdict.

13    And if you want to work longer, that's up to you.  You'll have

14    as much time as you need to come to a verdict in this case, and

15    we will all wait patiently for you.  The lawyers have obviously

16    put a great deal of work into this case and we all look forward

17    to seeing a result.

18           So, have a great evening, a safe trip home, and we'll

19    see you all tomorrow.  Please recess the jury.

20           (Jury not present)

21           THE COURT:  Everyone may be seated.

22           Obviously, these are the most anxious times for any

23    trial lawyer.  I always hated it when the jury was

24    deliberating, and I still get anxious over it as a judge, but

25    it's a little -- a lot less anxiety.  So, get some rest tonight

E3HKCAP6

1    and we will see you all tomorrow morning, all right?  Have a

2    good evening.

3              COUNSEL:  Thank you, your Honor.

4              (Adjourned to March 18, 2014 at 9:45 a.m.)

5                              * * *

6                        DEFENDANT EXHIBITS

7    Exhibit No.                              Received

8     1576 and 1574   . . . . . . . . . . . . . . .2611

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25