```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/29/2011
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

CAPITOL RECORDS, INC., *et al.*,

                    Plaintiffs,

      -against-

MP3TUNES, LLC, *et al.*,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

                                07cv9931

                                MEMORANDUM AND ORDER

WILLIAM H. PAULEY III, District Judge:

        Defendant Michael Robertson[1] moves for judgment as a matter of law, or

alternatively a new trial, and for remittitur following a jury verdict in favor of Plaintiffs.[2]

Plaintiffs, consisting of record companies ("Labels") and music publishers ("Publishers"), filed

this federal and state law copyright and unfair competition action alleging Robertson and

Defendant MP3tunes, LLC, made infringing copies of copyrighted songs and cover art available

to users of the MP3tunes service. The jury returned a verdict awarding Plaintiffs $48,061,073 in

damages.

---

[1] During the pendency of this action, Robertson changed his legal name to Michael Hammer.
Because his name was Robertson during the events at issue, this opinion will refer to him by that
name.

[2] Plaintiffs are Capitol Records, Inc.; Caroline Records, Inc.; EMI Christian Music Group, Inc.;
Priority Records LLC; Virgin Records America, Inc.; Beechwood Music Corp.; Colgems-EMI
Music Inc.; EMI April Music Inc.; EMI Blackwood Music; EMI Full Keel Music; EMI Golden
Torch Music Corp.; EMI Longtitude Music; EMI Virgin Music, Inc.; EMI Virgin Songs, Inc.;
EMI Al Gallico Music Corp.; EMI Algee Music Corp.; EMI Feist Catalog, Inc.; EMI Gold
Horizon Corp.; EMI Grove Park Music, Inc.; EMI Hastings Catalog, Inc.; EMI Mills Music,
Inc.; EMI Miller Catalog, Inc.; EMI Robbins Catalog, Inc.; EMI U Catalog, Inc.; EMI Unart
Catalog, Inc.; Jobete Music Co., Inc.; Screen Gems-EMI Music, Inc.; Stone Agate Music; Stone
Diamond Music; and Capitol Records, LLC.

While the world has moved beyond the free-MP3-download craze, the parties in this case have not. This hard-fought litigation spans 7 years and 628 docket entries. Numerous substantive motions were heard. And decisions by this Court did not deter the parties from revisiting the same issues time and again. As trial approached, the parties launched salvos of motions in limine seeking to resurrect discovery disputes, relitigate prior motions, and level an impressive array of claims and defenses.

A primary function of pre-trial litigation is to distill claims. Ultimately, the goal is to make a dispute understandable to a lay person. Despite this Court's efforts to winnow the issues, the parties insisted on an 82-page verdict sheet on liability and a 331-page verdict sheet on damages that included dense Excel tables, necessitating at least one juror's use of a magnifying glass. While the jury did its best, their assignment was beyond all reasonable scale.

To understand how this happened, one must look at the impetus for this litigation. Robertson created a business model designed to operate at the very periphery of copyright law. He encouraged users of his service to copy any MP3 they found on the Internet onto MP3tunes' servers. The Labels and Publishers viewed Robertson's activities as a threat to their continued viability. Just as Robertson tried to turn the Digital Millennium Copyright Act ("DMCA") against the Labels and Publishers, they sought to use it to destroy him by bringing a theater-wide assault with claims for thousands of works.

While Robertson's business practices sometimes infringed copyrights, many of the Plaintiffs' claims were just too big to succeed. Plaintiffs' evidence on their most significant theories of liability—red flag knowledge and willful blindness—was sparse. And Robertson—by his words, actions, and demeanor—came across as unworthy of belief. That led the jury to

rely on something other than the evidence in reaching portions of its verdict. For the following

reasons, Robertson's motions are granted in part and denied in part.

## BACKGROUND

MP3tunes provided an integrated music service through two websites:

MP3tunes.com and Sideload.com. MP3tunes.com offered online storage "lockers" where users

could store music and stream or download it from the locker to any computer with an Internet

connection. Sideload.com was a search engine that allowed users to search for free music

downloads. Sideload users could install the sideload plugin to their Internet browser and, when

navigating to a website with MP3 files, use the plugin to sideload the file. Sideloading is similar

to downloading except that the destination of the file was not the user's computer, rather, it was

the user's MP3tunes locker and Sideload. (See Tr. at 278-92 (Horowitz).) Once an MP3 file

was sideloaded, it was available to anybody who visited Sideload.

More information regarding the operation of Robertson's MP3tunes business

model is available in this Court's earlier Memoranda & Orders. See Capitol Records, Inc. v.

MP3tunes, LLC, --- F. Supp. 2d ----, 2014 WL 2431295 (S.D.N.Y. Apr. 7, 2014) (ruling on jury

charge); Capitol Records, Inc. v. MP3tunes, LLC, 07 Civ. 9931 (WHP), 2014 WL 503959

(S.D.N.Y. Jan. 29, 2014) (ruling on motions in limine); Capitol Records, Inc. v. MP3tunes, LLC,

07 Civ. 9931 (WHP), 2013 WL 1987225 (S.D.N.Y. May 14, 2013) (ruling on summary

judgment after Viacom) ("MP3tunes II"), reconsidering Capitol Records, Inc. v. MP3tunes,

LLC, 821 F. Supp. 2d 627 (S.D.N.Y. 2011) (ruling on summary judgment before Viacom)

("MP3tunes I"); Capitol Records, Inc. v. MP3tunes, LLC, 07 Civ. 9931 (WHP), 2009 WL

3364036 (S.D.N.Y. Oct. 16, 2009) (ruling on motion to dismiss).

In the liability phase, the jury sat attentively through a 12-day trial. The jurors found MP3tunes directly liable for infringement of Plaintiffs' reproduction and public display rights in cover art and for unfair competition with respect to pre-1972 sound recordings. Concluding that MP3tunes acted with both red flag knowledge and willful blindness, the jurors found MP3tunes secondarily liable for infringements by MP3tunes' users, third-party websites, and MP3tunes' Executives. Finally, the jury did not find MP3tunes secondarily liable for violating Plaintiffs' distribution rights. While the jury did not hold Robertson contributorily liable for MP3tunes' failure to remove certain works from lockers in response to takedown notices, it imposed secondary liability on Robertson for every other claim on which it held MP3tunes liable. (Sacks Decl. Ex. B, at 1-18.)

During the damages phase, the jury found MP3tunes and Robertson acted willfully as to all infringing acts except for MP3tunes' failure to remove works from lockers. The jury awarded Plaintiffs $48,061,073 in damages. (Def. Robertson's Br. at 1.)

## DISCUSSION

### I.   Judgment as a Matter of Law

#### A.   Legal Standard

A Rule 50(b) motion for judgment as a matter of law must be granted if the court concludes "there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive [at that verdict.]" Bucalo v. Shelter Island Union Free Sch. Dist., 691 F.3d 119, 127-28 (2d Cir. 2012) (citations omitted). The court is not permitted to "weigh[] the credibility of the witnesses or otherwise consider[] the weight of the evidence." This Is Me, Inc.

4

v. Taylor, 157 F.3d 139, 142 (2d Cir. 1998).  It must also "draw all reasonable inferences in favor of the nonmoving party" and "disregard all evidence favorable to the moving party that the jury is not required to believe."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000).

      B.    Plaintiffs' Theories of Liability

          1.    *Robertson's Vicarious Liability*

      To find Robertson vicariously liable for MP3tunes' copyright infringement through its Executives, the jury was required to find that "(1) Robertson had the right and ability to supervise the infringing activity of MP3tunes, and (2) Robertson received a financial benefit directly attributable to the infringing activity of MP3tunes."[3]  (Decl. of Ira Sacks dated May 1, 2014, Ex. A: Liability Charge ("Charge"), ECF No. 613-1, at 24; see Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 156 (S.D.N.Y. 2009) (citation omitted).)  Robertson contends there was insufficient evidence of a direct financial benefit.

      A direct financial benefit exists where there is a causal relationship between the infringing activity and an obvious and direct financial interest—for example, where infringing material acts as a "draw" to attract subscribers to a defendant's business. (Charge at 25; see A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1023 (9th Cir. 2001) (citation omitted).)  The evidence showed that, in the short-term, infringing content—obtained surreptitiously through Sideload.com, the sideload plugin, and the actions of MP3tunes' Executives and users—drew users to MP3tunes, expanded the user base, and allowed Robertson to sell additional MP3tunes' locker subscriptions.  In the long-term, Robertson planned to leverage that draw into

---

[3] The jury could only consider this theory of liability if it found MP3tunes liable for its Executives' direct infringement under the doctrine of respondeat superior.  (Charge at 24.)

a substantial user base creating a rival to iTunes.  While those long-term plans were unrealized, the jury found that Robertson received a financial benefit in the short-term.

      Robertson's argument conflates "financial benefit" with "profit."  Robertson derived a financial benefit by using the infringing material to draw additional subscribers.  It does not matter whether MP3tunes or Robertson profited, because the point was to grow the business and its user base.  A profit need not be realized to satisfy the standard for financial benefit.  See MP3tunes II, 2013 WL 1987225, at *10 (citing A&M Records, Inc., v. Napster, Inc., 114 F. Supp. 2d 896, 921 (N.D. Cal. 2000), rev'd on other grounds, 239 F.3d 1004 (9th Cir. 2001)); cf. Arista Records, Inc. v. MP3Board, Inc., 00 CV 4660 (SHS), 2002 WL 1997918, at *11 (S.D.N.Y. Aug. 29, 2002) ("Infringement which increases a defendant's user base or otherwise acts as a draw for customers constitutes a direct financial interest.").  Accordingly, Robertson's motion for judgment as a matter of law on this claim is denied.

      2.    *Robertson's Contributory Liability*

      To find Robertson contributorily liable, the jury was required to find that Robertson (1) had knowledge of the infringing activity and (2) induced, caused, or materially contributed to the infringing conduct of another.  (Charge at 25-26); see also Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005); Luvdarts, LLC v. AT&T Mobility, LLC, 710 F.3d 1068, 1072 (9th Cir. 2013) (citing Napster, 239 F.3d at 1020); Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971).)  The knowledge element is satisfied by actual or constructive knowledge of the direct infringement.  See Usenet.com, 633 F. Supp. 2d at 154.  The inducement/causation element is satisfied by evidence that Robertson engaged in conduct that is "part of, encourages, or assists

the infringement," or if he "provides the machinery, goods, site, or facilities of the infringement." (Charge at 26.)

Plaintiffs proved Robertson's constructive knowledge through evidence of Robertson's:  (1) control over MP3tunes; (2) knowledge that the major labels were not distributing works in MP3 format, meaning he knew the MP3s of major label songs on Sideload were infringing;[4] (3) encouragement of employees to sideload; (4) awareness of DMCA takedown notices; and (5) formulation of a company policy to ignore complaints of copyright infringement absent a formal DMCA notice.  Plaintiffs also proved Robertson contributed to the users' infringement by (1) funding the site and facilities for the infringing activity; (2) directing MP3tunes' development and setting relevant policies at the company; and (3) creating, developing, and marketing Sideload.com and the sideload plugin.  Accordingly, Robertson's motion for judgment as a matter of law on this claim is denied.

3.   *Robertson's "Tertiary" Liability*

Robertson contends that there is no legal basis for "tertiary liability"—that is, Robertson's secondary liability for MP3tunes' secondary liability.  Relying on Arista Records LLC v. Lime Grp. LLC, ("LimeWire I"), 784 F. Supp. 2d 398, 437-38 (S.D.N.Y. 2011), this Court rejected Robertson's arguments at trial.  (Tr. at 2406:20-2407:19.)  Limewire I held that an individual defendant can be held personally liable for claims of direct and secondary liability of a corporation.  784 F. Supp. 2d at 437-38 (citing Capitol Records, Inc. v. Wings Digital Corp., 218 F. Supp. 2d 280, 284-85 (E.D.N.Y. 2002)).

Just as he did at trial, Robertson points to Napster where the district judge dismissed a similar claim as a matter of law.  See In re Napster, Inc. Copyright Litig., 00 CV

---

[4] For reasons discussed later, this fact does not morph Robertson's knowledge for contributory liability into a finding that either Robertson or MP3tunes was willfully blind.

1369 (MHP), 2001 WL 36593841, at *2-4 (N.D. Cal. July 9, 2001).  But Napster depended on its assertion that no legal authority supports such a claim.  See Napster, 2001 WL 36593841, at * 2. Limewire I holds to the contrary and, as noted above, cites more recent and persuasive authorities.  Accordingly, this Court reiterates its earlier conclusion that a "tertiary" liability claim is cognizable.  And Plaintiffs' established that claim at trial.  Accordingly, Robertson's motion for judgment as a matter of law on this claim is denied.

4. *MP3tunes' Liability under Respondeat Superior*

The jury found MP3tunes liable under a respondeat superior theory for MP3tunes' Executive's sideloading of infringing works into their personal lockers.  To prove this claim, Plaintiffs were required to prove that the MP3tunes' Executives acted (1) "within the scope of their authority as MP3tunes employees" and (2) "in furtherance of MP3tunes' business." (Charge at 23-24.)

The jury could reasonably find that the MP3tunes "project"—in which MP3tunes' Executives uploaded "high quality tracks" to the Sideloading index to "seed" the database— proved this claim.  Specifically, the trial testimony established that MP3tunes' Executives "specifically sought out websites on the Internet to locate files and sideload them into the Sideload index," in their roles "as employees of MP3tunes." (Tr. 1413:4-11 (Lindahl).)  The list of popular artists whose songs were sideloaded by MP3tunes Executives was received in evidence and reviewed by the jury. (Ex. 66)  The jury also heard testimony that the sideloading occurred from MP3tunes' offices. (Tr. 367-17-369:2.)  These activities grew MP3tunes' user base by making the service more attractive to users. (See Infra Part I.B)  Accordingly, Robertson's motion for judgment as a matter of law on this claim is denied.

C.      DMCA Safe Harbor:  Red Flag Knowledge and Willful Blindness

The crux of this case is whether MP3tunes and Robertson are insulated from liability under the DMCA.  Congress enacted the DMCA to comply with treaty obligations "and to update domestic copyright law for the digital age."  Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19, 26 (2d Cir. 2012).  To that end, Congress established four safe harbors that protect service providers from liability for certain types of copyright infringement.  17 U.S.C. § 512; Viacom, 676 F.3d at 27.

The safe harbor at issue in this case protects qualifying service providers from liability for "information residing on systems or networks at [the] direction of users."  17 U.S.C. § 512(c).  The DMCA's protection must be earned.  A service provider qualifies for § 512(c) immunity only if the service provider:

> (i) does not have actual knowledge that the material or an activity
> using the material on the system or network is infringing;
>
> (ii) in the absence of such actual knowledge, is not aware of facts
> or circumstances from which infringing activity is apparent; or
>
> (iii) upon obtaining such knowledge or awareness, acts
> expeditiously to remove, or disable access to, the material;

17 U.S.C. § 512(c)(1)(A).  The second provision has come to be known as the "'red flag' knowledge" provision.  Viacom, 676 F.3d at 31.  In Viacom, the Second Circuit "establish[ed] an exquisite 'subjective/objective' standard for distinguishing between 'actual' and 'red flag' knowledge."  MP3tunes II, 2013 WL 1987225, at *3 (citation omitted).  Actual knowledge refers to subjective awareness of infringement, and "red flag" knowledge arises where a provider is aware of facts that would have made specific infringement objectively obvious to a reasonable person.  Viacom, 676 F.3d at 31.

9

In addition to red flag knowledge, knowledge may be imputed to a service provider through the common law doctrine of willful blindness. Viacom, 676 F.3d at 35. A provider acts with willful blindness if it is aware of a high probability that specific material is infringing but consciously avoids confirming that fact. Viacom, 676 F.3d at 35. Section 512(m)'s command that "DMCA safe harbor protection cannot be conditioned on affirmative monitoring by a service provider" limits the reach of the common law doctrine. Viacom, 676 F.3d at 35 (citing 17 U.S.C. § 512(m)). "Viacom offers little guidance on how to reconcile the tension between the doctrine of willful blindness and the DMCA's explicit repudiation of any affirmative duty on the part of service providers to monitor user content." Capitol Records, LLC v. Vimeo, LLC, 972 F. Supp. 2d 500, 523, amended on reconsideration in part, 972 F. Supp. 2d 537 (S.D.N.Y. 2013) (quoting MP3tunes II, 2013 WL 1987225, at *2).

Only knowledge of specific instances of infringement bars a service provider from the safe harbor, regardless of whether the knowledge is actual, or supplied though red flag knowledge or willful blindness. Viacom, 676 F.3d at 32, 35.[5] The requirement is a practical one—only specific knowledge enables the service provider to expeditiously remove infringing material. Viacom, 676 F.3d at 30. The statute does not impose "an amorphous obligation to 'take commercially reasonable steps' in response to a generalized awareness of infringement." Viacom, 676 F.3d at 31 (citing 17 U.S.C. § 512(c)(1)(A)); see also 17 U.S.C. § 512(m). Thus, when a provider knows that material at a specific location is infringing, it must act expeditiously to remove it or risk losing the safe harbor for infringements of that material. And that knowledge

---

[5] In contrast, "knowledge of specific infringements is not required to support a finding of contributory infringement." Usenet.com, Inc., 633 F. Supp. 2d at 154.

can be actual or as a result of red flag knowledge or willful blindness.  See Viacom, 676 F.3d at 32.[6]

The jury held Defendants liable for MP3tunes' users' copyright infringement by finding red flag knowledge and willful blindness as to four categories of works:  (1) takedown notices identifying ten or more infringing files on a domain; (2) Sideloads of MP3s before January 2007; (3) Sideloads by MP3tunes Executives; and (4) works by The Beatles.  Those categories were not court imposed; they were constructed by Plaintiffs, presumably to streamline their trial presentation.  The decision to cabin thousands of works into one or more of these categories foreshadowed a strategy that aggregated claims instead of focusing on specific instances of infringement.  Robertson argues that the evidence was insufficient to conclude the Defendants possessed knowledge of specific instances of infringement.

1.    *Takedown Notices Identifying 10 or More Infringing Files on a Domain*

Plaintiffs sent MP3tunes takedown notices listing thousands of songs and the source URLs from which they were sideloaded.  (Tr. 354:25-356:2 (Horowitz).)  Thirteen domains were listed at least ten times.[7]  (Sacks Decl. Ex. I (listing 13 domains).)  At trial, Plaintiffs argued Defendants knew those domains likely hosted other infringing content sideloaded by users but failed to remove that content.  The jury agreed and found Defendants acted with red flag knowledge and willful blindness in permitting users to continue to sideload content from those domains.

---

[6] The Section 512(c) safe harbor also requires that providers "not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity."  17 U.S.C. § 512(C)(1)(B).  This provision does not include a specific knowledge requirement.  Viacom, 676 F.3d at 38.  This Court found MP3tunes met this requirement, MP3tunes I, 821 F. Supp. 2d at 645-46, and this issue was not submitted to the jury (see Charge at 27).
[7] The number of files per domain ranged from 10 to 56.  (Sacks Decl. Ex. I, at 1 (PX 447).)

Red flag knowledge requires awareness of facts that would have made specific instances of infringement objectively obvious to a reasonable person. Viacom, 676 F.3d at 31-32. General knowledge is insufficient. For example, knowledge that a high percentage of content on a domain is infringing does not establish actual or red flag knowledge of particular instances of infringement. Viacom, 676 F.3d at 33. In this case, MP3tunes lacked even general knowledge. Even if MP3tunes tracked domains posting infringing files, a fact not in evidence (Tr. 358:16-359:8 (Horowitz)), MP3tunes would still need to investigate how much content the domain hosted before it could calculate what percentage was infringing.

To ascribe red flag knowledge to MP3tunes because it was possible for MP3tunes to research and identify other instances of infringing content hosted by these domains and sideloaded by users would "mandate an amorphous obligation to 'take commercially reasonable steps' in response to generalized awareness of infringement." Viacom, 676 F.3d at 31. But the DMCA imposes a duty on providers to track repeat infringement by users, not third parties. See 17 U.S.C. § 512(i)(1)(A).

The same reasoning disposes of the willful blindness argument. Imputing knowledge to MP3tunes would impose an obligation to affirmatively monitor content, which would contravene Section 512(m)'s clear instruction that no such obligation exists. See Viacom, 676 F.3d at 35. Therefore, Robertson's motion for judgment as a matter of law is granted as to his liability for secondary infringement of tracks sideloaded by users from these domains.

2.   *Sideloads of MP3s before January 2007*

The major record labels offered no MP3s for sale until 2007 (Tr. 147:14-148:9; Sacks Decl. Ex. J, at 1-2), and Robertson knew this (Platzer Decl. Ex. 39, at 2 (PX 378)). Although Amazon.com and some industry websites, such as South by Southwest (sxsw.com),

offered promotional MP3s before 2007, the vast majority of promotional works were offered in other formats. (Tr. 1501:3-1502:11; Sacks Decl. Ex. K.) Plaintiffs argued that because industry insiders knew MP3s of major-label works available before 2007 were illicit, MP3tunes knew that all pre-2007 sideloads of major-label MP3s were infringing. The jury agreed and found that MP3tunes acted with red flag knowledge and willful blindness in enabling sideloads of MP3s before January 2007.

Knowledge that a high percentage of a type of content is infringing is insufficient to create red flag knowledge. Viacom, 676 F.3d at 33. A party is willfully blind, however, when it is aware of a high probability that a specific type of content is infringing, available on a service, and consciously avoids confirming that fact. Viacom, 676 F.3d at 33. Here, the jury heard evidence from which it could conclude Defendants were aware that major record labels had not offered MP3s until 2007. (See, e.g., Tr. 1918:20-25; Platzer Decl. Ex. 39, at 2 (PX 378).)

But in the context of the DMCA, willful blindness is limited by the express statutory disavowal of a duty to affirmatively monitor. Viacom, 676 F.3d at 35. The common law doctrine would require Defendants to actively conduct routine searches and eliminate material likely to be infringing.[8] But under Viacom's interpretation of the DMCA, even when service providers possess sophisticated monitoring technology, they are under no obligation to use it to seek out infringement. See Vimeo, LLC, 972 F. Supp. 2d at 525. Thus, MP3tunes cannot be held liable for failing to routinely search its servers for major-label MP3s released

---

[8] Although MP3tunes had software that could identify the copyright holder of each work individually (Tr. 311:25-312:6 (Horowitz)), there was no evidence MP3tunes could search for major-label content or by file format (Tr. 312:7-17 (Horowitz) (expert found no MP3tunes code using the copyright holder data)).

before January 2007. And therefore, Robertson's motion for judgment as a matter of law is granted as to sideloads of MP3s before January 2007.

      3.    *Sideloads by MP3tunes Executives and Related Claims*

MP3tunes' Executives sideloaded songs. As MP3tunes' Executives sideloaded tracks, they viewed the source domain's URL along with the artist and track title. (Tr. 292:4-12). The MP3tunes' Executives knew personal sites on storage service domains and student pages on college websites had a high probability of hosting infringing material. (Tr. 2162:7-20 (Robertson); Tr. 1284:19-1285:5 (Brocious); see Plazter Decl. Ex. 71 (PX389) (listing obviously infringing websites such as clockworkchaos.net, fileden.com, www.myfilestash.com, and oregonstate.edu.) Because MP3Tunes' Executives observed those clearly infringing source domains, the jury could conclude that it would be objectively obvious to a reasonable person (here, MP3Tunes) that any tracks sideloaded from those domains were infringing. Accordingly, Robertson's motion for judgment as a matter of law is denied as to tracks sideloaded by MP3tunes' Executives and users from those domains.

      4.    *The Beatles*

MP3tunes' users sideloaded numerous tracks by The Beatles. (Sacks Decl. Ex. B, Table B-2.) In 2009, Robertson sent an email acknowledging that "the Beatles have never authorized their songs to be available digitally." (Platzer Decl. Ex. 68 at 1 (PX 383); see also Tr. 1042:18-22.) Although Robertson testified that he did not learn the Labels' position that no songs by the Beatles were available legitimately over the Internet until that year (Tr. 1080:24-1081:9), the jury was free to disregard that testimony, especially since it heard evidence that it was widely known in the music industry that authorized digital tracks by The Beatles were not available during that time period (Tr. 1043:17-22 (Robertson); 1505:2-19 (McMullan)). Thus,

Plaintiffs adduced evidence at trial that MP3tunes was aware of facts that would indicate to a reasonable person that sideloading any Beatles song before 2010 was an act of infringement.

However, MP3tunes loses the protection of the safe harbor only if it also knew of specific instances of infringement. MP3tunes' Executives personally sideloaded songs by The Beatles. (Tr. 674:1-21 (Horowitz); Platzer Decl. 66.) Therefore, the Executives possessed actual knowledge of those specific instances of infringement, and MP3tunes acted with red flag knowledge that those specific songs sideloaded by the Executives were infringing.

In addition, a user sent MP3tunes an email indicating the song "Strawberry Fields Forever" by The Beatles was available on Sideload.com. (Platzer Decl. Ex. 67, at 1 (PX 137).) Therefore, MP3tunes possessed red flag knowledge that its users had sideloaded infringing copies of "Strawberry Fields Forever." See UMG Recordings, Inc. v. Shelter Capital Partners LLC, 718 F.3d 1006, 1024-25 (9th Cir. 2013) (holding that a user's email to a service provider identifying infringing content on its service may be sufficient to establish red flag knowledge).

Plaintiffs also contend that Robertson had actual knowledge that he was infringing copyrights of works by The Beatles because he was "unable to deny that he personally demonstrated how to sideload works by using The Beatles as an example." (Mem. Opp'n 14.) But that is a bridge too far. When asked if he had searched for works by The Beatles, Robertson testified that he could not recall. (Tr. 1040:20-23.) Robertson's ambiguous response was not probed to any depth. His "I don't recall that" answer was not distilled to a "no, it did not happen," a "yes, it happened" or an "It could have happened but I just don't remember" answer. And there was no other evidence that answered counsel's question.

"[I]t is black letter law that questions asked by counsel are not evidence." Washington v. Schriver, 255 F.3d 45, 61 (2d Cir. 2001) (citation omitted). While the jury could

have disregarded Robertson's answer as a feigned lack of recollection, it could not, in the absence of other evidence, use it to conclude that Robertson sideloaded works by The Beatles.[9] And the record is bereft of any other evidence supporting the jury's finding of red flag knowledge and willful blindness as to specific works by The Beatles.

Despite proffering only evidence of the specific knowledge of Executive-sideloaded Beatles tracks and "Strawberry Fields Forever," Plaintiffs argue that MP3tunes possessed knowledge of all songs by The Beatles sideloaded by its users. The MP3tunes' Executives' personal sideloads and the user's email may have put MP3tunes on notice that its service probably linked to other songs by The Beatles. But MP3tunes cannot be required to search for links to Beatles songs to retain the protection of a DMCA safe harbor. See Viacom, 676 F.3d at 35 & n.10. Therefore, the jury heard insufficient evidence to support a finding of red flag knowledge and willful blindness as to songs by The Beatles other than "Strawberry Fields Forever" and those sideloaded by MP3tunes' Executives.

In sum, the jury's determination that MP3tunes possessed red flag knowledge as to instances of "Strawberry Fields Forever" and songs by The Beatles sideloaded by MP3tunes' Executives is supported by the evidence. But Robertson's motion for judgment as a matter of law is granted as to the other Beatles tracks.

D.   Challenges to Plaintiff's Claims of Specific Rights

1.   *Public Performance Claims*

The jury found Defendants vicariously and contributorily liable for third-party websites' violations of Plaintiffs' public performance rights. (Charge at 33.) Those findings

---

[9] Another witness testified that Robertson advised her generally "just to say 'I don't recall,'" in response to questions posed at deposition. (Tr. 1426:25-1427:5 (Wood).) While her testimony undermines Robertson's credibility, Robertson's response to counsel's question at trial is not affirmative evidence that Robertson searched for tracks by The Beatles.

rested on evidence that Sideload.com permitted users to play tracks hosted by third-party websites through the user's browser.  (Tr. 278:11-12; 287:16-288:7 (Horowitz), 1979:9-15, 1993:11-1995:23 (Robertson).)

The DMCA safe harbor is an affirmative defense to infringement of public performance rights.  See 17 U.S.C. § 512(c).  Therefore, MP3tunes' secondary liability for public performances is limited to Sideload.com links for which MP3tunes was willfully blind or had actual or red flag knowledge.[10]

Robertson attempts to sidestep this secondary liability by arguing that Plaintiffs submitted no evidence that any works were performed or displayed publicly by MP3tunes users. But that is irrelevant.  The question for the jury was whether third-party websites, not users, were performing Plaintiffs' works publicly.  (Sacks Decl. Ex A at 33.)  As discussed below, there was ample evidence that they were.

As a fallback, Robertson argues that third-party websites did not publicly perform the works-in-suit.  Public performance means, inter alia, to (1) perform or display the work in a public place or in a place where a substantial number of persons is gathered or (2) to transmit or display the work in or to the public by means of any device or process.  (See Charge at 31.) "[U]nder the transmit clause, [courts] must examine the potential audience of a given transmission by an alleged infringer to determine whether that transmission is 'to the public.'" Cartoon Network LP, LLLP v. CSC Holdings, Inc., 536 F.3d 121, 137 (2d Cir. 2008).  "Both factors—the identity of the transmitter and the source material of the transmission—limit the potential audience of a transmission . . . and are therefore germane in determining whether that transmission is made 'to the public.'"  Cartoon Network, 536 F.3d at 138.  In the context of this

---

[10] Although the claims for infringement by users and third-party websites concern violations by different users, both concern Defendants' knowledge of Sideload links to infringing material.

case, a third-party domain hosts a single master copy that is available for transmission to anyone on the Internet.

Robertson contends there was no master copy because visitors could opt to stream or download files in different formats to accommodate various device's capabilities. (Tr. 554:5-18 (Horowitz)). Even if the capability Robertson cites also applies to sideload.com, (Tr. 553:24-555:25 (Horowitz)), any reformatting of the master file to accommodate a visitor's computer or Internet speed does not alter the fact that the master file is unique. Cf. Cartoon Network, 536 F.3d at 137 (unique file refers to work used to make the transmission). Therefore, it was reasonable for the jury to conclude that the source domains were publicly performing Plaintiffs' works.

Plaintiffs also argue that the Supreme Court's opinion in Aereo establishes that the third-party websites performed the work publicly. But the Supreme Court expressly excluded "novel issues not before the Court, as to which 'Congress has not plainly marked [the] course.'" Am. Broad. Cos. v. Aereo, Inc., 134 S. Ct. 2498, 2511 (2014). Because the third-party domains here are not "substantially similar" to a community antenna television provider, they are beyond Aereo's reach. See Aereo, 134 S. Ct. at 2506.

Finally, Robertson contends that the jury's verdict relating to public performance is unsupported because there was no evidence any user ever used the playback feature on Sideload.com. "One infringes contributorily by intentionally inducing or encouraging direct infringement, and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." Grokster, 545 U.S. at 930 (citations omitted). Plaintiffs never asserted Defendants induced or encouraged third parties to make tracks available to MP3tunes' users. However, the jury heard evidence from which it could infer that

Sideload.com's features, including the playback feature, encouraged new users to sign up at MP3tunes.com. (Tr. 981:16-18.) Therefore, the jury could conclude reasonably that potential users had likely taken advantage of this feature.

Moreover, MP3tunes and Robertson could have terminated the playback feature but they did not. (See 1993:11-1995:23 (Robertson) (playback feature created at Robertson's direction).) And that feature enabled third-party violations of Plaintiffs' public performance rights. It was reasonable for the jury to find that Defendants are contributorily liable for the third-party websites' public performance violations. Accordingly, Robertson's motion for judgment as a matter of law on this claim is denied.

2.   *Reproduction of Cover Art*

The jury found MP3tunes liable for direct infringement of Plaintiffs' reproduction rights in cover art. (Sacks Decl. Ex. B, at 14.) Robertson designed MP3tunes' software to retrieve cover art from Amazon.com whenever a user uploaded music files to an MP3tunes locker. (Tr. 341:24-342:9; 517:13-519:17; 1212; Platzer Decl. Ex. 74 (ECF No. 616-23).) The art was uploaded to the user's locker and displayed when a song from that album was played. (Tr. 341:24-342:9; 517:13-519:17; 1212.) Each time a user played associated tracks, MP3tunes' software displayed the cover art. While users could upload cover art themselves, they were unlikely to do so. (Tr. 519:6-8 (explaining that he had never seen album art embedded on a CD); 687:24-688:22 (explaining that it was very unlikely that the cover art came from sources other than Amazon.com) (Horowitz).) The Labels found over 300 of their own cover art images in the MP3tunes database. (Platzer Decl. Ex. 73 (ECF No. 616-22, 616-23).)

Robertson contends that the jury should not have held MP3tunes liable for direct infringement of cover art because MP3tunes lacked volition. "When there is a dispute as to the

author of an allegedly infringing instance of reproduction," the infringer is the one whose

"volitional conduct . . . cause[d] the copy to be made." Cartoon Network, 536 F.3d at 131

(citation omitted).  It was reasonable for the jury to conclude that MP3tunes' volitional

conduct—creating a feature to automatically retrieve cover art from Amazon.com—caused the

unauthorized reproduction of the Labels' cover art.  Further, the evidence at trial demonstrated

that MP3tunes created this feature at Robertson's direction.  Accordingly, Robertson's motion

for judgment as a matter of law is denied as to MP3tunes' direct liability for its unauthorized

reproduction of cover art.

        3.    *Public Display of Cover Art*

        Robertson contends that MP3tunes did not publicly transmit cover art because

MP3tunes created a separate copy of each album cover for each user.  Each time any user

uploaded a track, MP3tunes' software automatically searched for and retrieved cover art,

regardless of whether other users had that cover art in their lockers.  (Tr. 345:2-347:1

(Horowitz).)  MP3tunes saved the cover art on its servers.  (Tr. 345:12-15 (Horowitz).)  Only one

user was capable of receiving each copy.  (Tr. 346:20-347:1 (Horowitz).)  Because there was no

master copy of the cover art, MP3tunes cannot be held directly liable for a public display of

cover art.  see Cartoon Network, 536 F.3d at 139; cf. MP3tunes I, 821 F. Supp. 2d at 649-50

(holding that MP3tunes could not be directly liable for violations of Publishers' public

performance rights in musical compositions because MP3tunes did not use a master copy).

Further, as described earlier, Aereo does not buttress Plaintiffs' argument because its holding

was explicitly limited to technologies substantially similar to the one before the Supreme Court.

Aereo, 134 S. Ct. at 2506, 2510-11.  Therefore, Robertson's motion for judgment as a matter of

law is granted as to MP3tunes' liability for public display rights in cover art.

4.  *Duplicative Statutory Damages Awards for Multiple Songs and Cover Art*

"The Copyright Act allows only one award of statutory damages for any 'work'

infringed." <u>Bryant v. Media Right Prods., Inc.</u>, 603 F.3d 135, 140 (2d Cir. 2010) (citing 17

U.S.C. § 504(c)(1)).  Materials that are sold only as part of a compilation, such as songs on an

album, ordinarily are not separate works for the purposes of statutory damages.  <u>See Bryant</u>, 603

F.3d at 141 (finding plaintiff issued works only as albums); 17 U.S.C. §504(c)(1) ("[A]ll the

parts of a compilation . . . constitute one work.").  But when a copyright holder or publisher

issues material both on an individual basis and as part of a compilation, the Copyright Act

permits a statutory damages award for each individual work offered separately.  <u>See Arista</u>

<u>Records LLC v. Lime Grp. LLC</u> ("Limewire II"), 06 CV 5936 (KMW), 2011 WL 1311771, at *4

(S.D.N.Y. Apr. 4, 2011).[11]

This Court charged the jury that Plaintiffs had the burden of proving whether "on

the date of infringement, each individual sound recording at issue in this case was available for

purchase as a single."  If Plaintiffs failed to meet that burden, the jury could make only "one

statutory damages award for the album on which [the individual] sound recording appears."

(Decl. of Ira Sacks, Ex. C: Damages Charge ("Damages Charge"), ECF No. 613-4, at 9-10.)  The

jury determined that every sound recording at issue was available for purchase as a single on the

date of infringement.

---

[11]Assuming an album has ten songs and that a defendant downloaded (infringed) each song, a
copyright owner may recover for that infringement between one and ten times.  If none of the
songs were made available separately as singles, then one recovery (for the entire album) is
available.  If not all of the songs are available as singles, then up to ten recoveries are available—
one for each of the songs available as singles and one for the album because of the song(s) only
available on the album.  Finally, if all of the songs are available as singles, then ten recoveries
are available—one each for the songs available as singles <u>but none</u> for the album.

Robertson contends that the verdict sheets—larded with Excel spreadsheets identifying hundreds of individual words—required the jury to decide the issue of infringement on a song-by-song basis. Because Plaintiffs did not offer the dates when each song in suit was made available as a single, Robertson argues that the jury's finding that every song was available as a single on the date of infringement is not moored to the evidence. The parties skirmished over this issue throughout the trial. Plaintiffs' knew whether each song in suit was available as a single and when it became available. But to this Court's frustration, they did not offer a summary chart or other evidence presenting song-by-song proof. Instead, Plaintiffs offered generalized testimony from record company executives.

Dominic Pandiscia of EMI and Capital Records was responsible for designing and implementing a strategy to monetize EMI's digital assets and explained how EMI sought to market its entire catalog as "[a]lbums, singles, [and] video assets." (Tr. 3053-54, 58.) Pandiscia testified that other than tracks by The Beatles and Bob Seger and one track by Pink Floyd, EMI's entire catalog was available as singles to the Labels' digital partners for downloading in DRM-protected files[12] as early as 2004 and for streaming on the Internet in 2007. (Tr. 3060:1-3062:25; Tr. 3065:21-3068:25; Tr. 3078:18-24; Tr. 3089:12-17.) He provided a "conservative estimate that 95 to 98 percent of our total catalog was available [as singles]." (Tr. 3068:22-25 (Pandiscia).) Pandiscia asserted that "generally, as a new release, [a track was made available for digital purchase] fairly instantaneously, so as soon as a track was serviced to a radio station it would be made available to the consumer to purchase." (Tr. 3080:16-19.)

Pandiscia acknowledged that he did not "personally verify" that the Labels' entire digital catalog was made available to iTunes. (Tr. 3086:15-18.) When asked to specify the date

---

[12] Digital rights management-limited files, or DRM-protected files, have built-in protections that restrict a consumer's ability to copy them or transfer them between machines. (Tr. 146:14-19.)

on which a particular song was released as a single, Pandiscia conceded that he "couldn't sit here and quote street dates for each individual track or artist. I don't have that knowledge base." (Tr. 3075.) Pandiscia's refrain on cross-examination about release dates for songs by specific artists was a reflexive variation of "I don't know the exact date." (Tr. 3069-75.) Pandiscia instead explained that new works were made available as singles when the works were released, while older works were made available as singles on the launch date of the given digital service provider, such as iTunes. (Tr. 3076-78.)

Mark Piibe of Sony Music Entertainment focused his testimony on how songs were made available to stream as singles. (Tr. 1121.) But he too was vague and unable to recall when Amazon started selling EMI digital content (i.e. sold works in singles-format). (Tr. 1160.)

While Plaintiffs knew whether and when each song in suit was available as a single, they declined to engage the jury on that atomized level, perhaps fearing that jurors would be overwhelmed because of the number of works in suit. Instead, their record company executives offered generalities from the witness stand, such as Pandiscia's conservative estimate that 95 to 98 percent of EMI's catalog was available as singles. Nevertheless, crediting Pandiscia's testimony, it was reasonable for the jury to conclude that Plaintiffs had shown by a preponderance of the evidence that any track not by The Beatles, or Bob Seger, or the one track by Pink Floyd was marketed as a single at the time of infringement.[13]

---

[13] Given a 95 percent chance that any song was available as a single, it was reasonable for the jury to conclude that each song in suit was more likely than not available as a single. This is true, despite the lack of evidence on a song-by-song basis. Generalized evidence on sets as a whole is often used to prove the characteristics of elements within those sets. While somewhat afield, one need look no further than residential mortgage-backed securities cases, where the characteristics of random samples of loans in a securitization are used to prove that other loans in the securitization have similar defects. See, e.g., Assured Guar. Mun. Corp. v. Flagstar Bank, FSB, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013).

Robertson also contends there was no evidence that at the time of infringement, any cover art was commercially available independent of the purchase of a sound recording. Pandiscia testified that cover art was available to digital service providers at the same time as the songs (Tr. 3078:5-24), and that cover art generally was commercially exploited by publishers through the sale of merchandise, (Tr. 129:8-17). Piibe testified that he separately negotiated some cover art licenses. (Tr. 1162:13-24 (explaining that cover art licenses represented "a very, very small business").) But Robertson is correct that there was no evidence that each and every cover art work was made available separately. And there is no way to determine, based on the trial record, which cover art was or was not available separately. Had Plaintiffs proved that the cover art was available separately, then Plaintiffs could recover for infringement of its cover art separate from the recovery of the sound recording. But they did not. Therefore, recovery is available only for cover art for which Plaintiffs have not recovered on a sound recording.

This result flows naturally from the concept that a copyright owner may only recover once for a sound recording that is available both as a single and as part of a compilation. The evidence was sufficient to show only that cover art was made available as part of an album or along with a single. Each single or album is itself a compilation consisting of the single or album and the cover art because they were coupled together. Therefore, Plaintiffs may only recover for cover art that they have not also recovered for the sound recording associated with it. In sum, Plaintiffs' may recover one award per single or album along with the covert art—if Plaintiffs recover for any single or album, they are not entitled to a separate award for the cover art associated with the album or single. Therefore Robertson's motion is granted in part as to cover art damages.

E.    Unfair Competition Claims

Because the Copyright Act applies only to post-1972 sound recordings, Plaintiffs asserted unfair competition and common law copyright claims for any pre-1972 sound recordings in suit.  Plaintiffs claimed that MP3tunes used infringing content to unfairly compete with Plaintiffs in the marketplace.  An unfair competition claim requires proof that MP3tunes (1) used Plaintiffs' works without authorization; (2) competed with Plaintiffs in the marketplace; and (3) acted for commercial benefit or deceived the public.  (Charge at 35-36.)  "[U]nfair competition[,] . . . in addition to unauthorized copying and distribution[,] requires competition in the marketplace or similar actions designed for commercial benefit or deception of the public."  Capitol Records, Inc. v. Naxos of Am., Inc., 4 N.Y.3d 540, 563-64 (2005) (citations omitted).  It also requires "some element of bad faith."  Empresa Cubana Del Tabaco v. Gen. Cigar Co. Inc., 385 F. App'x 29, 32 (2d Cir. 2010) (citations omitted).

MP3tunes' index of free music competed with Plaintiffs' sales and licensing of those same works.  Cf. Limewire I, 784 F. Supp. 2d at 437.  MP3tunes promoted links to free music files to increase the number of subscribers to its online locker service.  (Tr. 276:11-277:21 (describing premium user structure) (Horowitz); Tr. 981:16-18 (Sideload.com drove the most traffic to locker service) (Robertson).)  Internet sharing of unauthorized files was "rampant" and hurt industry sales.  (Tr. 1128:24-1130:24 (Piibe).)  MP3tunes' Executives sideloaded thousands of songs during that chaotic period.  (Tr. 362:25-364:14).  And the evidence at trial showed that MP3tunes misled users into believing they had no legal liability for sideloading songs.  (Tr. 1034:3-1037:17 (Robertson); Platzer Decl. Ex. 25, at 3.)  Therefore, it was reasonable for the jury to conclude that MP3tunes unfairly competed with Plaintiffs in the marketplace.

The evidence also demonstrated that Robertson controlled MP3tunes, encouraged its Executives to sideload, and deceived the public through MP3tunes' Frequently Asked Questions (FAQ) section of its website. The jury was entitled to disregard Robertson's self-serving statements to the contrary. (Tr. 1939:1-1940:23; 1978-79 (Robertson).) Therefore, Robertson's motion is denied as to liability for unfair competition.

## II.   New Trial Motion

Robertson moves for a new trial under Rule 59. "In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to [Rule] 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, 'the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice.'" Nimely v. City of New York, 414 F.3d 381, 392 (2d Cir. 2005) (alteration in original) (citing Munafo v. Metro. Trans. Auth., 381 F.3d 99, 105 (2d Cir. 2004) (internal quotation marks omitted)); see also ING Global v. United Parcel Service Oasis Supply Corp., 757 F.3d 92, 99 (2d Cir. 2014) (citation omitted). While a court is free to weigh the evidence and need not view it in the light most favorable to the verdict winner on a Rule 59 motion, a court should "rarely disturb a jury's evaluation of a witness's credibility." DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 134 (2d Cir. 1998).

Robertson contends this Court should grant a new trial because the jury reached a seriously erroneous result. However, there was ample evidence to support the jury's findings that survive the Rule 50(b) motion and, at bottom, those remaining claims turn on the jury's assessment of the credibility of the witnesses. The verdict reflects the jury's determination that Robertson was not credible and Plaintiffs' witnesses were. Those assessments were within bounds.

26

This Court observed Robertson's demeanor on the witness stand. No transcript can capture his whole affect; you really had to be there. In response to Robertson's counsel's first question, "Could you explain to the jury why you changed your name?" Robertson asked for a drink of water and then launched into a 735-word soliloquy:

> OK, well, it's a little personal, embarrassing, but here it goes.
>
> So when I grew up, I grew up as Michael Robertson, and I had a tough childhood and I had a father who was alcoholic and a drug addict and beat me. When I was 11, I had this sort of epiphany that he didn't beat any of the other kids and I looked way different than all the other people in the family. I was a scrawny little blond kid and he was six-foot-four with dark hair, and everyone else in the family was big. So I asked my mom, is he my real father. And she said, nope, you're adopted but she was my real mother.
>
> Well, I didn't—we didn't talk any more about it, and—so fast-forward to when I was 17. Then he got kicked out of the house and we got evicted and I moved out so my mom would just be with my sisters and it would be easier for her. Then I never saw my father after that. Sorry. Then I had two kids. And I explained to them that their stepfather was a bad man. And when they were eight—sorry. When they were eight, they asked me who their real dad was –
>
> Q: Do you mean real granddad?
>
> Real granddad. I'm sorry. I said I didn't know and I had always seen those shows on finding your adopted parent sort of thing. And I was kind of curious, right? People always say, well, I need to find out for medical reasons; I think they really want to find out because they're curious, you know, what does he look like and what happened and stuff like that. And so I decided, well, I'm going to look this guy up.
>
> So I talked to my mom. I said, can you give me the guy's information? So she says, I'll work on it and I'll get back to you. I said, OK.
>
> Then one day—it was a Friday, I remember it well—I got a package. And in the package was a letter and a VHS cassette and the letter was a guy—was from a guy named Ron Hammer. And said he was my father and that he was glad that I had reached out

27

to him, and that he wanted to propose a meeting. He told me to watch the tape. It was a VHS tape, and I didn't have any VCR in the house—I had to go to the garage and get it—so I didn't watch it on Friday, I watched it on Saturday.

I put the tape in. And David Letterman does this thing called Stupid Pet Tricks. I don't know if you like David Letterman but I do. He has this thing he does with Stupid Pet Tricks where people show up with their pet and do something wacky. And the tape was six clips from David Letterman's Stupid Pet Tricks, and all six of the clips were the same guy, with a dog named Zeke and that guy was Ron Hammer, my dad. He had this amazing dog that would bounce a basketball and dunk it and would hold a golf club in his mouth and putt the ball into the hole. So it was remarkable.

So I watched that on the Saturday. On Sunday, I'm flying to Japan for a business trip. And I get on the airplane, and down come the TV screens, you know, that show like TVs while you're flying. And there's the David Letterman show with one of the clips that I saw on the tape. I was like, whoa, I don't know if you believe in God but that's cosmic. So I said, I'm going to follow up with this guy.

So I flew up—he lived in Northern California—I flew in and I met with this guy. And he told me that the story—what he said was that my mom and him hooked up and then he went off to war in Vietnam. And while he was over there, he got I guess a telegraph or something from the Red Cross that said, you know, you've got a son waiting for you when you get back.

He told me that when he got back, he basically ran away. He got into a car and drove across the U.S. to escape the responsibility of a parent, and he was very remorseful for that. And he gave me his dog tags from Vietnam. That's what they wear, so if they're killed they know who they are.

I told him I didn't harbor any ill will, I wasn't mad at him, things happen in life, everyone has challenges. I told him he had two grandkids. He was excited because he didn't have any grandkids. He told me I had a brother. It was a good meeting.

So then I said, why don't we get together—

(Tr. at 1068-1071.)

28

Carried away on his own mystic transport, Robertson was overwhelmed with emotion and needed time to compose himself. Seizing the moment, his counsel posed a follow-up question: "Since you're struggling, Michael, why don't we move forward a little bit to the relationship between your birth father and your kids?" Robertson responded with a 186-word finale:

> So it turns out he's a great guy, maybe he made mistakes but he's a great guy. He became a devoted grandfather to my kids. And so three years ago, you know, I always told my kids they don't owe any allegiance to the name Robertson because it wasn't their real biological father but, more importantly, forget the biology, he wasn't a good man. So three years ago they said they wanted to change their last name to Hammer. I thought that was really cool thing to do. I thought it was a courageous thing to do because they were eight and six at the time, eight and seven. So I said, hey, I'll go with you and I will do it with you, I'll change my name too.
>
> So we logged on to the court, downloaded the paperwork and filed the paperwork, and then we had a court hearing and their grandfather came down. So my two sons' and my name are now Hammer, but because I'm in the business world known as Michael Robertson, nobody knows that story except you guys and their grandfather.

(Tr. at 1071-72.)

This seemingly rehearsed, five-minute fable-like narrative left the jury nonplussed and Plaintiffs' counsel shell-shocked. It was a dramatic presentation. Even if true, Robertson's decision to spin this yarn backfired on him. The jury saw it for what it was—a transparent attempt to tug at their heartstrings. Plaintiffs' counsel failed to appreciate what the jury grasped and reflexively moved for a mistrial claiming unfair prejudice. But Robertson's manipulative conduct only prejudiced him and that prejudice was not unfair. In denying Plaintiffs' motion, this Court observed, "[j]urors see through performances, and the Oscars are over for this year." (Tr. 1106:1-2.) The jury's verdict demonstrated that this Court's observation was spot on. The

jury's decision to disregard much of Robertson's testimony was entirely reasonable and just. Accordingly, Robertson has failed to show the verdict was egregious or a miscarriage of justice.

**III.    Remittitur**

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." Lee v. Edwards, 101 F.3d 805, 808 (1996) (quoting Tingley Sys. Inc. v. Norse Sys., Inc., 49 F.3d 93, 96 (2d Cir. 1995)). Statutory damages under the Copyright Act are designed to provide "reparation for injury" and "to discourage wrongful conduct." F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233 (1952); see Sony BMG Music Entm't v. Tenenbaum, 719 F.3d 67, 71 (1st Cir. 2013).

In determining whether a damage award is excessive in the context of a federal copyright infringement case, six considerations come into play:  (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties.  Psihoyos v. John Wiley & Sons, Inc., 748 F.3d 120, 127 (2d Cir. 2014) (citation omitted).

Robertson contends that the jury's statutory damages award on the federal claims is excessive because neither he nor MP3tunes were willful infringers.  The jury's finding that MP3tunes and Robertson were willful infringers is supported amply by the evidence. Willfulness may be shown by proof of a defendant's reckless disregard of the possibility that his conduct is infringing.  See Arista Records LLC v. Usenet.com, Inc., 07 CV 8822 (HB), 2010 WL

3629688, at *6-7 (S.D.N.Y. Feb. 2, 2010). The evidence demonstrating Robertson's contributory liability and knowledge of the infringing activity of MP3tunes, its Executives, and its users was sufficient to sustain a finding of willfulness.

Robertson contests the $10,000 awards against him for each of 6 songs that he sideloaded from "undisputedly reputable sources" and $100,000 awards against him for each of 14 songs where Robertson was the initial sideloader. The jury rejected Robertson's argument that he was an innocent infringer for the 6 songs and found him to be a willful infringer. That finding is supported by the trial evidence. Robertson objects to the $100,000 per song award as excessive. But the jury undoubtedly awarded significantly higher damages on those songs that jurors were convinced Robertson had been the first to sideload. That higher award appropriately accounts for the stronger evidence of willfulness and the need to deter wrongful conduct.

Robertson also argues that Plaintiffs' lost revenue is miniscule compared to the damages assessed by the jury, that no deterrent effect is needed, that Robertson cooperated with Plaintiffs during this litigation, and that the conduct and attitude of the parties does not militate toward a large award. "Statutory damages under the Copyright Act are designed not only to provide 'reparation for injury,' but also to 'discourage wrongful conduct.'" Tenenbaum, 719 F.3d at 71 (quoting F.W. Woolworth Co., 344 U.S. at 233 (1952)). There is a strong need to discourage Robertson and others from engaging in similar misconduct. The damages awards appropriately account for the Psihoyos factors.

The jury also awarded $30,000 for each work MP3tunes' Executives infringed and $25,000 for each work MP3tunes' users infringed under the theories of red flag knowledge and willful blindness. The evidence supporting these awards—to the extent liability has been upheld in this Memorandum and Order—is largely the same. While there are slight differences

in lost revenue among the differing categories, the impetus for statutory damages—deterrence and punishing willfulness—is the same and supports upholding the jury's damage awards.

Finally, to the extent cover art claims remain, the jury awarded $15,000 for each cover art copyright that was infringed. As discussed, at Robertson's direction, MP3tunes automatically retrieved cover art from Amazon.com. That demonstrates willfulness and supports the damages award. Unlike sound recordings, however, Plaintiffs adduced no evidence regarding gross sales of cover art. (Tr. dated July 23, 2014 at 70.) But the damage awards for cover art are significantly less than the awards for sound recordings. Here again, deterrence weighs in support of the jury's awards. Accordingly, Robertson's motion for remittitur of the statutory damages is denied.

## IV. Punitive Damages Award

Generally, punitive damages are unavailable for claims arising under the Copyright Act. See Oboler v. Goldin, 714 F.2d 211, 213 (2d Cir. 1983); accord On Davis v. The Gap, Inc., 246 F.3d 152, 172 (2d Cir. 2001). But they are available for common law claims pertaining to pre-1972 works, such as Plaintiffs' claims for unfair competition and common law copyright infringement. The jury awarded $7.5 million in punitive damages on Plaintiffs' common law claims. This Court turns to the question of whether that award comports with due process and New York law.

    A.    <u>Legal Standard</u>

        1.    *Due Process*

Due process prohibits the imposition of a "grossly excessive" punishment on a tortfeasor. TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 454 (1993); see also Payne v. Jones, 711 F.3d 85, 97 (2d Cir. 2013). Punitive damages are designed "to punish the defendant

and to deter him and others from similar conduct in the future." Vasbinder v. Scott, 976 F.2d 118, 121 (2d Cir. 1992) (citing Smith v. Wade, 461 U.S. 30, 54 (1983)).  But a grossly excessive punitive damage award "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003).

The Supreme Court constructed three "guideposts" to aid in determining whether a punitive damages award is "grossly excessive" and violates due process.  They are: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases.  See BMW of N. Am., Inc., v. Gore, 517 U.S. 559, 574-75, 582 (1996).

2.   *Excessiveness*

In addition to considering punitive damages vis-à-vis due process, a reviewing court must also evaluate a punitive damages award for excessiveness.  "[A] federal court in a case governed by state law must apply the state law standard for appropriateness of remittitur." Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 429-30 (1996).  A New York court may reduce a punitive damages award if it "is so grossly excessive as to show by its very exorbitancy that it was actuated by passion." Koch v. Greenberg, --- F.Supp.2d ----, 2014 WL 1284492, at *18 (S.D.N.Y. Mar. 31, 2014) (citing West v. Hogan, 88 A.D.3d 1247, 1251 (4th Dep't 2011)); see also Payne, 711 F.3d at 97.  A punitive damages award cannot be sustained under New York law unless the defendant's conduct meets a "very high threshold of moral culpability" because punitive damages are "a social exemplary remedy, not a private compensatory remedy." In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Lit., 725 F.3d 65, 128 (2d Cir. 2013) (citations omitted).  Courts should closely scrutinize punitive damage awards because "punitive damages

[are] not really a 'fact' 'tried' by the jury." Cooper Indus., Inc. v. Leatherman Tool Grp., Inc., 532 U.S. 424, 437 (2001) (quoting Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 549 (1996) (Scalia, J., dissenting)).

    The Gore guideposts "also inform [a] court's review of [punitive damage] awards for excessiveness that is short of constitutional excessiveness." See Payne, 711 F.3d at 96-97. Other relevant non-Gore factors include a defendant's wealth and whether the punishment is "reasonably related to the harm done and the flagrancy of the conduct." See Koch, 2014 WL 1284492, at *18 (quoting Liberman v. Riverside Mem. Chapel, Inc., 650 N.Y.S.2d 194, 201 (1st Dep't 1996). It is the district court's task "to make 'certain that the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition.'" Vasbinder, 976 F.2d at 121 (quoting Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991)); see also Gore, 517 U.S. at 568 (punitive damages vindicate a state's legitimate interests in punishment and deterrence).[14]

    B.   Discussion

      1. *Reprehensibility*

    The degree of reprehensibility is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Gore, 517 U.S. at 575. "[E]xemplary damages imposed on a defendant should reflect 'the enormity of his offense.'" Gore, 517 U.S. at 575 (quoting Day v. Woodworth, 54 U.S. (13 How.) 363, 371 (1852)). "[S]ome wrongs are more blameworthy than others." Gore, 517 U.S. at 575. For example: (1) "nonviolent crimes are less serious than crimes marked by violence or the threat of violence," Solem v. Helm, 463 U.S. 277,

---

[14]Because the due process and excessiveness analysis rely on many of the same factors, this Court will largely dispense with a separate discussion of the two standards and focus on due process.

292-93 (1983); (2) "trickery and deceit" are more reprehensible than mere negligence, TXO, 509 U.S. at 462; (3) conduct that risks harm to many, including nonparties, is more reprehensible, see Philip Morris USA v. Williams, 549 U.S. 346, 355 (2007); and (4) recidivism may be punished more severely, Gore, 517 U.S. at 576 (citing Gryger v. Burke, 334 U.S. 728, 732 (1948)).

Gore held that "purely economic" harm does not rise to the level of reprehensibility in its punitive damages analysis. "To be sure, infliction of economic injury, especially when done intentionally through affirmative acts of misconduct, or when the target is financially vulnerable, can warrant a substantial penalty.  But this observation does not convert all acts that cause economic harm into torts that are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages." Gore, 517 U.S. at 575.  Here, Robertson's actions were intentional, but the extent of Plaintiffs economic injury was never proved, and Plaintiffs are not "financially vulnerable."

Plaintiffs cast Robertson as a serial infringer by pointing to his involvement with FileZ, MP3.com, Lindows, "Project Bad Apple," the Sideload plugin, Anywhere CD, and Radio Search Engine.  But this evidence does not support Plaintiffs' theory that Robertson is a recidivist.  For example, FileZ was a search engine used to find potential business opportunities. (See, e.g., Tr. at 910.)  After a time, FileZ became MP3.com.  (Tr. at 914.)  Although MP3.com was found to have infringed copyrights, that finding was not against Robertson personally.  As for Lindows, trademark litigation arose between that company and Microsoft.  In the end, Microsoft paid Lindows $20 million to change its name to Linspire.  Microsoft's multi-million dollar payment to Robertson's company does not square with Plaintiffs' contention that Robertson is a recidivist infringer.  Cf. Gore, 517 U.S. at 574 n.19 ("[W]e have never held that a sentencing court could properly punish lawful conduct.") (emphasis in original)).

35

Robertson's tortious acts were nonviolent and had little effect on nonparties. However, during the commission of his tortious conduct, Robertson engaged in trickery and deceit. He stole copyrighted material and encouraged others to do the same. And he directed a hide-the-ball strategy when consumers made simple inquiries such as "What is Sideload.com's policy regarding copyright infringement?" Rather than answer that question, Robertson misled users into believing the user had no legal liability for sideloading songs. (Tr. 1034:3-1037:17 (Robertson).)

Moreover, while MP3tunes' business model—designed and implemented by Robertson—was based on infringing copyrights, its full potential was never realized. Plaintiffs' reprehensibility argument is undermined by this Court's finding that—with limited exceptions—MP3tunes and Robertson cannot be held liable for infringing works under red flag knowledge and willful blindness liability theories. And, as discussed, the proffered evidence of recidivism is of little utility. Overall, this factor supports a punitive damages award but not one as large as this jury verdict.

2.    *Ratio/Reasonable Relationship*

To comport with due process, punitive damages must bear a "reasonable relationship" to compensatory damages. Gore, 517 U.S. at 580. The proper inquiry is "whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct as well as the harm that actually has occurred." TXO, 509 U.S. at 460 (emphasis in original) (quoting Haslip, 499 U.S. at 21). Although the Supreme Court has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," Gore 517 U.S. at 582, it has also determined that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will

satisfy due process," State Farm, 538 U.S. at 425; see also Exxon Shipping Co. v. Baker, 554 US. 471, 501 (2008).

Still, "[a] general concer[n] of reasonableness . . . properly enters into the constitutional calculus." TXO, 509 U.S. at 443 (citing Haslip, 499 U.S. at 18) (alterations in original). Wrongdoing that is more difficult to detect may justify greater punitive damages awards. Gore, 517 U.S. at 582. Low compensatory damages, which provide little incentive to sue, may also justify a greater punitive damages award. In the context of malicious prosecution claims, significant punitive damages have been permitted even when only nominal damages were awarded. See Lee v. Edwards, 101 F.3d 805, 813 (2d Cir. 1996) (reducing punitive damage award to $75,000 in conjunction with a $1 nominal damages award).

Here, Plaintiffs elected not to offer proof of actual harm. Plaintiffs point out that the harm they suffered from Robertson and MP3tunes' copyright infringement is "difficult to trace to a particular user." (Pl's Br. at 30.) But that does not address the burden of calculating the economic harm itself. Plaintiffs elected to seek nominal damages of $1 per work against those who facilitate copyright infringement rather than actual damages against individual users. That was a strategic decision impacting punitive damages.

In determining whether the ratio between nominal and punitive damages is reasonable, "[i]t is appropriate for [the court] to examine punitive damage awards in similar cases." Lee, 101 F.3d at 812 (citing Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir. 1990)). "Courts have often found it helpful in deciding whether a particular punitive award is excessive to compare it to court rulings on the same question in other cases." Payne, 711 F.3d at 104. Plaintiffs concede that they know of no case in which damages were imposed analogous to the damages assessed here. (Tr. dated July 23, 2014 at 80.) Therefore, because of the uniqueness of

this case, this Court must engage in the "difficult" task of "calibrat[ing] the reprehensibility" of Robertson's conduct "to a reasonable punitive damages award in a vacuum." Stampf v. Long Is. R. Co., 761 F.3d 192, 209 (2d Cir. 2014) (citation omitted).

Plaintiffs' reliance on authorities where awards of punitive damages followed substantial compensatory damage awards is misplaced. In Wellogix, Inc. v. Accenture L.L.P., 716 F.3d 867, 886 (5th Cir. 2013), the Fifth Circuit affirmed an $18.2 million punitive damage award in conjunction with a $26.2 million compensatory award. In Adidas America, Inc. v. Payless Shoesource, Inc., 01 CV 1655 (KI), 2008 WL 4279812, at *16 (D. Or. Sept. 12, 2008), the district court reduced a $137 million punitive damages award to $15 million in the context of the case where a $30.6 million compensatory damages award was approved.

In contrast to Wellogix and Adidas, the jury in this case assessed only nominal damages. Such nominal awards arise more frequently in the context of federal civil rights cases where a defendant's actions led to a loss of liberty or some other fundamental right. See, e.g., Lee 101 F.3d at 811. Those cases are of little utility in evaluating a ratio/reasonableness factor in the context of a copyright infringement case. Accordingly, this Gore factor does not support a significant punitive damages award.

3.   *Similar Penalties Factor*

The third Gore guidepost requires comparing the punitive damages award and the "civil or criminal penalties that could be imposed for comparable misconduct." Gore, 517 U.S. at 583. A court reviewing punitive damages for excessiveness should "accord 'substantial deference' to legislative judgment concerning appropriate sanctions for the conduct at issue." Gore, 517 U.S. at 583 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301 (1989) (opinion concurring in part and dissenting in part)).

Under New York law, unauthorized use of copyrighted material exposes a defendant to both civil and criminal penalties. On the civil side, common law copyright infringement may give rise to both compensatory and punitive damages.[15] See, e.g., Roy Exp. Co. Establish. of Vaduz v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1106-07 (2d Cir. 1982). On the criminal side, it is a misdemeanor, punishable by up to one year in jail and a fine of $1000, to "transfer[] . . . any sound recording, with the intent to . . . use[ it] to promote the sale of any product, such article to which such recording was transferred." N.Y. Penal Law § 275.05; see N.Y. Penal Law §§ 70.15(1), 80.05(1). But neither a prison sentence nor a fine is required under New York law.[16] The Supreme Court has declined to create an civil penalty-to-imprisonment conversion rate, but has held that the possibility of imprisonment may be considered. See Haslip, 499 U.S. at 23. Freedom, of course, is priceless. And determining the value of any period of incarceration is exceedingly difficult.[17]

Plaintiffs contend that the statutory damages available under the Copyright Act offer a matrix of comparable civil penalties. A statutory damages award under the Copyright Act is "by definition an authorized civil penalty." Tenenbaum, 719 F.3d at 71. Statutory damages range from $200 to $30,000 per work for innocent infringement; $750 to $30,000 per work for infringement that is neither innocent nor willful; and $750 to $150,000 per work for willful infringement. Although Congress declined to sweep pre-1972 works under the umbrella of the

---

[15] As discussed supra, punitive damages may not be "grossly excessive."

[16] The fact that New York classifies Robertson's conduct as "criminal" supports imposition of a punitive damages award. However, because the crime is a misdemeanor and imprisonment and the imposition of a fine are discretionary, that "tend[s] to suggest that New York regards the conduct as occupying the lower echelons of criminality." See Stampf, 761 F.3d at 211 (citing Payne, 711 F.3d at 103-04).

[17] Indeed, the New York legislature declined to do so and adopted a standard of "fair[] and reasonabl[e] compensation" for persons wrongfully imprisoned. See N.Y. Court of Claims Law § 8-B. But a federal statute establishes a compensation system for federal inmates who are exonerated. 28 U.S.C. § 2513 (providing up to $50,000 per year for a non-death sentence).

Copyright Act, this Court may consider these penalties. See Gore, 517 U.S. at 584 (holding that a reviewing court may look to the penalties available in the state "and elsewhere" for similar malfeasance).

However, factoring in the jury's determination of liability on 323 works, the total statutory damages range is a minimum of $64,600 (under innocent infringement) to a maximum of $48,450,000 (under willful infringement). Accordingly, this similar penalties factor supports the punitive damages award here.

        4.    *Additional Factors*

Plaintiffs contend that this Court should consider Robertson's wealth in its punitive damages calculus. Because punitive damages act as a deterrent, a wealthier defendant may be subject to stiffer penalties. See Whitney v. Citibank, N.A., 782 F.2d 1106, 1119 (2d Cir. 1986). Despite Robertson's pleas of poverty, the jury could reasonably reject his testimony and conclude that he is still has access to the substantial wealth he amassed from the sales of MP3.com and other commercial ventures. This factor supports imposing a significant punitive damages award.

        5. *Conclusion*

The jury assessed nominal damages in the amount of $323 ($1 per work) for all works included in Plaintiffs' common law copyright infringement and unfair competition claims. The jury then assessed punitive damages of $7.5 million. If that punitive award were divided among all of the works for which the jury found liability, it would amount to roughly $23,220

per work.[18]  But the effect of this Court's rulings on willful blindness and red flag knowledge is to reduce the nominal damages from $323 to $40.[19]

Viewed holistically, the punitive damages award violates due process.  Certainly, Robertson's conduct deserves to be penalized:  he intentionally misled users into believing their actions did not violate copyright law; facilitated the infringement of numerous works; and contributed significantly to an era of rampant digital piracy.  Robertson embarked on an odyssey to exploit the copyrights of the record companies without paying for the privilege.  As Robertson quipped during the heady days of the MP3.com litigation, "if they . . . rule for us . . . it unlocks. . . $270 billion of music . . . really laying an incredible upside for MP3.com."  (Tr. at 935-36.) While Robertson cannot be classified technically as a recidivist, he sought to exploit the interstices between what is permitted and what is prohibited.  Had his grandiose scheme succeeded, it could have siphoned billions of dollars of revenue from copyright owners.

Accordingly, this Court finds that a punitive damages award of $750,000 comports with due process and is not "grossly excessive."  If Plaintiffs elect not to accept this amount, the Court will hold a new trial limited to the amount of punitive damages due Plaintiff.

## CONCLUSION

For the foregoing reasons, Michael Robertson's motion for judgment as a matter of law, or alternatively for a new trial, is granted in part and denied in part.  Specifically, Robertson's motion for judgment as a matter of law is granted as to Plaintiffs' claims of (1)

---

[18] The parties disagree over whether this Court may only consider the punitive damages award as a whole or if it may also consider them on a per-work basis.  There is no authority on this question.  Regrettably, the jury was not asked to parse the punitive damages award on a per-work basis.  This Court declines to engage in a calculus that it did not ask the jury to consider.

[19] Robertson and MP3tunes remain liable for 40 pre-1972 works:  "Strawberry Fields Forever," 16 from works sideloaded by Executives, and 23 works from source domains seen by Executives that were obviously infringing).

public display rights in cover art and (2) copyright infringement under red flag knowledge and willful blindness theories, expect for "Strawberry Fields Forever" and those works sideloaded by MP3tunes' Executives or sideloaded by MP3tunes' users in which the source domain's URL was obviously infringing and viewed by an MP3tunes Executive.  Robertson's motion for judgment as a matter of law is denied in all other respects.

Robertson's motion for a new trial on the punitive damage award is granted unless Plaintiffs elect to remit the jury's punitive damage award to $750,000.  Plaintiffs shall serve and file their election by October 10, 2014.  Robertson's motion for a new trial is denied in all other respects.  The parties are directed to submit a judgment consistent with this Memorandum and Order by October 17, 2014.  The Clerk of Court is directed to terminate the motions pending at ECF No. 611.

Dated:  September 29, 2014
      New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*

42